**SOUTHERN PACIFIC COMMUNICA-TIONS COMPANY, et al., Plaintiffs,**

v.

**AMERICAN TELEPHONE AND TELEGRAPH COMPANY, et al., Defendants.**

**Civ. A. No. 78–0545.**

United States District Court, District of Columbia.

Dec. 21, 1982.

As Amended Jan. 10, 1983.

Stephen Ailes, Richard A. Whiting, Richard Diamond, Edmund W. Burke, John R. Labovitz, Ellen M. McNamara, Janet L. Kuhn, Ralph A. Taylor, Jr., Michael C. Miller, Philip L. Malet, John W. Rumely, Jr., Kevin J. Brosch, Maureen O'Keefe Ward, James R. Young, Mark F. Horning, Steptoe & Johnson, Washington, D.C., for Southern Pacific Communications Co., et al.

George L. Saunders, Jr., Michael S. Yauch, Kenneth K. Howell, Chicago, Ill., Lee A. Monroe, Washington, D.C., Theodore N. Miller, C. John Buresh, Chicago, Ill., David J. Lewis, Washington, D.C., Gerald A. Ambrose, Robert E. Mason, Jules M. Perlberg, John C. Woulfe, Chicago, Ill., Langley R. Shook, Stewart A. Block, Washington, D.C., Craig L. Caesar, Charles H. Kennedy, Deborah H. Morris, Chicago, Ill.,

Alan L. Morrison, Julie D. Nelson, William P. O'Neill, Merinda D. Wilson, Sidley & Austin, Hugh N. Fryer, John M. Friedman, Jr., James F. Bendernagel, Jr., Washington, D.C., Dierdre A. Burgman, Steven M. Bierman, Thomas DeRosa, Robert Hirth, New York City, Craig King, Washington, D.C., John J. Langhauser, New York City, G. Ridgley Loux, Washington, D.C., Martha Solinger, Kenneth Thomas, Scott Univer, Alan M. Unger, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, Howard J. Trienens, Jim G. Kilpatric, Richard C. Schramm, William J. Jones, New York City, Peter C. Breitstone, Kathleen F. Carroll, New York City, Deborah S. Droller, Washington, D.C., Norman E. Gamble, A. Jared Silverman, J. David Stoner, Roger J. Siebel, New York City, American Telephone & Telegraph, Wiley A. Branton, Thomas J. Hearity, Kravetz & Hearity, Washington, D.C., for American Telephone & Telegraph, et al.

## TABLE OF CONTENTS

| | |
|---|---|
| INTRODUCTION | 850 |
| PARTIES | 852 |
| BACKGROUND | 854 |
| NATURE OF THE ISSUES | 866 |
| STANDARDS FOR ESTABLISHING A VIOLATION OF SECTION 2 OF THE SHERMAN ACT | 870 |
| MONOPOLY POWER AND RELEVANT MARKET | 871 |
| RELEVANT MARKET | 871 |
| DEFENDANTS' MARKET POWER | 877 |
| INTENT TO MONOPOLIZE | 888 |
| THE PRICING CLAIMS | 914 |
| TELPAK | 914 |
| HI/LO & MPL | 916 |
| DESCRIPTION OF HI/LO AND MPL RATES | 917 |
| HI/LO | 918 |
| MPL | 918 |
| APPLICABLE LEGAL STANDARDS FOR PREDATORY PRICING CLAIMS | 918 |
| EVIDENCE CONCERNING WHETHER AT&T'S RATES WERE BELOW COST | 927 |
| EVIDENCE CONCERNING WHETHER AT&T "PRICED WITHOUT REGARD TO COSTS" | 933 |
| PLAINTIFFS' ADDITIONAL CLAIMS WITH RESPECT TO TELPAK | 946 |
| SPCC'S CLAIMS REGARDING THE STRUCTURE OF TELPAK | 947 |
| SPCC'S CLAIMS REGARDING MAINTENANCE OF TELPAK DURING THE 1970'S | 953 |
| SPCC'S CLAIMS REGARDING JOINT TELPAK | 956 |

PLAINTIFFS' ADDITIONAL CLAIMS WITH RE-SPECT TO HI/LO ... 957

THE CHARGE OF MISREPRESENTATION ... 957

THE CHARGE THAT HI/LO UNDERCUT PLAIN-TIFFS' RATE ... 963

THE CHARGE THAT AT&T DID NOT PROFIT–MAXIMIZE ... 964

THE CHARGE THAT AT&T "PREANNOUNCED" HI/LO ... 965

LACK OF INJURY IN FACT ... 967

THE INTERCONNECTION CLAIMS ... 972

THE APPLICABLE LEGAL STANDARD FOR INTER-CONNECTION CLAIMS ... 972

DENIAL OF ACCESS TO INTERCITY FACILITIES ... 978

PIECE–OUT ... 979

INTERCITY FACILITY LEASING ... 985

DENIALS OF FX AND CCSA INTERCONNECTION ... 985

INTERSTATE FX AND CCSA ... 985

INTRASTATE FX ... 998

TERMS AND CONDITIONS OF THE PROVISION OF LOCAL DISTRIBUTION FACILITIES ... 1000

"COERCION" AND "DURESS" ... 1001

FILING OF STATE TARIFFS ... 1008

RATES FOR LOCAL DISTRIBUTION FACILITIES ... 1012

LOCAL DISTRIBUTION AREAS ... 1016

INTERCONNECTION REQUIREMENTS ... 1017

JOINT END–TO–END TESTING ... 1020

PRACTICES, PROCEDURES, AND PERFORMANCE ... 1021

NON–COOPERATION ... 1026

ORDERING PROCEDURES ... 1035

INSTALLATION AND REPAIR ... 1039

INSTALLATION ... 1040

REPAIR ... 1047

OTHER CLAIMS ... 1052

RELIANCE UPON FCC DECISIONS ON PRICING AND INTERCONNECTION CLAIMS ... 1054

FACT OF INJURY ... 1058

THE APPLICABLE LEGAL STANDARD FOR PROV-ING FACT OF INJURY ... 1058

EVIDENCE RELATING TO ALLEGED LOSS OF REV-ENUE ... 1059

EVIDENCE RELATING TO ALLEGED LOSS OF CUS-TOMERS ... 1062

EVIDENCE RELATING TO ALLEGED INCREASES IN COSTS ... 1065

OTHER CAUSES OF SPCC'S LOSSES ... 1066

AMOUNT OF DAMAGES ... 1073

SPCC'S DAMAGE EVIDENCE ... 1075

SUFFICIENCY OF THE "BUT–FOR" DAMAGE MOD-EL ... 1076

MARKET SHARE ASSUMPTIONS ... 1078

DEMAND ASSUMPTIONS ... 1079

PRICE ASSUMPTIONS ... 1080

ASSUMPTIONS ABOUT THE PLAN OF THE "BUT–FOR" COMPANY ... 1083

OTHER ASSUMPTIONS ABOUT THE CONDUCT OF THE "BUT–FOR" COMPANY ... 1085

DISCOUNT RATE ASSUMPTIONS ... 1087

ASSUMPTIONS ABOUT THE "DAMAGED" PRIVATE LINE BUSINESS ... 1087

PIECE–OUT CLAIM ... 1089

SEGREGATION OF DAMAGES ... 1090

THE SUFFICIENCY OF SPCC'S ALTERNATE MEA-SURES OF DAMAGES ... 1093

CONCLUSION ... 1095

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

### INTRODUCTION

This action was originally filed on March 27, 1978,[1] and was brought by Southern Pacific Communications Company and Transportation Microwave Corporation [SPCC] against the American Telephone and Telegraph Company [AT & T] and the Bell System operating companies.[2] The complaint was predicated upon Sections 1[3]

1. This case was originally assigned to the late Judge Waddy and later reassigned to this Judge on August 7, 1978.

2. Virtually all of the Bell System operating companies named as defendants are wholly owned subsidiaries of AT & T. These include Southwest Bell Telephone and Telegraph Company; South Central Bell Telephone Company; Illinois Bell Telephone Company; Bell Telephone Company of Pennsylvania; Diamond State Telephone Company; Michigan Bell Telephone Company; Northwestern Bell Telephone Company; New Jersey Bell Telephone Company; Ohio Bell Telephone Company; the Chesapeake and Potomac Telephone Company of D.C.; The Chesapeake and Potomac Telephone Company of Virginia; The Chesapeake and Potomac Telephone Company of West Virginia;

Indiana Bell Telephone Company; Pacific Northwest Bell Telephone Company; New England Telephone and Telegraph Company; and the Mountain States Telephone and Telegraph Company (Agreed Facts 8–3–015–016). In addition, as of December 31, 1981, AT & T owned a majority interest in The Pacific Telephone and Telegraph Company, which in turn owned 100 percent of Bell Telephone Company of Nevada (Agreed Fact 8–3–017); and AT & T owned a minority interest in Southern New England Telephone Company and Cincinnati Bell, Inc. (Agreed Fact 8–3–018).

3. Every contract combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal ... (15 U.S.C. § 1).

and 2[4] of the Sherman Act (15 U.S.C. §§ 1, 2) and alleged that the Bell System had monopolized and conspired and attempted to monopolize a relevant market in telecommunications service and had conspired to restrain trade in the market. The plaintiffs withdrew their Section 1 claim at status call on September 2, 1981 (Tr. 7–8), and the case was submitted to the Court for trial on the merits, sitting without a jury, on the charge that AT & T had monopoly power and had misused that power through conduct alleged to violate Section 2 of the Sherman Act. For the alleged violations, the plaintiffs seek $230.2 million,[4(a)] for damages, which is trebled to $690.6 million pursuant to Section 4[5] of the Clayton Act. (15 U.S.C. § 15). After waiver by both parties of jury demands, trial commenced on May 10, 1982.[6] SPCC completed its presentation of evidence, including the testimony of 24 witnesses and approximately 1,400 exhibits, on June 14, 1982. The trial consumed thirty-three trial days for both sides, including opening and closing arguments.

Defendants filed a motion for involuntary dismissal under Rule 41(b) of the Federal Rules of Civil Procedure on June 8, 1982, and filed supplementation and proposed findings of fact and conclusions of law on June 12, 1982. Plaintiffs filed their memorandum in opposition on June 15, 1982, after which the Court heard oral argument on defendants' motion. On June 21, 1982, the Court announced its decision to defer ruling on defendants' motion until it had heard all of the evidence.

Defendants began presenting their evidence, which included testimony of 147[7] witnesses and introduction of over 7,900 exhibits on June 23, 1982, and concluded their case on July 2, 1982, after only *eight* trial days. Plaintiffs presented their evidence in rebuttal on July 9 and 12, 1982, through the testimony of nine witnesses. On July 13, 1982, plaintiffs introduced 326 rebuttal exhibits and defendants introduced 23 surrebuttal exhibits. Both parties filed proposed findings of fact and conclusions of law on July 15, 1982, and reply findings on

**4.** Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court. (15 U.S.C. § 2).

**4(a).** This is in marked contrast to the plaintiffs' claim made in their opening statement of $567 million or $1.7 billion trebled damages.

**5.** Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. (15 U.S.C. § 15).

**6.** At the Court's urging, the parties entered into a period of intensive negotiations prior to trial designed to stipulate to uncontested facts, to set forth each side's respective contentions and to identify the evidence to be presented by each side at trial. Although the purpose of these negotiations was to narrow the issues and simplify the trial, the Court is convinced that, through no fault of either party, the process was largely a failure and that it consumed substantially more resources and time than could possibly have been warranted. Nevertheless, the parties were able to reach agreement on certain background facts which, to a limited extent, avoided the presentation of evidence and has proved useful to the Court in the preparation of these extensive findings.

**7.** Virtually all of defendants' witnesses submitted their direct testimony in written form including 78 witnesses who submitted both their direct testimony and cross-examination from *United States v. American Telephone & Telegraph Company*, No. 74–1698 (D.D.C.). Forty-seven of defendants' witnesses appeared in court, for either supplemental direct testimony and/or cross-examination. The plaintiffs submitted most of their direct testimony in written form as well and were then turned over for cross-examination. This process, which expedited the trial considerably was agreed to by plaintiffs and defendants.

July 17, 1982. The Court heard oral argument on July 19, 1982.

The following memorandum opinion shall constitute the Court's findings of fact and conclusions of law, as mandated by Rule 52(a) of the Federal Rules of Civil Procedure.

## PARTIES

### Southern Pacific Communications Company

Southern Pacific Communications Company (SPCC), a plaintiff in this case, is a wholly-owned subsidiary of the Southern Pacific Company (Agreed Fact 8–3–002). The Southern Pacific Company is a large and highly diversified holding company. In addition to ownership of Southern Pacific Transportation Company (SPTCo) and SPCC, Southern Pacific Company has extended interests in real estate, natural resources, and leasing (Agreed Fact 8–3–020; Furth, PX6–0001 at 3–7). In 1980, Southern Pacific Company had assets of $5.3 billion and total revenues of $2.8 billion.

SPTCo owns and operates one of the nation's largest intercity private microwave systems (Agreed Fact 7–1–009). Construction of this private microwave system began following the FCC's *Above 890*[7(a)] decision in 1959. (Furth, PX6–0001 at 11). When the entire system was completed in 1969, it consisted of approximately 650,000 voice circuit miles and 7,664 route miles from Portland through Oregon, California, Arizona, New Mexico, Texas, Louisiana, Arkansas, Missouri, to Illinois (*id.*).

SPCC was formed in January, 1970, to provide communication services to business, industry, government and educational entities over a domestic network between such locations as the Federal Communications Commission (FCC) authorized (Furth, PX6–0001 at 12–13). SPCC's initial plan involved using the existing microwave sites of SPTCo where feasible (*id.* at 13). Portions of SPCC's microwave system initially were constructed upon the towers, facilities, and right-of-way of the SPTCo private microwave system (Agreed Fact 7–1–009).

On February 9, 1970, SPCC filed its initial application with the FCC seeking authority to construct and operate a specialized common carrier microwave radio system between Seattle, Washington, and San Diego, California (Furth, PX6–0001 at 13). SPCC filed an additional application in April, 1970, for authority to construct a system between Los Angeles and St. Louis (*id.*).

Following the FCC's general authorization of competition in its 1971 Specialized Common Carriers Decision (PX1–0159, 29 F.C.C.2d 870 (Dkt. 18920), and the subsequent FCC grant of SPCC's construction application PX1–0267, 37 F.C.C.2d 245 (1972)), SPCC commenced commercial operations on December 26, 1973 (Furth, PX6–0001 at 14; Grant, PX6–0004 at 9).

In 1974, SPCC purchased 100% of the stock of Video Microwave, Inc., the voice and data facilities of United Video, Inc. and purchased through Sunset Communications, a wholly-owned subsidiary of Southern Pacific Company, 95% of the stock of Transportation Microwave Corp. (TMC), also a plaintiff in this case. In 1976, SPCC purchased certain assets of Data Transmission Company (DATRAN), including a microwave system extending from Houston to Chicago via Kansas City and St. Louis (Agreed Fact 8–3–020).

Today, SPCC offers a variety of services over a multi-million circuit mile system consisting of its own terrestrial microwave transmission facilities, complemented by leased wire, microwave, and satellite facilities (Furth, PX6–0001 at 14).

Throughout the development of SPCC, Southern Pacific Company has provided it with substantial financial support. Since

---

**7(a).** *Allocation of Frequencies in the Bands Above 890,* 27 F.C.C. 359 (1959) (Docket No. 11866, Report & Order) permitted private right of way companies, like pipelines and railroads persons eligible for authorizations in the Police, Fire, Highway Maintenance, Forestry Conservation, Local and Government Radio services; and other organizations whose rates and charges are regulated by a governmental entity to provide their own private microwave system.

1972, Southern Pacific Company has invested $173,547,000 in equity in SPCC and has guaranteed another $174,000,000 in debt. (*id.*) SPCC has grown from a company with assets of $9,552,303 in 1973 to one with $278,484,000 in 1980 (SPCC annual reports filed with the FCC (S 7–T)). To date, SPCC has· yet to make a profit in private line with its losses going from $1,025,969 in 1973 to over $15,000,000 in 1980 (*id.*). However, there is no dispute that SPCC is a presently profitable company, due principally to the provision of switched services, known as "SPRINT." (*See* S–7T 1981 Annual Report submitted by SPCC on April 30, 1982 and the May 27, 1982, Wall Street Journal at 18).

### American Telephone & Telegraph Company

The American Telephone and Telegraph Company (AT & T), a defendant in this case, is the parent company of more than 40 subsidiary corporations (Agreed Fact 8–3–003).

The major subsidiaries of AT & T are the Western Electric Company, Inc., Bell Telephone Laboratories, Inc., and the Bell Operating Telephone Companies (BOC). Together these companies make up what is known as the Bell System (Agreed Fact 8–3–004).

As of December 31, 1981, AT & T owned 100% of the stock of Western Electric Company. AT & T and Western Electric each owned 50% of Bell Telephone Laboratories (Agreed Fact 8–3–005). At the time this suit was filed, AT & T owned directly or indirectly, all of the stock of 17 operating telephone companies, the majority of the stock of two companies, and a minority of the stock of five others.[8] (Agreed Facts 8–3–015, 8–3–016, 8–3–017, 8–3–018).

---

8. AT & T's wholly-owned subsidiaries include: Southwestern Bell Telephone Company, which in 1979 served approximately 80.9 percent of the telephones in Arkansas, Kansas, Missouri, Oklahoma, and Texas; New York Telephone Company, which in 1979 served approximately 90.6 percent of the telephones in New York State; Southern Bell Telephone and Telegraph Company, which in 1979 served approximately 67.7 percent of the telephones in Florida, Georgia, North Carolina, and South Carolina; South Central Bell Telephone Company, which in 1979 served approximately 82.6 percent of the telephones in Illinois; The Bell Telephone Company of Pennsylvania, which in 1979 served 81.3 percent of the telephones in Pennsylvania; The Diamond State Telephone Company, which in 1979 served 100 percent of the telephones in Delaware; Michigan Bell Telephone Company, which in 1979 served approximately 87.1 percent of the telephones in Michigan; Northwestern Bell Telephone Company, which in 1979 served approximately 71.5 percent of the telephones in Iowa, Minnesota, Nebraska, North Dakota and South Dakota; New Jersey Bell Telephone Company, which in 1979 served approximately 97.6 percent of the telephones in New Jersey; The Ohio Bell Telephone Company, which in 1979 served approximately 62.1 percent of the telephones in Ohio; The Chesapeake and Potomac Telephone Company of Maryland, which in 1979 served approximately 99.8 percent of the telephones in Maryland, the Chesapeake and Potomac Telephone Company of D.C., which in 1979 served 100 percent of the telephones in the District of Columbia; The Chesapeake and Potomac Telephone Company of Virginia, which in 1979 served approximately 77.9 percent of the telephones in Virginia; The Chesapeake and Potomac Telephone Company of West Virginia, which in 1979 served approximately 86.6 percent of the telephones in West Virginia; Indiana Bell Telephone Company, Inc., which in 1979 served approximately 69.2 percent of the telephones in Indiana; and Wisconsin Telephone Company which in 1979 served approximately 69.1 percent of the telephones in Wisconsin.

As of December 31, 1981, AT & T acquired shares of three operating telephone companies in which it previously had a majority interest; Pacific Northwestern Bell Telephone Company, which in 1979 served approximately 71.6 percent of the telephones in Washington, Oregon and Northern Idaho; New England Telephone and Telegraph Company, which in 1979 served approximately 97.3 percent of the telephones in Maine, Massachusetts, New Hampshire, Rhode Island and Vermont; and the Mountain States Telephone and Telegraph Company, which in 1979 served approximately 94.4 percent of the telephones in Arizona, Colorado, Southern Idaho, Montana, New Mexico, Utah, Wyoming and El Paso County, Texas.

As of December 31, 1981, AT & T owned a majority interest in The Pacific Telephone and Telegraph Company, which, in turn owned 100 percent of the Bell Telephone Company of Nevada. In 1979, The Pacific Telephone and Telegraph Company served approximately 71.6 percent of the telephones in California, and Bell Telephone of Nevada served approximately 32.2 percent of the telephones in Nevada.

As of December 31, 1981, AT & T owned minority stock interest in the Southern New

There are now no minority interests in AT & T-owned companies. AT & T is the minority owner of two BOCs. (Brown, Tr. 5353).

The 24 consolidated companies had approximately 145.9 million telephones in service as of December 31, 1980, approximately 81% of the total in the United States (PX4–0874 at 3). Each of the Bell operating telephone companies possesses an exclusive franchise or government granted monopoly in the geographic areas in which it provides service (See e.g., Grant, Tr. 646). As of December 31, 1980, these companies' operating areas included 31.4% of the land area of the United States. The 24 Bell operating companies are also named defendants in this case (Complaint). Independent telephone companies now almost 1500 in number, provide service to about 36 million telephones in over half of the geographic areas of the United States having telephone service (Testimony of Richard A. Lumpkin S–6187 at 1–2). The independents have current annual revenues near $12 billion about half of which is derived from toll services and have approximately $39 billion invested in facilities and equipment. (id.)

The assets of AT & T and its consolidated subsidiaries were over $125 billion at the end of 1980. As of May 31, 1981, they had reached $129.5 billion (Agreed Fact 8–3–007).

In 1980, AT & T's total operating revenues were approximately $50.8 billion. Local service accounted for approximately $22.5 billion of this total; toll service accounted for approximately $26.1 billion; and directory advertisement and miscellaneous accounted for approximately $2.7 billion (Agreed Fact 8–3–008).

In 1980, AT & T's total operating expenses were approximately $34.2 billion and its net income was approximately $6.1 billion. Its total operating revenues for the twelve months ending May 31, 1981 were over $53 billion. Its net income for the

same period was approximately $6.3 billion (Agreed Fact 8–3–008). AT & T is the largest corporation in the world. (PX1–0017 at 2005).

As of year end 1980, AT & T employed over one million people, making it the largest employer in the United States next to the federal government (Agreed Fact 8–3–011). In fact, it has more employees than the active duty strength of the United States Army, according to plaintiffs' lead counsel who formerly was the Secretary of the Army.

The Long Lines Department (Long Lines) of AT & T in partnership with the Bell and independent operating telephone companies provides interstate and intercity telecommunication service in competition with SPCC (Agreed Facts 7–2–016, 7–2–018; Tr. 12; deButts, S–T–131 at 11–13; Owen, PX6–0005 at 4–5; Grant, PX4–0004 at 11–12; Vasilakos, PX6–0006 at 8; Kushan, PX6–0011 at 4; deButts, S–T–131, tab A at 29–30; Brown, Tr. 5334). At the end of 1980, Long Lines had total assets of approximately $7 billion and operating revenue of $3.5 billion. These figures represented approximately 5.2% of AT & T's total assets and approximately 6.9% of AT & T's total operating revenues respectively. At the end of 1980, the Long Lines Department had operating expenses of approximately $2.5 billion and net income of approximately $551.1 million (Agreed Fact 8–3–013).

In 1980, AT & T had 24 General Departments which provided the Bell operating companies with advice and assistance pursuant to "License Contracts" between AT & T and the Bell operating companies. AT & T bills the operating companies for these services. In 1980, AT & T collected $1.03 billion in revenues from the Bell operating companies under these "License Contracts" (Agreed Fact 8–3–014).

BACKGROUND

Although SPCC's allegations relate almost exclusively to actions taken, or alleged

England Telephone Company, which in 1979 served approximately 97.0 percent of the telephones in Connecticut; and Cincinnati Bell, Inc., which in 1979 served approximately 94.5 percent of the telephones in twelve counties located in Ohio, Kentucky, and Indiana (Agreed Facts 8–3–015–019).

to have been taken, during the period 1968–1978, the Court believes that those actions and the charges relating to them can best be understood in the context of the conditions in the telecommunications industry prior to that period. Therefore, before turning to those allegations and the evidence adduced by the parties at trial, the Court will briefly review the largely uncontested facts with respect to the conditions during the period in which the industry came to be regulated as a monopoly and with respect to the circumstances immediately preceding the changes primarily in the federal regulatory policy that occurred during the 1968–1978 decade.

Prior to World War II, the telecommunications industry was extensively regulated and was widely regarded as a lawful monopoly (Agreed Facts 7–3–043—044). Local exchange telephone service was provided under franchise by one of the Bell System operating companies or by one of the many independent telephone companies, depending upon the geographical area involved (Agreed Fact 7–2–017).[9] Long distance service was provided by the Long Lines Department of AT & T in partnership with the Bell and independent operating telephone companies (Agreed Facts 7–2–016, 7–2–018; Tr. 12; deButts, S–T–131 at 11–13).[10] The independent companies recognized the need for agreement on equipment compatibility,

operating procedures and division of revenues to facilitate the joint provision of long distance service (Agreed Fact 7–2–016). Under this network partnership, which developed early in this century, telephone service was provided on an end-to-end basis through an arrangement under which the Bell companies and the independent companies assumed joint responsibility for the service. This unique partnership arrangement often required a telephone company operating in one part of the network to take action which did not contribute directly to that company's ability to discharge service obligations in its franchised area. In return, the telephone company was reimbursed for the costs it incurred, including a return on investment, in connection with the provision of intercity service (Hough, S–T–1 at 12–14). Private line services, which are the focus of the issues in this case, were provided jointly by Long Lines and the operating telephone companies over the same facilities used for long distance service (Agreed Facts 7–1–018—020).[11]

During the late 19th century and the early decades of the 20th century, the technology of the new industry advanced to the point where it was technologically possible to connect exchanges together throughout the country, and thus to create a nationwide interconnected network (Agreed Fact 7–2–010).[12] However, the technological in-

9. Local exchange telephone service is the ordinary service used in nearly all homes and businesses. From a technical standpoint, it involves a wire connection from the telephone set to a switching system in a nearby telephone company switching center that is in turn connected by transmission trunks to switching systems in other switching centers within the exchange area (Tr. 14–15).

10. Long distance service operates in a manner similar to local exchange service but typically involves a two-step process in which the user first gains access to the local switching system through a dial tone and then requests access to the long distance toll switching system (in many cases the exact same switch) by dialing an area code plus the number of the telephone the calling party wishes to reach (Tr. 16–17).

11. Point-to-point private line service, which plaintiffs initially sought authorization to provide, connects two customer locations with a

dedicated circuit that does not require use of switching systems because the circuit is available to the customer on a continuing and exclusive basis (Tr. 17–18, 37–39; Grant, PX6–0004 at 2–4; Grant, Tr. 637). In contrast, foreign exchange (FX) and common control switching arrangement (CCSA) services, which are involved in certain of plaintiffs' interconnection charges, require dedicated intercity circuits, but also provide a connection into a switching system, located in a telephone company switching center (Grant, PX6–0004 at 5–7; Grant, Tr. 637–39).

12. Switching greatly simplifies the problem of communicating among a large number of terminals. Each terminal in a network can be connected to a central point and switched to any other connected terminal through a switching machine. The large number of switching machines achieves savings in transmission costs between any two terminals (Hough, S–

terdependence of the components of the network gave rise to a need to coordinate operations and the provision of service throughout the network. To meet this need, AT & T consolidated both local and toll facilities into its evolving system (Agreed Facts 7–2–007—008; see also exhibits cited in Regulation and History Doc. Sub. at 2–6 & App. A).

Regulation of the industry began in 1879, three years after the invention of the telephone, in recognition both of the natural monopoly character of the industry and of the increasing importance of telephone service to commerce and society (Agreed Facts 7–3–002—004; Tr. 11; Letwin, S–T–140 at 8). The purpose of these early regulatory statutes was to assure the provision of telephone service in the public interest (Agreed Fact 7–3–017; Hough, S–T–1 at 15; Letwin, S–T–140 at 10). Because of public dissatisfaction with duplicative exchange service,[13] competition in telecommunications services was discouraged (Agreed Facts 7–3–002, 7–3–015), and local telephone companies—both Bell and independent—were franchised as monopolies within their respective operating territories (Agreed Fact 7–2–017; Tr. 11; see also exhibits cited in Regulation and History Doc.Sub. at 7–10 & App. B(1)).

Although there appears to be some dispute about the reasons, in long distance service the same practical effect resulted. With the passage of the Communications Act of 1934, Congress provided that inter-

connection between telephone companies be ordered only where the public interest would be served by such interconnection (47 U.S.C. § 201(a)). In so doing, Congress refused to do what some had urged—namely, to make it an automatic duty of each carrier to interconnect whenever requested to do so by another carrier (Letwin, S–T–140 at 34). Moreover, as discussed below, there were arrangements under which the Bell and independent telephone companies divided revenues from long distance service on a basis that would essentially subsidize local service. Defendants have taken the position that the limited right of interconnection prevented uneconomic duplication of plant and facilities; and further, that the division of revenues policies spread the benefits of these economies widely to users throughout the country. The logic of this position is persuasive, and, in any event, consistent with congressional policy reflected in the Communications Act that telephone service be made widely available at reasonable costs (see generally exhibits cited in Regulation and History Doc.Sub. at 10–15 & App.B(2)).[14]

*There is no dispute that the emergence and growth of telecommunications regulation was also attributable to public recognition that the telephone had ceased to be a laboratory curiosity or a luxury to be afforded by a few, but had become essential to everyday life and commerce (Agreed Fact 7–3–001; Letwin, S–T–140 at 9). Moreover, there appeared to be a widely*

T–1 at 3–4; S–3X). The choice of routing is an economic decision based on the level of demand, the opportunities for sharing, and distance. If demand between two local machines is sufficiently high, a direct trunk group is provided to carry a major portion of the traffic. In intercity communications, demand is concentrated or pooled so that high capacity transmission systems with scale economies can be employed (Hough, S–T–1 at 3–8; S–3W).

**13.** *It is interesting to note that in the early years of the 20th century, there were competing telephone companies in approximately one-half of all cities with a population over 4000 (Agreed Fact 7–3–009). Initially, the public had welcomed this competition. After a fairly brief experiment, however, the public and its officials overwhelmingly concluded that com-*

*petition in telephone service was inefficient and wasteful (Letwin, S–T–140 at 15). The general experience with competition in this field was that it caused inconvenience, higher costs, and degraded service quality (Letwin, S–T–140 at 15; see also exhibits cited in Regulation and History Doc.Sub. at 7–10 & App. B(1)).* (Emphasis added)

**14.** Section 151 of the Federal Communications Act (47 U.S.C. § 151) (S–1203B) provides that telecommunications service should be regulated "to make available, so far as possible, *to all the people of the United States* a rapid, efficient, Nation-wide and world-wide wire and radio communication service with adequate facilities *at reasonable charges.*" (Emphasis supplied.)

*held belief at the time—and no serious dispute among the parties here—concerning the natural monopoly character of much of the business (Letwin, S–T–140 at 8–9). As a result, market forces were not trusted to provide quality service as widely as was thought to be socially desirable and at prices which were affordable by most households (Agreed Facts 7–3–002—003). Telephone companies were thus subjected to schemes of public utility regulation and to common carrier duties under which the carriers were not allowed to conduct their businesses as ordinary commercial enterprises (Agreed Fact 7–3–015; Hough, S–T–1 at 15–17; deButts, S–T–131 at 7–12; Letwin, S–T–140 at 10–14; see also exhibits cited in Regulation and History Doc.Sub. at 7–9 & App.B(1)).*

The duties and obligations imposed upon the telephone companies varied over time and from State to State. *However, the most significant of these duties as it relates to the issues in this case was the requirement to serve every subscriber within a carrier's operating territory, even if service had to be rendered at a price that did not fully cover all relevant costs (Agreed Facts 7–3–023—026, 7–4–002—003; Hough, S–T–1 at 15–16; Letwin, S–T–140 at 37–38; deButts, S–T–131 at 14; see also exhibits cited in Regulation and History Doc.Sub. at 23–26 & App.C). Consistent with the regulatory goal of promoting widely available telephone service at reasonable rates, the carriers structured their rates such that users of some services paid significantly more than the cost of their service in order that service could be provided elsewhere at prices that were low in relation to cost (Agreed Facts 7–4–012—013; deButts, S–T–131 at 15–17; Letwin, S–T–140 at 42–51; see also exhibits cited in Regulation and History Doc.Sub. at 26–35 & App.C).*

With respect to ratemaking for long distance services, the same regulatory policies resulted in the Bell System's price-cost margins being skewed in order to make services more affordable in some areas and to some groups of users (Letwin, S–T–140 at 50–51). The practice of nationwide rate averaging—which gave rise to the controversy over whether new entry should be permitted by specialized carriers such as SPCC, and if so, what kinds of rate adjustments AT & T should make to respond to such competition—required the same price for calls of equal distance, notwithstanding differences in the cost of transmitting messages between different points in the country (Agreed Facts 7–4–014—015; *Department of Pub. Serv. of Washington v. Pacific Tel. & Tel. Co.,* 8 F.C.C. 342 (1941) (S–1302); Hough, S–T–1 at 16; deButts, S–T–131 at 17; Letwin, S–T–140 at 42–51; see also exhibits cited in Regulation and History Doc.Sub. at 33–35 & App.C). The combination of rate averaging and continued technological advances in the efficiency of transmitting large volumes of messages between cities caused defendants' uniform long distance rates to reflect ever-widening margins on high-density routes (which are very profitable under an averaged rate structure) and low-density routes (where the uniform rate may be at or below the cost of service). Although plaintiffs attempted to dispute this proposition at trial, as discussed more fully below, no credible evidence was offered to establish the contrary proposition. In fact, many of the documents introduced by plaintiffs themselves explain and document this common phenomenon.

In addition to promoting the expansion of service to rural and other high cost areas, the Bell System's intercity rate structure was used to support low rates for basic exchange service. This was accomplished under jurisdictional separations procedures through which the FCC and the state commissions have allocated to the interstate rate base ever greater portions of the cost of facilities used jointly for local and interstate services.[15] For example, in 1971, the

---

**15.** These procedures were developed on a cooperative basis by the FCC and state regulatory commissions pursuant to the decision of the Supreme Court in *Smith v. Illinois Bell Tele-* *phone Co.,* 282 U.S. 133, 148–49, 51 S.Ct. 65, 68, 75 L.Ed. 255 (1930) (S–1152; Jones, S–T–53 at 4–6). They involve a process by which the cost of equipment and facilities used jointly for

separations process shifted approximately $126 million of Bell System revenue requirements from the various intrastate jurisdictions to the interstate jurisdiction. Between 1972 and 1980, the costs of equipment allocated to the interstate jurisdiction increased from $1.9 billion to $7.3 billion. Similarly, in 1980, interstate revenue requirements were $5.1 billion higher than they would have been had the costs of facilities and equipment been allocated exclusively on the basis of usage (Agreed Facts 7–4–017—022; Hough, S–T–1 at 17; Jones, S–T–53 at 6, 9–16; Letwin, S–T–140 at 51–54; deButts, S–T–131 at 17–18; see also exhibits cited in Regulation and History Doc.Sub. at 36–41 & App.C).

The regulatory goal of assuring widely available service also had an effect on the interconnection practices of the carriers and thus on the interconnection controversies advanced by SPCC here. There is no dispute that the Bell companies early recognized the need to exercise control over equipment connected to the telephone network in order to assure service quality; that contract provisions required that all

equipment used in providing telephone service remain the property of the carrier; and that those provisions prohibited the connection of customer provided equipment or systems to Bell telephone lines (Agreed Fact 7–4–005). Moreover, from the earliest days, regulatory decisions reflected a policy of imposing complete "end-to-end service responsibility"; that is, the carriers were held responsible for providing complete service, end-to-end, and were required to maintain ownership and responsibility for the installation, maintenance, and improvement of all the hardware in the system (Hough, S–T–1 at 19; deButts, S–T–131 at 14; Letwin, S–T–140 at 40–41; O'Reilly, S–T–139 at 4; Wooten, S–T–141 at 4–6).[16]

As a necessary consequence, the connection of other equipment or facilities to the network was prohibited, and regulatory agencies enforced the obligation of the carriers to structure their tariffs in this manner (Hough, S–T–1 at 19–20; Ashley, S–T–132 at 2–9; deButts, S–T–131 at 14; Letwin, S–T–140 at 41–42; Byers, S–T–133 at 4, 9).[17] *Accordingly, the tariffs of the tele-*

the provision of local service and interstate long distance service, such as the telephone instrument itself, is allocated between the intrastate rate base and the interstate rate base of the telephone companies. To the extent that the costs of commonly-used equipment or facilities vary with the amount of their usage, the costs may be assigned to the interstate or intrastate jurisdiction based upon that usage. However, where the costs do not vary with usage, the determination of the appropriate jurisdictional assignment may be based on public policy considerations (Jones, S–T–53 at 2–4). Over the years—and particularly in response to pressures from the state commissions to keep local and intrastate toll rates lower than they otherwise would be—the separations procedures have been applied in such a way that increasingly large amounts of these joint costs have been shifted from the intrastate rate base of both Bell and independent operating companies to the interstate rate base (Agreed Fact 7–4–020; Hough, S–T–1 at 17; Jones, S–T–53 at 6). As a result of the separations process, which has been prescribed by the FCC since 1967 in a Separations Manual (Agreed Fact 7–4–021), local revenue requirements, and hence local rates, are lower than they otherwise would have been by this amount, and interstate long distance rates are higher than they otherwise would have been by the same amount (Hough,

S–T–1 at 18; Jones, S–T–53 at 9–16; Letwin, S–T–140 at 53–54). See, *e.g., Southern Bell Tel. & Tel. Co.,* 92 P.U.R. (n.s.) 97 (Ala.Pub. Serv.Comm'n 1952) (S–1437) and other exhibits cited in Regulation and History Doc.Sub. at 36–41.

16. See, *e.g., Quick Action Collection Co. v. New York Telephone Co.,* P.U.R. 1920D 137 (N.J.Bd.Pub.Util.Comm'rs 1920) (S–0857); *Highland Telephone. Co.,* 1915 Annual Report South Dakota Railroad Comm'n 95 (S–0708); and other exhibits cited in Regulation and History Doc.Sub. at 20–23 & App.C.

17. For example, in *City of Los Angeles v. Southern California Tel. Co.,* 2 P.U.R. (n.s.) 247, 249 (Cal.R.R.Comm'n 1933) (S–1202), the California Railroad Commission rejected the attempt of the City of Los Angeles to substitute its own local telephone system for that of the telephone company and to connect its facilities to the network:

"The Commission has frequently expressed the opinion that a divided ownership of telephone equipment and responsibility for its maintenance is not compatible with efficient telephone service. It has frequently been declared that a telephone utility must own and maintain all facilities required for the trans-

phone companies—both Bell and independent—contained general prohibitions against attachment to the network of any device not owned and maintained by the telephone companies themselves (Agreed Facts 7–4–005—006). *These provisions were not merely sanctioned by the state regulatory agencies; they were required by those agencies as being necessary for the companies to fulfill their common carrier obligations* (Hough, S–T–1 at 20).

By the time the Communications Act was passed in 1934, the intrastate tariffs of virtually all the telephone companies contained such interconnection prohibitions (Agreed Fact 7–4–006). The Court's reading of the Communications Act discloses no apparent congressional disagreement with state policy in this regard. Under the Communications Act, telecommunications common carriers were required to offer to the public a complete end-to-end service, "including all instrumentalities, facilities, apparatus, and services" necessary to provide such service (47 U.S.C. § 153(a), (b)); and the FCC was given broad powers to assure the availability and quality of the equipment needed to provide that service, including the power "to require by order any carrier . . . to provide itself with adequate facilities for the expeditious and efficient performance of its service as a common carrier . . ." (47 U.S.C. § 214(d); Agreed Facts 7–3–047—048; Hough, S–T–1 at 20).

In the period following World War II, incentives and pressures for selective competitive entry began to emerge (Agreed Facts 8–1–001—004; deButts, S–T–131 at 19–20; Phillips, Tr. 5416–19). There seems to be general agreement that rapid technological change following World War II sig-

nificantly lowered the unit costs of high-density, long distance transmission facilities relative to the unit costs of low-density transmission facilities and of local service (Froggatt, S–T–2 at 2–4). According to defendants, although they took advantage of these cost saving opportunities, their intercity rate structure was not permitted to reflect the full measure of those savings (Boettinger, S–T–3 at 7–8). One relevant factor discussed above bearing upon this issue is that throughout this period the regulators continued their policy of allocating to the interstate rate base ever-increasing portions of local facility costs through revisions in the separations formula (Agreed Fact 7–4–020). Such increased interstate rate base costs were reflected in artificially higher rates for defendants' long distance services to the extent not offset by increases in productivity (Partoll, S–T–149 at 17–18; Jones, S–T–53 at 27–29). While there is some dispute about whether defendants' nationwide averaged rate structure also impeded their ability to reflect such savings, because the new technology was largely concentrated on high-density routes and the averaged rate structure spread those savings over all routes, the Court has already found that plaintiffs' effort to establish the contrary is unpersuasive.

At the state level, the pressures for competitive entry made no significant headway. The States were virtually unanimous in refusing entry—recognizing that competition was incompatible with the continuation of their traditional rate and service policies (deButts, S–T–131 at 20; Symons, S–T–142 at 2; Privett, S–T–143 at 2; Colter, S–T–144 at 4–5).[18]

mission of messages from one subscriber to another. Almost without exception a similar view has been expressed by the regulatory Commissions of other states."
See also S–1693; S–1746; S–1685; S–1409; S–1648B; and other exhibits cited in Regulation and History Doc.Sub. at 36–41 & App.C.

**18.** See, *e.g.*, *Peters Sunset Beach, Inc. v. Northwestern Bell Tel. Co.,* 60 P.U.R.3d 363 (Minn. R.R. & Warehouse Comm'n 1965) (S–1693); *Southwestern Bell Tel. Co. v. Hicks,* 57 P.U.

R.3d 188 (Ark.Pub.Serv.Comm'n 1965) (S–1685); *Electronic Detectors, Inc. v. New Jersey Bell Tel. Co.,* 62 P.U.R.3d 186 (N.J.Bd.Pub.Util. Comm'rs 1965) (S–1707); *Racine Flash Cab Co. v. Wisconsin Tel. Co.,* 65 P.U.R.3d 321 (Wis.Pub.Serv.Comm'n 1966) (S–1722); *Netsky v. Bell Tel. Co. of Pa.,* 65 P.U.R.3d 145 (Pa.Pub. Util.Comm'n 1966) (S–1721); *Harmony of Fort Lauderdale, Inc. v. Southern Bell Tel. & Tel. Co.,* 69 P.U.R.3d 261 (Fla.Pub.Serv.Comm'n 1967) (S–1746).

At the federal level, a very different pattern began to emerge. The FCC apparently continued to follow a general presumption against competitive entry, yet a few limited exceptions were permitted (Hough, S–T–1 at 21; deButts, S–T–131 at 20; Letwin, S–T–140 at 55–56). A review of the FCC's decisions confirms that these exceptions related to narrow segments of the market which required somewhat specialized services or equipment and which defendants and the other established common carriers—due to shortages occasioned by the war—were temporarily unable to supply (Agreed Fact 8–1–004; S–1354; Hough, S–T–1 at 21; Letwin, S–T–140 at 55–56; see also exhibits cited in Regulation and History Doc.Sub. at App.D).[19]

Selective entry in a regulated industry, taken together with a regulated industry's skewed rate structure, renders that industry vulnerable to "creamskimming" (Letwin, S–T–140 at 56; Hough S–T–1 at 18).[20] In other words, new entrants might choose to serve only the high-profit area of the business and leave those areas where rates are close to, or even below, costs to be served by established carriers with general service obligations (Brown, Tr. 5336–37; Hough, S–T–1 at 19; Byers, S–T–133 at 8–9). Although plaintiffs have sought throughout the presentation of their case to downplay this effect, it is clear to the Court that, in the course of authorizing certain limited forms of intercity competition, the FCC recognized that creamskimming might arise. However, the FCC appeared to conclude that any adverse effects on widely available, reasonably priced service would be minimized through the established carriers' reliance upon their longstanding restrictive interconnection tariffs (S–1367; S–1542; Hough, S–T–1 at 21–22; Ashley, S–T–132 at 5–14; deButts, S–T–131 at 21–22; Letwin, S–T–140 at 55–56; see also exhibits cited in Regulation and History Doc.Sub. at App.D). Implicit in that conclusion was the belief that these tariffs would protect the uniform rate structure from creamskimming by new entrants who might otherwise seek to piece-out their services with those of Bell System companies,[21] or expand the scope of their limited service authorizations.[22]

19. See, e.g., Use of Recording Devices, 11 F.C.C. 1033 (1947) (S–1344) (a recording device used in World War II which the Bell System was not in a position to supply on a commercial basis because the Government had required the telephone companies to concentrate their efforts on satisfying the post-war demand for basic residential service); Frequency Band 1000–13,200 Mc., 39 F.C.C. 298 (1948) (S–1354) (temporarily authorizing video broadcasters to share certain broadcast frequencies and to construct their own facilities until adequate common carrier facilities became available).

20. The Supreme Court recognized this effect of selective, specialized competition directed at the "cream" of the business of a general service public utility in *Panhandle Eastern Pipe Line Co. v. Michigan Public Service Comm'n*, 341 U.S. 329, 71 S.Ct. 777, 95 L.Ed. 993 (1951) (S–1423). In upholding an order of the Michigan Public Service Commission precluding selective competition by an interstate gas supplier, the Court reasoned (341 U.S. at 334, 71 S.Ct. at 780):

"Appellant asserts a right to compete for the cream of the volume business without regard to the local public convenience or necessity. Were appellant successful in this venture, it would no doubt be reflected adversely in Consolidated's over-all costs of service and

its rates to customers whose only source of supply is Consolidated."

21. The piece-out problem arises frequently in interconnection controversies between specialized carriers and general service carriers—especially when the latter are required to average rates across all routes and territories served. The term refers to any attempt of a specialized competitor or private firm to provide only an intermediate portion of the facilities needed for end-to-end communications service. If "piece-out" is permitted, the cheap facilities may be provided by the specialized firm seeking to interconnect while the general service carrier will be required to provide service over costly facilities at averaged rates which may not recover the high cost of serving its portion of the "pieced-out" route (Byers, S–T–133 at 8–9). In his cross-examination, Mr. Furth, President of Southern Pacific Company and Chairman of SPCC, admitted that in the transportation context, the railroads refused to piece-out voluntarily until required to do so by the ICC, based on similar economic considerations (Furth, Tr. 383–87).

22. The FCC's reasoning is apparent in early decisions relating to the intercity video area, where the Commission initially emphasized

Throughout the 1950s, pressures continued to mount to permit certain users to take advantage of ongoing technical innovations that permitted high-volume communications at costs lower than the Bell System's nationwide averaged rates for such services. As a consequence, the Commission undertook an investigation to determine whether the public interest would be served by permitting a broader right to construct private communications systems (*Allocation of the Frequencies in the Bands Above 890 Mc.* (Docket No. 11866); Hough, S–T–1 at 23–25; Froggatt, S–T–2 at 2–4; Boettinger, S–T–3 at 7–8).

In the *Above 890* proceeding, the Bell System opposed extension to all commercial enterprises of the right to construct and operate private microwave systems, pointing out that such authorizations could result in a substantial diversion of revenues from the existing carriers through creamskimming and thus adversely affect their ability to serve the public. Although the Commission rejected this position, it insisted it was not discounting the importance of the Bell System's concern about protecting its revenues; rather, the Commission concluded its actions would not result in such a diversion of revenues (27 F.C.C. 359 (1959) (S–1553); 29 F.C.C. 825 (1960) (S–1569)). While

recognizing that the matter required continued surveillance (27 F.C.C. at 412), the Commission again rested its conclusion, in substantial part, upon the interconnection restrictions in the tariffs of the carriers (27 F.C.C. at 413–14):

> "[W]e believe that there are certain factors or conditions which will operate as practical deterrents to private users in establishing their own systems ... [One] control is that the tariff regulations of certain common carriers will operate as a limiting factor, particularly where a private system is established and efforts are made to obtain interconnection with a carrier where common carrier facilities are available and the carrier would be compelled to 'short haul' itself."

Two consequences of great significance to the issues in this case flowed from the *Above 890* decision. First, in 1960 AT & T developed the Telpak tariff, a bulk rate competitive alternative to the construction of private microwave systems by large users (Hough, S–T–1 at 23–29; Froggatt, S–T–2 at 5–6; Boettinger, S–T–3 at 6–20).[23] Although Telpak became effective in 1961, twelve years before SPCC commenced operations as a common carrier, as will be discussed more fully below, a principal fo-

that its authorizations were only "temporary" pending the availability of adequate common carrier facilities to meet the demand. Because of the limited nature of these video authorizations, the Commission concluded that the threat of creamskimming, although valid in principle, would be insignificant in effect (*Frequency Band 1000–13,200 Mc.*, 39 F.C.C. 298 (1948) (S–1354); *AT & T and Western Union Co., Charges and Regulations for Television Transmission Services and Facilities ("Video I")*, 42 F.C.C. 1 (1949) (S–1386); Ashley, S–T–132 at 5–9; Letwin, S–T–140 at 56–60). An even clearer example of the same reasoning appears in *Western Union Telegraph Co.*, 17 F.C.C. 152, 173 (1952) (S–1450), where the Commission rejected a request by Western Union for interconnection because creamskimming would be an inevitable result of Western Union's plan to duplicate large parts of the existing Bell System network. In upholding the propriety of the Bell System's tariff provisions limiting interconnection, the FCC observed that such interconnection "would in effect give ... (Western Union) a 'blank check' for the construction of facilities ... over the

most desirable ... routes, without regard to the overall need for service by the public ..." (*id.* at 174; see also Ashley, S–T–132 at 8–9; Letwin, S–T–140 at 61–63). And, even where the Commission subsequently liberalized its initial video policies, it attempted to avoid facility duplication and the creamskimming of carrier revenues by prohibiting situations "in which a direct connection is desired with common carrier facilities" *Amendment of Part 4 of the Commission's Rules and Regulations Governing Television Auxiliary Broadcast Stations ("Video II")*, 44 F.C.C. 1354, 1362 (1958) (S–1542); see also Letwin, S–T–140 at 64–65.

**23.** The evidence reflects that a number of major private line customers indicated to the FCC during the *Above 890* proceeding that they were considering building or planning to build their own private microwave systems (Hough, S–T–1 at 26). The Federal Government, particularly the Department of Defense, had already built some of its own private microwave systems and was considering expanding them (*id.* at 25).

cus of SPCC's pricing charges relates to the claimed anticompetitive nature of Telpak's structure and rate level.

A second and more immediate consequence of the *Above 890* decision was that it fueled the pressure for new entry. Responding to such opportunities for entry, Microwave Communications, Inc. (MCI) applied to the FCC in December of 1963 for authority to construct and operate a microwave radio system between Chicago and St. Louis (see *Microwave Communications, Inc.,* 18 F.C.C.2d 979 (1967) (Initial Decision) (S–1768); 18 F.C.C.2d 953 (1969) (Final Decision) (S–1918)). MCI represented in its application that such a specialized carrier system was necessary to make some of the benefits of the FCC's *Above 890* decision available to small businesses by providing new and innovative specialized point-to-point private line services which were not being provided by the established carriers and which would not require connection to the nationwide switched network (18 F.C.C.2d at 981–82; Letwin, S–T–140 at 75–76; Byers, S–T–133 at 15).

In 1967, while MCI's application was pending, President Lyndon Johnson established a Task Force on Communications Policy which studied the question of competition in the telecommunications industry. The Task Force, chaired by Eugene Rostow, then Assistant Secretary of State (Hinchman, Tr. 2109; Rostow, Tr. 3671), issued a report (S–1873) which concluded, based on considerations of system optimization, system integrity, service reliability, and national security policy (Rostow, Tr. 3646), that the core of the public network ought to remain a regulated monopoly (Rostow, Tr. 3647). The Report did recommend limited

entry by specialized carriers, but indicated that such entry ought to be confined to point-to-point services which were not broadly connected to the network (Rostow, Tr. 3652, 3653).[24]

The Report also emphasized that existing common carriers should be allowed to take full advantage of their accumulated capital, plant, and equipment and stressed the necessity of not creating a protected system in which new entrants would be encouraged, but existing companies would not be allowed to compete fully (Rostow, Tr. 3654).

Notwithstanding the general conclusions reached by the Task Force, defendants and other general service carriers argued in the *MCI* case that such entry would be contrary to the public interest because telecommunications services could be provided more economically by one supplier as a result of economies of scale; that additional microwave systems would be duplicative and wasteful, and would adversely affect business and residential telephone users; and that specialized carriers without general service responsibilities would creamskim the existing averaged regulated rate structure by selective competition aimed at only the most profitable routes with heavy traffic and thus impose a heavier rate burden upon users on low-density routes (18 F.C.C.2d at 960 (S–1918)); see also exhibits cited in Regulation and History Doc.Sub. at App.E, pp. E–4—E–5).[25]

Although finding that "this is a very close case ... which presents exceptionally difficult questions," the FCC decided by a vote of 4 to 3 that MCI's application should be granted (18 F.C.C.2d at 966 (S–1918)). In reaching this decision, the FCC stated that "MCI is offering a service ... with

24. Limited entry into the private line field was advocated in the belief that it would not affect the integrity of the public switched network. The goal was the "removal of unnecessary restraints to promote innovation and to encourage greater responsiveness to consumer needs" (Rostow, Tr. 3649). The Report specifically anticipated that such limited entry would be "[s]ubject to regulations designed to protect the integrity, reliability and viability of the integrated system...." (Rostow, Tr. 3649).

25. In the initial decision, the Hearing Examiner made detailed findings on the nature and effects of defendants' practice of rate averaging, recognizing that rate averaging *"makes it possible for all subscribers to a service to benefit from efficiency and economies and not only those who are in a location less costly to serve than the average,"* even though the denser the route, *"the lower the cost"* and the sparser the route, *"the higher the carrier's costs"* (18 F.C. C.2d at 987). (Emphasis supplied).

unique and specialized characteristics" (18 F.C.C.2d at 960). On the basis of this finding, it rejected the general service carriers' creamskimming argument, concluding that "*[i]n the circumstances of this case*," no wasteful duplication of facilities was likely to be involved (*id.* at 960–62) (emphasis supplied); (Ashley, S–T–132 at 10–11; Letwin, S–T–140 at 75–77).

It is clear to the Court that there was substantial division within the FCC itself on the question of MCI's entry, and specifically on the question of the extent to which this kind of selective competition would lead to creamskimming (Ashley, S–T–132 at 9–12; Letwin, S–T–140 at 76–77). For example, the Chairman of the FCC, in explaining his opposition to the licensing of MCI, which also showed a concern for *all* telephone users, stated (18 F.C.C.2d at 972 (S–1918)):

> "[MCI] is proposing a typical 'creamskimming' operation. Thus, it has selected a major route, Chicago to St. Louis, with heavy traffic density characteristics and the concomitant lower unit costs. The existing common carriers, on the other hand have been encouraged by the Commission, primarily for social reasons, to base their rates both for message toll and private-line services on nationwide average costs. Thus, the small users in the hinterlands is afforded the same rates as the large users in the major cities. The evidence in this record tends to show, and there is no basis in our experience to believe otherwise, that AT & T and Western Union could offer lower rates for private-line service between Chicago and St. Louis than those proposed by MCI, were they to base such rates on their costs for that route alone.
>
> The chances are and the record so indicates, that AT & T and Western Union will be constrained to lower their private-line rates to meet the competition of

MCI. This, however, means that other users, either the small private-line users who are not so fortunate as to live in large cities or message toll users, or both, will have to make up the difference if total revenue requirements are to be met. This is in addition to the higher costs which are bound to fall on all communications users by virtue of the inefficient use of the frequency at stake."

It is also clear to the Court that the FCC's decision authorized MCI to provide only point-to-point private line service not requiring the use of defendants' switching machines (Byers, S–T–133 at 15–18). The FCC stated its understanding of MCI's proposal as involving "a limited common carrier microwave radio service, designed to meet the interoffice and interplant communications needs of small businesses"[26] (18 F.C.C.2d at 953 (S–1918)). Moreover, the FCC recognized that under the proposal MCI would only need what is known as local distribution facilities, in the form of a pair of wires reaching from MCI's microwave sites in the cities it served to the location of its customers in that city, thereby providing a "link between MCI's sites and . . . [a customer's] place of business" (18 F.C.C.2d at 954). Consequently, the FCC made no reference in its *MCI* decision to any possibility that MCI's circuits would be connected to a telephone company's switches. Indeed, Commissioner Robert E. Lee in his dissenting statement recognized this very problem wherein he stated (18 F.C.C.2d at 973 (S.1918)):

> One of the basic unresolved propositions in this case is how the FCC can expect MCI, who at best possesses extremely marginal financial qualifications, to invest $564,000 which again is a questionable estimate of costs, for a microwave system, which is presumably de-

---

**26.** Indeed, the FCC was very explicit in stating what MCI sought in its first sentence, "[T]his proceeding involves applications filed by Microwave Communications, Inc. (MCI), for construction permits for new facilities in the *Domestic Public Point-to-Point Radio Service* at Chicago, Ill., St. Louis, Mo., and nine intermediate points" (18 F.C.C.2d at 953 (S–1918) (em-

phasis supplied). This was echoed by Commissioner Lee wherein he stated: "[T]his proceeding involves proposed construction by Microwave Communications, Inc. (MCI), of an 11-hop common carrier point-to-point microwave system between Chicago, Ill., and St. Louis, Mo." 18 F.C.C.2d at 973 (S–1918). (emphasis supplied).

signed for service to the public *without also ruling on the interconnection issue.* (emphasis supplied).

Notable by its absence from the FCC's decision was any declaration that the FCC was moving to a policy of unrestricted competition in the common carrier field, or even of restricted or limited competition beyond the offering of the specialized point-to-point service that MCI had described in its application (Letwin, S–T–140 at 76; Ashley, S–T–132 at 9–15; Partoll, S–T–149 at 7; see also exhibits cited in Regulation and History Doc.Sub. at App.E).

The *MCI* decision resulted in a deluge of new applications for authority to construct and operate facilities for specialized common carrier service and served as the springboard for SPCC's entry into the industry (Agreed Fact 8–2–009). SPCC filed applications for authority to provide specialized services initially between Seattle, Washington, and, San Diego, California and between Los Angeles, California, and, East St. Louis, Illinois (Agreed Fact 8–3–020). Other companies filed similar applications, and to deal with this situation, the FCC instituted a broad rulemaking inquiry designed to permit consideration in one proceeding of the policy questions raised by all of these applications (*Specialized Common Carriers,* 24 F.C.C.2d 318, 322 (1970) (Notice of Inquiry) (S–2070); Furth, Tr. 395; Letwin, S–T–140 at 77).

The views and comments submitted by SPCC and the other applicants in the *Specialized Common Carriers* proceeding described in detail the kinds of services for which they sought authority to construct microwave systems (24 F.C.C.2d at 321–24 (S–2070); see also exhibits cited in Regulation and History Doc.Sub. at App.E, pp.

E–5—E–6). Based upon a review of the notice and pleadings, the Court is convinced that none of the applicants sought authority to provide ordinary telephone services, and none sought to connect their proposed systems with the switching machines or the switched network of the Bell System and other general service carriers. As will be discussed below, the specialized carriers in their applications and pleadings also made no mention of FX or CCSA-type service and the Commission did not discuss it in its decision. Although plaintiffs' witnesses were somewhat evasive on this point, they confirmed that an essential thrust of SPCC's planned entry was the offering of new and innovative services not then being provided by defendants (Furth, Tr. 380; Miller, Tr. 415–18, 446–47; Brodman, Tr. 1806).

In June 1971, the FCC handed down its *Specialized Common Carriers* decision approving in principle the entry of specialized carriers and declaring as a matter of policy that there should be competition in the specialized services to which it applied (29 F.C. C.2d 870 (1971) (S–2211)). In doing so, it appears to the Court that the FCC was following the general recommendations of the Task Force. Thus, although the Commission recognized the threat of creamskimming in its decision (29 F.C.C.2d at 915), it minimized such potential impact on the ground that SPCC and the other newly authorized carriers would serve theretofore untapped markets with "new" and "specialized" services and that creamskimming was therefore likely to be insignificant (*id.* at 912; Ashley, S–T–132 at 18–20; Letwin, S–T–140 at 77–78; Partoll, S–T–149 at 7; see also exhibits cited in Regulation and History Doc.Sub. at App.E).[27]

**27.** The Court is concerned over an apparent lack of candor on the part of plaintiffs concerning the creamskimming question and the nature of the "new and innovative" services plaintiffs proposed to provide. It is clear to the Court that the specialized carriers, including SPCC, attempted to minimize the impact of the creamskimming problem during the *Specialized Common Carriers* proceeding by stressing their intention to provide new and innovative services and to develop latent, untapped markets.

It is also clear to the Court from the testimony of plaintiffs' witnesses in this case that their principal business strategy was to engage in creamskimming—that is, offer services identical to those of defendants on the highest density, most profitable routes at rates 15 to 20 percent below the rates of defendants (Brodman, Tr. 1776–77). In fact, SPCC relied upon this strategy in attempting to sell its services, emphasizing that because it was serving "metropolitan areas," and "avoiding the smaller,

The *Specialized Common Carriers* decision was not a model of clarity—[28] a fact that is apparent to the Court both from a reading of the decision and the controversy and litigation that surrounded its implementation. Indeed, the Commission either did not discuss or deferred to future proceedings the resolution of all of the major issues raised by the Commission's authorization of competition by the specialized carriers.

On the matter of the establishment of ground rules for price competition between the specialized carriers and the existing carriers, the Commission recognized that changes in the Bell System's nationwide average rates "may be in order, and . . . will not be opposed by the Commission" and emphasized that the established carriers would have "an opportunity to compete fairly and fully" taking advantage of any price that "will realistically and reasonably reflect economic advantages, if any, that are inherent in [Bell's] plant and operations" (29 F.C.C.2d at 915 (S–2211)). Moreover, consistent with the position advanced by the Department of Justice, the Commission pointed out that it would not condone any " 'protective umbrella' for the new entrants or 'any artificial bolstering of operations that cannot succeed on their own merits' " (*id.*). However, the Commission found it "neither practical nor appropriate" to adopt "precise principles" to govern changes in defendants' rates in the *Specialized Common Carriers* decision (*id.* at 916–17). Instead, the Commission pointed out that the question of general competitive pricing methodology was at issue in another

Commission proceeding (Docket No. 18128) and that, in any event, it would "address any problems as they arise" (*id.;* see also exhibits cited in Regulation and History Doc.Sub. at App.E).

As to the scope of the specialized carriers' authorization, the decision did not define the specialized services in which it authorized the new carriers to engage, nor did it define the obligations the FCC expected the general service carriers to assume in order to help these new carriers get into business. Instead, it treated the terms "specialized services" and "private line" services as synonymous with the services that SPCC and the other applicants in the proceeding had proposed (29 F.C.C.2d at 906–08, 911 (S–2211)), found these "proposed facilities and services" to be in the public interest (*id.* at 920), and indicated that the general service carriers should provide local distribution facilities for such services (*id.* at 940; Ashley, S–T–132 at 16–27; see also exhibits cited in Regulation and History Doc.Sub. at App.E).

Moreover, although the Commission required the established carriers to provide such local distribution facilities on nondiscriminatory terms, it did so without defining what such terms would be and without any apparent consideration of the problems inherent in making services and facilities ordinarily provided jointly between network partners available to customer competitors who were not, and apparently did not desire to be, part of that network partnership.

Finally, the Commission did not discuss the question of whether the specialized

---

less profitable locations," it could provide service "at prices generally lower than other carriers" (Hollis, Tr. 2318–19). Moreover, Mr. Grant, SPCC's former President and now Vice-Chairman, suggested that SPCC intended to provide "roughly 60 percent of our circuits" as "customized," but was most unconvincing in identifying how these circuits differed, except in price, from those offered by AT & T (Grant, Tr. 776–77). Finally, SPCC's damage study is based upon the "but for world" assumption that three specialized common carriers, of which SPCC was one, would obtain, and share equally, 60 percent of the defendants' existing business along high-density routes (Vasilakos,

Tr. 2986)—an assumption which the Court simply cannot reconcile with plaintiffs' initial representations that they would provide "new and innovative" services, would not simply engage in a creamskimming operation, and, therefore would not divert substantial revenues from the established carriers. *See Specialized Common Carrier Services,* 24 F.C.C.2d 318, 333 (1970) (Docket No. 18920, Notice of Inquiry).

**28.** Indeed, Judge Grady in *MCI v. AT & T* characterized the decision as an "abomination" and "one of the worst examples of legal draftsmanship I have ever seen." (*MCI v. AT & T,* Tr. 3785).

common carriers would be allowed to piece-out Bell System service. Indeed, the Commission made no declaration or order requiring the established carriers to interconnect with competitors for any purpose other than to provide "local distribution service" and only in connection with the specialized services authorized in that case, thus apparently eliminating the possibility of a piece-out situation (Letwin, S–T–140 at 78–79).

Following the *Specialized Common Carriers* decision, plaintiffs proceeded with their plans to commence operations. They worked on construction plans, negotiated with equipment suppliers, composed budgets and financial plans and recruited staff members (Miller, PX6–0002 at 10). In addition, SPCC met with representatives of AT & T and Pacific Telephone to discuss obtaining local distribution facilities to serve its initial customers in California and Arizona (Kopf, PX6–0003 at 4–5). Although SPCC claims that there were problems during those negotiations—claims which the Court will address below—there is no dispute that a contract between SPCC and Pacific Telephone for the provision of local distribution facilities was executed on October 23, 1973, and, after obtaining necessary tariff amendments from the California Public Utilities Commission, which became effective on December 12, 1973, plaintiffs began serving their first customers on December 26, 1973 (Kopf, PX6–0003 at 16).

## THE NATURE OF THE ISSUES

Having traced the development of the telecommunications industry and regulatory policies leading up to the *Specialized Common Carriers* decision, the Court believes that it is necessary to put in context the evolution of regulatory policy during the decade following that decision as it relates to the broad issues raised by the authorization of competition in the provision of "specialized" private line services.

There are four broad issues which emerge from that decision and lie at the heart of plaintiffs' specific claims in this case. These are: (1) what was the nature of defendants' permissible pricing responses to the newly-authorized competition and the basis on which such responses were to be justified; (2) what were the scope of both the services the new entrants were authorized to provide and defendants' corresponding interconnection obligations; (3) what was the meaning of the nondiscriminatory operating relationships mandated between the new entrants and defendants and other established carriers; and (4) what was the extent of defendants' obligation to provide plaintiffs and the other specialized carriers with interconnections which would enable the specialized carriers to piece-out defendants' network.

There is one overriding phenomenon of the evolution of regulatory policy following the *Specialized Common Carriers* decision that helps both to explain the specific claims at issue in this case and to chart the Court's course in their disposition. It is the existence of pervasive and continuing regulatory uncertainty which was engendered by that decision and which continued throughout the entire period at issue in this case.

In the pricing area, the Commission had, as discussed above, deferred consideration of an appropriate costing standard to Docket No. 18128. It was not until 1976 that the Commission issued a decision on that question. *AT & T, Revisions of Tariff FCC No. 260, Private Line Service, Series 5000 (TELPAK)* (Docket No. 18128), 61 F.C.C.2d 587 (1976) (S–4575). Even then, the matter was not resolved as the Commission, after further investigation, abandoned the costing standard it had adopted. Indeed, only recently has the Commission issued a costing manual setting forth guidelines for doing cost studies and the Commission has made clear that even that is only an interim manual. *AT & T, Manual and Procedures for the Allocation of Costs,* 84 F.C.C.2d 384 (1981) (S–6005). Thus, almost eleven years after the *Specialized Common Carriers* decision, the question of the appropriate costing methodology still remains open to further change (see exhibits cited in Regulation and History Doc.Sub. at App.E). Yet throughout that period and throughout this trial,

defendants' pricing tariffs have been attacked for failing to comply with standards that the Commission was either unable, or unwilling, to articulate in advance.

Similar uncertainty prevailed during this era regarding the scope of the services the specialized carriers were authorized to provide (Ashley, S–T–132 at 16–28; Byers, S–T–133 at 13–20; deButts, S–T–131 at 24–25; see also exhibits cited in Regulation and History Doc.Sub. at App.E). In their applications to the FCC, the new carriers represented that they only proposed to provide "new and innovative" services not requiring connections to defendants' switching machines. Thus, neither the specialized carriers in their applications and pleadings nor the Commission in its *Specialized Common Carriers* decision said anything about providing services such as FX and CCSA which required such connections. Subsequently, when the issue arose as to whether MCI was entitled to interconnections to provide FX and CCSA, the Court of Appeals for the Third Circuit held that the *Specialized Common Carriers* decision was "unclear" as to this issue. *MCI Communications Corp. v. American Tel. & Tel. Co.,* 496 F.2d 214, 221, 224 (3d Cir.1974) (S–2981). Shortly thereafter, however, the FCC held that the new entrants were authorized to provide these services and directed defendants to make the necessary connections. *Bell System Tariff Offerings of Local Distribution Facilities for Use by Other Common Carriers,* 46 F.C.C.2d 413 (1974) (S–2987).

Two years later, when several of the specialized carriers, including SPCC, began providing ordinary switched long distance services, the FCC held that these switched services exceeded the scope of the private line services the specialized carriers had been authorized to provide. In a decision which revolutionized the telecommunications industry, the Court of Appeals for this Circuit reversed the FCC and found that the specialized carriers' operating authority had not been expressly limited by the FCC in the *Specialized Common Carriers* decision and thus that the scope of their authorization was unlimited. *MCI Telecommunications Corp. v. FCC,* 561 F.2d 365 (D.C.Cir. 1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 780, 54 L.Ed.2d 790 (1970) (S–5123).[29] Yet, once again, despite these radical and unanticipated shifts in regulatory policy, defendants have been accused of unreasonably denying interconnections for switched services to the new entrants, where neither defendants, nor even the Commission itself, could reasonably anticipate how regulatory policy on this question would ultimately evolve.

On a third issue, AT & T's obligation to provide facilities to the specialized carriers on nondiscriminatory terms, the FCC has not yet made clear the meaning of that term in the context of network partners (AT & T-Long Lines, the Bell operating companies and the independent telephone companies) providing joint services, as opposed to the operating companies providing facilities to customers/competitors not involved in a cooperative partnership arrangement. As described more fully below, AT & T attempted to sit down with the specialized carriers and resolve some of these issues under the aegis of the Commission during late 1974 and early 1975, but AT & T's offer to treat the specialized carriers as network partners with the concomitant benefits and obligations was rejected outright by plaintiffs and the other carriers (Kelley, S–T–59 at 22–23). Although defendants were able to develop solutions to certain of these issues with little or no regulatory guidance, and the FCC accepted the settlement agreement which resulted from these negotiations (S–3471) and presided over meetings to monitor its implementation, the FCC has done nothing further to clarify this complex and difficult question. However, much of the

---

**29.** Following the Court of Appeals' decision in 1977, the FCC instituted Docket 78–72 to consider further the question of the scope of the services which the specialized carriers should be authorized to provide. This proceeding is still pending, although the specialized carriers have been providing predominantly MTS and WATS-like switched services for the past several years. (*MTS and WATS Market Structure,* 67 F.C.C.2d 757 (1978) (S–5454); Partoll, S–T–149 at 32.)

controversy in the industry following the *Specialized Common Carriers* decision, and much of the evidence in this case, relates to charges of "discrimination" (Kelley, S–T–59; see also exhibits cited in Regulation and History Doc.Sub. at App.E).

Finally, as to a fourth issue raised by the FCC's authorization of competition by the specialized carriers, that of piece-out and its resulting technical and economic problems, the FCC once again created an atmosphere of uncertainty. The FCC accepted the tariffs filed by AT & T in 1968 after the *Carterfone* decision (13 F.C.C.2d 420 (1968), 14 F.C.C.2d 571 (1968)), which allowed the interconnection of customer-provided terminal equipment and private microwave systems to the network, but contained provisions designed to prevent piece-out (Byers, S–T–133 at 6–13). The FCC similarly accepted substantially identical tariff revisions filed by AT & T in 1971 after the *Specialized Common Carriers* decision which permitted connections between the facilities of the specialized carriers and those of the defendants, but also contained a "customer-premise" provision designed to prevent piece-out (Hough, S–T–1 at 85–86; deButts, S–T–131 at 59; Byers, S–T–133 at 13–20; see also Darling, S–T–148 at 10; exhibits cited in Regulation and History Doc.Sub. at App.E). On the related question of the leasing of intercity facilities by defendants to plaintiffs and other new entrants, the Court is satisfied that in the *Specialized Common Carriers* decision, the FCC neither mentioned, nor even intimated, that defendants had any obligation to make such facilities available. Although defendants voluntarily offered to provide such facilities in 1974 and after five years of silence on the issue, in 1976 the FCC declared the piece-out tariff provisions to be unlawful (S–4449C), defendants are accused here of act-

ing unreasonably with respect to both issues.

Beyond the overriding influence of regulatory uncertainty on the issues in this case, in the Court's view, there is one additional matter that necessarily must be addressed at the outset in order to have a proper understanding of those issues—that is, the economic bases for AT & T's opposition to new entry in the telecommunications industry. The evidence is clear that AT & T was concerned that it protect its ability to serve the public interest by fulfilling its regulatory obligations through continued adherence to the long-standing pricing and service policies discussed above (deButts, S–T–131).[30]

A principal economic consideration in the FCC's authorization of competitive entry in intercity telecommunications services was to test whether AT & T's economies of scale outweighed any advantages of specialization that might be achieved by new entrants (Rosse, S–T–43). Implementation of such a test was a crucial factor in the position taken by AT & T toward new entry and expanded competition during this period (deButts, S–T–131).

Economies of scale means that a proportional increase in all inputs to a firm's production generates a greater than proportional increase in its output, all else constant (Rosse, S–T–43 at 3). In other words, when a firm's output increases by 10 percent, its costs increase by a lesser percentage. Thus, a large firm with scale economies is able to produce output more cheaply than a smaller firm using the same technology (*id.;* Baumol, Tr. 3759–60).

The record evidence on the Bell System's economies of scale falls into essentially five categories: (i) common sense[31]; (ii) engineering-economic studies; (iii) econometric

---

**30.** This sentiment was echoed by Chairman Hyde in his dissent in *Application of Microwave Communications, Inc.,* 18 F.C.C.2d 953 (1960) (S–1918).

**31.** Chairman Hyde saw these economies of scale in *Application of Microwave Communications, Inc.,* 18 F.C.C.2d 953, 972 (1969) (S–1918) wherein he stated:

The evidence in this record tends to show, and there is no basis in our experience to believe otherwise, that AT & T and Western Union could offer lower rates by private-line service between Chicago and St. Louis than those proposed by MCI, were they to base such rates on their costs for that route alone.

studies; (iv) productivity studies; and (v) perceptions of proposed entrants in the market. Defendants presented compelling evidence in each of these five categories. Common sense suggests that the technology, organization, and historical record of the telecommunications network exhibit economies of scale (Rosse, S–T–43; Tr. 5745, 5752). The engineering-economic studies illustrate the characteristics of the facilities used to provide intercity services and demonstrate the declining unit cost of larger systems (Skoog, S–T–45; Mandanis, S–T–46; Rosse, S–T–43 at 21–26). Moreover, the econometric studies and productivity studies introduced by defendants confirm that these potential economies have in fact been realized by AT & T (Vinod, S–T–44; Christensen, S–T–48; Rosse, S–T–43 at 26–37). Evidence illustrating the perceptions of the proposed entrants similarly confirms the fact that AT & T enjoys substantial economies of scale (Smith, S–T–166 at 3–4; Ginty, S–T–47 at U.S.Tr. 18085–86; Phillips, Tr. 5455–56; S–2197; S–2420).

It appears to the Court that there are three reasons for defendants having achieved such clear economies of scale. First, as defendants' witnesses explained, higher levels of demand allow efficient use of high-capacity facilities and technologies which provide transmission service at progressively lower unit costs (Hough, S–T–1 at 3–11; Mandanis, S–T–46 at 15–16; Rosse, S–T–43 at 8). Second, the process by which the network is configured allows for the fullest utilization of these high-capacity, low-cost facilities (id.; Mandanis, S–T–46 at 17). Finally, defendants supply the entire spectrum of communications services, and through the networking principle, demand for all those services is concentrated or pooled so that it can be transmitted and switched over the same facilities (id.). This last phenomenon is referred to by economists as "economies of scope" (id.). Economies of scope exist when it is cheaper to produce two or more goods or services together than to produce each one separately (Rosse, S–T–43 at 15; Phillips, S–T–173 at 25). The shared use of physical plant by different services appears to the Court to

contribute in large part to the economic advantages of defendants' single integrated telecommunications network (Skoog, S–T–45 at 8; Rosse, S–T–43 at 16; Hough, S–T–1 at 10).

The Court is thus satisfied that the Bell System enjoys substantial economies of scale which have increased over time (Rosse, S–T–43 at 18; Phillips, S–T–173 at 16–17; Christensen, S–T–48; Mandanis, S–T–46; Ginty, S–T–47; Sutter, Tr. 4930–31; Skoog, S–T–45 at 6, 8; Vinod, S–T–44 at 5; see also exhibits cited in Regulation and History Doc.Sub. at App. E, pp. E–5—E–6, E–13—E–14). Indeed, based upon the evidence in this record, the Court has no question that defendants' exploitation of economies of scale has been a major factor in the strong productivity growth achieved in the provision of telephone service in this country (Christensen, S–T–48 at 25–30) and has contributed to widely available, reliable telephone service of a kind unrivaled elsewhere in the world.

Through the rebuttal testimony of Dr. James Heckman, plaintiffs attempted to controvert the proposition that AT & T enjoys economies of scale in its intercity operations. Dr. Heckman's own testimony, however, reveals that he knows "very little" about the telecommunications industry and that he was completely unaware of the high capacity facilities which enable the Bell System to achieve economies of scale in the provision of intercity services (Tr. 5744–45). Consequently, Dr. Heckman's attempt to dismiss Mr. Mandanis' and Dr. Skoog's engineering-economic studies, which demonstrated substantial economies of scale in intercity transmission facilities, was not convincing. Indeed, Dr. Heckman frankly admitted that his study does not address the issue of whether Bell possesses economies of scale for intercity services. In Dr. Heckman's words, his "evidence is somewhat narrow ... It did not address that specific question [economies of scale in long distance telecommunications services]" because he "didn't study it" (Tr. 5754). Thus, his conclusion of diseconomies of scale results from an econometric analysis of the

entire Bell System, including its local operations and cannot support any conclusion that there are no economies of scale in intercity services (Tr. 5755–56). Moreover, the results of Dr. Heckman's econometric study bear no relation to reality. For example, Dr. Heckman acknowledged that his study suggested that the cost of having two firms providing telecommunications services could be as much as 82 percent below the cost of the Bell System providing all such services (Tr. 5756–57). The Court finds such results to be unsound and entitled to no weight.

Dr. Heckman did concede that the perception of proposed entrants would be "ideal" data in determining whether economies of scale exist in the telecommunications industry (Tr. 5760). In fact, the record in this case is replete with such evidence. For example, Mr. Ginty, a representative of Arthur D. Little and Company who worked with General Electric in evaluating whether that company should construct a private microwave system, observed that "the Bell System could install and operate microwave systems at prices competitive with private systems and in fact lower than competitive systems since their capacity along major routes is much larger than private systems with the attendant economies of scale" (Ginty, S–T–47 at U.S.Tr. 18085–86; see also Phillips, Tr. 5455–56; S–2197; S–2420).

Because of the Bell System's demonstrated economies of scale and scope, there is no question in this record that defendants' costs are lower than those of plaintiffs for any given output (Rosse, S–T–43 at 48; Phillips, S–T–173 at 30; see also Ginty, S–T–47 at U.S.Tr. 18085–86; Smith, S–T–166 at 3–4). It is conceivable that such scale advantages might be somewhat offset if plaintiffs had access to different technologies (or could exploit technologies in ways not possible for defendants) or if plaintiffs' management were more efficient than defendants' management (Rosse, S–T–43 at 48). However, there is no evidence that this is the case. Indeed, as discussed in more detail below, the record evidence conclusively refutes the possibility that plaintiffs were more efficient than the Bell System. Thus, there is no question on this record that, because of these scale economies, defendants could compete effectively with plaintiffs or others in the provision of private line services if allowed to respond freely (Baumol, Tr. 3759–60).

In these circumstances, the Court concludes that it was defendants' effort to continue to provide the benefits of the economic advantages it enjoyed to the public, coupled with the continuing regulatory uncertainty with which it was faced, that lie at the heart of the specific issues in this case to which the Court now turns.

## THE STANDARDS FOR ESTABLISHING A VIOLATION OF SECTION 2 OF THE SHERMAN ACT

■ The essential elements plaintiffs must establish to prove a private monopolization claim are not in dispute. These are: (1) that the defendant possesses monopoly power in a relevant market; (2) that the defendant has unlawfully exercised that power to attain, or maintain, a monopoly in the relevant market; (3) that the plaintiff has suffered injury in fact as a result of those unlawful acts; and (4) that damages in a reasonably ascertainable amount have been proved. *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701 (7th Cir.1977), *cert. denied*, 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).

■ The application of these principles is qualified where the conduct being attacked involves the exercise of rights protected by the First Amendment. It is not a violation of the antitrust laws to speak out on public issues or to attempt to persuade a regulatory agency to change its policy, unless plaintiffs can demonstrate that such activity was a "sham" designed to deny

them "free and meaningful access to the agencies and courts." *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 512, 92 S.Ct. 609, 612, 30 L.Ed.2d 642 (1972); *Federal Prescription Service, Inc. v. American Pharmaceutical Ass'n,* 484 F.Supp. 1195 (D.D.C.1980), *rev'd in part and aff'd in part,* 663 F.2d 253 (D.C.Cir.1981), *cert. denied,* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982). In the absence of such proof by plaintiffs, the First Amendment "shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." *United Mine Workers v. Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965); *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 81 (1961).

As the Court will now detail in considering plaintiffs' specific pricing, interconnection and other charges, SPCC has failed to present evidence satisfying these standards.

### MONOPOLY POWER AND RELEVANT MARKET

▬ The threshold showing required of plaintiffs in this case is proof that defendants possess monopoly power in a relevant market. Monopoly power is defined as the power to "control prices or exclude competition" in the relevant market. *United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); see also *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391–92, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956).

Plaintiffs' position is that the relevant market consists of the market for all business and government intercity telecommunications services and is nationwide in scope (Owen, PX6–0005 at 4; Melody, PX6–0018 at 18). Plaintiffs have defined this product market to include not only private line services, which have been the focus of the issues in this case, but also ordinary long distance services, including MTS and WATS, as well as telegraph, data, facsimile, and broadcast

services (Owen, PX6–0005 at 4–11; Melody, PX6–0018 at 17). Defendants, on the other hand, contend that insufficient evidence has been presented to support such an expansive market definition, and urge a relevant market which is narrower both in terms of services and geography (Pace, S–T–156). Defendants further contend that they lack monopoly power in any relevant market, regardless of which party's market definition is adopted.

Although plaintiffs did present evidence on the issues of market definition and monopoly power through the testimony of their experts, Drs. Owen and Melody, the Court has serious reservations concerning the credibility of both witnesses [32] and, in any event, is not satisfied that plaintiffs sustained their burden on either issue. As the Court will now explain, based upon the evidence of record, the Court concludes that the plaintiffs did not establish the relevance of the broad product and geographic market for which they contend; that the market in which the defendants' monopoly power must be assessed is the high-density intercity, interstate private line market to which plaintiffs limited their entry, or would have entered; and that no sufficient showing of defendants' monopoly power, in the private line market or any other market as it relates to this case, has been made.

### THE RELEVANT MARKET

▬ The relevant market in this case, as in any monopolization action, must be limited to the geographic area in which the parties effectively compete [33] (*Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 627, 5 L.Ed.2d 580 (1961)), and to those products or services which are in fact reasonably interchangeable with one another. *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). The purpose of the Court's inquiry into the relevant market, therefore, is to determine the "area of effective competition" in which it makes

---

**32.** The Court will discuss this further below.

**33.** This shall also include the area in which the plaintiffs planned to compete in its "but-for" world.

sense to measure defendants' alleged market power *vis-a-vis* the plaintiffs. *Standard Oil Co. v. United States,* 337 U.S. 293, 299–300 n. 5, 69 S.Ct. 1051, 1055 n. 5, 93 L.Ed. 1371 (1949).

■ The relevant market in this case is telecommunications service, which involves the electronic or electromagnetic transmission of information over distance from identified senders to identified recipients (Owen, PX6–0005 at 4). Local telephone service in all areas of the country is provided by the Bell Operating Companies (BOC's) and the more than 1500 independent telephone companies (Grant, PX6–0004 at 1–2; Owen, PX6–0005 at 4–5; Melody, PX6–0018 at 16 *see also* Testimony of Richard A. Lumpkin, S–6187, at 1–2). AT & T and the independents are the monopoly suppliers of local distribution facilities in areas served by SPCC (Grant Tr. 696). Neither SPCC nor all specialized common carrier firms compete with the BOC's or the independents in providing local service (Owen, PX6–0005 at 5; Grant, PX6–0004 at 3–4). It is thus the intercity portion of the telecommunications business that is relevant to this lawsuit (Owen, PX6–0005 at 5).

■ While plaintiffs have argued for a single relevant product market, including MTS/WATS as well as private line service, the Court is unable to conclude on this record that MTS and WATS services [34] were within the zone of effective competition between these parties during the relevant time period. Plaintiffs offered evidence to show that MTS and WATS services display cross-elasticity of supply and demand with private line services (Melody, PX6–0018 at 17–18; Owen, PX6–0005 at 12–15). This evidence included the testimony of several AT & T witnesses, including the immediate past and present Chairmen of the Board of AT & T (Brown, Tr. 5339–5345; Miller, S–2089 at 265; Miller, S–2091 at 415–16; Jones, S–T–53, tab A at 26; deButts, S–T–131, tab A at 85). In addition, defendants' own internal documents also exhibit AT & T's recognition that MTS, WATS and private line service are cross-elastic. (PX1–0003; PX1–0005; PX1–0009; PX1–0012; PX1–0013; PX1–0015; PX1–0018; PX1–0028; PX1–0032; PX1–0044; PX1–0045; PX1–0047; PX1–0048; PX1–0049; PX1–0053; PX1–0078; PX1–0080; PX1–0081; PX1–0092; PX1–0107; PX1–0109; PX2–0025). Moreover, the plaintiffs contend that because each of these services are provided on the same network of intercity transmission facilities, suppliers of these services can shift from supplying one service to supplying another in response to shifts in customer demand (Owen, PX6–0005 at 6–7, 13–14; Melody, PX6–0018 at 18). While there is no doubt that to some extent this is true, in the Court's opinion, the evidence on the degree of cross-elasticity is inconclusive and insufficient to support a determination that MTS and WATS are within the relevant market.

Important differences in the characteristics of these three services suggest that clear gaps in the chain of substitutability exist between them.[35] In fact, when one of

---

**34.** Plaintiffs include in their relevant market telegraph and TWX/Telex services, which are intercity telecommunications services characterized principally by the fact that the communication is received in written form and simultaneous two-way communication is not possible. (Owen, PX6–0005 at 11–12). Both telegraph and TWX/Telex service are provided over the same or similar intercity transmission facilities that provide other intercity telecommunication services. (Owen, PX6–0005 at 12).

**35.** MTS is a switched service permitting the use of any telephone to reach any point in the nationwide switched network (Pace, S–T–156 at 33). Multiple users share the intercity circuits and switching systems and pay only for conversation time, and because facilities are shared, the customer is not guaranteed access to all points on the system during peak periods (*id.*). In contrast, private line generally involves the leasing of circuits dedicated to his individual use (*id.*). The only points reachable are those to which the customer has leased facilities (*id.*). Private line service tariffs typically set a fixed monthly charge, so as to recover the cost of dedicating the circuit to the customer (*id.*). WATS is a shared-switched service that enables the purchaser to receive communications from callers over a wide area (In-WATS/800 Service) or place calls over a wide area (Out-WATS) without being charged on a per call basis (*id.*). In-WATS/800 service appeals to firms desiring to make it convenient

plaintiffs' economic experts, Dr. Hieronymus, was asked how anyone could argue that MTS and WATS are in the same relevant market as private lines, he answered that "they are not in the same market" (Hieronymus, Tr. 2857).[36] Plaintiffs' experts were thus in disagreement on the question (Hieronymus, Tr. 2856–57), but Dr. Hieronymus' evaluation was consonant with that of defendants' expert, Dr. Pace, who determined that MTS and WATS should be excluded from the relevant market because of insufficient demand cross-elasticity (Pace, Tr. 4853). Moreover, this testimony is consistent with the practical realities of the marketplace, which suggest that a majority of MTS customers would not find private line services to be a practical or economic substitute for MTS.[37] As Dr. Pace further pointed out, a common carrier must serve the demand; thus, it cannot shift facilities from one service to another arbitrarily (Pace, Tr. 4854). This appears to be an important constraint in the determination of supply substitutability, and the Court accordingly concludes that the necessary interchangeability has not been shown.

This is not to say that there is no cross-elasticity between private line and MTS and WATS. The testimony of an AT & T witness reveals that the cross-elasticities were 0.1 or lower (Pace, S–T–156 at 35). Mr. Pace goes on to testify as follows (S–T–156 at 35–36):

> For example, Bell Exhibit 4, submitted in Docket No. 19919 (Hi/Lo proceeding,

1973), attempts to estimate shifts from MTS to AT & T's own revised PLS rates or to SCC service. The shift factor developed is 0.1, indicating that a 10 percent reduction in PLS rates would result in only a 1 percent change in MTS revenue (p. 66c). The same document also considers shifts from WATS to PLS. It concludes that "a total shift from WATS to private line of approximately 3 percent was considered as the most that could reasonably be expected at even lower ranges of private line rates" (pp. 73–74).

Bell Exhibit No. 1A, submitted in the 1969 TELPAK case, is another example. This exhibit presented estimates of revenue shifts between TELPAK, MTS and WATS resulting from the implementation of various test rates. Test rate 3, which involved TELPAK rate increases ranging between 20 percent and 30 percent, was estimated to result only in a shift of $9.9 million to MTS/WATS, or less than one-half of 1 percent of the then existing MTS/WATS revenue. The implied cross elasticity is 0.0025.

A number of SPCC documents reveal that SPCC did not view the cross-elasticities between PLS and WATS/MTS as high. For example, Document No. 1BLE2489–499, a draft speech by an SPCC spokesman, states at pages 10 and 11:

> Bell handled 9.5 billion long distance calls in 1973, an 11 percent increase over 1972 levels. Assuming that the contribution to common and fixed costs from $500 million

and costless for customers to place long distance calls to them (*id.* at 33–34). Out-WATS appeals to firms placing a large volume of calls throughout a region or the nation (*id.* at 34). A combination of MTS and private line service would be an attractive substitute only if a large volume of calls were placed to a few well-defined areas (*id.*).

**36.** The plaintiffs contend that the word not is in error. (Plaintiffs comments on Defendants PFLCL at 8). However, according to the Court's notes, the transcript is correct. Moreover, should Dr. Hieronymus' testimony be changed, the Court's opinion would not.

**37.** Plaintiffs' own experience since they began offering MTS/WATS-like SPRINT service would tend to undercut the significance of any cross-elastic effect. SPCC has devoted virtual-

ly all new construction to SPRINT (Lim, Tr. 2797, 2799; Brodman, Tr. 1828) and, in fact, the specialized carriers are today generating nearly all their profits from that type of service (deButts, S–T–131 at 85). If substantial cross-elasticity exists, common logic dictates that MTS/SPRINT would not offer the substantially higher profitability conceded by SPCC's executives (Grant, Tr. 771). SPCC's damage study also reflects insignificant cross-elastic effects between private line, MTS and WATS (Pace, S–T–156 at 38). For these reasons, the Court finds plaintiffs' proof to be too conjectural and internally inconsistent to warrant a finding that the demand cross-elasticity between private line and switched MTS/WATS services is sufficiently strong to establish the existence of a single market (Pace, S–T–156 at 33).

in private lines business is $250 million, recovery of that contribution from 9.5 billion long distance calls would involve an increased charge of 2.6 cents. *Most of that long distance business has no cross-elasticity with private line business.* (Emphasis supplied).

Based on the foregoing the Court does not find a high enough cross-elasticity to include MTS and WATS in the same market as private line service.

 Even if the evidence did establish some reasonable degree of interchangeability between MTS/WATS and private line service, the Court concludes that it would nonetheless be appropriate to limit the relevant product market in this case to private line services.[38] It is clear that regulation during the relevant period bears directly on the market definition, and the relevant market ought not include areas in which SPCC either was not authorized to compete or chose not to compete. For this reason, the market definition plaintiffs propose is overbroad. It is clear to the Court that SPCC was not authorized by the FCC to provide other than private line services un-

til the 1977 *Execunet* decision [39] (see *MCI Telecommunications Corp. v. FCC,* 561 F.2d 365 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 780, 54 L.Ed.2d 790 (1978)). Furthermore, SPCC was authorized to provide intrastate private line service in only three states (Pace, S–T–156 at 26); no other state authorizations were sought; and intrastate service was never supplied by SPCC without such authorization (*id.*).[40] To conclude that unauthorized services should be included in the relevant market would be both factually and legally inconsistent.

 Moreover, it would be patently unfair to include MTS & WATS in the relevant market, for as the toll service revenues of AT & T indicate, private line service accounts for less than 10% of all toll revenues (since the inception of the specialized common carriers. *See* Table I.[41] In other words, approximately 90% of AT & T's toll service revenues was not a part of this case. SPCC, or any other specialized common carrier was not allowed to compete for that 90% prior to 1977.

---

**38.** Were the Court to adopt plaintiffs' theory of the relevant market, the Court's finding that defendants do not possess market power would not be disturbed. While defendants' share of such a market would unquestionably exceed their share of the narrower private line market, that share would have no relevance because no competition for non-private line services existed between these parties prior to the 1977 *Execunet* decision. *MCI Telecommunications Corp. v. FCC,* 561 F.2d 365 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 780, 54 L.Ed.2d 790 (1978). Moreover, plaintiffs' evidence shows that defendants' share of the broader intercity business telecommunications market has suffered some erosion since 1977 (Owen, PX6–0005 at 18, Table I)—an erosion which can reasonably be expected to grow with time.

**39.** Not only did SPCC and the other specialized common carriers fail to seek authorization to provide the switched services early on, but many others shared the view that the SCC's could only provide private line service pursuant to the *Specialized Common Carrier* decision, including the FCC. *MCI Telecommunications Corp.,* 60 F.C.C.2d 25 (1976) (Docket No. 20640), Decision; *See* Statement of Leroy T.

Carlson, Jr., President, Telephone and Data Systems, Inc., at appendix c–2.

**40.** It is important to note that the plaintiffs make little mention of the effect of regulation. During the relevant time period, SPCC was authorized to provide private line-service in only three states—California, Oklahoma and Texas. It was further noted that no intrastate service actually was sold in Oklahoma and that for the year 1977, California intrastate revenues were less than $17,000. Finally, it was pointed out that no other state authorizations were sought and that intrastate service was never supplied by SPCC without explicit state authorization (Pace, S–T–156 at 26). Moreover, the Public Utility Commissions in both California and Oklahoma mandated that SPCC's intrastate services be offered at the same rates as the other current Pacific Telephone and Telegraph Company and Southwestern Bell Telephone Company rate schedules respectively (*id.* at 26–27).

**41.** This chart depicts the percentage of the total toll service represented by private line. *See* Table I.

Table I
## AT&T TOLL SERVICE REVENUES [1]
### 1968-1978

| Year | Message Toll Services (1) | Wide Area Toll Service (2) | Toll Private Line Services | | | | | | | | Other Total Toll Services (11) | Total Toll Services [2] (1)+(2)+(10)+(11) (12) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Telephone (3) | Teletype-writer (4) | Other Tele-graph (5) | TELPAK (6) | Program Trans-mission Audio (7) | Program Trans-mission Video (8) | Other Services (9) | Total [2] (3) to (9) (10) | | |
| | | | | | | ($000) | | | | | | |
| 1968 | $ 5,431,288 | $ 376,405 | $232,345 | $101,485 | $2,733 | $215,471 | $20,558 | $49,753 | $ 41,377 | $ 663,722 | $ 622 | $ 6,472,036 |
| 1969 | 6,201,504 | 462,050 | 260,548 | 110,078 | 2,876 | 276,445 | 21,262 | 58,486 | 56,313 | 786,008 | 626 | 7,450,188 |
| 1970 | 6,685,443 | 505,017 | 284,399 | 101,169 | 2,864 | 349,104 | 18,177 | 76,571 | 69,377 | 901,660 | 41 | 8,042,160 |
| 1971 | 7,311,591 | 590,531 | 298,482 | 98,928 | 3,044 | 358,024 | 18,323 | 76,392 | 84,503 | 932,697 | 44 | 8,834,863 |
| 1972 | 8,208,787 | 753,438 | 347,060 | 93,577 | 3,158 | 368,961 | 18,117 | 79,587 | 110,692 | 1,021,152 | 41 | 9,983,418 |
| 1973 | 9,449,713 | 963,095 | 398,156 | 83,447 | 3,114 | 397,340 | 18,167 | 70,051 | 141,282 | 1,111,508 | 43 | 11,524,359 |
| 1974 | 10,369,982 | 1,182,695 | 411,413 | 75,050 | 3,046 | 438,598 | 18,108 | 65,961 | 164,102 | 1,176,272 | 45 | 12,728,945 |
| 1975 | 11,517,140 | 1,426,961 | 437,921 | 70,744 | 3,133 | 487,446 | 18,980 | 62,015 | 199,555 | 1,279,794 | 352 | 14,224,246 |
| 1976 | 13,184,679 | 1,862,822 | 499,163 | 67,978 | 3,492 | 511,097 | 18,524 | 61,823 | 238,158 | 1,400,236 | 1,756 | 16,399,492 |
| 1977 | 14,629,816 | 2,328,403 | 562,060 | 58,079 | 3,524 | 517,920 | 19,308 | 58,098 | 286,601 | 1,505,589 | 4,324 | 18,468,132 |
| 1978 | 16,663,999 | 2,808,357 | 669,885 | 51,006 | 3,951 | 515,854 | 20,757 | 61,052 | 404,229 | 1,726,733 | 7,540 | 21,206,629 |

[1] The figures shown include overseas revenues. For example, in 1968, overseas MTS revenues were $145,802,000 or 2.68 percent of total MTS, while overseas PLS revenues were $8,657,000, or 1.30 percent of total PLS. In 1978, overseas MTS revenues were $842,957,000 (5.06 percent of total MTS), while overseas PLS revenues were $6,837,000 (0.40 percent of total PLS).

[2] Totals may not add due to rounding.

Source: 1968-1978: Federal Communications Commission, Statistics of Communications Common Carriers, Table 16, 1968-1978.

■ Additionally, all of the charges made by plaintiffs in this case have been limited to private line services, and plaintiffs' damage study reinforces this view of the separation of the private line market. The study examines only interstate circuits (Pace, S–T–156 at 28), is expressly limited to private line business, and envisions an extraordinarily successful company offering private line services alone (Vasilakos, Tr. 3054; Whitaker, S–T–203 at 4). The Court concludes, therefore, that interstate, intercity private line service constitutes a separate market and is the relevant product market within which to assess defendants' alleged monopoly power. This market definition is also in accord with the FCC, where in a recent *Further Notice of Proposed Rulemaking,* the FCC found "MTS/WATS, private line and public switched services traditionally have been viewed by the carriers, the public and this agency as distinct services catering to distinct needs." *Deregulation of Telecommunications Services,* 84 F.C.C.2d 445, 502 (1981).

■ The available market for SPCC's private line services is distinctly more limited than plaintiffs suggest. Plaintiffs propose to include government consumption of telecommunications services, yet the evidence indicates that a significant portion of federal government purchases would not have been open to competition for security reasons.[42] General Jacobsmeyer testified that the specialized common carriers' routes and control centers were deemed to lack "survivability," a factor more determinative than cost (Jacobsmeyer, S–T–163 at 9). AT & T was able to provide the "sole-source" service desired: it could offer centralized management, hardened control centers, and restoral capability (*id.* at 8; Pace, S–T–156 at 42). Based on such important factors, he estimated that more than 75 percent of all Department of Defense private line services would have been purchased from AT & T, almost regardless of cost (Jacobsmeyer, S–T–163 at 4). This is consistent with the testimony of General Paschall, former Director of the Defense Communications Agency, who confirmed that for technical and security reasons, AUTOVON[43] circuits connecting switching centers were purchased from AT & T (Paschall, S–T–164 at 14–16). After April 1975, AUTOVON access[44] lines could be procured competitively (Paschall, S–T–164 at U.S.Tr. 19695), and yet they were still leased entirely from Bell and independent operating telephone companies (*id.* at 19697–98). Only an estimated 20 percent of the military expenditures would not be "sole-sourced," and only about half of this 20 percent available to competition would be located on long-haul, high-density routes where SPCC constructed its facilities (Pace, S–T–156 at 43). This testimony indicates that SPCC was not and could not realistically have been an effective competitor for the bulk of the government's private line business during the relevant period, and thus it should be excluded from the relevant market.[45]

**42.** SPCC was excluded from a significant portion of the federal government purchases by actions of the federal government and not by AT & T. To include this in the market would only increase AT & T's market share, even though that business was not up for competitive bids.

**43.** AUTOVON is a private line telephone system solely for the use of the Department of Defense and is the Department's worldwide direct distance dialing network. It is divided into two parts, one the continental United States, and the other the overseas portion. The overseas portion is owned and operated by the Department of Defense. The continental portion is leased from the Bell System-independent interstate partnership (Paschall, S–T–164 at 14).

**44.** In addition to the explicit sole source policy regarding AUTOVON circuits, AT & T became the effective sole source for many other circuits included in special command and control networks that were initially installed with specialized terminal and switching equipment provided, operated, maintained and managed by AT & T starting in the 1950's and 1960's. *E.g.,* AUTOVON, the Strategic Air Command Primary Alerting System (SAPAS) and the Joint Chief of Staff Alerting Network (JCSAN) (Jacobmeyer, S–T–163 at 4).

**45.** Moreover, when private line AUTOVON circuits (access lines only) were opened for competitive bids in August of 1979, SPCC, as well as the other specialized carriers did not file a bid. Instead, according to General Jacobmey-

For similar reasons, the Court concludes that a nationwide market definition is inappropriate. SPCC's proposed geographic market is overbroad because it includes areas of the telecommunications market in which SPCC either chose not to compete or was not eligible to compete; in fact, plaintiffs seek to define a market irrespective of their own competitive plans. Plaintiffs' evidence has not shown that SPCC ever competed (or intended to compete) with the Bell System over any but the high-traffic density intercity telecommunication routes[46] (Brodman, Tr. 1874–75; Hollis, Tr. 2319). Indeed, SPCC used this strategy as a marketing tool wherein customer(s) were informed:

> "Southern Pacific Communications is a specialized communications carrier offering service only to specific metropolitan areas across the country. By avoiding the smaller, less profitable locations, SPCC provides quality service at prices generally lower than other carriers."
>
> (Letter from David E. Webster, Account Representative to Mr. W.F. Sanders of Algonquin Gas Transmission for a circuit from Brighton, Ma to Washington, D.C. S–4924)

Plaintiffs seek to minimize the significance of their marketing selection, and thus enlarge the relevant market, by suggesting they could have served a greater portion of the country but were precluded by defendants' piece-out restrictions.[47] The Court finds this argument unpersuasive for several reasons. First, SPCC has failed to prove that piece-out was technically acceptable: the evidence, to the contrary, indicates it was unacceptable both to plaintiffs'

technical experts (Grant, Tr. 751) and to potential customers (id. at 750; see also Berner, Tr. 5887). Second, the record nowhere reveals that such an arrangement would be economical, even in the optimistic "but-for" world of plaintiffs' damage study (Berner, Tr. 2933–38; Lim, Tr. 5905–07). Finally, it is clear that SPCC has never shown a serious interest in obtaining piece-out, as it never approached the FCC about the restrictions (Vasilakos, Tr. 874–77), and has only one such circuit in operation today (Grant, Tr. 751). It thus appears that plaintiffs' actual geographic realm of competition represents a deliberate business choice.

In these circumstances, the Court concludes that the geographic scope of the relevant market must accordingly be limited to those high-density city-pairs which SPCC has elected to serve, either in the real world or SPCC's "but-for-world." Additionally, as plaintiffs' damage study and testimony indicate, SPCC did not seek to compete for private line service over extremely short distances (Hieronymus, Tr. 2812; Vasilakos, Tr. 2965; Pace, S–T–156 at 44).

## DEFENDANTS' MARKET POWER

In determining whether defendants have been shown to have violated § 2 of the Sherman Act, the Court's inquiry must be based on two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell

---

er, they found it more profitable to use their plant for switched services. As will be discussed later, this is further evidence of the fact that the private line market is not as profitable as SPCC would have this Court believe. Indeed, the Court is convinced that plaintiffs would never make a profit in private line.

**46.** This sentiment was echoed by Mr. Thomas E. Gleason in his comments regarding the proposed consent decree in the *United States v. AT & T*, Nos. 74–1698 and 82–0192 (D.D.C.) on behalf of seven small independent telephone

companies operating in the state of Kansas, wherein he stated (S–6213 at 3):

> No other Common Carrier (OCC) provides service to our subscribers and we do not anticipate having these services in the future. The profitable markets for OCC services are between more densely populated cities and surrounding communities. Our subscribers must rely on the facilities and service provided by the Bell System.

**47.** The Court will discuss further the piece-out restrictions later in the opinion.

Corp., supra, 384 U.S. at 570, 571, 86 S.Ct. at 1703; See, e.g., United States v. E.I. duPont de Nemours & Co., supra; Melody, PX6–0018 at 19–21; Owen, PX6–0005 at 33–48; Owen, Tr. 961–69, 5684, 5697.

 On the first element, plaintiffs contend that defendants control an overwhelming share of the market, however defined, and thus as a prerequisite, have monopoly power. "[T]he existence of such power ordinarily may be inferred from the predominant share of the market." United States v. Grinnell Corp., supra, at 571, 86 S.Ct. at 1704. That being the case, it is clear that under any market definition, it can be inferred that as a prerequisite, AT & T has monopoly power [48]. As the following tables indicate, AT & T's market share ranged from a high of 95.6% to a low of 66.5% [49].

The following charts indicate that under any market definition, AT & T has an inference of monopoly power.

TABLE II [50]

Market Shares in the Relevant Market
(Excluding Independents)
1973–1978
(Per AT&T Witness Pace, S–T–156 at 62)

| Year | AT&T | Western Union | OCCs | MCCs | PMWs |
|---|---|---|---|---|---|
| 1973 | 79.5 | 10.8 | 0.1 | 1.8 | 7.8 |
| 1974 | 77.4 | 10.5 | 0.7 | 2.9 | 8.5 |
| 1975 | 75.1 | 9.7 | 3.4 | 2.5 | 9.3 |
| 1976 | 68.8 | 9.1 | 9.7 | 3.1 | 9.3 |
| 1977 | 66.5 | 10.0 | 10.4 | 2.8 | 10.3 |
| 1978 | 67.2 | 8.9 | 11.6 | 2.7 | 9.6 |

TABLE III
Market Shares in the Relevant Market
(For AT&T, Witness Pace, S–T–156 at 63)
Including Independents

1973–1978

| Year | AT&T | Independents | AT&T + Inds | Western Union | OCCs | MCCs | PMWs |
|---|---|---|---|---|---|---|---|
| 1973 | 74.5% | 6.3% | 80.8% | 10.1% | 0.1% | 1.7% | 7.4% |
| 1974 | 72.7 | 6.1 | 78.8 | 9.9 | 0.6 | 2.7 | 8.0 |
| 1975 | 70.5 | 6.1 | 76.6 | 9.1 | 3.2 | 2.4 | 8.7 |
| 1976 | 64.8 | 5.7 | 70.5 | 8.6 | 9.1 | 2.9 | 8.8 |
| 1977 | 62.6 | 5.9 | 68.5 | 9.4 | 9.8 | 2.6 | 9.7 |
| 1978 | 64.5 | 3.9 | 68.4 | 8.6 | 11.1 | 2.6 | 9.3 |

48. "It appears that something more than 50% of the market is a prerequisite to a finding of monopoly." Telex Corp. v. International Business Mach. Corp., 510 F.2d 894, 919 (10th Cir. 1975) quoting from Cliff Food Stores, Inc. v. Kroger, Inc., 417 F.2d 203, 207 n. 2 (5th Cir. 1969); See e.g., American Tobacco Co. v. United States, 328 U.S. 781, 797, 66 S.Ct. 1125, 1133, 90 L.Ed. 1575 (1946) (over two-thirds of the entire domestic field of cigarettes, and over 80% of the field of comparable cigarettes constituted a substantial monopoly); United States v. Grinnell Corp., supra, 384 U.S. at 571, 86 S.Ct. at 1704 (87%); United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948) (70%); Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 834 (1911) (90%); Amplex of Md. Inc. v. Outboard Marine Corp., 380 F.2d 112 (4th Cir.1967) cert. denied, 389 U.S. 1036, 88 S.Ct. 768, 19 L.Ed.2d 823 (1968) (60%).

49. This range is based upon all of the alternative relevant markets as shown below.

50. Both Table II and III represent the market shares for the relevant market in this proceeding, defined as the market for the provision of intercity, interstate private line, other than short-haul service, to business and non-sole-source government users located in high-density cities. This market definition accurately reflects the arena within which SPCC and AT & T competed during the relevant time period as well as the arena in which plaintiff realistically might have competed but for the alleged anti-competitive AT & T conduct which it challenges. (See also Pace, S–T–156 at 61).

TABLE IV [51]

Market Shares in the Adjusted Domestic Interstate Toll
Private Line Market
(Excluding Independents)

1973–1978
(Per SPCC Witness Owen, PX6–0005 at 32)

| | AT&T | Western Union | MCCs | SCCs | Satellite Carriers |
|---|---|---|---|---|---|
| 1973 | 85.8% | 11.1% | 3.1% | 0.0% | * |
| 1974 | 86.4 | 10.9 | 1.9 | 0.7 | 0.0 |
| 1975 | 84.6 | 10.6 | 1.8 | 2.8 | 0.3 |
| 1976 | 79.9 | 10.1 | 2.3 | 6.4 | 1.3 |
| 1977 | 77.7 | 9.9 | 1.9 | 8.5 | 1.9 |
| 1978 | 77.5 | 8.4 | 1.9 | 9.9 | 2.4 |

* No companies operating

TABLE V

Market Shares in the Adjusted Domestic Interstate Toll
Private Line Market
Including Independents

1973–1978
(Per SPCC Witness Owen, PX6–0005 at 29)

| Year | AT&T | Independents | AT&T + Ind | Western Union | MCCs | SCCs | Satellite Carriers |
|---|---|---|---|---|---|---|---|
| 1973 | 78.0% | 8.1% | 86.1% | 11.0% | 2.8% | 0.0% | * |
| 1974 | 78.4 | 8.4 | 86.8 | 10.8 | 1.8 | 0.7 | 0.0 |
| 1975 | 76.6 | 8.6 | 85.2 | 10.5 | 1.6 | 2.5 | 0.2 |
| 1976 | 72.5 | 8.4 | 80.9 | 10.0 | 2.1 | 5.8 | 1.2 |
| 1977 | 70.0 | 8.9 | 78.9 | 9.8 | 1.7 | 7.7 | 1.7 |
| 1978 | 72.4 | 6.0 | 78.4 | 8.3 | 1.8 | 9.3 | 2.2 |

* No companies operating

51. The principal difference between the market share analysis of Dr. Pace (Table II and III) and Dr. Owen (Table IV and V) is that Dr. Pace includes the market share of private microwave systems and Dr. Owen does not.

TABLE VI [52]

Market Shares in the Domestic Intercity Business Telecommunications
Service Market
(Excluding Independents)
(Per SPCC Witness Owen, PX6–0005 at 22)

| Year | AT&T | Western Union | MCCs | SCCs | Satellite Carriers |
|------|------|---------------|------|------|--------------------|
| 1973 | 95.0 | 4.5 | 0.5 | 0.0 | * |
| 1974 | 95.4 | 4.2 | 0.3 | 0.3 | 0.0 |
| 1975 | 95.3 | 4.0 | 0.2 | 0.4 | 0.0 |
| 1976 | 95.1 | 3.6 | 0.3 | 0.9 | 0.2 |
| 1977 | 95.1 | 3.3 | 0.3 | 1.1 | 0.3 |
| 1978 | 95.3% | 2.9% | 0.2% | 1.3% | 0.3% |

* No companies operating

TABLE VII

Market Shares in the Domestic Intercity Business Telecommunications
Service Market
Including Independents
1973–1978
(Per SPCC Witness Owen, PX6–0005 at 18)

| Year | AT&T | Independent Telephone Companies | AT&T ÷ Ind | Western Union | MCCs | SCCs | Satellite Carriers |
|------|------|--------------------------------|------------|---------------|------|------|--------------------|
| 1973 | 81.3 | 13.8 | 95.1 | 4.5 | 0.4 | 0.0 | * |
| 1974 | 81.2 | 14.3 | 95.5 | 4.2 | 0.2 | 0.1 | 0.0 |
| 1975 | 81.2 | 14.3 | 95.5 | 4.0 | 0.2 | 0.3 | 0.0 |
| 1976 | 80.9 | 14.4 | 95.3 | 3.6 | 0.3 | 0.7 | 0.1 |
| 1977 | 80.7 | 14.6 | 95.3 | 3.3 . | 0.2 | 0.9 | 0.2 |
| 1978 | 80.4% | 15.2% | 95.6% | 2.9% | 0.2% | 1.1% | 0.3% |

* No companies operating

---

Having met the first prerequisite (inference of monopoly power), the Court must focus its attention on the question of whether defendants have the ability to control prices or entry in that market. *United States v. Grinnell Corp., supra; United States v. E.I. duPont de Nemours & Co., supra;* Melody, PX6–0018 at 19–21; Owen, PX6–0005 at 33–48; Owen, Tr. at 961–69, 5684, 5697. The plaintiffs contend that the defendants have attempted to deter or impede market entry. Moreover, the plaintiffs contend that the defendants have a monopoly in the relevant market by virtue of the various barriers to market entry—such as the regulatory process, AT & T's

control of "essential facilities," substantial capital expenditures, risk disparities, AT & T's enormous size, and customer brand loyalty. The defendants counter by contending that market share is misleading, pointing to rapid entry into the market and erosion of their market share, and further that the exercise of regulatory controls over entry, interconnection and pricing negates whatever market power they might otherwise possess.

The plaintiffs first contend that the regulatory process operates as a barrier to entry into the telecommunications market (Melody, PX6–0005 at 19). In order to enter the market, new entrants, like SPCC, must ob-

**52.** Both Tables VI and VII are based on the plaintiffs' definition of the relevant market. However, the Court has rejected the plaintiffs' definition as overbroad as shown above.

tain microwave licenses and other entry and construction permits from the regulatory authority (*id.*). The time and delays involved in obtaining the necessary permits may impair a competitor's willingness and ability to enter the market (*id.*). The plaintiffs further contend that AT & T has the ability to increase these costs and delays and discourage entry by opposing the applications of SPCC and other specialized common carriers attempting to enter the market without regard to the merits (Owen, PX6–0005 at 33) and that AT & T realized that opposition of SPCC's state certification before the California Public Utilities Commission would result in delay of SPCC's in-service date.[53] (PX1–0046 at LA1N 2209).

■■■ Upon a careful review of this contention, the Court finds that the plaintiffs are wrong. First, it is the FCC not AT & T that requires new entrants, like SPCC to obtain the necessary microwave permits. 47 U.S.C. § 214. Moreover, AT & T has a right to file comments to the new applications, just like any other interested party, which right is protected under the *Noerr-Pennington* doctrine and by the Federal Communications Act of 1934. Any delays that result from AT & T's petitions in this regard are a result not of AT & T's attempt to obfuscate the issues, but rather of the various regulatory bodies' close scrutiny of the obviously meritorious petitions.[54] The Court notes that the various regulatory commissions have been in business for a long time and should be able to separate the wheat from the chaff. From personal experience this Court knows the Commission at the State and Federal levels are really very sophisticated and knowledgeable about their responsibilities. The Court also notes that the plaintiffs' statements regarding

the California Public Utilities Commission, above, are inaccurate. It was not AT & T's petition that caused any delays, but rather, it was the California PUC's dissatisfaction with SPCC that caused the delay, and plaintiff's presented no evidence to the contrary.

■■■ Likewise, any construction permit delays were not the fault of AT & T. Rather, they were the result of delays SPCC experienced in obtaining construction permits from various cities. In Mr. Grant's April 14, 1975, SPCC report for the Board of Directors meeting, he points out (S–3519 at 3PLA0837):

All sites for microwave construction on the Washington, D.C., New York segment have been under option for a number of months however, we have encountered severe opposition in five sites by civic groups working with local planning boards and zoning commissions. These last minute interventions will inevitably cause construction delays.

Again, at a staff meeting on February 17, 1976, it was pointed out that SPCC was having site acquisition problems. (S–4099 at 2). Surely, these problems were not caused by AT & T.

Moreover, the grant of entry and construction permits, though necessary, is not a sufficient condition for successful entry into the market (Owen, PX6–0005 at 46). In order to provide service, entrants into the market must also obtain interconnections with local exchange carriers (Owen, PX6–0005 at 42; Melody, PX6–0018 at 20; Grant, PX6–0004 at 4; Grant, Tr. 659–60; Pace, Tr. 4866; PX1–0120 at ¶ 62). For nearly all metropolitan areas in the nation, the local carriers are the Bell operating companies—monopoly subsidiaries of AT &

---

**53.** AT & T witness Brauetigam admitted that Bell had incentives to use the administrative process to delay realization of the FCC's pro-competitive policies, but not that AT & T did that in fact (Brauetigam, Tr. at 5044–45; *see also* PX7–0126 at 227–29). It is the Court's opinion that any resultant delay was the result of the FCC's inaction and/or ineptness, as well as known regulatory lag which is so common in these proceedings.

**54.** The plaintiffs have not cited one instance where any regulatory agency, either at the federal or state level has found the comments of the defendants frivolous or that defendants opposition or activity at the regulatory level contrary to the Common Carriers position was a sham. On the contrary they were nothing more than the exercise of defendant's legitimate regulatory rights as well as their rights under the First Amendment to the Constitution.

T [55] (Grant, PX6–0004 at 1–2; Melody, PX6–0018 at 20; Pace, Tr. 4866).

The plaintiffs contend that the local interconnection facilities cannot be duplicated by AT & T competitors [56] and that AT & T witnesses Pace and Phillips agreed that these are "essential facilities or bottlenecks," [57] to which access is necessary in order for the specialized common carriers to provide service (Phillips, Tr. at 5440–41; Pace, Tr. at 4866).

■ Through its control of "essential interconnection facilities," plaintiffs contend that AT & T possessed the power to exclude competitors or to disadvantage competitors by granting them access to facilities on terms less favorable than those imposed upon the defendant's Long Lines department. (Owen, PX6–0005 at 42; Melody, PX6–0018 at 20–21). However, the Court finds that the plaintiffs have ignored a very important factor. That is the power of the FCC to mandate interconnection pursuant to 47 U.S.C. § 201(a). [58] Indeed, as previously pointed out and bears repetition here Commissioners Robert E. Lee and James J. Wadsworth pointed out in their dissent in *Application of Microwave Communications, Inc.,* 18 F.C.C.2d 953, 973 (1969) Docket No. 16509, (Decision) wherein they stated:

One of the basic unresolved propositions in this case is how the FCC can expect MCI, who at best possesses extremely marginal financial qualifications,

to invest $564,000 which again is a questionable estimate of costs, for a microwave system, which is presumably designed for service to the public *without also ruling on the interconnection issues.* MCI proposes only a backbone route which will require that the customer make separate arrangements for the local loops from the MCI pickup and terminal points. The local loops will have to be provided by other communication common carriers now serving the areas.

*Actually, what is implied or overlooked in a grant of these applications is that there has taken place, in fact, a prejudgment that we will order interconnection of the MCI facilities with existing landline carriers for the local loops. Such prejudgment is in violation of section 201 of the act which requires, in part, that the Commission may order the interconnection, "—after an opportunity for hearing, finds such action necessary or desirable in the public interest—"* (Emphasis supplied.)

Accordingly, the Court does not find the interconnection issue a barrier to entry. [59]

■ The plaintiffs next contend that the substantial capital outlays and lengthy construction programs that are required to enter the intercity telecommunications market are also barriers to entry (Owen, PX6–0005 at 33; Melody, PX6–0018 at 19–20). This is in addition to the enormous size of AT & T and the corresponding risk that

---

**55.** The independents also provide interconnections in the same fashion as AT & T, yet they have not been sued.

**56.** The local facilities can be duplicated by AT & T competitors but it would not be economically feasible at this time. Moreover, there is an increasing concern, at least by the independents that the new "by-pass" technology would obviate the need for the intercity carriers to interconnect with the local exchanges. (*See also,* Comments of Mr. V. Louise McCarren of Vermont, S–6192 at 3).

**57.** The question of what constitutes essential facilities or bottle-necks will be discussed later. For present analysis, the Court will acknowledge that SPCC must have access to the local operating companies of both Bell and the independents for their interconnections.

**58.** Section 47 U.S.C. § 201(a) provides:

(a) It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.

**59.** Whether AT & T did in fact manipulate the interconnections is a question of fact which will be discussed later.

new entrants must undertake. The costs associated with entry are increased by the nature of consumer demand, which is national in scope (Owen, PX6–0005 at 33–35; Melody, PX6–0018 at 19–20). Because of this demand, firms entering the market must build as large a network as possible in order to be attractive to most users.[60] (Owen, PX6–0005 at 33–35; Melody, PX6–0018 at 19–20). Moreover, this system must be built against the competition from the defendants that in 1973, when SPCC first entered the market, had total assets of $67 billion, local service revenues of $11 billion, toll service revenues of $12 billion, and overall operating revenues of $23 billion. (Owen, PX6–0005 at 37–40). Due to the size of AT & T, the plaintiffs contend that the new entrants are also faced with the risk of losses or extinction from any alleged anticompetitive actions on the part of AT & T (Melody, PX6–0018 at 19; Owen, PX6–0005 at 41).

Once again, the Court fails to see how the defendants can be charged with monopoly power merely because of defendants' size and the fact that large amounts of capital are required for entry into the telecommunications business. Upon a review of these contentions, the Court finds that the testimony of Dr. Pace is right on point wherein he states (S–T–156 at 78–9):

> Available information reveals that a complete DOMSAT system, consisting of three satellites (two in orbit and one spare) and the necessary earth stations, requires an investment of $100 million to $200 million. A reasonably extensive terrestrial microwave network may involve somewhat more investment. For example, as of the end of 1980, SPCC had a gross investment of $215 million in communications plant. MCI had approximately $150 million invested in communications plant by the time it first achieved significant profitability. As discussed below, such outlays are not large relative to the sizes of firms that have entered or considered entering this market. How-

ever, there are several reasons why it would be an oversimplification to view even outlays of this magnitude as required for entry. First, OCCs can concentrate on serving limited geographic areas and meeting specialized telecommunications needs. Moreover, since 1976, it has been possible to lease facilities to fill out the system as needed. Indeed, today it is entirely feasible to begin providing interstate telecommunications services as a resale carrier with a very small capital investment and, over a period of years, to begin constructing the links in one's own system at the most profitable points. Second, history demonstrates that the market can be entered on a much smaller scale by sharing capital-intensive facilities. AMSAT, for example, entered the business by purchasing a 20 percent interest in Western Union's Westar satellites. In the future, Hughes plans to offer individual satellite transponders for sale.

In sum, to say that entry into the provision of intercity telecommunications services requires hundreds of millions of dollars fails to recognize the leasing and ownership sharing arrangements that have existed for the past five years. Entry can be achieved without vast capital outlays.

Beyond this, the interstate telecommunications services market already has attracted a number of very large firms operating in related businesses, such as communications and computer equipment. For example, IBM, ITT and RCA have assets of $26.7 billion, $15.4 billion and $7.1 billion, respectively, which ranks each of them among the 50 largest industrial corporations in the United States. In addition, they each had net income in 1980 exceeding $300 million. These firms clearly would have less difficulty raising capital than would a smaller company such as MCI. As previously noted, however, even MCI was able to obtain "the largest financing ever for a start-up, non-

---

**60.** There is, however, room for a specialized common carrier to build a small system to cater to a particular geographic area.

operating company" (McGowan, Tr. 3609). Nothing has been presented to show that capital requirements have in the past, or are expected in the future to pose a substantial barrier to entry into this market.

■ Among users of intercity telecommunications service, there is an enormous amount of "brand loyalty" associated with AT & T that plaintiffs' contend operates as a barrier to market entry (Owen, PX6–0005 at 41). New entrants, like SPCC, can overcome this loyalty only by providing either higher quality service or lower prices for equivalent quality service (Owen, PX6–0005 at 41; Burke, S–T–8, tab C at 22338).

With respect to brand loyalty to AT & T, the Court again is unable to see how this indicates that AT & T possess monopoly power in the relevant market. The fact of brand loyalty can be attributable to the quality of the service of AT & T which has developed from the fact that for over 80 years, AT & T was the legal and regulated monopoly provider of telecommunication service.

■ After reviewing the evidence, the Court is unable to conclude that defendants have been shown to possess monopoly power in the relevant market. A striking factor to the Court is the remarkable pace of entry by new firms. Based upon plaintiffs' own calculations,[61] defendants' share of the private line market dropped approximately 10 percent between 1973 and 1977, and during that period, the specialized carriers, on an incremental basis, gained a higher and higher share of the market (Owen, PX6–0005 at 29, Table 3; PX1–0241, Table 5; Owen, Tr. 1035). It is clear that defendants' market share declined very rapidly, and such decline would appear more consist-

ent with a lack of monopoly power than with its possession (Pace, Tr. 4845). Plaintiffs' expert, Dr. Owen, could not name any other industry where new entrants captured so high a percentage of the market in the first five years of their existence (Owen, Tr. 1037–38). Moreover, in response to a question from the Court, Dr. Owen admitted that if the market figures show anything, they show the absence of anticompetitive conduct by defendants and the success of the FCC's policy to foster competitive entry (Owen, Tr. 1035–38).

The success of that policy is certainly shown by the fact that, according to defendants' witnesses, there are approximately forty to fifty competing carriers now, and new entrants in the market are appearing every week (T.P. Marshall, Tr. 4020–21).[62] In New York alone, during the time period relevant to this case, there were six to eight national "non-reseller/non-international record carrier/non-Western Union" specialized common carriers (T.P. Marshall, Tr. 4025). While there have been a few mergers by the original entrants (Hough, Tr. 3551), approximately ten of the early entering carriers are still providing private line service (id.). Entry continued to occur, and existing firms expanded their commitment to the business, even after competitive responses by AT & T (Pace, S–T–156 at 73). The growth of the major specialized common carriers and domestic satellite carriers has been vigorous, with estimated revenues increasing from under $1 million in 1973 to over $180 million in 1978 (id.). This pattern of rapid and vigorous entry after regulatory or court decisions permitting competition strongly suggests to this Court that the market has not been characterized

---

61. This is true regardless of which set of plaintiffs' calculations are reviewed. In preparation for his rebuttal testimony, Dr. Owen "adjusted" his earlier calculations to reflect the evidence proffered by defendants. Dr. Owen's earlier figures showed a decline from 85.8 percent to 77.7 percent (Table IV at 68); his subsequent calculations reflect a decline from 80.9 percent to 71.4 percent (PX1–0241 at Table V). Thus, the earlier figures show a drop of nearly ten percent, and the subsequent figures show a

drop of greater than ten percent. Defendants' calculations are quite similar, showing a decline from 79.5 percent to 66.5 percent (Pace, S–T–156 at 62).

62. The current total number of competitors includes both terrestrial and satellite carriers, vying for the same business (Hough, Tr. 3551). Resale carriers as well augment the number of competitors (Hough, Tr. 3552).

by significant barriers to entry other than regulatory prohibition (*id.*).[63]

*The momentum of the growth of SPCC alone undercuts any notion that defendants possessed the power to control the relevant market. In this regard, the West Coast experience of plaintiffs is demonstrably relevant. The record indicates that, while at the end of 1974 there were fewer than 400 SPCC circuits in the territory served by Pacific Telephone, by the end of 1975 the number had increased six-fold; at the end of 1976 that number had nearly doubled; by the end of 1977, there was a virtual 100 percent increase over the previous three-year total* (Schwartz, Tr. 4595). *Moreover, SPCC's revenues rose from virtually zero in 1973 to almost $50 million in 1978* (Pace, S–T–156 at 69–70). *It is difficult to conceive of such an explosive growth rate in a context of monopoly power.*

The Court finds this evidence of market trends to be significant. As Dr. Owen conceded, market trends are important indicators of market power (Owen, Tr. 1034), particularly where, as in this case, competition was legally impermissible until 1971. Such a regulatory barrier to entry deprives the market share data presented by plaintiffs of much of their force as a guide to defendants' market power.[64] As the *Report of the Attorney General's National Committee to Study the Antitrust Laws* stated, "[t]he ultimate test of freedom of entry is the appearance of new rivals." *id.* at 375 (1975); see also *Transamerica Computer Co. v. IBM Corp.*, 481 F.Supp. 965, 980 (N.D.Cal.1979).

There is another major respect in which the evidence does not support a finding of monopoly power in the relevant market. There is no dispute among the parties that the FCC and state regulatory agencies have exercised active control over the overall level of earnings of defendants, such that the attainment of monopoly profits is foreclosed (Agreed Facts 7–4–007–010).[65] As Dr. Owen admitted, responding to the Court, defendants could not charge "one nickel more" for their services than the FCC would allow (Owen, Tr. 5698–99). Had defendants been allowed to exploit fully their economies of scale, they could clearly have limited new entry into the market (Pace, S–T–156 at 77; see Phillips, S–T–173 at 30). To assure the availability of telephone service at reasonable rates, however, both the FCC and the state regulatory agencies have insisted on establishing rates designed to limit strictly defendants' earnings (Hough, S–T–1 at 16). Defendants were under "total" rate of return regulation (deButts, Tr. 4061), and the history of defendants' earnings denies any suggestion that monopoly profits were assured under that regulation (deButts, Tr. 4061–62). The rate of return authorized by the FCC has been keyed to its determination of AT & T's cost of capital (Agreed Fact 7–4–008). However, defendants' actual earnings on their interstate operations have neither kept pace with their authorized rate of return nor with the rising cost of capital. In fact, although the FCC had authorized a

---

**63.** Regulation may also have the effect of artificially inducing entry, if the regulator limits the ability of incumbents to make normal competitive responses (Pace, S–T–156 at 6)—(a situation the Court finds to have occurred here.) By so doing, the regulator may create an environment within which inefficient firms can enter and survive (Pace, S–T–156 at 83), at the expense of the public, particularly in a field such as the telecommunications industry.

**64.** As Dr. Owen suggested, such barriers to entry render market share data less significant in this case than in others (Owen, Tr. 5697). It should also be noted that the market share data overstate defendants' alleged market power in another way. Dr. Owen apparently used revenues attributable to both switching and trans-

mission services in calculating defendants' market share (Owen, Tr. 1044–46). This inclusion tends to result in an overstatement of AT & T's market share since the shares for the competing carriers were derived only from revenues attributable to transmission services (Pace, S–T–156 at 4, 64). As Dr. Owen conceded, even if defendants were driven completely out of the private line market, his method of deriving market shares could still show defendants with a dominant share of the market (Owen, Tr. 1046).

**65.** Attributable to this intensive regulation is the fact that, during some years in the 1930s and 1940s, AT & T did not earn the dividends it paid (deButts, Tr. 4065).

rate of return of 9.5 to 10 percent in 1975, AT & T's actual earnings on interstate operations in 1976, as reported to the FCC, were 9.2 percent—less than the Commission had authorized (Agreed Fact 7–4–011). Similarly, many commissions have authorized returns well below the interest rates necessary to market defendants' long-term bonds (Hough, S–T–1 at 16). As hereinafter discussed more fully, the Court finds plaintiffs' effort to question the clear implication flowing from this kind of regulatory control of earnings, through hypothetical and unsupported testimony of so-called "cross-subsidy," to be unpersuasive. Where regulatory control over earnings negates an alleged monopolist's ability to earn monopoly profits, a finding of monopoly power then becomes highly questionable as is the case here. *See, e.g., Almeda Mall, Inc. v. Houston Lighting & Power Co.,* 615 F.2d 343, 354 (5th Cir.), *cert. denied,* 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980); *Mid-Texas Communications Systems, Inc. v. American Tel. & Tel. Co.,* 615 F.2d 1372, 1387 (5th Cir.), *cert. denied,* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980). Indeed, as the FCC recently noted in a broad investigation into rate and entry regulation in the communications industry, the statutory framework and legislative history of Title II of the Communications Act clearly show that the regulatory scheme was designed "primarily to constrain the market power of communications suppliers" and to prevent "the problems associated with monopoly control or market power." *Policies and Rules Concerning Rates for Competitive Common Carrier Services and Facilities Authorizations Therefore,* 84 F.C.C.2d 445, 457, 459 (1981).

■ The Court is also unpersuaded by plaintiffs' claim that defendants exercised monopoly power by manipulating the terms and conditions under which new entrants could interconnect with Bell operating company facilities. If the market were unregulated, ownership by one firm of facilities to which others require interconnection might indicate the existence of monopoly power (Pace, S–T–156 at 79). However, Section 201(a) of the Communications Act of 1934, as well as other statutory provisions, give the FCC full power to control and regulate interconnection practices. Even if all of the interconnection refusals and other actions attributed to defendants occurred as alleged—which the Court concludes herein did not take place—there is nothing in this record to show that those actions were effective in preserving any control by defendants over the scope of the new carriers' market. Similarly, there is nothing to suggest any potential carriers were dissuaded from entering the market because of defendants' interconnection policies (Pace, S–T–156 at 80). In fact, the record shows that the FCC stood ready, willing and able to intervene whenever plaintiffs or other new entrants believed that defendants were treating them unfairly (see Kelley, S–T–59).

Thus, with respect to the charge that defendants delayed the specialized carriers' entry by breaking off negotiations and filing tariffs with state regulatory agencies covering the provision of local distribution facilities, the record confirms that the FCC, acting *sua sponte,* resolved these disputes within a week of the time that defendants informed the Commission that they intended to file such tariffs (Grant, PX6–0004 at 13; Miller, PX6–0002 at 11).[66] Similarly, notwithstanding the uncertainty with respect to the scope of the new carriers' authorized services described above, the FCC resolved expeditiously the issues of interconnection for the provision of FX/CCSA services, for intercity facilities, and for customers outside specified local distribution areas when these matters were raised. Thus, the FCC issued an order to show cause to defendants relating to these mat-

**66.** AT & T notified the FCC on September 28, 1973 that it intended to file tariffs with state regulatory commissions covering the provision of local distribution facilities to specialized carriers. On October 4, 1973, FCC Chairman Burch sent AT & T a letter directing that these tariffs be filed instead with the FCC, and they were so filed with the Commission within four days. (PX1–0055).

ters on December 13, 1973, before SPCC began operations, and required defendants to respond to MCI's contention that such interconnections were required. *Bell System Tariff Offerings of Local Distribution Facilities for Use by Other Common Carriers* (Docket No. 19896), 44 F.C.C.2d 245 (1973). The FCC fully resolved these matters by its order of April 23, 1974 (46 F.C. C.2d 413).

The Commission also appears to have responded promptly to complaints about the technical manner in which defendants provided interconnections to SPCC and the other specialized carriers. When SPCC and others complained about the tariffs filed by AT & T on May 3, 1974, to implement the FCC's April 23 order, within two months the Commission instituted an investigation into the technical details of those complaints (SPCC Participation in Significant Private Line Proceedings (SPCC Lawyers' Exhibit); Kelley, S–T–59 at 11). Although the FCC has been unable to address effectively the discrimination question, given the complexity of the problems, the Court believes that the FCC dealt with these questions expeditiously, ultimately allowing the parties to work out a settlement agreement under its supervision. See *AT & T, Offer of Facilities for Use by Other Common Carriers* (Docket No. 20099), 52 F.C.C.2d 727, 732 (1975).

Plaintiffs were unable to point to any allegedly anticompetitive practice involved in this case which could not have been resolved by the FCC (Vasilakos, Tr. 2960–74). Moreover, the record supports defendants' position that those issues which were brought before the Commission, *e.g.*, the interconnection and technical issues outlined above, were promptly addressed (Vasilakos, Tr. 2971–73). In fact, Mr. Kopf, SPCC's General Counsel, conceded that the FCC had "given SPCC consideration beyond that normally expected of a regulatory

agency" (Kopf, Tr. 496). The cumulative effect of this history suggests strongly to the Court that AT & T lacked the power to prevent, or even significantly to delay, entry in the relevant market.

The record also fails to support plaintiffs' claim that defendants enjoyed the freedom to control prices in the market (see Owen, Tr. 5698–99). In the Court's view, this conclusion follows from several factors. First, every AT & T tariff at issue in this case was the subject of FCC proceedings, and the Commission fully exercised its authority to suspend, investigate or declare "unlawful" any interstate rate proposed by defendants. Second, the Commission imposed a requirement that AT & T secure "special permission" before it could even file a tariff adjusting its private line rates (Hough, S–T–1 at 58; deButts, S–T–131 at 62). Although that requirement was subsequently declared to be unlawful, *American Tel. & Tel. Co. v. FCC,* 487 F.2d 865 (2d Cir.1973), AT & T was not able to file the Hi/Lo tariff for nine months—from February 1973, when it sought special permission, until November 1973, after the Court of Appeals issued its decision. The Hi/Lo tariff did not actually go into effect for another seven months, until June of 1974 (Brodman, Tr. 1786; Grant, PX6–0004 at 22). Thus, for almost 2½ years after the initial specialized carrier, MCI, went into business, defendants were unable to implement a competitive pricing response. Third, AT & T was also prohibited from eliminating its Telpak tariff from July 1977 until May 1981 as a result of an injunction issued by the Court of Appeals for this Circuit (Tr. 1817, 2277, 2286; Hough, S–T–1 at 38–40).[67]

Far from confirming plaintiffs' contention that defendants possess the power to control prices and entry in the relevant market, the Court concludes that the evidence does not establish the required showing of defendants' monopoly power within

---

**67.** Another indicator of AT & T's relative lack of power to control market prices concerns the standard by which the FCC purported to assess AT & T's tariffs. AT & T maintained that its private line rates should be based upon long run incremental costs (Baumol, S–T–4 at 48;

Aldrich, S–T–28 at 10). The FCC imposed a fully distributed cost standard upon AT & T, however (Baumol, S–T–4 at 48; Johnston, S–T–5 at 4), and the record shows that fully distributed costs would normally be expected to exceed incremental costs.

the meaning of Section 2 of the Sherman Act.[68]

## INTENT TO MONOPOLIZE

Plaintiffs argue that even if none of the conduct of the Bell System considered alone is predatory or anticompetitive, taken together, and viewed in light of various documents that are alleged to show defendants' anticompetitive intent, the Court should conclude that there was a deliberate plan, conceived at AT & T headquarters and carried out at every level of the Bell System, to destroy the business of plaintiffs and other non-Bell telecommunications carriers. (Tr. 311; 1443–45; 786–866; 1614–1617; 1625–1629; 2171–2178; 2182–2183; 3134–3163).

This theory of the case is based primarily on the decision in *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). In that case, the Supreme Court held that it was error for the Court of Appeals to divide an antitrust conspiracy case into five separate episodes, and to judge the sufficiency of plaintiffs' case as to each episode as though it were a separate lawsuit. (*id.* at 698–99, 82 S.Ct. at 1410). The Court observed that "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each"; and that the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a

whole ..." (*id.* at 699, 82 S.Ct. at 1410). In considering the claim by the defendants that one of the acts which they were alleged to have committed pursuant to the conspiracy was in fact lawful, the Court stated, in the dictum on which the plaintiffs in this case apparently rely, that "acts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme" (*id.* at 707, 82 S.Ct. at 1414).

It is by no means certain to the Court that the rule of *Continental Ore* is intended to stretch so far as plaintiffs suggest. The acts complained of in *Continental Ore*, unlike the actions with which the defendants in this case are charged, were alleged to be part of a conspiracy to monopolize, and included such plainly unlawful conduct as price-fixing and joint refusals to deal (*id.* at 693, 82 S.Ct. at 1407). The Court is satisfied that nothing in *Continental Ore* requires a conclusion that a defendant that has not engaged in an unlawful conspiracy, and has committed *no* acts in themselves violative of the Sherman Act, could be found guilty of antitrust violations on some theory that the acts have "synergistic effects" that convert lawful conduct into violations of law.[69] Such a doctrine, with its potential for converting entirely innocent conduct into violations of law, would at the very least demand careful and sparing application. Indeed, the Court may direct its inquiry to determine whether the acts in question constitute reasonable, pro-

---

**68.** By finding that AT & T lacks monopoly power in the relevant market, it would generally be unnecessary for the Court to decide the second element, *i.e.*, whether AT & T unlawfully acquired and/or maintained their monopoly power. However, the Court will address all of the issues raised by the plaintiffs to further elucidate the Court's findings that AT & T did not violate § 2 of the Sherman Act.

**69.** As the Court reads the relevant decisions, the courts have uniformly held that where multiple claims of anticompetitive conduct are advanced, these claims must be separately considered in the context of the evidence as a whole. Moreover, once a claim is found to be without merit, such a claim cannot be used as a basis for finding other claims to constitute a

violation of the antitrust laws because treating such claims collectively "cannot have any synergistic effect" and thus cannot support a charge of Section 2 monopolization. *Northeastern Tel. Co. v. Am. Tel. Co.*, 651 F.2d 76 at 95 n. 28 (2nd Cir.1981); *California Computer Products, supra*, 613 F.2d at 746 (rejecting a claim that a "course" or "pattern" of lawful conduct could nevertheless constitute a Section 2 violation because "there can be no synergistic result ... from a number of acts none of which show causal antitrust injury"); *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921, 928 (2d Cir.1981) (holding that "[e]ven though many of the issues ... are interrelated and interdependent ... we must ... analyze the various issues individually").

competitive conduct for a "monopolist." *See California Computer Products v. International Business Machines Co.,* 613 F.2d 727, 746 (9th Cir.1979).

Fortunately, it is not necessary for the Court to decide whether plaintiffs' expansive reading of *Continental Ore* can be justified. Even if the Court were to assume that a series of entirely lawful actions can somehow be converted into an antitrust violation through evidence that they were undertaken with anticompetitive intent, plaintiffs' evidence does not approach the standard for proof of such intent under the applicable case law.

Plaintiffs' proof on the issue of intent falls into two broad categories. First, plaintiffs have introduced a series of transactional episodes which are alleged to represent substandard service by defendants to SPCC, and from which (without any direct evidence of unlawful intent) they apparently ask that an inference of anticompetitive purpose be drawn. Second, plaintiffs have introduced a group of documents in which AT & T employees express concern over its competitive position and ability to meet its public service obligations.[70]

In the Court's view, the first kind of evidence shows at worst that SPCC was dissatisfied with the service provided to it by defendants, and is plainly insufficient to show anticompetitive purpose. This very issue, in fact, was recently addressed by the Court of Appeals in the *Northeastern* case. In rejecting a claim that defendants had deliberately provided inferior service to the customers of a competitor, the Court of Appeals stated (651 F.2d at 94):

"[A]ppellee's proof cannot pass muster even under the generous *Continental Ore* standard. Northeastern did not introduce any evidence whatsoever that SNET provided appreciably poorer service to Northeastern's patrons than it did to businesses using SNET equipment. Similarly, there was not a scintilla of evidence that SNET's failure to provide better service to plaintiff's customers was intentional. Northeastern merely demonstrated that SNET often underestimated the time necessary to cure various electrical malfunctions, including 'changeover' problems—*i.e.,* those arising when Northeastern's equipment was connected into SNET's telecommunications system. This evidence was insufficient to sustain a finding that SNET deliberately acted to stifle competition. Cf. *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 508 F.2d 547 (1st Cir.1974), *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975). This portion of the jury's verdict also cannot stand."

Here, as in *Northeastern,* the plaintiffs' evidence concerning defendants' provision of service shows at most that defendants' installation and repair performance was less than perfect. Considerably more is required to convert this record into proof of an antitrust violation: it must be shown that defendants adopted and carried out a deliberate policy of providing inferior installation and repair service to plaintiffs.[71] However, the evidence of record conclusively establishes that the policy of AT & T at the highest corporate levels was to provide plaintiffs and other specialized carriers with the facilities and services that

**70.** Plaintiffs also contended that defendants "priced without regard to costs," thus giving rise to an inference of anticompetitive intent. However, as the Court concluded below, this theory is absolutely devoid of support in the record, and thus, no such inference can properly be drawn.

**71.** The mere fact that there are problems—even significant problems—in a complex business arrangement does not suggest to the Court that one of the parties is intentionally seeking to injure the other. Problems in such situations are inherent. As discussed more fully below, plaintiffs encountered the same or worse problems in dealing with the independent telephone companies as they did in dealing with the Bell System (Grant, Tr. 658–59). Moreover, SPCC's internal problems, described as a "mess" by Mr. Vasilakos (Vasilakos, Tr. 3086–88), appear to have been far greater than those encountered in dealing with defendants. It is significant that although plaintiffs ask this Court to infer that defendants intentionally impeded SPCC, SPCC's own employees were not willing to draw such an inference (Gundy, Tr. 1305–06).

they required expeditiously and efficiently, that substantial steps were taken both at AT & T and at the operating companies to implement that policy and that the policy was, in fact, implemented. Far from showing anticompetitive intent, the Court concludes that the record conclusively establishes the opposite.

■ The second kind of evidence relied on by plaintiffs consists of documents and speeches of AT & T management containing alleged expressions of anticompetitive intent by AT & T. The documents and speeches plaintiffs have offered into evidence, when read as a whole, do not support any finding of anticompetitive intent.

The first are entirely legitimate concerns that any business might have—concern over revenue loss to competitors who are charging lower prices, concern over what type of competitive pricing response should be made, concern over possible charges of unfair competition, concern over the attitudes of public officials including the FCC, state regulatory agencies and Congress. Mr. Charles Brown, then President of Illinois Bell and now Chairman of the Board of AT & T, recounted these concerns and his frustration (Brown, Tr. 5334–35):

> "[T]he competitors were coming in under our prices when clearly our costs were a lot lower than our prices would normally indicate. We had price averaging all over the country, and I was pointing out to Mr. deButts and others, and it was somewhat surprising that my career continued along this track, that they were sitting around not doing anything about this matter in the sense of recognizing that we were now in competition, and nationwide averaging in this sort of situation was not going to do anything but merely permit the new competitors to peel off the business, because our rates were higher than they needed to be."

■ It is difficult to understand how anyone could consider these concerns as anticompetitive and certainly the Court does not so conclude. At most, the documents reflect a desire to compete aggressively and a thorough consideration of the available alternatives.[72] As the Court has concluded above, nothing in the antitrust laws prohibits a corporation, even a "dominant" corporation, from seeking to compete. *California Computer Products, supra,* 613 F.2d at 742; *Telex Corp. v. IBM Corp.,* 510 F.2d 894, 927 (10th Cir.), *cert. denied,* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975).

The plaintiffs start their analysis of defendants alleged anticompetitive conduct in November 1969, three months after the FCC's *MCI* decision and two years before the decision in *Specialized Common Carriers.* Horace Moulton, AT & T's Vice President and General Counsel, made an address to AT & T's Public Affairs Conference on the subject of competition. (PX2–0095). In this address he stated, "[W]e were really monopolists at heart," and explained, "I say this because we were convinced—and rightly so—that the public communications system of this country could only be managed in the public interest by a single coordinated and integrated organization." (*id.* at 1415).

With respect to specialized common carriers, Mr. Moulton stated "[I]t is clear in today's economic climate that the burden is upon us to show that the competition posed by these newcomers is not in the public interest and is contrary to proper and necessary regulatory goals. This is a big order." (*id.* at 1421). However, it is important to note that Mr. Moulton's speech went further and pointed out that AT & T could be a very effective competitor if given the right to compete. In selecting an incremental cost approach, Mr. Moulton noted:

---

**72.** Plaintiffs select a handful of colorful phrases from these documents, such as "we are determined to fight it," "steps must be taken to stop the juggernaut," and "you have to hit the nail on the head" and would have the Court infer from these statements that defendants intended to block competition by all means available to it. Based upon the Court's experience, these phrases are probably mild in tone compared to the language often used by businessmen. *In any event, taken as a whole and when read in context, they evidence nothing more than a healthy intent to compete, and to protect the public and the defendants' dual obligation to protect its stockholders.*

"In so doing, we have opted for competitive pricing and thus for competition, and competition by definition means sharing the market with our competitors and not excluding them from it."

(*id.* at 1417–18).

The whole tone of his speech was not one of anticompetitive intent, but rather one of "food for thought", that is, to start examining the new environment that AT & T was entering.

In June, 1970, an AT & T Task Force produced a report on Intercity Competition. (PX1–0017). The foreword to that Report stated:

"It is probably true that if Bell had been serving all markets well (from the POTS [Plain Old Telephone Service] customers to those with complex data transmission needs), the aspiring competitors might never have filed applications."

(*id.* at 1). The Report summarized one of the Bell System's goals as ensuring that the "emergence of competition" would be "unprofitable to the would-be entrant," and counseled "a more aggressive" approach to the marketplace "in the competitive areas of the business." (*id.* at 26, 29). The whole theme of this report went further than plaintiffs' limited interpretation. As the note on the first page indicated (at 1998):

"This material is for discussion purposes only and the views herein are advanced to encourage further research and understanding."

Competition had become a fact of life for the Bell System and they had every right to analyze those effects. This report was far from anticompetitive but was one of raising questions that the Bell System should be concerned about as it entered the new age of competition.

In May 1972, a year following the *Specialized Common Carriers* decision, the Presidents of the Bell Operating Companies met in Key Largo with AT & T senior management. Notes of the Key Largo meeting report that the President of Northwestern Bell, Mr. Nuremberger, abjured the suggestion that AT & T delay in responding to MCI's initial tariff filing: "I would meet 'em or beat 'em. You bastards are not going to take away my business." PX1–0003 at AC64 0434. He later asked: "How many MCI's will proceed with construction plans if we file matching rates now? A big fat zero." (*id.* at AC64 0435). Alfred van Sinderin, President of Southern New England Telephone Company, agreed: "Shouldn't we act now rather than wait until they have going businesses which regulators might not permit us to dislodge?—[I]f we're going to do this, we have to do it now." (*id.* at AC64 0434). Charles Brown, then President of Illinois Bell, similarly argued: "(We) must take account of prospect of intrastate competition. Large amount of revenues vulnerable which we can preserve if we choke off now. I think you have to hit the nails on the head." (*id.* at AC64 4035).

The outcome of the Key Largo meeting was described in a conference report:

The conferees generally agreed that a decisive response to the entry of specialized common carriers is required to *provide a clear signal—inside and outside the business—of the Bell System's competitive spirit.* What remains at issue are questions of timing and strategy. The Executive Policy Committee has set a deadline of September 1 for completion of studies of the various alternatives open to us. (Emphasis supplied).

PX1–0005 at 2355.

What these comments evidence is not anticompetitive intent, but rather a concern on behalf of reasonable businessmen who saw their revenues being taken away. These businessmen felt helpless because they had made no competitive response, nor were they permitted at that time. These were businessmen who were straddled with nationwide average prices and saw new entrants unburdened with common carrier responsibility undercut their prices. Perhaps the best example of their plight would be if there was one regulated gas company. At every gas station in the country the price of a gallon of gas would be $3.00. The price would be $3.00 a gallon at the busiest and most profitable gas station despite the fact

that the gas company's cost is only $.50 a gallon. However, for these high profits at the very profitable station(s), the gas company must also maintain a station on Route 3 U.S.A. where business is very slow and the cost of the gas is $8.00 a gallon, yet the gas company can only charge $3.00 a gallon. Then, one day, competition is permitted. A competitor opens up a station across the street from the busiest and most profitable station and only charges $1.00 a gallon. Immediately, 80% or more of the business goes to the new entrant where costs are $.60 a gallon. The established gas company sees all of its business being taken away, yet the regulatory body does not permit them to lower their prices at these profitable locations to meet competition, despite the fact that their costs are lower (or approximately even) than the new entrants. Such was the situation faced by the Bell presidents, a recognition that some competitive strategy must be developed. That is exactly what the Court finds the Bell System attempted to do.

During the summer of 1972 AT & T produced a report on Intercity Competitive Service Plans, which was reviewed by the Company's Executive Policy Committee on September 8, 1972. (PX1–0028) Among the considerations recognized in those papers was the impact of an AT & T pricing response upon the specialized common carriers: "Bell competition could deter investors from SCC's", "[L]enders and investors would think twice if Bell competes." (id. at 2468). However, once again the Court finds that the general theme was one of competition and what Bell should do, not anticompetitive behavior. Moreover, as has already been pointed out, MCI had little trouble raising needed capital and SPCC had the backing of its parent, SPT Co.

On February 12, 1973, John deButts, Chairman of the Board of AT & T, spoke to the Detroit Economics Club and reported on the Company's reaction to *Specialized Common Carriers* and other decisions of the FCC. (PX1–0076) He recounted that the communications industry had been developed under "the concept of a universal system, designed and configured to operate as a single integrated entity." (*id.* at 9). He went on to state:

"I will admit to you that my own instinctive response to emerging competition in our business matches that of Theodore N. Vail, who—back in the days of the brass-knuckled competition our business experienced in the early 1900's—declared—in a statement we would now call Churchillian—'We have established and organized the business and do not propose to see it taken from us . . . .' Nor do we today." [*id.*]

The Court notes that the plaintiffs neglected to continue Mr. deButts' speech wherein he continued:

I have made it plain that, if there is to be competition, the Bell System is going to be a tough competitor, even though I recognize that changed times may call for changed conditions. (*id.*)

This does not evidence anticompetitive intent on the part of AT & T, but rather that AT & T intends to be an effective competitor.

On March 2, 1973, Mr. William G. McGowan, Chairman of MCI, met with Mr. deButts. (PX1–0031) During that meeting McGowan indicated at several points that MCI was considering bringing an antitrust suit against AT & T. (*id.* at 2466, 2468.) Following the session with McGowan, Mr. deButts instructed that his general counsel, Mr. Garlinghouse, "accelerate his antitrust orientation program for the companies." (*id.* at 2469).

Approximately two weeks after the McGowan-deButts meeting, on March 15, 1973, Mr. Stoddard, AT & T's Marketing Director, notified Mr. Betteridge, Assistant Vice President, Market and Service Plans, that document destruction guidelines had been formulated and that a shredder "is available and in use." (PX1–0038 at 1756 (Vol. I, Tab D, 20)). Among the classifications in the guidelines was "COMPANY PRIVATE;" such documents were to be retained "only" if they were not available and were necessary for "current performance." (*id.* at 1757, 1758). Discarded docu-

ments were to be "destroyed by shredding." (*id.* at 1758.)

▮ Categories of documents specifically scheduled for destruction included:

e. Evaluative material concerning Market strategy alternatives.

i. Personal memos relating to evaluative information or recommendations.

1. Information generated by other departments, for example, cost studies of Bell equipment or service (*id.* at 1759).

This again does not evidence anticompetitive activity. In a new competitive age the defendants had a right to assure the security of their documents.[73] Moreover, the plaintiffs have not intimated one instance where they believe that particular relevant documents had been destroyed, for the stated policy was to shred documents that *were* available elsewhere. Surely, for a company that knew it was going to be sued under the antitrust laws, any anticompetitive conduct would be mighty brazen. The Court does not find that AT & T has acted in such a manner.

At a San Francisco conference held on May 17–18, 1973 representatives of PT & T and AT & T met to discuss Private Line Competition. (PX1–0092.) During the meeting "very sensitive" profiles on the specialized common carriers were made available, with the caution that the "information furnished not be reproduced, copied or distributed." (*id.* at 0442) The conference report "suggested" that "we also be careful of the information we put into our files as any and all of this could be subpoened (sic)." (*id.*)

Later in 1973, AT & T produced a film on the subject of record retention entitled "What's in our files?" (deButts, Tr. 4122). Screened by a quarter million Bell employees, it depicted the disastrous circumstances of an employee who had retained in his files an unfortunate document (deButts, Tr. at 4122–23). Even so, Mr. deButts pointed out that the documents still had to be maintained. (*id.*)

In a September 20, 1973 speech to NARUC, Mr. deButts reaffirmed his belief in the "concept of a universal system" operating as a "single integrated entity." (PX1–0001 at 4) He stated that the "alternative to regulated monopoly" confronting AT & T was not "free and open competition," but "contrived competition," and urged a "moratorium on further experiments in economics." (*id.* at 4, 5.) He continued: "There is something right about monopoly—regulated monopoly." (*id.* at 4.) Disputing the notion that MCI was "stiff competition," he observed that customers had switched to MCI because they had been offered the choice between "virtually equivalent products," one of which, MCI's, bore a "price tag about a third less than the other." (*id.* at 9.) He went on: "That, I submit, is not competition." (*id.*) Mr. deButts concluded that, if the Company were not to face "genuine competition" in the private line field, but an "arbitrary allocation of the market to others in [the] name of competition," "I assure you the Bell System is not ready to accommodate peaceably to that prospect." (*id.*) Once again, Mr. deButts continued to exercise his constitutional right to at least bring the transformation of the telecommunications industry into the public arena.

Secondly, and perhaps more importantly, these documents reflect a concern over the wisdom and direction of FCC policies and whether those policies were in the public interest. It is this aspect of the so-called "intent" documents on which plaintiffs have focused most of their attention. In particular, plaintiffs have pointed to the publicly stated belief of Bell System management, perhaps best illustrated by a speech by the then Chairman of the Board of Directors of AT & T, John D. deButts, on September 20, 1973 (PX1–0001). (In order that there be no misunderstanding of what Mr. deButts stated, his speech is hereinafter quoted in full.)

NARUC Annual Convention
Seattle, Washington
September 30, 1973
J.D. DeButts

---

**73.** The Court notes that there are many other companies that make use of shredders, including the Courts of the United States and throughout the government's other branches.

## AN UNUSUAL OBLIGATION

It is a single honor to have the opportunity to address this convention. I do not know how many of my predecessors as chief executive officer of the Bell System have been afforded this privilege. Perhaps only one—and that was back in 1927. While I dare not hope that I can use this occasion as well as Walter Gifford did, the prospect that your next invitation may not come for another 46 years suggests that I had better try.

When Mr. Gifford came before this organization almost half a century ago in Dallas, he declared it his intention to "state very briefly the principles that guide the management of the Bell System." What he said then has become the classic statement of our business' purpose.

"The fact," Mr. Gifford said, "that such a large part of the entire telephone service of the country rests solely upon this Company and its Associated Companies imposes on the management an unusual obligation to see to it that the service shall at all time be adequate, dependable and satisfactory." And he went on to say that in his view the only sound policy that would fulfill this unusual obligation is "to continue to furnish the best possible telephone service at the lowest cost consistent with financial safety."

How valid—and how viable—is this policy today?

There is no question in my mind that down through the years it has served our business well. What is more to the point, it has served the public well.

It has served the public well in terms of the quality, dependability and availability of service. It has served the public well in terms of the efficiency and economy with which that service is provided. And it has served the public well in terms of continuously advancing operational proficiency and a pace of technological innovation unmatched to my knowledge in any other industry. In short, I think it's fair to say that what Mr. Gifford called the "unusual obligation" resting on the Bell System and the independent telephone companies who share it has been by any reasonable standard well met.

From what then, does this "unusual obligation" arise?

It arises quite simply from the way we in the United States have chosen to supply ourselves with communications services. Almost unique among the nations of the world, this country has entrusted the development and operation of its communications resources to private enterprise. It has endowed these enterprises with the rights and responsibilities of common carriers, each solely privileged to purvey its services within its territory but all in turn strictly accountable through regulation to the public they serve. In short, what gives rise to the unusual obligation that motivates our industry and inspires its accomplishments is what we have come to call the common carrier principle.

If there is no question that the application of this principle to telecommunications has served our country well down through the years, there is no question either that not since the days of its inception has this principle been more severely challenged that it is today.

Whence comes this challenge?

It comes from entrepreneurs who see *opportunities for profit in serving selected segments of the telecommunications market* and who—not unnaturally—want a piece of the action. It comes from manufacturers or, in a good many instances, importers of communication hardware who seek to supplant the regulated common carriers in supplying the terminals for the common carrier network. It comes from newly authorized purveyors of communications services who, unburdened by any obligation to the whole body of customers, address *their attention —again, not unnaturally—to those it costs least to serve and profits most.*

Admittedly the challenge comes from customers as well. Mostly these are large businesses who see advantage to themselves in the new pricing arrangements competition will engender but who have no obligation—and therefore no disposition—to reck-

895

on the cost of those new arrangements to the public at large.

And the challenge comes, too, from some members of the regulatory community itself. Doubtless some of it reflects a wariness of sheer size and the potential for abuse that goes with it. Some of it may reflect the premise—to my mind insufficiently examined—that in all times and places competition is good and monopolies are bad and that regardless of the costs and consequences, the former should supplant the latter.

But what I have been saying to the people inside our business is that we would deceive ourselves did we not recognize that regulators—indeed thoughtful people in all walks of life—are constantly and earnestly testing and appraising our performance and asking whether competition might not spur progress faster than present arrangements.

That this issue ought to be debated I can hardly deny and the Bell System wouldn't get very far if it did. Currently, it is the focus of regulatory proceedings bearing on such matters as interconnection, certification, intercity private line rates, the use of satellites for domestic communications and the effects—for good or ill of vertical integration in the telecommunications industry. In addition, all these topics—and more—figure in the current hearings of Senator Hart's Subcommittee on Anti-Trust and Monopoly.

At issue in all these matters is the degree to which competition should obtain in a field that has been brought to its current state of development through the application of basic principles—end-to-end responsibility for service, the systems concept, the common carrier principle itself—that *the doctrine of competition for competition's sake puts in jeopardy and could in time destroy.*

What concerns me is that, although debate over this issue has been going on with increasing intensity for some years now, the general public remains to this date very largely unaware of it or of its stake in the outcome.

What concerns me, too, is that so basic a question might over time get resolved in bits and pieces—a docket at a time, so to speak—and that, when all is said and done and the verdict rendered, the public interest will not appear among the beneficiaries. Surely this will be the consequence if we do not ourselves speak out for what we believe.

What do we believe?

First of all, we believe that if competition is, as its advocate alleges, the wave of the future in *telecommunications, our responsibilities* then require us to be as effective competitors as we know how to be. Indeed, in those sectors of the industry in which competition has already been mandated, we have long since recognized that we have an obligation to meet competition for services which, if lost to others, would result in an increase in the cost of our common carrier service or deny opportunities for cost reduction in the future. In short, *if the rules are going to be changed, we'll live by the new rules and, if those new rules are fair and fairly administered, we have every confidence that we can give a good account of ourselves.* Indeed, as of now I don't think there remains any doubt—among our customers, among our own people, among our competitors, as to whether the Bell System intends to compete or knows how to compete.

At the same time we have recognized that the urgencies of competition do not exempt us from responsibility for rigorous examination of its long-term consequences or from the necessity to face up to the decisions and actions that the results of this examination might logically require of us. Accordingly we have been asking ourselves whether in the event that objective deliberation should bring us to the conclusion that competition and the fragmentation of function and responsibility that stem from it would seriously impair service over the long run and add significantly to its costs, do we not then have an obligation—an unusual obligation, if you will—to take a stand in opposition to current trends and prepare ourselves to debate the issue explicitly, not

only on the legal, legislative and regulatory fronts, but before the court of public opinion as well.

We have reached the conviction that the time has come to do just that.

We believe that the people of this country have been well served—and will continue to be best served—by a concept that has provided it the most highly developed communications service in the world, the concept of universal system, designed and configured to operate as a single integrated entity, its services available on equitable terms to all its users. Wherever they are, who ever they may be.

Further we believe that these services are so "affected with the public interest" as to require that their prices and the profits that derive from them be subject to continuing public regulation.

And we believe, too, that the public interest, construed as we must construe it as the widest availability of high quality communications at the lowest over-all cost to all its users, cannot help but be impaired by the duplication of facilities from the further encroachment of competition in an industry where compatibility of components and precise coordination of process are crucial.

In short, we believe that there is something right about the common carrier principle. There is something right about regulation. And—given the nature of our industry—there is something right about monopoly—regulated monopoly. Believing these things, we believe, too, that the time has come for those who believe so to say so.

The time has come to alert the public to what the public is largely unaware—and that is that regulatory decisions have already been taken in its name that, whatever advantages they may afford for *some* people, cannot help but in the long run, hurt most people.

The time has come, we believe, for a thorough thinking-through of the future of telecommunications in this country—a thinking-through sufficiently objective as to at least admit the possibility that there may be sectors of our economy—and tele-communications one of them—where the nation is better served by modes of cooperation than by modes of competition, by working together rather than by working at odds.

The time has come, then, for a moratorium on further experiments in economies—a moratorium sufficient to permit a systematic evaluation—not merely of the question of whether competition might be feasible in this or that segment of telecommunications—but of the more basic question of the long-term impact of its further extension on the public at large, the adequacy, dependability and availability of its service and the price it will have to pay for it.

In this thinking through, the members of this organization, it seems to me, are uniquely equipped to take the lead. I say this because your first responsibility is to the public at large—not to some customers but to all customers and not only to today's public but tomorrow's as well.

Now what has brought us to the conviction I have expressed here—admittedly in the most general terms?

Three things: first, the record of what has been accomplished over more than half a century of operation under the common carrier principle; second, the not altogether happy experience of competition—or what goes by that name—in those sectors of telecommunications where it has already been mandated and what that experience forebodes for the future; and, third, a recognition, born of that experience, that the alternative to regulated monopoly confronting us is not free and open competition but contrived competition—in short, government sponsored market allocation with all the potential for inefficiency this implies.

What has been accomplished by the common carrier principle down through the years is embodied in the nationwide switched network, a technological achievement unmatched in scale and complexity and the precision of its operations. Capable on command of performing any one of seven million billion possible interconnections, this network is too valuable a resource to

risk a perhaps irreversible threat to its performance that would ensue from fragmentation of responsibility for that performance.

The risk is not an imaginary one—as witness our experience of the impact of customer-provided terminal gear over the five years since "Carterfone." For example, current studies indicate that intercity private line serving links equipped with at least one customer-provided terminal generate trouble reports at a rate at least 50 per cent higher than do serving links equipped with Bell terminals only. And studies now in progress of message telephone lines are showing like results—a trouble report rate for lines equipped with customer-provided terminals more than 25 per cent higher than for lines connected solely to Bell terminals.

Admittedly these studies do not themselves tell us how many wrong numbers or how much crosstalk and other "harms" to the network and service of others arise from customer-provided terminals as compared to telephone company provided terminals. I would suggest, however, that the disparities in trouble report rates I have cited are sufficiently consequential as to suggest an urgent need for caution before proceeding to a further liberalization of interconnection requirements. How high are the stakes will be clearly evident from the fact that an increase of but one per cent in ineffective calling attempts will add some $75 million to the capital costs of the network and some $27 million to annual operating expenses.

For some five years now, we have pursued our announced aim of facilitating the connection of customer-provided equipment by making interface devices as simple and inexpensive as possible. To pretend, however, that our experience thus far has been satisfactory—to us or to all our customers— would be just that—to pretend. Competing goals of network protection and low cost require compromises that are not fully satisfactory on either count. Awkward as they sometimes are, we can—because we must—"live with" these compromises. But

we cannot live with the deterioration of network performance that would be the inevitable consequence of "certification" and the proliferation of customer-provided terminals that would ensue from it. No system of certification we can envision— and no interface requirement—can provide a fully adequate alternative to the unequivocal and undivided responsibility for service that the common carrier principle imposes.

It is regulation's role to see to it that this responsibility is fulfilled. To see that it is, some commissions have moved to establish explicit service standards. Obviously we can hardly object to being held rigorously to account for services for which we are in fact responsible. But when that responsibility is divided, not only is our ability to meet it impaired but so is regulation's ability to see that we do. In view of the impact of interconnection on their constituents— that is, all users of communications service—it seems to me imperative that state commissions, as some have done already, take prompt initiatives to assure they are not precluded from exercising this fundamental aspect of their jurisdiction.

Not the least of the reasons for doing so are dollars-and-cents reasons.

As you know, revenues from the telephone companies' vertical and toll services help keep exchange rates low. You know, too, that higher charges to business customers permit lower charges to residence customers. And country folk don't pay more for their telephone service than do city folk—this even though it often costs more to serve them.

We call this "value of service" pricing. Its aim is to bring service within the economic reach of as many people as possible, thereby enhancing the usefulness of service for everybody. Certainly it's hard to imagine how today's virtually universal service could have been achieved without it. Indeed, I will assert that it could not. And I will assert, too, that no special interest outweighs the public interest in preserving this principle.

For where will the burden of increasing interconnections fall? Surely, not on the

customers for vertical services. And surely not on the business who—for whatever reason of his own—choses to buy a PBX from a vendor rather than lease it from the telephone company. No, the burden will fall on the average customer, the users of the basic services that it has been regulatory policy from time immemorial to keep as inexpensive as possible. As interconnection siphons off revenues from other services, not only the telephone companies but the commissions that regulate them will find themselves increasingly restricted in their ability to pursue what they have hitherto considered a basic aim—an aim that I for one am not prepared to abandon.

But that is only the beginning. Those of you who are learned in the mysteries of separations procedures recognize that about 18 per cent of station equipment costs are assigned to interstate operations for rate making purposes. And, you will recognize, too, that as customers replace telephone company terminals with terminals they provide themselves a shift—a potentially massive shift—of revenue requirements will occur. By one estimate, a ten per cent loss of the terminal market by the common carriers will increase state revenue requirements by almost $220 million a year, a 50 per cent loss by more than $1.0 billion. (The burden of this shift, by the way, falls disproportionately on the independent telephone companies, adding in the event of a 50 per cent loss of the terminal market over $250 million to their annual revenue requirements.)

How rapid competitive inroads in the telecommunications market will be, I cannot predict. What I do know, however, is that the prime targets of competition are precisely those segments of this market that are the most profitable ones. And I know, too, that whether these inroads are slow or fast, the consequence will be the same—a shift of revenue requirements to the states and ultimately upon the last bastion of common carrier revenue, basic telephone service. The ultimate effect of this shift is not hard to see—a shutoff of service to people with marginal incomes. This, I submit, is the reverse of the traditional objective of the common carrier industry

and of its regulators. It is the reverse of what has heretofore been considered the public interest.

I for one am inclined to doubt that a public already sullen if not mutinous over rising costs that make rate increases clearly necessary will be disposed to welcome further increases of the dimensions I have cited. Particularly will they be disposed not to welcome them when they come to recognize that for what only some people want everybody pays.

But is the public even faintly aware of such a prospect? I think not. Is it not then part of our unusual obligation to see that the public is made aware? I think it is. What is more, I would at least raise a question as to whether regulators, charged as they are with defining and defending the public interest, do not have a like obligation to do what they can to make sure that by speaking out before it is too late the public understands its stake in the interconnection issue. For however that issue is decided, it will be the public that bears the consequences and pays the price.

Compared to our experience of the impact of the interconnection of customer-provided equipment, our experience of the consequences of competition from the so-called specialized common carriers in the private line field has been relatively limited. Indeed, in a very real sense, it might be said that we have had no experience of such competition at all.

To be sure, MCI for more than a year now has been offering private line services on the route between Chicago and St. Louis. But, to conclude from this that competition has thereby been established in this sector of the private line market is to adopt a definition of that word that does not accord with that in any dictionary I have consulted.

What may not be widely known is that— as of right now, not 20 months since it opened for business—MCI has captured over 80 per cent of Bell System point-to-point private line services between customer premises in those two cities. What is

more, 40 per cent of MCI's customers are businesses that formerly relied exclusively on the Bell System's long distance services between the two cities, but who now use MCI private lines for a substantial portion of their requirements.

That would seem to indicate that MCI is a pretty stiff competitor. I would submit, however, that we have yet to see competition or anything resembling competition in the market for private line service between Chicago and St. Louis.

Why, then, did our customers switch? Not because MCI offers services that are in any significant way new or different from those the existing common carriers offer. They switched for the same reason that you or I might switch were we offered a choice between virtually equivalent products, one of which bears a price tag about a third less than the other.

That, I submit, is not competition.

Let me take a moment to tell you why I say that.

Some of you will recall that again and again Bell System's submissions to the FCC in the specialized common carrier case asserted that, reluctant as we might be to see the end of nationwide average pricing in the private line field, should the Commission nonetheless find it in the public interest to permit selective entry by those specialized carriers we would be ready to live with the consequences provided only that the same ground rules apply to all competing parties, including us. The Commission's order, you will recall, provided ample—and eloquent—reassurance on this point.

One measure of our reluctance to part— even on a limited basis—with the principle of nationwide averaging is the fact that it was not until 14 months after the first new intercity carrier became operational that we finally sought Commission permission to file—and to put in effect as promptly as possible restructured private line rates responding to the newly competitive environment confronting us. What we proposed— and still propose—is a two-level rate structure that calls for lower rates on the high capacity, low cost routes that specialized common carriers seek to serve and—necessarily—higher rates elsewhere.

That was in February—to this date it remains a question as to whether there will in fact be genuine competition in the private line field or whether what we confront will not turn out to be simply an arbitrary allocation of the market to others in the name of competition and heedless of the higher costs to the public that will be its inevitable consequence. I assure you the Bell System is not ready to accommodate itself peaceably to that prospect.

This experience foreshadows what can happen as our presumed competitors extend their activities selectively to other routes and, eventually, to most if not all of the more profitable major communications corridors in the nation. In less than three years, these carriers—at their currently projected level of development—will have siphoned off no less than $220 million of revenues that private line services would otherwise contribute to meeting the common costs of the Bell System's other services.

Again where will the burden fall? Again it will fall on the average customer in the form of higher exchange rates, higher long distance charges. It will fall, too, on private line customers in cities and towns on the high cost routes the specialized common carriers choose not to serve. Again for what only some people want everybody pays.

We believe that this prospect is a sufficiently realistic one as to raise a serious question as to whether further entry from the private line field truly meets the public interest. When the FCC determined—now more than two years ago—that the public interest would be served by permitting virtually free entry to the private line field, it did so without any evidentiary hearings. Surely a decision of this dimension, threatening as it does the undoing of basic policies to which this nation very largely owes the advanced development of its communications services, merits nothing less than the fullest examination of its potential conse-

quences. The time for such an examination is now.

What has been most useful—and at the same time most troubling—about the interval since the FCC mandated what it called "competition" in the private line field is that it forced us to a recognition that the prospect confronting us is not free and open competition as an alternative to monopoly but rather a third alternative affording the virtues of neither and the disadvantages of both and that is regulated competition—a division of the marketplace arbitrarily imposed and artificially maintained.

I recognize that the question of regulatory policy at issue here is a profoundly difficult and vexing one. Admittedly there is a certain attractiveness in the notion that, where competition can be substituted for regulation, it ought to be. Our instincts as Americans, reared in the free enterprise tradition, support the notion.

On the other hand, it appears worth noting that the fervor for competition on the part of some regulatory officials has not been accomplished by any demonstration of enthusiasm for its necessary concomitant— deregulation . . .

Which brings us to the question: *can* there be competition—real competition— when not all the parties to it enjoy the same constraints? A free market, if it is truly free, affords not only free entry but free exit as well. And competition, if it means anything, means that all the parties to it are equally at liberty to choose which markets they will serve and which they won't. In principle, it would relieve common carriers from the obligation to assure the availability of those services to all comers. In short, it would destroy the common carrier principle and the commitment to public service it engenders.

I doubt that there is anyone in this room who thinks that's going to happen or that it will be permitted to happen. But the consequences to the public could be quite as drastic if in pursuit of ad hoc solutions we seek to accommodate ourselves to opposing principles without rigorously thinking through to the long-term outcome of doing so.

I suggest that the time for that thinking-through is now and that it is time, too, that the public be made a party to it.

Now I am sure this audience—more clearly than any other I can think of—recognizes that a decision such as ours—to take to the public the case for the common carrier principle and thereby by implication to oppose competition, espouse monopoly—is not taken lightly. Particularly, is it not taken lightly in a company it's no secret is the world's largest. I want you to know that we have thought about the risks.

It will be alleged—indeed it has been— that it is not the public interest but our own that motivates our stand, that our purpose, however idealistic a face we might seek-to put on it, is simply to protect our markets and the profits that derive from them.

To that charge, I have but one rejoinder: ours is a business that seeks profits only to serve. I don't expect our would-be competitors to believe that. And in this day of widespread skepticism about the motives of large institutions, it would probably be unrealistic to expect many among the public to believe it either. Perhaps you don't. But, as I've said many times to our own managers, the day that we ourselves stop believing it will be the day when we'll begin to lose—and deserve to lose—the opportunities that go along with the great responsibilities the public has entrusted to us.

Moreover, I would point out that Walter Gifford, when he appeared before this convention 46 years ago, stated it to be a fundamental precept of our business that profits beyond those required to provide service should be returned to the customer in the form of lower rates or improvements in facilities or both. We have done our best to live by the precept ever since—with, I should observe, more than a little help from you.

By nothing I've said do I mean to imply that telephone people are better or worse than anybody else. What I do claim is that there is a perhaps unique dynamics at work in our enterprise that compels its managers

to conform their aims to public expectations. In some measure, the unusual obligation we have taken upon ourselves is simply a human response to the unusual trust that has been placed in us. At the time, it would be unrealistic to deny that it derives in some measure, too, from the fact that we are retaining the right to manage and the satisfactions that come from exercising our own initiatives depends on perceiving—and doing—what is right before regulation tells us to. In any case, I think you will be ready to grant that our business did not grow to be almost a hundred years old by pursuing interests at odds with those of the public it exists to serve.

I would, then, simply ask this question: who among the parties at issue on these matters—the hardware manufacturers—the large users, the purveyors of selective intercity services—does self-interest compel to speak for the interest of the public at large, the average customer? Who, if not we?

We recognize, of course, that the work of telecommunications is not "ours" and that today there are a great many organizations beside our own whose talents could effectively be brought to bear on the growth and improvement of the nationwide telephone network. Our aim is to expand and not restrict their opportunities to do so. To that end we are looking for ways by which we in the Bell System might broaden the base of participation in this task of supplying the facilities for a constantly growing, constantly changing network. The Western Electric Company is a great outfit and, I am sure, determined to retain its leadership in the production of communication facilities of advanced design. But to be best where it counts most Western Electric can't be best in everything. Nor does it seek to be. In 1972, for example, Western Electric provided about $500 million of telecommunications products—switching equipment, wire and cable, carrier and microwave equipment—which it had purchased from others on behalf of the Bell telephone companies—and the telephone companies themselves bought some $200 to $300 million more directly from outside suppliers. I

anticipate that in the years ahead the job of supplying the network will be even more broadly shared and that increasingly suppliers outside our business who are ready, willing and able to fulfill the rigorous standards of performance that quality service demands will be helping to build the telecommunications network of tomorrow.

There is another risk we run in taking our stand against a further extension of selective competition in telecommunications and that is the risk of appearing to have set ourselves against change, of clinging to the past against the discomfitures of an uncertain future.

But I submit—indeed I would insist—that not all we've inherited from the past is bad. It is in fact my own conviction that ours is—and has been for a very long time—a business ahead of its time and not behind it. This is a conviction, by the way, in which I am not alone. Increasingly, the Bell System with its integrated structure and its disciplined approach to the utilization of resources is being cited by serious students of economic organization as a prototype for the organization of a wide range of industrial and social undertakings crucial to the nation's well-being, a forerunner of the kind of enterprise—performance-oriented rather than product oriented it will take to bring technology fully to bear on the service of man.

Increasingly, too, telecommunications authorities in other countries are seeking our advice with a view to restructuring their systems to match ours—and without exception, they encourage us to oppose the erosion of end-to-end responsibility, and erosion that experience has taught them is wrong.

So it is. the future, not the past, that dictates our stand in opposition to a further fragmentation of communications. For the future insofar as we can see it is one in which, confronting increasing complexity, we shall require more rather than less coordination to control it. More rather than less, product and process engineering will become indistinguishable, requiring a more

and more disciplined integration of the functions involved in translating science into service. And more rather than less, the dramatic opportunities now under development—the millimeter waveguide and, beyond it, optical transmission—call for aggregations of demand that, if compromised, could significantly delay their introduction. Against these prospects, fragmentation of the communications market, we are convinced, would represent a serious retrogression for which our posterity will pay not only in terms of higher costs for disordered service but also in terms of opportunities deferred.

Who then speaks for the future?

It is not to oppose change that we suggest that we at least know where it is taking us before we embrace it. Indeed, I recognize that the very conviction I've expressed here today, should they prevail, will themselves call for change. For example, I never thought I would hear myself calling for more regulation rather than less. But if that is the price of confirmation of the common carrier principle and the concentration of responsibility that goes with it, that to me is a price we ought to pay. Indeed, I would *invite* explicit regulation of any aspect of our business where the public might require additional reassurance that its interests are being fairly and objectively served.

There is a final risk we run in urging a re-examination of current trends in regulatory policy—and that is that the convictions I have expressed here may not prevail. Realism suggests that in every particular they won't. But, having convictions, we are ready to test them against the convictions of others in the hope that the outcome, while it might not meet the perfect satisfaction of anybody, will prove in the long run best for everybody.

On a good many occasions I have said that our business exists for no other reason than for the service it provides the public and that therefore our responsibility to investors places no greater obligation on us than doing the very best service job for the public—the entire public—that we know how to do. Regulations obligation, too, is to the entire public. It is this shared obligation—yours and ours—that has prompted me today to speak out—and to urge you to speak out—against trends that unless we call a halt to them, could slowly sabotage the very policies on which our ability to fulfill that obligation is based.

This nation owes much, I think, to the man who long ago shaped the regulatory principles on which the communications industry has grown down through the years. We have an obligation, I suggest, to do what we can to assure that tomorrow's public, looking back to our times, will feel itself as well served.[74]

In that speech, Mr. deButts indicated his belief that the specialized common carriers would serve only those segments of the market that are the most profitable and that the inevitable long run consequences would be higher prices for those consumers living in the poorer, more sparsely settled communities and increases in the rates for local exchange service, particularly residential exchange service. He pointed out that while the FCC said it wanted competition, it had refused to allow AT & T to file a tariff deaveraging its rates and it remained "a question as to whether there will in fact be genuine competition in the private line field or whether what we confront will not turn out to be simply an arbitrary allocation of the market to others in the name of competition and heedless of the higher costs to the public that will be its inevitable consequence." He called for re-examination of the FCC's policies on competition.[75] Mr. Brown made similar speeches, urging

74. The Court finds it important to recite the entire speech as it shows a genuine concern and the part of Mr. deButts for the protection of the telecommunications system for *all*.

75. During Mr. deButts' cross-examination, plaintiffs sought to suggest that his underlying motivation was the protection of the Bell System's profits. Even were that so, a violation of the antitrust laws or a showing of the requisite anticompetitive intent would not have been established. However, the Court found convincing Mr. deButts' explanation that he "had no concern about the profitability of the compa-

that the FCC review its decisions, and that the public be given a chance to decide what the policy should be (Brown, Tr. 5332). In fact, Mr. Brown testified without apology that he and his colleagues had articulated that message in "every forum we could think of" (Brown, Tr. 5331). It is obvious to the Court that the concerns of Messrs. Brown and deButts in particular and AT & T in general was to prevent a possible scenario as detailed in the January 27, 1982 *Electronics* magazine. In an article entitled "*What next for AT & T and IBM,* the staff of *Electronics* wrote (at 73):

> Members of the House and Senate telecommunications subcommittees, their staffs, and telecommunications industry competitors of AT & T are all determined to avoid what a number of them see as a "worst case" scenario for the U.S. telecommunications market after AT & T has spun off its operating companies.
>
> That scenario, set around 1986, envisions AT & T's chairman testifying before a joint hearing of the House and Senate subcommittees comprised of many angry and embarrassed members. "AT & T regrets", its chairman might say, "*that the quality of American's service has declined while local telephone and terminal rates have tripled in the past four years.* But let us remind you that the decision to force the breakup of the Bell System and its national network was not our idea. That decision, supported by many distinguished members of Congress, originated in the U.S. Department of Justice."

Indeed, some of their concerns are coming to fruition. It was reported in a September 8, 1982, Washington Post article (at E14) that telephone users are facing big local rate increases.

> "An Associated Press survey has found what appears to be a record dollar amount of rate hike request before state utility commissions—worth an estimated $6.2 billion in annual revenues.
>
> . . . . .
>
> The Bell System companies now owned by AT & T have requested, or announced their intention to request a total of $4.82 billion in additional annual revenues." (id.) [76]

While these revenues requests cannot be entirely attributable to competition, what is certain is that the average consumer's bill will go up, while the intercity, interstate services will remain lower due to the effects of competition.

Upon close scrutiny of this speech, it is obvious that the theme was not one of anticompetition, but rather, one of *pro consumer.* The changes that were occurring at the FCC were far removed from the general public. It is the state regulatory bodies that receive the most heat when rates are raised. As Mr. E.J. Larkin of the New York Public Service Commission stated (U.S.Tr. 24565):

> When rates are raised, its the state commissioners that take the heat, and of course the federal regulators have enjoyed tremendous economies of scale in interstate calling.

Mr. Larkin goes on to state (U.S.Tr. 24581):

> But what it boils down to is that we in the states have the problem (controlling

ny" (Tr. 4061) in speaking out about the FCC's changing regulatory policies. In fact, as the Court found above in its discussion of monopoly power, during this period, the defendants were not even allowed to earn their cost of capital. In these circumstances, as Mr. deButts testified, defendants had no assurance that they could earn their authorized rate of return, much less monopoly profits (deButts, Tr. 4062). Perhaps what is most revealing about AT & T's intent is even if AT & T had succeeded in quashing all competition, what could they do? Could AT & T make supracompetitive profits overall as the sole provider of telecommunica-

tions? *The answer is an unequivocal no.* All that AT & T would earn was their authorized rate of return and *no more.*

**76.** The Court would note that these increases are before the state commissions, that are vested with the responsibility of protecting the average consumer. The Court does not mean to imply that competition is the sole reason for these proposed rate increases, but the fact of the matter is that it is the average consumer whom Messrs. Brown and deButts' expressed concern for who will end up paying a higher proportion of the increases.

rates). We have all the equipment, we have to impose the rates, and we get the trouble. We find whole commissions wiped out overnight simply and solely because the people get in an uproar (over rate increases). In Connecticut the whole Commission went.

Mr. Rollins of the Texas Public Utility Commission noted that "there is impending widespread citizen uprising against higher local telephone utility rates." (S–6180 at 6). Such concern for the average consumer was also expressed in the comments of U.S. I.T.A. in the *United States v. AT & T*, No. 74–1698 (S–6233 at 95):

> The proposed modifications attempts, *inter alia,* to facilitate competition in the market for long distance calls. However, an analysis of customer toll billings indicates that service offerings from competing non-telephone companies for long distance service would be economically attractive to only approximately 10% of current residential customers. *U.S.I.T.A. respectfully submits that the Independent/Bell integrated network must continue to function efficiently for the benefit of the total customer body including the remaining 90%.* The states and the consumer, particularly the residential and small ones of our society were thus fortunate to have someone like Mr. deButts to express their concerns.[77] (Emphasis supplied).

Plaintiffs do not challenge any of these statements as false and certainly have presented no evidence that they were false. Indeed, the Court's review of the record confirms that the Bell System's concerns that the FCC's policies on competitive entry would not serve the public interest were

shared by many others, including representatives of independent telephone companies and members of state regulatory agencies (Privett, S–T–143 at 2–5;[78] Symons, S–T–142 at 2–5; Pearson, S–T–145 at 2–9, 21–22; Hooks, S–T–244 at 3–5, 14–15; Larkin, U.S.Tr. 24569–75, 24586–88; Wooten, S–T–141 at 4–12). As Cyrus J. Colter, a former member of the Illinois Commerce Commission, testified (Colter, S–T–144 at 4–6):

> "The FCC's new competition, in my view, was fundamentally inconsistent with some of the most basic and long-standing goals of telecommunications regulation. In simplest terms, I believed then (as I do now) that competition in the provision of telecommunications service will destroy the regulatory rate structures under which the goal of universal telephone service has been sought and, for most practical purposes, achieved."

Similarly, Francis Pearson, a former President of NARUC and Chairman of the Washington Utilities and Transportation Commission, testified (Pearson, U.S.Tr. 20238):

> "I first came into the Commission when universal telephone service nationwide equal rates, as far as toll is concerned, and value of service were being practiced, and that and competition just plain don't work together."

For that reason, Mr. Pearson was "unalterably opposed" to competition (Pearson, S–T–145 at 2):

> "I was unalterably opposed to the introduction into the telecommunications industry of competition simply for competition's sake. In that view I was supported by the vast majority, if not all, of the other state commissions. We were par-

---

**77.** Indeed, the views of Mr. deButts are consistent with those of Alexander Graham Bell, who wrote in 1876 upon inventing the telephone (S–0273):

> "This is a great day with me. I feel that I have at last struck the solution to a great problem—and the day is coming when telegraph wires will be laid on to houses just like water or gas—and friends converse with each other without leaving home."

Mr. Bell's vision was not that only a few could enjoy the benefits of his new invention, but

that like the other utilities it could be enjoyed by everyone. This is precisely Mr. deButts attitude.

**78.** Mr. Privett, a former Commissioner of the Oklahoma Corporation Commission "strongly believed it was my obligation to strive for the provision of universal, high quality, low-cost telephone service for the average Oklahoma citizen." (S–T–143 at 2–5).

ticularly concerned about what we perceived to be the creeping expansion of competition into the telecommunications industry without an investigation into the effects of such competition on the existing rate structure."

The state agencies have been particularly outspoken in their opposition to increased "competition" in the telecommunications field based on their fear that that competition will adversely affect the rates for local exchange service (see Colter, S–T–144 at 9–10; Symons, S–T–142 at 2–5; Privett, S–T–143 at 2–5; Pearson, S–T–145 at 12–21; see also exhibits cited in Regulation and History Doc.Sub. at App. E, pp. E–8—E–11). In its appeal of the *Specialized Common Carriers* decision, for example, the National Association of Regulatory Utilities Commissioners (NARUC) argued that:

> " 'Effectuation of the Order would serve to increase the burden to intrastate telephone users by reason of the diversion of interstate usage of telephone network facilities to the detriment of telephone users whose rates are regulated by state authorities.' "

*Washington Util. & Transp. Comm'n v. FCC,* 513 F.2d 1142, 1146 (9th Cir.), *cert. denied,* 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975) (S–3377). At the Commission, NARUC contended that competition would cause a wasteful and inefficient duplication of facilities (29 F.C.C.2d at 966):

> "[The] 1934 Act clearly intended the Commission would regulate common carriers as monopolies, and that new carriers would be authorized only in event of inadequate service by existing carriers. Any FCC decision authorizing wasteful and duplicative facilities would divert revenues from existing carriers, which could impair national uniformity of interstate rates, increase the burden on interstate and intrastate users, and waste spectrum."

In his testimony in this case, Mr. Thomas J. O'Reilly, long-time counsel for independent telephone companies and their national trade association, the United States Independent Telephone Association (USITA), confirmed that independent telephone companies shared the concern of the state commissions and the Bell System "over the direction of the FCC's policies" in the 1970s (O'Reilly, S–T–139 at 7). Mr. O'Reilly testified that these policies created "serious problems" for the local exchange customers in areas served by independent telephone companies (O'Reilly, S–T–139 at 10). Because the independent companies receive a substantial contribution towards the costs of local exchange service through the separations and settlements process, they were understandably concerned that the introduction of competition would erode such contribution (O'Reilly, S–T–139; see also S–2918; S–0124; S–2919; S–3529; S–5842; S–5880; S–5591; S–5875).

Studies conducted during this period also demonstrated that the introduction of competition in the telecommunications industry would lead to a substantial increase in residential local exchange service rates.[79] In 1973, the NARUC Committee on Communications instituted a formal investigation to determine the potential impact of competition upon local service rates because it was believed that the FCC had not adequately considered the effect its decision would have upon such rates (Pearson, S–T–145 at 21; Wooten, S–T–141 at 18–20). The Committee concluded that sooner or later the price of basic residential service would have to be increased significantly if the FCC's new policies with respect to competition were not altered (S–3016 at 91):

> "[I]t is clear that the adverse impact at issue results in the gradual shifting of costs of operation from one class of subscriber to another, in this case to the detriment of the residential user. Contrary to the contentions of many parties, not only is such an impact almost certain

---

**79.** Even from its earliest beginnings, the residential rates were subsidized. In a May, 1877 telephone advertisement "[t]he terms for leasing two telephones for social purpose connecting a dwelling house with any building will be $20 a year, for business purposes $40 a year . . . (S–0274).

to occur, absent immediate corrective regulatory action, but the degree of impact which is threatened is such that the widespread availability of basic telephone service at reasonable prices may well be jeopardized."

The Bell System's 1973 and 1975 Residential Cost Studies, which were the subject of Mr. Genthner's testimony, reached conclusions similar to those of the NARUC investigation. Both of these Residential Cost Studies demonstrated that if the services that were being opened to competition were priced to cover only their directly attributable costs, the loss of contribution from those services "would have precipitated substantial increases in local exchange rates" (Genthner, U.S.Tr. 13883). As Mr. Genthner explained (Genthner, S–T–57 at 10):

"If the rates for these other services were to be restructured so as to cover only their directly attributable costs, they would not produce this revenue support for local residential service—even if they continued to cover all common overhead costs. The studies showed that in such circumstances the rates for local residential service would have to be increased significantly. The magnitude of this potential increase was shown to be approximately 75 percent in the 1973 study and 79 percent in the 1975 study."

The fact that Mr. deButts' views were shared by many others involved with the telecommunications industry reinforces the Court's conclusion that those views were reasonable (Privett, S–T–143 at 5; Colter, S–T–144 at 7–10; Wooten, S–T–141 at 4). Indeed, subsequent events bear out the conclusion that Mr. deButts' concerns were legitimate. In spite of representations by the specialized carriers in the early 1970s that they would not engage in creamskimming, and that they would not divert substantial revenues from existing carriers because they would be providing "new and innovative" services (*Microwave Communications, Inc.,* 18 F.C.C.2d 953 (1969) (S–1918); *Specialized Common Carriers,* 29 F.C.C.2d 870 (1971) (S–2211); Rosse, S–T–43 at 47–63), the damage study submitted by the plain-

tiffs in this case is predicated on the assumption that plaintiffs would serve only the high-density areas and that they and other specialized common carriers would immediately capture 60 percent of the Bell System's private line business in these areas. And, as far as is evident in this record, SPCC never did anything other than attempt to creamskim. Indeed, the record reflects that SPCC told its customers that it was able to undercut the Bell System's prices because SPCC served only selective areas and ignored "the smaller, less profitable locations" (Hollis, Tr. 2319).

Although the Commission never conducted a full-scale study to determine what the long-range effect of its actions on selective entry has been (deButts, Tr. 4047), Mr. deButts testified, and plaintiffs have never seriously disputed, that competition with the Bell System has caused higher rates for residential customers (deButts, Tr. 4084). This is because defendants' costs of providing residential service exceed the revenues from those services (Genthner, S–T–52 at 6), so that residential rates are subsidized (Brown, Tr. 5341). Indeed, a study of this issue submitted by defendants concluded that "the demand for telephone service is price sensitive," and "there are wide differences in price sensitivity across the population" (Perl, S–T–54, U.S.Tr. at 21444–45). Given this price-sensitivity, "increases in the range of 50 to 200 percent would have significant impact on the overall proportion of households with telephones" (Perl, S–T–54 at 1), with a disproportionate impact on minorities, the poor, the elderly and other socio-economic groups least able to bear that burden (*id.* at 5–6).

Read as a whole, and in the context of other evidence in this case, the "intent" documents proffered by plaintiffs reflect genuine concern for residential consumers of telephone service, a concern expressed in the unfortunate absence of a public debate (see Brown, Tr. 5332; deButts, S–T–131 at 86). In light of these facts, the Court agrees with the testimony of former Commissioner Hooks that "profound social issues" were raised by the Commission's au-

thorization of limited entry (Hooks, S–T–147 at 2). These issues, recognized in the speeches of Mr. deButts, are much more significant than plaintiffs' construction of the "intent" documents would suggest.[80]

▪ Under the *Noerr-Pennington* doctrine, it is not a violation of the antitrust laws for defendants to speak out on public issues or to attempt to persuade the FCC to change its policy. In the absence of a "sham" such action is clearly protected under the First Amendment.

▪ Pursuant to that principle, evidence of public speeches or other political activity ordinarily cannot be used as evidence of intent unless plaintiffs can demonstrate that such activity was a "sham." Plaintiffs have offered no evidence to indicate that the Bell System executives were engaged in anything other than a legitimate attempt to stir public debate over the FCC's policies, and the Court's findings with respect to the reasonableness and propriety of the positions taken by defendants' executives in their speeches conclusively negates any notion that those positions were a "sham."[81]

Nor is there any evidence that the opinions expressed by the Bell System executives were anything other than genuinely held views. Plaintiffs' exhibits indicate that Bell System executives were saying in their internal meetings the same things that Mr. deButts stated in his speeches—that the Bell System had an obligation to provide quality service at the lowest possible cost and that the selective entry of carriers such as SPCC would lead to "higher costs to the public" (see, *e.g.*, PX1–0099).

The plaintiffs also rely on the September 1973, Corporate Planning Studies Division of AT & T generated "Synthesis Report" containing findings derived from over 60 interviews with Bell System's upper management regarding the interexchange market. (PX1–0023 at 1014) "The views expressed in this paper are those of the authors and not necessarily those of the AT & T Company or any of its officers." (*id.*) "The material has been developed for discussion purposes only and the views are advanced to encourage further research and understanding." (*id.*) The report recognized that "the exclusivity of our possession of technical expertise has gradually eroded" in the wake of the "burgeoning growth" and "widespread availability of microwave technology," and that this in turn gives "less credence to single supplier arguments." (*id.* at 1020.)

The Synthesis Report further recognized that the entry of competitors was influenced by "our own vulnerability because of pricing methods and service criteria" (PX1–0021 at 0049) and acknowledged that "[W]e have overbuilt much of the plant," there has been "too much 'gold plating'," innovations by others have probably been "discouraged," and "our technical development process is too slow." (PX1–0149 at 1174, 1181, 1164, 1187) The Report noted that many managers regarded an "inattention to the desires of some business customers" as another factor motivating competitive entry:

> Business customers have long wanted alternative suppliers to keep us on our toes and to fill in the voids in our service offerings. There appears to be strong historical evidence that . . . customers' desires do not receive full attention with-

---

**80.** Several commissioners testified that their earlier fears that the FCC's actions would mean some persons would be unable to afford even basic telephone service have been confirmed by recent rate increases for such service (Hooks, S–T–147 at 15; Pearson, S–T–145 at 21).

**81.** During the cross-examination of Mr. deButts and Mr. Brown, plaintiffs engaged in what the Court views as an ill-conceived effort to demonstrate that defendants' advocacy of legislation by Congress to address the proper role of competition in the telecommunications indus-

try provides a basis for inferring anticompetitive intent. Although the Supreme Court in *dictum* in *Pennington* suggested that evidence of this kind reflecting the clear exercise of constitutionally protected rights might be admissible under limited circumstances for that purpose (381 U.S. at 670–71 n. 3, 85 S.Ct. at 1593 n. 3), the Court's finding that defendants' expressions of views on these issues was reasonable leads *a fortiori* to the conclusion that their speeches and support of legislation reflecting those views were likewise reasonable.

out the presence of others in the marketplace. (PX1–0023 at 1021)

In addition to assessing the reasons for competitive entry, the Synthesis Report commented on AT & T's abilities "to operate in a new environment." (PX1–0023 at 1030) The Report observed that a "significant constraint" on that ability was attributable to the Bell System's "inertial resistance to change" which derived from the fact that "[t]he selection and training of our managers, structure of the business, operational methods, and pricing policies have all been oriented to a monopolistic or protected business operation." (*id.* at 1029–30.) In the same vein, the Report acknowledged,

"We certainly want to be good competitors, but our employee body has been conditioned by decades of monopoly operation."

(PX1–0021 at 0057.)

According to the Report, the managers perceived AT & T's strategy for dealing with the new competition as one of "delay and minimize the loss of our monopoly position," a tactic "designed to limit competitive encroachments through devices such as restricting the use other carriers may make of our facilities...," an objective of "giving up as little and as slowly as possible." (PX1–0023 at 1006, 1007, 1077) The Report summarized the managers' view of the corporate position "as one of buying time." (*id.* at 1026; PX1–0021 at 0052)

The Report described the corporate strategy as follows:

The corporation has a stated objective relating to our competitive posture which indicates that we do not plan to voluntarily relinquish our existing markets, *and in fact are attempting to reacquire an interexchange monopoly.*

(PX1–0021 at 0055 (emphasis supplied))

Nonetheless, the Report noted that "broad, long range corporate goals" had not yet been communicated to the Bell System managers, who sought guidance as to "concrete positive objectives and tactics for the interexchange market." (PX1–0023 at 1026) As the Report stated, "They (the technical managers) were unanimous in their desire to have a stated objective role for the Bell System to play." (PX1–0149 at 1181)

■ Based on the foregoing Report SPCC would have this Court infer anticompetitive intent. However, again the Court must note that this report was done to find out the thoughts of some of AT & T's employees and does not represent the corporate policy of the company as espoused by Messrs. deButts and Brown. Moreover, the fact that a few of its employees may have expressed anticompetitive intent does not justify this Court conferring such intent upon the whole company especially when those intentions never came to fruition. As the entire record of this case indicates, AT & T acted in good faith, despite the uncontested predicament that AT & T was in, *i.e.,* being both a supplier and a competitor.

On October 17, 1973, a month after the Synthesis Report reflected management's desire for a stated corporate objective, Mr. deButts delivered a presentation on closed circuit television to the Bell operating company managers. (PX1–0099 at 1) In all, 200,000 Bell employees heard this speech. (deButts Tr. 4079) In it, Mr. deButts told his managers:

So we have taken our stand. We have declared that the Bell System no longer will accommodate itself to regulatory trends we are convinced will impair its ability to do its job.

(PX1–0099 at 4.) He went on to urge that "the further entry of specialized carriers [be] suspended pending a complete determination of the consequences of sabotaging the common carrier principle that has served the nation so well." (*id.* at 6.)

Mr. deButts reiterated a statement made in his September NARUC speech that "the public interest" could not help but be impaired by the "duplication of facilities and the division of responsibility" that "inevitably will ensue" from the "further encroachment of competition." (*id.* at 7.) This position, he further reiterated, "represents the

deepest convictions of Bell System management." (*id.*) Preventing such encroachment was, according to Mr. deButts, "a task to which Bell System Management is ready to commit all the resources necessary to accomplish it." (*id.* at 19.)

Mr. deButts made this point again later in his presentation:

> Our policy represents a conviction that I trust we *can now share without reservation*—and that is that neither this business nor the public it serves will benefit from the inevitable consequence of a further extension of selective competition in the field of telecommunications. Having a common *conviction,* we have a common *responsibility* for doing all we can to assure that that conviction prevails.

(*id.* at 23 (emphasis in original)).

Mr. deButts' message to management went on to enlist its support in the task of reacting to the advent of competition:

> On the issue that is now joined, *you are no longer observers.* You are where the action is and you yourselves are among the *principal* actors. To put the matter directly, there may be no more significant index of our performance—*your* performance—in the months and years ahead than the degree of public understanding and support of the common carrier principle that you are able to generate in each of the states in your company's territory, in each of the communities your company serves.

(*id.* at 24 (emphasis in original)).

During a discussion of this presentation at trial, Mr. deButts reiterated his view regarding the duties of corporate employees: "I think it is the responsibility of any employee to hew to an established policy in the company." (deButts, Tr. 4048). It is clear to the Court, that more than any other man, Mr. deButts firmly spoke up for the average consumer.

In September and October of 1973, other AT & T officials similarly discussed the impact of the entry of the specialized common carriers and the company's response.

On September 27, Fox Stoddard, AT & T Marketing Director, in a speech to the California Telecommunications Association, spoke of the "entrepreneurs" who "want a piece of the action" and asserted his belief that "the public interest" would be impaired by the "further encroachment of competition." (PX1–0109 at 597, 598) "There is something right," he stated, "about monopoly—regulated monopoly." (*id.* at 599.)

A week later, AT & T's Director of Public Relations, Paul M. Lund, delivered a speech to the Bell System's Presidents' Conference in which he endorsed the "common carrier concept" and criticized "the market structure approach to competition" as not only "inferior" but "impossible." (PX1–0006 at 1043.) He described the "market structure approach" as a "sacred cow," commenting generally that "[a]nti-trust in the United States is a form of national religion." (*id.* at 1043, 1044.) Mr. Lund observed,

> We say that the result of mixing competition and regulation—especially if the bartender is the FCC—will be that most unpalatable concoction, government enforced cartelization of the telecommunications industry."

(*id.* at 1043.) Mr. Lund urged that "[s]teps must be taken to stop the juggernaut of interconnection and contrived competition." (*id.* at 1058.)

Mr. deButts reported the corporate position on competition in his February 12, 1974 letter to AT & T's shareholders (PX1–0108) He wrote that the "basic policies" of "end-to-end responsibility," the "systems concept" and "the common carrier principle" were being directly challenged. (*id.* at 3.) He wrote further that a "question of particularly grave import" was the "degree to which competition should obtain in an industry recognized throughout most of its history as a natural monopoly." He described the competition AT & T faced as "selective" and "contrived" (*id.* at 4, 8) and indicated that AT & T would "oppose" such competition. (*id.* at 8.) He pledged that

"[t]he Bell System will abdicate no sector of telecommunications where we believe—and can by our own performance prove—that we can do a better job for the public than anyone else."

(*id.* at 9.)

Mr. deButts repeated these views in a May 12, 1975 address before the International Communications Association. (PX1–0115) He began by speaking again of "universal service," the concept of "undivided responsibility," and the notion that the telephone industry was "a single continuous process." (*id.* at 2.) He continued by reaffirming the belief that "competition works to the disadvantage of the average user" and the commitment that "where it does [we] are determined to fight it." (*id.* at 8.)

On January 28, 1976, Mr. deButts spoke to the Fordham Forum of the "rhetoric of competition" which appealed to "the presumption that it is settled national policy that in whatever segment of our economy competition can be established it should be." (PX1–0093 at 2) During the speech, Mr. deButts contended,

"At issue is the degree to which competitive standards should supplant the public interest standards that have been the test of the industry's performance throughout most of its history."

(*id.* at 11.)

Mr. deButts went on to state AT & T's position on the issue:

"In our industry, we believe competition—or, more precisely, regulated competition that is, in effect a government imposed allocation of the market—is adverse to the interest of the public."

(*id.*)

In his Fordham address Mr. deButts also described the depth of AT & T's commitment:

"[W]e in the telephone industry do not intend to stand idly by and watch the slow erosion of the work of a hundred years. We recognize an obligation *to compete aggressively* for revenues that,

if lost to others, would require us to raise the rates the average consumer pays."

(*id.* at 8.)

In assessing the new competition, AT & T regarded SPCC as a viable contender. In the Intercity Competitive Service Plans drafted in the summer of 1972, it was noted that SPCC had filed to become a specialized common carrier and that, as a railroad with its own "right-of-way," "existing microwave sites," "operating experience" and "trained personnel," it could pose a serious competitive threat. (PX1–0028 at LA1A 0600) In September 1972, a study reviewed by AT & T's Executive Policy Committee reported that SPCC had hired S.R.I. to develop marketing procedures and prepare a tariff and had approached Pacific Telephone and Telegraph regarding interconnection. (PX1–0045 at LA1N 1765) Other materials prepared by the Executive Policy Committee's September, 1972 meeting predicted that SPCC would be "in service by 4th Quarter 1973" and stated that SPCC's "risk not as high as other SCC." (PX1–0046 at LA1N 2299) The Corporate Business Divisions' "Synthesis Report" similarly notes that SPCC is "strong both financially and technically." (PX1–0021 at 0048); *see also* PX1–0013; PX1–0030; PX1–0053; PX1–0078; PX1–0079; PX1–0086; PX1–0088; PX1–0092.

■ The plaintiffs would have this Court hold that AT & T's reaction to the *Specialized Common Carriers* decision, as evidenced by these speeches and internal memoranda of its corporate leadership showed anticompetition. Plaintiffs' "intent" documents do not show any intent to monopolize. To the contrary, they reflect an intent to raise what are obviously serious public interest questions. Far from suggesting anticompetitive intent, the Court finds that the documents reflect a highly commendable intent on the part of the Bell System to fulfill its obligations to the public in spite of a recognition that it would be accused, as it has been, here and elsewhere, of evil motives in doing so (see deButts, S–T–131 at 4). In the Court's view, the "unusual obligation" Mr. deButts described was not simply rhetoric, but a reality, and he is to be commended, rather than con-

demned, for having the courage to speak out.[82]

■ Plaintiffs urge the Court to conclude from their "intent" documents that the Bell System intended to violate FCC orders and embarked upon a systematic campaign to "kill off" its competition. As counsel for plaintiffs candidly admitted, however, there is not a single document or a single incident that by itself would establish any of these contentions (Tr. 3147). Nevertheless, plaintiffs urge that the documents and the incidents taken altogether add up to a concerted plan headed up by AT & T executives in New York to discriminate against SPCC and other specialized carriers, to misrepresent facts to the FCC and to refuse to follow the orders of the FCC. According to plaintiffs' counsel, the existence of documents written by "senior" AT & T people and stating a need to deal with competition, means "there can be no question" that there was a plan to violate the antitrust laws (Tr. 3119–3121).

The Court finds this claim to be unsupported. Plaintiffs have presented no evidence indicating that any Bell System executive ever directed any employee to engage in anticompetitive activity or not to cooperate fully with the FCC, and Bell employees who prepared cost studies and supervised interconnection have unequivocally denied this assertion (Ankner, Tr. 4705–06; Schwartz, S–T–70 at 3–4; Brown, Tr. 5319; Hough, S–T–1 at 109; Froggatt, S–T–2 at 44; see also Aldrich, U.S.Tr. 22944). The Court finds these witnesses to be highly credible. In assessing the witnesses, the Court takes note of the caliber of the de-fendants' witnesses. While plaintiffs presented management and supervisory personnel as their witnesses, the defendants went one step further, namely, they presented actual technicians and the individuals who had *actual day to day contact with plaintiffs and the other SCCs*. Additionally, the defendants presented a wide array of outside experts and competitors who testified favorably for the defendants. As defense counsel stated during his opening statement concerning Dr. Baumol, there are only three possibilities about the claim(s) that SP is advancing: (1) there is somehow a gigantic conspiracy in which everyone is involved and he (Dr. Baumol) doesn't know about it, (2) that he (Dr. Baumol) is telling a lie, or (3) the possibility that it didn't happen (Tr. 166). The Court finds no "gigantic conspiracy," nor does the Court find that the defendants' witnesses have lied. Thus, as the opinion details, the Court finds that the alleged anticompetitive acts of the defendants did not happen.

■ Moreover, the Court has read every single document to which plaintiffs have directed its attention, and there is absolutely nothing in those documents indicating the existence of a plan of the kind plaintiffs hypothesize.[83] In fact, plaintiffs' exhibits demonstrate that the Bell System executives recognized that the public positions they were taking might expose them to spurious claims of anticompetitive behavior and that special efforts should be taken to reiterate to Bell System employees the need to treat plaintiffs and other specialized common carriers in a fair and nondiscriminatory manner.[84] For example, in a speech

---

**82.** Contrary to plaintiffs' arguments that Mr. deButts sought to exclude all competition, nothing in his speeches gives rise to such a conclusion. As he testified here, he merely called for a moratorium on further expansion of FCC policy until the FCC addressed and resolved the policy issues involved (deButts, Tr. 4052, 4056).

**83.** The Court has also taken into account the possibility of some lack of documentation for AT & T's actions. Based on the entire record of this case, even if this were the case, the Court would still not draw an inference of anticompetitive intent.

**84.** Plaintiffs argue that the fact that AT & T recognized it might be sued under the antitrust laws and had its legal department prepare antitrust seminars to educate its employees somehow reflects the existence of anticompetitive intent (*e.g.,* Tr. 2663–2665). That argument is unpersuasive, particularly because the Court finds nothing in the evidence presented that would permit any conclusion that AT & T was attempting to hide anticompetitive conduct rather than prevent it. Indeed, it showed a company that was keenly aware of the parameters in which it must operate.

made by Mr. deButts to his employees in which he discussed his decision to speak out against the policies of the FCC, he stressed the "absolute necessity to assure that the *conduct of our business*—and the articulation and presentation of our case to employees and the public—is proof against charges of unfair anti-competitive behavior" (PX1–0099).

Similarly, as discussed above, after a meeting between Mr. deButts and Mr. McGowan, the chief executive officer of MCI, in which the latter threatened an antitrust suit against the Bell System, Mr. deButts instructed one of AT & T's Vice Presidents to "*re-emphasize*" to the presidents of the operating telephone companies "that our policy is to process orders with the same speed and efficiency that we process orders from our own customers" (PX1–0031; deButts, Tr. 4155), and that MCI should be given no legitimate cause for complaint (deButts, S–T–131 at 73).[85]

■ Plaintiffs' suggestion that AT & T's top management was somehow subtly urging its employees to violate FCC orders has no foundation in this record. To the contrary, the record shows that the Bell System lower management understood that the Company's opposition to FCC policy was based upon principle and that although the Company intended to "fight" what it considered to be the unsound policy decisions of the FCC, it was going to "cooperate fully"

with the FCC in its day-to-day activity (PX1–0023 at AF 961080).[86] Mr. deButts carried this message to lower employees over closed-circuit television, impressing upon them their duty to obey the law (deButts, Tr. 4151–52).[87]

■ Plaintiffs virtually concede that the management and employees of the Bell System genuinely believed that the FCC's policies were not in the public interest. Indeed, it is by virtue of that belief, because of these employees' "devotion to their concern," plaintiffs argue, that the Court should conclude they *must* have engaged in anticompetitive conduct (Tr. 313). Such an inference would be wholly improper. The Court cannot substitute speculation for evidence, and there is no evidentiary basis for the Court to draw the inferences plaintiffs require. It would be both illogical and inconsistent with the record. Plaintiffs can not concede that defendants were genuinely concerned with the public interest; and that the Bell companies are "the best corporate citizen in almost every community in the United States" (Tr. 312), and expect the Court to conclude from this that defendants engaged in unlawful conduct. Accordingly, the Court finds that the defendants lack the requisite intent to violate the antitrust laws, either by inference or speculation.

As will be further discussed in this opinion, the Court would be remiss if it did not

---

**85.** Plaintiffs' effort to establish that defendants engaged in a systematic program of document destruction following this meeting from which an inference of anticompetitive intent should be drawn must likewise be rejected. The document upon which plaintiffs principally rely in this connection (PX1–0038), *when read in its entirety,* reflects a concern with document preservation, not document destruction, and the circumstances surrounding its preparation were fully explained to the Court's satisfaction (Stoddard, S–T–13 at 20–22).

**86.** Plaintiffs have called the Court's attention to documents characterizing the Bell System's policy as one of "delay" or "limiting" competition. In context, the Court views these expressions as reflecting the belief of some employees that the Bell System might be unsuccessful in its efforts to persuade the FCC to change its policies and at most would only slow down that agency's movement away from the historic reg-

ulatory principles of universal service and end-to-end responsibility.

**87.** The Court further notes that, although many SPCC employees are former Bell System employees, plaintiffs have not offered any testimony by a single Bell System employee, or former employee, that he or she understood Bell System policy to be anything less than to treat competing carriers in a fair and non-discriminatory manner. By contrast, many of defendants' employees, holding various positions at various levels and in various parts of the country, testified uniformly as to their understanding of a policy not to discriminate. (*e.g.,* Hough, Tr. 3537; Marshall, Tr. 4015–4021; Hunt, Tr. 4157; Brown, Tr. 5328–5329; Thompson, S–T–65 at 1–2; Saenger, S–T–69 at 1; Wehman, S–T–64 at 4; Franklin, S–T–56 at 3, 8; Spencer, S–T–81 at 3, 4).

initially point out some very disturbing aspects of this case. Namely, the roles that Drs. Owen and Melody and Messrs. Hinchman,[88] and Cox[89] have played in trying to wreck havoc on *the* largest corporation in the world. Upon a careful review of the record in this case, the Court finds at least the appearance of impropriety on the part of these individuals.

It is undisputed that Dr. Owen, while at the Office of Telecommunications Policy (OTP),[90] wanted to go about the business of breaking up AT & T and proceeded by trying to recruit others at the Department of Justice (DOJ) and the Federal Communications Commission (FCC) to follow his idea in 1972 and 1973. He was rebuffed by the staff of the FCC, under Mr. Bernard Strassberg,[91] who coincidentally was working on a draft opinion which was to find Telpak lawful and Long Run Incremental Cost (LRIC) an appropriate costing methodology. (S–2825c) Dr. Owen was able to convince one of the Commissioners to follow his idea. That Commissioner's chief aid was Mr. Walter Hinchman.[92] Towards the end of 1972, Mr. Strassberg had on his desk the draft opinion finding Telpak lawful, (S–2825c) but for reasons known only to himself, refused to approve the opinion.[93] Mr. Strassberg stepped down from his post on December 31, 1973 and on January 1, 1974, Mr. Walter Hinchman took over Strassberg's job as Chief of the Common Carrier Bureau with the same draft opinion waiting on his desk for approval. Mr. Hinchman did not approve the decision[94] and instead writes his own opinion, despite the fact that he knew absolutely nothing about the facts surrounding Telpak or what LRIC was (Tr. 4980–81). Moreover, during the discovery process, the defendants attempted to discover the TELPAK draft opinion S–2825, but were unsuccessful until they received a Court order during the trial of this case to search the files of Mr. Hinchman's office, which he had taken from his FCC job.

The Court cannot overlook Dr. Melody, a former staffer at the FCC, who stated that no one at the FCC would listen

---

**88.** Mr. Hinchman in particular lacks any credibility. It was Mr. Hinchman who as Chief of the Common Carrier Bureau had the job of regulating the Bell System from January 1, 1974 until September-October, 1978. Yet, he goes around the country now saying he could not do it. At the same time he testifies in every forum possible against the Bell System and its "evils." (Tr. 5000).

**89.** Though Mr. Cox was not a witness in this case, he represented the kind of people the Bell System had to face at the FCC. Mr. Cox, was a former member of the FCC, and cast a deciding vote on the FCC's 4 to 3 decision in 1969 granting MCI's application for the construction of facilities between Chicago and St. Louis. Mr. Cox resigned as an FCC Commissioner on August 31, 1970, and on September 1, 1970 assumed the position as Senior Vice President of MCI. (Brief of Appellant AT & T in the United States Court of Appeals for the Seventh Circuit at 16 n. 14).

**90.** Dr. Owen was chief economist of the White House Office of Telecommunications Policy (OTP) in 1971 and 1972. (Owen PX6–0005 at 1) Dr. Owen was a consultant at OTP in 1973. (Tr. 5708).

**91.** When Dr. Owen went to the FCC, he was confronted with the view that many at the FCC believed that Bell was the low cost provider of telecommunications services and, that competi-

tion wouldn't work without a rate umbrella. (Tr. 5708–9).

**92.** Indeed, Mr. Hinchman and a number of others were trying to decide what the right policy for the industry was. (Tr. 5706). Additionally, Dr. Owen and others were discussing at that time the antitrust solution to the competition in telecommunications as well as the regulatory solution. (Tr. 5709–10).

**93.** The Court does not suggest that there is anything wrong with Mr. Strassberg's failure to approve the draft opinion. Indeed, it was his right to do anything that he wanted with the draft.

**94.** Again, the Court does not find anything wrong with Mr. Hinchman not approving the draft opinion. S–2825(c). However, when AT & T searched the files of the FCC, they were unable to find this draft opinion. It was not until this Court, during the trial hereof, permitted AT & T to search Mr. Hinchman's personal files were they successful in obtaining the document. At the very least, this impinges on the integrity of Mr. Hinchman for taking public files from the Commission on his departure. This, despite the fact that Judge Waddy ordered all of the files at the FCC to be held pending discovery by AT & T.

to his view. Is it any wonder, when the ones vested with the responsibility to listen were Messrs. Strassberg and Hinchman. Dr. Melody is the same individual who acted as a consultant to the FCC while at the same time consulting with AT & T's competitors, MCI and DATRAN. If Dr. Melody were a lawyer, he would surely have been a target of disciplinary proceedings for this conduct. (*See*, 18 U.S.C. 207). It is based on these facts that the Court will accord no credibility to the testimony of Dr. Melody and Mr. Hinchman. It is this type of improper activity that gives the Government a bad name and should not be countenanced.

## THE PRICING CLAIMS

██ In the usual Section 2 case where claims of predatory pricing are made, the Court must determine whether the defendant reduced its price below its costs for the purpose of destroying competition and with the intention of thereafter recouping its losses by charging the supracompetitive

prices its monopoly makes possible. *See Northeastern Tel. Co. v. American Tel. & Tel. Co.*, 651 F.2d 76, 89 (2d Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982). The Court is confronted in this case with a most unusual situation—predatory pricing claims that are not based on any customary or common theory of below-cost pricing. Rather, according to plaintiffs' counsel, their contentions are: (1) that "AT & T priced disregarding its cost;" (2) that AT & T structured its rates to forestall competition; and (3) that AT & T misrepresented the nature of its tariffs to the FCC (Tr. 1752–53).

These predatory pricing charges were directed at three AT & T tariffs for private line service: Telpak, Hi/Lo and Multischedule Private Line (MPL), described more fully in succeeding findings.[95]

## TELPAK

On January 16, 1961, AT & T filed a new private line tariff, Tariff F.C.C. No. 250,

---

**95.** Plaintiffs also challenged AT & T's tariff for Dataphone Digital Service (DDS). Although disclaiming any injury from that tariff (Vasilakos, Tr. 2983; SPCC Response to AT & T Contention 8–E–0001), plaintiffs have contended that the circumstances surrounding the filing of DDS are relevant to AT & T's alleged anticompetitive intent. SPCC's evidence regarding DDS, however, consisted only of passing references by Dr. Melody and the FCC's decision in Docket No. 20288 (PX3–0335). The Court finds that this evidence is inadequate to establish either predatory pricing or predatory intent. *American Tel. & Tel. Co. v. FCC*, 602 F.2d 401, 410 n. 49 (D.C.Cir.1979); *Pacific Engineering & Production Co. v. Kerr-McGee Corp.*, 551 F.2d 790, 795 (10th Cir.1977).

Moreover, defendants have introduced convincing counter-evidence that the DDS tariff was based upon thorough and reasonable cost and market demand studies, and that the rates were reasonably anticipated to be well above either fully distributed or incremental costs (see Muench, S–T–18 at 34–53; Ambrose, S–T–17 at 4–40; Eastmond, S–T–11 at 57–61; Guild, S–T–15 at 18–29). In addition, it appears that the substantial geographic and pricing restrictions and delay imposed on DDS by the FCC had a material effect on its attractiveness and accounted significantly for the disparities the FCC identified between AT & T's projections and actual results for DDS (Hough, S–T–1 at 75–78; Frank, S–T–19; Muench, S–T–18 at 54–56, 63–64; McWhorter, S–T–25; Hase, S–T–24; Ambrose, S–T–17 at U.S. Tr. 22870–74; S–

4821; S–5065). The record also indicates that the FCC imposed these restrictions and delay upon DDS in order to shelter less efficient competition and, in effect, to allocate the market (Sutter, Tr. 4920–31; S–3194B; S–3253B; S–0007U; S–3217; S–3234B; S–3258B). The only cost data before the Commission or its staff when these restrictions were under consideration indicated that DDS would not be cross-subsidized at the tariffed rates and that DDS was dramatically less costly than competing specialized carrier data transmission services (Brauetigam, Tr. 5016, 5020–22; S–3052B; S–2552B; S–2664B; S–2668B; S–2618C; S–2606). Dr. Brauetigam concluded that the DDS "costs were a twentieth to fortieth of those offered by the competing carriers. So even if there was a great deal of uncertainty about the cost itself, there is still a fair amount of room there for error on my part, and the facilities would still have been compensatory" (Brauetigam, Tr. 5033–34; S–2618C at AAW4 2594). Finally, it is apparent that AT & T's selection of rates for DDS was not designed to undercut Datran (Muench, S–T–18 at 40–42). Datran had not filed its tariff when the DDS tariff was filed and had not even decided upon its final rate levels (S–2948; S–2974; S–2984). Moreover, Datran was apparently inefficient even by SPCC's standards (S–4424; S–4433). The evidence strongly suggests that Datran simply could not compete with AT & T's efficiency.

called Telpak. The Telpak tariff became effective on February 16, 1961. (Agreed Fact 1–1–006.) In 1966, Telpak was designated as Series 5000 of AT & T's Tariff F.C.C. No. 260. (Agreed Fact 1–1–006.)

Telpak was not a physical entity but rather a pricing arrangement for large quantities of private line circuits. AT & T provided private line service priced under Telpak in similar manner and using the same facilities as it used to provide service priced under its single-channel private line tariffs. (Hollis PX6–0014 at 4).

A TELPAK customer could use the available channels within its TELPAK classification for a variety of communication services, including voice grade, teletypewriter, data or facsimile transmission. (Agreed fact 1–3–043). The customer could use the available channels to alternate the type of services he needs, such as voice grade transmission during the day and data transmissions at night. (*id.*) In addition, the customer could arrange for full duplex (two-way transmission) or half duplex (one-way transmission) service. (*id.*)

The original Telpak tariff offered volume discounts to customers under four classifications, A, B, C and D, allowing a customer to use respectively up to 12, 24, 60 and 240 voice grade equivalent circuits. (Agreed Fact 1–1–007; Boettinger S–T–3, tab A at 15.)

The customer could arrange to use the circuits available in a Telpak package to provide a series of distinct communications services, including wideband channels for data and high-speed facsimile transmission and channels of lesser bandwidth for voice grade and teletypewriter transmission. (Agreed Fact 1–1–007b). AT & T furnished service under Telpak on a two-point or multi-point basis. (Hollis PX6–0014 at 4). Customers could combine interstate and intrastate private line circuits in one Telpak pricing package. (Agreed Fact 1–3–044).

Although AT & T described Telpak as a "broad-band" offering, (PX2–0017; PX2–0205, 30 F.C.C. at 627 (Telpak); PX2–0201, 38 F.C.C. at 371–73 (Dkt. 14251)), AT & T actually provided private line service under Telpak on a diverse routing basis. *Under diverse routing the customer's channels were not limited to a specific route or to a single frequency band on a specific facility.* (Agreed Facts 1–1–010). Rather, AT & T routed the circuits priced under Telpak over a variety of routes and facilities, and using many different, smaller bandwidths. (Agreed Facts 1–1–010, 011).

Monthly Telpak charges were based on two rate elements: 1) an intercity mileage (IXC) charge; and 2) a channel termination charge. (Hollis PX6–0014 at 5; PX–2–0015 of 2; Boettinger S–T–3, tab A at 15–16).

The IXC charge consisted of a fixed rate per airline mile and was based upon the size (A, B, C or D) of the Telpak package. The IXC charge did not vary with the number of circuits actually used by the customer. Nor did it vary with the type of private line service (*i.e.,* voice, data, etc.) for which the customer used the circuits. (PX2–0015; Hollis PX6–0014 at 5).

As originally filed, IXC charges for the Telpak classifications were:

| Telpak Classification | Maximum Voice Grade Channel Equivalent | Rate Per Airline Mile Per Month |
|---|---|---|
| A | 12 | $15 |
| B | 24 | $20 |
| C | 60 | $25 |
| D | 240 | $45 |

[Agreed Fact 1–1–010.]

The TELPAK tariff's for C and D was raised five times since its inception [96], three times prior to SPCC's entry into the market. These rate increases were requested as follows:

September 1, 1968:

| | | |
|---|---|---|
| C | 60 | 28 |
| D | 240 | 60 |

(Agreed Facts 1–3–021)

---

**96.** Each proposed TELPAK rate increase caused users to file petitions requesting that the FCC take some action to reschedule the rate increases, to reject them, or to require their withdrawal. *See e.g.,* Agreed Facts 1–3–010–11.

February 1, 1970:

| | | |
|---|-----|------|
| C | 60 | 30 |
| D | 240 | 85 |

(Agreed Fact 1–3–002)

May 4, 1972:

| | | |
|---|-----|------|
| C | 60 | 30 |
| D | 240 | 85 |

(Agreed Fact 1–3–023)

March 9, 1975:

| | | |
|---|-----|-------|
| C | 60 | 31.55 |
| D | 240 | 89.35 |

(Agreed Fact 1–3–024)

March 29, 1976:

| | | |
|---|-----|-------|
| C | 60 | 32.50 |
| D | 240 | 92.05 |

(Agreed Fact 1 3–025).

The basic Telpak pricing unit for IXC was called a Telpak "section." This was the airline distance between two geographic service points, called "end points." (Hollis, PX6–0014 at 5.) The Telpak "section" did not constitute any physical entity but was simply a pricing mechanism. (*id.*) AT & T did not necessarily route circuits priced under Telpak between the endpoints of the Telpak pricing section. (*id.*)

Circuits priced under Telpak need not have originated or terminated at the endpoints of a Telpak pricing section. (Hollis, PX6–0014 at 11). The portion of a circuit that extended beyond the endpoint of a Telpak pricing section was called an "endlink" or "leg-out." An endlink was also a pricing mechanism and did not necessarily denote the existence of any physical circuit between its pricing points. (Hollis PX6–0014 at 11–13); Agreed Facts 1–3–046, 047).

The channel termination charge was a flat charge per month for service terminations at each end of a circuit. The terminal charges applied only to circuits that a customer actually used in a Telpak section. (Hollis, PX6–0014 at 5; Agreed Fact 1–1–008). A customer did not always arrange for use of all circuits available in his Telpak classification. (Agreed Fact 1–1–007a).

As originally filed, channel terminals were $15.00 for telephone and teletypewri-ter terminals ($30 for two ends of a channel) and $15 to $1,300.00 for special data and high-speed facsimile terminals.[97] (Agreed Fact 1–1–008.)

The Telpak offering expressly allowed interconnection to other AT & T-provided services and facilities. There was no provision in the Telpak tariff to allow interconnection to the facilities of nonconcurring common carriers. (PX2–0024 at AD680066, Section B.3.a. and b.)

In 1967, AT & T eliminated Telpak A and B (Agreed Fact 1–1–007) after the FCC declared them to be non-cost justified.[98] ((PX2–0201, 38 F.C.C. at 385–87, 395 Dkt. 14251); PX2–247, 37 F.C.C. at 1118 (Dkt. 14251)). Thus, at the time SPCC on December 25, 1973, entered the market AT & T offered only Telpak C and D. As of 1975, TELPAK accounted for only 3 percent of AT & T Long Lines's private line customers; yet it accounted for 54 percent of AT & T's private line revenues and 70 percent of its private line circuit miles. (PX2–0414).

## HI/LO & MPL

AT & T provided private line services under its private line tariff, AT & T Tariff FCC No. 260. (*See Agreed Fact 2–1–006.*) Under Tariff 260, services were provided under various "Series." Individual voice grade private line circuits were provided under Series 2000 (voice) and Series 3000 (data) of Tariff 260. (*id.;* PX3–0043 at 48; (Brodman, Tr. 1774.)

On November 15, 1973, AT & T filed the Hi/Lo rate revisions to Series 2000/3000 of AT & T's private line Tariff FCC No. 260. (PX3–0043 at 1.)

Following protests filed by various parties, (*id.*) the Hi/Lo rates were suspended and set for investigation by the FCC. (PX3–0071, 55 F.C.C.2d at 224 (Hi/Lo Interim Decision).) The FCC's investigation of Hi/Lo was Docket 19919. (*id.*)

---

**97.** The channel terminals were continually increased to a high of $43.30 per month ($86.60 for the two ends of a channel).

**98.** The Court would note that the FCC could have mandated that TELPAK be withdrawn at this time, or any other time, if they were illegal or for any other reason that the FCC desired.

Under the FCC's rules, if rates are found unlawful during the period they are under suspension, they never go into effect. (PX3–0241, 74 F.C.C.2d at 41–42 (MPL Final Decision).) Rates automatically become effective upon expiration of the suspension period if the investigation has not been concluded. The fact that such rates go into effect does not indicate Commission approval of them. (*id.*)

After the period of suspension and a further voluntary delay by AT & T (PX3–0043 at 2), the Hi/Lo rates became effective June 13, 1974, before the FCC's Hi/Lo investigation had been completed. (PX3–0043 at 6; PX3–0071, 55 F.C.C.2d at 224 (Hi/Lo Interim Decision).)

On January 22, 1976, the FCC declared Hi/Lo non-cost justified [99] and ordered AT & T to file replacement rates. (PX3–0072, 58 F.C.C.2d at 362 (Hi/Lo Final Decision).) The FCC found AT & T's cost data inadequate to permit it to prescribe rates, stating: "Besides being insufficient to support the Hi/Lo rates, the record of this case is insufficient to permit us to justify any rate prescription, even for an interim period." (PX3–0072, 58 F.C.C.2d at 370 (Hi/Lo Final Decision).) Thus, the FCC permitted Hi/Lo to remain in effect, even though allegedly not cost justified, pending AT & T's filing of the replacement rates. The Hi/Lo rates remained in effect until August 20, 1976. (PX3–0241, 74 F.C.C.2d at 2 (MPL Final Decision).)

AT & T filed the replacement rates, the Multi-schedule Private Line ("MPL") tariff, on April 19, 1976. (PX3–0236.)

Following protests by various parties, the FCC suspended MPL for investigation. (PX3–0240; PX3–0241, 74 F.C.C.2d at 2) (MPL Final Decision). Upon expiration of the statutory suspension period on August 20, 1976, the MPL rates automatically went into effect. (PX3–0241, 74 F.C.C.2d at 2 (MPL Final Decision).)

The MPL rates were declared non-cost justified on October 4, 1979. (PX3–0241, 74 F.C.C.2d at 49 (MPL Final Decision).)

Notwithstanding a lack of alleged reliable cost information from AT & T, the FCC again allowed the non-cost justified rates to remain in effect. The Commission stated:

Perhaps the primary goal underlying our efforts to achieve accurate, auditable cost of service information has been to reveal any interservice cross-subsidizations that may occur, and thereby to be in a position to assess the competitive implications of specific AT & T rates.

(*id.* at 31). Continuing, the Commission said:

Although we have conducted several in-depth investigations in which major AT & T tariffs have been found unlawful, ... the records in these proceedings disclosed little reliable cost of service information which could have formed the basis for a rate prescription. Despite our frustration, we had no recourse but to allow the unlawful tariffs to remain in effect....

(*id.* at 41–42).

On June 26, 1981, AT & T filed rate increases for MPL. (Hieronymus PX3–0030 at 22–25).

## DESCRIPTION OF HI/LO AND MPL RATES

Prior to the entry of specialized common carrier competition into the private line market, AT & T priced its Series 2000/3000 services on a uniform nationwide basis, *i.e.,* charges for circuits of the same airline mile distance were equal regardless of the locations of the service points. (PX3–0114 at 2; *see* Agreed Fact 2–1–014.) AT & T described its uniform rates as "averaged" on the theory that the rates were established to cover the "averaged" costs of the services as a whole. (PX3–0114 at 2; PX3–0043 at ii.)

When AT & T filed the Hi/Lo rates, it described them as a high density/low densi-

---

**99.** The Court notes that the Hi/Lo and MPL rates were found unjust, unreasonable and unlawful in violation of 47 U.S.C. § 201(b) which is a public interest standard and not an antitrust standard. (PX3–0241, 74 F.C.C.2d at 48.)

ty rate "deaveraging", *i.e.*, the uniform rates were being replaced by rates which "reflect[ed] the significant cost differences between the lower cost, high capacity facilities on high density routes compared to the higher costs on low-density routes." (PX3–0043 at 51.)

Hi/Lo was AT & T's response to specialized common carrier competition in the voice grade interstate private line services (series 2000 and series 3000) "to reflect the cost and economies inherent in its plant and operations...." (PX3–0043 at ii).

## HI/LO

The Hi/Lo rates established three rate schedules: "HiD" (high density), "LoD" (low density) and short haul (for circuits 25 miles or less in length). (PX3–0114 at 11–12.) Each Hi/Lo rate schedule had three elements, a fixed monthly "station terminal" charge, a fixed monthly "channel terminal" charge, and an Interexchange Channel ("IXC") (per mile) charge. For HiD, the IXC rate was $.85 per mile; for LoD it was $2.50. (*id.* at Attachment A at 1.)

Private line circuits connecting two cities designated as HiD rate centers were billed at HiD rates; circuits connecting a LoD rate center with either a HiD rate center or another LoD rate center were billed at LoD rates; circuits of 25 miles or less in length were billed at short haul rates. (PX3–0114 at 13 (Vol. III, tab R, 1); Brodman Tr. 1786–87.)

Four HiD engineering criteria filed in the Hi/Lo tariff determined which cites were identified as "HiD" and thus qualified for the low, HiD rates. (PX3–0104 at 4).

Under the Hi/Lo tariff, AT & T designated 369 cities as HiD rate centers; all others were categorized as low density ("LoD"). (PX3–0104 at 13; PX3–0298; PX3–0114; Agreed Fact 2–1–027.)

Under Hi/Lo, a circuit serving a LoD rate center could avoid being charged LoD rates for the entire length of the circuit by "homing in" on a HiD rate center, and using a "HiD link" for billing purposes between the HiD "homing point" and another

HiD rate center. (PX3–0114 at 13–14; Brodman Tr. 1785–88.)

A circuit connecting a LoD service point and another point via a "HiD link" would be billed at the $2.50 LoD rate on the link between the LoD city and the HiD homing city. (Tr. 1785–88 (Brodman)). The "HiD link," *i.e.*, the airline distance between the HiD "homing point" and the other HiD city would be billed at $.85 per mile. (*id.; PX3–0114*.)

Unlike the pre-Hi/Lo Series 2000/3000 rates, Hi/Lo applied only to "non-Telpak connected" ("NTC") circuits; it did not apply to a circuit, part of which was billed in a Telpak section. (PX3–0316; PX3–0318; PX3–0521; PX3–0535; PX3–0714; *see* Agreed Fact 2–1–037.) Because the Hi/Lo rate revisions did not apply to Telpak end-links, the rates for circuits classified as end-links remained unchanged at the pre-Hi/Lo Series 2000/3000 rate levels. (*See* Agreed Fact 2–1–037.)

## MPL

The MPL tariff was also based on the high density/low density rate structure concept (PX3–0954 at 0837; PX3–0693 at 0791; PX3–0687 at 0746; PX3–0230 at 6; (Ginn) S–T–73, tab A at 10–11.) Instead of "HiD," the high density cities in MPL were called "Category A" rate centers. (PX3–0230.) All others were designated "Category B." (*id.*)

MPL had three rate schedules. MPL Schedule I, which was equivalent to Hi/Lo's HiD rate schedule, applied to services between two Category A rate centers. (PX3–0230). MPL Schedule II applied to services between a Category A center and a Category B center; Schedule III applied to services between two Category B centers. (*id.; see* Ginn, S–T–73, tab A at 11).

## THE APPLICABLE LEGAL STANDARD FOR PREDATORY PRICING CLAIMS

Before turning to the evidence introduced at trial with respect to plaintiffs' pricing claims, the Court believes it appropriate to address the legal standards which

properly govern its consideration of those claims. Prior to trial, the parties submitted extensive briefs on the applicable legal standard for predatory pricing, and the Court has considered those in reaching its decision here. In summary, the Court concludes that a cost-based standard must be adopted to judge plaintiffs' predatory pricing claims and that a standard based on marginal or incremental cost is the most consistent with the pro-competitive thrust of the antitrust laws. The Court recognizes that the Courts of Appeals have not taken a uniform position with respect to the extent to which prices above marginal cost may be considered predatory, but the Court's analysis of the evidence in this case convinces it that a marginal or incremental cost standard is appropriate here. In any event, the Court finds no authority for a non-cost standard such as plaintiffs propose, and does not see how such a standard could be adopted without the risk of penalizing the very kind of price competition the antitrust laws are intended to foster.[100]

From the Court's review of the authorities, it appears that a showing of below-cost pricing has consistently been held to be an essential element of a plaintiff's *prima facie* case. For example, in *Broadway Delivery Corp. v. United Parcel Service, Inc.,* 651 F.2d 122, 131 (2d Cir.), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981), the Second Circuit held:

"[T]he plaintiffs' evidence of predatory pricing was in itself seriously deficient. Whether or not one agrees that proof of pricing below marginal or average variable cost is essential to a predatory pricing claim, the plaintiffs could not demonstrate price predation by the defendants *without proof permitting a careful assessment of the relationship between the defendants' prices and costs.* See generally 3 P. Areeda & D. Turner, *supra,* ¶¶ 710–11. The plaintiffs' proof did not permit a reasonable fact-finder to make this assessment." (Emphasis supplied.)

The Ninth Circuit in *Hanson v. Shell Oil Co.,* 541 F.2d 1352, 1359 (9th Cir.1976), *cert.*

denied, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977) held, that:

"Hanson's failure to show that Shell's prices were below its marginal on average variable costs was a failure as a matter of law to present a prima facie case under § 2." (footnote omitted).

Similarly, where the plaintiff has failed to show that the defendant intentionally priced below cost, directed verdicts have often been granted. See, *e.g., Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.,* 615 F.2d 427, 432–33 (7th Cir.1980); *International Air Industries, Inc. v. American Excelsior Co.,* 517 F.2d 714, 724 (5th Cir.1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976); *California Computer Products, Inc. v. IBM Corp.,* 613 F.2d 727 (9th Cir.1979).

As the Ninth Circuit stated:

"While proof of pricing below marginal or average variable cost is prerequisite to a prima facie showing of an attempt to monopolize, such a showing if made, would not show a *per se* violation. There may be nonpredatory and acceptable business reasons for a firm engaging in such pricing. Plaintiff's showing of below-cost pricing merely clears the first hurdle and raises the question of justification."

*Hanson v. Shell Oil Co., supra* 541 F.2d at 1359 n. 6.

This uniform insistence on proof of below-cost pricing is rooted in the central pro-competitive purposes of the Sherman Act, which seeks to promote price competition. As the Supreme Court emphasized in *Schine Chain Theatres, Inc. v. United States,* 334 U.S. 110, 120, 68 S.Ct. 947, 953, 92 L.Ed. 1245 (1948), "price cutting without more is not a violation of the Sherman Act" but "is indeed a competitive practice." Any rule which unduly restricts vigorous price competition, therefore, would penalize firms from taking the very action which is expected and encouraged of them and would lead to a situation in which "the antitrust laws would thus compel the very sloth they

---

**100.** The Court will of course discuss the plaintiffs' contention later.

were intended to prevent." *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 273 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).

■ It is also clear to the Court that the principles encouraging price competition on the merits are fully applicable to firms with a "dominant" share of the market. As the Ninth Circuit explained in *California Computer Products, supra,* 613 F.2d at 742:

"Where the opportunity exists to increase or protect market share profitably by offering equivalent or superior performance at a lower price, even a virtual monopolist may do so."

The same conclusion was reached by the Second Circuit in *Northeastern Tel. Co., supra,* 651 F.2d at 93:

"[A] monopolist's right to compete is not limited to actions undertaken with an altruistic purpose. Even monopolists must be allowed to do as well as they can with their business."

Consequently, the Court is in full agreement with the proposition that the evidence must show "more than an intent to win every sale, even if that would result in the demise of a competitor . . . before it can be concluded a defendant has the type of exclusionary intent condemned by the antitrust laws." *Transamerica Computer Co. v. IBM Corp.,* 481 F.Supp. 965, 1010 (N.D.Cal. 1979).

■ The fact that a "monopolist's" competitive pricing practices may be directed at particular competitors and may even cause them financial harm does not impinge upon the protection accorded vigorous competition. The purpose of the Sherman Act is to preserve the opportunity and incentive to compete, not to coddle competitors:

"Even legitimate price decreases will necessarily have a non-remunerative effect upon other firms in the market. These decreases will reduce competitors' profit margins and they may drive the inefficient firm out of business while the firm which originally reduced prices continues

to make a profit. It is the very nature of competition that the vigorous, efficient firm will drive out less efficient firms. This is not proscribed by the antitrust laws. 'Antitrust legislation is concerned primarily with the health of the competitive process, not with the individual competitor who must sink or swim in competitive enterprise.' "

*Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848, 855 (9th Cir.1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978). See also *Chillicothe Sand & Gravel Co., supra,* 615 F.2d at 431.

■ Because of this recognized importance of price competition, the Court "must exercise great care in differentiating between legitimate price competition and that 'predatory pricing' which constitutes a restraint of trade." *Janich Bros., Inc., supra,* 570 F.2d at 856. Accordingly, the Court cannot rest a finding of predatory pricing on some vague, subjective theory such as "pricing without regard to cost." Rather, the Court concludes that in order for plaintiffs to meet their burden of proof, plaintiffs must demonstrate "the relationship between . . . prices and costs in order to determine whether . . . price behavior was predatory." *International Air Industries, Inc., supra,* 517 F.2d at 722, 723.

Although the Courts of Appeals have not all taken uniform positions on what the appropriate cost standard should be, there does not appear to be any dispute in the cases that a marginal cost [101] analysis is an important, if not essential, starting point for any determination of predatory pricing.

Most directly relevant to this question is the recent decision in *Northeastern Tel. Co., supra,* a case involving predatory pricing charges advanced against AT & T. Reviewing established economic principles, the Court of Appeals explained the rationale for its conclusion that "the relationship between a firm's prices and its marginal costs provides the best single determinant of predatory pricing" (651 F.2d at 87–88):

---

**101.** Marginal costs are variable costs divided by output; average total costs, which is the benchmark that SPCC contends is appropriate,

are the sum of fixed and variable costs divided by output. (Pl. July 15, 1982, Post-Trial Memo of Law at 31–32).

"Marginal cost pricing ... fosters competition on the basis of relative efficiency. Establishing a pricing floor above marginal cost would encourage underutilization of productive resources and would provide a price 'umbrella' under which less efficient firms could hide from the stresses and storms of competition. Moreover, marginal cost pricing maximizes short-run consumer welfare, since when price equals marginal cost, consumers are willing to pay the expense incurred in producing the last unit of output. At prices above marginal cost, *per contra,* output is restricted, and consumers are deprived of products the value of which exceed their costs of production." In the Second Circuit's view, therefore, a marginal cost standard was "consistent with the pro-competitive thrust of the Sherman Act," and it also minimized the risk and cost of "inadvertently condemning" as predatory pricing what in fact may have been vigorous price competition (*id.*). Accordingly, the Second Circuit held that "prices below reasonably anticipated marginal costs will be presumed predatory, while prices above reasonably anticipated marginal cost will be presumed non-predatory" (*id.* at 88).

Although *Northeastern* involved the same telecommunications industry [102] and the same defendants as are involved in this case, and thus impresses the Court as particularly applicable here, it is only one of a number of decisions relying upon a marginal or incremental cost standard to assess predatory pricing claims. *See, e.g., Superturf, Inc. v. Monsanto Co.,* 660 F.2d 1275, 1281 (8th Cir.1981) ("even if Monsanto is a monopolist, it was within its rights to respond to the lower prices of its competitors while still pricing above its marginal costs"); *Murphy Tugboat Co. v. Crowley,* 658 F.2d 1256, 1259 (9th Cir.1981) (defendants' prices were not "predatory" where there was no allegation that the prices were below marginal costs); *Chillicothe Sand & Gravel Co., supra,* 615 F.2d at 432 (use of marginal or average variable cost is both a

"relevant and extremely useful factor in determining the presence of predatory conduct"); *Pacific Engineering & Production Co. v. Kerr-McGee Corp.,* 551 F.2d 790, 795–97 (10th Cir.), *cert. denied,* 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977) ("evidence of marginal cost ... is extremely beneficial in establishing a case of monopolization through predatory pricing"); *International Air Industries, Inc., supra,* 517 F.2d at 723–24 ("we do not believe that the monopolist's pricing behavior could be deemed anticompetitive unless the monopolist set a price below its own marginal cost"); *California Computer Products, supra,* 613 F.2d at 742–43 (directed verdict proper where plaintiff "failed to produce evidence of pricing below marginal or average variable cost").

The Court of Appeals for this Circuit has not yet had occasion to address this issue squarely. It has, however, recognized "the general prevalence of the incremental or marginal cost idea in the law of predatory pricing" in Sherman Act cases. *American Tel. & Tel. Co. v. FCC,* 602 F.2d 401, 410 n. 49 (D.C.Cir.1979).

Marginal or incremental cost pricing has also been espoused as the correct costing method by a number of commentators on antitrust policy. The leading analysis reaching this conclusion was by Professors Areeda and Turner in *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697 (1975). See also 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 715(a)–(c) at 164–74 (1978). Since then, the relevance of marginal or incremental costs for assessing predatory pricing claims under the antitrust laws has also been espoused by other well-known commentators. See, *e.g.,* Bork, *The Antitrust Paradox: A Policy at War with Itself,* pp. 154–55 (1978); McGee, *Predatory Pricing Revisited,* 23 J.L. & Econ. 289, 292–93 (1980).

In the Court's view, the economic concept of marginal cost is not only widely recognized, but elementary. Marginal cost is the increase in the total costs that results from producing an additional unit of output.

---

**102.** The principal difference between the two is the relevant market.

When the price of a dominant firm's product equals the product's marginal cost, only less efficient firms will suffer; more efficient firms will be covering the additional costs of production and contributing to the common costs of operation or even operating profitably. Therefore, establishing a pricing floor above marginal cost would encourage underutilization of productive resources and would provide a price "umbrella" under which less efficient firms could hide from the competitive process. See *Northeastern Tel. Co., supra,* 651 F.2d at 87–88; *California Computer Products, supra,* 613 F.2d at 743; *International Air Industries, supra,* 517 F.2d at 724.

In this case, AT & T based its competitive private line rate adjustments primarily on a method known as long run incremental costs ("LRIC").[103] Long run incremental costs or average incremental costs are a form of marginal costs reflecting the change in total costs caused by changes in output over a longer period of time (Froggatt, S–T–2 at 34–35; Eastmond, S–T–11

at 20; Ankner, S–T–10 at 2–9; Baumol, S–T–4 at 10, U.S.Tr. 23156; Olley, S–T–29 at 14). Long run or average incremental costs thus include certain items of long term expense that are typically considered fixed and would generally be excluded from a calculation of average variable cost, such as the cost of plant and equipment, as well as the cost of capital.[104] It is generally recognized that long run or average incremental cost approximates anticipated average total cost for various levels of production. 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 712 (1978); Baumol, *Quasi-Permanence of Price Reductions: A Policy for Prevention of Predatory Pricing,* 89 Yale L.J. 1, 9 n. 26 (1979); Joskow & Klevorick, *A Framework for Analyzing Predatory Pricing Policy,* 89 Yale L.J. 213, 252 n. 79 (1979).[105]

The only question that seems to be open in the Courts of Appeals decisions is whether, on the particular facts, some standard over and above marginal costs may also be considered.[106] In this respect, defendants'

**103.** AT & T's costing methods evolved over time from "current costs" to "full additional costs" to LRIC. All three of these methods were based upon the same underlying principles, and the change from one to the other appears to the Court to reflect a continuing effort by AT & T to improve its procedures (see Froggatt, S–T–2 at 7–14, 29–42; Eastmond, S–T–11 at 13–25; Baumol, S–T–4 at 12–16).

**104.** As the term suggests, "variable costs" are costs that vary with changes in output. Variable costs typically include such items as materials, fuel, labor and maintenance. The sum of all variable costs divided by output yields average variable cost. 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 715(c) (1978). In contrast to variable costs, fixed costs are those costs which do not vary with changes in output. When fixed costs are added to total variable costs, the sum is a firm's total cost, and that total divided by output yields average total cost (*id.* at ¶ 712).

**105.** During the period of extended regulatory uncertainty leading up to the Docket No. 18128 decision, and thereafter pursuant to that decision, AT & T also conducted various fully distributed cost ("FDC") studies in support of its private line rate adjustments (see generally Johnston, S–T–5 at 9–42). Fully distributed cost is an accounting concept focusing on the historical costs reflected in the books of the company. Fully distributed costs require an

allocation of the firm's total costs to the firm's various product lines. However, unlike the concept of average total cost, which has sound economic underpinnings when defined as average incremental cost, the allocation methods used to compute fully distributed cost are inherently arbitrary and have no economic basis (Baumol, S–T–4 at 8–9, 36, U.S. Tr. 23153–65; Olley, S–T–29 at 16–17; Braeutigam, S–T–204 at 13–17; Tr. 5018, 5020; Arrow, S–T–30 at 5).

**106.** One case that in certain circumstances permits a deviation from marginal cost is *Wm. Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014 (9th Cir.1981). As an alternative to proving pricing below marginal cost, *Inglis* would permit plaintiff to establish a *prima facie* case by showing, first that a defendant reduced its prices to a level below average total cost and second, "that the anticipated benefits of the prices, at the time they were set, depended on their anticipated destructive effect upon competition and the consequent enhanced market position of the defendant" (668 F.2d at 1034). It is clear from *Inglis* itself, however, that that case provides no support for plaintiffs here. First, SPCC has not shown AT & T's prices were below its average total cost. Second, as the Court discusses more fully below, the "intent" documents upon which SPCC relies cannot be read as evidencing an anticompetitive intent, and thus do not fall within the situation addressed

witnesses, particularly its expert economists, all strongly endorsed the use of incremental cost as the appropriate measure of predatory pricing in the circumstances of this case (Baumol, S–T–4 at 10–12, 19–20, U.S.Tr. 23152–65, Tr. 3748–49; Olley, S–T–29 at 13, 15–17, Tr. 5381–82; Arrow, S–T–30 at 4–8, Tr. 4345; Braeutigam, S–T–204 at 9–11, 14–17, Tr. 5048; S–1623B). And Dean Rostow testified that it was both his personal view, and the conclusion of the President's Task Force on Communications Policy, that long run incremental costs should be the appropriate pricing standard for the competitive telecommunications industry (Rostow, Tr. 3655–61; S–1873 at 234).

In addition, the Antitrust Division of the Department of Justice has advocated the use of incremental cost pricing for the telecommunications industry. Thus, on appeal from the FCC's decision in Docket No. 18128, the Antitrust Division argued that, in contrast to fully distributed costs which leads to "umbrella pricing," long run incremental costs "is not only pro-competitive but aids the users of services for which

there is not competition." Brief for the United States at 34–35, filed August 21, 1978, *Aeronautical Radio, Inc. v. FCC,* No. 77–1333 (D.C.Cir.) (S–5716 at 34–35).[107] This appears to be a long-standing position of the federal government (see Long Run Incremental Costs/Telpak Doc.Sub.). It is apparent that the rest of the federal government was in disagreement with the FCC's decision to follow FDC. The policy of the Department of Justice was also echoed by the Department of Defense. In its March 19, 1976, brief in support of Exceptions of the Executive Agencies of the United States to the Recommended Decision of the Chief Common Carrier Bureau, released on January 19, 1976, it stated (S–4154 at 2, 3):

> "The Chief, Common Carrier Bureau, in his Recommended Decision herein has, however, ignored this evidence, and, relying upon erroneous legal precedent and overlooking the extensive economic advantages of an incremental cost pricing approach to ratemaking, found incremental cost (termed "marginal cost pricing" by the CCB) theory to presently be inapplicable to the pricing of Bell's competi-

in *Inglis.* Indeed, in *Inglis,* the Court of Appeals held that a conclusive showing of anticompetitive intent had not been made even though a consultant's report to defendant proposed several pricing strategies aimed at putting pressure on less efficient competitors, and other internal documents indicated that the defendant's goal was "market dominance." In the Ninth Circuit's view, the first of these documents indicated no more than a "recommendation of intensified price competition" and the others added "little that would suggest unlawful intent" (*id.* at 1039). Even *Inglis,* therefore, which stands alone as the most lenient test adopted by any appellate court, requires much more rigorous proof than merely showing that prices below average total costs were accompanied by an intent to compete and a recognition that competition would be hard on less efficient competitors.

**107.** In its brief, the government stated:
"The Commission has now adopted the umbrellas pricing which seven years ago it properly rejected as contrary to the public interest. It did so without a clear explanation of why the public will benefit from this stultification of competition.

The Commission's fully-distributed cost approach requires that the fixed or general costs be allocated among all services in pro-

portion "to the investment and expenses that had been directly attributable to the services." ... Costs of capital will also be so allocated, ..., so that each service is required to earn a rate of return equal to that of the over-all company rate of return....

AT & T is the predominant supplier of telecommunications services, enjoying tremendous advantages due to its size and established name recognition. The prices it charges will affect the prices charged by the competing specialized carriers because it is the dominant firm in a concentrated market with high barriers to entry. The Commission here is imposing a rigid rate-making standard that will impede significant price competition. AT & T, subject to extremely narrow waiver provisions, will as a practical matter have virtually no freedom to price a service any differently than it prices its basic monopoly services, *notwithstanding possible efficiencies.*

*Long-run incremental cost pricing, by contrast, is not only procompetitive but aids the users of services for which there is not competition.* (Emphasis supplied). (footnotes omitted) (S–5716 at 34–35).

tive interstate services. The CCB has, however, also determined that incremental cost pricing "could" be acceptable in the future provided various "modifications" are made in the present approach (DOD Exceptions 4–12).

The DOD, on behalf of the Federal Executive Agencies, is of the opinion that the record herein has adequately demonstrated the present theoretical acceptability of incremental cost pricing in determining the appropriate earnings relationships among and earning levels of Bell's various interstate services, and that it is merely AT & T's presently proposed LRIC methodology that is unsupportable and unlawful. DOD further believes that the CCB's equivocation (see DOD Exception 7) in failing to actively seek to determine how the appropriate modifications and controls essential to an implementation of incremental cost theory to the pricing of Bell's competitive interstate services is without justifications."

See also S–4167; S–4230.

The Court notes that DOD's comments were right on point. For the author of the decision finding FDC the appropriate costing methodology in lieu of LRIC, Mr. Walter Hinchman, admitted under oath that he knew nothing about cost, much less the difference between LRIC and FDC. (Hinchman, Tr. 4980–2) Moreover, Mr. Hinchman testified that he never even read the record in Docket 18128 (Hinchman, Tr. 4981).

**108.** Indeed, although SPCC in this case attacks LRIC, Mr. Grant, SPCC's President, was advised in connection with the filing of AT & T's Hi/Lo tariff that "the concept of using a variable or incremental cost should be condoned by SPC, due to SPT's [Southern Pacific Transportation's] reliance on variable costing" (S–67).

**109.** In a brief filed in the Supreme Court of the United States on April 10, 1968, of which Southern Pacific, by Thormond A. Miller, was a signatory, an Association of American Railroads stated (S–1822C at 12):

"What the appellants, by advocating the use of fully distributed cost floors, are seeking is not the recognition and preservation of inherent advantages, but the establishment of artificial and uneconomic pricing restraints which will deny the railroads the right to enjoy their inherent cost advantage and to

Additionally, plaintiffs' parent, Southern Pacific Company, has long advocated the use of incremental costs in setting railroad rates under the Interstate Commerce Act (Miller, Tr. 431–33).[108] This has also been the long-standing position of the Association of American Railroads, of which Southern Pacific is a member (Baumol, Tr. 3747–40; S–1623B; S–1822C).[109] The Interstate Commerce Commission has now adopted that standard by virtue of the Staggers Rail Act of 1980, 49 U.S.C. § 10701a(c)(2) (1980).[110] See Western Coal Traffic League v. United States, 677 F.2d 915 (D.C.Cir. 1982).

Perhaps the most interesting aspect of the plaintiffs' contentions that FDC should be the appropriate pricing methodology, is that SPCC used LRIC in at least seven of its cost studies submitted to the FCC. By letter dated March 31, 1975 in Transmittal No. 37, SPCC filed cost data to support changes in its private line tariffs. (S–3499B) On page 6, the Transmittal stated:

"The basis of ratemaking used in presenting the data.... is a long run variable (or incremental) cost basis. This is appropriate because SPCC would incur negligible increases in overhead expenses due to the increased sales which we have shown will result...."

See also S–4050 at 6; S–4614B at 36; S–4937B; S–4999B; S–5265B; S–5637D.

Although the FCC adopted fully distributed cost in Docket No. 18128 as the stan-

thereby compete effectively with other modes. And, more importantly, the position of the appellants will deprive the public of the benefits of competition in the form of lower transportation charges."

The Brief went on to state (id. at 34):

Briefly, it is elementary economics that in determining the wisdom of making a price reduction of an individual service to respond to competition, the only relevant cost is incremental cost or, as that term is used here, out of pocket cost."

**110.** 49 U.S.C. § 10701a(c)(2) provides:

A rate for transportation by a rail carrier that equals or exceeds the variable cost of providing the transportation is conclusively presumed to contribute to the going concern value of such rail carriers."

dard for pricing of telecommunications services, the record here shows that this was not a foregone conclusion and may have been primarily motivated by a desire to protect inefficient new carriers such as SPCC from the full economic consequences of competition, rather than on a reasoned economic basis (Rostow, Tr. 3662–64; Owen, Tr. 5713–15; Baumol, S–T–4 at 8; Strassburg, S–T–171 at U.S.Tr. 23386–87). Indeed, the Court finds it of interest that following the hearings in Docket No. 18128, the FCC staff apparently agreed that LRIC should be adopted as the appropriate standard under the Communications Act, and a proposed decision to that effect was drafted by members of the Common Carrier Bureau in November 1973 (Strassburg, S–T–171 at U.S.Tr. 23444–46;[111] S–2676; S–2825).[112]

In any event, the Court is convinced that a predatory pricing standard based upon fully distributed costs would be inconsistent with sound legal and economic principles, and therefore, it must reject plaintiffs' alternative position that the Court should adopt such a standard to the extent that it requires, as it has, a showing of a cost-price relationship to establish predatory pricing. The Court of Appeals in *Northeastern* rejected a similar argument, concluding that a fully distributed cost test "would promote economic inefficiency, would be difficult to apply, [and] would elevate the interests of single market competitors over those of consumers . . ." (651 F.2d at 90).

The Court's conclusion is not altered by plaintiffs' reliance upon *Utah Pie Co. v.*

*Continental Baking Co.,* 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967), and the FCC's decision in Docket No. 18128, neither of which supports the use of a fully distributed cost test to assess a claim of predatory pricing under Section 2 of the Sherman Act. With respect to *Utah Pie,* as Areeda and Turner have pointed out, the Court was unclear on which cost measurement it used to find 'below cost' pricing." Areeda & Turner, *supra,* 88 Harv.L.Rev. at 727 n. 59. Similarly, the FCC decision in Docket No. 18128 was expressly limited to *regulatory* pricing issues. *AT & T,* 61 F.C.C.2d 587 (1976). *As the Court of Appeals for this Circuit has recognized, the standards applied under the Communications Act "may be more restrictive than those common in antitrust cases,"* referring specifically to "the Commission's use of [fully distributed costs]" as the basis for pricing. *American Tel. & Tel. Co. v. FCC,* 602 F.2d 401, 410 n. 49 (D.C.Cir.1979). Moreover, even in the regulatory context at issue on appeal from the Commission's decision in Docket No. 18128, *Aeronautical Radio, Inc. v. FCC,* 642 F.2d 1221 (D.C.Cir.1980), *cert. denied,* 451 U.S. 920, 101 S.Ct. 1998, 68 L.Ed.2d 311 (1981), Judge Wilkey urged that the FCC's adoption of fully distributed cost pricing be held to be beyond the discretion of the FCC because LRIC was the only appropriate standard to assure "economic efficiency," emphasizing that *"so long as rates are above LRIC, agencies and courts can rest assured that monopoly service customers are NOT subsidizing the firm's operations in the competitive market . . ."* (642 F.2d at 1239–41) (emphasis in original).

---

**111.** This document (S–2676) is a memo to Mr. Strassberg from Mr. Baker describing a meeting held on July 7, 1976. Present at that meeting were Mssrs. Strassburg, Ende, Griffith, Nelson, Anderson, Gerlando, and Baker whereby they reached the tentative conclusion that:

> "Bell's LRIC studies with the related burden tests as may be modified in the decision will be acceptable in support of proposed future rate changes for the competitive private line services. Any proposed set of rates must pass the burden test and provide revenues at least equal to LRIC."

**112.** This document (S–2825c) was prepared pursuant to S–2626. This is a second draft of

the working group in Docket 18128 in which the Commission found LRIC an appropriate costing methodology. While it is recognized that the Commission had no obligation to approve this second draft, as the Court has so stated previously (Tr. 4977):

> "This goes to the question of one of the very elements of your case on liability. . . . It goes to the question of intent.
>
> . . . . .
>
> To show there was respectable opinion that what AT & T did was not necessarily with the intent to deceive or anything else as you have and everybody else has charged."

The principal opponent of LRIC and the principal advocate of FDC in this case was plaintiffs' witness, Dr. Melody.[113] The thrust of his argument, as the Court understands it, is that use of long run incremental costs is inappropriate where a firm such as AT & T provides both competitive and monopoly services and operates under an overall rate of return set by regulators. Dr. Melody asserts that under these conditions use of LRIC to set rates for competitive services leads to unlawful cross-subsidy because common costs are borne by the monopoly service and thus that fully distributed costs should be used instead. Dr. Melody's view concerning what constitutes a "cross-subsidy" has no apparent support among other economists who testified in this case (see Baumol, S–T–4 at 31; Olley, S–T–29 at 14–17; Arrow, S–T–30 at 5–7, 30–31). The Court notes that this view is also in conflict with the testimony of L.W. Doritz, VP, Mo.Pub.Serv.Comm'n, before House Subcomm. on Telecom., Consumer Protection & Finance who stated (S–6197 at 7–8):

> "A major concern of the United States Department of Justice that triggered its decision to file the current antitrust lawsuit against AT & T related to the alleged use of profits from monopoly services to subsidize competitive offerings. DOJ maintained that the Bell System could raise monopoly prices in order to cut prices offered in the competitive arena and still maintain the same rate of return on overall investment. *This view does not comport with the actual pricing of telecommunications services in Missouri.*
>
> *All telephone services provided in Missouri by SWBT (Southwestern Bell Telephone) with the exception of interstate toll are regulated by the Missouri Commission. Consequently, in Missouri, SWBT could not lower the prices of its competitive services (principally CPE) and raise the prices of its monopoly services without the approval of the Missouri Commission.*" (Emphasis supplied).

It is clear to the Court that it was not Bell that was the problem, but rather the FCC's own ineptitude.

Moreover, the Court cannot reconcile Dr. Melody's views with the case law, particularly *Northeastern Tel. Co., supra.* The Court of Appeals in *Northeastern* squarely addressed the principal argument made here by Dr. Melody against an incremental cost standard—that this standard is inadequate because it creates the potential for AT & T to cross-subsidize losses from competitive services with excess profits from monopoly services. The Second Circuit labeled such an argument "seriously flawed" (651 F.2d at 90), and the Court is satisfied that that reasoning is applicable here.

As the Second Circuit pointed out, there is no valid distinction between the ability of a regulated and an unregulated firm to cross-subsidize, and to abandon the marginal cost rule for diversified firms would create "a haven for inefficient competitors" (651 F.2d at 90). Additionally, the cross-subsidy argument "emphasizes the interests of single-market rivals over those of consumers and the competitive process" (*id.*). Finally, this argument ignores the basic principle that the marginal cost standard itself is sufficient to detect unlawful cross-subsidization, because "when price exceeds marginal or average variable cost, no subsidy is necessary" (*id.*).[114]

Significantly, the Department of Justice Antitrust Division has also rejected the

---

**113.** This view also contradicts another principal SPCC witness, Dr. Bruce Owen, who on February 14, 1972, while still at the Office of Telecommunications Policy wrote (S–2349 at 1): "Communications services, like other services provided by utilities should ideally be priced at marginal cost."

**114.** In addition to *Northeastern*, other Courts of Appeals have rejected similar arguments focusing on the relationship between the challenged rates and the rates for other services offered by the defendants. In these cases, the courts have held that it is only the price-cost relationship of the challenged rates which is relevant, and that rate structure concepts such as cross-subsidy or price discrimination are not valid measures of predatory pricing. See, *e.g., Pacific Engineering & Production Co., supra,* 551 F.2d at 798 (price discrimination argument dismissed even though there was no cost justification for the differing prices charged, be-

kind of cross-subsidy argument made by Dr. Melody. As pointed out above, in the appeal from the FCC's Docket No. 18128 decision, the Antitrust Division argued that an incremental cost test, not a fully distributed cost test, should be the appropriate pricing standard for the telecommunications industry. In that case, the Antitrust Division also explained that incremental cost pricing does not result in "cross-subsidization in any sense used by either economists or public utility regulators because monopoly (or other low elasticity) customers are not paying part of the other service, the one that is putatively subsidized. They are paying only costs which they would have to bear in the absence of that other service" (S–5716 at 38).

The Court thus concludes that marginal or incremental cost is the appropriate standard for judging plaintiffs' predatory pricing claims. The Court will now turn to the evidence submitted with respect to these claims.

## EVIDENCE CONCERNING WHETHER AT & T'S RATES WERE BELOW COST

With respect to each of the tariffs attacked in this case, plaintiffs have not relied upon the marginal cost test or any other cost-based test for determining predatory pricing.[115] Rather, counsel for plain-

cause "charging higher prices in another submarket does not change ... legitimate competition into an injury to competition"); *International Air Industries, supra,* 517 F.2d at 728 (unless a firm is "selling below marginal cost, it would have no need of aid from other markets and the dollar figures elsewhere would therefore be irrelevant"). Similarly, as Professors Areeda and Turner have explained, even where a firm has been accused of " 'subsidizing' low returns in a competitive market with higher returns on a monopolized product, ... illicit pricing can be established only by showing that in the competitive market the firm is pricing below marginal cost or the 'surrogate' average variable cost." Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697, 721 (1975).

tiffs proceeded on an entirely different theory of proof, arguing that they needed only to show that AT & T set its rates in "disregard of its actual costs." Plaintiffs thus focused their attention principally on asserted errors in AT & T's cost studies that plaintiffs claim rendered those studies inadequate as a basis for pricing. Plaintiffs' principal expert witness, Dr. Melody, repeatedly emphasized that "I have been unable to do a cost study to tell you what AT & T's costs are" (Melody, Tr. 2407, 2453–54, 2458, 2470). Similarly, while plaintiffs' other cost witnesses, Mr. Tucker and Mr. Scott, criticized the FDC and LRIC cost studies for Hi/Lo and MPL and offered readjustments to those studies, their intention was only to show that AT & T "priced without regard to cost" and that AT & T's cost were higher than what was reported to the FCC. Before these witnesses testified, plaintiffs' counsel emphasized: "[T]hey are not going to quarrel with the way the studies were done, they are simply going to look at the data.... I want to stress for the Court we are not saying that those are AT & T's actual costs" (Tr. 1755–56). And Dr. Melody in his rebuttal testimony re-emphasized that neither the Scott nor the Tucker calculations were intended to be a "proper costing" of AT & T's services (Melody, Tr. 5619; see also Lim, Tr. 5927).[116]

Defendants, on the other hand, introduced into evidence numerous detailed stu-

**115.** To the extent the Court does adopt a cost-based test, the plaintiffs contend that FDC should be the floor.

**116.** Plaintiffs now, however, have taken the position that the calculations made by Mr. Scott and Mr. Tucker can be used to show that AT & T's rates for Hi/Lo and MPL were below cost. The Court, therefore, has examined these calculations from that perspective, but for the reasons set out in more detail below, does not believe they can be accorded any weight. The Court was skeptical of Mr. Scott's and Mr. Tucker's testimony when they appeared; and the testimony of AT & T witnesses, particularly Mr. Johnston and Mr. Ankner who were responsible for conducting the underlying studies being criticized, has convinced the Court that Mr. Scott and Mr. Tucker erred in several respects, with the result that they substantially overstated AT & T's costs. Scott and Tucker

dies showing that the rates set in the challenged tariffs were projected to be above cost—under both LRIC and FDC methods— and further that they were actually above cost. Although plaintiffs have challenged some of the methodology used in AT & T's LRIC and FDC studies, the Court, for the reasons stated below in discussing those criticisms, has concluded that AT & T's costing methods were reasonable and appropriate. Accordingly, the Court finds that the cost studies submitted by defendants are competent evidence that defendants' prices were above cost for each of the challenged tariffs.

■ With respect to Telpak, defendants submitted studies calculated on various FDC methods from 1967 through 1979 which had been performed at the request of the FCC and filed with the Commission (Johnston, S–T–5 at 76–78 & Att. 9).[117] The results of these studies confirm that, in the time period at issue in this case, Telpak was producing earnings in excess of all costs attributed to the service under even the most stringent of the fully distributed cost methods (Hough, S–T–1 at 41). For instance, set forth below are the results of studies conducted pursuant to FDC Method 7 (the method ultimately selected by the FCC in its 1976 Docket No. 18128 decision), compared with the total net return on investment for all of AT & T's interstate services (S–4727B; Johnston, S–T–5 at Att. 9):

| | 1973 | 1974 | 1975 | 1976 | 1977 | 5 Year Average |
|-------------------|-------|-------|-------|-------|-------|----------------|
| Telpak | 12.2% | 12.2% | 12.6% | 9.0% | 8.1% | 10.8% |
| Total Interstate | 8.6% | 8.5% | 8.5% | 9.2% | 9.6% | 8.9% |

Although the Court has rejected fully distributed costs as a proper standard for predatory pricing, this evidence clearly shows, and the Court so finds, that Telpak was covering its costs from the time that SPCC commenced operations until the time that AT & T filed its tariff to terminate the

were both lacking in credibility and qualifications.

117. Although plaintiffs offered few specific criticisms of AT & T's fully distributed cost studies for Telpak, Dr. Melody did question the 1973 FDC Method 1 study by comparing it with the 1972 study and asserting that he was unaware of any explanation for the fact that while Telpak revenues increased in 1973, the dollar value of gross plant, net investment and expenses decreased (Melody, Tr. 5596–99). This criticism was raised first in rebuttal, and it is the Court's opinion that Dr. Melody had not really analyzed the study he purported to criticize. Thus, it appears that there are at least several possible explanations for this phenomenon of which Dr. Melody evidenced no thorough consideration—including a 1972 Telpak rate increase; a continuing decline over time in AT & T's average embedded investment per circuit mile; retirements in AT & T's older, higher cost plant; and the use of a new Redcap (or facilities inventory) analysis (Melody, Tr. 5608–10, 5649–53). Moreover, the Court is unpersuaded by Dr. Melody's attempt to show an inconsistency between the 1973 FDC Method 1 Telpak study and the 1973 FDC Method 1 study for a category entitled Private Line Telephone.

Dr. Melody's theory apparently is that since the revenue for both of these categories increased between 1972 and 1973, the investment and expense amounts for each of the categories should also have moved in the same direction. Yet, Dr. Melody himself conceded that up to half the investment in the Private Line Telephone category consisted of equipment such as Autovon switches which have no comparable component in the Telpak category and that it was possible that this difference accounted for the difference in results (Melody, Tr. 5607–09, 5648–49). Moreover, from the Court's review of the record, when Telpak results are compared with more comparable studies, such as the Hi/Lo rate element study, the changes from 1972 to 1973 in the two sets of results are entirely consistent (S–2938B at 18; S–33 at 4):

| | Hi/Lo HiD Rate Element | | Telpak | |
|--------------------------|------|------|------|------|
| | 1972 | 1973 | 1972 | 1973 |
| Gross Plant | 2412 | 2019 | 1594 | 1397 |
| Net Investment | 1936 | 1606 | 1198 | 1053 |
| Total Maintenance Expense| 166 | 137 | 95 | 78 |
| Total Operating Expense | 400 | 333 | 222 | 195 |

Telpak offering, even under the erroneous standard advocated by plaintiffs.[118]

The record also contains incremental cost studies conducted by AT & T with respect to the Telpak rates in effect at the time SPCC entered the business. These were the studies conducted in support of the Telpak rate increases proposed in 1969 and 1971 and were described in detail in the testimony of Messrs. Eastmond (S–T–11 at 41–48), McCarthy (S–T–7 at 3–10) and Miller (S–T–22 at 3–13). The 1969 study showed that the newly increased rates were projected to produce an improvement in annual contribution of $86 million in excess of incremental costs (PX2–0275; Hough, Tr. 3592),[119] and with the 1971 proposed increase, earnings would be improved even further (Eastmond, S–T–11 at 47–48).

The only evidence introduced by plaintiffs relating to the Telpak revenue/cost relationship during the 1970s when SPCC was in business were several internal AT & T documents which plaintiffs argue show that Telpak was not profitable. For the most part, the Court cannot tell what kind of analysis underlies these documents or what they were intended to reflect; and for this reason alone, the Court cannot give this evidence any significant weight. It appears, however, that several of the documents do not even relate to Telpak's revenue/cost relationship[120] and that several others in fact show that Telpak

**118.** Plaintiffs rely on a collection of documents pre-dating the commencement of their operations as purported proof of below cost pricing of Telpak. The Court does not believe that documents from this early time period can establish predatory pricing for purposes of this case, and indeed the Court has previously dismissed plaintiffs' charges against AT & T's Multiple Channel and Series 11000 tariffs for this reason. Order, May 18, 1982. In any event, the Court is satisfied with AT & T's explanation of the Telpak revenue-cost relationship during the 1960s. Thus, as explained by Mr. Hough, President of Long Lines during this period, and Mr. Froggatt, an AT & T Vice President responsible for cost analysis at that time, AT & T's ability to adjust the Telpak rates in the mid-1960s was constrained by the uncertainties resulting from the FCC's investigation of Telpak in Docket No. 14251, the subsequent appeal of that decision and the Court-imposed stay of that decision pending appeal (Hough, S–T–1 at 33–34; Froggatt, S–T–2 at 28–29). Within four months of the September 1966 Court of Appeals decision, however, AT & T in January 1967 proposed rate increases to the FCC based on its continuing studies of Telpak earnings levels. Due to extreme customer opposition, however, it was not until 1970 that the increases first proposed in 1967 were able to be implemented fully. Indeed, when AT & T filed those increases in February 1968, it was forced to withdraw them and to substitute a lesser, so-called "interim" increase, which became effective later that year, despite continuing customer opposition (Hough, S–T–1 at 35–38; see also Telpak User Support Doc. Sub. at 5–12). Even then AT & T continued studying the Telpak rates, and in 1971 proposed another increase, which, over substantial customer opposition, became effective in 1972 (Hough, S–T–1 at 38; see also Telpak User Support Doc. Sub. at 12–14). In the Court's view, AT & T's actions in this context were both reasonable and responsible and in no event support plaintiffs' predatory pricing claim.

**119.** Despite the showing that the rates selected for filing in 1969 (Test Rate 3) would cover relevant costs and generate substantial additional contribution, plaintiffs have contended that AT & T should have selected an even higher rate (Test Rate 4) for filing. As Mr. Hough explained, however, AT & T at that time faced substantial practical constraints both in terms of customer pressure and the time available for additional studies, and it was his opinion that Test Rate 3 was the optimum rate to file (Hough, S–T–1 at 36–37). The Court can find no basis upon which to second-guess Mr. Hough's testimony on this point, and as discussed in more detail below, the Court does not accept plaintiffs' profit maximization theory in the context of this case. Finally, whatever can be said about the 1969 increases, the Court finds it difficult to infer predatory pricing when AT & T shortly thereafter proposed still an additional increase. Indeed, this emphasizes the position that AT & T was in, unlike other businesses that can raise and lower their prices on a "whim", AT & T *always* had to receive permission from the appropriate regulatory body before they would raise or lower their prices.

**120.** See, *e.g.*, PX2–0164, which appears to relate to losses to competition, not to the earnings level of Telpak. This October 3, 1974 letter to Mr. Betteridge from Mr. Parker stated, "A principal source of concern regarding a delay in filing HiPak is the *impending significant losses of our Telpak market.*" (Emphasis supplied).

rates to be covering costs.[121] Moreover, other of the documents do not appear to reflect current conditions at all, but rather to show rough projections into 1977 and 1980 which were associated with some kind of rate planning effort (*e.g.,* PX2–0168; PX2–0175). But by 1977, AT & T had filed to terminate Telpak, thus rendering these projections of little significance. On balance, the Court cannot find that these unexplained documents are sufficient to meet plaintiffs' burden of proof, particularly when compared to AT & T's detailed, formal studies.[122]

The evidence in the record also demonstrates that the Hi/Lo rates were set above cost. When the Hi/Lo tariff was filed, only the high-density interexchange channel rate of $.85 per mile per month was reduced from previous levels. The evidence shows, however, that the $.85 rate for the interexchange high-density rate element was set on the basis of studies showing that it would be profitable, whether measured under LRIC or FDC standards (Hough, S–T–1 at 57). Thus, the results of the initial studies prepared by AT & T in 1972 in support of the tariff showed, in comparison to the $.85 rate, an average cost per mile per month of $.62 on an FDC Method I basis (Johnston, S–T–5 at 60–61 & Att. 6; S–2938B [D–29–49]). And on a LRIC basis, the cost was $.35, or 240 percent below the $.85 rate (Ankner, S–T–10 at 9; S–0264 [D–29–48]).

Subsequent studies prepared before the Hi/Lo tariff became effective confirmed that the tariff would be profitable. A cost study using FDC Method 1 updated to reflect costs for the twelve months ending June 1973 showed monthly costs for the high-density interexchange channel rate element to be $.51 per mile (Johnston, S–T–5 at 61; S–33 [D–29–51A]). AT & T also conducted a cost study under FDC Method 7 for the twelve months ending August 1974 and found the monthly cost of the high-density interexchange channel rate element to be $.37 (Johnston, S–T–5 at 61; S–3122 [D–29–766]). If calculated considering only directly attributable costs (a methodology akin to the LRIC method), this August 1974 study showed that cost to be $.31 per mile (Johnston, S–T–5 at 61; S–3123 [D–29–52]).[123]

Evidence reflecting the actual operating experience under the Hi/Lo tariff established that the Hi/Lo rates were profitable. AT & T submitted to the FCC data on the actual net earnings ratios for Hi/Lo for 1974 and 1975 calculated on the basis of FDC Methods 1, 2, 6 and 7 (Johnston, S–T–5 at 60; S–3744 [D–29–767]; S–4057 [D–29–768]). Under each method, the results showed substantial earnings (Johnston, S–T–5 at Att. 5):

| | Method 1 | Method 2 | Method 6 | Method 7 |
|---|---|---|---|---|
| 1972 | 8.5% | 9.7% | 11.2% | 10.5% |
| 1973 | 8.2% | 9.4% | 10.7% | 9.8% |
| 1974 | 8.6% | 10.1% | 11.5% | 10.7% |
| 1975 | 8.1% | 9.9% | 10.7% | 10.1% |

The record also contains the cost data introduced by AT & T for the MPL tariff, which showed that MPL was profitable and produced a rate of return in excess of the overall authorized interstate rate of return (Johnston, S–T–5 at 68–74; Hough, S–T–1

121. See, *e.g.,* PX2–0171 at 20, which for the years 1973 and 1974 shows annual revenues over embedded direct costs of $111 million and $122 million respectively.

122. One other claim made by plaintiffs is that materials filed by AT & T in 1980 in connection with the termination of Telpak indicated that Telpak would fail the burden test if it were continued in 1981. As the Court understands it, however, the reason that AT & T decided to terminate Telpak was because a change in FCC policy undercut the premises upon which Telpak was based (Hough, S–T–1 at 38), and the Court therefore cannot discern how projections under these changed conditions have any bearing on the lawfulness of the rates established under the previous FCC policy. Moreover, in light of the restrictive conditions of the injunction requiring AT & T to continue Telpak in effect, it would be understandable if Telpak's revenue-cost relationship deteriorated at some point after 1977.

123. These 1973 and 1974 studies confirmed AT & T's expectations that the costs for its high-density corridors were dropping, and thus the data used in the original Hi/Lo FDC study (1969 data updated to 1972) was a conservative measure of actual costs for the service (Johnston, S–T–5 at 61, 64).

at 69–70). The initial FDC studies, under Methods 1, 2, 6, and 7 submitted to the Commission in April 1976, were based on data for a 12-month period ended September 30, 1975 and demonstrated that, had MPL been in effect during that period, the tariff would have produced a return of between 11.5 percent (FDC Method 1) and 15.2 percent (FDC Method 6), as compared to an overall authorized interstate rate of return of between 9.5 and 10 percent (Johnston, S–T–5 at 68). Studies were also done on a schedule-by-schedule basis and showed that the earnings ratio for the competitive Schedule I rates was higher than either the MPL service as a whole or the Schedule II and III rates. For Methods 1 and 7, these results were (Johnston, S–T–5 at Att. 7; S–174 [D–30–118]; S–180 [D–30–124]):

| | MPL Total Service | Schedule I | Schedule II | Schedule III |
|---|---|---|---|---|
| FDC–1 | 11.5% | 12.7% | 11.2% | 10.4% |
| FDC–7 | 14.8% | 17.4% | 13.9% | 13.5% |

AT & T also introduced subsequent FDC studies for calendar year 1976, submitted in June 1977, which were based on the revised FDC Method 7 procedure prescribed by the FCC in its Docket No. 18128 decision and incorporated in the January 1977 cost manual developed by the FCC staff in consultation with AT & T. The June 1977 studies showed that, had MPL been in effect for the entire year, the service overall would have produced an earnings ratio of 13.3 percent, and Schedule I would have produced on earnings ratio of 16.2 percent (Johnston, S–T–5 at 70–71; S–4972D [D–30–132]). A second study submitted in June 1977 reflected the actual experience under the MPL tariff. This study produced an earnings ratio for MPL of 11.6 percent and 14.4 percent for Schedule I (Johnston, S–T–5 at 72; S–189 [D–30–140]).

Further, the record contains studies performed by AT & T of the cost of MPL for the years 1977, 1978, and 1979 using the revised FDC Method 7 procedures as set forth in the revised August 1977 cost manual (Castellano, S–T–23 at 2). These studies, done for internal management purposes, showed that in 1977 MPL had an overall earnings ratio of 14.5 percent and Schedule I had earnings of 19.3 percent. For 1978, the studies (using a slightly modified methodology) showed an overall MPL earnings ratio of 15.7 percent and Schedule I earnings of 24.8 percent. A similar study for 1979 showed an overall MPL earnings ratio of 10.8 percent and Schedule I earnings of 28.3 percent (Castellano, S–T–23 at 3–4; Tr. 3924).

The record also reflects that in 1980, AT & T submitted to the FCC an FDC study which recalculated the 1978 Annual FDC Report results (originally submitted in June 1979) based on new exchange plant allocation procedures prescribed in the FCC's Docket No. 20814 Order (Johnston, S–T–5 at 73). This recalculation of the 1978 FDC data responded to the one criticism of the MPL cost study procedures mentioned in that Order, and the revised procedures used in the 1980 recalculation were said by the FCC staff to be in "apparent compliance" with the Order (S–5831; S–5863). The recalculation showed an earnings ratio of 14.4 percent for private line telephone channels—which at that time was an FCC reporting category comprised essentially of MPL services (Johnston, S–T–5 at 73–74).

Because of the FCC's orders in the *Hi/Lo* proceeding and subsequently in Docket No. 18128, most of AT & T's MPL cost studies were on an FDC basis (Hough, S–T–1 at 69; Ginn, S–T–73 at 7–8). However, AT & T also submitted incremental cost studies in support of MPL, and these studies showed that the MPL rates would substantially increase the contribution to the firm. The results, which were introduced at trial, showed that with the MPL rates in effect, AT & T would be better off by approximately $33 million the first year, $42 million the second year and $54 million the third year (Ginn, S–T–73 at 14; Castellano, S–T–23 at U.S.Tr. 2618–20; S–5158B [D–30–111]).

The record also contains independent confirmation of the results of the AT & T studies, showing that the Telpak, Hi/Lo, and MPL rates were in fact profitable. William G. Morrison, a partner in the accounting firm of Peat Marwick Mitchell

& Co., testified that his firm was retained by AT & T to perform an independent [124] study of the costs and actual revenues for Telpak, Hi/Lo and the high-density portion of Hi/Lo for the year 1974 and for MPL for 1976 (Morrison, S–T–20 at 1). Mr. Morrison's studies, using LRIC methodology, showed that each service produced revenues that exceeded its costs (including the specified AT & T return on investment and taxes) and made a substantial contribution to the profits of AT & T (*id.* at 8; S–0006 [D–14–155]; S–0034 [D–29–111]; S–2873B [D–29–112]; S–3990C [D–30–312]). The studies further demonstrated that the high-density portion of the Hi/Lo tariff—the portion plaintiffs asserted had high costs and a predatorily low rate—was even more profitable than the Hi/Lo tariff as a whole (Morrison, S–T–20 at 8). The Court believes that this independent expert [125] analysis of AT & T's actual profits from these services is entitled to substantial weight and that it is significant for two reasons. It is, of course, evidence that AT & T's rates were above costs and were not predatory. It also is highly probative of the integrity of the cost studies done by AT & T employees. Indeed, Mr. Morrison stated (S–T–20 at 10), "AT & T methodologies and data systems, including the PLIAC process and the Redcap Studies, are among the most sophisticated I have ever encountered."

█ Although plaintiffs urged otherwise, the Court is convinced that FCC decisions regarding AT & T's pricing tariffs do not fill the gap created by plaintiffs' failure to prove below cost pricing. Based upon its review of those decisions, it is clear to the Court that they do not demonstrate that AT & T priced below its costs. This fact is manifest from the decisions themselves, and was conceded by plaintiffs (Vasilakos, Tr. 3019–20).

The FCC has not held that any of the AT & T tariffs challenged by SPCC established rates that were below cost. For example, in its *Hi/Lo* decision, the Commission ruled no more than that AT & T had not sustained its burden of proof because it had not submitted in support of the tariff the kind of data which the Commission, for the first time, had decided it wanted to have. Thus, the FCC emphasized that it was not "ruling on the merits . . . of Hi/Lo," either as to the "lawfulness of the Hi/Lo rate structure" or as to the level of the rates established in the tariff itself, *AT & T,* 58 F.C.C.2d 362, 363 (1976) (PX3–0072), and the Commission did not find that the Hi/Lo rates were unlawfully low.

The same is true of the Telpak tariff. In its Docket No. 18128 decision, the Commission stated that the Telpak "earnings appear to be within the zone of reasonableness." *AT & T,* 61 F.C.C.2d 587, 659 (1976) (PX–3–0232). And subsequently, the Commission observed: "[T]he Telpak rates have not been found to be unlawfully low." *AT & T,* 65 F.C.C.2d 295, 303 (1977). Moreover, the Court notes with interest that in the draft recommended decision in Docket No. 18128 prepared in November 1973, the FCC staff concluded, based upon its review of the record, "that the existing RATE LEVELS OF TELPAK, of private line telephone and private line telegraph services ARE HEREBY FOUND LAWFUL" (S–2825C at 156).

█ As the Court of Appeals for this Circuit has held, the "rhetoric" of "unlawfulness" in the FCC's decisions regarding these tariffs does not equate to a finding of substantive illegality. In *MCI Telecommunications Corp. v. FCC,* 627 F.2d 322, 337, 338 (D.C.Cir.1980), the Court of Appeals

---

**124.** In response to the question of whether AT & T attempted to influence his work in the Government case, Mr. Morrison responded (S–T–20 at Tab B, Tr. 22997), "They made no attempt to influence our work. This is our work and independently done and represents Peat, Markwick's efforts." With the Peat name behind this study, the Court is satisfied that there was in fact complete independence in performing this study.

**125.** It must be pointed out that the plaintiffs experts are generally former FCC employees and therefore their independence is suspect. Moreover, they are not subject to the same stringent code of ethics that Mr. Morrison is, as a partner in Peat, Marwick.

held that the FCC's findings of "unlawfulness" in a case where a tariff is found not to have adequate supporting materials is not equivalent to a determination of substantive illegality. The Commission itself thereafter evaluated its *MPL* decision according to this standard and in its *MPL* order on reconsideration stated that "our ostensible conclusion that the MPL rates were 'unjust and unreasonable' was not based upon a substantive assessment of the rates on their merits." *AT & T,* 85 F.C.C.2d 549, 557 (1981).

■ Even if the FCC had found AT & T's tariffs substantively unlawful under the Communications Act, for the reasons discussed more fully below in connection with the Court's consideration of the process by which Commission decisions were prepared during this period, they would be entitled to little, if any, weight in this case. In any event, such determinations would not equate to a violation of the antitrust laws. As pointed out above, the Court of Appeals for this Circuit has recognized that the standards applied by the FCC under the Communications Act may be more restrictive than those applicable under the antitrust laws. Additionally, a number of other courts have expressly held that a finding of disapproval by a regulatory agency does not mean that the conduct at issue was not reasonable under the antitrust laws. *Phonetele Inc. v. American Tel. & Tel. Co.,* 664 F.2d 716 (9th Cir.1981); *Mid-Texas Communications Systems, Inc. v. American Tel. & Tel. Co.,* 615 F.2d 1372 (5th Cir.), *cert. denied,* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980); *City of Groton v. Connecticut Light & Power Co.,* 662 F.2d 921 (2d Cir. 1981). See also *Pan American World Airways, Inc. v. United States,* 371 U.S. 296, 327–28, 83 S.Ct. 476, 493–94, 9 L.Ed.2d 325 (1963); *Hughes Tool Co. v. Trans World Airlines, Inc.,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973); *Terminal Warehouse Co. v. Pennsylvania R. Co.,* 297 U.S. 500, 56 S.Ct. 546, 80 L.Ed. 827 (1936); *Seatrain Lines, Inc. v. Pennsylvania R.R. Co.,* 207 F.2d 255 (3d Cir.), *cert. denied,* 345 U.S. 916, 73 S.Ct. 727, 97 L.Ed. 1350 (1953).

For the foregoing reasons, the Court has concluded that plaintiffs did not carry their burden of proving that defendants' prices were below cost and indeed that the preponderance of the evidence strongly shows that AT & T's prices were above its costs calculated on either an incremental or fully distributed cost basis. Accordingly, the Court finds that AT & T did not violate Section 2 of the Sherman Act in setting the rates for the Telpak, Hi/Lo or MPL tariffs.

EVIDENCE CONCERNING WHETHER
AT & T "PRICED WITHOUT
REGARD TO COSTS"

Even if plaintiffs were correct in maintaining that a claim of predatory pricing can be established by evidence that a defendant "priced without regard to costs," the evidence does not demonstrate that AT & T engaged in such conduct. The principal focus of SPCC's pricing "without regard to costs" theory appears to be an attack on the methods and procedures used by AT & T in the cost studies that AT & T filed with the FCC to support its rate adjustments. Plaintiffs contend that these studies are "hypothetical and fictitious," and that they contain "egregious deficiencies" and "fundamental abuses" (Melody, PX6–0018 at 34–35, Att. G).

■ Before assessing the evidence relating to these charges, there are several preliminary and related matters that the Court will address. One is plaintiffs' claim that AT & T did not utilize any cost information in setting its rates, and that all of the cost studies were done after the fact solely for submission to the FCC. In light of the numerous contemporaneous studies introduced by AT & T in this case, the Court finds plaintiffs' charge on its face to be of doubtful validity (see also Arrow, S–T–30 at 43–47), and this initial reaction is confirmed by the evidence. Defendants' witnesses responsible for rate selection testified uniformly that costs were critical to the process (Hough, S–T–1 at 36–37, 54–58, 67–72; Boettinger, S–T–3 at 20–25; Stoddard, S–T–13 at 6–9; Ginn, S–T–73 at 12–14), and this testimony is fully supported by the documentary evidence.

With respect to Telpak, plaintiffs' own evidence demonstrated that cost considerations were integral to the rate selection process. Thus, plaintiffs introduced a document entitled "Broadband Report" (PX2–0017) which they described as being "put together by a task force within AT & T in September, 1960" and as proposing "AT & T's competitive response to the *Above 890* decision" (Tr. 2630). This Report contains a separate analysis of the cost of providing Telpak and shows that costs were studied on both an "In plant" and "current" cost basis (PX2–0017 at AD11 1429–47). These cost studies and their use in the rate selection process were described in detail by Mr. Froggatt and Mr. Boettinger, retired Bell System employees who were responsible for the initial Telpak filing (Froggatt, S–T–2 at 4–14; Boettinger, S–T–3 at 20–26). Mr. Boettinger testified that "cost questions were at the front of our minds" throughout the Telpak study, and he explained that the cost studies for which Mr. Froggatt was responsible were rigorously examined in every detail before the tariff filing (S–T–3 at 20–21, 24–25). Moreover, he presented documentation he used at the 1960 Bell System Presidents' Conference where Telpak was approved, which indicated that two aspects of the Telpak justification were (Boettinger, S–T–3 at 9; S–3P):

> "6. Based on *new* plant costs and fully allocated expenses, Telpak rates will show higher than overall interstate return.
>
> "7. Thus Telpak will benefit—not burden—other ratepayers."

Plaintiffs did not even challenge the testimony of Mr. Froggatt or Mr. Boettinger on this subject, and the Court finds it convincing.

The evidence with respect to Hi/Lo is similar, with plaintiffs' own evidence showing that extensive cost information was available and presented to AT & T's decision-making bodies prior to the filing of the tariff. PX2–0106, which was presented to AT & T's Executive Policy Committee, indicates that the cost of defendants' high-capacity facilities was \$.25—\$.30 per mile per month on a long run incremental cost basis and \$.50—\$.60 on a fully distributed cost basis (PX2–0106 at LA2B 1846), both below the \$.85 high-density rate filed. And PX4–0099, which is identified as a status report to the January 1973 Bell System Presidents' Conference, shows the revenue, cost and contribution results of a study of the various test rates under consideration (PX4–0099 at 16, 18, 24, 52, 62). As explained by several AT & T executives, these test rate studies were in fact the basis for the Hi/Lo rate selection, and the Court so finds (Hough, S–T–1 at 55–56; deButts, S–T–131 at 60–62; Eastmond, S–T–11 at 51–56; Stoddard, S–T–13 at 5–7). Moreover, it is clear from the record that the Hi/Lo planning proceeded from cost studies showing that AT & T's costs on the Chicago-St. Louis route were substantially lower than the rates which MCI intended to put in place (Hough, S–T–1 at 50–52; Johnston, S–T–5 at 55–58; S–1K; S–2298B). And according to the unchallenged testimony of Mr. Stoddard and Mr. Hough, the Hi/Lo test rates themselves were also based on cost considerations, including the results of the Chicago-St. Louis study (Stoddard, S–T–13 at 7–8; Hough, Tr. 3536).

AT & T's MPL rate planning is also shown by the record to have been heavily dependent on the results of contemporaneous cost analyses. The FCC in its *Hi/Lo* decision had required that any replacement tariff be supported by FDC Method 1 studies, and the uncontested evidence submitted by AT & T demonstrates that the FDC cost results became the cornerstone of the MPL rate selection (Hough, S–T–1 at 69–70; Ginn, S–T–73 at 7–8, 12–15; Johnston, S–T–5 at 68–70). Not only were the rates set to produce an earnings ratio for the entire service that covered FDC Method 1 costs, but each schedule and each rate element within the service was set at levels to cover costs (Ginn, S–T–73 at 12–14; Hough, S–T–1 at 69–70; S–3988D). Indeed, as set out in the recommendation to the Long Lines Department Board which approved the MPL tariff for filing, the specific objectives in establishing the MPL rate levels included (Hough, S–T–1 at 70–72; S–4197):

"—Cover FDC (Method I) costs, including a minimum of 9.5% ratio of net operating earnings to net investment ('earnings ratio') for each Schedule.

"—Achieve Schedule I 'earnings ratio' higher than Schedules II and III to demonstrate that Schedule I is not subsidized by other Schedules."

From the Court's review of the evidence, these objectives were not only seriously pursued, but were in fact satisfied.

A second preliminary matter which the Court will address is plaintiffs' purported comparison of the single channel rates in effect in 1960 with the initial Telpak rates (Melody, PX6–0018 at Att. K).[126] Plaintiffs assert that the single channel rate was approximately $2.00 per mile and that in Docket No. 11645 AT & T was arguing that this rate was necessary to cover the cost of private line service. They then question how the Telpak rates could have had any cost basis when, according to plaintiffs' calculations, the Telpak D rates were as low as $.20 per mile. In essence, plaintiffs are arguing that the Telpak rate level alone demonstrates that rates could not have been set with regard to cost.

The comparison and therefore the conclusion which plaintiffs attempt to draw appears to the Court to be both inaccurate and misleading. First, the cost study underlying the $2.00 rate does not, in the Court's view, reflect costs which would be applicable to providing Telpak services. This cost study is not in evidence, but as indicated in the FCC's Docket No. 11645 decision, the study was based upon 1955 costs, updated to 1957. Both Mr. Froggatt and Mr. Johnston, AT & T cost witnesses, explained that microwave radio systems were being put into operation at that time, but there were technical problems which made them undesirable for use in providing private line service (Johnston, Tr. 3817–18; Froggatt, Tr. 3711). As a result, private line services were assigned to older, higher cost, but at that time more reliable, facili-

ties such as K carrier. The technical problems with microwave radio were subsequently solved, however, and with the incorporation of this low cost plant into the network, average investment costs declined substantially. Thus, Mr. Froggatt pointed out that between 1955 and 1960 when the Telpak tariff was being developed, there was a 22½ percent decline in Long Lines' average book cost per circuit mile (Froggatt, Tr. 3719–20). This decline has continued over time as more lower cost microwave radio and coaxial cable systems have been constructed and the older more expensive plant has been retired, so that between 1955 and 1980 the average Long Lines' investment per circuit mile decreased from $41.93 to approximately $11.00 (S–20022 at 710; Ankner, Tr. 4707–08).

Not only were the technical and cost characteristics of the network undergoing substantial change at the time Telpak was introduced, but economic conditions were also markedly different. With the FCC's *Above 890* decision, competition from private microwave systems became a reality, and these systems could be constructed utilizing only the new technology. In these circumstances, AT & T decided that in order to provide a viable common carrier alternative to these systems, the rates for Telpak should be based on the current and future costs of technology then being added to the network, rather than on the basis of historical costs such as used in the Docket No. 11645 studies (Froggatt, S–T–2 at 2–8; Boettinger, S–T–3 at 20–25).

AT & T sought expert economic advice both at the time of the Telpak studies and thereafter, and it continually received confirmation of the validity of its costing approach (Froggatt, S–T–2 at 10–11, 31; Baumol, S–T–4 at 3, 12). Moreover, this approach makes eminent sense to the Court. If AT & T had priced Telpak on the basis of historical costs, there can be little doubt that private microwave systems would have

---

**126.** The Court is addressing this question of AT & T's rates in the 1960s only because it appeared to the Court to have been a major part of plaintiffs' theory of pricing without regard to

cost. AT & T's rates in the 1960s are of so little relevance to the question to be decided here that but for plaintiffs' insistence, it would have been omitted entirely from this analysis.

developed much more substantially, with the result of a loss of contribution to AT & T and thus an increase in the rates to all Bell System ratepayers (Phillips, Tr. 5419–20). On the other hand, so long as the Telpak rates were in excess of the cost of the new facilities being added to the network at an apparently rapid and continuous pace, the business obtained by offering the service would be profitable to the Bell System.

Moreover, focusing again on plaintiffs' rate comparison, the purported $.20 per mile Telpak D rate was not the actual rate being charged by AT & T in the early 1960s. As Mr. Froggatt explained, such an asserted rate level is based on the assumption of 100 percent fill for Telpak D (or in other words a utilization by the customer of all 240 channels). In the early 1960s, however, the actual fill for Telpak was substantially less. Mr. Froggatt recalled the average fill to be about 44 percent (Froggatt, Tr. 3708–09), and his testimony is confirmed by the FCC decision in Docket No. 14251, which indicates that the actual fill for Telpak D as of July 1962 was 105 of the 240 channels or 44 percent (38 F.C.C. 370, 386). At such a utilization level the effective Telpak D rate was approximately $.50 per mile.

■ Turning now to the crux of plaintiffs' pricing without regard to cost claim—their criticisms of AT & T's costing procedures—it is important first to put this matter in legal perspective. The requirements of the Sherman Act, particularly in the area of permissible pricing, must be ones that can be stated as clearly defined "objective, understandable standard[s]" which can guide a firm's business decisions. *Transamerica Computer Co. v. IBM Corp.,* 481 F.Supp. 965, 990 (N.D.Cal.1979). See also *Berkey Photo, supra,* 603 F.2d at 282 (a firm should not have to be so omniscient as to be able to anticipate all instances where a finder of fact might conclude with the benefit of hindsight that its decisions violated the Sherman Act). Thus, even assuming that plaintiffs' theory of liability is acceptable under the Sherman Act, liability must be based on a finding that the methodologi-

cal deficiencies or omissions plaintiffs cite to the Court were clearly and predictably unreasonable from the outset because they failed to comply with a clear cut standard of accepted principles of cost accounting against which AT & T's studies may be judged.

■ Similarly, it is not the function of this Court to choose the most appropriate costing technique. At most, even under plaintiffs' theory, this Court may only decide whether or not the technique or procedure chosen by AT & T was reasonable under the circumstances. It is therefore not sufficient to prove liability for plaintiffs to find some witnesses who make after-the-fact criticisms of AT & T cost studies, if AT & T's methods had any supportable basis in economics or cost accounting. See *ILC Peripherals Leasing Corp. v. IBM Corp.,* 458 F.Supp. 423, 439 (N.D.Cal.1979), aff'd sub nom. *Memorex Corp. v. IBM Corp.,* 636 F.2d 1188 (9th Cir.1980), *cert. denied,* 452 U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981) (the courts will not second guess business decisions "[w]here there is a difference of opinion as to the advantages of two alternatives which can both be defended").

■ Applying these sound, common sense principles to the evidence in this case, the Court finds that plaintiffs have failed to establish the facts that would support liability even under the novel theory plaintiffs proposed. The evidence shows that AT & T used, what were at the time and remain today, reasonable costing procedures that have the support of a number of eminent economists and cost accounting experts (see Baumol, S–T–4 at 10, 12–13, Tr. 3748–49; Arrow, S–T–30 at 5–8, 46–47, Tr. 4340; Phillips, Tr. 5420; Olley, S–T–29 at 2–3, 13–14, Tr. 5369–70; Frank, S–T–19 at 5–8; Morrison, S–T–20 at 10), and of experts in the Office of Telecommunications Policy (see Braeutigam, S–T–204 at 5–12, Tr. 5016; Sutter, Tr. 4929–31). Indeed, many of these experts have testified that the procedures used for cost accounting by AT & T were among the most sophisticated and professional the witnesses had seen.

The Court is also convinced by defendants' evidence, and defendants' witnesses who took the stand, that the cost and demand studies challenged here by plaintiffs were all done in good faith with the goal of producing the most accurate study possible in light of the data available and the uncertain and shifting standards used by the FCC (see Hough, S–T–1 at 40–41; Froggatt, S–T–2 at 7–8, 47; Johnston, S–T–5 at 2–8; Ankner, S–T–10 at 27; Eastmond, S–T–11 at 6; Ambrose, S–T–17 at 40–43; Cogswell, S–T–6 at 5–7; McCarthy, S–T–7 at 10–12; McAllister, S–T–9 at 10; Miller, S–T–22 at 1; Burke, S–T–8 at 2–9).

In light of this evidence, the fact that plaintiffs' witnesses, namely, Dr. Melody, Mr. Tucker and Mr. Scott, found room to make after-the-fact criticisms [127] of the cost studies is wholly inadequate to meet plaintiffs' burden of proof. Indeed, the record shows that the criticisms leveled by plaintiffs' witnesses have been addressed and refuted by defendants' witnesses. Moreover, it appears to the Court that this entire effort by plaintiffs' witnesses is largely nothing more than an attempt to exploit the precarious position in which AT & T found itself as a result of the FCC's failure to adopt any definitive standards for AT & T's cost studies.

To begin with, it is clear from the record that costing is not a precise or static art. Dr. Melody testified directly that costing is an "inexact science" (Melody, Tr. 2520). He also agreed that what would be reasonable to one economist or cost accountant would not necessarily be reasonable to another economist or cost accountant (Melody, Tr.

2520). This also reflects the view of the FCC, which has recognized that costing is an evolutionary process that is constantly changing (Tr. 2466–67).

It is also clear to the Court that the FCC, to which all the studies at issue were submitted, did not give AT & T guidance during the relevant period as to what kind of procedures the Commission expected to be followed for producing an acceptable cost study. Thus, the record shows that "there has never been any Commission standards for precisely how to do a cost study" (Scott, Tr. 2031). The FCC has never stated the formulae to be used and has never given guidance as to what constitutes a valid tariff (Scott, Tr. 2032, 2033; Melody, Tr. 2406–07). Indeed, the FCC has held an "institutional bias" against providing this kind of guidance (Scott, Tr. 2072–73). As Mr. Scott conceded, this lack of guidance has left AT & T in a "rather precarious position" (Scott, Tr. 2033–34). AT & T could not price its services too high which the FCC would strike as excessive, nor could AT & T price its services too low which the FCC would strike as non-compensatory and competitors would claim was predatory.[128]

The Court is struck by the fact that the FCC not only failed to specify particular procedures for cost studies, but it failed for over 10 years to resolve the basic question of whether long run incremental costs or fully distributed costs should be the primary basis for ratemaking under the Communications Act.[129] This issue arose at the Commission at least as early as 1965, and was not even provisionally resolved until 1976 in the Commission's Docket No. 18128

---

**127.** These after-the-fact criticisms were made despite the fact that Dr. Melody and Messrs. Scott and Tucker were former FCC employees who were thus in a position to have their positions implemented. With respect to Dr. Melody, the Court can only assume that he presented his position to the staff while at the FCC and was rebuffed. It is claimed that neither Mr. Scott or Mr. Tucker had occasion to work on AT & T tariffs while at the FCC. Yet their criticisms of the AT & T cost studies are conceptual and thus applicable (or should be) to all cost studies. Thus, the Court again assumes that these concepts were brought to the FCC's

attention and they were rebuffed. To the extent that these concepts were not brought out at the Commission merely evidences "Monday-morning quarterbacking" which this Court will not countenance.

**128.** Indeed what plaintiffs have failed to account for in its but-for-world is that AT & T would have received approval to institute the higher but-for-rate.

**129.** After more than 21 years, the Commission *never made a definitive ruling* on the structure of Telpak.

decision. *AT & T,* 61 F.C.C.2d 587 (1976). In the *Specialized Common Carriers* decision the Commission specifically deferred ruling on this issue, despite pleas by the parties that a resolution was necessary in the new competitive environment (29 F.C.C.2d at 916–17) (PX4–0617). And the Commission finally acted when it did in Docket No. 18128—four years after the record in that proceeding was closed—only after being ordered to do so by the Court of Appeals for this Circuit (Scott, Tr. 2009–11; *Nader v. FCC,* 520 F.2d 182 (D.C.Cir.1975)).

In its Docket No. 18128 decision, the Commission chose FDC Method 7 as the basic ratemaking standard. That still did not finally resolve the issue, however, because in 1981, the Commission reversed its position, and, at least for an interim period, adopted a different (separations based) fully distributed cost methodology. *AT & T,* 84 F.C.C.2d 384 (1981), *aff'd sub nom. MCI Telecommunications Corp. v. FCC,* 675 F.2d 408 (D.C.Cir.1982).

Even while intact, however, the Commission's 1976 decision in Docket No. 18128 does not appear to the Court to have provided definitive guidance. The Commission in that decision held that procedures to implement FDC Method 7 had to be revised and clarified before they could be utilized in new studies, and it (1) directed "the Bureau Staff (in consultation with the carriers) to correct . . . infirmities in Method 7," and (2) required AT & T thereafter "to file rates based on the reconstructed Method 7 analysis" (61 F.C.C.2d at 667; Agreed Fact 2–2–014). The procedures were revised and set out in the form of a cost allocation manual (Johnston, S–T–5 at 2, 7–11; Hough, S–T–1 at 74; Ginn, S–T–73 at 21–32; S–4764; Agreed Facts 2–2–015, 2–2–017). This manual, however, was apparently disregarded by the Commission, even though there is no evidence of which the Court is aware that the Commission ever found that any of AT & T's studies did not comply with the manual (Scott, Tr. 2013–17).[130]

▮ To the Court, the circumstances surrounding the cost allocation manual provide a compelling example of the intolerable situation in which AT & T found itself. The evidence is undisputed that AT & T in good faith consulted with the Commission staff as required by the Commission's order in Docket No. 18128. It is similarly unchallenged that the responsible AT & T personnel left the consultative sessions with the beliefs that AT & T was bound by the manual for its future studies and that the FCC Cost Analysis Task Force was satisfied that the manual faithfully implemented the Docket No. 18128 decision (Ginn, S–T–73 at 21–32; Johnston, S–T–5 at 30–33). Indeed, the FCC Staff Cost Analysis Task Force issued publicly two separate reports regarding the manual which any objective observer would read as confirmation of AT & T's beliefs (S–4756B; S–4816C):

> "At the conclusion of the consultative sessions held to date, Bell and the staff have formulated the bases and methodologies to be employed for the Datum process, FDC allocation procedures and forecasting and translation techniques, in a manner consistent with the Commission's Order . . . in Docket 18128 . . . ." (S–4756B at 5)

> \* \* \* \* \* \*

> "The task force . . . believes that the Manual as adopted by Bell satisfies the Commission's prescribed guidelines regarding methodological revisions and provides a proper basis for constructing the June, 1977 filings.

> " . . . No comments were found to warrant substantive revisions of the Manual at this time, or to call into question its standing as the proper basis for the June filing. The Manual corresponds with the Commission's directives concerning Method 7 and Method 1 revisions . . . ." (S–4816C at 7–8).

---

130. Mr. Scott, one of plaintiffs' cost experts testified as follows (Tr. 2017).

Q. In the MPL decision did the Commission ever make a filing (sic) that AT & T failed to adhere to the cost manuals of January 1977 or August 1977?

A. Not that I can recall.

Yet, in the *MPL* case, where AT & T specifically submitted new studies conforming to the manual, the Commission would not even consider whether AT & T's studies complied with the manual. *AT & T,* 74 F.C.C.2d 1, 13 (1979) (PX3–0241). See Hough, S–T–1 at 74–75; Ginn, S–T–73 at 32–39; Johnston, S–T–5 at 74–75. Worse than having no guidance at all, there is a strong indication from the evidence that AT & T may have been affirmatively misled by the Commission's directive in Docket No. 18128 that AT & T abide by the revised FDC Method 7 procedures which the Commission ordered its Common Carrier Bureau staff to develop.

The Court of Appeals for this Circuit has recognized the unfair situation created by the Commission's failure to establish clear costing and ratemaking standards. In *MCI Telecommunications Corp. v. FCC,* 627 F.2d 322 (D.C.Cir.1980), a case involving AT & T's WATS service, the Court acknowledged that ratemaking theories may change and new information may become relevant, but it held that (*id.* at 340):

"... there must be some reasonably prompt decisionmaking point at which the FCC says: 'To the best of our knowledge and expertise at this time, the rates are just and reasonable. Perfect, perhaps not, but just and reasonable, yes.' That is all the statute requires."

The record in this case confirms what the Court of Appeals recognized—that the Commission has not adhered to this standard and that this has "frustrated AT & T, its competitors, consumers, FCC Commissioners and this court" (*id.* at 341).

The Court of Appeals in the *MCI* WATS case again had to order the Commission to take the action necessary to develop standards, including standards for cost support material, by which a tariff could be judged on its merits (*id.* at 345–46). Apparently, it was this order by the Court that resulted in 1981 in the Commission for the first time adopting a cost allocation manual (84 F.C. C.2d at 386, 410; 86 F.C.C.2d at 667).

Moreover, while each of plaintiffs' principal cost witnesses was at the FCC during the relevant time period, they either did not make the criticisms of AT & T's studies made in this case or they failed to persuade the Commission to adopt their views at the time. Dr. Melody admitted that the Commission never adopted his recommendations (Melody, Tr. 2407). Similarly, the Commission has never used anything like the type of analysis proposed by Mr. Scott or Mr. Tucker as appropriate in this case (Scott, Tr. 1970). Indeed, a cost allocation proposal known as the "Hinchman report," which Mr. Scott worked on after leaving the Commission, was expressly rejected by the FCC (Scott, Tr. 2021). The Commission found that this proposal would require an "overwhelming mass of detail," would interfere with economic efficiency, and would introduce "potentially severe rate instability" and prevent "the emergence of realistic economic signals to AT & T's competitors and customers of telecommunications service" (*AT & T,* 78 F.C.C.2d 1296, 1330–33 (1980) (PX3–0340).

On the other hand, despite this continuing regulatory uncertainty, the evidence discloses that AT & T took all reasonable efforts to comply with what it understood to be the Commission's requirements at any point in time. Thus, AT & T frequently sought the advice of the FCC staff, and when it was informed by the staff of perceived problems in AT & T's prima facie compliance with Commission requirements, these problems were resolved (Scott, Tr. 1974–75; Ginn, S–T–73 at 17–19; Johnston, S–T–5 at 73; Ankner, S–T–10 at 13–15). Similarly, AT & T complied with FCC Rule 61.38, the Commission's principal rule on cost support material (Scott, Tr. 2031, 2034). And the Commission itself has recognized that the problems it has identified in AT & T's cost studies stem from the complexity of the process, and do not require a finding that AT & T acted improperly in its development of allocation methods (78 F.C.C.2d at 1306–08).

AT & T's actions in connection with the 1977 cost manual, discussed above, provide still additional evidence of AT & T's cooperation with the FCC staff in an effort to

achieve some agreement on the acceptable costing procedures. A similar series of meetings also occurred eight years earlier, and apparently met the same unproductive end. Thus, after a number of sessions with the FCC staff, including Dr. Melody, AT & T personnel in 1969 believed they had reached an understanding on the procedures for LRIC studies that would be considered appropriate (Eastmond, S–T–11 at 17–19; Aldrich, S–T–28 at 11–15, U.S.Tr. 22943–47; McCarthy, S–T–7 at 9; Miller, S–T–22 at 9–12; Joskow, S–T–21 at 2; Baumol, S–T–4 at 15–18). Yet, despite his participation in these meetings, Dr. Melody soon began again criticizing many of the same procedures which were thought to have been agreed upon (Aldrich, S–T–28 at 15–16, U.S.Tr. 22957–59; Eastmond, S–T–11 at 19, 31–32).

Indeed, AT & T's concern with reaching some common understanding with the Commission was so great that in 1979 after he became Chairman of the Board, Mr. Charles Brown personally became involved in this matter. Mr. Brown testified that he met with Mr. Darby, Chief of the Common Carrier Bureau; expressed his distress and frustration with the Commission's rejection of AT & T's tariffs without ever having established any clear guidelines for support materials; and requested from Mr. Darby some statement of what the Commission wanted (Brown, Tr. 5319–21). In a response which the Court considers very revealing of the regulatory uncertainty from which AT & T has suffered, Mr. Darby informed Mr. Brown that he "apparently didn't know how things worked around there" (Brown, Tr. 5321). According to Mr. Darby, AT & T was to submit a tariff and then the Commission would say whether it should be rejected (id.).

Against this sad history, the Court is convinced that SPCC's challenge to AT & T's costing procedures is largely an attempt to blame AT & T for a problem which, if anyone's fault, was the FCC's. Over 60 years ago, Justice Brandeis recognized that "experience teaches us that it is much easier to reject [cost allocation] formulas presented as being misleading than to find one apparently adequate." *Groesbeck v. Duluth, South Shore & Atlantic R.R. Co.,* 250 U.S. 607, 614–15, 40 S.Ct. 38, 41, 63 L.Ed. 1167 (1919). The FCC apparently struggled for years without finding procedures that it thought were adequate, and this Court will not now in hindsight take the approach of rejecting the reasonable procedures used by AT & T during this period of regulatory uncertainty.

The Court's conclusion regarding plaintiffs' failure of proof is reinforced by an examination of the alleged deficiencies in AT & T's studies which Dr. Melody, Mr. Scott and Mr. Tucker claim to have found. The Court has reviewed the evidence on each of the points raised by these witnesses, and it can find no basis upon which to conclude that AT & T deliberately manipulated its studies or intentionally used unreasonable procedures. To the contrary, the Court finds that the claimed "abuses" and "deficiencies" at most concern differences in opinion on various costing methods about which reasonable men can and do differ. In fact, Dr. Melody conceded that all of the points about which he testified were ones on which reasonable professionals could differ (Melody, Tr. 5604–05). And at one point or another during his testimony, Dr. Melody acknowledged that not only respected economists such as Dr. Arrow and Dr. Baumol disagreed with him, but that the Department of Justice, the Office of Telecommunications Policy and members of the FCC staff did as well (Melody, Tr. 2552–57, 2564, 5612–14, 5631, 5643).

With respect to Dr. Melody's testimony, the Court is constrained initially to express its serious reservations about his objectivity. From his testimony, Dr. Melody appears to be a long-time opponent of AT & T; he began consulting for AT & T's competitors almost immediately after leaving the FCC in 1971 and has testified against the Bell System on a number of occasions since then (Melody, PX6–0018, Att. A; Tr. 5631–39; S–3Y; S–3031). Moreover, his testimony on its face is so entirely hypothetical and exaggerated as to raise questions regarding the weight it should be giv-

en. Additionally, it is in conflict with many positions he expressed before becoming a consultant to SPCC and other competitors of AT & T. The record shows, for instance, that he has reversed his views on a utility's use of marginal cost pricing (Melody, Tr. 2530–33, 2539–40).

■ The underlying predicate of Dr. Melody's testimony, in the Court's view, also undercuts the weight that it should be given. Dr. Melody appeared to be a partisan for rates set on a stringent fully distributed cost basis and his disagreement with AT & T's costing methods seems to the Court to be primarily a disagreement with the long run incremental cost methodology (Melody, Tr. 2409). Dr. Melody made it clear that the "fundamental abuses" which he claims existed were in his view all basically a part of the LRIC methodology (Melody, Tr. 2413, 2438–40, 2442). And he asserted that his real concern is with "cross-subsidy," which he believes is inherent in AT & T's use of long run incremental costs (Melody, PX6–0018 at 11–16, Tr. 2396–99). The Court has already rejected these arguments above and has adopted marginal or incremental cost as the legal standard applicable to this case. Even if incremental cost were not the only appropriate standard for predatory pricing, however, it is clear to the Court that the use of this methodology, which has the support of so many respected economists and legal authorities, cannot constitute pricing without regard to cost.

In addition, each of Dr. Melody's claimed "fundamental abuses" was fully refuted in the testimony of AT & T witnesses. In the Court's view, these witnesses showed that Dr. Melody's complaints were either based on factually incorrect assumptions or simply reflected a difference of opinion about a reasonable costing technique used by AT & T (Johnston, S–T–5 at 42–54; Ankner, S–T–10 at 18–26; Froggatt, S–T–2 at 38, 43–47; Eastmond, S–T–11 at 26–36; Cogswell, S–T–6; McCarthy, S–T–7; Burke, S–T–8; McAllister, S–T–9; Ambrose, S–T–17 at 75–85; Muench, S–T–18; Miller, S–T–22).

Moreover, AT & T's witnesses, particularly Mr. Ankner, more than effectively rebutted Dr. Melody's charge that AT & T's studies were not documented sufficiently that they could be understood or verified. Mr. Ankner responded to each of the "dead ends" which Dr. Melody claimed to exist in the Hi/Lo study (Melody, Tr. 2451–52), pointing out in each instance the source of the data and where it was documented (Ankner, S–T–10 at U.S.Tr. 22166–97; S–5905C [D–29–778]; see also Olley, S–T–29 at 30–31; Baumol, S–T–4 at 35–40; Ambrose, S–T–17 at 42–43).

For example, one of Dr. Melody's major criticisms of AT & T's FDC and LRIC cost studies for the Hi/Lo tariff was his assertion that these studies "ignore BOC plant" (Melody, PX6–0018 at 41–42, Tr. 2418–25). The essence of this charge is that in developing the costs for private line service, AT & T allegedly has ignored the costs of Bell operating company plant, even though interstate private line services are provided using operating company as well as Long Lines facilities (Melody, Tr. 2418–19). The AT & T employees who were responsible for the FDC and LRIC studies, particularly Mr. Johnston and Mr. Ankner, testified that they did indeed take into account the cost of operating company plant and that Dr. Melody has completely misstated the facts (Johnston, S–T–5 at 43–46; Ankner, S–T–10 at 16–18; Ambrose, S–T–17 at 77–78). Contrary to the implication of Dr. Melody's assertion, *actual* operating company plant costs were used in calculating the cost of low capacity facilities and local channels used to provide private line service (Johnston, S–T–5 at 44; Ankner, S–T–10 at 18). For high capacity facilities, AT & T also calculated the cost of facilities owned by the operating companies, but did so by applying cost data generated by Long Lines because Long Lines cost data was representative of the cost of the high capacity facilities owned by the Bell System (Johnston, S–T–5 at 45–46; Ankner, S–T–10 at 17–18). The reasonableness of this procedure was confirmed by AT & T's witness

Dr. Olley (S–T–28 at 32–33), and the Court agrees with this view.[131]

Another example of the lack of substance to Dr. Melody's criticisms relates to AT & T's use of "capacity costs" (Melody, Tr. 2442, 2575) and Dr. Melody's claim that use of this concept led to AT & T's erroneous use of a 75 percent fill factor in its LRIC studies.[132] Dr. Melody claims that a 35 percent fill is more realistic (Tr. 2527–28). As explained during trial by Professor Baumol (Tr. 3762–65), capacity costs is a well established, reasonable costing technique (see also Baumol, S–T–4 at 41–46; Olley, S–T–29 at 18–19). Moreover, Dr. Melody seems confused with respect to fill. In an incremental study, a forward looking fill appears to the Court plainly to be the correct concept, but Dr. Melody's claim is based on average fill at a point in time (Ankner, S–T–10 at 22; Baumol, Tr. 3765). The record shows that the 75 percent fill factor was an objective forward looking fill which was developed after consultation with engineering personnel and which reflected the methodology employed by Long Lines fundamental planning engineers in the development of the fundamental plan for new route construction (Ankner, S–T–10 at 22; Eastmond, S–T–11 at 32; Olley, S–T–29 at 22–25). Moreover, the evidence demonstrates that this was in fact a conservative estimate. Thus, a study by Mr. Ankner, based on actual construction and utilization during the period 1968–1979, proved that the actual incremental fill over that period was 80.6 percent (Ankner, S–T–10 at 23–24, U.S.Tr. 22208–10, Tr. 4678; S–4S [D–29–754] ).[133]

The Court also finds it significant, in assessing Dr. Melody's attack on the reasonableness of AT & T's costing methods, to examine what was being done by others in the industry. In this regard, Dr. Baumol examined the cost studies which SPCC has filed with the FCC and found that Dr. Melody could have made similar charges of "abuse" regarding virtually any of SPCC's studies (Baumol, S–T–4A). For example, SPCC did not quantify expected competitive losses, based its costs on assumed rather than actual plant characteristics, and

131. The record shows that this procedure of estimating certain Bell operating company costs from Long Lines costs was explained to the FCC in the early 1960s and that AT & T provided documentation to the FCC staff showing that operating company costs per circuit mile were in fact comparable to Long Lines costs per circuit mile for the same type of circuit (PX2–0021; PX2–0022).

132. Although Dr. Melody now criticizes the capacity cost concept, and testified that he also did so during conferences with AT & T economists in 1969 (Tr. 5571–73), notes of those conferences flatly contradict Dr. Melody's testimony. Thus, notes of a June 10, 1969 conference reflect that Mr. Killoch of AT & T made a presentation regarding the capacity cost concept and that Dr. Melody reacted quite favorably, stating: "The model seems to be extremely useful and provides good insight into the problem. It takes into consideration the fact that investment decisions depend on price, and presents the value of 'timing' of investment decisions. I am very optimistic about this approach and I must say that the model is good and you are also a good teacher" (S–1905B at 2). These notes confirm the Court's already stated view regarding Dr. Melody's apparent lack of objectivity and credibility.

133. Although plaintiffs attempted to attack Mr. Ankner's actual incremental fill calculation on cross-examination, it is the Court's opinion that Mr. Ankner adequately responded to each of the issues raised and was both an extremely convincing and credible witness who had devoted a substantial portion of his professional career to cost analysis. Thus, with respect to the treatment of L5 coaxial cable in his analysis, Mr. Ankner testified that the fill of the getting started cost was treated as L5 because these systems were being constructed to serve ultimately as L5; that the electronics were included as L4 or L3 where the systems were first used as such; and that, most importantly, these systems could have been treated entirely as L4, with later conversion to L5, with no effect on the final result (Ankner, Tr. 4679–82). And when questioned about how the incremental fill on certain facilities could be in excess of 100 percent, Mr. Ankner explained that incremental fill is the ratio of the additional revenue producing circuit miles over the additional capacity, and therefore an incremental fill of over 100 percent could result from additional demand being served without any addition of capacity. In such a situation, another way of approaching the problem would be to treat the existing facilities as having an incremental cost of zero, and when averaged over time the result would be the same as the approach used by Mr. Ankner (Ankner, Tr. 4685–88).

used an 80 percent fill assumption (*id.* at 3, 6–7). As Dr. Baumol emphasized, this does not mean that SPCC has engaged in cost abuses. It simply indicates that any cost study may be criticized for imperfections and provides a way of placing Dr. Melody's testimony in its proper context (Baumol, Tr. 3775–76; S–T–4A at 14).

It is also relevant that at least some members of the FCC staff have had views directly contrary to those expressed here by Dr. Melody. These contrary views were reflected in a draft of the Recommended Decision in Docket No. 18128 which was written in 1973 (S–2825C). At that time there appeared to be at least a tentative agreement among the staff that LRIC would be acceptable for pricing purposes (Strassburg, S–T–171 at U.S.Tr. 23444–46; S–2676), and the draft decision reflects that view. More significantly for present purposes, the draft also addressed a number of the costing procedures criticized now by Dr. Melody—including capacity cost, fill factor, depreciation methods and unit cost derivation—and in all instances approved AT & T procedures (S–2825C at 114–26). With respect to capacity cost and fill, for example, the draft decision states (*id.* at 118):

> "We feel that in estimating the cost of a voice grade channel a 75 percent mastergroup fill or utilization factor reflects the estimated future capacity operational fill."

> \* \* \* \* \* \*

> "We endorse the use of capacity costs of high capacity line haul facilities in a LRIC study as a reasonable approach to prospective unit investment costs of these facilities and a method of eliminating the short run effect of construction programs."

The Court obviously cannot give this draft decision controlling weight, but it is another indication that Dr. Melody's testimony reflects at most one view of a subject over which reasonable persons can differ.

As is already apparent, the Court is not according any weight to Dr. Melody's testimony. If there were any doubt remaining, however, there is additional evidence which the Court considers to be highly probative. This is a study conducted by Mr. Ankner of the actual incremental investment per revenue producing circuit mile for the high capacity, high frequency interexchange line component of the high-density interexchange rate element over the period 1969 through 1979 (Ankner, S–T–10 at 26–27; S–76 [D–29–753]). Because this study looks retrospectively at actual incremental investment, it puts charges such as failure to consider inflationary effects, use of stale data and fill into perspective (Ankner, S–T–10 at U.S.Tr. 22213). The results of this study showed a monthly cost of $.358 cents, or only about 2.3 percent difference from the $.35 cost projected by Mr. Ankner in his initial 1972 Hi/Lo LRIC study (*id.* at 22213–14).

The Court does not find the testimony of Mr. Scott or Mr. Tucker, both employees of Walter Hinchman Associates, to be any more persuasive than that of Dr. Melody. In the first place, the Court has serious doubts about their expert qualifications. They purported to "correct" AT & T's cost studies for Hi/Lo and MPL (Scott, Tr. 1969; Tucker 1886–87, 1890), but neither witness has an educational background directly relevant to his testimony here; neither is a CPA or engineer; and neither has practical experience in the telecommunications industry (Tucker, Tr. 1882–86; Scott, Tr. 2006–09). Their only related professional experience is a few years employment at the staff level at the FCC; but neither of them examined AT & T's Hi/Lo or MPL tariffs while at the FCC and neither of them has previously performed a study similar to the kind they offered into evidence in this case (Scott, Tr. 1964–66, 1969–71, 1990–91; Tucker, Tr. 1882, 1930–31).[134]

134. To the extent that plaintiffs are also relying on the Scott and Tucker calculations as evidence of Telpak costs, the calculations are entitled to even less weight. Plaintiffs' theory in this respect is apparently based on the fact that the cost of any one particular circuit is the same regardless of the tariff under which it is sold. This simplistic notion, however, fails to account for the fact that, overall, the circuits sold under Telpak have had different physical

In fact, neither Mr. Scott nor Mr. Tucker seemed knowledgeable about AT & T's actual plant, engineering, or costs—they made "readjustments" to AT & T cost studies in a vacuum, apparently unconcerned that their calculations were about a real company, with real equipment, that had real costs. Thus, Mr. Tucker admitted he did not know whether the associated company plant on high-density routes was "one penny more expensive" than Long Lines' plant (Tucker, Tr. 1945); nor could he testify regarding the capacity or cost differences of various facility types (Tucker, Tr. 1937–38). And while he was willing to testify that AT & T's costs per mile were as high as $1.71 or $1.77,[135] he conceded that he had never seen any carrier report costs as high as $1.00 while he was employed at the FCC (Tucker, Tr. 1954). It was equally apparent to the Court that Mr. Scott lacked knowledge of AT & T's costs and even on the basis of his own calculations, Mr. Scott could not determine the costs of the high-density interexchange rate element.[136] He testified that he did not have an opinion on whether that rate element was above or below cost (Scott, Tr. 2052–53).

The limited nature of Mr. Tucker's and Mr. Scott's knowledge and experience is also apparent from the nature of the criticisms which they made to AT & T's studies. For example, one of the major criticisms leveled by both Mr. Tucker and Mr. Scott was that AT & T "smoothed" its facilities inventory data in the development of certain of the translators used to convert from plant quantities into market quantities. Yet, the record indicates, almost overwhelmingly, that the purpose of smoothing was to assure that the data reflected known plant characteristics; that smoothing is a widely used and accepted statistical technique; that AT & T conducted sensitivity tests to assure the validity of the smoothed data; and that, in any event, the use of smoothed instead of unsmoothed data was inconsequential in terms of the cost study results (Johnston, S–T–5A at 3–4; S–5641B; Ankner, S–T–10A at 10; S–7I; Olley, S–T–29 at 37–38, Tr. 5398–403; Castellano, Tr. 3932–35). Mr. Scott also criticized the use of differential techniques in the translator development. On this issue, the Court is also convinced that differential analysis is a well-established analytical technique and that Mr. Scott's criticism is based largely on his ignorance of network design and operations. Thus, while Mr. Scott asserted that it is "bizarre" and "physically impossible" in a growing network to get a negative increment for intermediate carrier terminations, the evidence shows that as demand grows, the function performed by this equipment is taken over by other equipment, with the expected result being that the number of intermediate carrier terminations decreases (Olley, S–T–29 at 38–39, Tr. 5391–93; Ankner, S–T–10A at 10).

Evidence that the Tucker and Scott readjustments are arbitrary and unrealistic is also provided by the unexplained inconsistencies in their studies. In fact, the costs as calculated by Mr. Scott's adjustments to AT & T's LRIC method were higher than the costs calculated by Mr. Tucker's adjustments to AT & T's FDC method (Scott, Tr. 2036–37). Mr. Scott did not agree with Mr. Tucker on whether this was an appropriate relationship (Scott, Tr. 2037–38), but the Court of Appeals for this Circuit has recognized that long run incremental costs for

and cost characteristics than the circuits sold under the single-channel tariffs. Thus, for example, Telpak circuits as a whole differed from single-channel circuits in terms of route-to-air ratio, length of haul, and facility mix, all of which result in differences in the service costs of Telpak as compared to the single-channel offerings (Johnston, Tr. 3860–61; Froggatt, Tr. 3718–19; PX3–0325).

**135.** The absurdity of these high cost numbers is apparent to the Court when juxtaposed against SPCC's "but-for" weighted average prices for private line. (PX5–0145). Not until the third quarter of 1984 does AT & T even charge a $1.71 in the "but-for" world and the second quarter of 1986 for the $1.77 figure.

**136.** This is contrary to the testimony of Mr. Morrison of Peat, Marwick who testified that "the underlying data and procedures were available from AT & T to conduct a proper cost study. (S–T–20 at 10).

private line services are normally lower than fully distributed costs. *Aeronautical Radio Inc. v. FCC,* 642 F.2d 1221, 1231 (D.C. Cir.1980), *cert. denied,* 451 U.S. 920, 101 S.Ct. 1998, 68 L.Ed.2d 311 (1981). And given plaintiffs' strong advocacy against LRIC as the appropriate costing standard, it is plain that they view LRIC as lower.[137]

Most significantly, defendants' witnesses effectively responded to Mr. Tucker's and Mr. Scott's criticisms and demonstrated to the Court's satisfaction that the Tucker and Scott calculations seriously overstated AT & T's costs. Mr. Johnston addressed the FDC studies, and showed that Mr. Tucker's criticisms regarding facilities mix and translators were both incorrect and inconsequential; that the unit costs used by Mr. Tucker were unrealistically high and not representative of actual Bell System investment; and that Mr. Tucker's adjustments to local channel or station terminal costs were based on a misunderstanding of AT & T's local loop plant (Johnston, S–T–5A at 2–7). Correcting the errors in Mr. Tucker's calculations, Mr. Johnston derived an end-to-end average cost per circuit mile for the high density portion of Hi/Lo of $1.04, compared to the two different results of $1.77 and $1.51 reached by Mr. Tucker, and a cost of $1.18 for MPL Schedule I compared with Mr. Tucker's $1.71 (Johnston, S–T–5A at 7–8; S–6G; S–6H). As corrected, both the Hi/Lo and MPL average end-to-end FDC costs per circuit mile were well below the average revenue for these services (S–6G; S–6H):

| | Revenues | Costs |
|-------|----------|--------|
| Hi/Lo | $1.33 | $1.04 |
| MPL | $1.41 | $1.18 |

The only point on which plaintiffs even seriously challenged Mr. Johnston's corrections to Mr. Tucker's mistakes was Mr. Johnston's use of 1969 Long Lines unit cost data for low capacity facilities such as K-carrier instead of the more recent Long Lines data that was available at the time the original Hi/Lo and MPL studies were done.[138] In the Court's opinion, however, Mr. Johnston more than adequately explained that because of Long Lines' small and declining ownership percentage of such low capacity facilities, the 1969 book cost data were more representative of total Bell System investment than the later data which were greatly inflated because of Long Lines' retirement of these facilities in the 1970s (Johnston, S–T–5A at 5–6, Tr. 3840, 3844). Indeed, Mr. Tucker conceded during his own cross-examination that the more recent "K carrier investment may not be representative for all miles in the Bell System" (Tucker, Tr. 1942). In these circumstances, the Court accepts Mr. Johnston's testimony and rejects that of Mr. Tucker.

Mr. Scott's analysis of AT & T's LRIC studies was addressed by a number of defendants' witnesses. *Mr. Eastmond, Dr. Olley and Mr. Ankner addressed methodologi-*

137. In the Court's view, the Scott and Tucker calculations were inconsistent with each other in other critical respects. Mr. Scott, for instance, was not sure why Mr. Tucker's average revenue per mile for the high-density portion of Hi/Lo in his study was $1.33, while Mr. Scott's was $1.42 (Scott, Tr. 2025–26). But then, after asserting that a disparity in revenue figures would account for a difference between the two studies, Mr. Scott was unable to explain why, when he and Mr. Tucker used similar average revenue for a certain air band, the results were a monthly FDC figure of $.59 per mile and a monthly LRIC figure of $.91 per mile (Scott, Tr. 2035). He admitted, however, that this unexplained difference of approximately 50 percent was significant (Scott, Tr. 2036–37). He finally conceded that such inconsistencies mean "you can do anything with numbers if you want to" (Scott, Tr. 2026).

138. On cross-examination, plaintiffs also tried to create the impression that Mr. Johnston erred in his calculation of expense factors and that he omitted certain costs associated with test board equipment. As the Court understands it, however, the entire point regarding the expense factors is related to the extent of change in the facilities mix between Mr. Tucker's and the original AT & T studies, and, as Mr. Johnston explained, the change was so small as to be miniscule (Johnston, Tr. 3855). And with respect to test board equipment, Mr. Johnston testified that in his corrections to Mr. Tucker's adjustments he used exactly the same station terminal costs as in the original MPL studies (Johnston, Tr. 3846–47), which studies clearly indicated that test boards were included in the station terminal costs (S–176 at 3–56).

cal criticisms of the kind made by Mr. Scott on such matters as fill, expense to investment ratios, treatment of inflation and development of translators (Eastmond, S–T–11 at 27–36, 49; Olley, S–T–29 at 32–42; Ankner, S–T–10 at 16–27). The Court finds these witnesses to have provided reasonable justification for AT & T's methods,[139] particularly after examining this matter in the context of the corrections Mr. Ankner also made to Mr. Scott's calculations. Accepting Mr. Scott's methods for purposes of analysis, Mr. Ankner corrected Mr. Scott's implementation of those methods to adjust for such matters as Mr. Scott's miscalculation of average system fill; Mr. Scott's use of indices, instead of actual amounts, to trend costs over what are now historical periods; and errors in Mr. Scott's regression analysis of expense to investment ratios (Ankner, S–T–10A at 3–9). When these corrections were made, the average cost per mile as calculated by Mr. Scott was reduced from $1.58 to $.98 for the high density portion of Hi/Lo (S–7G) and from $1.62 to $1.00 for MPL Schedule I (S–7H). Mr. Ankner's corrections were not even seriously questioned on cross-examination, and the Court accepts the results of his calculations as credible and probative evidence of the overstatements of cost by Mr. Scott.[140] Once again, as corrected, both the Hi/Lo and MPL end-to-end LRIC cost per circuit mile were well below the average revenue for these services (*id.*):

| | Revenues | Costs |
|---|---|---|
| Hi/Lo | $1.53 | $ .98 |
| MPL | $1.37 | $1.00 |

In *Transamerica Computer Corp. v. IBM Corp.*, 481 F.Supp. 965, 998 (N.D.Cal.1979), the Court held:

"All methods of indirect cost recovery are arbitrary and flawed in some respects. The flexibility of revenue apportionment is apparent, yet this Court will not attempt to 'correct' that characteristic by mandating the use of a patch work system based on one accountant's views of the facts of this particular case. To do so would not only be bad accounting, it would be bad law. Businessmen would have no notice of what was required to be done if arbitrary adjustments were allowed to be applied after the fact to their reasonable and consistent cost accounting."

In the Court's view, SPCC's "pricing without regard to cost" approach is a similar attempt to create such a "patch work system," and the Court flatly rejects this effort.

## PLAINTIFFS' ADDITIONAL CLAIMS WITH RESPECT TO TELPAK

As a part of their pricing claims, plaintiffs have argued that the structure of AT & T's Telpak tariffs constituted an anticompetitive "package pricing arrangement";

**139.** The Court previously has addressed the issues of fill and translator development. With respect to AT & T's use of average expense to investment ratios, the Court finds that this was a reasonable procedure based upon studies showing a high correlation of expenses to investment over time and sensitivity tests showing that the use of past relationships would continue to hold in the future (Eastmond, S–T–11 at 33–35; McCarthy, S–T–7 at 7–9; Ankner, S–T–5 at 23–24, Ankner, S–T–5A at 7–9; Olley, S–T–29 at 40–42; S–2038 at 31–33, 87–88; S–1905). With respect to the treatment of inflation, the Court believes that AT & T's practice of reflecting only known inflationary increases was consistent with what the Court understands to be traditional regulatory practice and was supported by AT & T's long record of productivity gains which historically more than compensated for inflationary increases (Eastmond, S–T–11 at 49; Ankner, S–T–10 at 24–25; Ambrose, S–T–17 at 48–50; Olley, S–T–29 at

19–21, 41). Moreover, the Court notes that at the time the Hi/Lo tariff was filed, regulations of the Wage and Price Commission prohibited public utilities from reflecting anticipated inflation when seeking rate increases (see Price Commission Regulations Doc. Sub.).

**140.** The principal point brought out by plaintiffs in cross-examination was that for certain aspects of his correction calculations Mr. Ankner used a five-year period beginning one year later than the period Mr. Scott used. As Mr. Ankner explained, however, he had actual data available for the period he used, and he believed it was a truer test of the validity of the projections in his original 1972 study to compare them against actual results than to use indices as Mr. Scott did (Ankner, Tr. 4700–01, 4704). The Court finds Mr. Ankner's approach to be both sensible and persuasive.

that AT & T maintained Telpak during the 1970s even though it was no longer necessary to provide a common carrier alternative to private microwave systems; and that the Joint Telpak arrangement initially entered into in 1968 between AT & T and Western Union should have been extended to the specialized common carriers (Tr. 2635–38). Based upon the Court's review of the record, plaintiffs have failed to introduce evidence sufficient to support any of these claims.

## SPCC'S CLAIMS REGARDING THE STRUCTURE OF TELPAK

Although a pricing structure claim of the kind advanced by SPCC has not frequently been litigated, the Court believes that under the facts presented here the Telpak structure was plainly lawful. This is made clear by the decision in *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427 (7th Cir.1980), which rejected a claim that a "package pricing" arrangement there at issue was predatory. Like Telpak, the pricing package involved in *Chillicothe* had certain attributes that customers found attractive, and like Telpak, the components of the package were sold either individually or together, but the price of components would change if the package was broken up (*id.* at 433). In these circumstances, the Court in *Chillicothe* concluded that there was no evidence on which

a jury could determine that the package pricing was predatory (*id.*).

Plaintiffs argue that *Chillicothe* is inapposite and that the Court should adopt as the applicable law the decision in *Smith-Kline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056 (3d Cir.), *cert. denied*, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978). The Court does not agree.[141] In *SmithKline,* defendant had a patent monopoly over two of the three most successful forms of cephalosporin-type antibiotics. Plaintiff and defendant both marketed identical forms of a third, unpatented type. Defendant was found to have violated the Sherman Act by giving a discount to hospitals that made purchases of all three types of cephalosporin. Because hospitals would in any event buy the two patented products, the discount plan gave defendant's unpatented product an unwarranted advantage over plaintiff's identical product.

The key fact in *SmithKline* was defendants' use of an impenetrable patent monopoly to give it an advantage in its sales of a non-patented product. There is no such impenetrable monopoly here. Indeed, the whole purpose of the *Specialized Common Carriers* decision was to permit entry in the provision of private line telecommunications services. In these circumstances, it is clear to the Court that no exclusive AT & T franchise prevented SPCC from competing fully against AT & T

---

**141.** Plaintiffs' reliance on *American Manufacturers Mutual Insurance Co. v. American Broadcasting—Paramount Theatres, Inc.*, 388 F.2d 272 (2d Cir.1967), and on *Advance Business Sys. & Supply Co. v. SCM Corp.*, 415 F.2d 55 (4th Cir.1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970), is entirely misplaced. These cases involved a classic tying arrangement where the defendant was accused of using its market power over one product to coerce its customers into purchasing other unwanted products. The Court does not understand any such claim to have been made against Telpak, and indeed the record indicates that AT & T's Telpak customers wanted AT & T to maintain Telpak, petitioned the FCC to reject AT & T's Telpak termination filing, and were instrumental in obtaining the injunction after AT & T decided to terminate Telpak (Telpak Termination Doc. Sub. at 2–3). Plaintiffs' counsel concede as much (Tr. 2277).

Similarly, *White & White, Inc. v. American Hospital Supply Co.*, 540 F.Supp. 951 (W.D. Mich.1982) does not support plaintiffs' claim here. *White & White* held unlawful a multi-product rebate plan based on the combined purchase of many different types of products sold by defendant (from surgical gowns to food), only some of which were also supplied by plaintiffs. The court's theory was that the combination of multiple products in a single rebate plan made it likely that customers would purchase only defendants' products to maximize the available rebate, even though plaintiffs offered some products which might be superior (*id.* at 1004). The decision, thus, has nothing to do with bulk discounts of a single product, such as Telpak, and the court there specifically noted that if the volume discount terms "were limited to a single broad product submarket category ... no apparent injury to competition would result" (*id.* at 1005).

for its Telpak customers. Indeed, SPCC has little or no trouble selling its capacity and as the Court has mentioned throughout this opinion, SPCC simply could not keep up with the demand.

This is not to say that SPCC always found it easy to obtain bulk communications customers. The evidence shows that these customers in some cases had a national scope and found AT & T's service more suited to their needs than SPCC's limited service (Gibney, Tr. 2365–66). But this advantage of nationwide scope was not a use of monopoly power. The fact that AT & T provided service between two points where SPCC had chosen not to serve does not mean that these routes were foreclosed to competition in the same sense that the patent in *SmithKline* created a monopoly for a specific product.

█ SPCC's complaint that AT & T has advantages because of its nationwide scope is no different than the complaint of any small new company that decides to enter a market already occupied by another company with an established position as a large, reliable supplier. As the Second Circuit held in *Berkey Photo, supra,* 603 F.2d at 276:

> "*[A] large firm does not violate § 2 simply by reaping the competitive rewards attributable to its efficient size,* nor does an integrated business offend the Sherman Act whenever one of its departments benefits from association with a division possessing a monopoly in its own market. So long as we allow a firm to compete in several fields, we must expect it to seek the competitive advantages of its broad-based activity—more efficient production, greater ability to develop complementary products, reduced transaction costs and so forth. *These are gains that accrue to any integrated firm, regardless of its market share, and they cannot by themselves be considered uses of monopoly power.*" (Emphasis supplied.)

Similarly, there is no antitrust basis for plaintiffs' claim that it was more difficult

to market their services because they were in effect forced to dislodge an entire Telpak to make sales. Even if such a claim were true,[142] it would not show that Telpak was unlawful. In fact, SPCC's claim is in substance similar to a claim that the Court of Appeals rejected in *Northeastern Tel. Co., supra,* 651 F.2d at 92–93. There, plaintiff charged that the Bell System's two-tiered pricing policy (that allowed a customer to build up equity in his Bell supplied telephone equipment) discouraged the customer from purchasing Northeastern's competitive equipment. The Court said of that argument (*id.* at 92):

> "It is reasonable to suppose that one who has just made his first Tier A payment is unlikely to buy a Northeastern PBX. But the incentives influencing his decision are no different than those operating on one who has just bought any other consumer item, a new car for example."

The Court concluded that this two-tier payment plan was nothing more than an ordinary marketing method available to all in the market and accordingly not a use of monopoly power condemned by the Sherman Act (*id.* at 93). Bulk rate service was similarly a marketing method available to all.

Accordingly, the Court concludes, as a matter of law, that the structure of the Telpak tariff did not violate the Sherman Act. Even if there were a sound legal basis for SPCC's claim, however, the evidence presented by SPCC concerning the structure of Telpak is largely inconclusive and contradictory. SPCC's witnesses did not even agree on the basis of their complaint about Telpak. For instance, Mr. Gibney, Director of Field Sales for SPCC, testified, and Mr. Brodman, Director of Sales Development for SPCC, agreed, that "the price of service under the Telpak tariff was not the main item. It was the structure of the tariff that hurt us the most" (Gibney, Tr. 2346; Brodman, Tr. 1780). On the other hand, Mr. Hollis, former Vice President Marketing of SPCC, admitted (Hollis, Tr.

---

**142.** As discussed below, the evidence shows in fact that SPCC has been very successful in selling circuits, particularly bulk circuits, to AT & T's Telpak customers.

2310–11) that he had previously testified under oath:

"I have said all along that we could sell against Telpak, it is just the rates that we were having to charge, was the objection."

SPCC advanced three principal complaints directed at the structure of Telpak. First, SPCC challenged the so-called "fictitious routing" of Telpak, ostensibly because Telpak prices were based on air miles rather than the actual route of circuits. Second, SPCC complained about the availability of "free" channels because a customer not using the full capacity of its Telpak section (for which it had already paid) could add additional channels by paying for additional channel terminals at each end of each channel added. Third, SPCC took issue with the ability of a Telpak customer to reconfigure its Telpak network on a monthly basis in order to obtain the lowest possible rate.

In the Court's opinion, all of these complaints must be assessed in the context in which Telpak was originally developed. The FCC's Report and Order in *Allocation of the Frequencies in the Bands Above 890*, 27 F.C.C. 359 (1959), adopted an expansive new policy of liberalized licensing for non-communications companies' private microwave systems, declaring that "[t]he record supports the determination that there is a need for private point-to-point systems" (27 F.C.C. at 413). Following this decision, AT & T began to assess the impact of the construction and operation of private microwave systems on AT & T's revenues and rates (Boettinger, S–T–3 at 4–6).

AT & T was principally concerned that, under the then-current rates for private line services, which reflected regulatory policies relating to nationwide averaging, value of service pricing and jurisdictional separations, a company or government agency considering whether to construct a private microwave system would be likely to construct its own system even though the costs of such a system were higher than the costs incurred by AT & T for equivalent service (Boettinger, S–T–3 at 7–8). Unless AT & T adjusted its rates downward toward costs, it seemed likely that AT & T would lose the business of many of its largest customers (Hough, S–T–1 at 25, Tr. 3578; Boettinger, S–T–3 at 7–8). This view was shared by Western Union, which in its brief in the *Above 890* proceedings argued that permitting private microwave would jeopardize its very existence and warned that "the seriousness of the threat posed to Western Union by these proceedings cannot be overemphasized" (S–1533 at 6; see also S–0016).

Indeed, soon after the *Above 890* decision, several of AT & T's major customers, among them the federal government, began planning possible private systems (Boettinger, S–T–3 at 7; S–1628, S–0016,[143] S–0009 [144]). AT & T considered it essential to continue to serve [145] at least some of these

---

**143.** This is the testimony of Roger G. Bruhn of Lockheed Aircraft Co. in 1962 (Docket 14251) wherein he stated (at 13):

"We would undoubtedly look to more widespread use of private microwave if TELPAK did not provide common carrier facilities on an economically competitive basis."

**144.** This is the testimony of Mr. Norman J. Ream also of Lockheed Aircraft Co. in 1962 (Docket 14251) who buttressed Mr. Bruhn's testimony wherein he stated (at 29):

"There is no doubt in my mind whatever that in the absence of a common carrier offering such as TELPAK we would rely more and more upon private microwave facilities. This would be so because under those conditions, and as requirements such as bulk data processing increases, the only feasible method for handling these requirements within a

realistic economic framework would be private microwave.

**145.** Mr. J.S. Anderson of ARINC testified in Docket 14251 on September 5, 1962, that (at 30–2):

"The principal thing we did was to confront the Telephone Company with the fact that the airline industry could construct and operate its own nationwide private microwave communications system at substantially lower costs than that obtainable under existing private line tariffs.

. . . . .

The ownership, operation and maintenance of radio stations is our main business and our experience with microwave stations has been very good. We have no doubts on the technical capability of private microwave systems to meet the airline requirements.

customers or face a potentially massive diversion of revenues which, because of AT & T's averaged rate structure, could cause an increase in other rates throughout AT & T's business (Hough, S–T–1 at 25). On the other hand, AT & T believed that if it could provide bulk service at rates that more than covered their relevant costs, the services would make some contribution for the benefit of all customers (Boettinger, S–T–3 at 8). It seems fair to say that AT & T's choice was to maintain its then current rates and face the loss of nearly all the contribution provided by its largest customers or reduce its rates to a more cost-related level and maintain at least some amount of that contribution.

Because AT & T sought "to provide large users with a viable alternative in the way of common carrier service" (Hough, Tr. 3576), AT & T specifically designed the Telpak tariff to mirror as closely as possible the economic characteristics of a private microwave system from a customer's standpoint (Boettinger, S–T–3 at 10; Hough, S–T–1 at 27). The record shows that beginning in 1960, AT & T formed a task force to determine the economic characteristics of and the potential demand for bulk communications services—its growth prospects, technical requirements, and the expectation and desires of the customers (Boettinger, S–T–3 at 4–6, 10–15). The final product of this effort was "The Broadband Report" (S–1568) (Boettinger, S–T–3 at 6). This analysis was done with the consultation of Arthur D. Little Co., which produced two studies that confirmed the competitive alternative that private microwave systems presented for large users (S–1578; S–4).[146] AT & T also consulted with Dr. Ronald Coase, an economist at the University of Chicago (Boettinger, S–T–3 at 28–29; Hough, S–T–1 at 26). It was on the basis of these economic and demand studies that AT & T selected the four base Telpak channel capacities—Telpak A, B, C, and D (Boettinger, S–T–3 at 15).

The validity of designing and pricing the Telpak offering to resemble closely the private microwave alternative was recognized by the FCC in its initial Telpak investigation, even though the differential from AT & T's single-channel rates was not justified by differences in costs. Thus, in an order of December 7, 1961 in Docket No. 14251 (S–1601); the Commission rejected a cost justification requirement of the kind urged by SPCC here stating:

"What Motorola, in effect, is asking us to do is to hold that, in any case involving volume rates, the differential in rates must be correlated to a difference in cost of furnishing service, regardless of the degree of competitive necessity. This we do not believe is consonant with the holding of the Supreme Court in *Eastern Central Motor Carriers Association v. U.S.*, 321 U.S. 194 [64 S.Ct. 499, 88 L.Ed. 668] (1944).

Were we to assume, arguendo, the fact of competitive necessity and nonetheless hold TELPAK rates unlawful, as we are asked to do here, we would, in effect, be saying that competition is immaterial.

---

146. In the testimony of John T. Magee of Arthur D. Little Company, Docket 14251 (December 13, 1961), Mr. Magee concluded (at 33, 34):
"We conclude that TELPAK rates are generally in the competitive cost range with private microwave systems. While one alternative or the other may show a cost advantage in particular circumstances and, while cost is only one of the factors which must be taken into account in any comparison, the existence of the TELPAK service means that we as systems analysts would have to consider both TELPAK and private systems carefully in the light of specific circumstances to decide which to use. We could not rule one or the other out of consideration simply on the basis of costs.

We forecast a substantial growth in the demand for bulk communications services. A generally competitively priced common carrier service available to the bulk communications users will permit the company carriers to compete for the bulk market we forecast. *The absence of this choice will force users to turn away from the common carriers on a price basis.* The availability of a common carrier service will stimulate development of bulk communications systems in total. (Emphasis supplied)."
Faced with such independent analysis that AT & T would lose a substantial number of its bulk carriers, AT & T had no choice but to implement a competitive rate.

This ... we may not do. Nor do we think that as a matter of policy we are justified in making such a conclusion at this stage without full consideration of all pertinent factors." [147]

And subsequently in 1964, the Commission reached its conclusion that "[t]here is apparent justification for TELPAK C and D classifications in terms of meeting competition from private microwave systems having channel capacities comparable to those offered by such TELPAK classifications." 38 F.C.C. 370, 395 (1964).

This background explains the reasons for many of the structural features of Telpak about which SPCC now complains. Because a private system would be constructed with a certain channel capacity, Telpak was offered in fixed classifications, such as 240 channels for Telpak D or 60 channels for Telpak C, that appeared at the time to comport with the various size private systems that might have been constructed (Hough, S–T–1 at 27; Boettinger, S–T–3 at 15–16).[148] One result of providing a fixed number of channels for a flat price, wheth-

er with Telpak or private microwave, is what SPCC characterizes as "free channels," *i.e.*, if the customer (or owner of a private system) [149] had used less than all the channels he had paid for in the package, increasing the number of channels in use would not increase the cost (except for termination charges) (Hough, S–T–1 at 28–30; Boettinger, S–T–3 at 19–20; PX2–0017 at 7–8; PX2–0225).[150] It is clear then, that what SPCC calls "free channels" was not some unjustified gimmick—it was rather a natural consequence of selling a specified number of circuits at a single rate, regardless of how many the customer used.

Likewise, SPCC's charge that Telpak engaged in phantom routing is explained by a comparison to private systems. What SPCC calls fictional routing involves no more than billing the customers as if the customer had a microwave system between the city pair where the call was sent and received [151] (Boettinger, S–T–3 at 18–19). Typically the private microwave system would be constructed on a direct route be-

---

**147.** These holdings by the Commission that cost justification is not required for a difference in rates are entirely consistent with the standards of the Sherman Act discussed above. See *Pacific Engineering & Production Co., supra,* 551 F.2d at 798; *International Air Industries, supra,* 517 F.2d 714, 728.

**148.** In 1962, for instance, Motorola, Inc., a maker of microwave equipment, claimed in an advertising circular that private microwave system costs were less than single channel private line rates with only twenty-four channels of service (S–1571B).

**149.** The Court notes that a private microwave system would be built with X amount of capacity, though at any given time the owner would not be using all of the available capacity. Thus, any additional circuit needs would in essence be "free" and, thus decrease the unit cost of all of the circuits in use. Yet, a company would not build a private system without extra capacity for many reasons, *i.e.,* expectant future growth and the minimum capacity of the system.

**150.** Mr. Hough analogized the situation to one where a customer buys a five pound bag of flour and uses one pound a week. The pounds of flour used in the second, third, fourth and fifth weeks are not "free"—they have already

been paid for in the original purchase. Similarly, the customer has paid for all 240 circuits in Telpak D, even if he uses only some. When he uses his additional circuits, they are no more "free" than the fifth pound of flour in the five pound bag (Hough, S–T–1 at 30). Thus, SPCC's argument that it cost the Government only an additional $.26 per circuit mile when the Government used its spare Telpak channels (see Melody, PX6–0018 at 118–19), fails to consider that the Government had already paid for the channels.

**151.** This claim is that the physical routing of the circuits priced in a TELPAK section would not necessarily follow the path selected by the customer for pricing purposes. (PX2–0103 at 175; PX2–0024; PX2–0223 at 1955). That is, the TELPAK charges were calculated as if all of the circuits priced in a TELPAK section travelled together over the same route between the same two service points. However, there was no requirement under the tariff that any of the circuits in a TELPAK pricing section actually travel along the same geographic route; nor was there any requirement that the circuits priced in a TELPAK section actually originate or terminate at the endpoints of the section which the customer designated for pricing purposes. (Hollis, PX6–0014 at 11; PX2–0024).

tween the cities.[152] AT & T, however, seeks to make the most efficient and economic use of its facilities, and at times this may lead to indirect routing of calls (Boettinger, S–T–3 at 17–18; Hough, S–T–1 at 30–31; Gibney, Tr. 2359–60). The fact that a particular call is not routed directly to the receiving city is not of concern to the customer, whose only interest is in obtaining a good clear connection (Hough, S–T–1 at 30–31). The so-called fictional routing, therefore, is not relevant from the customer's standpoint and consequently would not impede SPCC's ability to compete with AT & T to serve the requirements of these customers (Boettinger, S–T–3 at 18–19).

Reference to the economics of operating a private microwave system also leads the Court to reject SPCC's charge that Telpak's pricing structure created what SPCC claims were "powerful economic incentives for customers to aggregate all of their circuit needs and include as many as possible" within Telpak (Plaintiffs' Memorandum in Opposition To Defendants' Motion For In-

voluntary Dismissal Under Rule 41(b) at 47). The same or greater "aggregation" incentives would apply if the customer owned a private microwave system. The Court, for example, can well imagine the communications manager of a firm owning such a system admonishing the firm's employees to use the company-owned system whenever possible to keep down long distance charges from the common carrier.

The one aspect of Telpak structure that does not appear to the Court to have been directly comparable to a private system is the ability to reconfigure the network for pricing purposes on a monthly basis. However, in the Court's view, this pricing policy simply reflects the efficiencies of a large network—a factor which the FCC recognized as proper in the *Specialized Common Carriers* decision, which explicitly permitted AT & T to price so as to reflect the inherent advantages of its plant and operations (29 F.C.C.2d at 915). Moreover, the Court cannot understand how this aspect of the Telpak structure could be detrimental to

---

152. A customer that had bulk communications needs between two areas of the country and decided to make the most efficient and economical use of a private microwave system would build such a system over the area where the bulk of his needs lie and interconnect with AT & T to reach the final destinations. In others a customer may have a few locations scattered in the New York City area as well as the Washington, D.C. area. Each of the locations needs to be connected with the bulk of the telecommunications needs between the Washington, D.C. area and the New York City area.

In lieu of building a private microwave system to each plant, the company's system would be built as follows.

While it is clear that Springfield, Va., Falls Church, Va., and Wheaton, Md. have communications needs with Long Island, each of these cities would not build a separate private microwave system to Long Island, White Plains and to Westchester. This is precisely the kind of flexibility that AT & T attempted to provide. Rather a company would build a private system over 210 miles between New York City and Washington, D.C. and interconnect with AT & T for the remaining portion to the final destinations. Without such a system (or some other bulk offering) it is undisputable that at least some of the bulk telecommunications users would have built their own systems thereby depriving AT & T of those added revenues (and making it a little less attractive for the SCC's).

SPCC, for just as a Telpak customer had the ability to reconfigure its Telpak network, it also had the continuing option of switching from Telpak to the services of the specialized carriers. See Smith, Tr. 4823 (General Electric's policy was to look continually at alternative ways of serving its needs at the lowest cost).

Finally, SPCC's claim that the structure of Telpak was unlawful overlooks the fact that virtually any tariff for telecommunications services, and particularly those which include bulk rates, will have some of the same features that SPCC raises here. This truth was brought home in defendants' cross-examination of plaintiffs' principal witness on Telpak structure, Mr. Hollis. That testimony confirms that SPCC itself incorporated the same structural elements in its tariffs as those about which it complains with respect to Telpak. For example, with respect to SPCC's "fictitious routing" claim, the record shows that SPCC's pricing does not follow the route of the actual circuits either (Hollis, Tr. 2298–99). Moreover, under several of SPCC's tariffs, Mr. Hollis conceded in response to a question from the Court, that "there could be some free channel, yes, sir" (Hollis, Tr. 2300).

■ Accordingly, the Court concludes that Telpak arose as a legitimate response to private microwave competition and that the structure of Telpak was reasonable in light of the purposes for which the tariff was designed. Furthermore, the Court notes that all of the features of Telpak to which SPCC objects here were in place at the time that the initial Telpak tariff was filed, more than ten years prior to the development of competition from specialized common carriers. In sum, the Court finds no basis for SPCC's claim that the structure of Telpak was unlawful.[153]

## SPCC'S CLAIMS REGARDING MAINTENANCE OF TELPAK DURING THE 1970s

Plaintiffs also assert that AT & T maintained Telpak long after any threat of private microwave systems had dissipated and that AT & T purposefully decided to use Telpak as a supplement to Hi/Lo in its response to the specialized common carriers. Assuming for the moment that plaintiffs are correct, if Telpak was priced above cost as the Court found in its earlier discussion, then the Court can see nothing amiss in AT & T's retention of Telpak, even with the understanding that it would be useful in meeting competition from the new carriers. *Northeastern Telephone, supra,* 651 F.2d at 92–93. (see also Private Microwave/Telpak Doc.Sub. at 2–6). Throughout the 1960's and 1970's, AT & T considered it essential that Telpak be continued as a competitive alternative to private microwave, and Telpak would have been maintained even in the absence of SPCC and other new entrants (Hough, S–T–1 at 42–43).

It is clear from the record that during the 1960s and 1970s AT & T's major customers continually indicated that they would construct private microwave systems if Telpak were terminated or the rates increased substantially (about 20 to 30 percent over existing rates). One major AT & T customer that was most vocal in its threats to construct its own system was Aeronautical Radio, Inc. (ARINC), an organization of airlines. The record shows that as early as 1962, ARINC told the FCC staff that ARINC had urged AT & T to adopt Telpak because ARINC "could construct and operate its own nationwide private microwave communications system at substantially

---

**153.** Plaintiffs also complain that SPCC was unable to lease Telpak circuits from AT & T. As discussed below, AT & T had no duty under the antitrust laws or the *Specialized Common Carriers* decision to lease SPCC non-essential facilities. Moreover, AT & T could not have leased Telpak channels without amending or abrogating its prohibitions against resale and sharing of Telpak. In the context of these long-standing tariff prohibitions, and in the context of the legitimate business reasons that underlay the tariff prohibitions (see Boettinger, S–T–3 at 25–26), the Court finds that AT & T was under no obligation to lease Telpak circuits to the specialized common carriers. *See Almeda Mall, Inc. v. Houston Power & Light Co.,* 615 F.2d 343, 352–54 (5th Cir.), *cert. denied,* 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980) (the antitrust laws do not require a public utility to permit resale of its services).

lower costs than that obtainable under existing private line tariffs" (S–1628). During FCC investigations of AT & T's proposed Telpak rate increases in 1968 and in 1971, ARINC continued to represent to the FCC that it would construct its own system if Telpak rates ceased to be competitive with private microwave costs (S–1783B; S–2189B). Indeed, in 1971, ARINC commissioned Collins Radio Co. to design and develop the costs for a large private microwave network for the airline industry. ARINC presented the study to the FCC, stating that it planned to build such a system if the Telpak rates became too high (S–2187; S–2178; S–2179; S–2180; S–2246).

Other Telpak customers similarly represented to the FCC in the late 1960s and early 1970s that they would construct their own systems if Telpak rates were not maintained competitive with private microwave system costs. These included the Air Transport Association, Greyhound Corp., the Association of American Railroads, Pan American Airlines, United Airlines, and Eastern Airlines (Private Microwave/Telpak Doc.Sub. at 3–4).

The record also shows that in the late 1960s and early 1970s General Electric Co. seriously considered constructing a private system (PX4–0294). Mr. Smith, the senior officer at General Electric responsible for the company's consideration of private microwave in that period, testified that GE investigated the possibilities of both private microwave and satellite systems when GE's communications costs increased in the 1960s and early 1970s due to AT & T's rate increases (Smith, S–T–166 at 3–4). According to the testimony, GE "came very close to implementing [its] own system in the early 1970s," but decided to abandon its plans when it became apparent in 1972–1973 that Telpak rates had stabilized (Smith, S–T–166 at 4–5, Tr. 4821). Mr. Smith testified, however, that had GE been faced with even a 20–30 percent increase in Telpak rates, GE would have built its own system (Smith, S–T–166 at 5, Tr. 4822).

Additionally, the record shows that private microwave was an alternative to Telpak for the United States Government, which would have been "seriously considered" if Telpak rates had been increased substantially (Hollis, Tr. 2295). Indeed, the Government—the largest private line user—would have begun, according to the evidence, "as a matter of urgency, to build its own microwave system" in the early 1970s if Telpak rates had been increased (Goodnetter, PX2–0367 at 2460).

The Department of Defense is the largest private line user within the Federal Government (Jacobsmeyer, S–T–163 at 3).[154] General Lee M. Paschall, former Director of the Defense Communications Agency (DCA), and the chief policy witness for the United States in the FCC's Telpak proceeding in Docket No. 18128, testified that "if the Bell System had not adopted its Telpak tariff, or had not offered rates somewhat similar to those in Telpak, the United States Government would have, in fact, constructed a substantial amount of its own private microwave system in the United States, at least over high-density routes" (Paschall, S–T–164 at 4–5). General Paschall further testified that this was the official position of the Department of Defense when he testified before the FCC in 1971 and remained so during his entire tenure (Paschall, Tr. 4767–68, 4770). General Jacobsmeyer, former Vice Director of DCA, similarly testified that, if Telpak had been terminated in the mid-1970s, he would have advocated shifting Defense circuits to a private network similar to the one the Defense Department was constructing overseas, combining satellites and terrestrial microwave (Tr. 4778–79). Indeed, the Department of Defense is now constructing the Defense Switched Network to replace Telpak service with a mixture of government-owned military satellites, private microwave and cable (Jacobsmeyer, S–T–163 at 7–9).

---

**154.** In 1980, the Defense Commercial Communications Office procured approximately 45,000 of the 90,000 Government private line circuits, or about $100 million of telecommunications service (Jacobsmeyer, S–T–163 at 3; Tr. 4775).

The record also shows that in the mid-1970s, as concern that AT & T would terminate Telpak began to grow among AT & T customers, ARINC and other large users renewed their consideration of construction of private microwave systems (Brodman, Tr. 1821; Jacobsmeyer, S–T–163 at 6–7). Some of these major customers, among them ARINC, GE, the Air Transport Association and the United States Government, opposed AT & T's 1977 proposal to terminate Telpak and instituted the petition for review in the Court of Appeals that resulted in the entry of the July 21, 1977 injunction requiring that Telpak be maintained until review had been completed (Hough, S–T–1 at 39).

The record further shows that, since the termination of Telpak in 1981, the trend towards private systems has accelerated, although, with the changing technology, the focus has shifted to communications by a private satellite system rather than by private microwave systems (Paschall, Tr. 4752, 4753). General Paschall, currently president of American Satellite Co., a domestic satellite carrier in competition with both AT & T and SPCC (Paschall, Tr. 4746), testified that several large corporations, among them Citicorp, have constructed their own system and "a number of major companies" such as Federal Express and Shell have been "actively considering constructing" such systems (*id.* at 4752–53). Like AT & T before it, American Satellite has responded to "those [considering private systems] by offering them something that is competitive" (*id.* at 4753).

Indeed, SPCC itself, since the termination of Telpak, has been threatened by its large users, including ARINC, with construction of private systems if SPCC raises its bulk rate (currently 30 percent below AT & T's rates) (Hollis, Tr. 2294–95; Brodman, Tr. 1813–15).

Finally, the record shows that there was in fact a substantial amount of private microwave construction even with the Telpak tariff. Route miles for all private networks, excluding those owned by the United States Government, have increased from about 56,000 route miles in 1961 to 141,000 miles in 1971 and to 272,000 miles in 1981 (Hough, S–T–1 at 42; S–3S; S–3R; S–3Q). There is no reason to believe on this record that there was not in fact a real threat of even more growth had Telpak or a similar tariff never been instituted in 1961 or retained in the 1970s. As Mr. Hough testified, "If Telpak had not been in existence, all of the information that we had both from large users and from studies we had made was that there would have been a lot more private microwave" (Tr. 3543–44).

■ Against this strong and consistent evidence that the threat of private microwave systems was real and continued throughout the 1970s, justifying AT & T's retention of Telpak, SPCC offers only a few documents showing that during the late 1960s and early 1970s AT & T viewed Telpak as a success in stemming losses to private construction (PX2–0095; PX2–0038). Evidence that Telpak was successful does not, of course, mean it should have been discontinued when it was clear that the reasons for Telpak persisted. SPCC simply makes too much of other AT & T documents indicating that "few customers" would be interested in building private systems (see PX2–0156; PX2–0060). It was not the number of customers, but the volume of business and revenue lost, that would be the concern if these customers abandoned their use of common carriers for private systems. Accordingly, the Court concludes that AT & T acted reasonably in maintaining Telpak during the late 1960s and 1970s.[155]

155. SPCC also refers the Court to internal AT & T documents showing that in 1971 AT & T began to study alternative rate plans which might replace Telpak (PX2–0181; PX2–0051). But, as SPCC acknowledges, the focus of the examination of alternatives to Telpak was to respond to the possibility that Telpak sharing would be required under the FCC's 1971 *Telpak Sharing* decision. These documents in no way indicate that AT & T at this time did not view private microwave as a realistic alternative for customers, and AT & T's decision to retain Telpak after the Court of Appeals reversed the Commission's *Telpak Sharing* decision in fact

## SPCC'S CLAIMS REGARDING
## JOINT TELPAK

 There is also no support for SPCC's claim that AT & T's participation in a Joint Telpak arrangement with Western Union, but not with specialized carriers, violated the antitrust laws or demonstrates anticompetitive intent. The evidence shows that in late 1967 Western Union pressured AT & T to modify its Telpak tariffs to permit customers to order services from either Western Union or the Bell System as a result of a change in the Government's telecommunications procurement policy (Hough, S–T–1 at 43–44; Agreed Facts 1–5–008, 1–5–009, 1–5–011, 1–5–013; see also Tr. 2636). At the time, Western Union largely was providing record and data services to the Government (Hough, S–T–1 at 43; Agreed Fact 1–5–008). Under the Joint Telpak tariffs, which were filed with and accepted by the FCC in 1968, AT & T and Western Union charged identical Telpak rates, and thus the Government could order a portion of its Telpak base capacity from Western Union and a portion from AT & T, with the carriers then dividing the revenues in accordance with the proportion each sold (Hough, S–T–1 at 43).[156]

Following the *Specialized Common Carriers* decision MCI requested that AT & T enter into a similar Joint Telpak arrangement with it (Tr. 2637). This, of course, would have meant that Telpak customers could use either MCI service or AT & T service and pay the same rate under a Joint Telpak tariff.[157] After discussions with MCI and the staff of the FCC, AT & T concluded that the implications of competing carriers charging identical prices were

sufficiently serious to refer the question to the FCC for resolution in light of the FCC's overall policy of promoting competition in private line services (Hough, S–T–1 at 44–45; Agreed Facts 1–5–030, 1–5–032, 1–5–039). Although AT & T filed such a petition, the FCC never resolved the question (Agreed Facts 1–5–039, 1–5–044; Hough, S–T–1 at 46).

SPCC argues that AT & T's decision to refer the Joint Telpak question to the FCC for resolution somehow shows AT & T's anticompetitive intent. The Court completely rejects this claim. First, it is apparent that not even the specialized carriers could agree upon what the terms and conditions of a Joint Telpak arrangement with them should have been (Hough, S–T–1 at 45–46). This alone justified referral to the FCC. Moreover, because Joint Telpak would have eliminated price and other competition between AT & T and the specialized carriers—a question that the FCC would likely want to consider in light of its newly-announced competitive · policy—this action was all the more appropriate.

Finally, there is nothing in SPCC's Joint Telpak claim that shows that SPCC was injured by AT & T's actions, and the Court · does not understand SPCC to assert that it was injured. There is not even a suggestion in the record that SPCC itself ever requested to participate in Joint Telpak (Hough, S–T–1· at 45). This void in the evidence alone is fatal to SPCC's position, even if AT & T's refusal to extend Joint Telpak were somehow improper. The law is clear that in the absence of a request by SPCC to participate in an arrangement

---

confirms that AT & T still believed that a common carrier alternative to private microwave was necessary.

**156.** Plaintiffs have contended that AT & T knew that Telpak would injure the specialized carriers because of the evidence that plaintiffs insist shows that Telpak injured Western Union. This claim is without substance. The evidence clearly shows that it was not Telpak that injured Western Union, but rather the impact of the FCC's *Above 890* decision. Indeed, in the *Above 890* proceedings, Western Union had recognized this and had taken the position

that authorization of private microwave competition would cause Western Union to go out of business (Boettinger, S–T–3; S–16; S–1556C; S–1533).

**157.** It is not clear from the record how MCI expected to succeed in selling its services on that basis. Indeed, in apparent recognition of this fact, SPCC deviated from the position of MCI and the FCC staff, and in its comments filed with the Commission, SPCC took the position that it could have additional and different bulk rates (S–3431; S–3494).

such as Joint Telpak and an ability to effect such participation through a filed tariff, there is no basis for a finding that the antitrust laws have been violated. See *MCI Telecommunications Corp. v. FCC*, 561 F.2d 365, 374 n. 44 (D.C.Cir.1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 780, 54 L.Ed.2d 790 (1978); *Cottonwood Mall Shopping Center, Inc. v. Utah Power & Light Co.*, 440 F.2d 36, 38, 43 (10th Cir.), *cert. denied*, 404 U.S. 857, 92 S.Ct. 107, 30 L.Ed.2d 99 (1971); *Martin v. Phillips Petroleum Co.*, 365 F.2d 629, 634 (5th Cir.), *cert. denied*, 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966).

### PLAINTIFFS' ADDITIONAL CLAIMS WITH RESPECT TO HI/LO

In an effort to bolster their charge that Hi/Lo was "priced without regard to costs" or was otherwise anticompetitive, plaintiffs have advanced four additional claims: that AT & T misrepresented the nature of Hi/Lo to the FCC; that the $.85 high-density rate drastically undercut the rates of SPCC and other new entrants; that the $.85 high-density rate did not "maximize" AT & T's profits; and that the Hi/Lo tariff was unlawfully "preannounced." [158] A review of the evidence with respect to these charges convinces the Court that each of them is unsupported and therefore must be rejected.

### THE CHARGE OF MISREPRESENTATION

A major part of plaintiffs' effort at trial—what plaintiffs have called the "very heart" of the pricing case (Tr. 2088)—was devoted to attempting to establish that AT & T knew that its Hi/Lo tariff concept was fundamentally flawed and unsupportable, and that AT & T therefore "fabricated" its cost studies and intentionally deceived the FCC into permitting an alleged anticompet-

itive tariff to go into effect (Tr. 1995). Having carefully considered the evidence upon which plaintiffs base this serious charge, the Court has concluded that there is no basis whatever for finding that AT & T misrepresented anything to the FCC.

To support this claim, plaintiffs read into the record portions of AT & T documents which plaintiffs' counsel characterized as showing misrepresentation. But, because plaintiffs claimed that the subject was "extremely complex" (Tr. 2086, 2088) and that the technical nature of the documents made them "almost impossible to understand" (Tr. 2087), plaintiffs took the step of putting on the stand an "expert" witness who would "assist in this [documentary] presentation" (*id.*) The "expert" selected by plaintiffs was Walter Hinchman, the Chief of the FCC Common Carrier Bureau at the time the Hi/Lo tariff was filed (Hinchman, Tr. 2218), and the author of the Commission's decision that rejected the Hi/Lo tariff (Tr. 2220–22).

Mr. Hinchman was represented as being one of the purported victims of AT & T's alleged misrepresentations and certainly was in a position to address this charge. Counsel for AT & T appropriately asked Mr. Hinchman on cross-examination to identify the documents that Mr. Hinchman thought showed a misrepresentation by AT & T to the FCC. Mr. Hinchman *could not point to a single document containing any misrepresentation* (Hinchman, Tr. 2214–15). Indeed, after Mr. Hinchman evaded a question on cross-examination requesting him to specify a document containing a misrepresentation, the Court was forced to instruct him to give a direct answer. Mr. Hinchman's only response was "I am sorry I guess I don't understand that, Your Honor" (Hinchman, Tr. 2215).

---

**158.** Although SPCC's witnesses, including Mr. Hinchman and Dr. Melody, also suggested that there was something improper about the nature of the deaveraging reflected in the Hi/Lo and MPL tariffs, SPCC's counsel conceded that "we don't have any quarrel with that as a concept or principle, or indeed, as a competitive situation that they were confronted that should per-

mit deaveraging" (Tr. 856). Moreover, in its *Hi/Lo* decision, the FCC reaffirmed its position, first set forth in the *Specialized Common Carriers* decision, that "we shall not oppose a departure from nationwide price averaging on the part of existing carriers in response to direct competition. . . ." *AT & T*, 55 F.C.C.2d 224, 230 (1975).

Plaintiffs' explanation for Mr. Hinchman's complete failure to support their allegation that the FCC was deceived by AT & T was that "Mr. Hinchman was not offered as a personal knowledge witness" about that subject (Plaintiffs' Response to Defendants' Proposed Findings of Fact and Conclusions of Law, June 16, 1982, p. 23). However, the Court is compelled to reject this explanation.

Although the Court was struck by Mr. Hinchman's evasiveness on cross-examination and his obvious lack of candor, and therefore, must accord no weight at all to what little substantive testimony he presented, Mr. Hinchman did testify that he had reviewed "all the documents" that he received from plaintiffs' counsel over "the period of the past couple of months," including "the basic filings to the Commission" (Hinchman, Tr. 2213–14). Moreover, he was called to assist in SPCC's presentation of the very evidence that SPCC claimed constituted misrepresentation and in fact was on the witness stand when SPCC's counsel presented its evidence to the Court. Further, he was more than simply a disinterested technical expert. As previously noted, Mr. Hinchman was the Chief of the FCC's Common Carrier Bureau for five years (Hinchman, Tr. 4994) and handled every major rate case during that period (id.), including the investigation of the Hi/Lo tariff (id. at 2220–22). Since leaving the FCC staff, Mr. Hinchman has frequently spoken at communications conferences on the very subjects that are involved in this case (id. at 4998). The Court therefore concludes, as it indicated it would when it asked Mr. Hinchman to give a direct answer, that Mr. Hinchman's failure to identify a single misrepresentation means that there was none (Tr. 2214).

Notwithstanding this fatal collapse of plaintiffs' misrepresentation claim, and notwithstanding plaintiffs' earlier assertion

that the subject is extremely complex and requires expert assistance to understand, plaintiffs have persisted in asserting in post-trial arguments that AT & T documents do reflect misrepresentation and have now offered the Court their own interpretation of these documents.[159] Accordingly, the Court will now consider these allegations against the proffered evidence and the testimony of defendants' witnesses.

One aspect of the Hi/Lo tariff upon which plaintiffs have focused relates to whether implementation of Hi/Lo resulted in an overall rate reduction for Series 2000/3000 private line telephone service. Plaintiffs claim that AT & T represented that the Hi/Lo tariff was a genuine deaveraging resulting in increases and decreases in rates, but yielding no substantial change in AT & T's overall revenue for Series 2000/3000 service, when in fact AT & T allegedly knew that Hi/Lo was nothing but a systematic rate cut that would yield substantial revenue reductions. From the Court's analysis, the record does not support plaintiffs' claim.

In its tariff filing materials, AT & T represented that Hi/Lo was designed "to maintain, in the overall, substantially the same general level of revenues for the services currently being furnished" (PX3–0114 at 9). The level of charges for some customers was projected to increase and for other customers to decrease (id.). These statements were said to be based on a repricing of the annual inventory of interstate private line services for 1971 (before any consideration of market effects), and the underlying workpapers for this analysis were presented to the Commission during its investigation of Hi/Lo in Docket No. 19919 (PX3–0114 at 19; S–2871B at 340–47). A similar analysis was presented to AT & T management prior to the filing of the Hi/Lo tariff (PX4–0099 at 58, 64), and Mr. deButts, AT & T's Chairman of the

**159.** After argument on defendants' Rule 41(b) motion, plaintiffs conceded "what now appears to have been an error on our part" with respect to their interpretation of at least one group of AT & T documents—those concerning a purported claim that "AT & T misrepresented to the Commission in the Hi/Lo proceedings the extent of its projected 1976 losses to SCC competition" (Memorandum of Southern Pacific Communications Co. Regarding Issues Raised at Oral Argument, June 21, 1982, at 12).

Board during this period, testified that AT & T's objective was to maintain essentially the same revenue level after Hi/Lo became effective (deButts, Tr. 4115–16).

The Court has reviewed the materials cited by plaintiffs and finds no basis upon which to conclude that AT & T knowingly misrepresented the anticipated revenue effects of Hi/Lo to the FCC. To the Court's knowledge plaintiffs have not challenged either the results or the premises of the repricing analysis underlying AT & T's statements; nor have they shown that the information on which AT & T management relied did not reasonably reflect the company's expectations.[160] Moreover, there is no showing in the record of any significant revenue decrease after implementation of Hi/Lo. Contrary to plaintiffs' suggestion that AT & T did not undertake to monitor the actual revenue impact of Hi/Lo, plaintiffs' own exhibits reflect that such monitoring did in fact take place (PX3–0739; PX3–0740). Thus, one of the documents relied upon by plaintiffs (PX3–0739) indicates that while Long Lines revenues from Hi/Lo were expected to decrease, associated company interstate revenues from Hi/Lo were expected to increase; and the two monthly revenue analyses plaintiffs introduced into evidence show that revenues declined in one month and increased the next month, producing essentially the "wash" AT & T anticipated (deButts, Tr. 4116; PX3–0739; PX3–0740). What additional information the Court can discern from the record regarding gross operating revenues for series 2000/3000 services is likewise inconsistent with plaintiffs' claim, indicating a continuing increase in revenues during the 3-year period surrounding implementa-

tion of Hi/Lo (S–3244 at 3; S–3744 at 6; S–4057 at 6):

| Year | Gross Operating Revenue |
|---|---|
| 1973 | $222,500 |
| 1974 | $235,500 |
| 1975 | $266,000 |

A second claimed misrepresentation identified by plaintiffs relates to AT & T's representation that the distinction between service provided among high-density rate centers and service provided among low-density rate centers was cost related whereas, plaintiffs assert, AT & T documents showed that there were no cost differences between high-density and low-density locations.

As Mr. Guild, the AT & T engineer responsible for developing the criteria for selecting high-density rate centers testified, there were four tests that had to be satisfied before a location could qualify as high-density. The criterion upon which plaintiffs have focused in connection with this claim is that the location be served by high-capacity microwave radio or coaxial cable transmission facilities, defined as those facilities having a capacity of 1200 circuits— or in engineering terms, two mastergroups or greater (Guild, S–T–15 at 7).[161] The rationale for the two mastergroup criterion, according to Mr. Guild and Mr. Hough, who reviewed and approved the criteria as President of Long Lines, was that such high capacity facilities on average exhibited significantly lower costs than lower capacity facilities and thus that the criterion provided a sound economic basis for the minimal, two-level nationwide deaveraging plan that evolved into Hi/Lo (Guild, S–T–15 at 3, 9, Tr. 3667–69; Hough, Tr. 3529–30).

---

160. The principal basis for plaintiffs' argument appears to be the purported fact that approximately 85 percent of the circuit mileage under the Hi/Lo tariff was sold at the high-density rates (see PX3–0310). Plaintiffs, however, have not shown that this is in any respect inconsistent with AT & T's 1971 reprice analysis, particularly since that analysis expressly did not take into account market effects. Moreover, because a substantial percentage of the rate increases reflected in AT & T's analysis were for short haul circuits (see S–2871B at

346), it appears to the Court to be potentially misleading to make any judgment on the basis of circuit mileage data.

161. The remaining criteria were that the location have multiplexing equipment by which voice grade circuits are derived from high capacity facilities, that the location have access to all other high-density locations over high capacity facilities and that the location have local distribution facilities to extend service to a customer's premises (id.).

In connection with its claim that the two mastergroup criterion did not reflect genuine cost differences, SPCC relies principally upon an internal AT & T document, authored in February 1972 (PX3–0468), which states that "since many cities already have both HiD and LoD facilities in place there is no clear-cut discontinuity in the cost function that could be used as a basis for selecting the cities (pricing points) that are to be designated as HiD locations." As Mr. Guild explained at length, however, the Hi/Lo criteria were not intended to separate individual locations into high cost or low cost classifications, but rather to identify locations which had access to higher capacity, lower cost facilities among them (Guild, Tr. 3913–19). Obviously, any particular location may have low capacity facilities serving the immediate outlying area, but that has no bearing on whether the facilities between that location and another particular location are high capacity or low capacity. Because Hi/Lo was an intercity service, it seems apparent to the Court that the criteria had to be directed to segregating the facilities between locations, as Mr. Guild explained, not to classifying particular locations according to the facilities that terminated there.

Moreover, the document upon which SPCC relies does not state that there are no cost distinctions between high-density and low-density locations, but only that the dividing line may not be "clear-cut." In other words, as defendants' witnesses have testified, the costs of various types of transmission facilities lay out on a continuum, from the very highest cost facilities having a cost in excess of $230 per mile (open-wire facilities) to the very lowest cost facilities, having a cost of less than $1.00 per mile (single side band radio) (Hough, S–T–1 at 9; Guild, S–T–15 at 9, Tr. 3913–15; Stoddard, S–T–13 at 11–12). However, from its review of the record, the Court is satisfied that when high-capacity facilities as defined in the Hi/Lo tariff are considered as a group, their costs on average are lower than the costs of low-capacity facilities (Hough, S–T–1 at 53; Guild, Tr. 3920–21). Because that is what AT & T told the FCC in describing the Hi/Lo tariff (PX3–0114 at 7), nothing in the documents cited by SPCC leads to the conclusion that AT & T misrepresented the facts to the FCC.

The Court's finding in this regard is not altered by plaintiffs' argument that certain transmission facilities defined as high-capacity under the two mastergroup criterion did not have lower costs than certain transmission facilities not so defined (PX3–1058; PX3–0840; PX3–0805; PX3–0422; PX3–1045). As a matter of common sense, given the diversity of AT & T's network of transmission facilities, any division of those facilities into two categories may very well result in some types of facilities that are in a grey area so close to the dividing line that they could reasonably go on either side, as well as some anomalies of the kind plaintiffs have identified (Guild, S–T–15 at 9; Stoddard, S–T–13 at 12). What is important, as the Court has already found, is that the average cost of those facilities on one side of the line was substantially lower than the average cost on the other side. In these circumstances, the Court concludes that the two mastergroup criterion provided a reasonable basis for distinguishing between high cost and low cost facilities for purposes of the Hi/Lo tariff. Finally, it is ironic that plaintiffs should claim that these facts were not known by, or were misrepresented to, the FCC, when the first of the documents they rely upon (PX3–1058) is a page from the support for the Hi/Lo tariff filed by AT & T with that agency.

Notwithstanding the foregoing evidence supporting the two mastergroup criterion, plaintiffs also assert that in fact providing service between high-density locations was *more* costly than providing service between low-density locations, and that AT & T's representation to the contrary was knowingly false. This assertion was repeated several times at trial (*e.g.,* Tr. 2125), and was one basis for Dr. Melody's criticism of the Hi/Lo cost studies (Melody, Tr. 2585–86). However, this claim is not supported by the evidence.

In connection with this argument, plaintiffs principally relied on a document that

purports to show that construction costs are higher in the northeast than elsewhere in the United States (PX3–0482; Tr. 2122–30). This fact may be true, but such construction costs cannot be equated to the costs of providing service between various locations throughout the country and have little to do with the unit cost per circuit (Hough, S–T–1 at 47). For example, it may cost more to construct a bus than a small passenger car, but providing public transportation with a bus costs less per passenger carried than using a fleet of passenger cars for the same purpose.[162] Moreover, even if regional cost differences exist, there is no reason to believe that all costs,. those for serving both high-density and low-density locations within a particular region, would not be affected to the same extent, with the relative difference between the two remaining the same in any particular region. Finally, SPCC has not established that AT & T did not include these higher costs for the northeastern states in its overall nationwide average costs for high-density service.[163] For all these reasons, plaintiffs have failed to establish this claim.

Another group of AT & T's internal documents upon which plaintiffs have focused the Court's attention in connection with their misrepresentation claim relates to how traffic was to be routed between high-density rate centers. SPCC offered into evidence several AT & T documents written in 1970 and 1971 describing a concept that would have deaveraged rates in a manner such that high-density traffic would be routed exclusively on high capacity facilities (Tr. 2098–2147). These early documents reflect concern that a plan of this kind may not have been practical because, in actual operation, traffic is also occasionally routed between high-density locations on low capacity facilities when required for efficient and economic routing.

Plaintiffs concede that the concern expressed about this initial deaveraging concept was resolved in early 1972 when it was decided to base the tariff on the cost of "high density corridors" (Tr. 2167–68). They claim, however, that the concept that traffic in high-density corridors would be routed over low cost, high capacity facilities was deliberately deceptive because in fact AT & T planned to route traffic over any type of facility, regardless of whether it was actually low cost or high capacity (PX3–0495). Thus, SPCC argues that in fact substantial amounts of traffic priced at high-density rates would be routed over low capacity facilities, and that AT & T failed to disclose this fact to the FCC. Based upon the Court's review of the record, this claim must be rejected. AT & T represented to the FCC that in the normal course it expected to route traffic priced at high-density rates over high capacity facilities, but that a small amount might be routed over low capacity facilities as system efficiency required (PX3–0046 at 119; Hough, Tr. 3530–31). This was entirely consistent with AT & T's internal routing guide which stated that service between HiD rate centers

---

**162.** SPCC also referred the Court to PX3–0904 which purports to be a statement of "Book Costs Per Circuit Mile—By States" for the Bell System as of December 1975. SPCC interprets this document as also supporting its claim that high-density locations are more costly than low-density locations (Tr. 2236–38). This document, however, has no apparent relationship to routes or density of traffic. On its face it shows that book cost per circuit mile is directly proportional to the size of the State—a showing that long haul intrastate circuits are less costly than short haul intrastate circuits (Hough, Tr. 3531–33). Thus, the District of Columbia (the smallest jurisdiction) has the highest cost per circuit mile ($307) and Rhode Island has the second highest ($167). California, the most populous state, and one of the largest, has one of the lowest costs ($55). As

Mr. Hough testified, there is no basis for reading this document as establishing anything with respect to the construction, labor, maintenance or other costs of providing service between high-density locations (Hough, Tr. 3531–33). The Court agrees.

**163.** Although plaintiffs have suggested that an inference adverse to defendants should be drawn from the fact that AT & T considered, but did not implement, a regional deaveraging plan, there was no obligation to engage in regional pricing, *Broadway Delivery Corp. v. United Parcel Service, Inc., supra,* 651 F.2d at 131, and the Court is satisfied that there was a reasonable basis for not doing so (deButts, Tr. 4106; Olley, Tr. 5387–89).

"will normally be connected by HiD facilities" (PX3–0495). Moreover, to compensate for this eventuality, AT & T's Hi/Lo cost studies included in the high-density costs 2 percent low capacity facility costs, and AT & T so advised the FCC (PX3–0046 at 119; Ankner, S–T–10 at 19). In fact, an analysis of the routing of circuits priced at high-density rates conducted by Mr. Ankner showed for 1975 that over 95 percent of the traffic between high-density locations was actually routed over high capacity facilities of two mastergroups or greater (Ankner, S–T–10A at 11–12). Given this state of the evidence, the Court is satisfied that there was no misrepresentation on this question.

Finally, plaintiffs contend that AT & T misled the Commission in explaining the basis upon which it selected high-density locations. According to plaintiffs, the criteria for the selection of high-density rate centers described above were somehow contrived, and instead, the selection was based on anticompetitive grounds, with the effect that the high-density locations actually designated "blanketed" more than 90 percent of the cities where AT & T expected competition to arise (PX3–0477; PX3–0433; PX3–0407). There is no evidence, however, that AT & T ever deviated from the engineering, cost-based criterion of at least two mastergroups that it told the FCC it was applying in selecting high-density locations. Indeed, Mr. Guild testified that no such deviation occurred (Guild, S–T–15 at 9, Tr. 3918–22).

Moreover, plaintiffs' contention completely ignores the fact that SPCC and other new carriers were attracted to the high-density routes that could be served with low cost facilities (S–4924), and where rate-cost disparities in AT & T's averaged rate structure, and thus the opportunities to cream-skim, were most substantial (Hough, S–T–1 at 54; Stoddard, S–T–13 at 10). In the Court's view, it was thus natural, and indeed inevitable, that there would be a substantial overlap between the routes served by the specialized carriers and the high-density network reflected in the Hi/Lo tariff.

Having reviewed the record with care, the Court is convinced that plaintiffs have failed to establish any of their claims that AT & T misrepresented its Hi/Lo tariff to the FCC. The Court has dealt with this issue at some length—more than the evidence itself deserved—because of the seriousness of the charges made, particularly for a company that must continue to appear before the administrative agency that plaintiffs have charged it deceived.[164] So that the record is clear, from the evidence presented here, AT & T appears to have been extraordinarily responsive to the FCC's requests for information in the *Hi/Lo* investigation, as well as in other tariff investigations that have been raised in this case. Indeed, the Court is impressed with the efforts AT & T expended to provide the FCC with complete and open responses (Olley, S–T–29 at 30–31; Aldrich, S–T–28 at 17–20; Ankner, S–T–10 at 13–16). The Court finds it ironic that the very breadth and detail of these responses have been used against defendants in a proceeding where a major claim is that the responses were incomplete and deceptive.

■ In these circumstances, where there was no misrepresentation proven, there can be no antitrust violation resulting from AT & T's representations to the FCC. Under the *Noerr-Pennington* doctrine, "genuine individual or concerted action undertaken before legislative bodies, administrative agencies or courts is absolutely immune from antitrust liability," and is not "automatically impugned by evidence that the Defendants' ultimate or exclusive intent is to restrain competition, or that an identifiable result . . . is injury to Plaintiffs' business." *Federal Prescription Service v. American Pharmaceutical Ass'n,* 484 F.Supp. 1195, 1208 (D.D.C.1980), *rev'd on other grounds,* 663 F.2d 253 (D.C.Cir.1981).

---

**164.** What is noteworthy is that to the Court's knowledge, no commissioner has come out with such a charge, nor has any proceeding been implemented at the FCC concerning such charges. Equally lacking is any charge of misrepresentation before the state commissions. Rather, the Court is presented with a biased, interested person in the form of Mr. Hinchman.

In the Court's view, *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau,* 674 F.2d 1252 (9th Cir.1982), cited by SPCC, does not lead to a different result. The decision in *Clipper Exxpress* requires, in addition to the usual elements of an antitrust violation, proof "that a defendant's actions ... were not genuine efforts to influence government action" (*id.* at 1269). In that case, the Court of Appeals reversed the grant of a motion for summary judgment where the defendant stipulated that it had deliberately furnished false information to an agency, and had made "countless other misrepresentations of both fact and law" (*id.* at 1270). There is not the slightest resemblance in this case to the facts in *Clipper Exxpress.*

## THE CHARGE THAT HI/LO UNDERCUT PLAINTIFFS' RATE

Although the high-density rate under the Hi/Lo tariff was reduced from the previous nationwide averaged levels, the record does not support plaintiffs' claim that the high-density rate undercut the rates of the specialized common carriers. MCI was the only new carrier in operation in February 1973 when AT & T's special permission application was filed, and AT & T's $.85 per circuit mile high-density interexchange rate was in the mid-range of MCI's $.75 part-time rate and its $1.00 full-time rate (Hough, S–T–1 at 56; PX3–0475 at 4; PX3–0114 at 20–22). SPCC had not yet filed a tariff in February 1973, and did not do so until October of that year (Grant, Tr. 684; Brodman, Tr. 1777–78). It appears from the record, however, that SPCC had previously proposed a $.75 rate in its FCC application for authority to operate between Los Angeles and East St. Louis, and that this proposed SPCC rate was taken into account in AT & T's selection of the higher $.85 rate (PX3–0046 at 217–19; Hough, S–T–1 at 56).

When SPCC filed its first tariff in October 1973, it established a slightly higher rate of $.95 per circuit mile for circuits of less than 500 miles, but a substantially lower rate of $.53 per circuit mile for circuits of greater than 500 miles (S–2793B; Hough, S–T–1 at 63). Once Hi/Lo became effective in June 1974, SPCC lowered its $.95 rate to $.69 and raised its $.53 rate to that level (S–3060; Hough, S–T–1 at 64). Moreover, two weeks later, SPCC further reduced its rates between certain cities in response to satellite competition (S–3068; Hough, S–T–1 at 64). There is thus no basis in the evidence upon which the Court could conclude that Hi/Lo drastically undercut plaintiffs' rates. In fact, the opposite conclusion appears fully warranted.

Plaintiffs' related contention concerning MPL is similarly unsupported. By the time MPL was filed, SPCC had modified its own rates several times, including establishing a substantial bulk discount based on the total number of circuits a customer ordered (whether on the same route or not) and, as pointed out above, establishing special point-to-point rates in response to the low rates of a number of satellite carriers (S–3068; Grant, Tr. 706–08; Brodman, Tr. 1807–10, 1857–61). These various tariff modifications brought SPCC's rates down to levels as low as $.30 to $.40 per circuit mile (Grant, Tr. 710; Brodman, Tr. 1829, 1858–59; Hollis, Tr. 2307, 2315), and "a lot" of SPCC's business—about 75 percent in terms of installed circuits—was at these reduced rates (Brodman, Tr. 1810, 1867). Although plaintiffs claim that MPL undercut SPCC's rates, the Court finds no evidence that the MPL rates, even at the longest distances, were as low as SPCC's bulk or point-to-point rates.

Indeed, the evidence indicates that AT & T purposefully established the MPL rates so they would be above the lowest rates of competitors and that the information available to AT & T management showed SPCC's point-to-point rates to be significantly below the MPL levels (Hough, S–T–1 at 70; Ginn, S–T–73 at 13; S–4197). Further confirmation of the fact that MPL did not undercut SPCC's rates is provided by PX3–0932, a document introduced by plaintiffs in their rebuttal case, in which a comparison is made of the rates under various SPCC, AT & T and Western Union tariffs.

With respect to SPCC's point-to-point and satellite tariffs and AT & T's MPL tariff, PX3–0932 shows that the MPL rates were higher in all the circumstances compared:

| Route | SPCC Point-to-Point | SPCC Satellite | AT&T MPL |
|---|---|---|---|
| LA–NY | $1000 | $1000 | $1399.60 |
| SF–NY | 1000 | 1000 | 1447.60 |
| LA–Cgo | 750 | 750 | 1060.40 |
| SF–Cgo | 750 | 750 | 1162.40 |
| LA–Dallas | 750 | 600 | 888.80 |
| SF–Dallas | 750 | 700 | 1012.40 |

## THE CHARGE THAT AT & T DID NOT PROFIT–MAXIMIZE

Plaintiffs' third claim—that the $.85 high-density rate selected by AT & T was not the "profit-maximizing" rate—is both unsupported and unsound. Indeed, it appears to the Court that AT & T not only refrained from undercutting its competitors' rates, but did so even though a $.65 rate would have been more economically justified than the $.85 rate (Hough, S–T–1 at 56). The evidence showed that AT & T studied the economic effects of a number of high-density test rates, including a $.65 rate (Test Rate 1), a $.85 rate (Test Rate 2), a $1.00 rate (Test Rate 3), and a $1.10 rate (Test Rate C) (Hough, S–T–1 at 55; PX3–0475; PX3–0046 at 178–80; PX4–0099 at 16, 52). The documents show that for the year 1976 with "full competitive development"—that is assuming that the existing new entrants expanded their routes according to applications for construction permits on file with the FCC—AT & T would be better off by $39 million if it filed the $.65 rate, as compared to an increase in contribution of only $16 million from the $.85 rate and a decrease of $2 million from the $1.00 rate (Hough, S–T–1 at 56; S–3987B; S–2536B; PX4–0099 at 16, 62; Tr. 3494–99). Thus, as between Test Rates 1, 2 and 3, it is clear to the Court that the $.65 rate (Test Rate 1) was the profit-maximizing rate, and as between the $.85 rate (Test Rate 2) and the $1.00 rate (Test Rate 3), the $.85 rate was the obvious economic choice.

Plaintiffs' claim that AT & T should have selected the $1.00 rate (Test Rate 3) on the theory that such a rate would have "maximized" AT & T's profits in the short term 1974 period, is both beside the point and incorrect. Viewing Hi/Lo alone, the $.85 rate (Test Rate 2) produced a $5 million improvement in 1974 assuming full competitive development, whereas the $1.00 rate produced no improvement in contribution at all. In any event, the Court will not second-guess competent and experienced businessmen in selecting their rates so long as their decisions have a reasonable basis. The choice of the $.85 rate, based on the fact that it provided the best contribution in 1976 in the face of expected competition, certainly is not an unreasonable method of setting prices. Indeed, Mr. Hough, who participated in the final rate selection for Hi/Lo, testified that the 1974 time period was viewed as too short for use in setting rates and the 1976 period was seen as more realistic (Hough, Tr. 3534–37).

Even if plaintiffs could establish that defendants selected a rate that did not "maximize" their profits, the Court concludes that there is no basis for imposing a requirement to profit-maximize in the circumstances of this case. While a few courts in *dicta* have suggested that a profit-maximizing requirement might be appropriate in rare situations (see, *e.g.*, *International Air Industries, supra,* 517 F.2d at 724), no court has actually imposed such a requirement, and the Ninth Circuit has held that pricing that is not profit-maximizing may be legitimate, competitive behavior. *Inglis, supra,* 668 F.2d at 1034 n. 29.

Moreover, in the case of a regulated public utility, the Court does not believe such a requirement could ever be justified. In the telecommunications industry, the FCC long ago established the principle that AT & T would not be allowed to price its private line services to achieve maximum profitability. See *AT & T, Private Line Cases,* 34 F.C.C. 244, 298–99 (1961); 34 F.C.C. 217, 228 (1963). Furthermore, a profit-maximization requirement in a regulated public utility industry would be inconsistent with the economically accepted theory of Ramsey pricing. As Professor Kenneth S. Arrow, a Nobel prize winning econ-

omist testified, under the Ramsey pricing theory, the social optimum is achieved if a multiproduct firm subject to a revenue constraint prices its services in inverse relationship to their elasticity of demand. Ramsey pricing would call for AT & T to price services subject to competition relatively low and thus to obtain from such services less contribution than from higher-priced "monopoly" services (Arrow, S–T–30 at 27–43; see also Baumol, S–T–4 at 30–35, U.S.Tr. 23197–210). This is particularly true where, as the Court has found to be the case here, that firm enjoys substantial economies of scale and its prices equal or exceed incremental costs (Arrow, S–T–30 at 6–7).[165] Although there is some dispute in the record whether AT & T articulated its adherence to, and fully implemented, Ramsey pricing principles, the evidence does indicate that AT & T's pricing generally followed Ramsey principles (Baumol, S–T–4 at U.S.Tr. 23207–10; Olley, S–T–29 at 15–16).[166] In any event, the relevance of Ramsey pricing is that it reenforces the Court's conclusion that the imposition of a profit-maximization standard in evaluating defendants' competitive pricing responses would be both legally and economically unsound.

## THE CHARGE THAT AT & T "PREANNOUNCED" HI/LO

Plaintiffs' final claim is that AT & T unlawfully "preannounced" the Hi/Lo tariff. As the Court understands it, SPCC charges that when AT & T filed its application for special permission to file the Hi/Lo tariff on February 26, 1973, and announced that filing publicly at the time, it did so with no intent of placing the tariff in effect, but, instead, to "chill" the market and frustrate the entry of SPCC and other specialized carriers. There is no support in the record for this charge, and accordingly the Court rejects it.

The underlying theory behind plaintiffs' "preannouncement" charge is that the delay between the filing of the application for special permission in February 1973 and the effectiveness of the tariff in June 1974, some sixteen months later, was brought about by AT & T for anticompetitive purposes. However, as the Court views the evidence, it was the FCC and the specialized carriers, not AT & T, that brought about the delay of which plaintiffs complain here.

As pointed out above, at the time the Hi/Lo tariff was "announced," AT & T was subject to a special permission requirement, imposed by the FCC in February 1972 in Docket No. 18128, under which AT & T was required to file an application with the FCC and to obtain FCC permission before it could even file a tariff adjusting its private line rates (Hough, S–T–1 at 58; S–2346). When the application for special permission was filed (S–2567; S–2568), the FCC referred the application to Bernard Strassburg, then Chief of the Common Carrier Bureau. Although AT & T filed explanatory materials describing Hi/Lo with its ap-

---

**165.** The Court's conclusion in this respect is confirmed by the position of the Department of Justice Antitrust Division in the appeal of the FCC's Docket No. 18128 decision. Not only did the Department in that appeal support LRIC, but it also advocated what it called "inverse demand elasticity" pricing—the equivalent of Ramsey pricing (S–5716 at 36; Melody, Tr. 5642). As the Department of Justice stated (S–5716 at 36 n. 34):

"Two key facts underly this approach, known in the trade as 'inverse demand elasticity' pricing.... First, the industry has constantly decreasing costs so that the extra business it picks up at lower prices is in fact the least costly to provide. Second, the higher-priced group has low elasticity, that is, it will buy a certain amount of service no mat-

ter how the price varies over a wide range. No one has challenged that both key facts are present here."

**166.** As one of the many points covered broadly in his rebuttal testimony, Dr. Melody testified that AT & T could not have engaged in Ramsey pricing, principally because it had not conducted the LRIC studies for all of its services necessary to implement this pricing approach (Melody, Tr. 5593–94). This unsupported assertion, however, is directly contrary to the testimony of Mr. Eastmond that incremental costs, together with demand studies, were used by AT & T in evaluating rate changes for all of its services, MTS and WATS services as well as the then more competitive private line services (Eastmond, S–T–11 at 20).

plication, the FCC staff, at the urging of the specialized carriers, including MCI, with whom Mr. Strassburg apparently was meeting at the time to devise a strategy to delay the filing (S–2601), requested that AT & T file all of the studies supporting the tariff before it would pass upon the application (Hough, S–T–1 at 59). AT & T indicated that it would provide the supporting studies to the staff, but did not believe it either necessary or appropriate that the data be provided to its competitors (id.). When the FCC staff persisted in its unwillingness to act, AT & T filed an Application for Review with the Commission in an effort to obtain action on its special permission request (S–2630).

The matter remained essentially in this posture until October 19, 1973, when the United States Court of Appeals for the Second Circuit found the special permission requirement unlawful in connection with review proceedings that had been initiated by AT & T. *American Tel. & Tel. Co. v. FCC,* 487 F.2d 865 (2d Cir.1973). The Court is satisfied that AT & T thereafter continued to move promptly to place the tariff in effect, as it had following the filing of the special permission application. Pursuant to the Second Circuit's decision, the Commission vacated its special permission requirement on November 14, 1973, and AT & T filed the tariff with the FCC on the next day, to become effective within the minimum two-month period provided for in the Commission's rules (S–2816B; S–2815B; Hough, S–T–1 at 60). The Commission then suspended the tariff for the full three-month period permitted under the Communications Act. Thereafter, AT & T acquiesced in a request from the Chairman of the FCC, at the urging of the specialized carriers, voluntarily to defer the effective date of the tariff, and Hi/Lo went into effect on June 13, 1974 (S–2879; S–2971; S–2980; Hough, S–T–1 at 60–61; see also Preannouncement of Hi/Lo Doc.Sub.).

Thus, the period from the filing of the Hi/Lo special permission application until the date that the Hi/Lo rates became effective was entirely due to the operation of the Communications Act and the Commission's regulatory authority. In these circumstances, the Court concludes that the filing of the special permission application and the resulting delay cannot form the predicate for a finding that the Sherman Act has been violated.[167]

■ In *Ronson Patents Corp. v. Sparklets Devices, Inc.,* 112 F.Supp. 676 (E.D.Mo. 1953), and *ILC Peripherals Leasing Corp. v. IBM Corp.,* 458 F.Supp. 423 (N.D.Cal.1978), the courts recognized that "it is not unusual in the commercial world" to announce a new product, service or price "ahead of its actual advent on the market" and that such conduct, even by a monopolist, cannot properly be found to violate the antitrust laws (112 F.Supp. 688–89; 458 F.Supp. at 442). In the Court's view, that principle applies with particular force in this case, where the challenged conduct was a result of regulatory requirements beyond AT & T's control.[168]

---

**167.** To the extent that plaintiffs can be understood to complain not that the request for permission to file was made, but that it was publicized, the Court is likewise convinced that no violation can properly be found. The Hi/Lo special permission application was a public document filed with the FCC as part of a pending proceeding before the Commission. Once that application was filed, the Hi/Lo rates were public. Publicizing the contents of public records of a pending governmental proceeding is protected by the First Amendment and is therefore not actionable under Section 2 of the Sherman Act. *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 491–97, 95 S.Ct. 1029, 1044–47, 43 L.Ed.2d 328 (1975); see also *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of*

*N.Y.,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

**168.** Although the Court addresses plaintiffs' showing with respect to injury in fact resulting from AT & T's challenged pricing practices below, there is no evidence in the record from any customer that the so-called "preannouncement" of Hi/Lo caused that customer to decline to order service from plaintiffs or to delay ordering service from plaintiffs—evidence which, as the Second Circuit held in *Berkey Photo* (603 F.2d at 289), is essential to any claim such as "preannouncement" involving injury resulting from the impact of a challenged practice upon a plaintiff's customers.

## LACK OF INJURY IN FACT

█ As discussed above, SPCC has failed to show that AT & T engaged in predatory pricing. It has failed to prove that AT & T's rates were below cost, and its other theories are without legal or evidentiary support. Even if there were credible evidence of predatory pricing, however, SPCC's predatory pricing case would still fail, because it has not demonstrated injury as the result of AT & T's rates. In fact, in several instances, SPCC's witnesses admitted they were not injured by AT & T's pricing or tariffs.

The Court is convinced that Mr. Brodman's testimony alone negates plaintiffs' claims that they were injured by the Hi/Lo tariff. Mr. Brodman, who was offered as plaintiffs' witness on injury from Hi/Lo and MPL, admitted that SPCC lost no money as a result of Hi/Lo (Brodman, Tr. 1812–13):

> "Q. Can you, sitting here under oath, Mr. Brodman, tell us that you lost one nickel from your Hi/Lo response, taking into consideration the fact that you raised part of your rates, that the great bulk of your business was being sold under bulk rates, and a significant portion was probably sold under part time rates?
>
> \* \* \* \* \* \*
>
> "A. The answer is absolutely correct, it is no. The answer is no."

No witness contradicted Mr. Brodman. In fact, his testimony was confirmed by that of Mr. Grant, who testified that since SPCC's monthly rate in 1975 was between $.40 and $.42 per mile, AT & T's high-density rate of $.85 would not adversely affect SPCC (Grant, Tr. 710).[169] This is consistent with the opinion that Mr. Grant held at the time Hi/Lo became effective. Mr. Grant told investors that even in the face of the

Hi/Lo rates, after SPCC filed for lower rates, it would still realize adequate revenues (Grant, Tr. 700–01). In April 1974, for instance, Mr. Grant wrote to Connecticut General Life Insurance Co. (an investor in SPCC), stating that "Even on the basis of the revised competitive rates, [SPCC] will realize adequate compensation" (S–2962 at 9). Mr. Grant conceded that this statement was based upon an analysis which was "as thorough" as possible at the time (Grant, Tr. 701).

The reasons why the $.85 high-density rate did not injure SPCC are apparent from the record. Although SPCC's pre-June 1974 single-channel full time rate was $.95 per mile for circuits up to 500 miles and $.53 for circuits over 500 miles, this was the highest of many available rates.[170] SPCC also had a discounted part-time rate and a discounted bulk rate that became effective at only 2 circuits (Brodman, Tr. 1805, 1808; S–2793B). For 9 circuits, SPCC's bulk discount brought its initial rates down to $.80 per mile for circuits under 500 miles; for 20 circuits its rate was $.60 per mile; and at 240 circuits its rate was only $.30 per mile (Hough, S–T–1 at 63; Grant, Tr. 679–80; Brodman, Tr. 1829–30). Thus, for much of the business SPCC planned to serve, its initial November 1973 rates were already substantially below the Hi/Lo rates. When SPCC in June 1974 restructured its single-channel full time rates by increasing the $.53 rate to $.69 and lowering the $.95 rate to $.69 (S–3060), therefore, it is apparent why this response to Hi/Lo had no significant effect on SPCC's revenues (Grant, Tr. 700–01; Brodman, Tr. 1812–13).

Moreover, wholly apart from its Hi/Lo response, SPCC filed a new tariff on June 26, 1974 (less than two weeks after Hi/Lo took effect and only nine days after SPCC filed its $.69 rate in response to Hi/Lo)

169. In addition, Mr. Brodman's conclusion is supported by—and in fact was predicted by—two reports prepared for SPCC by consulting organizations shortly after the Hi/Lo special permission application was filed, one by Transcomm, Inc. and the other by the Stanford Research Institute. Both those reports accurately projected that the Hi/Lo tariff would

have little, if any, competitive impact on SPCC (S–2609; S–2625).

170. SPCC documents recognized that even SPCC's initial full time single-channel rates undercut the high-density rates by some 16 percent on long-haul routes such as San Francisco to Houston (S–2850 at 5).

(S–3068). This new tariff responded to competitive rates of domestic satellite carriers which were beginning to take a substantial number of SPCC's potential customers. The new June 26, 1974 rates were dramatic reductions from the June 17, 1974 rates. For instance, the New York to San Francisco route was set at $.42 per mile or some 50 percent below AT & T's $.85 rate (Brodman, Tr. 1858–59; Hough, S–T–1 at 64). If SPCC were in fact concerned about AT & T, then their rates would have been decreased 15% below the $.85 rate of AT & T. The reason that SPCC's rate was reduced to half of AT & T's rate is fairly obvious to the Court. That is, competition from the other common carriers, potential growth in private microwave and competition from the satellites.

In fact, the evidence clearly shows that "fierce" satellite competition (S–4074 at 1), not AT & T's Hi/Lo rates, kept SPCC's rates low (Effect of Hi/Lo Doc.Sub. at 7–9). By early 1974, soon after it commenced operations, SPCC was already competing with three satellite carriers, and Mr. Brodman conceded that there was a high cross-elasticity of demand between SPCC's services and the services of satellite carriers (Brodman, Tr. 1838–40, 1865). Indeed, the evidence establishes that a "price war" broke out as a result of the competitive struggle between the satellite carriers and SPCC (Grant, Tr. 707; Brodman, Tr. 1860–61; S–3690).

The impact on SPCC of the satellite carriers' price competition continued to be substantial throughout the period the Hi/Lo tariff was effective. For example, by mid-1975 SPCC had lost long haul circuits to satellite competition due to price (S–3690), and SPCC feared it would be virtually driven from this market (S–3728). Through late 1975 and early 1976, SPCC lost both new and installed business to satellite carriers, particularly in the Southwest, and at the end of this period the effects of this price competition on SPCC were beginning to spread to other cities (S–3441; S–3655; S–3690; S–3728; S–3729; S–3743; S–3857; S–3886; S–3889; S–3930; S–3942; S–3946; S–3948; S–4074; S–4137).

In addition, the Court finds that due to the bulk nature of most of SPCC's business, the single-channel Hi/Lo tariff could not even potentially have had a significant effect upon SPCC (Effect of Hi/Lo Doc.Sub. at 9–10). SPCC marketing efforts specifically emphasized obtaining bulk sales (S–6090), and this effort was plainly successful. As of July 1975, approximately three-quarters of SPCC's circuits were concentrated among customers purchasing forty-one or more circuits (S–3693B), and these customers would not have been affected by Hi/Lo. As Mr. Grant admitted, the $.85 high-density rate had not been the rate against which SPCC had to compete for most of its business (Grant, Tr. 709).

Finally, plaintiffs' actual business experience in connection with the Hi/Lo tariff is contrary to their claims of injury in fact resulting from Hi/Lo. The evidence demonstrates that during the entire period from the filing of the Hi/Lo special permission application until Hi/Lo was replaced by the MPL tariff, SPCC had a chronic backlog of circuit orders and experienced steadily growing annualized revenues on a month-to-month basis (Effect of Hi/Lo Doc.Sub. at 10). For instance, in May of 1975, SPCC had sold out its entire system from San Francisco to St. Louis and from Buffalo to New York City (S–3563; see also S–3519; S–3406; S–3152; S–3488; S–3718).

It is also clear to the Court that plaintiffs did not establish that they suffered injury in fact as a result of MPL. Notwithstanding the fact that SPCC chose to reduce its single-channel rate in response to MPL, Mr. Brodman conceded that MPL may not have had any impact on SPCC at all (Brodman, Tr. 1874). This is confirmed by the internal SPCC documents tracking monthly revenue per channel mile. These documents show that SPCC's monthly revenue per channel mile was $.407 in March 1976, the month before MPL was filed, and $.412 per channel mile in January 1977, four months after MPL became effective (S–4624; S–4409; S–4418; S–4490; S–4586; S–4649; S–4776). This absence of injury was under-

scored by Mr. Grant himself in a memorandum to Mr. Biaggini, dated January 6, 1977, which states that MPL "did not result in the loss of any customers . . ." (S–4752 at 2).

Moreover, as with the Hi/Lo tariff, the evidence discloses that SPCC was much more concerned with and affected by "increased price competition from satellite carriers" (S–4655) than by MPL (see also S–4526; S–4597; S–5195B). Because SPCC was forced to maintain lower rates to compete with these satellite carriers, AT & T's MPL rate for high-density corridors simply was not a factor in the key area where SPCC was seeking sales. The evidence also shows that most of SPCC's business continued to be concentrated among bulk users who would not even potentially have been affected by the MPL tariff (S–4871; S–4928). Finally, and again as with Hi/Lo, during the entire period from the time MPL became effective until the discovery cut-off date in this case, SPCC had a substantial backlog of circuit orders and compiled an impressive series of annualized revenue increases on a month-to-month basis (Effect of MPL Doc.Sub. at 6). Accordingly, the Court finds that the MPL tariff had no cognizable effect on SPCC.

▇▇▇ Nor was there any adequate showing of injury in fact attributable to Telpak. In the Court's view, perhaps the most telling proof of this is the fact that SPCC never opposed Telpak or its continued maintenance (Brodman, Tr. 1819; Hollis, Tr. 2284; S–6209). Telpak was already in existence when SPCC entered the market (Grant, Tr. 686), and SPCC believed it could make inroads into that market (Vasilakos, PX6–0006 at 5) and do so profitably (Grant, Tr. 689).

The evidence confirms that SPCC was able to sell against Telpak and was able to sell all its available circuits (S–6068B at 2). Mr. Brodman testified that even in the early days of SPCC's operation, SPCC had successes in selling its services to Telpak

users and replacing AT & T service for these customers (Brodman, Tr. 1778–80). In fact, by July 1975, most of SPCC's business was with large customers under bulk rates where the company was competing against Telpak (Brodman, Tr. 1810), and by 1976, 75 to 80 percent of SPCC's installed circuits were sold under bulk rates (Brodman, Tr. 1867).

SPCC's success in selling to customers that also had Telpak is most evident in the testimony of R.G. Brown, one of SPCC's rebuttal witnesses. Mr. Brown's testimony (PX6–0031) confirms that nearly all of SPCC's business was made up of bulk sales to large, nationwide corporations. In fact, Attachment 1 to his testimony shows that a total of 75 SPCC customers (6.2 percent of the SPCC's total 1,205 private line customers) accounted for nearly 70 percent of SPCC's revenue. The list of these 75 customers reads like a "Who's Who" of major business in the United States and many, if not most, were Telpak customers or potential customers. Among the SPCC customers listed on Attachment 3 are American Express, ARINC, Atlantic Richfield, Bunker Ramo, CBS, Coldwell Bankers, Exxon, Ford Motor, General Dynamics, General Electric, General Motors, Gulf & Western, Hewlett Packard, ITT, Martin Marietta, Mobil Oil, Occidental Petroleum, RCA, Union Carbide, Union Oil, and Xerox. Moreover, the total revenues SPCC obtained from the 75 customers sampled by Mr. Brown rose almost astronomically (Brown, PX6–0031, Att. 3):

| Year | Total Billed Revenue For Sampled Customers |
|------|----------------------|
| 1974 | $ 612,900 |
| 1975 | $ 4,038.100 |
| 1976 | $13,754,400 |
| 1977 | $22,749,300 |

This substantial increase in revenues between 1974 and 1977 among these blue ribbon customers clearly puts to rest any notion that SPCC could not sell to large customers who were likely Telpak users.[171] In

---

171. The private line revenues from these customers leveled off after 1977, consistent with the testimony of SPCC witnesses (Furth, Tr.

390; Grant, Tr. 771, 774) that, when SPCC began marketing SPRINT in 1978, SPCC artificially limited its private line circuits to approxi-

light of this evidence, SPCC's concerns about "free channels" and "aggregation incentives" can carry no weight.

Indeed, to the extent that Telpak kept major businesses from building private microwave systems in the 1960s and 1970s, it would appear that SPCC actually benefited from Telpak. As discussed above, AT & T's major customers, including the U.S. Government, ARINC and General Electric (which now are also customers of SPCC), threatened repeatedly to build their own private microwave systems if Telpak rates were raised. It is a fair inference from this evidence that these customers would have built their own networks promptly had Telpak never been implemented, or if it had been eliminated in the 1971 period (see Joskow, Tr. 5108). This clearly would have left SPCC worse off today. Mr. Smith from General Electric explained that if General Electric had built its own system in the late 1960s or early 1970s, then by the mid-1970s when SPCC was ready to provide service "virtually the entire General Electric market would have disappeared, and there is no reason why other large companies would not have followed General Electric's lead" (Smith, S–T–166 at 5). This same point was emphasized by plaintiffs' witness, Mr. Goodnetter, a former Government telecommunications procurement official, who testified that a Government-owned system "would have eliminated the requirement for services from other carriers" (Goodnetter, PX2–0367 at Tr. 2462–63). Summing up the reasons for implementing and retaining Telpak, Mr. Hough explained: "[O]nce someone makes the commitment to a private microwave system and has it there, why that business is lost for a long long time" (Tr. 3543–44).[172]

Events since the elimination of Telpak in May 1981 also support the conclusion that SPCC was not injured by Telpak. SPCC has been forced to maintain a bulk rate approximately 30 percent below AT & T's rate (Brodman, Tr. 1815) because of the continual threat from bulk users to build private systems, including ARINC (Hollis, Tr. 2294–95). This plainly indicates that, even without Telpak, SPCC's rates would still have been forced down to their current level to prevent the development of private microwave or private satellite systems (Smith, S–T–166 at 5–6; Pascall, Tr. 4752–53). Indeed, SPCC's competitor, American Satellite Co., is apparently continuing to take steps to remain competitive with private systems and this, like Telpak, would force SPCC to also keep competitive with private systems. There can thus have been no real injury to SPCC caused by the fact that AT & T was also forced to maintain its Telpak prices to compete with private systems.

Indeed, the effect of competitive factors other than AT & T is clearly shown in the rebuttal evidence submitted by plaintiffs in an effort to show the revenue impact on SPCC of AT & T's pricing tariffs. One of SPCC's rebuttal witnesses purported to show the effect of Telpak by calculating the amount of revenue SPCC would have received if it could have priced all of its services at 15 percent below the applicable Hi/Lo or MPL rates, and then subtracting the amount actually earned by SPCC in that period (Lim, PX6–0032 at 7 & Att. 2, Tr. 5919–20). The most striking aspect of this data is that the revenue disparity increases dramatically in the last half of 1981, *after* Telpak is terminated and at a time when plaintiffs concede AT & T's rates are lawful (Lim, Tr. 5920, 5929). SPCC's witnesses attempted to attribute this to the lingering effect of Telpak, but to the Court,

---

mately 10,000 and put its marketing emphasis and system expansion in its SPRINT switched service, the revenues from which are not included in Mr. Brown's figures (see PX6–0031 at Att. 2).

**172.** In these circumstances, it is obvious to the Court that many of SPCC's claimed difficulties with the Telpak structure would also have been present if Telpak did not exist and if, instead, SPCC faced competition from private microwave systems (Hough, S–T–1 at 31). For instance, the owner of a private system with excess capacity would, like a similarly situated Telpak customer, have access to "free" channels until system capacity was reached (Hough, S–T–1 at 28–30; PX2–0017 at 7–8; PX2–0225).

this is a clear indication that neither Telpak nor AT & T's single-channel rates were the cause of any depressed SPCC revenues, and that the most likely cause was the other market forces discussed above such as competition from satellites and private microwave.

■ Accordingly, the Court finds that the Telpak tariff did not cause SPCC injury in fact. What little evidence of claimed injury plaintiffs could muster related to the difficulties SPCC seemed to have had in competing with Telpak during the period after July 1977 when the injunction entered by the Court of Appeals for this Circuit prohibited AT & T from terminating Telpak for existing customers. SPCC's witness, Mr. Hollis, testified that the effect of the injunction was to freeze the Telpak circuits for existing customers during the pendency of the injunction—from July 1977 to May 1981 (Hollis, Tr. 2286–87). Although SPCC seeks to blame AT & T for the alleged adverse impact of the injunction on SPCC's sales, the record is clear that AT & T took all reasonable efforts to terminate Telpak and was prevented from doing so by court orders to which it was obligated to adhere (see documents cited in the Termination of Telpak Doc.Sub. at 2–6). In these circumstances, there is no basis for finding AT & T in any way liable for the impact of the injunction on SPCC.[173]

■ Finally, the Court's conclusion concerning lack of injury in fact to SPCC as a result of AT & T's pricing decisions is reinforced by the evidence, based on SPCC's own cost figures submitted to the FCC, showing that even when competing against Telpak rates, SPCC always recovered its costs. For example, in March 1975, SPCC submitted cost data to support changes in its private line tariffs that showed its long run incremental costs for intercity circuits were approximately $.21 per channel mile per month (S–3499B at 49). The same SPCC document further informed the FCC that "even our lowest mileage rate ($.30 per channel-mile per month) has a substantial contribution to overhead and profit" (id. at 48, 49). Similarly, SPCC represented to the FCC in January 1976 that its long run incremental costs for intercity circuits were $.26 per circuit mile per month (S–4050, Worksheet 2, p. 38). There is also evidence that SPCC took these cost figures seriously and used them in calculating its appropriate rates. For instance, the record shows that SPCC was selling circuits to its competitor, MCI, at the rate of $.30 per mile and apparently considered that to have been a profitable transaction (Hollis, Tr. 2313–14). In light of this evidence, the Court is satisfied that AT & T's rates which plaintiffs challenge here were not so low that SPCC could not have competed with them at a substantial discount and still have recovered its costs (see also Tr. 1442–43).[174] At bottom, SPCC's theory of injury in this case has been that it was deprived of profits that would have accrued to it had it been able to price its services at any level that it chose. The record shows that the competitive forces driving SPCC's prices down were not generated by AT & T, but rather competition from satellite carriers and potential competition from private systems. Thus, SPCC's complaint, even if taken at face value, is no more than a complaint that it

---

**173.** SPCC cites *DiGaetano v. Texas Co.*, 300 F.2d 895, 897 (3d Cir.1962), for the proposition that the entry of an injunction will not shield AT & T from claims about Telpak for the period *prior* to the injunction. This is no doubt correct, but the Court has found no impact on SPCC from Telpak in this period. The Court is aware of no case, and SPCC has offered none, that would hold AT & T liable for complying with the injunction entered by the Court of Appeals.

**174.** This evidence also disposes of plaintiffs' reliance on *Borden, Inc. v. FTC*, 674 F.2d 498

(6th Cir.1982). The Court has substantial doubts about whether *Borden* correctly states the law applicable in a Section 2 case, but in any event that case holds only that a firm cannot use its unique brand loyalty to drive equally efficient competitors with equivalent products to sell below the competitors' own average variable costs. *Id.* at 515–16. There is evidence here that SPCC was not as efficient as AT & T, and its product was admittedly inferior. Yet, the clear and undisputed evidence is that SPCC was always selling above its own incremental cost.

met with robust competition and was forced to maintain competitive rates. This is precisely the competitive process that the Sherman Act was intended to foster and cannot provide any basis upon which to find that AT & T violated the antitrust laws.

## THE INTERCONNECTION CLAIMS

Plaintiffs' interconnection claims are based on the notion that defendants failed to provide SPCC with full and nondiscriminatory access to defendants' facilities and services. More specifically, SPCC's interconnection claims fall into four general categories: (1) allegedly wrongful denials of access to AT & T's intercity transmission facilities; (2) allegedly wrongful denials of access to local interconnections which would have enabled SPCC to provide interstate and intrastate FX and CCSA services; (3) allegedly discriminatory and unreasonable terms and conditions with respect to the provision of local distribution facilities; and (4) allegedly discriminatory and unreasonable practices and procedures with respect to the various interactions between SPCC and AT & T and the Bell System operating companies.

 Having carefully reviewed the record with respect to plaintiffs' interconnection charges, the Court concludes that these charges must be rejected—both as a matter of law and as a matter of the evidence adduced at trial. As explained more fully in the following section, the legal premise of plaintiffs' position is seriously flawed. Based upon the Court's review of the relevant precedents, it is clear that the antitrust laws simply do not require absolute equality of treatment among "competitors," even where a monopolist controls so-called "essential" facilities. Instead, the Court concludes that these interconnection claims are properly governed by the Rule of Reason, and that when that principle is applied in light of the shifting and uncertain regulatory context described above, in which all these charges arose, no violation of the Sherman Act has been established.

With respect to the evidence, the Court concludes that plaintiffs have failed to prove these charges, irrespective of the legal standard the Court applies. Thus, the evidence establishes that although defendants had no regulatory or antitrust obligation to provide plaintiffs with intercity facilities, such facilities were provided on reasonable terms; that at the very least there was a legitimate dispute over plaintiffs' authority to provide FX and CCSA, and once resolved, the necessary interconnections were provided; that the terms and conditions under which local distribution facilities were provided were reasonable; and that notwithstanding the differing configuration of physical facilities and operating relationships which precluded absolute equality of treatment as a factual matter, the Bell operating companies treated plaintiffs as well as, or better than, Long Lines and their own customers.

Before turning to an analysis of the specific interconnection charges, the Court will set forth the appropriate legal principles on which that analysis is based.

## THE APPLICABLE LEGAL STANDARD FOR INTERCONNECTION CLAIMS

Virtually all of plaintiffs' interconnection claims are predicated upon the theory that the local distribution facilities provided to SPCC by defendants are essential facilities within the terms of the "essential facilities" doctrine adopted by the Court of Appeals for this Circuit in *Hecht v. Pro-Football, Inc.,* 570 F.2d 982, 992 (D.C.Cir.1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978). That doctrine provides that (*id.*):

> " 'where facilities cannot practicably be duplicated by would-be competitors, those in possession of them must allow them to be shared on *fair terms.* It is illegal restraint of trade to foreclose the scarce facility.' " (Emphasis supplied.)

The Court of Appeals stated that a facility should be deemed essential "if duplication ... would be economically infeasible and if

denial of its use inflicts a severe handicap on potential market entrants" (*id.*).[175]

■ As this Court reads *Hecht,* the basic requirement that emerges is that an essential facility must be shared "on fair terms" with competitors (570 F.2d at 992). This does not mean that a competitor must be given "absolute equality of access to essential facilities" or "parity" with the owner of the facility, but only that the terms of access be "fair" or "just and reasonable." In this respect, the Court's view of *Hecht* is consistent with that of Judge Greene in *United States v. American Tel. & Tel. Co.,* 524 F.Supp. 1336, 1360–61 (D.D.C. 1981):

> "The Court has concluded that absolute equality of access to essential facilities, without regard to the feasibility of such access or the burden it would impose upon the owner of the facilities, is not mandated by the antitrust laws.... In short, problems of feasibility and practicability may be taken into account by the Court in determining the sufficiency under the law of the access to essential facilities granted by defendants to non-

Bell carriers. To put it another way, parity is not necessarily required."

In evaluating the legality of defendants' interconnection practices under the essential facilities doctrine, therefore, the Court must determine whether defendants' practices were fair and reasonable under the circumstances, not whether the access to defendants' local distribution facilities provided by the Bell Operating Companies to SPCC was identical in all respects to that provided to AT & T's Long Lines Department.[176]

■ Arguing that *Hecht* is not controlling here, defendants point out that the essential facility cases only require that competitors be given "access" to the essential facility. The Court agrees. There is no case requiring the owner of an essential facility to enter into a joint service arrangement with a competitor.[177] *Cf. Thompson v. United States,* 343 U.S. 549, 72 S.Ct. 978, 96 L.Ed. 1134 (1952). To the extent that the interconnections sought by plaintiffs would in effect require defendants to enter

**175.** It is undisputed that the local distribution facilities (LDF's) are essential facilities as they are essential to SPCC's ability to render service to its customers. The Court would point out, however, that this is spurious at best, for it is possible to duplicate the LDF's. For its application before the FCC, Datran stated "that end-to-end facilities are essential to its switched digital data network and that interconnection with the local telephone exchange systems is not suitable to it." *Specialized Common Carriers,* 29 F.C.C.2d 870 (1971) went on to conclude "that new carriers should have the option of constructing their own independent local facilities to provide end-to-end service. (footnote omitted) (*id.* at 940). Further, the SCC's could make use of by-pass-facilities which are:

> "Alternatives to local telephone company provided distribution. Facilities such as cellular radio, two-way cable TV, short haul microwave and direct satellite to roof top antennas are examples of technological developments being employed by other common carriers (OCC's) and cable TV, companies which potentially have the capability to circumvent the use of the local telephone network."

(AT & T Telecommunications Glossary March, 1982 at 5.)

Indeed, by a 6 to 1 vote, the FCC gave Communications Satellite Corp., permission to begin building a revolutionary system to broadcast

television programs directly to viewers' homes via satellite, bypassing existing local television stations. *Washington Post,* at D8 (September 24, 1982).

**176.** Surely the Armory Board would not be required to enter into the same lease arrangement with plaintiff as it had with *Hecht* Pro-Football Inc. that was signed in 1959; only that a fair contract was entered into. It may well be that with the passage of time (and inflation) 12% of the gross revenues would be inadequate and that the 1000 free tickets limitation would be inappropriate. However, both parties must abide by the terms of the lease. In this Court's opinion one should not be able to come in over 15 years or after any significant passage of time after the fact and receive the exact same contract without taking into account the surrounding circumstances.

**177.** In *Hecht,* for example, the Court of Appeals held that the Washington Redskins could be required to share RFK Stadium with another professional football team during times when the stadium was not being used by the Redskins. The essential facilities doctrine, however, could not be construed to require the Redskins to play a game with a competing football team.

974

into joint service arrangements, therefore, it appears to the Court that the essential facility doctrine would not apply. However, for purposes of this decision, the Court will assume that the essential facility doctrine applies to all disputes relating to local distribution facilities.

Plaintiffs do not contend that defendants' intercity facilities are "essential facilities" within the terms of the *Hecht* case.[178] Indeed, such a contention would be inconsistent with the basic premise of the FCC's *Specialized Common Carriers* decision, where the FCC held that it was feasible and attractive for SPCC and the other specialized common carriers to provide intercity facilities for themselves. As the Court reads that decision, SPCC and the other carriers were authorized to enter the industry for the very purpose of constructing, and providing "specialized" private line services over their own intercity facilities.

■■■ Although the claims regarding intercity facilities do not fall within the "essential facilities" doctrine, plaintiffs nevertheless contend that defendants had an obligation to share their non-essential intercity facilities with plaintiffs on the theory that a refusal to share such facilities constitutes an unlawful "refusal to deal" by a "dominant firm." If accepted by the Court, the effect of plaintiffs' argument would be to impose virtually the same obligation on defendants with respect to the sharing of both essential and non-essential facilities—a proposition which the Court finds to be both unsound and unsupported in law or fact on this record.

There is an important distinction between a refusal to "deal" and a refusal to assist a competitor by sharing non-essential facilities. Thus, although some cases have suggested that a monopolist may be liable under the Sherman Act for refusing to sell to a competitor when its refusal was motivated by an intent to drive the competitor out of the market by unfair means,[179] the Court is unaware of any case holding that a monopolist must assist its competitors by sharing its non-essential facilities as if it were engaged in a joint venture with the competitors. The reason the law has not gone that far is apparent from any common sense analysis. For example, a newspaper publisher might be required to adopt a nondiscriminatory policy in accepting advertisements, but it would not be obligated under any circumstances to share its printing press so as to enable a would-be competitor to economize on printing costs. Similarly, an automobile manufacturer might be required to provide automobiles to its dealers, but it would not be obligated under any circumstances to allow others to use its assembly lines to produce a competitive automobile.[180]

Moreover, there are a number of decisions supporting defendants' position. For example, in *Almeda Mall, Inc. v. Houston Lighting & Power Co.,* 615 F.2d 343, 352–53 (5th Cir.), *cert. denied,* 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980), the Court of Appeals for the Fifth Circuit held that there was "no antitrust violation" where a public utility declined to make its facilities available to would-be competitors seeking "to preempt the utility's business for their own profit," particularly where, as the Court finds to be the situation in the instant case, the competitors "could enter and compete" by providing their own facilities but "none have chosen to do so." Similarly, in *American Football League v. National Football League,* 323 F.2d 124, 131 (4th Cir.1963), it was held that "[t]here is no basis in the antitrust laws" for a claim

**178.** See Plaintiffs' Memorandum in Opposition to Defendants' Motion for Involuntary Dismissal Under Rule 41(b) at 179.

**179.** See, *e.g., United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919); *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927); *Lorain Journal Co. v.* *United States,* 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951).

**180.** Indeed, in situations where such facility sharing among competitors has been proposed, questions have been raised whether such arrangements might themselves run afoul of the Sherman Act. See, *e.g.,* 15 U.S.C. § 1801 *et seq.*

based upon a refusal to share facilities with a competitor. And in *SCM Corp. v. Xerox Corp.,* 463 F.Supp. 983, 1011–12 (D.Conn. 1978), *remanded on other grounds,* 599 F.2d 32 (2d Cir.1979), *aff'd,* 645 F.2d 1195 (2d Cir.1981), the court pointed out that "no case has been found" in which "even a monopolist" has been held liable under the Sherman Act "when he refuses to share his assets with a potential competitor." [181]

■ Given this state of the law, the Court agrees that defendants had no obligation under the antitrust laws to assist plaintiffs by sharing non-essential intercity facilities that SPCC could have provided for itself. Indeed, imposing such an obligation would be obviously unfair to defendants and directly contrary to the concept of competition on the merits which lies at the heart of the antitrust laws. This would in the Court's view place all of the other OCCs in the position of being national carriers. The OCCs would merely build on the most profitable routes (which they already do) and lease the remaining circuits from AT & T and the independents to fulfill its customers needs. Thus, the OCCs would be national in scope for its customers in the profitable areas without having to serve any one (or provide equipment, etc.) in the non-profitable areas. This Court will not give credence to such activities nor will it condone such as it defies common sense in the context of this case and the telecommunications industry.

■ In addition to these basic antitrust principles, there are also certain regulatory principles which the Court finds relevant to an assessment of plaintiffs' interconnection charges. As the Court pointed out above, the interconnection obligations of communications common carriers are regulated under Section 201(a) of the Communications Act (47 U.S.C. § 201(a)), which establishes specific standards and procedures for interconnections between carriers involving interstate service. Section 201(a) imposes a duty on carriers to provide interconnections to other carriers only "where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest" (*id.*). Prior to an opportunity for hearing and a Commission determination under Section 201(a) that a requested interconnection would be in the public interest, the Court is therefore, satisfied that a carrier has no duty under the Communications Act to provide interconnection to another carrier.

In determining whether a requested interconnection is in the public interest under Section 201(a), a review of the relevant decisions confirms that the FCC is required to take into account a number of factors under that broad standard besides the effect of the interconnection on competition. Indeed, the Supreme Court has explicitly held that the Communications Act "contradicts the notion that national policy unqualifiedly favors competition in communications," and the Act "prohibits competition" when competition "does not satisfy the 'public interest standard' " (*FCC v. RCA Communications, Inc.,* 346 U.S. 86, 93, 73 S.Ct. 998, 1003, 97 L.Ed. 1470 (1953))—a principle more recently applied by the Court of Appeals for this Circuit in *Hawaiian Tel. Co. v. FCC,* 498 F.2d 771, 777 (D.C.Cir.1974). Consistent with this principle, on the same occasions the FCC has found that particular interconnections would not be in the public interest notwithstanding the fact that the requested interconnections would have led to greater competition. See, *e.g., Western Union Telegraph Co.,* 17 F.C.C. 152, 174–75

---

**181.** The decisions in *Almeda Mall, American Football* and *SCM* reflect the long-standing principle that a monopolist "is not bound to so use its property that others ... may make profit to themselves." *Donovan v. Pennsylvania Co.,* 199 U.S. 279, 294, 26 S.Ct. 91, 94, 50 L.Ed. 192 (1905). See also *Export Liquor Sales, Inc. v. Ammex Warehouse Co.,* 426 F.2d 251, 253 (6th Cir.1970), *cert. denied,* 400 U.S. 1000, 91 S.Ct. 460, 27 L.Ed.2d 451 (1971) ("[u]nder the *Donovan* holding, the [defendant] may ... refuse to lease to [plaintiff] space on [its] premises"); *Town of Massena v. Niagara Mohawk Power Corp.,* 1980–2 Trade Cas. ¶ 63,526 at p. 76,814 (N.D.N.Y.1980) ("nothing in the history of the Sherman Act ... requires a monopolist to affirmatively assist potential competitors by subsidizing their entry into the marketplace or granting them preferential access to a unique facility").

(1952); *Oklahoma-Arkansas Telephone Co. v. Southwestern Bell Telephone Co.,* 6 F.C.C. 809, 812 (1939).

In the Court's view, Section 201(a) necessarily also requires the carrier receiving an interconnection request to decide in the first instance whether the requested interconnection would be in the public interest, and it contemplates that this initial determination should be made on the basis of the same standard used by the FCC, not merely on the basis of competitive considerations standing alone.[182] Moreover, where the carrier concludes that the requested interconnection would not be in the public interest, Section 201(a) requires that the interconnection be denied, for any other approach would improperly enable another carrier to obtain an interconnection without regard to the public interest—a situation described by the FCC as "a clear circumvention of the Congressional intent expressed in Section 201(a) of the Act." *AT & T and Western Union Co., Charges and Regulations for Television Transmissions Services and Facilities,* 42 F.C.C. 1, 20 (1949).

Because regulatory statutes and policies like those reflected in Section 201(a) contemplate that regulated companies will sometimes have to act in ways that might be regarded as unreasonable under the antitrust laws in the absence of regulation, the Supreme Court has held that traditional antitrust concepts are to be applied to regulated conduct with enough flexibility under the rule of reason to permit regulated companies "sufficient breathing space" within which to carry out their regulatory responsibilities without incurring antitrust liability. *Silver v. New York Stock Exchange,* 373 U.S. 341, 360–61, 83 S.Ct. 1246, 1258, 10 L.Ed.2d 389 (1963).[183]

▮ Applying this principle to interconnections between carriers, the Court concludes that a denial of interconnection prior to an FCC determination of the public interest will be deemed reasonable under the antitrust laws if there was an objectively reasonable basis for believing that the interconnection was not in the public interest based on recognized public interest considerations. Thus, as the Fifth Circuit held in *Mid-Texas Communications Systems, Inc. v. American Tel. & Tel. Co.,* 615 F.2d 1372, 1380–81, 1389–90 (5th Cir.), *cert. denied,* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980), a denial of an interconnection request will be regarded as reasonable under the antitrust laws if the denial was based "on articulable concerns relating to the public interest as defined in Section 201(a)" (615 F.2d at 1381). Carefully analyzing the statutory scheme, the Court in *Mid-Texas* emphasized that Section 201(a) contemplates that some interconnection requests will not be in the public interest and should not be permitted (*id.* at 1380). Because the statute places "the initial onus of refusal" on the carrier to prevent interconnections that are not in the public interest (*id.*), the Court of Appeals concluded that "public

---

**182.** This concern must also take into account any potential harm to the system. As Mr. Enticknop stated, "It also must not be forgotten that a telephone network is highly susceptible to harm." (Enticknop, S–T–155 at 6.)

**183.** See also *United States v. Marine Bancorporation, Inc.,* 418 U.S. 602, 627, 94 S.Ct. 2856, 2872, 41 L.Ed.2d 978 (1974); *United States v. Citizens & Southern National Bank,* 422 U.S. 86, 91, 95 S.Ct. 2099, 2104, 45 L.Ed.2d 41 (1975); *Jacobi v. Bache & Co.,* 520 F.2d 1231, 1237–39 (2d Cir.1975), *cert. denied,* 423 U.S. 1053, 96 S.Ct. 784, 46 L.Ed.2d 642 (1976); *Mid-Texas Communications System, Inc. v. American Tel. & Tel. Co.,* 615 F.2d 1372, 1389–90 (5th Cir.), *cert. denied,* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980); *Phonetele, Inc. v. American Tel. & Tel. Co.,* 664 F.2d 716, 737–43 (9th Cir.1981). In analyzing this principle and the resulting flexibility under the rule of reason it requires, Professors Areeda and Turner have observed (1 P. Areeda & D. Turner, *Antitrust Law* 140 (1978)):

"[A]ntitrust courts can and do consider the particular circumstances of an industry and therefore adjust their usual rules to the existence, extent, and nature of regulation."

One example of this adjustment is that a "specific intent" must be shown in order to establish a Section 2 violation where a regulated public utility is involved. *See City of Groton v. Connecticut Light & Power Co.,* 662 F.2d 921, 931–32 (2d Cir.1981); *City of Mishawaka v. American Electric Power Co.,* 616 F.2d 976, 985 (7th Cir.1980) *cert. denied,* 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981).

policy will be vindicated only if interconnection is denied" by the carrier where there is an objectively reasonable basis for believing that interconnection is not in the public interest (*id.* at 1389). For that reason, the Fifth Circuit recognized that it would be "contrary to public policy to permit antitrust liability" to be imposed where the carrier denies interconnection on the basis of legitimate public interest factors, and that such a denial need not be approved by the FCC in order to be protected under the rule of reason; it need only be shown that the denial was reasonably "based on legitimate regulatory factors relevant to Section 201(a)" (*id.*).

■ Other courts have also recognized that conduct by a regulated utility that was objectively reasonable at the time of its adoption does not violate the antitrust laws even if subsequently disapproved by the regulatory agency. In *Phonetele, Inc. v. American Tel. & Tel. Co.,* 664 F.2d 716, 737–43 (9th Cir.1981), for example, the Ninth Circuit concluded that a carrier interconnection practice subsequently disapproved by the FCC as "unnecessarily restrictive" would nevertheless be deemed reasonable under the antitrust laws if, at the time that the practice was adopted,

there was an objectively reasonable basis to conclude that the practice was necessitated by public interest considerations recognized as legitimate by the FCC.[184] Similarly, in *City of Groton v. Connecticut Light & Power Co.,* 662 F.2d 921, 931–32 (2d Cir.1981), the Second Circuit held that utility rates which had been disapproved by a state regulatory agency were not so devoid of reasonableness under regulatory policies existing at the time the rates were filed as to give rise to a violation of the antitrust laws.

Guided by these principles, the Court will now turn to the specific interconnection claims advanced by plaintiffs as hereinbefore set forth. As a threshold matter, the Court must note one fact which in its view casts a grave shadow over all of SPCC's interconnection claims. Although Mr. Biaggini, SPCC's Chairman, knew Mr. deButts, AT & T's Chairman, and other senior Bell System executives on a social, civic, and business basis and saw them frequently, at no time—until the day before this lawsuit was filed in 1978—did he raise with them any of the matters about which SPCC now complains (Biaggini Tr. 3177–78, 3196–99, 3208–09). Mr. deButts testified that he would have attempted to redress any legitimate complaints brought to his attention by Mr. Biaggini (deButts, Tr. 4102–04), and

**184.** Contrary to plaintiffs' position, the Court of Appeals in *Phonetele* did not establish a "least restrictive alternative" test as the standard under the Sherman Act. Indeed, on reconsideration, the Ninth Circuit made it clear that an anticompetitive tariff could be justified on a showing that it was "a reasonable, properly focused mechanism, considering other alternatives then available" (Order of March 15, 1982). In this respect, *Phonetele* is fully consistent with the decision of the Court of Appeals for this Circuit in *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 40 n. 67 (D.C.Cir.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977), holding that the imposition of a least restrictive alternative standard on conduct regulated under the public interest standard of the Communications Act would be inconsistent with the purpose and structure of the regulatory scheme established in the Communications Act. See also *American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1248–49 (3d Cir.1975) ("in a rule of reason case, the test is not whether the defendant employed the least restrictive alternative"); *Transamerica Computer Co. v. IBM Corp.,* 481 F.Supp. 965,

1022 (N.D.Cal.1979) ("it is the choice of an unreasonable alternative, not the failure to choose the least restrictive alternative, that leads to liability"); *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 58 n. 29, 97 S.Ct. 2549, 2561 n. 29, 53 L.Ed.2d 568 (1977) (location restriction upheld under the rule of reason even though it "was neither the least nor the most restrictive provision that it could have used"); *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 303 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980) (pointing out that a least restrictive alternative rule would encourage lawyers merely to conjure up less restrictive alternatives after the fact in order to second-guess proper business judgments); *Newberry v. Washington Post Co.,* 438 F.Supp. 470, 475 (D.D.C.1977) (holding that defendant need not show that the approach chosen was the "least restrictive alternative" in a rule of reason case); *Consolidated Farmers Mutual Ins. Co. v. Anchor Savings Ass'n,* 480 F.Supp. 640, 653 (D.Kan.1979) ("so long as the defendants' actions are reasonable, they need not constitute the 'least restrictive alternative' available.").

there is absolutely no reason for this Court to find that he would not have done so. Moreover, this Court's own experience, confirmed by the testimony of Mr. Smith, a senior General Electric executive (Smith, Tr. 4818),[185] is that Mr. Biaggini would have complained to Mr. deButts if he believed at the time that AT & T was engaging in unlawful misconduct harmful to SPCC. In any event, the Court has concluded, as discussed below, that SPCC's evidence does not support any of its interconnection charges.

## DENIAL OF ACCESS TO INTERCITY FACILITIES

In addressing plaintiffs' claims concerning denial of access to AT & T's intercity facilities, it is important to note at the outset that two matters which are involved in plaintiffs' other interconnection claims are not involved in this particular claim. First, as the Court pointed out above, plaintiffs have conceded that AT & T's intercity facilities do not constitute "essential facilities" under the *Hecht* doctrine. Second, this claim does not involve any disputes concerning the requirements of the 1971 *Specialized Common Carriers* decision. Although that decision, as discussed elsewhere, is ambiguous in a number of respects, it clearly did not impose any obligation upon AT & T to lease intercity facilities to, or piece-out services with, the specialized common carriers. The interconnection obligation imposed in that decision was limited to local distribution facilities and the Court does not understand SPCC to assert that facilities between cities constitute "local" facilities.

Plaintiffs' theory on intercity facility leasing is limited to the early years of operation, 1974 and 1975, when their own intercity microwave facilities connected only a few cities. During that period, plaintiffs contend that they could serve the communications needs of customers with locations not on SPCC routes only if SPCC could access the intercity facilities of AT & T. The nature of plaintiffs' contention is illustrated by the hypothetical example discussed by Mr. Vasilakos, SPCC's Executive Vice President, which involved a customer with a communications requirement for private line service between a location in Los Angeles and a location in New Orleans (Vasilakos, PX6–0006 at 10). SPCC asserts that although it could not provide the complete private line service over its own intercity facilities in 1974 or 1975, it could have provided a portion of that service if (1) AT & T had been willing to lease intercity facilities to SPCC (between Houston and New Orleans in the hypothetical) which would have enabled SPCC to have provided the entire service, partially over its own facilities and partially over leased AT & T intercity facilities, or (2) if AT & T had been willing to "piece-out" the service, with AT & T providing the piece between New Orleans and Houston and SPCC providing the piece between Los Angeles and Houston (*id.* at 10–11).[186]

---

**185.** The Court finds Mr. Smith's testimony of particular importance not only of how reasonable businessmen conduct business but also the reasonableness in all of plaintiffs' claims of AT & T. Mr. Smith was asked the following question by SPCC (by Mr. Labovitz) to which he responded (Tr. 4818):

Q. Was one of the major reasons that General Electric abandoned the private microwave plan that it had trouble with AT & T trying to get interconnections?

A. Certainly not. We were carrying on— our operating people were carrying on extensive negotiations with AT & T, and as in any negotiations like that you have many gives and takes and up the hill, down the hill, around the hill. If at any point we thought that we were not getting a fair shake out of AT & T or that we had policy questions, we would have gone to John deButts or other top executives of AT & T. That is the way business is done, and I would have had no hesitancy in doing that.

The Court also notes that Mr. Smith's testimony carries substantial weight as he was negotiating on behalf of one of the top three telecommunications users in the country.

**186.** The parties seem to agree that the distinction between leasing of intercity facilities and the piecing-out of an intercity service is more than semantics. As the Court understands it, the leasing concept preserves the ability of the carrier providing the service to provide that service on an end-to-end basis. In other words, the customer is provided the entire service by a single carrier, even though that carrier utilizes not only its own transmission facilities but also

According to Mr. Vasilakos, AT & T "absolutely refused to lease SPCC any intercity facilities at any price" and this refusal damaged SPCC because "[t]here were many customers that we would have been able to serve had AT & T leased SPCC intercity facilities" (Vasilakos, PX6–0006 at 10). Similarly with respect to piece-out, Mr. Vasilakos testified that "AT & T's private line tariff contained a restriction, which precluded the direct interconnection of an SPCC circuit with that of an AT & T circuit" unless the interconnection were made by switching equipment at the customer's "premises in that intermediate city" (*id.* at 11).

AT & T denies that it absolutely refused to lease intercity facilities to SPCC, pointing out that it filed tariffs in May 1974 offering such facilities to all the specialized carriers (S–3000B; S–3002; Hollis Tr. 2302–03; Kelley, S–T–59 at 10), but asserts that it had no regulatory nor antitrust obligation to do so and that its conduct was reasonable. AT & T agrees that the customer premises provision of its tariffs was designed to permit interconnection only at legitimate customer premises and to prevent piece-out, but asserts that this tariff provision was reasonable, consistent with regulatory policies, and not violative of the antitrust laws. AT & T also asserts that SPCC has failed to prove any injury as a result of AT & T's conduct with respect to piece-out or intercity facility leasing and this Court agrees with the defendants here as well.

As pointed out above, the Court has carefully examined the evidence of record under the assumption that the legal standard advocated by SPCC is correct.[187] The Court has concluded, even on that assumption, that the evidence discloses no antitrust violation by AT & T with respect to intercity facility leasing and/or piecing-out of intercity circuits.

## PIECE–OUT

■ The Court finds that the most glaring failure of plaintiffs' proof on the piece-out claim is the absence of any credible evidence that plaintiffs suffered any injury. The critical assumptions underlying plaintiffs' claim are (1) that customers would have ordered pieced-out circuits if AT & T's tariffs had permitted piece-out; and (2) that SPCC had sufficient excess capacity in its own transmission facilities in 1974–1975 to serve this piece-out demand. Each of these assumptions is flatly contradicted by the evidence of record.

Plaintiffs presented no direct evidence that customers wanted piece-out. Indeed, Mr. Vasilakos could identify only one actual customer affected by AT & T's piece-out tariffs (Vasilakos, Tr. 902) and Mr. Grant, SPCC's President, could identify only one piece-out circuit in operation today, six years after the FCC decision eliminating the customer premises provision from AT & T's tariffs (Grant, Tr. 751; see PX4–0755).

leased transmission facilities in the provision of that service, and the customer pays the tariff rate of the serving carrier only (Vasilakos, PX6–0006 at 10). On the other hand, the "piece-out" concept involves two carriers each providing a portion of single end-to-end service with neither carrier having responsibility for the entire service. In this situation the customer pays the tariff rate of each carrier (*id.* at 11).

187. As noted above, the Court does not believe the antitrust laws required AT & T to assist SPCC by sharing non-essential facilities SPCC could have provided for itself. The Court must also reject plaintiffs' alternative legal theory that defendants' piece-out tariff involved an unlawful tie-in under the antitrust laws. A tying arrangement can arise only where the "tying" and "tied" items are in fact two separate products or services. *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 613–14, 73 S.Ct. 872, 883, 97 L.Ed. 1277 (1953); *Foster v. Maryland State Savings & Loan Ass'n,* 590 F.2d 928, 931 (D.C.Cir.1978), *cert. denied,* 439 U.S. 1071, 99 S.Ct. 842, 59 L.Ed.2d 37 (1979); *United States v. Jerrold Electronics Corp.,* 187 F.Supp. 545, 559 (E.D.Pa.1960), *aff'd per curiam,* 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1971). By its terms, the tariff restriction on piece-outs did not apply where the customer had a genuine desire for private line service along two separate routes; it applied only where the customer attempted to divide a single through service over one route (Tr. 48–49). Consequently, the Court finds that defendants' piece-out tariff cannot be properly characterized as a tying arrangement.

The record discloses two obvious reasons why piece-out is such an unusual phenomenon. First, by definition, a pieced-out circuit involves a situation where service responsibility is fragmented between two competitors. It is obvious to the Court that such a situation in the telecommunications industry necessarily will involve a decrease in service quality and an increase in technical and operational problems, and these facts were confirmed by witnesses for both plaintiffs and defendants. SPCC's own technicians were opposed to piece-out because it was technically difficult to accomplish (Grant, Tr. 751); and SPCC's customers were not seriously interested in pieced-out circuits because most customers wanted a single carrier to be responsible for end-to-end service (Grant, Tr. 750). Moreover, defendants presented convincing evidence that fragmentation of service responsibility between two or more carriers necessarily will give rise to technical and operational difficulties resulting in service quality deficiencies (Enticknap, Tr. 3972; S–T–155 at 5–6; Hough, S–T–1 at 93–94). Mr. Enticknap pointed out that problems existed even where goodwill existed wherein he testified (S–T–155 at 7–8):

"In my own experience I have found that even where goodwill existed between all concerned, i.e., the United States Military and the Bell System, it was often difficult to insure continuous high grade service. In fact, in certain very critical circuits, the problem was best solved by leasing end-to-end service. This not only facilitated the establishment of the circuit at the required performance level, but also insured on-going monitoring and routine maintenance at mutually agreed intervals.

In view of the foregoing considerations, I believe that the approach adopted by AT & T in the early 1970's with respect to interconnection with the specialized common carriers was completely consistent with sound communications system practice and was designed to insure the integrity of the telephone network. After all, SPCC and the other specialized common carriers had very little experience in the provision of telephone service to the public. As such there was a legitimate concern that if proper precautions were not taken the public switched network could be harmed. This was especially true in the case of FX and CCSA interconnection. It should also be noted that the specialized common carriers were approaching the Bell System as competitors not partners, like the independent telephone companies. In this situation, finger-pointing and accusations were even more likely to occur.

Finally, it is difficult for me to understand how SPCC intended to satisfy its customers' needs for high quality data transmission if they were going to piece out their network. In this situation, SPCC would not have had the ability to test and monitor all components of the facilities they intended to offer their customers."

An even more glaring weakness in the plaintiff's claim is that SPCC recognized as late as November 18, 1976, that piece-out was not technically desirable because it presented "operational nightmares and, God knows, we don't want to create any additional problems for operations" and therefore refrained from accepting any more orders (S–4654c). This viewpoint was shared by others in the industry, including Bernard Overeynder, former manager of GE's private microwave project. In *United States v. AT & T,* Mr. Overeynder testified as follows regarding the "customer premises" provision of the piece-out tariffs:

"We did not feel it was unreasonable, the fact that AT & T would require it. We were responsive to AT & T's concern that if it were not on the customer premises, where there was a normal requirement for communications, certain customers could ask the telephone company to provide leased lines across the Rocky Mountains where the customer would bring his microwave systems to the foot of the mountain and at the other end pick it up at the foot of the mountain. That would clearly be an unreasonable situation. I think AT & T's demand that the connec-

tion be made at the customer premises would prevent such unusual situations." (S–6021 at 3–4).

Second, SPCC presented no evidence that it could have economically engaged in piece-out. The only evidence on the possibility of piece-out was presented by Dr. Berner, an "expert" economist who prepared plaintiffs' piece-out damage study. Dr. Berner admitted, however, that he had made no study to determine the effect, if any, of AT & T's piece-out tariff on SPCC in the real world (Berner, Tr. 5883–84, 2899). Dr. Berner merely presented a study that purported to show that in a hypothetical world, under hypothetical conditions, SPCC might have been able to obtain some additional business with piece-out. As originally presented, Dr. Berner's study was predicated on an assumption that AT & T's June 1981 MPL tariff rates—which SPCC concedes are lawful—are "not distance sensitive" (Berner, Tr. 2933), when in fact those rates are distance sensitive with the rate per mile declining with distance (id.). This assumption permitted Dr. Berner to conclude, using Mr. Vasilakos's Los Angeles-Houston-New Orleans hypothetical, that a customer would want piece-out because a customer's total cost with a piece-out arrangement would be approximately 10 percent less than if Bell provided the entire service (S–5D; Berner, Tr. 2932). In fact, however, using the actual MPL rates, the customer's total cost for the piece-out would be higher, not lower, than if Bell provided the entire service (S–5E; Berner, Tr. 2893–97).

On rebuttal, Dr. Berner presented a revised study to take into account the distance sensitive rates. This revised study purported to show that SPCC could have obtained an additional $1.28 million in gross revenues through piece-out. Aside from the fact that the study still had no relationship with the real world (Berner, Tr. 5883–84), the Court finds Dr. Berner's hypothetical to be based upon assumptions that conflict with the admitted facts. First, even under all of his assumptions, the total net revenues SPCC could have obtained from piece-out was about $300,000 (Lim, Tr. 5904). Given the defects the Court finds in the plaintiffs' "but-for" damage model, that amount is speculative at best.[188] Secondly, Dr. Berner's calculations are predicated on two assumptions that conflict with plaintiffs' own testimony. Dr. Berner assumes in his calculations that a customer would be willing to piece-out a circuit and deal with two carriers whenever he has minimum savings (Berner, Tr. 5887). That assumption is inconsistent with the fact that customers prefer to have one carrier responsible for their service on an end-to-end basis (Grant, Tr. 750). Dr. Berner also assumes that SPCC could provide a pieced-out circuit at the same cost that it could provide a circuit on an end-to-end basis (Berner, Tr. 5888). That assumption conflicts with the admitted fact that piece-out is technically difficult to accomplish (Grant, Tr. 751). Given these flawed assumptions, the Court finds SPCC has failed to establish any injury in fact from AT & T's piece-out tariff.

Plaintiffs' second key assumption—that SPCC had "excess capacity" available for use to serve this piece-out demand—is equally flawed. As SPCC itself has noted, any injury it may have suffered could occur only if it had excess capacity in 1974–1975 on its own network (Plaintiffs' Memorandum in Opposition to Defendants' Motion for Involuntary Dismissal under Rule 41(b) at 178). In fact, however, as the Court details below, there is extensive evidence that SPCC did not have excess capacity during this period (Capacity Problems in the Real SPCC Doc.Sub. at 2–4).[189]

**188.** The absurdity of the but-for damage model is demonstrated by the fact that the $300,000 in revenues that Dr. Berner concludes that SPCC could have obtained in the but-for world became $2.8 million in damages after being run through the damage model (PX5–0364). Neither Dr. Berner nor any other SPCC witness was able to explain this patently absurd result (Berner, Tr. 5886–86; Lim, Tr. 5905–07).

**189.** Ironically, not only does the record show that SPCC generally had more business than it could handle, it shows that as early as August 1974, SPCC had "sold out" its capacity between Phoenix and San Antonio (S–3152) so that it could not have obtained any additional

■ In these circumstances, the evidence, at most, reflects nothing "more than *de minimis* injury"—a showing that is inadequate under the rule of *Berkey Photo, supra*, 603 F.2d at 289. In addition, plaintiffs' claims of injury rest only on the unsupported assertions of Mr. Vasilakos. However, it is well settled that "when the fact of injury is in issue, the 'isolated self-serving statements' of a plaintiff's corporate officers may not provide substantial evidence" to establish that essential element. *H & B Equipment Co., Inc. v. International Harvester Co.*, 577 F.2d 239, 247 (5th Cir.1978).

■ Notwithstanding these fundamental flaws in plaintiffs' piece-out claims, the Court has examined the evidence concerning AT & T's customer premises tariff and has concluded that the tariff had legitimate technical, economic, and regulatory justifications and therefore was lawful even under plaintiffs' legal theory.[190]

With respect to piece-out, the record reflects that in the wake of the 1968 *Carterfone* decision, AT & T filed tariff revisions which permitted the interconnection of a customer's private microwave system with Bell System provided services at any legitimate customer premises (S–1827B; S–1877; Hough, S–T–1 at 80–81; Byers, S–T–133 at 5–6; Darling, S–T–148 at 4–5). These tariff revisions, which the United States Department of Justice characterized as a "substantial liberalization" (S–1871 at 2–3), were designed to permit interconnection whenever the customer had a legitimate communications requirement at the point of interconnection but to prevent pure "piece-out" (S–1827B; Byers, S–T–133 at 5–6; Hough, S–T–1 at 81; Darling, S–T–148 at 4–6). These provisions were accepted by the FCC as being in compliance with the *Carterfone* decision in December 1968 (S–1877) and were thereafter subject, together with other post-*Carterfone* tariff revisions,

revenues from leasing or piece-out in the very Los Angeles-Houston-New Orleans example used by Mr. Vasilakos to illustrate how SPCC could allegedly profit from leasing or piece-out.

**190.** SPCC argues that AT & T's piece-out policy was designed solely to impede competition, and was not premised on technical or economic considerations. In support of this proposition, plaintiffs introduced documents authored by AT & T personnel. The Court is not convinced that the evidence adduced by plaintiffs supports SPCC's allegations—in fact some of plaintiffs' exhibits clearly support the conclusion that AT & T's piece-out policy was premised on legitimate technical and economic considerations. (*See e.g.*, PX4–0076; PX4–0085.) Indeed, a memo from W.E. Albert to Mr. K.D. Howatt on 7–10–72 expressed the valid concerns of AT & T wherein he pointed out (PX 4–0085 at LA1D0161–3):

"We have reviewed the totality of problems in attempting to comply with G.E.'s request for joint carrier-customer provision of a complex, integrated private communications network. From this we conclude that it is not possible to jointly furnish such a network in a manner that will provide proper service without diseconomies and subsidization of GE by the Telephone Company's other customers. These would arise from many intangible areas of joint planning, sharing our know-how, and changing design, maintenance and administrative disciplines to more expensive operations. Extending interconnection of the type requested by GE to other customers, each with different requirements would produce a vast intermingling of ownership and control of elements in the CCSA network, and its connection to the public telecommunications network that would be impossible to administer and maintain so as to provide GE and other similar users acceptable service. Further, the provision of such a complex, interconnected system was not envisioned in the tariff changes made with respect to the interconnection of customer provided terminal equipment and communications systems.

After evaluation of the complexities that developed during the protracted negotiations with GE, it is the Bell System's conclusion that joint carrier-customer provision of CCSA networks should not be undertaken.

The joint provision of such a network by a common carrier and co-supplier, such as GE, would create an environment of direct competition between the two suppliers. GE would be motivated to suboptimize its portion of the integrated private line network. The stated objective of GE to minimize its costs would cause GE to take advantage of the carrier's tariff-cost relationship. *The net result would be detrimental to each, and the general public. The carriers motivation and responsibility always is to optimize the total network to achieve minimum cost of the total facilities and equipment in order to best serve the entire public.*" (Emphasis supplied).

to an extensive regulatory review and scrutiny extending over a several year period (S–1877; S–1883; S–1919; S–2071; S–2076; Hough, S–T–1 at 81–82; Byers, S–T–133 at 6–10; Darling, S–T–148 at 5–7).

In December 1971, after discussions with the FCC staff and with MCI, substantially identical tariff provisions were filed by AT & T which permitted a customer to arrange for the interconnection of a service provided by MCI with Bell System services at a legitimate premises of the customer (S–2267; S–2292; Byers, S–T–133 at 23–24; Hough, S–T–1 at 85–86). These tariff revisions were accepted by the FCC and permitted to go into effect on one day's notice pursuant to a special permission application filed by AT & T (S–2300; S–2303; S–2305; Hough, S–T–1 at 86; Byers, S–T–133 at 24). The same tariff provisions were later amended to become applicable to SPCC and other specialized common carriers (Vasilakos, Tr. 874; PX6–0006 at 11).

 In addition to this evidence, which establishes to the Court's satisfaction that the piece-out tariffs complied with FCC policies in the early 1970s, there is a great deal of additional evidence tending to establish that the FCC and its staff were well aware of the piece-out tariffs and agreed that the objectives of the piece-out tariffs complied with regulatory policies, and that AT & T reasonably relied upon indications that those tariff provisions were consistent with and required by regulatory policy (Byers, S–T–133 at 9–13; Byers U.S.Tr. at 20086, 20089; Hough, S–T–1 at 85–86; deButts, S–T–131 at 57; Darling, S–T–148 at 5–6; S–1883; S–1884; S–1885; S–2044C; S–2048; S–2051B; S–2071; S–2076). As Mr. Byers testified (S–T–133 at 13):

"[T]he fact that the Commission staff never sought on its own initiative to institute such a proceeding (on the validity of piece-out) confirms my own judgement that the staff recognized the validity of the piece-out provisions and their underlying economic justification. That GE never sought to initiate such a proceeding indicates to me that it too, recognized the validity of the carriers' need to protect against piece-out, a proposition that Mr. Overeynder of GE has supported in his testimony in this case."

The Court finds particularly significant, in this regard, an informal complaint filed by one of MCI's customers, Scientific Time Sharing Corp., in late 1972. That informal complaint, which was apparently normal FCC practice, was sent by the FCC staff to AT & T for response (Darling, S–T–148 at 12). In its response dated March 30, 1973, AT & T advised the FCC that "it is clear that MCI's objective is to force the Bell Companies to 'piece-out' MCI's facilities and to join MCI in providing through service" and that "[s]uch an arrangement is not permitted under Bell System tariffs, nor is it covered by any contractual arrangement between MCI and the Bell Companies" (S–2600). AT & T went on to point out its understanding of FCC policies in this regard (id.):

"[W]e do not understand that any of the Commission's decisions with regard to the so-called Specialized Common Carriers have contemplated that the Bell System must augment any competing carrier's system by means of the Bell System's intercity network, or conversely that any other carrier can, by picking and choosing where it wishes to operate, piece out, fragment or otherwise participate in the provision of Bell System services. In none of the proceedings regarding the Specialized Common Carriers was this issue considered. This type of through service, whether jointly provided or provided under some other form of combined rates, would have undesirable effects on both the quality and cost of service to the public which we do not believe the Commission has contemplated or authorized."

AT & T's straight-forward explanation of its understanding of regulatory policies with respect to interconnection, as quoted above, was never contradicted by the FCC or the FCC staff (Byers, S–T–133 at 35–37; Byers, U.S.Tr. at 20137). Indeed, there is evidence that the FCC staff concurred in defendants' understanding during this time frame (Darling, S–T–148 at 12).

As the Court has already observed with respect to other of plaintiffs' interconnection claims, the customer premises tariff was never challenged by SPCC before the FCC. However, in 1976, the FCC ruled that the customer premises provision was unlawful under the Communications Act (PX4–0755). Mr. Darling, an FCC staff member who had been familiar with the post-*Carterfone* tariffs throughout this period, testified that in his view the 1976 decision was "a major change in Commission policy" (Darling, S–T–148 at 8). Based upon the foregoing history of FCC review of, and acquiescence in, these post-*Carterfone* tariff provisions, it is clear to the Court that AT & T acted reasonably in adopting and adhering to these tariffs and could not reasonably have anticipated the FCC's 1976 decision. Even were that not the case, however, for the reasons discussed below in connection with the Court's broader consideration of the regulatory decisions relied upon by plaintiffs, that decision would be entitled to little weight and the Court has so treated it.

Beyond this regulatory setting, the Court finds that there were valid unresolved public interest considerations—principally involving economic and technical considerations—that lie behind defendants' piece-out tariffs during this period. According to defendants' witnesses, the economic justification for the tariff flowed from the fact that if SPCC and the other specialized common carriers had been permitted to piece-out intercity circuits at will, this necessarily would have substantially increased their ability to cream-skim AT & T's nationwide averaged private line rate structure prior to the time AT & T was able to de-average its private line rates with the Hi/Lo tariff (Cook, S–T–57 at 10–11; Hough, S–T–1 at 47–49; deButts, S–T–131 at 69–70). The question of cream-skimming obviously presents public interest questions which were addressed by the FCC in its 1971 *Specialized Common Carriers* decision only with respect to the question of entry along particular routes. However, as the Court reads that decision, the incremental cream-skimming resulting from unlimited piece-out was not addressed by the FCC, and consequently presented an unresolved public interest issue. Indeed, even General Electric, which sought to piece-out the Bell System provided CCSA network, believed the customer premises tariff requirement was "not an unreasonable requirement" and that demands for unlimited piece-out were "unreasonable" (S–6021). The technical justification has been mentioned earlier—pieced-out circuits are technically inferior and give rise to increased operational and maintenance problems.

In the Court's view, these unresolved technical and economic factors are two of the numerous factors underlying the traditional regulatory policy that regulated common carriers are to provide and be responsible for service on an end-to-end basis. This policy was not changed by the 1968 *Carterfone* decision, as is evidenced by the fact that the Commission subsequently made it clear that the *Carterfone* decision dealt with connections to and not replacements of any portion of telecommunications services traditionally provided by the common carriers (Hough, S–T–1 at 80; Byers, U.S.Tr. at 20075; S–1851; S–1877; S–1919; S–2406) and that the post-*Carterfone* tariff revisions were "not in conflict" with the *Carterfone* decision (S–1877; S–1919). The Commission forcefully reiterated this point in 1972—after the *Specialized Common Carriers* decision—and made it clear that an approach resulting in a carrier providing "only a portion" of a tariffed end-to-end service "would constitute a basic and substantial change" in regulatory policy (S–2406).

Moreover, the Commission's policy that competitive carriers generally should provide and be responsible for service on an end-to-end basis was also reiterated in its 1972 *Domestic Satellite* decision—"carriers should own, to the extent practicable, the facilities used to provide end-to-end services to their customers" (S–2359 at 66; S–2405 at 856) and in its 1973 decision authorizing AT & T's satellite application—"carriers . . . should be responsible for providing end-to-end service to their customers" (S–2720 at 658).

Against this background, the Court finds that AT & T's piece-out interconnection tariffs were consistent with FCC regulatory policy in the early 1970s and that AT & T reasonably relied upon indications that those tariffs did comply with regulatory policy. Consequently, the Court concludes that AT & T's conduct in refusing voluntarily to enter into piece-out interconnection arrangements with the specialized common carriers until and unless the FCC resolved the public interest questions presented by such arrangements was reasonable and cannot form the basis of an antitrust violation.

## INTERCITY FACILITY LEASING

The fundamental problem with plaintiffs' claim that AT & T refused to lease intercity facilities to SPCC is that it is factually wrong. Although SPCC's principal witness on this matter, Mr. Vasilakos, testified that AT & T did not begin to lease intercity facilities to SPCC until mid-1975 as a result of the agreement in Docket No. 20099 (Vasilakos, PX6–0006 at 11), the record is to the contrary. In February 1973, AT & T advised the FCC and the specialized carriers, including SPCC, that it would lease intercity facilities to the specialized carriers when the Hi/Lo tariff went into effect (S–2566; S–2568; S–2570; Cook, S–T–57 at 10–11). In fact, on May 3, 1974, sometime before the Hi/Lo tariff went into effect, AT & T and the Bell System operating companies filed tariff revisions with the FCC which provided for the lease of intercity facilities to the specialized common carriers (S–3000B; S–3002; Hollis, Tr. 2302–03; Kelley, S–T–59 at 10). Under those tariff provisions, and again with reference to SPCC's hypothetical described above, AT & T would have leased an intercity facility to SPCC between SPCC's technical operating center in Houston and SPCC's technical operating center in New Orleans and then would have provided a local distribution facility from the New Orleans technical operating center to the customer premises in that city (S–3000B).

Although Mr. Vasilakos seemed totally unaware of the May 3, 1974 tariffs (Vasila-

kos, Tr. 901–04), plaintiffs' position appears to be that the requirement that it have a technical operating center in the distant city itself was unreasonable. SPCC, however, has presented no evidence why this concept was unreasonable and no reason occurs to the Court why a carrier proposing to offer services to customers in a city should not have an operating center in that city. In any event, this matter was addressed in the Docket No. 20099 discussions and AT & T agreed in November 1974 to revise its tariffs to permit, in effect, a lease of an intercity facility directly from an SPCC operating center in one city to a customer premises in another city (S–3277). Consequently, SPCC had an ability to lease intercity facilities without restrictions before the end of 1974.

The Court concludes that AT & T's conduct with respect to intercity facility leasing was reasonable. AT & T voluntarily announced that it would provide intercity facilities under lease arrangements—thereby preserving the end-to-end service responsibility concept—as soon as the Hi/Lo tariff went into effect; AT & T actually permitted intercity facility leasing in May 1974 even before the Hi/Lo tariff went into effect and voluntarily further revised the May 1974 tariffs later that year in response to requests by the other carriers in the Docket No. 20099 negotiations. Given the economic factors discussed above, the Court concludes that AT & T's conduct was eminently reasonable and in no sense in violation of the Sherman Act. In any event, for the same reasons as discussed in connection with piece-out, the Court finds that SPCC failed to establish any injury in fact from AT & T's intercity leasing conduct.

## DENIALS OF FX AND CCSA INTERCONNECTION

### INTERSTATE FX AND CCSA

Plaintiffs contend that the Commission's 1971 decision in the *Specialized Common Carriers* proceeding (Docket No. 18920) au-

thorized the new entrants to provide FX [191] and CCSA [192] services, that AT & T either knew or should have known that the new carriers were so authorized and that AT & T was obligated to provide them with FX and CCSA interconnections under that decision, and that AT & T unlawfully denied SPCC interconnections to enable it to participate in the provision of interstate FX and CCSA services until the FCC's April 1974 decision in Docket No. 19896. Thus, plaintiffs assert that the FCC authorized the specialized carriers to provide "private line services," that FX and CCSA are "private line services," and that AT & T knew or should have known that this was the scope of the carriers' authorizations. Plaintiffs also assert that AT & T's refusal to provide FX and CCSA interconnections violated the antitrust laws and caused it injury.

■ The Court has carefully reviewed the evidence of record relating to this charge and has concluded that plaintiffs have failed to establish that defendants acted unreasonably or that the antitrust laws have been violated. The Court notes that

in pretrial motion of AT & T to exclude FX and CCSA claims from the case pretrial, the Court denied AT & T's motion on May 21, 1982, but was careful to point out that a "dark shadow was cast on the validity of these claims" based on the testimony to date. The Court left open the opportunity for plaintiffs to further explicate their position. For the reasons stated herein, the Court finds that the plaintiffs have failed to articulate a violation of the antitrust laws with respect to FX and CCSA. Moreover, for the reasons set forth below, the Court finds that the 1971 *Specialized Common Carriers* decision did not obligate AT & T to provide FX or CCSA interconnections, that that decision was reasonably interpreted by AT & T as not authorizing SPCC or the other specialized carriers to provide FX or CCSA services and as not obligating AT & T to provide FX or CCSA interconnections to those new carriers, that AT & T acted reasonably in refusing voluntarily to provide FX or CCSA interconnections until the FCC's April 1974 decision in Docket No. 19896, and that SPCC suffered no injury from AT & T's conduct.

**191.** FX (foreign exchange) is a telephone exchange service furnished to a customer through a central office of an exchange other than the exchange in which the customer is located. (AT & T Telecommunications Glossary March, 1982 at 30). This service gives a telephone user in one locality the equivalent of a local telephone in a second distant city. (Grant, PX6–0004 at 5–6; and Attachment 2, Grant, Tr. 637). This is accomplished by extending a private line dedicated solely to the user from its premises in City A, called the closed end, to the telephone company local office in the distant City B, called the open end. (Grant, PX6–0004 at 5–6 and Attachment 2; Grant, Tr. 637). When the customer picks up his telephone receiver in City A, the dial tone he receives comes from the City B local telephone office. (Grant, PX6–0004 at 5–6 and Attachment 2; Grant Tr. 637). The customer can then dial as a local call any number in the City B local telephone company area. (Grant, PX6–0004 at 5–6 and Attachment 2; Grant, Tr. 637). Conversely, any person in City B can reach the customer in City A by dialing a local number in City B. (Grant, PX6–0004 at 5–6 and Attachment 2; Grant, Tr. 637).

**192.** CCSA (common control switching arrangements) is a service provided by established telephone common carriers which furnishes an intercity private line switching network for a

customer; CCSA service is provided for the exclusive use of the customer, or a customer and the customer's authorized users. However, the switches used to provide CCSA service may be used to serve more than one customer. (AT & T Telecommunications Glossary, March, 1982 at 10). This service gives a large company the equivalent of a complete private or dedicated telephone system. (Grant, PX6–0004 at 6–8 and Attachment 3; Grant, Tr. 637). In a CCSA configuration, a customer leases several switches or portions of switches throughout the country from the partnership of AT & T Long Lines, the BOC's and the independents. (Grant, PX6–0004 at 6–8 and Attachment 3; Grant, Tr. 637). These switches are connected to long-haul lines known as intermachine trunks (Grant, PX6–0004 at 608 and Attachment 3; Grant, Tr. 637) Both the intermachine trunks and the access lines are dedicated, private lines. (Grant, PX6–0004 at 6–8 and Attachment 3; Grant, Tr. 637). Specialized common carriers such as SPCC provide both intermachine trunks and access lines, but cannot provide either FX or CCSA service without obtaining local distribution facilities from the BOC's and the independents or through the use of by-pass equipment. (Grant, PX6–0004 at 6–7 and Attachment 3; Grant, Tr. 637).

SPCC's argument that FX and CCSA services are private line services and that the 1971 FCC decision authorized the specialized carriers to provide all private line services essentially rests on the testimony of Thormund Miller (PX6–0002), General Commerce Counsel for Southern Pacific, and subsequent decisions of the FCC and the Courts of Appeal for the Third Circuit and the District of Columbia Circuit (Plaintiffs' Memorandum in Opposition to Defendants' Motion for Involuntary Dismissal Under Rule 41(b) at 132–37). The Court will first address the arguments based on subsequent regulatory and judicial decisions.

Plaintiffs assert that the April 1974 decision of the Commission in Docket No. 19896, as affirmed by the Court of Appeals for the Third Circuit,[193] and the 1977 *Execunet I* decision of the Court of Appeals for this Circuit [194] prove that SPCC was authorized to provide FX and CCSA services and that AT & T knew that SPCC was authorized to provide such services. In the Court's view, these decisions are not dispositive of either of the propositions advanced by SPCC.[195]

 The Court finds the *Execunet I* decision to be inapposite for two simple reasons. First, whether SPCC was autho-rized to provide FX and CCSA cannot be determined by retroactively applying that 1977 decision to a controversy which took place between 1971–1974. The *Execunet I* decision reversed a clearly defined policy of the FCC, and it did so on a ground that could not conceivably have been and was not anticipated by the parties—that is, the inadequacy of the hearing in the *Specialized Common Carriers* proceeding.[196] Second, the holding of the *Execunet I* decision is fully served by prospective application, and, as a matter of equity, retroactive application would serve no legitimate purpose. In light of the foregoing, the Court believes that the standards requiring application of the non-retroactivity principle as set forth· by the Supreme Court in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), are satisfied.[197] Moreover, the *Execunet I* decision is of no evidentiary significance on the issue of what AT & T knew or should have known in 1971–1974.

 Likewise, the Court finds that the Commission's decision in Docket No. 19896 and its subsequent affirmance by the Third Circuit are not dispositive of plaintiffs' charge. The FCC's decision on its face recognized the "possible uncertainty as to the scope of our prior orders" (46 F.C.C.2d at

---

**193.** *Bell System Tariff Offerings of Local Distribution Facilities for Use by Other Common Carriers* (Docket No. 19896), 46 F.C.C.2d 413 (1974), aff'd sub nom. *Bell Tel. Co. of Pa. v. FCC,* 503 F.2d 1250 (3d Cir.), *cert. denied,* 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975).

**194.** *MCI Telecommunications Corp. v. FCC,* 561 F.2d 365 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 780, 54 L.Ed.2d 790 (1978).

**195.** The Court is of the opinion that the question of whether the *Specialized Common Carriers* decision did or did not authorize the new carriers to provide FX and CCSA is a question of law. This does not mean, however, that if, contrary to this Court's conclusion, the decisions referred to above do resolve· the question as a matter of law, that AT & T's conduct violated the antitrust laws. As the Court discusses below, even if the *Specialized Common Carriers* decision did authorize the new carriers to provide FX and CCSA services, AT & T's conduct was reasonable under the circumstances and thus fully meets the Rule of Reason standard.

**196.** See Partoll, S–T–149 at 4–17.

**197.** The Supreme Court has applied the non-retroactivity principle in a variety of situations. See, *e.g., Allen v. State Board of Elections,* 393 U.S. 544, 572, 89 S.Ct. 817, 835, 22 L.Ed.2d 1 (1969); *Cipriano v. City of Houma,* 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969). Thus, in *Cipriano,* the Supreme Court applied the principle that "where a decision of an appellate court could produce substantial inequitable results if applied retroactively then 'injustice and hardship' should be avoided by a holding of non-retroactivity" (395 U.S. at 706, 89 S.Ct. at 1900). Similarly, in *Bendix Corp. v. Balan, Inc.,* 471 F.2d 149, 155–58 (7th Cir.1972), *cert. denied,* 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973), the Seventh Circuit applied the principle to prevent the recovery of antitrust damages during a period prior to the Supreme Court's decision in *Lear, Inc. v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), because the claim involved depended upon the *Lear* decision to overrule a prior precedent that would have barred recovery.

436). Nevertheless, the FCC proceeded to make new public interest findings concerning the scope of the specialized common carriers' authorizations as well as AT & T's interconnection obligations. The Commission's decision, appealed under the Administrative Procedure Act, was affirmed by the Third Circuit (*Bell Telephone Co. of Pennsylvania v. F.C.C.*, 503 F.2d 1250 (3d Cir. 1974)). This decision, however, is also not dispositive, as the Court of Appeals reviewed a rulemaking proceeding to determine whether the FCC abused its discretion by deciding on April 23, 1974 that henceforth the specialized carriers were authorized to provide FX and CCSA, and that AT & T was obligated to provide interconnections for those services.[198]

More relevant to the present inquiry, in the Court's view, is the earlier April 15, 1974 holding of the Third Circuit in *MCI Communications Corp. v. American Tel. & Tel. Co.*, 496 F.2d 214, 224 (3d Cir.1974), that a "legitimate dispute" existed as to whether the specialized carriers were authorized to provide FX and CCSA. The Third Circuit's finding was made in an appeal of a preliminary injunction issued under Section 406 of the Communications Act (47 U.S.C. § 406). Consequently, the finding that "a legitimate dispute" existed was an essential holding underlying the Court's order vacating that injunction.

SPCC's reliance on the testimony of Mr. Miller is similarly misplaced. In the first place, Mr. Miller conceded that SPCC never specifically requested authority from the FCC to provide FX or CCSA service (Miller, Tr. 404–5), and that SPCC did not request authority to connect its private line circuits to Bell System switches during Docket No. 18920 (Miller, Tr. 406)—a connection that would have been necessary for SPCC to provide FX and CCSA service to its customers (Hough, S–T–1 at 86; PX4–0126 at 3; PX4–0307). Moreover, Mr. Miller's cross-examination clearly established that he had only the vaguest notion then or now of what FX and CCSA services are or how they work (Miller, Tr. 406–15)—a deficiency that not only negatively impacts on the weight to be accorded his testimony but also explains his failure to come to grips with several facts which in the Court's view are particularly significant.

One problem with Mr. Miller's testimony and plaintiffs' position is that they proceed on the simplistic notion that private line services are all the same. This simply is not the case. The FCC's definitions of the terms "point-to-point private line service," "FX" service, and "CCSA service," which are consistent with usage by the parties here, make it clear that, whether or not the phrase "private line" correctly describes all three services,[199] FX and CCSA are "switched" services.[200] In each case the

198. The Commission's proceeding in Docket No. 19896 was not an evidentiary proceeding. In light of this fact and for reasons discussed elsewhere, the Court has given very little weight to this decision. The Third Circuit's subsequent affirmance has no independent evidentiary significance particularly given the limited scope of that Court's review.

199. Whether FX and CCSA are "private line" services is not truly relevant because, as the Court discusses below, the key question is what services were proposed. However, the Court is satisfied that FX is not a true private line service and cannot be obtained under AT & T's interstate private line tariff (Byers, S–T–133 at 27). FX is a "hybrid" service requiring a "foreign exchange channel," *i.e.*, an intercity dedicated channel serving the same purpose as an extension cord, which is provided under AT & T's interstate private line tariff and which is then connected to local exchange service pro-

vided under the local tariffs of the local operating company to form FX service (Byers S–T–133 at 27; Byers, S–T–133, U.S. Tr. at 20214; PX4–0735).

200. In its 1976 *Execunet* decision (*In re MCI Telecommunications Corp.*, 60 F.C.C.2d 25, 43 (1976)) the FCC defined these terms as follows:

"*Point-to-point private line* service is a term which denotes a *dedicated* or private local channel at each end, connecting the customer's premises to the carrier's local central office, and an interexchange channel (IXC) which connects the central offices. At the customer's premises, the local channel is connected with a telephone, private branch exchange (PBX), teletypewriter or other terminal equipment. The local channel at each end is dedicated solely to the private line service."

"*Foreign Exchange (FX) service* includes a dedicated local channel, as with point-to-

switching is done by telephone company switching machines which also are used in the provision of regular exchange and long distance service (Hough, S–T–1 at 90; S–2813; S–2885; S–2909; S–2936D; Fraser, S–T–150 at 8–9). Mr. Miller's testimony also ignores the fact that FX and CCSA are services which routinely had been available from the existing carriers for years before the *Specialized Common Carriers* decision (Ashley, S–T–132 at 18–20), a fact that is of particular significance in analyzing what services were and were not authorized by that decision.

As the starting point for its analysis, the Court has examined in detail both the 1971 *Specialized Common Carriers* decision (29 F.C.C.2d 870–983) and the 1970 Notice of Inquiry which initiated the proceedings in Docket No. 18920 (24 F.C.C.2d 318–354). Based on its examination of these materials, as well as its examination of many of the submissions of the participants, the Court has concluded that the *Specialized Common Carriers* decision did not authorize the new carriers to provide FX and CCSA services.

Docket No. 18920 was established by the FCC as a general rulemaking proceeding to deal with policy questions arising from "a large number of applications . . . to provide specialized common carrier services" (24 F.C.C.2d at 318) which had been filed in the wake of the 1969 "*MCI* decision [where] the Commission granted applications of MCI to provide specialized interstate common carrier services between Chicago and St. Louis" (*id.* at 329). As noted above, the 1969 *MCI* decision did not authorize MCI to provide FX or CCSA services (Strassburg, S–T–171, U.S.Tr. at 23354). This fact, taken with the portions of the Notice of Inquiry just quot-

ed, strongly supports the conclusion that the Commission did not view any of the applications, including SPCC's, as proposing FX or CCSA services at the time it initiated Docket No. 18920.

The Notice of Inquiry formulated five broad policy questions, the first and most fundamental of which was "whether as a general policy the public interest would be served by permitting the entry of new carriers in the specialized communications field" (24 F.C.C.2d at 327). Although the term "specialized communications" was not precisely defined, the terms FX and CCSA do not appear even once in the thirty-six page Notice and the Court finds a number of references which strongly suggest those services were not encompassed within that term. For example, the Notice points out that MCI stressed the " 'distinct difference between a public telephone service which is a natural monopoly and a customized communications service offered on a private point-to-point basis' " (*id.* at 324); that the "applicants all propose to provide specialized private line services, . . . low cost, flexible services which are needed and not now provided in the same manner by existing carriers" (*id.* at 324–25); that "the special service markets are quite different from the standard toll telephone service" (*id.* at 330); that "the principal attraction for the new applicants here is not the cream of the existing markets, but rather special service markets that have not been developed" (*id.* at 333); and that "the proposed services are designed to meet demands not being satisfied by the current services of the established carriers" (*id.* at 337).

The Commission's decision, which answered the policy question on entry formulated

point private line, at one end of the service (commonly referred to as the closed end), connected at the carrier's central office with an IXC which terminates in a central office in a distant local exchange (the open end). The customer at the closed end has non-toll access into the local exchange served by that distant central office. A telephone number of the distant local exchange is assigned to the FX service so that the FX customer may be accessed in the same manner as if he were situated within that local exchange."

"*Common Control Switching Arrangement (CCSA) service* consists of a network of private lines, subscribed to by the customer, which are accessed through switches, located at the carrier's central office, via dedicated local lines. These lines terminate on the customer's premises in connections similar to those provided in connection with point-to-point private line service."

in the Notice in the affirmative, similarly does not use the term FX or CCSA on a single occasion. And, as in the Notice, there are a number of references throughout the Commission's discussion that confirm that FX and CCSA services were not considered by the FCC as encompassed within the term "specialized communications." For example, as does the Notice, the FCC's decision stressed that "the applicants are seeking primarily to serve a potential specialized market which is largely yet to be developed" (29 F.C.C.2d at 892), and that the existing carriers' concerns about revenue diversion and creamskimming were not well taken because, *inter alia* "[Western Union's] largest systems are switched systems ... with which the MCI type carriers would not compete" (*id.*). Indeed, the FCC agreed with the existing carriers that the impact of entry on those carriers was a "relevant factor" in assessing the public interest, but concluded that there was "no reason to anticipate that new entry in the specialized field would result in any substantial diversion of AT & T's revenues" because, *inter alia,* the "proposed services of the applicants are designed to meet needs not adequately met by the established carriers in the past" (*id.* at 912–13).

The Court is convinced from its examination of the Notice and the *Specialized Common Carriers* decision that the proceedings did not encompass the issue of whether the public interest would be served by the introduction of competition in the provision of services directly connecting to the public switched network such as FX and CCSA. In addition to the factors mentioned above, the Court is particularly struck by the absence of a single sentence anywhere in the lengthy discussion dealing with the potential impact on service quality if a multiplicity of competing carriers were permitted to directly interconnect with AT & T's central office switching machines. In view of the

testimony of Mr. Hough (S–T–1), the senior Bell System executive responsible for the operation of the public switched network for more than fifteen years—testimony which stressed the extreme complexity and fragility of what is conceded to be the finest telephone system in the world—the Court finds it inconceivable that the Commission was considering any such thing.

The Court recognizes, however, that the question of what services were authorized in the *Specialized Common Carriers* proceeding ultimately involves an interpretation of paragraph 103 of the decision,[201] for that is where the Commission's ultimate conclusion is articulated. Unfortunately, there as elsewhere the decision lacks clarity because that conclusion is articulated in terms of the services "proposed" by the applicants and nowhere is there a simple declaration clearly defining the "proposed services." However, the Court's review of the evidence leads it to conclude that no applicant proposed services, such as FX and CCSA, which directly connect to the public switched network.

AT & T has submitted substantial evidence, which the Court finds persuasive, establishing that none of the applicants, including SPCC, "proposed" switched services directly connecting to the public switched network (Ashley, S–T–132 at 27 & App.A).[202] For example, SPCC's February 6, 1970 application for authority to provide specialized common carrier service between Seattle, Washington and San Diego, California stated that SPCC did not intend "to offer a switched public telephone service" (S–2019 at 2) and SPCC's Comments in Docket No. 18920 reflect SPCC's intent "to provide all services necessary to meet its subscribers point-to-point communications needs" (S–2092 at 18). Particularly noteworthy is the fact that SPCC in its Com-

---

**201.** "103. In light of all the foregoing and the record as a whole, we ... find that: there is a public need and demand for the proposed facilities and services ..." (29 F.C.C.2d at 920).

**202.** The only applicant proposing any "switched" service was Datran and that com-

pany made it very clear to the FCC that it did not want to interconnect with the Bell System at all, not even for the purpose of obtaining local distribution facilities (Ashley, S–T–132, App.A at 12–14).

ments pointed out alleged "problems of a switched system such as that of AT & T" which requires a "large amount of central office equipment" and contrasted this with "the non-switched service proposed by Southern Pacific" (S–2092 at 25).

Similarly, MCI informed the Commission that the "Specialized Common Carriers will provide only specialized point-to-point private line services" (S–2096 at 102–03) and that "none of the applicants proposes to provide local exchange, inter-city switched voice, message telegraph or switched teletypewriter services" (S–0004V at 25). MCI also sought to downplay the concerns of Western Union and the California Farm Bureau about revenue diversion and cream-skimming by asserting that "the type of government leased systems involved are switched systems, while the MCI type carriers are strictly point-to-point" (S–2096 at 163) and stressing that the "Farm Bureau does not understand that the specialized carriers have no plans to provide switched voice service" (S–2137 at 3 n. 3).

 Accordingly, the Court finds that the applicants did not propose, and the FCC's 1971 *Specialized Common Carriers* decision did not authorize the new entrants to provide, FX or CCSA services. In addition, the Court has concluded that AT & T acted reasonably in interpreting the *Specialized Common Carriers* decision as not authorizing the new carriers to provide FX and CCSA services nor obligating AT & T to provide FX or CCSA interconnections, and in refusing voluntarily to provide FX and CCSA interconnection until the FCC's April 1974 decision in Docket No. 19896.

In the Court's view, these conclusions are supported by the testimony of AT & T employees, including senior executives, concerning their conduct on the FX/CCSA issue (Hough, S–T–1 at 78–105; deButts, S–T–131 at 56–57; Ashley S–T–132 at 1–32; Byers, S–T–133 at 1–51). The Court finds this testimony convincing, particularly when placed in the context of events in the 1971–1973 time frame subsequent to the *Specialized Common Carriers* decision.

In 1971, shortly after that decision, MCI asserted that it was entitled to provide FX service under the *Specialized Common Carriers* decision, and that AT & T had an obligation to provide it with the switched network connections to make that possible (Hough, S–T–1 at 87; deButts, S–T–131 at 59; Byers S–T–133 at 19). AT & T maintained its position that switched network interconnections, such as FX and CCSA, were not included in the FCC's decision (Hough, S–T–1 at 87–88; deButts, S–T–131 at 59; Byers S–T–133 at 21–23). Mr. Kelley Griffith of the FCC staff advised MCI representatives to write the Commission if they had any interconnection complaints. He further stressed that the *Specialized Common Carriers* decision indicated that the Commission would promptly resolve any disputes thus submitted (Byers S–T–133 at 21–23). From the record here, it appears to the Court that MCI ignored this clear invitation to raise the FX issue in 1971 and to obtain a prompt determination from the FCC, and thus the FCC took no action to inform AT & T that its position was incorrect (Byers S–T–133 at 19–25).

Moreover, as the Court pointed out above in its discussion of the piece-out charge, during the latter part of 1971 AT & T proposed revised tariff provisions which would permit customers to interconnect MCI's services to AT & T's service on legitimate premises of the customer, but which clearly precluded FX, CCSA, and piece-out interconnections (Byers S–T–133 at 23–24). These revisions were reviewed with MCI representatives and FCC staff members. MCI did not oppose AT & T's December 1971 tariff filings which precluded such connections, and the FCC, in accepting those tariff filings without comment, gave every indication that AT & T's position was correct (Hough, S–T–1 at 85–86; deButts, S–T–131 at 59; Byers S–T–133 at 24; see also Darling, S–T–148 at 10).

From the Court's perspective, perhaps the most significant evidence establishing that AT & T's understanding that the new carriers had not been authorized to provide FX and CCSA services was concurred in by the FCC and the new carriers themselves is

contained in a series of briefs filed by the FCC and the Department of Justice, as well as SPCC and MCI, with the Court of Appeals for the Ninth Circuit in connection with the appeal of the *Specialized Common Carriers* decision taken by the National Association of Regulatory Utility Commissioners (NARUC) (S–2427; S–2426; S–2423). Both the SPCC brief (S–2426 at 3) and the MCI brief (S–2423 at 11) adopted and incorporated by reference the section of the brief of the FCC and the Justice Department entitled "Counterstatement of the Case" (S–2427 at 4–20). In that section, the FCC and Justice stated as follows (*id.* at 8–9):

"[M]any applicants, such as intervenors MCI, Southern Pacific, Interdata, etc., sought permission to construct point-to-point microwave facilities solely for the provision of private line communication services. It was made clear that their facilities would not be connected with the interstate telephone network of AT & T, although many applicants would require connection with local telephone companies in order to obtain local distribution (*i.e.* from the microwave terminal to a customer's premises)."

The Court has no question that the quoted extract from the Government's brief, which was adopted by reference by both SPCC and MCI, is flatly inconsistent with the notion that the new carriers had sought and obtained authorization to provide FX or CCSA services because those services, by definition, directly connect to switching machines which form the heart of the public switched network (PX4–0126 at 3; PX4–0307; S–2885 at 3; Kelley, S–T–59 at 8).

Other portions of the briefs filed with the Ninth Circuit by the FCC and the Justice Department, as well as SPCC, support the same conclusion. For example, the Government brief stressed that the services authorized to the new carriers "are not dependent upon the interconnection with each other or with the switched network of the Bell System", adding that "it is not necessary to the usefulness of the proposed systems that they be interconnected with the interstate public telephone system of AT & T" (S–

2427 at 43). That same brief also pointed out that the new carriers would need "local loops" to extend their service from their microwave terminals to a customer's location and that "the one specialized carrier now in operation, MCI, is successfully so interconnected with Bell System telephone companies in Chicago and St. Louis" (S–2427 at 43 n. 16).

The SPCC brief is equally clear and vivid on the proposition. For example, SPCC told the Court of Appeals that the services it had been authorized to provide did not require connections to be made for individual calls, a statement that once again is flatly inconsistent with FX and CCSA services which do require connections to be made on a per-call basis (S–2426 at 18):

"[T]he various specialized carriers (including Southern Pacific Communications Company) proposed to furnish a private line service, providing by lease to customers dedicated facilities physically connecting the communication points on a continuing basis, rather than a switched network service. As defined by the Commission: 'Private line service ... provides the customer with the means of continuous communication without the necessity for the carrier to establish connections for each individual call or message'."

Indeed, Thormund Miller, who signed SPCC's brief, conceded that FX service does necessitate individual carrier established connections (Miller, Tr. 425–26).

The Court is of the view that the foregoing briefs filed with the Ninth Circuit are entitled to great weight. The Government brief was submitted over the signatures of the Assistant Attorney General and John Pettit, the General Counsel of the FCC. Mr. Pettit testified in this case that the idea that the specialized common carriers were authorized to provide FX and CCSA was flatly inconsistent with the representations made by the FCC and the Department of Justice in their brief to the Court of Appeals and that that brief was prepared in consultation with the FCC staff, including Mr. Strassburg and other members of the Common Carrier Bureau (Pettit, S–T–134

at 3–4). Similarly, it is inconceivable to the Court that the briefs filed by SPCC and MCI were not carefully reviewed by various members of each of those companies.

In these circumstances, only one of two conclusions is possible—either the SPCC and MCI briefs are accurate, in which case both MCI and SPCC confirmed to the Ninth Circuit that they had not been authorized to provide FX and CCSA services, or both MCI and SPCC deliberately misled the Court of Appeals. The Court sees no need to resolve this issue in this case. As noted above, the conclusion is inescapable that AT & T's understanding of the scope of the authorizations of the new carriers and its own interconnection obligations was confirmed by written representations made to the Court of Appeals by the FCC, the Department of Justice, MCI and SPCC.

Additional support for the Court's conclusions is found in connection with informal complaints filed with the FCC in late 1972 and 1973 by Scientific Time Sharing (STS) and Cone Mills, two of MCI's customers. As pointed out above, the STS informal complaint involved private line piece-out (AT & T's post-*Carterfone* tariff provisions), as well as a data arrangement resembling FX. The Cone Mills' informal complaint involved FX. In both cases, AT & T advised the FCC of its position that MCI was not authorized to provide FX type service and that AT & T was not obligated to provide interconnections for such service (Byers, S–T–133 at 35–36; S–2600; S–2654). As Mr. Darling of the FCC staff testified with respect to these complaints, "I reached the same conclusion as AT & T and no further action was taken by the staff" (Darling, S–T–148 at 12).

The Court finds further confirmation for its view in the FCC's September 12, 1973 grant of AT & T's satellite application. In its March 1973 Statement on Access and Interconnection, AT & T informed the FCC of its proposals for providing facilities to the domestic satellite carriers (S–2600B; Hough, S–T–1 at 88–89). These proposals did not include FX or CCSA interconnections (Byers, S–T–133 at 38). In August 1973, American Satellite petitioned the Commission to reject AT & T's satellite application unless AT & T was expressly directed to provide the new carriers with FX and CCSA interconnections (S–2699; Byers, S–T–133 at 38–39; Hough, S–T–1 at 89). In its September 12, 1973 decision, the FCC indicated its desire that interexchange facilities should be provided to the domestic satellite carriers under tariff, rather than contract, on a somewhat broader basis than had been proposed by AT & T, but otherwise found that AT & T's position on interconnection was "in substantial compliance" with the Commission's policy objectives (S–2720 at 659; Hough, S–T–1 at 89; Byers, S–T–133 at 39). In view of the fact that the FX/CCSA issue was explicitly raised by American Satellite, the Court cannot reconcile the FCC's treatment of that issue with plaintiffs' position here that defendants were acting unreasonably.

Indeed, it is clear to the Court that SPCC's position in this case on the FX/CCSA issue is flatly inconsistent with the view it held at the time, as reflected in the notes taken during a meeting on October 3, 1973 between senior representatives of MCI and senior representatives of SPCC, including Messrs. Grant and Miller.[203] During the course of the meeting, Mr. Cox and Mr. McGowan left to meet with Mr. Strassburg, then Chief of the Common Carrier Bureau. Notes prepared by Mr. Cox make it clear that Mr. Strassburg was concerned about "whether they should go to the Commission" and, according to Mr. Grant's own handwritten notes, the "odds" that MCI would be authorized to provide FX and

---

**203.** According to defendants, the October 3, 1973 meeting was a key event in the evolution of a plan or scheme developed by Mr. Strassburg and MCI—with SPCC's knowledge—designed to secure FX/CCSA rights for the specialized carriers without ever having the FCC address the issue (Byers, S–T–133 at 41–49 & App. A; Interconnection—FX/CCSA Doc.Sub. at 2–6). Although not dispositive of the issue, as discussed below, the Court finds substantial support that such a plan did, in fact, exist.

CCSA services were only "50–50" (S–2761, S–2762 and S–2762A).[204]

As noted above, the Court's conclusion that SPCC lacked clear authority to offer FX and CCSA services is confirmed by the April 1974 decision of the Court of Appeals for the Third Circuit in *MCI Communications Corp. v. American Tel. & Tel. Co.*, 496 F.2d 214 (3d Cir.1974).[205] There the Court of Appeals found a "substantial question," which was "open to legitimate dispute," whether the FCC's *Specialized Common Carriers* decision "embraced . . . interconnections enabling MCI to provide FX and CCSA service . . ." because the decision was "unclear" on this issue (*id.* at 220–24).

AT & T's interpretation of the *Specialized Common Carriers* decision was supported by several non-AT & T witnesses who testified at trial and whom the Court finds credible and convincing witnesses. Paul Darling, Chief of the Tariff Division of the Common Carrier Bureau, testified that it was always his understanding that the specialized carriers were not authorized to provide services such as FX which involve direct connection to the public switched network (Darling, S–T–148 at 9–13; U.S.Tr. 20277–79). Similarly, Eugene V. Rostow, who served as Chairman of the Task Force on Communications Policy under President Johnson, testified that he did not interpret the *Specialized Common Carriers* decision to include FX and CCSA (Rostow, Tr. 3651–54).[206] And General Lee Paschall, who was then Director of the Defense Communications Agency, testified that it was his understanding of the decision that the specialized carriers were being authorized to provide only point-to-point private line services and not switched services such as FX and CCSA (Paschall, S–T–164 at 3).

Moreover, defendants presented the testimony of additional witnesses who reached the same conclusion. Thus, James Ogg, Vice President of the Central Telephone Company of Virginia, an independent telephone company, testified that his company analyzed the *Specialized Common Carriers* decision and concluded that it did not permit FX or CCSA service (Ogg, S–T–136, U.S.Tr. 20387–89). R.L. Erickson of Collins Radio held a similar view (S–2892 at 2) as did Richard Ohlson, Vice President of General Telephone of California (S–6234X at 46–48). Carlos Fox, President of Interdata, an MCI company, testified that he understood the decision in Docket No. 18920 to be restricted to point-to-point private line services (Fox, S–T–135, U.S.Tr. 20635). And, Thomas J. O'Reilly, counsel for the United States Independent Telephone Association (USITA), testified that it was his "firm belief" that the specialized carriers had not been authorized to provide services that interconnected with the switched network and that he was "quite surprised" by MCI's claimed entitlement to FX and CCSA interconnections (O'Reilly, S–T–193 at 17; U.S.Tr. 24622).

Of particular significance to the Court is evidence that senior members of the FCC staff did not believe the *Specialized Common Carriers* decision clearly authorized the new carriers to provide FX or CCSA services. John Pettit, General Counsel for the FCC during this period, testified that the decision "should not be read as authorizing the specialized common carriers to provide FX or CCSA services" and that Messrs. Strassburg and Griffith of the FCC were "wrong" in believing FX and CCSA had been authorized (Pettit, S–T–134 at 2). Mr. Pettit also stated that "it was my view that the specialized common carriers were not

---

**204.** Mr. Kelley Griffith of the FCC staff also testified in his deposition that during this time period "MCI people felt that the Commission's decisions [regarding FX/CCSA services] were ambiguous or hazy . . ." (S–5479 at 104).

**205.** The Third Circuit vacated a preliminary injunction requiring AT & T to provide FX and CCSA interconnections to MCI. According to defendants, MCI sought and obtained the pre-

liminary injunction as part of the scheme developed by Mr. Strassburg discussed earlier. Once again, the Court finds substantial support for this view of the events of that period.

**206.** Dean Rostow also testified that the Task Force recommendations did not include or contemplate FX and CCSA or "anything of the sort" (Rostow, Tr. 3651–52).

authorized to provide FX or CCSA services" (*id.* at 7).

The testimony of Mr. Pettit also throws light on the views held by Walter Hinchman, who succeeded Mr. Strassburg as the Chief of the FCC's Common Carrier Bureau on January 1, 1974 and who therefore was the principal architect of the "findings" made by the FCC in its Docket No. 19896 decision. Mr. Hinchman was the head of the FCC's Plans and Policies Bureau in December 1973. At that time, according to the testimony of Mr. Pettit, Mr. Hinchman was asked by the FCC to prepare a memorandum on various issues relating to the 1971 decision (Pettit, S–T–134 at 5–6). Even Mr. Hinchman's memorandum to the Commission of December 5, 1973 comments on the "ambiguity" in the *Specialized Common Carriers* decision on the FX/CCSA question in striking terms (S–2831 at 3):

> "The language of the Specialized Carrier decision is vague as to what constitutes the specialized private line services which are its subject. One can infer from portions of the Order that the specialized carriers were thereby authorized only to offer dedicated non-switched services
>
> . . . .
>
> "This ambiguity is at the heart of the current controversy [concerning FX and CCSA] . . . ." [207]

In this context, it is apparent that the April 1974 decision of the Commission in Docket No. 19896, in spite of its language, represented a change in FCC policy and a "reinterpretation" of the *Specialized Common Carriers* decision. Mr. Darling of the FCC staff testified that he told AT & T representatives that the *Specialized Common Carriers* decision did not include FX or CCSA (Darling, S–T–148 at 9). It is inconceivable to the Court that Mr. Strassburg, who later said the *Specialized Common Carriers* decision required Bell to provide FX and CCSA interconnections, would not have told that to AT & T representatives when the issue first came up in 1971 or again in 1972 or earlier in 1973 if he had truly believed it. AT & T had repeatedly made it clear, both formally and informally, that it understood the *Specialized Common Carriers* decision to exclude FX and CCSA. Yet, Mr. Strassburg acknowledged that he never told anyone that AT & T was wrong prior to September 21, 1973, when Mr. deButts made a speech that criticized FCC policy and which Mr. Strassburg considered to have placed the issues on a "personal basis with Strassburg." [208]

Further confirmation of the reasonableness of defendants' actions comes from Mr. W.C. Fox, founder of Interdata Communications, Inc., another SCC who testified (S–T–135, Tab A 20634)

**207.** The April 1974 decision in Docket No. 19896, however, makes no mention of this "vague . . . ambiguity." Instead, while acknowledging that the Commission's prior decision "may not have been perfectly clear" (46 F.C.C.2d at 436), the opinion is quite critical of the Bell System. In the Court's view, the language used in the April 1974 decision is intellectually dishonest. The Court has had ample opportunity to observe Mr. Hinchman—he testified in this case on three separate occasions— and it is an understatement to say, as the Court found above, that he lacks credibility. For this reason and others discussed elsewhere, the Court gives no weight to the April 1974 decision with respect to the question of what AT & T knew or should have known prior to that date.

**208.** Throughout 1972, based on its understanding of the *Specialized Common Carriers* decision, AT & T had refused to provide FX or CCSA interconnections to MCI for MCI's Chi-

cago to St. Louis route. Yet, as pointed out above, in the 1972 brief on appeal of that decision, the FCC specifically referred to MCI being "successfully" interconnected with defendants (S–2427 at 43, n. 16). Mr. Pettit, who was General Counsel for the FCC at the time the brief was written, testified that the Common Carrier Bureau "had participated in the preparation and review of the brief" (S–T–134). The Court shares the view of Mr. Pettit that *if* the FCC had intended the *Specialized Common Carriers* decision to include FX and CCSA, it certainly would not have made contrary representations to the Court of Appeals (Pettit, S–T–134 at 4–5). The fact that the FCC in April 1974 asked its General Counsel to send its decision in Docket No. 19896 to the Court of Appeals "to dispel any ambiguities the brief may have created" merely confirms the conclusion that the FCC revised its view on FX and CCSA in 1974 (46 F.C.C.2d 413, 425 n. 14 (1974) (S–2988)).

"We were going to offer point-to-point service between the cities I mentioned earlier, New York, Philadelphia, Baltimore, Washington.

.　　.　　.　　.　　.

The service would not have included FX service."

Mr. Fox goes on to opine that he thought that the FCC's decision in Docket 18920 did not include FX.

Wholly apart from the foregoing events confirming the reasonableness of AT & T's belief that SPCC was not authorized to provide FX and CCSA services, the evidence presented at trial convinces the Court that AT & T's position concerning the provision of FX and CCSA interconnections to the specialized carriers was dictated by legitimate economic and technical concerns. Thus, the record establishes that AT & T was genuinely concerned that the provision of such services by the new entrants would increase the threat of creamskimming, would substantially increase the diversion of MTS/WATS revenues and would inevitably add to the pressures for price-cost realignments, the impact of which would increase the rates for local telephone service (deButts, S–T–131 at 4–27, 58; Strassburg, S–T–171, U.S.Tr. at 23441).

In the Court's view, AT & T presented abundant support for the proposition that the reasonableness of its concerns about providing SPCC and the other specialized carriers the interconnections necessary to provide FX and CCSA services was justified based on technical and operational factors. The switched network provided by the Bell System is highly complex, composed of thousands of facilities and switches, and millions of terminal devices, all interacting so that the entire system works as a whole (Hough, S–T–1 at 3–12). There were. significant technical and operational problems with respect to the connection of services used by the specialized carriers in the provision of FX and CCSA services (Hough, S–T–1 at 96). As explained by Mr. Hough, these problems follow from the fact that unlike the situation where a Bell operating company provides local distribution facilities for point-to-point services, interconnections for FX and CCSA involve direct connection to the interstate message network (Hough, S–T–1 at 90–91). Such interconnections remove any insulation between defective operations in the SPCC network and the interstate message network and thus posed a serious threat to all users of the nationwide network (id.).

Mr. Hough concluded, on the basis of his review of SPCC documents, that SPCC's system "sustained frequent, prolonged outages and that SPCC was aware that such outages could and did take down Bell System central offices (S–3917C, S–3923, S–3961B, S–4564B, S–3792B)" (Hough S–T–1 at 100). SPCC's witnesses and documents confirmed the legitimacy of AT & T's concerns. SPCC's interconnection "expert," Mr. Deschaine, testified that a "massive failure ... could tie up the [common control switching] equipment, indeed it may be likely" (Deschaine, Tr. 1590). Documents from SPCC's files and the testimony of defendants' operating company witnesses show that SPCC system failures had precisely such an effect on defendants' switching equipment (S–3792B; S–3793). For example, during 1975, SPCC and the other common carriers had major service outages in Pennsylvania that blocked several thousand calls made by defendants' customers (Evans, S–T–74 at 2–6) and SPCC experienced similar failures in New York in 1974 (Boran, S–T–91 at 6). In contrast, failures in Long Line facilities generally do not produce such blockages because of the redundancy and back-up built into Long Line facilities (Evans, S–T–74 at 6).

It is thus evident to the Court that FX/CCSA interconnection posed legitimate technical, operational and economic public interest questions which had not been resolved by the FCC. As Mr. Strassburg conceded, AT & T acted properly in refusing voluntarily to provide interconnections when the public interest questions involved had not been resolved by the FCC (Strassburg, S–T–171, U.S.Tr. at 23441–43).

Based upon the foregoing, the Court finds that defendants conduct with respect to FX/CCSA prior to April 23, 1974 was reasonable and did not violate the antitrust laws.[209] Even if the 1971 *Specialized Common Carriers* decision could be construed to have permitted FX and CCSA services, the Court finds that it was reasonable for defendants to conclude that FX and CCSA were beyond the scope of SPCC's authorized services and thus it was proper for defendants to deny FX and CCSA interconnections until the public interest questions involved were resolved by the FCC.

Finally, the Court is convinced that SPCC suffered no injury in connection with AT & T's refusal to provide FX and CCSA interconnection prior to the Commission's decision in Docket No. 19896. First, for a number of reasons SPCC officials admitted that the company was in no position to provide such services. Mr. Vasilakos, SPCC's Executive Vice President, wrote a letter dated January 30, 1974, in which he stated "I still have no information either technical or pricing on FX service. We can't sell it until we know what it is, and how it works" (Vasilakos, Tr. 915–17; S–2906). At trial, he attempted to explain this letter as reflecting the fact that SPCC did not have firm pricing and technical information on FX at that time (Vasilakos, Tr. 917). However, none of the conversations in which he allegedly was told by SPCC personnel that defendants would not provide the information was ever memorialized in writing, and Mr. Vasilakos himself never bothered to speak to anyone at Pacific Telephone or any other Bell company

about SPCC's alleged need for such technical information on FX (Vasilakos, Tr. 918). The Court finds that Mr. Vasilakos' testimony lacked credibility and that SPCC failed to prove that it had the technical capability necessary to provide these services.

Even if the Court were to assume that SPCC had the requisite technical capability prior to April 23, 1974, SPCC's own tariffs did not authorize it to provide FX and CCSA (S–3009; S–3146). SPCC's tariffs did not offer FX and CCSA services until May 1974 (S–3009; S–3146). According to Mr. Grant, those services were not included in SPCC's initial tariff because he recognized that FX and CCSA were "controversial issues" (Grant, Tr. 763, 767–68).

As SPCC did not file and have accepted by the Commission a tariff purporting to offer FX or CCSA service prior to May 4, 1974, its claims regarding the denial of FX and CCSA interconnections must be rejected. *Cottonwood Mall Shopping Center, Inc. v. Utah Power & Light Co.,* 440 F.2d 36, 37–38 (10th Cir.), *cert. denied,* 404 U.S. 857, 92 S.Ct. 107, 30 L.Ed.2d 99 (1974) (plaintiff who lacked regulatory authorization to provide a service not entitled to maintain an antitrust action relating to that service); *see also American Bankers Club, Inc. v. American Express Co.,* 1977–1 Trade Cas. ¶ 61,247 (D.C.1977).

Finally, the Court finds that SPCC was not damaged by the FX and CCSA issue due to the time element. That is, SPCC served their first customer on December 26, 1973, and in only four months,

**209.** The Court has examined carefully a number of AT & T documents put into evidence here by SPCC which SPCC asserts show that AT & T knew that its conduct was inconsistent with the FCC's orders. The court finds, to the contrary, that none of these documents support that proposition directly or indirectly. What they do show is a general concern by Bell System employees at various levels about the potentially adverse economic, technical and operational consequences of FCC policy trends and possible future FCC directives. Typical perhaps is PX4–0436, a memorandum to Mr. Charles Brown, then President of Illinois Bell and currently Chairman of the Board of AT &

T. While the document does show, as SPCC asserts, that AT & T realized that the size of the market for FX and CCSA services was substantial, it also shows, as SPCC does not point out, that the author was advising Mr. Brown that Illinois Bell had refused FX and CCSA connections to MCI because it "was an attempt by MCI to supply a service they were not authorized to provide" (*id.* at 3). No reason occurs to the Court nor has any been suggested by SPCC why an Illinois Bell employee would mislead Mr. Brown about MCI's authorization or lack thereof to provide FX or CCSA service.

they were able to provide the service. This short period of time in an industry that was in a state of complex changes is just not enough for this Court to find antitrust liability. Moreover, such denial was not enough to seriously injure SPCC's business. Accordingly, the Court finds that plaintiffs suffered no injury in fact caused by defendants' refusals to provide FX and CCSA interconnections.

## INTRASTATE FX

Plaintiffs also charge that AT & T improperly denied SPCC interconnections to enable SPCC to provide FX service "where both ends of the circuit were physically located within a single state," even where the circuits were part of an interstate network (Vasilakos, PX6–0006 at 20–21). SPCC contends that AT & T improperly and unjustifiably refused to provide such facilities in apparent contravention of the FCC's decision in Docket No. 19896, thereby demonstrating AT & T's monopolistic intent and consequent harm to SPCC. After carefully examining all the evidence in connection with the "intrastate FX" issue, the Court concludes that SPCC failed to prove any of the elements of its claim in this respect.

■ At the outset, the Court notes that the only evidence of injury presented by SPCC with respect to this claim consisted of general statements in Mr. Vasilakos'

testimony. Mr. Vasilakos, however, did not claim that SPCC lost customers or sales as a result of AT & T's actions. On the contrary, Mr. Vasilakos' testimony concerning SPCC's "injury" was primarily related to Texas, the State where this issue first arose, and his decision to direct his sales force to "suspend their efforts to sell FX service in Texas" (Vasilakos, PX6–0006 at 20). This evidence, as shown below, confirms that any substantial delay SPCC experienced in obtaining orders for FX facilities wholly within that State was primarily attributable to SPCC, not AT & T. Mr. Vasilakos also makes reference to vague, unsupported hearsay statements concerning customer "fears," testimony which is insufficient to sustain a finding of injury.[210]

■ Beyond this defect, an additional flaw in plaintiffs' claims is that here, as elsewhere, SPCC simply ignores the existence of state regulation. All States today have regulatory agencies and the Communications Act of 1934 gives the States, not the FCC, jurisdiction over intrastate telecommunications services. The evidence of record indicates that the States, particularly Oklahoma and California,[211] historically asserted jurisdiction over FX service provided between two points in a single State, regardless of whether those facilities were connected to or part of an interstate network.[212] (Darling, S–T–148A at 9; Free-

---

**210.** Despite SPCC's initial indications that Mr. Brodman would speak to these issues, Mr. Brodman's testimony did not encompass the intrastate FX question. AT & T, however, submitted the written testimony of Messrs. Allen (S–T–137), Freeman (S–T–138), Privett (S–T–143) and Symons (S–T–142), all of whom were personally involved in this issue. As plaintiffs chose not to cross-examine any of these witnesses and none appeared as witnesses in the Government or *MCI* cases, there can be no doubt about their credibility. On the other hand, the Court has serious doubts about both the knowledge and the credibility of Mr. Vasilakos. At one point, Mr. Vasilakos' testimony in connection with these issues was controverted by Mr. Grant (*Compare* Grant, Tr. 749–50 *with* Vasilakos, Tr. 898–99).

**211.** Indeed, SPCC knew as early as June 22, 1973 that "[i]f SPCC were to file a tariff specifying points of communication only within the

state of California, it would be rejected ..." (Letter of SPCC's counsel, Mr. Forrest to Mr. Thurmond A. Miller (S–2661 at 1) It is obvious to the Court that this letter would also have applied to intrastate FX and CCSA, though at the time it is debatable whether SPCC even contemplated such service.

**212.** It is interesting to note how SPCC attempted to circumvent the various state commissions by devising "schemes" to make intrastate lines interstate. In a June 26, 1973 letter to Mr. Forrest, Mr. Albertson stated, "[h]opefully, this makes them appear as interstate, although, I wonder if the FCC will add up all the channels going to Los Angeles, etc., as they did when we routed our Houston circuits into Los Angeles." (S–2683 at AE 1194). SPCC went even further with the use of a rusty-switch approach to legalize an intrastate circuit (S–0147) and informed its salesmen to "never put in writing

man, S–T–138 at 3; Allen, S–T–137 at 15; Symons, S–T–142 at 4).

The intrastate FX issue first arose in Texas in 1974, which until recently, was the only state without a state regulatory commission exercising control over the provision of intrastate telecommunications services. In May, 1974, SPCC submitted orders to Southwestern Bell (SWB) for interconnections to enable SPCC to provide FX service between Houston and Dallas to SPCC customers. At that time, SWB took the position that it would not process the orders from SPCC for intrastate FX service. On July 23, 1974, SPCC filed a petition with the FCC to require interconnection facilities to enable it to provide FX service between Dallas and Houston. The FCC Common Carrier Bureau filed comments on August 7, 1974. On August 16, 1974, SWB filed comments with the FCC stating that it agreed to interconnect with SPCC to enable SPCC to furnish FX and CCSA services between cities within the State of Texas, and requesting that SPCC's

petition be dismissed as moot. The FCC Common Carrier Bureau informed SPCC by letter dated September 6, 1974 that SWB's willingness to provide the interconnections appeared to render SPCC's petition as moot. SPCC accepted SWB's offer to provide these interconnections on October 17, 1974.[213] (Agreed Fact 4–2–001).

■ The evidence shows that the issue in this case, as it arose in 1975 in Oklahoma and California,[214] involved situations where SPCC attempted to provide physically intrastate FX services in the face of decisions made by the public utility commissions of those two states that SPCC was not authorized to provide intrastate FX services (S–3449; Privett, S–T–143). The California Public Utility Commission made it explicitly clear that it had jurisdiction over intrastate service and that SPCC required a certificate of public convenience and necessity from the Commission in order to commence service and that the intrastate service did not include FX service.[215] (S–3449 at 9–11, 49,

any reference to or suggestions that a customer use(s) a rusty switch to gain interstate service." (S–2833). *See also,* S–3521 (Comments of G. Hurley on the recent proposal to standardize on a rusty-switch for the purpose of legalizing interstate sales). A rusty-switch is a concept whereby one customer that has a need for an intrastate network is connected to one out-of-state line on which he has no real service requirements. The use of a rusty-switch was to avoid state public utility commission jurisdiction. (S–6078)

Furthermore, with respect to the interstate/intrastate controversy, Mr. Darling of the FCC stated (S–T–148A, at 2), that "[i]f one company provided the service then intrastate was contaminated." Thus the intrastate line was classified as interstate. If, however, two companies provided the line, then there was no contamination. (*id.*) Moreover, Mr. Darling testified that he informed Mr. Forrest about the situation. (*id.* at 3).

**213.** Although Southwestern Bell apparently declined initially to provide such interconnections, the evidence shows that only a few weeks later Southwestern Bell met with SPCC representatives and voluntarily offered to provide the requested interconnections. (Agreed Fact 4–2–17; S–3138; *See also* Agreed Fact 4–2–10; S–3133 and S–3139). Southwestern Bell, however, pointed out that the offer could not be taken as a commitment to provide similar facilities in States which had state regula-

tory bodies (S–3138). SPCC refused this offer and sought to press the issue in Texas in the hope of obtaining a favorable ruling from the FCC applicable to other States (S–3138). Several months later, after the FCC took the position that the controversy was moot in light of Southwestern Bell's offer, SPCC accepted the offer (S–3231; S–3176; Agreed Fact 4–2–1). Consequently, it is clear to the Court that any injury which resulted from the Texas intrastate FX controversy was attributable primarily if not solely to SPCC's decision to delay accepting Southwestern Bell's offer.

**214.** In California and in Oklahoma, the state regulatory bodies were primarily concerned about creamskimming and the resultant harm on their general ratepayers of new entry by specialized carriers. (Privett, S–T–143 at 4–5; Symons, S–T–142 at 4–5).

**215.** The Court recognizes that on October 9, 1975, the FCC concluded that "the Bell System Companies must continue to provide the interconnections and facilities to SPCC to interconnect with the facilities ... located within the state of California and Oklahoma, pursuant to the applicable interstate tariffs." (PX4–0681, 56 F.C.C.2d at 21). This was affirmed by the D.C. Circuit on June 30, 1977, in *California v. F.C.C.,* 567 F.2d 84 (D.C.Cir.1977) *cert. denied* 434 U.S. 1010, 98 S.Ct. 721, 54 L.Ed.2d 753 (1978). However, what is important is that

50). Consequently, the Bell operating companies involved were faced with decisions of the state regulatory agencies that directly related to the scope of SPCC's service authorizations, and a reasonable interpretation of those decisions suggested that the operating companies were possibly prohibited by law from providing the interconnections requested (Symons, S–T–142 at 3–4; Privett, S–T–143 at 5; Freeman, S–T–138 at 2).

The California Public Utilities Commission had entered an order prohibiting SPCC from providing any service requiring a direct connection to the exchange network, including FX (Symons, S–T–142 at 4; Agreed Fact 4–2–2; S–3449). This prohibition was interpreted by Pacific Telephone employees as restricting SPCC's ability to provide intrastate FX service (Freeman, S–T–138 at 2). When faced with SPCC orders for such services, PT & T provided the interconnections under protest and sought guidance from the California Commission (Agreed Fact 4–2–2; Freeman, S–T–138 at 3–5). The evidence establishes to the Court's satisfaction that Pacific Telephone acted reasonably and in good faith (Darling S–T–148A at 10; Freeman S–T–138).

The intrastate FX issue presented in Oklahoma was virtually identical to California. Once again the local Bell operating company provided the interconnections requested and sought guidance from the state regulatory body (Allen, S–T–137 at 10). Despite an intervening decision from the FCC, the Oklahoma Commission ruled that

SPCC was providing intrastate service without a certificate of convenience and necessity (Privett, S–T–143 at 5).[216] As the Chairman of the Oklahoma Corporation Commission testified, Southwestern Bell properly presented the intrastate FX question to the Oklahoma Commission (Privett, S–T–143 at 5). The Court agrees.

As the foregoing recitation of the facts surrounding the intrastate FX claim illustrates, SPCC has failed to demonstrate any injury arising from AT & T's conduct. SPCC presented only the vague and unsupported assertions of Mr. Vasilakos which were overcome by the evidence of AT & T's witnesses. The record clearly shows that in Oklahoma and California the requested interconnections were supplied, and that in Texas, any delays in obtaining interconnections were primarily the result of SPCC's own actions.[217] Similarly, SPCC failed to prove that defendants' conduct was in any way unreasonable or in violation of the antitrust laws. Thus, the Court concludes that plaintiffs failed to establish any of the elements necessary to support this charge.

## TERMS AND CONDITIONS OF THE PROVISION OF LOCAL DISTRIBUTION FACILITIES

From December 1973 until May 1975, the terms and conditions under which defendants provided local distribution facilities to SPCC were set forth in tariffs that were based on a draft model facilities contract negotiated and agreed to by SPCC and AT

---

nothing contradicts the notion that the actions of the defendants were reasonable. Indeed, Circuit Judge Robinson, in his dissent in *California* states his disagreement with the Commission actions, not substantively but procedurally.

... The Commission did not, however, undertake to explain why such a difficulty would arise, nor how close that difficulty is to impossibility (FX interconnections). This unfortunate lack of specificity, is understandable, since the record is devoid of any evidentiary basis for the Commission's assertions, and it, is hardly common knowledge. It is to be noted, moreover, that the Commission refused to convene a proceeding in which this factual question could be fleshed out. Since the Commission's findings come up substan-

tively short and even so is unsupported by the evidence, I cannot accept the conclusions that flow from it. (footnote omitted) (*id.* at 90).

**216.** This ruling subsequently was reversed by the Oklahoma Supreme Court, but at no time did Southwestern Bell refuse to provide the interconnections sought (Privett, S–T–143 at 5; Allen, S–T–137 at 6–8, 14; Agreed Fact 4–2–3).

**217.** Indeed, despite the fact that SWB agreed to provide the connections on August 16, 1974, it took almost a month for SPCC to respond. (Agreed Fact 4–2–001) This does not establish to the Court's satisfaction a company desperately wanting or needing to provide FX service.

& T before SPCC became operational in December 1973 (PX4–0756; PX4–0758). From May 1975 until the present, the provision of local distribution facilities has been governed by tariffs that reflect the Settlement Agreement in Docket No. 20099 negotiated under the aegis of the FCC, signed by various carriers—including SPCC and AT & T—and accepted by the Commission as being in the public interest and as an "acceptable compromise" on matters then in dispute between the parties (S–3469; S–3470; S–3556).

Nonetheless, plaintiffs advance a number of claims relating to the terms and conditions on which defendants have furnished local distribution facilities. *First,* with respect to the manner in which the terms and conditions were established, SPCC contends (1) that defendants unreasonably decided to file facilities tariffs in 1973 rather than conclude the ongoing negotiations with SPCC for a facilities contract; and (2) that defendants improperly decided to file those facilities tariffs with the State Regulatory Commissions instead of with the FCC. *Second,* SPCC advances four specific charges with respect to the terms and conditions themselves: (1) that the rates charged for local distribution facilities were excessive; (2) that prior to Docket No. 20099, defendants unreasonably limited to a defined local distribution area, or LDA, the geographic area in which defendants would make local facilities available; (3) that defendants' insistence on a "clean interface" between SPCC and Bell operating company facilities prior to Docket No. 20099 unreasonably required SPCC to provide its own station packages of signaling equipment, thereby denying SPCC the use of Bell-provided fully equipped end links, and that defendants likewise unreasonably required that the interconnection take place at the customer's premises rather than at defendants' central offices; and (4) that defendants refused to participate with SPCC in joint end-to-end testing of SPCC's private line services. Third, SPCC argues that it was "coerced" or acting under "duress"

when it agreed to the interconnection terms and conditions about which it now—years later—complains.[218]

The Court has examined in detail the evidence on all of plaintiffs' charges relating to LDF terms and conditions and concludes that SPCC has failed to prove that any of its claims give rise to a violation of the antitrust laws. Moreover, based upon the record before it, it is clear to the Court that SPCC has failed to prove any injury flowing from these claims.

Because plaintiffs' claim of "coercion" and "duress" overrides, in the Court's view, the other categories of SPCC's charges related to interconnection terms and conditions, the Court will address that claim first. As the Court will explain below, the credible evidence shows plaintiffs' "coercion" and "duress" claim to be without foundation and, in the judgment of the Court, designed to mask the deficiencies of SPCC's other interconnection claims.

### "COERCION" AND "DURESS"

In February 1973, a full ten months before SPCC served its first customer, AT & T provided to SPCC a draft model facilities contract (PX4–0756). After negotiation and an exchange of drafts, in July 1973 AT & T sent to SPCC a modified facilities contract (PX4–0758). AT & T and SPCC held further negotiations regarding these drafts in order to reach an agreement regarding the terms and conditions on which SPCC would receive local distribution facilities (Jackson, S–T–58A, at 5–8). SPCC in fact entered into a contract with Pacific Telephone on October 23, 1973 which contained the terms of the draft model facility contract, including those that SPCC now asserts were onerous and unreasonable (S–2792). The evidence establishes that the parties entered into that agreement as an interim measure designed to govern Pacific's provision of local distribution facilities to SPCC until superseded by tariffs filed with the "the appropriate regulatory bod-

---

**218.** While the plaintiffs dispute this, the fact is that they have not shown where they have made any such complaint, except among themselves.

ies" (S–2792 at 9, 11 [219]; Snyder, S–T–71 at 13). Pacific Telephone filed with the California Public Utilities Commission an application for authorization to proceed with the agreement that had been negotiated (S–2792 at 1–3). The Court finds that this agreement is persuasive evidence that SPCC agreed to the terms and conditions at issue in this case.[220]

Throughout the trial, plaintiffs argued that they had been "coerced" or that they had acted "under duress" when they agreed to the "onerous" terms and conditions of the facilities contract negotiated with AT & T in 1973. The facts, however, are so at variance with this charge that the Court can only conclude that SPCC invented its claim of "coercion" and "duress" for the purpose of this lawsuit.

 From the Court's review of the record, it is convinced that SPCC was satisfied with—and voluntarily agreed to—the terms and conditions set forth in the contract negotiated with AT & T in 1973 about which SPCC now complains (S–2629; S–2614; S–2674; S–2705) and that it was a fair contract negotiated in good faith. Mr. Kopf, SPCC's General Counsel who negotiated the contract on behalf of SPCC, testified he thought that only minor modifications were needed for the contract to become "appropriate" and "reasonable" (Kopf, Tr. 503) and that SPCC's executives thought that only minor modifications would be necessary before the contract proposed by AT & T became a satisfactory basis for beginning business (Kopf, Tr. 498–99). Mr. Kopf's superiors instructed him not to press his more technical objections to the draft contract (Kopf, Tr. 501).

Nonetheless, Mr. Kopf did raise some minor—in the Court's view, misplaced—objections to the draft contract, among them one with respect to the so-called "as available" clause. Thus, in support of SPCC's claim that AT & T acted in bad faith in the 1973 negotiations with SPCC, Mr. Kopf testified that he interpreted language in the proposed contract to permit AT & T to furnish local distribution facilities on a wholly "discretionary" basis, only when in the Bell System's unilateral judgment they were available (Kopf, Tr. 512–13). In this regard, a related provision in the draft contract provided (S–2672, App.C, para. 2):

> "The Telephone Company will process and fill Lessee's orders with the same order of priority that the Telephone Company serves its own private line customers, but the Telephone Company shall have no obligation to fill Lessee's orders where such action would impair the furnishing of Telephone Company's message telecommunications services."

The Court understands this provision not to permit defendants to give preferential treatment to their own private line business but instead to allow them to accord priority to message service provided to the general public (Jackson, S–T–58A at 9). Giving message service priority over private line services has long been the practice of the

---

**219.** Paragraph 9(c) of the Application filed with the California Public Utilities Commission provides:

> "This agreement shall be an interim agreement and shall be effective until superseded pursuant to the provisions of Section 8d above or for a period of one year from the date of its effectiveness, whichever is earlier."

**220.** It is the Court's view that SPCC's acceptance of the terms and conditions contained in the 1973 draft facility contract is underscored by SPCC's separate negotiations with the independent telephone companies for the provision of local distribution facilities. For example, upon review of a contract proposed in 1973 by the largest independent, General Telephone Company, Mr. Albertson of SPCC stated "my suggestion is to simply reword it along the lines of the present AT & T Local Loop Agreement" (S–2725). Similarly, on July 9, 1975, Mr. Kopf remarked to Mr. Geier of SPCC, regarding the provision of local loops by the independent telephone companies, that "the terms and conditions of these contracts appear to be more onerous than those maintained in the Bell Company tariffs" (S–3683). As discussed below, defendants filed tariffs in the fall of 1973 that were patterned after the provisions of the draft facilities contract negotiated by SPCC and AT & T. Those tariffs contained terms that SPCC admits were, if anything, more favorable to SPCC than had been the terms of the draft contract (Grant, Tr. 674–75; Cook, S–T–57 at 29).

telephone industry in this country (Jackson, S–T–58A at 9–10; S–5863C; S–5608D), a practice which this Court cannot fault.[221] Accordingly, the only appropriate inference the Court can draw from Mr. Kopf's tortured interpretation of the contract term at issue is not that defendants' proposal of the term was in bad faith but instead that Mr. Kopf should have known better.

The Court finds particularly significant the memorandum from the President of SPCC, Mr. Jaekle, to Mr. Biaggini, the Chairman of Southern Pacific, on April 13, 1973, written immediately after an intensive in-house review of the draft contract. Mr. Jaekle wrote: "It appears that the proposed interconnection agreement prepared by AT & T will be satisfactory after minor revisions are made and then can be signed by SPCC and the other specialized common carriers" (S–2614).

Then, on April 30, 1973, Mr. Albertson of SPCC sent to AT & T a revised draft of AT & T's model facility contract that contained virtually no proposed changes in any of the significant terms and conditions at issue in this case (S–2623). In these circumstances, the Court cannot avoid the conclusion that SPCC was fully aware of the terms and conditions to which it did not object and that it in fact had no significant problem with the draft. The Court's finding that there was neither "duress" nor "coercion" in SPCC's assent to the terms of the 1973 contract is buttressed by Mr. Albertson's public representation to two prospective lenders that SPCC had "negotiated agreements with AT & T that are not unreasonable" (S–2674 at 2).

Plainly, by August 1973 SPCC viewed the draft contract as the appropriate vehicle to launch its business. Thus, with full knowledge of what SPCC now claims were "onerous" proposed contract terms, Mr. Grant, in August 1973, recommended to Mr. Biaggini that SPCC expend an additional $40 million to construct a nationwide network and projected that the private line business would be profitable by 1976 (Grant, Tr. 685, 689–91, 693–94). Indeed, a memorandum of an SPCC management meeting, dated August 29, 1973, stated that "[t]he local loop contract is satisfactory to get us into business" (S–2705 at 2). The Court also views as significant the fact that, by September 1973, the only further revision to the draft facility contract that SPCC sought was the inclusion of a so-called "most favored nation" clause, irrelevant here (S–2721).

Based upon the foregoing, the Court finds that SPCC's charge that it was "coerced" or "under duress" when it agreed to the 1973 facilities contract is unfounded in the record of this case. While SPCC did not receive all that they may have wanted, this does not give rise to a claim of duress. Afterall, SPCC had the financial backing of its parent and accordingly was equal in its negotiations with AT & T. This is clearly no David vs. Goliath situation. The Court also must reject plaintiffs' collateral charge that AT & T generally conducted itself in bad faith in the 1973 negotiations. Accordingly, the Court rejects plaintiffs' suggestion that AT & T delayed the negotiations. By contrast, the evidence shows that long delays in the negotiation process were attributable to SPCC's inaction. For example, although AT & T had given SPCC a copy of AT & T's facility contract with MCI in September 1972 and SPCC promised in November 1972 to return a revised contract, SPCC never submitted such revisions; moreover, SPCC did not forward its comments on AT & T's February 1973 draft facility contract until the end of April 1973 (Jackson, S–T–58A at 6–7; S–2623; Snyder, S–T–71 at 7–8).[222]

---

**221.** In fact, since the mid-1930s AT & T private line tariffs on file with the FCC have provided that "... where a shortage of channels or equipment exists at any time either for temporary or protracted periods, the establishment of Long Distance Message Telecommunications Service shall take precedence over all other services" (S–5863C). Moreover, the Court understands this was the practice in the industry in general, as is evident from the fact that independent telephone companies, such as General Telephone, had similar provisions in their contracts with SPCC (S–5608D).

**222.** The Court finds equally without merit SPCC's charge that an early AT & T proposal to provide local distribution facilities to the

Throughout the trial, SPCC repeatedly claimed that plaintiffs also entered into the Settlement Agreement negotiated under the aegis of the FCC in Docket No. 20099 only under "duress" or "coercion." The Court has reviewed the record and concludes that this charge is equally lacking in support as plaintiffs' claim regarding the 1973 contract negotiations.

The FCC initiated Docket No. 20099 on July 5, 1974 in order to investigate all aspects of defendants' provision of facilities to other carriers (S–3084; Kelley, S–T–59 at 10; Weinstein, S–T–201 at 4). That proceeding followed shortly upon the FCC's April 23, 1974 decision in Docket No. 19896, in which the Commission required defendants to furnish interconnection facilities to enable the specialized carriers to offer FX and CCSA services and further required defendants to furnish local facilities "similar" to those provided to AT & T's Long Lines Department on a non-discriminatory basis (S–2988).[223]

The Court found persuasive defendants' evidence that the Commission provided no guidance whatsoever regarding how defendants were to accomplish this mandate and, moreover, that the Docket No. 19896 decision itself radically changed the regulatory policy that had governed the relationship between defendants and the newly-authorized competitors in the provision of intercity private line services (Kelley, S–T–59 at 7; Weinstein, S–T–201 at 3; Hough, S–T–1 at 97). Prior to that decision, the FCC's policy appeared to contemplate end-to-end service to customers provided by competing carriers. The local distribution facilities provided to the specialized common carriers following the *Specialized Common Carriers* decision enabled them to provide their own end-to-end service to their customers. The Court understands, however, that the bright line of demarcation between Bell operating company facilities and specialized carriers facilities could no longer exist following the FCC's directive in its Docket No. 19896 order that Bell operating companies furnish facilities to enable the specialized common carriers to provide FX service and to insert their facilities in Bell-provided CCSA networks.

The uncertainty in the industry about how the competing carriers should relate to each other following the FCC's decision in Docket No. 19896, coupled with the breadth of the Commission's proposed inquiry in Docket No. 20099, in the Court's view rendered the latter proceeding a potentially highly charged situation. In this atmosphere, the Court finds entirely reasonable and, indeed, laudable, as did the FCC (S–3199B),[224] defendants' suggestion to the Commission that informal negotiations be

other carriers under the so-called "capital contribution" concept somehow evidences AT & T's bad faith. The proposal, which was never implemented and which was in fact withdrawn early in the parties' contract negotiations, called for the specialized carrier to make an up-front payment for a facility that would be dedicated to that carrier's use, with a monthly service charge to be paid at a rate lower than would be the case under a lease agreement. The Court finds that the proposal merely represented a reasonable method for AT & T to recoup its capital costs of constructing the required facilities for the specialized carriers and that it was not designed to divert capital away from the carrier's network construction program (PX4–0020; Cook, S–T–57 at 8). The Court further concludes, based on the evidence presented, that far from being discriminatory, there were substantial economic advantages to be gained by SPCC under the "capital contribution" approach as evidenced by the widespread acceptance of a similar plan by other carriers who desired an alternative to leasing as a

means of utilizing AT & T's ocean cable facilities (Cook, S–T–57 at 7–8).

**223.** Following the FCC's decision in Docket No. 19896, defendants filed revised facility tariffs in May 1974 which contained substantially the same terms as had the preceding tariffs, except that they also provided for interconnections to enable SPCC and the other specialized carriers to offer FX and CCSA services and for the leasing of defendants' interconnection facilities between a specialized carrier's technical operating centers (S–3000B; S–3000D; S–3002).

**224.** In its Memorandum Opinion and Order dated September 26, 1974, the Commission held (which was signed by Walter Hinchman) (S–3199B):

"2. We believe that to the extent that it is possible to resolve the issues herein outside the context of formal procedures it would be in the public interest to do so where such informal procedures will lead to an accelerated resolution of the issues."

held between the various carriers with the participation of the FCC in lieu of a formal paper proceeding (Kelley, S–T–59 at 14–17; Weinstein, S–T–201 at 5–6; Hough, S–T–1 at 103–05). SPCC's claim that it had no choice but to accept AT & T's proposal to negotiate is contradicted by the evidence for they agreed with the procedure on October 17, 1974.[225] Moreover, had SPCC not agreed to the procedure, then their recourse would have been to merely go forward before the Commission.[226]

At the end of five months of intensive informal negotiations held under the aegis of the FCC in Docket No. 20099, AT & T, SPCC and the dozen or so other participating carriers entered into a new contract for the provision of local distribution facilities (S–3470; Kelley, S–T–59; Weinstein, S–T–201). The parties, including SPCC, submitted the contract,[227] which was known as the Settlement Agreement, to the FCC, and the Commission accepted it as being in the public interest and as "an acceptable compromise" of the issues presented by Docket No. 20099 (S–3469B; S–3556) on April 23, 1975.[228] The terms and conditions of the Settlement Agreement were incorporated

Moreover, it is important to note that the Commission did not end its proceedings, but rather postponed them for six weeks to see if the parties were able to reach accord informally (S–3199B at ¶ 3).

**225.** The use of the informal conferences was concurred in by SPCC on October 17, 1974 wherein it wrote (S–3206 at 2):

"SP Communications also agrees with the Bell System that the questions for resolution distributed at the informal conference merit early attention, and welcome the offer of the Bell System to work informally with the Commission and the interested parties in resolving as many issues as possible expeditiously and without protracted formal proceedings."

**226.** This negates SPCC's claim that AT & T's proposal was an ultimatum which SPCC had to accept. For if SPCC were dissatisfied, they could have brought their concerns before the Commission, who unquestionably had the power to resolve the issue, one way or another.

**227.** In its March 13, 1975, joint motions to the Commission seeking approval of the Settlement Agreement of FCC Docket No. 20099 signed by all the parties, it was stated (S–3469 at 3):

2. "As a result of these informal settlement discussions, conducted under the aegis of the Commission with the direct participation of representatives of the Chief, Common Carrier Bureau, the *undersigned parties have reached agreement on a settlement* which is set forth in the Settlement Agreement attached hereto and incorporated as a part hereof.

3. *The undersigned parties believe that the settlement,* as reflected in the attached Settlement Agreement, will *serve the public interests of the parties,* because it affords for an interim period an expeditious and acceptable compromise of differences on matters which would otherwise necessitate substantial time, expense and effort to resolve through formal Commission processes.

4. *The separated Trial Staff of the Common Carrier Bureau,* a party to this proceeding, believes *that the terms of the Settlement Agreement represents an acceptable compromise of the respective parties having individual interests in the outcome of the proceeding.* Because the Settlement Agreement is generally limited in duration to an interim period, the *separated Trial Staff believes that the public interest would best be served by the Commission action requested of the parties.*" (Emphasis supplied).

**228.** In its April 23, 1975, Memorandum Opinion and Order the F.C.C. stated (S–3556; 52 F.C. C.2d at 732):

"We believe that the terms of the Settlement, including the responsibilities undertaken by the parties, are in the public interest because they expedite and further the implementation of established Commission policy. Furthermore, as noted by the parties, the settlement affords an expeditious and acceptable compromise of differences on matters which would otherwise necessitate substantial time, expense and effort to resolve through formal Commission processes. Therefore, we will accept the settlement (without necessarily approving it) as a disposition, without prejudice, of Docket No. 20099."

Recognizing that problems may still exist, the Commission left the door open for *any* party to air their complaints wherein it stated (*id.*) at 733:

"We will expect all parties to the Settlement Agreement not only to comply with its terms, but also to adhere to its spirit. We expect to closely monitor the implementation of the Settlement Agreement, and to this end we endorse the proposal to conduct, as necessary, meetings of the parties under the aegis of the Commission's Common Carrier Bureau to review the progress made in implementing the Settlement Agreement. It is our hope that, through these meetings, the par-

in new facilities tariffs filed by defendants in May 1975 (Kelley, S–T–59 at 40). The evidence shows that the illustrative tariffs on which those filings were based were hammered out line by line by the parties to the Docket No. 20099 negotiations, and, as such, the Court must conclude that SPCC, as well as the other carriers, consented to and was satisfied with each and every term and condition contained in the tariffs (S–3470; S–3556; Kelley, S–T–59 at 37–39; Weinstein, S–T–201 at 16–18). With minor modifications, those consensual tariffs continue to govern defendants' provision of local distribution facilities to SPCC (Kelley, S–T–59 at 40–41).

Having carefully reviewed the evidence presented on this point, the Court finds no basis for SPCC's assertion that it was "coerced" or that it acted "under duress" in participating in the Docket No. 20099 negotiations. The most convincing evidence about the lack of "coercion" or "duress" is provided by Mr. Biaggini, who repeatedly asserted that there was no "coercion" or "duress." (Biaggini, Tr. 3206–7). The Court likewise finds that the record amply establishes that SPCC did not sign the Docket No. 20099 Settlement Agreement under coercion or duress.

 Although plaintiffs claim otherwise, defendants' good faith in connection with the negotiations and Settlement Agreement in Docket No. 20099 is manifest from the record in this case. The Court finds, first, that the negotiations were suggested by AT & T in the honest hope that informal discussions between AT & T and specialized carriers, with the participation of the FCC, would arrive at workable solutions to the disputes with those carriers (Kelley, S–T–59 at 14; Weinstein, S–T–201 at 6).

It is also evident on this record that AT & T conducted itself in good faith during the five months of intensive negotiations that took place. Thus, the FCC's representative,

Mr. Weinstein, testified that the negotiations were "enormously successful," and he praised the "genuinely good faith effort of the Bell negotiators" (Weinstein, S–T–201 at 1, 8). AT & T committed extraordinary resources and talent to make the negotiations fruitful (Kelley, S–T–59 at 18). In addition to the negotiators, literally hundreds of Bell System people worked behind the scenes to provide the necessary technical information and support (Kelley, S–T–29 at 20; Hough, S–T–1 at 105). The Bell System team was "cooperative," "responsive" and "bent over backwards" to respond to requests for information in the face of "frequently abusive tactics" by the other carriers and made the "most significant contribution to the success of the process" (Weinstein, S–T–201 at 8, 9). Defendants' good faith is further shown by the implementation of new administrative and operating practices as these issues were resolved during the negotiations, well in advance of a final settlement of the docket (Kelley, S–T–59 at 36).

The Court has assessed the credibility of the witnesses who testified regarding whether SPCC was "coerced" or "under duress" with respect to Docket No. 20099. In particular, the Court was impressed by the demeanor and character exhibited by Mr. Kelley, AT & T's chief negotiator, and Mr. Weinstein, the FCC's representative who chaired the 20099 negotiations. Both Mr. Kelley and Mr. Weinstein testified convincingly regarding the circumstances surrounding Docket No. 20099 and withstood vigorous cross-examination regarding their objectivity. By contrast, plaintiffs' evidence in support of its Docket No. 20099 claims consists largely of hearsay testimony by individuals, like Mr. Grant, who did not participate personally in the negotiations. The Court found it significant that SPCC did not produce any of its 20099 negotiators for the Court to scrutinize at trial, although

ties will be able to informally resolve any differences which may arise. *However, we wish to make clear that no one is, precluded from bringing to the Commission's attention* *any matter which it believes requires Commission action."* (Emphasis supplied).
To the Court's knowledge, SPCC did not do this.

four—Messrs. Hunich, Forrest, Gibbs and Sternberg—were identified on the record.[229]

It is the Court's finding based on the foregoing that there is no credible or competent evidence to support SPCC's charge of coercion or duress in connection with Docket No. 20099, particularly in view of SPCC's failure ever to complain to anyone—at the FCC or AT & T—that it acted "under duress" or was "coerced" by defendants. The Court likens SPCC's claim to that of a plaintiff in a negligence case, who just before trial accepts the defendant's settlement offer. Then years later, comes back to Court to complain that the settlement was accepted under duress or coercion. This despite the fact that plaintiff was represented by excellent counsel. For no matter how antagonistic the parties are, once the jury (or Court) returns its verdict, the parties are bound to abide by it. Certainly the plaintiff may not have received everything that he may have wanted for what a jury may have returned with, but that is the purpose of what the settlement was for. To eliminate all risks and uncertainty, as well as an expedition of the process, even if it is a matter of hours. In the situation at bar, SPCC had excellent representation, who agreed with the settlement process. However unlike the plaintiff in the example above, SPCC had a right to address any new problems or difficulties either in informal settings or before the Commission. The fact that they did neither, leads the Court to believe that SPCC was satisfied with the agreement.[230]

In its 1971 *Specialized Common Carriers* decision, the FCC stated that "should any future problem arise, we will act expeditiously to take such measures as are necessary and appropriate in the public interest

to implement and enforce the policies and objectives of this Decision" (S–2211, 29 F.C. C.2d 870 at 940). Notwithstanding this invitation and the belief of SPCC's lawyers that SPCC had always enjoyed "an excellent relationship with the FCC" (S–3424), SPCC never complained to the Commission about any difficulty it experienced in negotiating a contract with defendants (Kopf, Tr. 914–94). Thus, Mr. Kopf stated in a memorandum dated February 13, 1975 (S–3424):

> "SPCC has been particularly benefited by the FCC on numerous occasions. SPCC has sought and obtained from the FCC expedited consideration of applications for construction permits. The FCC has also granted requests for waivers to permit early construction of certain SPCC segments; requests for temporary authority to use SPTCo. communications facilities in advance of construction of the SPCC system; and requests for emergency operating authority into certain locations. I feel that the FCC has given SPCC consideration beyond that normally expected of a regulatory agency."

The Court also found persuasive on this point Mr. Weinstein's testimony that he did not recall any complaints of duress by SPCC's negotiating team, that he had not heard of such a claim until this lawsuit, and that, contrary to SPCC's charge, SPCC seemed genuinely pleased with the result of the negotiations (Weinstein, S–T–201 at 18–19). Moreover, *the record is devoid of any evidence that SPCC has complained to the FCC about "coercion" or "duress" during the seven years since the Settlement Agreement in Docket No. 20099 was executed:* (Emphasis supplied).

---

**229.** Although plaintiffs offered Mr. Sternberg's deposition testimony, the Court finds that Mr. Sternberg did not lend any credible support to SPCC's claim that it entered into the Settlement Agreement in Docket No. 20099 under duress. By contrast, in a letter to Mr. Miller, SPCC's General Counsel, describing the negotiations, Mr. Sternberg informed Mr. Miller that general agreement had been reached on the majority of the unresolved issues (Sternberg, Ex. 9 at 1; Dep.Tr. at 88–90).

**230.** This does not mean that SPCC received everything that they wanted, but as the Court sees it, unless they (SPCC) did receive *everything* that they wanted, then they would still be in Court claiming a violation of the antitrust laws. What is very interesting to the Court is that SPCC to this date has not raised these problems with the Commission where they could have been resolved expeditiously.

As noted above, the Court also regards as particularly significant the failure of Southern Pacific's Chairman of the Board, Mr. Biaggini, to complain to AT & T's Chairman, Mr. deButts, regarding any of the terms and conditions of defendants' provision of local distribution facilities, notwithstanding Mr. Biaggini's admittedly close personal relationship and long-standing professional and civic association with Mr. deButts and with other senior Bell executives (Biaggini, Tr. 3178, 3196; deButts, Tr. 4102–03). And if Mr. Biaggini's silence were not dispositive, SPCC's "coercion" claim surely must fail in the light of Mr. Biaggini's admission that, at bottom, there was "no duress" and "no coercion" associated with SPCC's execution of the Settlement Agreement (Biaggini, Tr. 3206–07). In his rebuttal testimony, Mr. Biaggini termed defendants' conduct in this case as "Mickey Mouse" (Biaggini, Tr. 5985–6). This does not mean or constitute a violation of § 2 of the Sherman Act.

### FILING OF STATE TARIFFS

SPCC contends that defendants acted unreasonably and in bad faith in filing tariffs in the fall of 1973 that established the terms and conditions governing the provision of local distribution facilities to SPCC. This charge in turn involves two interrelated claims. First, SPCC alleges that defendants unreasonably decided in August 1973 to file facilities tariffs to supersede the draft facilities contract then being negotiated between AT & T and SPCC. Second, SPCC claims that defendants' decision to file those facilities tariffs with the state commissions instead of with the FCC was improper. The Court finds on the record before it that these claims, whether viewed separately or together, do not constitute an antitrust violation.

 It is undisputed that, in the fall of 1973, AT & T decided to advise the Bell System operating companies that local distribution facilities should be offered to the specialized common carriers under tariffs rather than pursuant to contracts with those carriers (Agreed Fact 5–2–052), and that AT & T made that decision after negotiations with SPCC for a suitable contract were well underway (Kopf, Tr. 460–62; PX4–0725). SPCC contends that defendants' unilateral decision to supersede the draft contract with tariff filings was unreasonable and made in bad faith. Defendants presented substantial evidence, which the Court found persuasive, that their decision to file facilities tariffs in August 1973 was motivated not by any intention to impede SPCC but instead by a good faith desire to raise the non-compensatory rates embodied in the long-standing facilities contracts between AT & T and Western Union and to eliminate any basis for the specialized carriers claims of discrimination *vis-a-vis* Western Union (Cook, S–T–57 at 22–30).

Prior to the FCC's *Specialized Common Carriers* decision in 1971, AT & T had been providing local distribution facilities to Western Union under long-standing contracts at rates that were based on 1966 costs and which, by 1971, were believed by AT & T to be unduly low and possibly non-compensatory (Cook, S–T–57 at 22). AT & T was of the view that the non-compensatory rates charged to Western Union, if permitted to continue in effect, might have to be offered to the new intercity entrants in the light of the directive in the *Specialized Common Carriers* decision that the Bell System provide local distribution facilities to all other common carriers, including Western Union, on a non-discriminatory basis (Cook, S–T–57 at 21–22). Defendants presented evidence that, in AT & T's judgment, it would have been economically irresponsible as well as not in the public interest to offer local distribution facilities to all other carriers at the non-compensatory rates set forth in the Western Union contracts (Cook, S–T–57 at 27–28).[231] AT & T therefore concluded that it

---

**231.** The Court agrees with this position. If defendants had provided facilities to SPCC at the Western Union contract rates, it would have meant subsidizing SPCC in the amount of approximately $13 million through March 1978 (Cashman, S–T–31, Attachment 2). Since other carriers would have had to be favored with identical subsidies, the loss to the Bell operat-

should seek to modify its contracts with Western Union to raise the local distribution facilities rates to compensatory levels (Cook, S–T–57 at 22–23). Initially AT & T sought to accomplish this objective by negotiation because the contracts could only be terminated on five years written notice[232] and because negotiation for such changes had been customary for decades (Cook, S–T–57 at 23).

The evidence further demonstrates that AT & T made extensive efforts to renegotiate its contracts with Western Union beginning in 1971 and continuing into 1973. In March 1973, Western Union and AT & T executed a letter agreement contemplating rate increases (S–2586). However, by late June it was evident to George Cook, AT & T's Vice President responsible for relations with Western Union and the specialized common carriers, that Western Union would not agree to higher rates for local facilities provided by the Bell operating companies (Cook, S–T–57 at 26).[233] By this time, internal AT & T studies showed that the Western Union charges would have to be almost doubled to become compensatory (Cook, S–T–57 at 23–24; S–2544B) and AT & T's Executive Policy Committee was informed of these facts and alternative approaches to resolving the dilemma were thus posed in a series of meetings in July–August 1973 (Cook, S–T–57 at 26–32).

AT & T concluded that its only remaining course of action to resolve the dilemma was to file local distribution facilities tariffs that would apply to all other carriers, including Western Union, and that would provide for rates higher than those previously charged to Western Union (Cook, S–T–57 at 26–32; deButts, S–T–131 at 75–77). In this regard, defendants presented credible evidence of their good faith belief that the Western Union rates were non-compensatory[234] and that under applicable law such facilities tariffs would supersede AT & T's contractual obligations to Western Union and would compel Western Union to pay local facility rates equivalent to those to be charged to other carriers, such as SPCC (Cook, S–T–57 at 28–30). The evidence thus establishes that AT & T intended this action to preclude any complaints by the specialized common carriers that AT & T was discriminating against them in favor of Western Union (Cook, S–T–57 at 30).

The Court is particularly struck by the briefing notes used by Mr. Cook in his discussions with AT & T's Executive Policy Committee (S–2671; S–2678B). That Committee's ultimate decision to file state tariffs clearly was based on factual data provided to it showing that the existing Western Union charges were far too low, that as a legal matter tariffs would supersede the contracts, and that the filing of tariffs would be the best way to achieve FCC policy objectives, eliminate charges of discrimination, and avoid subsidization of the specialized carriers by the general public (S–2679; S–2698).

The Court finds that defendants' decision to offer local distribution facilities to the specialized common carriers pursuant to tariff filings was reasonable in the light of existing circumstances, and in no way constitutes support for plaintiffs' charges of monopolization. Moreover, it is clear to the

ing companies, which ultimately would have been borne by other customers, would have been much greater.

**232.** The Western Union Contract No 1 provides (PX4–0614 at 11(b)): "This Agreement may be terminated by either party upon five years' written notice to the other party."

**233.** As to Western Union, the Commission ultimately held in Docket 19896 that the tariffs did not supercede the contracts and Bell had to continue to provide facilities to Western Union pursuant to contracts No. 1 and No. 2 until the fall of 1978 when the five year notice of termi-

nation given in September, 1973 ran out. (Agreed Fact 5–2–067).

**234.** It is clear to the Court that the local distribution facilities provided Western Union pursuant to the 1970 Contract was based on 1966 costs. (Jackson, S–T–158 at 21). The Court is satisfied with the defendants' explanation of why Western Union LDF's were based on 1966 costs. That is, the rates actually went into effect in September 1968, and were not finally memorialized in a contract until January 1, 1970. (Jackson, S–T–158 at 24).

Court that it was better to set these rates by tariff, which would be changed when needed, rather than contract, which would be for a specified period of time.[235]

 Apart from the reasonableness of defendants' decision to offer local distribution facilities under tariff rather than contract, the evidence amply demonstrates that SPCC in no way was injured as a result of that decision. As a threshold matter, the Court finds that SPCC was not, or certainly should not have been, surprised by AT & T's decision to file tariffs. Indeed, the evidence shows that SPCC was on notice that defendants might elect to offer local distribution facilities under tariff (Jackson, S–T–58 at 8–9). The draft facilities contract sent to SPCC in July 1973 contained the following provision, to which SPCC did not object (PX4–0758 at 21):

> "The Telephone Company reserves the right to offer the use of a part or all of the facilities leased hereunder ... *under its tariffs filed with appropriate regulatory bodies* or otherwise lawfully published. To the extent the use of facilities are covered by tariff, this Agreement shall be deemed superceded on the effective date of such tariff ...." (Emphasis supplied.)

In this regard, the Court rejects as not credible the testimony of Mr. Kopf that, as SPCC's General Counsel, he did not focus upon this provision of the draft contract (Kopf, Tr. 510–11). Even if true, the oversight of counsel cannot be attributed to defendants.

Moreover, as Mr. Kopf testified, SPCC preferred tariffs to contracts (Kopf, Tr. 477–79). In fact, SPCC planned to sign the contract and then to institute legal proceedings to compel defendants to file tariffs (Kopf, Tr. 531–32; Biaggini, Tr. 3229–32). SPCC similarly considered legal action against General Telephone Company to compel it to provide local distribution facilities under tariff rather than under contract (S–2809). Of perhaps the greatest significance, in the Court's view, is Mr. Grant's admission that the tariffs filed by defendants were if anything more favorable to SPCC than had been the draft facilities contract that those tariffs replaced (Grant, Tr. 674–75).

Finally, the Court finds that SPCC was not adversely affected by the fact that the facilities tariffs did not become effective until January 11, 1974. During the 17-day period prior to January 11 in which SPCC was in operation, defendants provided local facilities to SPCC pursuant to interim contracts (Grant, PX6–0004 at 13; App. S–T–85 at 15; S–2792). Under these circumstances, the Court concludes that SPCC was not injured by defendants' decision to file the subject tariffs.

---

**235.** Collins Radio Company recognized the precarious position that AT & T occupied in a January 15, 1974 memorandum to the file, wherein Mr. Erickson noted (S–2892 at 3, 4):

> "Bell does find itself in a dilemma on the rate issues, however because of the 'contract' versus tariff approach that it has followed with Western Union.
>
> The fundamental distinction between a tariff and a contract is that a tariff is subject to change at any time upon a showing that it is not reasonable or that it will yield non-compensatory revenues. A contract on the other hand, is fully valid for a specific term irrespective of the compensatory nature of its rates or the reasonableness of its terms. *A common carrier such as AT & T normally must conduct all businesses through tariffs.* The reason for this is that all of its operations must be conducted theoretically at least, in a manner such that all segments of the public derive approximately equal benefits from the carrier's services. In dealing with other carriers, however, AT & T has sometimes entered into contracts rather than filing tariffs. This has been understandable, particularly in dealing with Western Union who has been until recently only a "record carrier" conducting a business in which Bell had no great interest. Now that Western Union has become a Specialized Common Carrier, as have many others, competing directly with AT & T for voice as well as record private line business, a situation has arisen that was not contemplated when the contract was entered. The contract, if it is valid, still has four years to run. Where the matter really begins to bind is that the FCC says that Bell must continue furnishing WU interconnection services on the basis of the contract. The Philadelphia court, at the same time, says that there can be no discrimination in rates between WU and other SCC's. *Whipsaw.*" (Emphasis supplied).

SPCC further criticizes defendants' decision to file facilities tariffs with the state regulatory commissions instead of the FCC. The record is devoid of any evidence, however, that tends to show that defendants chose to file the tariffs with the States with any intent to impede the entry of the specialized common carriers or that those filings in any way harmed SPCC. By contrast, defendants offered convincing evidence that their decision was motivated strictly by a desire to file the tariffs with the most appropriate regulatory authorities and that they had reasonable grounds to believe that the FCC staff acquiesced in the view that the States were the appropriate forum (Cook, S–T–57 at 31–36; deButts, S–T–131 at 76; Strassburg, U.S.Tr. at 23367–69).

The record reflects that a number of factors led defendants to believe that filing their facilities tariffs with the state commissions rather than with the FCC was appropriate. Thus, Mr. Cook, at that time AT & T's Vice President for State Regulatory Matters, testified that the decision was motivated by several considerations (Cook, S–T–57 at 31–32). First, since the local distribution facilities to be furnished were fundamentally the same as those used in the provision of defendants' own local intrastate private line services, AT & T believed that the state commissions, which exercised jurisdiction over the provision of those services, would similarly exercise jurisdiction over the provision of local distribution facilities to the specialized common carriers. Second, a number of state commissions had exercised their statutory approval authority over local facilities lease contracts with Western Union, MCI and other carriers, and the FCC had not indicated that this was inappropriate.[236] Third, since the primary purpose of filing the tariffs was to supersede the existing Western Union contracts, which in some instances had required approval by state regulatory commissions, defendants believed that the superseding tariffs would require approval by those same state commissions. Finally, the rates to be charged under these tariffs were to be based on existing intrastate private line tariffs which were already subject to the approval of the state regulatory commissions (id.). The Court believes each of these factors to be reasonable on its face and plaintiffs introduced no evidence suggesting otherwise.

In addition to these considerations, the Court found particularly significant the evidence that the Chief of the Carrier Bureau of the FCC in 1973, Mr. Strassburg, led defendants reasonably to believe that their filing of facilities tariffs with the state commissions was appropriate. Thus, the evidence shows that, on two separate occasions in 1973, Mr. Strassburg met with Mr. Cook. The first meeting occurred in June 1973. At that meeting Mr. Strassburg observed that filing tariffs likely would be the best way to set local facilities rates and resolve the problem of attempting to negotiate contracts with a multiplicity of carriers including Western Union (Cook, S–T–57 at 35; Strassburg, S–T–171 at U.S.Tr. 23361). Then, on September 28, 1973, Mr. Cook met again with Mr. Strassburg to review with him AT & T's plans to file tariffs, as he had suggested, and AT & T's conclusions concerning the state agencies as the more appropriate forum. Mr. Strassburg's reaction was that AT & T's plans seemed reasonable; moreover, Kelley Griffith, Mr. Strassburg's Deputy Bureau Chief who also was present at this latter meeting, indicated to Mr. Cook that AT & T's approach was fair and rational (Cook, S–T–57 at 36; Strassburg, S–T–171 at U.S.Tr. 23365–69).

In the Court's view, defendants' position is buttressed considerably by the uncertainty that the Court finds existed generally in this period within the telephone industry and among the regulators regarding the scope of federal and state jurisdiction over

236. For example the Illinois Commerce Commission exercised jurisdiction over both the 1971 Illinois Bell-MCI contracts and the 1973 Illinois Bell-MCI contracts, in each case finding that the terms and conditions were reasonable and that it had jurisdiction (Marshall, C. Tr. at 4311–14; S–2262D; S–2721D; S–2721E).

telecommunications matters (Cook, S–T–57 at 53). Serious jurisdictional disputes erupted between the States and the FCC in late 1973—disputes which were not finally resolved until 1976. See *Telerent Leasing Corp.*, 45 F.C.C.2d 204, 214 (1974), *aff'd sub nom. North Carolina Utils. Comm'n. v. FCC,* 537 F.2d 787 (4th Cir.), *cert. denied,* 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976).[237]

Based on the foregoing, the Court finds that defendants were reasonably justified in their belief that the state regulatory commissions were the appropriate bodies with which to file the local distribution facilities tariffs. Moreover, the fact that the FCC subsequently asserted jurisdiction over such tariffs by letter order dated October 4, 1973 (S–2763) does not evidence bad faith by defendants. In the Court's view, that order establishes, at most, that there had been a genuine controversy surrounding this issue prior to that time.[238]

As a separate and independent ground on which to dismiss SPCC's claim regarding the filing of state tariffs, the Court also finds that SPCC failed to prove any injury arising from those filings. The evidence demonstrated instead that defendants acted promptly to refile the facilities tariffs with the FCC once the Commission had ordered defendants to do so (Cook, S–T–57 at 37–38).

## RATES FOR LOCAL DISTRIBUTION FACILITIES

During SPCC's first year of operation, the rates it paid defendants for local distribution facilities were governed by the facilities tariffs filed with the FCC as a result of the October 4, 1973 FCC latter order. Those rates had been included in the draft facilities contract that SPCC agreed to before it commenced operations[239] (PX4–0756; PX4–0758), which in turn was based on tariff rates applicable to defendants' intrastate private line customers (Cook, S–T–57 at 20–21). As part of the Settlement Agreement in Docket No. 20099, AT & T agreed to substantial discounts in the tariff rates for both interexchange and intraexchange facilities, retroactive to December 1974 (S–3470). The tariffs providing for those discounted rates remain in effect today, seven years later.

SPCC contends that defendants have charged excessive rates for the provision of local distribution facilities under their facilities tariffs. Thus, SPCC asserts that the tariff charges it paid for local facilities prior to the Settlement Agreement in Docket No. 20099 were higher than the amounts Western Union paid under its contracts with AT & T, on the one hand, and higher than the costs incurred and recovered by the telephone industry interstate joint en-

---

**237.** The *Telerent* proceeding was instituted by the FCC on September 7, 1973, "in order to remove or alleviate the confusion and uncertainty" that then existed over whether the FCC or state regulatory agencies had jurisdiction over the terms and conditions of interconnection to the nationwide switched network (45 F.C.C.2d at 213–14, 219–20). In its declaratory ruling, which was not released until February 5, 1974, the FCC preempted the exercise of jurisdiction by the States over those matters in the future. On appeal, the Court of Appeals for the Fourth Circuit, while affirming the Commission's decision, split 2 to 1 on the question whether the FCC had the power to preempt state jurisdiction in this manner. *North Carolina Utils. Comm'n v. FCC,* 537 F.2d 787 (4th Cir.), *cert. denied,* 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976). Moreover, neither the FCC nor the Fourth Circuit even suggested that anyone had acted improperly by resorting to state regulatory agencies prior to the FCC's issuance of its declaratory ruling governing the future regulation of the industry.

**238.** In addition, the Court finds that the filing of tariffs with state regulatory agencies constituted petitioning activity protected from attack under the Sherman Act by virtue of the *Noerr-Pennington* doctrine discussed above. As the Court has shown above, there was a very strenuous fight going on during this time period as to who had jurisdiction, the FCC or the states, with AT & T caught right in the middle. Even to this day, the state commissions express concern about the erosion over their powers to regulate intrastate service (*See, e.g.* S–6193 at 13; S–6197 at 13).

**239.** In its April 30, 1973, redraft of the proposed agreement between SPCC and the telephone company, SPCC, by Mr. J.M. Albertson, made no revisions to the schedule of charges attached as Appendix C. (PX4–0757 at 37–39).

terprise in furnishing facilities to Long Lines, on the other. SPCC also claims that the tariff rates in effect since December 1974, although discounted from the initial tariff rates, have continued to be excessive. Moreover, as further support for its substantive claims on rates, SPCC contends that none of the tariff rates filed by defendants were cost-supported.

The evidence clearly establishes that defendants' tariff rates for local distribution facilities not only were reasonable but also that those rates were significantly below defendants' costs in providing those facilities. Indeed, rather than demonstrating that defendants' facility charges to SPCC and other specialized carriers were too high, the evidence graphically demonstrated that those rates had the effect of creating an enormous subsidy to the specialized common carriers, including SPCC, while causing a concomitant revenue drain to defendants and a burden on the public (Cashman, S–T–31A at 3; Field, S–T–32; Kelley, S–T–59 at 34; Marshall, C., Tr. 4337).

In support of its claim regarding the pre-Docket No. 20099 facility tariff rates, SPCC relied principally upon Mr. Kopf's testimony that those rates were higher than the rates charged Western Union for local distribution facilities (Kopf, Tr. 505). As a threshold matter, although Mr. Kopf testified that he thought the Western Union rates constituted an appropriate "benchmark" (Kopf, Tr. 504), SPCC introduced no evidence whatsoever that the rates contained in the Western Union contracts were appropriate for facilities to be provided to SPCC in the mid-1970s, several years after the cost studies, as noted above, on which the Western Union charges were based. Further, SPCC introduced no evidence that the Western Union contracts covered the costs to defendants of the facilities provided to Western Union or that the facilities provided SPCC were identical or even similar to those provided Western Union.

Quite the contrary, the Court is satisfied that the Western Union contract rates for Bell facilities were non-compensatory at least as of 1973, as noted above, and that the facilities themselves were less expensive to provide and less complex than the local distribution facilities provided the specialized carriers (Kelley, S–T–59 at 33; Jackson, S–T–58 at 21; Cook, S–T–57 at 22; Field, S–T–32 at 2–3; Cashman, S–T–31). In particular, the evidence shows that the facilities furnished Western Union were used primarily for its message telegraph service, a far different and less expensive use than a private line telephone service such as SPCC offered at the time—that is, the provision of voice grade facilities is more expensive than the provision of unengineered, bare wire pairs such as defendants provided under the Western Union contracts (Jackson, S–T–58 at 21–22, U.S.Tr. 21003).

In opposing SPCC's claim that the rates that it paid defendants for local facilities were excessive both before and after Docket No. 20099, defendants rely principally upon Ms. Cashman's testimony (S–T–31) regarding several local distribution facility cost studies that she undertook in connection with this case (S–6234E; S–6234F; S–6234G). The Court found Ms. Cashman's testimony especially credible and persuasive and her studies both soundly conceived and convincing in responding to SPCC's claims with respect to facility rates. In addition, Ms. Cashman's testimony and the studies themselves were buttressed by the testimony of knowledgeable witnesses from a number of Bell operating companies, as well as a professional statistician (Budd, S–T–33; Byrne, S–T–34; Donovan, S–T–35; Dudley, S–T–36; Hammond, S–T–37; Konrad, S–T–38; Molfetta, S–T–39; Morgan, S–T–40; Nehez, S–T–41; Zuella, S–T–42).

Ms. Cashman's facility cost studies (S–6234E; S–6234F; S–6234G) compared the Bell operating companies' costs of providing local facilities to SPCC with the tariff rates actually paid by SPCC and with the prices SPCC would have paid if charged at the same "rates" as were "charged" to Western Union and Long Lines. The Court concludes that the methodology employed in these studies was sound and that the results were persuasive. The studies conclusively

show that SPCC was not overcharged for local facilities either before or since Docket No. 20099 (Cashman, Tr. 3949).[240]

Indeed, Ms. Cashman's studies amply demonstrate that SPCC was charged far less for local distribution facilities than the costs to the operating companies of providing them (Cashman, Tr. 3949; S–T–31 at 2, 8). Thus, it was shown that for each $1.00 of revenue generated by the local facilities provided to SPCC, the costs to the operating companies were approximately $1.60 (S–6234E). Moreover, the evidence shows that, if SPCC had been charged at Western Union contract rates, the effect on defendants would have been even more inequitable and would have resulted in an even greater subsidy to SPCC than arose from the actual tariff rates (Cashman, S–T–31 at 2, 8–9). In this regard, for each $1.00 of revenue generated at Western Union rates, the costs to the operating companies would have been approximately $3.25 (Cashman, Tr. 3939–50; S–T–31 at 9; S–6234F).

Finally, defendants' facility cost studies demonstrate that, contrary to SPCC's claims, SPCC was charged substantially less for local distribution facilities than the amount attributable to the provision of such facilities to AT & T's Long Lines Department. Thus, for the liability period in this case, it was shown that if SPCC had paid an amount equal to the compensation recovered by the Bell operating companies under the division of revenues process for facilities furnished to Long Lines, the charges to SPCC for these facilities would have almost doubled (Cashman, Tr. 3950; S–T–31 at 2, 10; S–6234G).[241]

Plaintiffs' claim that defendants have never cost-justified their local distribution facility rates rests on nothing more than the admitted fact that the FCC has never made a finding that the rates were cost-justified. The Court finds that fact to be irrelevant. In any event, the reason that the Bell System has been unable to present the FCC with cost studies that the FCC would find acceptable is because—as is the case with cost studies for AT & T's own private line service described above on the standards governing the nature of the cost support for tariff filings—the FCC keeps revising its policies (Cook, S–T–57 at 49; Field, S–T–32 at 8–18).

Based on the uncontroverted facts established by defendants' evidence, the Court must conclude that the effect of defendants' non-compensatory facility rates has been to create an enormous and growing subsidy to the specialized common carriers, including SPCC, and a concomitant revenue shortfall to defendants. Indeed, the local distribution rates assumed in SPCC's damage study would result in a cumulative subsidy to SPCC of approximately $280 million

---

**240.** SPCC offered no credible evidence that the rates that it paid for local facilities were unreasonable. In an attempt to undercut Ms. Cashman's testimony and her studies, Dr. Melody testified during SPCC's rebuttal case that Ms. Cashman had used current costs instead of historical or incremental costs, which Dr. Melody asserted would have been lower. Aside from the fact that Dr. Melody had no basis for his assertion other than his unsupported opinion, he did not testify that Ms. Cashman should have used something other than current costs or that if she had her ultimate conclusion that the rates were below costs would have been different. Moreover, Mr. Field testified that under studies conducted using FDC–7 Methodology, which is based on historical costs, the rates charged specialized carriers for local distribution facilities in 1977 would have had to be *increased 90 percent* merely to cover costs and earn the authorized rate of return (Field, S–T–32 at 5–6).

**241.** During the informal negotiations held in Docket No. 20099, AT & T offered to remove from the Bell System's internal division of revenues process the provision of local distribution facilities to Long Lines and thereupon to offer those facilities to the specialized common carriers, Western Union and Long Lines at identical rates and on the same terms and conditions (S–3233B; Kelley, S–T–59 at 30–33; Weinstein, S–T–201 at 16). Mr. Weinstein, the FCC's representative at the negotiations, agreed with AT & T that its proposal would resolve any alleged claim of discrimination between the rates, terms and conditions applicable to the other carriers and to Long Lines (S–T–201 at 16). Nonetheless, the other carriers, including SPCC, rejected AT & T's proposal and instead insisted upon the *substantial* tariff rate discounts that have now been in effect for seven years (Kelley, S–T–59 at 30–33; Weinstein, S–T–201 at 15–16).

through the originally claimed damage period (Cashman, S–T–31A at 3; S–7(S)). The Court is deeply troubled by the subsidization effect of defendants' local distribution facility charges to SPCC. As Mr. Kelley testified, the rate discounts embodied in the Docket No. 20099 Settlement Agreement, coupled with rising costs to defendants, have exacerbated the subsidy effect, and the Bell System is currently losing more than $100 million per year in the provision of local facilities to the specialized carriers (Kelley, Tr. 4253; S–T–59 at 33–34).

In the light of the persuasive evidence that defendants' charges to SPCC for local distribution facilities were too low rather than too high, it is evident that SPCC simply cannot prevail on its antitrust claim that the tariff rates were unreasonable and anticompetitive. Even assuming that local distribution facilities constitute "essential facilities" under *Hecht, supra,* the law is clear that a holder of such facilities may charge a reasonable price for their use. *United States v. Terminal Railroad Ass'n,* 224 U.S. 383, 411, 32 S.Ct. 507, 516, 56 L.Ed. 810 (1912). The antitrust laws do not require a monopolist to subsidize its competitors. As the court stated in *Town of Massena v. Niagara Mohawk Power Corp.,* 1980–2 Trade Cas. ¶ 63,526 at 76,814 (N.D. N.Y.1980):

> "Nothing in the history of the Sherman Act (prior to remedial relief) requires a monopolist to affirmatively assist potential competitors by subsidizing their entry into the marketplace or granting them preferential access to a unique facility."

Since, in the Court's view, rates significantly higher than those actually charged SPCC would withstand antitrust scrutiny, SPCC's claim to an even greater subsidy than it in fact received must be rejected as being wholly contrary to the substance and purpose of the Sherman Act.

Moreover, there is certainly no evidence that defendants' rates for local distribution facilities injured SPCC. Insofar as the record demonstrates that SPCC was substantially undercharged for those facilities, SPCC's persistence in its claim of injury, in the Court's judgment, lacks any foundation whatsoever. SPCC's claims on this issue also must be dismissed for failure to prove "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). The record unequivocally shows that the rates charged to Western Union for local distribution facilities had no competitive impact on SPCC. Thus, SPCC offered no evidence that it ever lost a single customer or even a single circuit to Western Union as a result of any difference between the rates paid by SPCC for local distribution facilities and the rates paid by Western Union for the facilities it received under its contracts with defendants. Moreover, by SPCC's own admission, it was not threatened by the Western Union rates and believed it would not lose business to Western Union (Kopf, Tr. 506). Indeed, Mr. Brodman testified that Western Union was "really not a competitor" (Brodman, Tr. 1840), as did other SPCC witnesses in their depositions (S–6057 at 47; S–6099 at 38–43; S–6122B at 22).

Since the Court finds that the rates that defendants charged SPCC for local distribution facilities were below defendants' costs in providing those facilities, SPCC's claim that defendants acted in bad faith or unreasonably by failing to file cost-based tariffs becomes meaningless. The Court nevertheless finds that the tariff rates charged SPCC for local distribution facilities were in good faith based on defendants' intrastate private line rates on file with and approved by state regulatory bodies throughout this country (PX4–0209; Kelley, Tr. 4243; Cook, S–T–57 at 32; Field, S–T–32 at U.S.Tr. 23093; Weinstein, Tr. 4910). The facilities that SPCC requested and received from the Bell operating companies were comparable to local private lines (Tr. 1390; Biaggini, Tr. 3234; Weinstein, Tr. 4910–11). In these circumstances, the Court concludes that defendants acted reasonably by basing local distribution facil-

ity rate levels on the prices charged other customers for similar services.[242]

## LOCAL DISTRIBUTION AREAS

Prior to the Settlement Agreement in Docket No. 20099, defendants' facilities tariffs contained a provision that defined the geographic area radiating outward from SPCC's technical operating centers within which Bell would provide local distribution facilities (Cook, S–T–57 at 17–19). SPCC contends that this "local distribution area," or "LDA," requirement prevented SPCC from obtaining the local distribution facilities essential to serve potential customers located outside the LDAs, that the geographical limitations were unreasonably small, and that SPCC consequently was injured by this tariff requirement.

The Court finds as a threshold matter that SPCC's claim regarding the local distribution area requirement covers at most the period from December 1973, when SPCC became operational, until May 1975, when the FCC accepted the Settlement Agreement in Docket No. 20099, which eliminated the LDA requirement (S–3470). In support of its claim that the LDAs were unreasonably small, SPCC offered only the testimony of Mr. Vasilakos that SPCC was denied a local loop from Los Angeles to Ventura, California, a distance of 50 to 60 miles (Vasilakos, Tr. 906).[243]

Against this meager evidence, defendants presented credible and persuasive evidence that the rationale underlying the LDA re-

quirement was reasonable and that the LDAs established were reasonable in size. Thus, defendants pointed to the FCC's 1971 *Specialized Common Carriers* decision, which expressly stated that the established carriers with "exchange facilities" were expected to furnish them to other carriers (S–2211; 29 F.C.C.2d 870 at 940). In the Court's judgment, the instructions AT & T sent to the Bell operating companies concerning the definition of LDAs (S–2587)— and the LDAs actually made available to the specialized carriers—went beyond this requirement.[244] The basic objective of these instructions was to offer the specialized common carriers "facilities throughout an area where congestion and franchises would make it difficult or economically impractical for [such a] carrier to provide its own facilities" (*id.* at 4). The operating companies were further instructed that the local distribution area should, at a minimum, be as large as the exchange area (Cook, S–T–57 at 19). The record is devoid of any evidence that any operating company failed to comply with these instructions.

■ Under these circumstances and in the absence of any contrary evidence, the Court finds that defendants' inclusion of an LDA provision in its pre-Docket No. 20099 tariffs was reasonable and did not constitute a denial of "essential" facilities under *Hecht, supra.* Accordingly, the Court finds that the LDA requirement did not violate the antitrust laws.[245]

---

**242.** Still another fact indicating the reasonableness of defendants' local distribution facility charges is that those charges were substantially less than what SPCC has agreed to pay to independent telephone companies. According to SPCC, the independent telephone companies charged approximately $58 for each local loop compared to approximately $35 charged by defendants (Lim, Tr. 5937–39).

**243.** The Court has already dealt with SPCC's claims regarding intercity facility leasing and, to the extent the LDA claims are the same, the Court's earlier findings apply. The Court, however, assumes—although it is not entirely clear—that SPCC's claim here is that the LDAs were unreasonably small. In addition, as also noted above, after May, 1974 SPCC could have served any customer located anywhere—in-

cluding Ventura, California—by leasing intercity facilities from AT & T.

**244.** For example, the Chicago area LDA provided to MCI in 1971 included the entire Chicago Inner-Metropolitan Rate Area—an area covering over 1,000 square miles—even though the Chicago exchange covers only the city limits of Chicago (Marshall, C., Tr. 4310; S–93; Jackson, S–T–58 at n. 7).

**245.** The Court's finding is not altered by the evidence, offered by SPCC, that various Pacific Telephone proposals to define LDAs were forwarded to that company's marketing department, among others, for comments (PX4–0810; PX4–0811). The Court finds such a practice of interdepartmental review of company proposals to be a normal and reasonable business

The Court further finds that, even if defendants' definition of local distribution areas was in some way unreasonable, the claim nonetheless is deficient because plaintiffs failed to prove any injury flowing from the LDA concept. Mr. Vasilakos also testified that he could not recall either the cost of the particular local loop he claimed defendants had refused to provide, or whether it would have made economic sense for SPCC to provide this service (Vasilakos, Tr. 907–08). Mr. Grant testified that the local distribution areas defined by defendants were larger than could economically be utilized by SPCC, and in any event, that the cost of local loops at the outer limits of the LDA exceeded what SPCC reasonably could charge its customers (Grant, Tr. 660, 661). Mr. Vasilakos himself conceded that where the cost of SPCC's circuit link could not be justified, plaintiffs' complaint about the definition of the LDA was merely academic (Vasilakos, Tr. 909–10). The record is thus devoid of any evidence that any potential customers outside the LDAs during the period of time in which the requirement was in effect would have taken SPCC's service had it obtained facilities covering a wider geographic area. Moreover, SPCC did not call any potential customers to testify. As such, SPCC's claim of injury is defective because "the record [is] totally devoid of evidence ... [from] any customers" relating to the challenged practices. *Berkey Photo, supra,* 603 F.2d at 288–89. Indeed, practices since the elimination of the restriction only further confirm that SPCC was not injured by this requirement. The evidence shows that following the elimination of the local distribution area requirement in May 1975, virtually all (97.9 percent) new SPCC customers continued to be within the boundaries of the former local distribution areas (Nehez, S–T–41 at 7; Molfetta, S–T–39 at 4; Budd, S–T–33 at 4;

Konrad, S–T–38 at 6; Hammond, S–T–37 at 4; Byrne, S–T–34 at 4; Donovan, S–T–35 at 4; Dudley, S–T–36 at 4).

## INTERCONNECTION REQUIREMENTS

SPCC advances three principal complaints with respect to the interconnection arrangements required under defendants' facilities tariffs. First, SPCC claims that, prior to Docket No. 20099, defendants refused to lease its fully-equipped end links, thus requiring SPCC to install its own signaling and line conditioning equipment, called station packages, at the customer's premises. Second, SPCC asserts that, even after the Settlement Agreement in Docket No. 20099, defendants continued to refuse to lease SPCC end links for use with customer owned and maintained (COAM) equipment, thereby requiring the continued use of station packages with such equipment. Third, SPCC contends that, prior to Docket No. 20099, defendants required SPCC to interconnect its customers' Centrex CO services at the customers' premises instead of at the local Bell operating company central office. SPCC maintains that the requirements that it install station packages and that it interconnect Centrex service at its patron's premises added to SPCC's operating expenses by forcing its outside plant forces to travel to the customer site and that those requirements degraded the quality of SPCC's service as well.

With respect to SPCC's claim that it was entitled to lease fully equipped end links from defendants prior to Docket No. 20099, the Court finds that there is no evidence in the record to suggest that plaintiffs in fact ever requested that AT & T provide such end links. Thus, although the July 1973 draft of the proposed facilities contract recognized that SPCC would provide the functions performed by the station package

procedure. Furthermore, the Court is persuaded that an operating company should be expected to review its plans for designation of local distribution areas, which represent the business community surrounding a city, with its marketing department. As Mr. Snyder testified rhetorically: "who is better qualified than your marketing department to determine what the business community consists of" (Snyder, Tr. 4588). Accordingly, the Court concludes that the review of proposals for local distribution areas by Pacific Telephone's marketing department does not evidence any anticompetitive intent or practice on the part of defendants.

(PX4–0758), SPCC believed this contract to be "reasonable" and proposed only minor modifications, none of which had anything to do with this issue (Kopf, Tr. 498–99; PX4–0209). SPCC's lack of any real concern in this area is shown by Mr. Grant's failure even to raise the issue with AT & T, despite being advised to do so by personnel at Pacific Telephone (Grant, Tr. 754; Jackson, S–T–58A at 2).

 Although SPCC's silence on the point should dispose of the matter, the record reveals that defendants' refusal to offer end links to SPCC in any event would not constitute a denial of "essential" facilities because it was not "economically infeasible" or a "severe handicap" for SPCC to provide its own station packages. *Hecht, supra.* In this regard, the evidence shows that in many instances SPCC preferred to install its own station packages rather than to obtain end links from defendants. Thus, Mr. Grant admitted that, in the case of specialized circuits and large customers with diverse communications needs, it was actually advantageous for SPCC to provide the station package (Grant, Tr. 754–55, 776–77; S–6052B). The Court found particularly significant SPCC's insistence, even after AT & T agreed to provide fully equipped end links in the Docket No. 20099 negotiations, that it retain the option of providing station packages itself (Grant, Tr. 754–55) and SPCC's practice thereafter of continuing to use station packages at a substantial number of its installations (S–3972; S–4091; S–5715 at 75–76; S–6097 at 78–81).

 Apart from these factors, the Court also finds that the requirement that SPCC provide its own station packages in lieu of Bell-provided end links was entirely reasonable and appropriate in the light of the "clean interface" concept that characterized the engineering and operational relationship between defendants and the specialized common carriers prior to Docket No. 20099 (Thovson, S–T–66A at 2–3; Kelley, S–T–59 at 7–8; Jackson, S–T–58A at 1–5). Defendants presented evidence that the interconnection facilities provided to the specialized common carriers following the *Specialized Common Carriers* decision enabled them to provide their own end-to-end service to their customers. A clear line of demarcation—or "clean interface"—existed between the facilities provided by defendants to the specialized carriers and the private line facilities provided by those carriers themselves. Each party was fully responsible for the performance on its side of the demarcation line and the specialized common carriers provided the overall, end-to-end service to their customers (Kelley, S–T–59 at 7–8; Jackson, S–T–58A at 1–5; Thovson, S–T–66A at 2–3).

Development of interconnection arrangements consistent with the "clean interface" approach reflected, in the Court's judgment, prevailing FCC policies and the wishes of both the new specialized carriers and AT & T to provide and be responsible for service on an end-to-end basis (S–2112; S–2257; S–2427; S–2441; Jackson, S–T–58A). The evidence shows that as early as 1970, at a meeting between representatives of MCI, Illinois Bell, and Southwestern Bell, MCI's President, John Goeken, stated his company's desire to provide "complete end-to-end service" (S–2112). To implement MCI's stated intention to provide end-to-end service, defendants' engineers determined clean interfaces were needed for testing and other purposes. This "clean interface" concept was subsequently developed by defendants into workable interconnection arrangements in coordination with MCI in 1971 and 1972 (S–2257). The concept was utilized in connection with the provision of service by MCI as well as other carriers until the Docket No. 20099 negotiations without complaint by anyone to AT & T (Jackson, S–T–58A at 2; Thovson, S–T–66 at 3–7). Indeed, MCI found the arrangement to have significant advantages (Station Packages Doc.Sub.).

 The record further establishes that AT & T's intent in establishing well-defined interfaces was to "isolate each carrier's area of responsibility including equipment ownership and to provide maximum flexibility of design and operation with

minimal maintenance, administrative and engineering interaction" (PX4–0647 at 804). The Court is persuaded that the concept of a clear point of demarcation between two carriers' services is consistent with sound communications system practice and designed to ensure the integrity of the telephone network (Enticknap, Tr. 3979; Thovson, S–T–66A at 2–3). The Court further finds, based on the record before it, that the requirement that the specialized common carriers provide their own station packages of signaling and related equipment was reasonably justified in the light of the clean interface approach (Jackson, S–T–58A at 2) and in view of the unequivocal dictate of the 1971 *Specialized Common Carriers* decision that the new carriers were to provide non-duplicative, innovative private line services.

The evidence convincingly demonstrates that the bright line of demarcation between Bell operating company facilities and specialized carrier facilities could no longer exist following the FCC's directive in its Docket No. 19896 that defendants provide FX and CCSA interconnections to the specialized carriers. Unlike point-to-point private line service, services like FX and CCSA required direct connection to the switching machines of the public switched network and a much more interactive relationship between the operating companies and the specialized common carriers (Kelley, S–T–59 at 8; Hough, S–T–1 at 79). Defendants presented evidence that when FX or CCSA services are provided entirely by the Bell System, the Bell operating companies and Long Lines cooperate on many working levels and act as full partners to assure that the service they jointly provide is adequate to their customers, but when switched services are provided by multiple suppliers who are not part of a single organization with a common purpose, as was to be the case following the FCC's Docket No. 19896 decision, a host of very difficult administrative, engineering, operational and service problems are created (Kelley, S–T–59 at 8; Hough, S–T–1 at 90–99). The Court concludes based upon this record that the FCC's directive regarding FX and

CCSA services required the development of a significantly different and more complex working relationship between the Bell System and the new intercity competitors than had existed prior to the Commission's April 23, 1974 decision in Docket No. 19896. The Court notes in this regard that this FCC decision, like others discussed elsewhere, provided no specific guidance on how the broadly stated policy was to be implemented (see Weinstein, S–T–201 at 3).

The Settlement Agreement reached in Docket No. 20099 reflected the parties' agreement, based upon their best understanding of FCC policies, for more interactive and cooperative design, engineering, installation, operational, maintenance and testing relationships between defendants and the other specialized carriers, including SPCC, while attempting to retain as much end-to-end responsibility as was practicable (Kelley, S–T–59 at 41; Weinstein, S–T–201 at 12–13). As a reflection of the shift in the way in which the competing carriers viewed their relationship, defendants agreed to lease end links to the other carriers, except where the service was to terminate in customer owned and maintained (COAM) equipment (S–3470; S–3556). SPCC, despite having agreed to that provision of the Settlement Agreement, now complains that defendants unreasonably refused to make available end links where COAM equipment was involved.

The Court finds that defendants acted reasonably in declining to make end links available to the other carriers for services terminating in customer owned and maintained equipment. Thus, the record amply demonstrates that this restriction was motivated by the reasonable engineering judgment that COAM equipment necessarily was of uncertain origin and quality and that defendants' employees necessarily would be unfamiliar with such equipment (Thovson, S–T–66A at 15–16). Moreover, one of SPCC's own employees acknowledged that the restriction was reasonable (S–6063 at 198–99; see also Thovson, S–T–66A at 15–17). Mr. J. Wallis, formerly of Chessie System (as well as a disinterested

party), testified that he thought that the interconnection restrictions were reasonable and that "[i]f he were to permit interconnection on his system, he would take similar precautions" (S–T–154, Tab A at 16888–91).

■ The Court finds that SPCC's claims relating to station packages—both before and since Docket No. 20099—must be dismissed in any event for failure to demonstrate any injury. The credible evidence on this issue shows that there is no technical or engineering reason why the use of a station package rather than an end link should have resulted in inferior performance on SPCC's service to its customers (Thovson, S–T–66A at 5). Use of a station package involves no additional or more complex equipment than is involved in use of an end link; the only difference lies in the placement of the equipment itself (Thovson, S–T–66A at 5). The Court concludes that any transmission impairments alleged by SPCC to have been associated with the use of station packages are more properly attributable to problems with the equipment SPCC used (S–3578; S–3612), inadequate transmission parameters or SPCC's failure to meet its own transmission standards (Thovson, S–T–66A at 5–6). Finally, in the Court's view, SPCC's lack of concern regarding any injury—potential or real—arising from the station package requirement is underscored by Mr. Grant's failure even to raise the station package issue with AT & T, despite being advised to do so by Pacific Telephone if there were any genuine problems (Grant, Tr. 754; Jackson, S–T–58A at 2).[246]

■ SPCC also criticized the tariff requirement, prior to Docket No. 20099, that interconnection of CENTREX CO service take place at the customer's premise rather than at the Centrex switch in the Bell operating company's central office. The Court finds, however, that this arrangement was in accordance with defendants' existing tariffs and imposed no additional costs on

SPCC. Indeed, the evidence shows that the cost of the facility and equipment to extend the CENTREX CO demarcation point to the customer's premises was borne by the local Bell operating company, and not by SPCC (Thovson, S–T–66A at 11). In addition, the credible evidence convincingly rebuts SPCC's claim that this arrangement caused SPCC any undue technical difficulty (Thovson, S–T–66A at 11–12). In any event, the evidence established that early during the negotiations in Docket No. 20099, defendants agreed to remove this requirement and, since May 1975, interconnection of SPCC's CENTREX CO service to customers has been permitted at defendants' central offices. The Court regards this claim as trivial at best and, accordingly, not a predicate for the imposition of antitrust liability.

## JOINT END–TO–END TESTING

Finally, SPCC charges that defendants refused to engage in joint end-to-end testing with SPCC on SPCC-provided services and on multi-carrier-provided customer networks. The record is devoid of any evidence that SPCC ever requested that defendants participate in joint end-to-end tests prior to the negotiations in Docket No. 20099 and, in the view of the Court, there would appear to have been no need for such tests during that time frame in the light of the prevailing "clean interface" approach to the carriers' responsibilities. Moreover, the evidence establishes that the Settlement Agreement in Docket No. 20099 provided for joint end-to-end testing between the Bell companies and the specialized carriers in narrowly prescribed circumstances (S–3469). From this perspective, it appears to the Court that SPCC's claim boils down to the suggestion—unsupported by the record—that defendants unreasonably refused to agree during the negotiations to more liberal terms and conditions on which such tests would take place.

---

**246.** The Court also found it significant that the draft facilities contract that SPCC and AT & T negotiated in 1973 recognized that SPCC would provide the functions performed by the station package (PX4–0758) and that the minor modifications proposed by SPCC did not address the station package requirement (Kopf, Tr. 498–99; PX4–0209).

As the Court has observed with respect to SPCC's other claims relating to negotiated terms and conditions, the short answer here would appear to be that plaintiffs agreed to the provisions for joint end-to-end testing set forth in the Docket No. 20099 Settlement Agreement (S–3469; S–3470; S–3556). The Court, however, has examined the evidence on this point and finds in any case that defendants acted reasonably in limiting the circumstances in which they would participate with SPCC in such tests.

The Court found the uncontroverted testimony of Mr. Kelley (S–T–59), AT & T's chief spokesman at the Docket No. 20099 negotiations, and Mr. Weinstein (S–T–201), the FCC's principal representative at those sessions, particularly persuasive on this point. Thus, the evidence shows that the availability of joint end-to-end testing was debated vigorously during the parties' negotiations, that the specialized carriers insisted that they be entitled to require the Bell operating companies to participate in such testing of specialized carrier circuits more or less whenever a "trouble" condition was reported to the specialized carrier, without first fully searching for and attempting to clear the condition, and that the specialized carriers further insisted that they should not be required to pay defendants their costs in participating in such joint testing (Kelley, S–T–59 at 42; Weinstein, S–T–201 at 13). AT & T's position, on the other hand, was that joint end-to-end testing should be necessary only in relatively rare circumstances if the other carrier properly "sectionalized" the trouble before contacting an operating company (Kelley, S–T–59 at 42; Weinstein, S–T–201 at 13).

Defendants nevertheless agreed to participate in joint end-to-end testing with the other carriers under some circumstances, provided that those carriers were willing to pay a fair price for defendants' participation; within the interstate partnership, the Bell operating companies' costs incurred in joint testing of Bell interstate services are fully recovered through the division of revenues process (Kelley, S–T–59 at 43). In the Court's view, defendants legitimately feared that there was potential for abuse by the other carriers of any procedure for joint end-to-end testing unless the process was carefully controlled and the carriers paid a fair price for the service (Kelley, S–T–59 at 43; Weinstein, S–T–201 at 13). The other common carriers rejected defendants' offer, whereupon defendants agreed to engage in joint end-to-end testing in those rare instances when it might actually prove necessary (Kelley, S–T–59 at 43–44; Weinstein, S–T–201 at 13–14; S–3469).

Based upon the foregoing and in the absence of any evidence that defendants did not perform in accordance with the terms of the Settlement Agreement, the Court concludes that defendants acted reasonably and responsibly with respect to the question of when joint end-to-end testing with SPCC would be appropriate. It appears clear to the Court that SPCC's claim regarding joint end-to-end testing is nothing more than an attempt to get something for nothing or to have defendants further subsidize plaintiffs' operations, which this Court simply cannot and will not sanction.

## PRACTICES, PROCEDURES, AND PERFORMANCE

In addition to plaintiffs' allegations concerning the denials of interconnections and those concerning the terms and conditions for interconnection established through the contracts and tariffs discussed above, SPCC has made a number of charges relating to defendants' conduct in the day-to-day relationship between plaintiffs and defendants through which facilities and services were provided to SPCC and its customers. These allegations deal with the practices and procedures defendants utilized or adopted for dealing with SPCC as well as defendants' performance in meeting certain standards imposed internally or sought by SPCC in the areas of installation and maintenance of local distribution facilities.

SPCC's charges encompass four categories of defendants' conduct, each of which has several discrete elements. However, in general, SPCC's charges are that: (a) de-

fendants, through the Bell operating companies, deliberately failed to cooperate with SPCC in the provision of facilities and followed a policy of resisting competition at the direction of the chief executives of AT & T, principally Mr. deButts himself; (b) defendants, through the Bell operating companies, imposed inefficient and inadequate procedures on SPCC for processing requests for local distribution facilities and exchanging or supplying necessary technical and other information concerning such facilities; (c) defendants, through the Bell operating companies, deliberately provided substandard and inferior performance to SPCC in the actual installation and maintenance of local distribution facilities as compared to the performance given the Long Lines Department of AT & T; and (d) defendants abused their control over local distribution facilities to compete unfairly with SPCC by: (i) engaging in arbitrary reclassifications of the rate treatment afforded customers who used SPCC intercity services to replace defendants' intercity services; and (ii) by utilizing information available due to defendants' local franchise monopolies to develop competitive plans and strategies for use against SPCC.

The Court has carefully examined all the evidence offered by the parties on these allegations and has concluded that they are without merit. Thus, for the reasons set forth below, the Court finds that defendants cooperated fully with SPCC and facilitated rather than resisted its efforts to compete; that the procedures for processing requests for local distribution facilities and exchanging or supplying information were reasonable and adequate in the circumstances and were not discriminatory; that defendants' performance in installing and maintaining facilities for SPCC was at least equal in nature to that given the Long Lines Department and defendants' own customers and frequently superior; and that defendants' rate classification practices and competitive information practices were not abuses of their local monopoly franchises. In addition, the Court finds that due to SPCC's own operational, technical, and marketing practices and deficiencies, it suffered no injury from defendants' conduct.

Before considering the specific allegations regarding defendants' practices, procedures and performance, the Court finds it appropriate to address the basic premise of SPCC's allegations—a premise the Court concludes is fundamentally erroneous. SPCC essentially argues that it stands in the same relationship to the operating companies as does the Long Lines Department of AT & T and thus is entitled to exact parity in procedures and performance with those used or that achieved for Long Lines. At bottom, SPCC's position is that any difference in the procedures or practices employed by the operating companies in dealing with Long Lines from those employed in dealing with SPCC is inherently discriminatory and anticompetitive. Similarly, SPCC asserts that any difference in the installation or maintenance performance achieved for Long Lines or defendants' own customers and that achieved for SPCC constitutes anticompetitive discrimination.

The Court has previously rejected the legal predicate for plaintiffs' claim that they must be afforded access to defendants' local distribution facilities identical in all respects to that provided to AT & T's Long Lines Department. As explained above, neither *Hecht* nor any other authority treating the so-called "essential-facility doctrine" mandates the exact equality that SPCC demands. Nonetheless, SPCC asserts that it is the victim of discrimination by the operating companies in favor of Long Lines and that any difference, without regard to the reasons or circumstances accounting for such difference, between itself and Long Lines is discriminatory. SPCC's position is wrong not only legally but factually. The record establishes that the relationship between SPCC and the operating telephone companies and between Long Lines and the operating telephone companies is not the same and cannot be the same. It is also clear from the record that neither SPCC nor the other specialized common carriers wanted to establish such a relationship.

There is ample evidence in the record demonstrating both why differences in

practices and performance between SPCC and Long Lines are to be expected and are entirely reasonable under the circumstances. The record demonstrates to the Court's satisfaction that there are significant structural, technical, and operational differences between Long Lines and the specialized common carriers and that these differences precluded precise identity or exact parity in the practices, procedures and performance related to the provision of local facilities (Weinstein, Tr. 4903–04; Hunt, Tr. 4158; Hough, Tr. 3538–3542; Kelley, S–T–59 at 25, Tr. 4236, 4250; Kushan, Tr. 1472).

Defendants have identified four reasons why SPCC's attempt to analogize itself to the Long Lines Department with respect to the relationship with the operating telephone companies is incorrect and misleading. These are: (1) that the financial arrangements which characterize the relationship between Long Lines and the operating companies are significantly different than the relationship between SPCC and the operating companies, involving essentially the difference between a partnership and an arm's-length customer-supplier relationship; (2) that there are substantial differences in the physical character of the Long Lines-operating company relationship and the SPCC-operating company relationship, which differences generally result in the utilization by SPCC of longer, more complex local distribution facilities than utilized by Long Lines; (3) that Long Lines has invested considerably more effort and resources than SPCC in the provision of means to maximize the efficiency of local distribution and that although SPCC could have made similar arrangements, it has chosen not to do so; and (4) that the relationship between Long Lines and the operating telephone companies is one based on the joint provision of service and characterized by years of experience and long-established procedures and routines, whereas the SPCC-operating company relationship involves not the joint provision of service but

rather the furnishing of piece-parts by the operating companies as suppliers in a process relatively new and unknown to both SPCC and the operating companies. SPCC has not contested the validity of any of these factors but essentially ignores their existence.

The first of these factors flows directly from the "network partnership" or "interstate enterprise" (Hough, S–T–1 at 12–15; Kelley, S–T–59 at 8, 9, 22–25) through which Long Lines and the operating telephone companies jointly provide interstate services, and under which the operating companies are assured of being fully compensated for their contributions, either in facilities, services, or personnel, to the partnership (Kelley, S–T–59 at 26–27; Tr. 4232, 4236).[247] Whenever an operating company furnishes facilities or services to the interstate partnership, it recovers all its expenses plus a return on its investment regardless of how expensive the work done or the facility furnished might have been (Hough, Tr. 3538–39; Kushan, Tr. 1471–72). This recovery is accomplished through agreements and procedures known as Division of Revenues (Hough, S–T–1 at 13; Kelley, S–T–59 at 26–27, Tr. 4236; Kushan, Tr. 1470–1472). The effect of this partnership relationship and the associated financial arrangements is that Long Lines and the operating companies jointly provide services and share in the revenue generated by their customers' use of the services with each participant suitably compensated for its contribution (Kelley, S–T–59 at 26).

The financial arrangements between the specialized common carriers, such as SPCC, and the operating telephone companies are considerably different than those of the network partnership. Neither SPCC nor any other specialized carrier was willing to enter into such a partnership and indeed specifically rejected such a role when, as discussed above, it was offered during the negotiations in Docket No. 20099 (Kelley,

---

**247.** Contrary to SPCC's assertions, the Bell operating companies do not simply sell interconnection facilities or local distribution facilities to Long Lines. Rather, they furnish cables, buildings, microwave stations, switching machines, and other facilities required by the partnership for the joint provision of service (Kelley, S–T–59 at 21, 24, 26; PX4–0295).

1024

S–T–59 at 22, Tr. 4231–32; Weinstein, S–T–201 at 11).[248]

The practical consequence of the specialized carriers' refusal to enter into financial arrangements based on divisions of revenues is that these carriers and the operating companies have a supplier-customer relationship. This relationship is structured by contracts or tariffs which specify what facilities or services will be provided at applicable charges. It is readily apparent to the Court that such a relationship does not lend itself to the assurance enjoyed by the operating companies in the interstate partnership that their expenses will be fully recovered. Indeed, SPCC contends that it has no obligation whatsoever to pay the operating companies for services except for work done during normal working hours and only then as part of the basic charge for facilities (Vasilakos, Tr. 914). It would clearly be unreasonable to find that the operating companies discriminate by not providing services to SPCC for which SPCC is not willing to pay. The Court declines to reach such a conclusion.

██ The second factor pointed out by defendants and which the record fully supports is that the substantial differences in the physical character of plaintiffs' and defendants' telecommunications networks affect the ability of the operating companies to provide equivalent service to SPCC and Long Lines. As the testimony of defendants' witnesses, particularly Mr. Hough and Mr. Hunt, establishes, the physical nature of defendants' telecommunication system (the "plant") lends itself far more to the integrated and efficient provision of service than does that of SPCC. Thus, the Long Lines Department establishes its intercity termination points—called "Serving Test Centers"—with careful regard to the distribution plant and facilities of the Bell operating companies by building at the natural

hubs of the local facilities (Hough, Tr. 3539; Hunt, Tr. 4161–4166; S–2I, S–2J, S–6T, S–6W, S–6U, S–7B). In addition, as Mr. Hunt testified (Hunt, Tr. 4161–4166; S–2I, S–2J, S–6T, S–6W, S–7B) in general the interstate enterprise or Long Lines builds substantially more termination points to serve major urban areas than does SPCC. It is obvious to the Court that the result of such planning is that less local distribution plant is required for Long Lines circuits.

For reasons entirely of its own choice, and valid in themselves, however, SPCC tends to build its intercity termination points (called "Technical Operating Centers") without regard to the distribution plant and facilities of the Bell operating companies (Hunt, Tr. 4159). It is also clear from the record that SPCC has chosen not to build equivalent numbers of Technical Operating Centers (to correspond to defendants' Serving Test Centers) in major urban areas. In general, during the time period relevant here, SPCC served cities such as San Francisco and Los Angeles with only one center whereas defendants build numerous Serving Test Centers in the same cities (S–2J, S–6T, S–6W, S–7B). The result of these differences is that quite frequently distribution facilities provided to specialized carriers such as SPCC are more complex and longer, with more intermediate links, than those used for the interstate enterprise (Hunt, Tr. 4126–63; Hough, Tr. 3514).

Plaintiffs' witnesses conceded that differences in the physical layout of SPCC and Long Lines facilities could contribute to differences in repair and installation time for these facilities (Kushan, Tr. 1468). For example, Mr. Kushan, Vice President Government Relations of SPCC and a former AT & T employee, and Mr. Deschaine, an "expert" who was both a former SPCC and former Pacific Telephone employee,

248. Even before Docket No. 20099, MCI, the first specialized carrier and the model for SPCC and the industry, made it clear that the specialized carriers did not wish to be part of the Bell System interstate enterprise. Thus, MCI stated in 1973 that interconnection with the Bell operating companies would not involve "the provi-

sion of joint service, the division of charges therefor, or participation in any other joint or intra-corporate business relations between Long Lines and the telephone operating company subsidiaries of AT & T" (S–2824B at 3; Jackson, S–T–58A at 4).

testified that as the number of central office links in a local facility increases, so do the opportunities for trouble and the complexity and time required to isolate and repair troubles (Kushan, Tr. 1464–65; Deschaine, Tr. 1549–50; see also, Hough, Tr. 3540; Hunt, Tr. 4166–67). The fact that SPCC's local facilities were more difficult to troubleshoot than Long Lines' was also confirmed by defendants' technicians responsible for repair of SPCC's circuits (Boran, S–T–91 at 5). In addition, the record establishes that the greater number of links in SPCC circuits increases the difficulty of installation and the possibility of error in that task (Hunt, Tr. 4166–67; Kushan, Tr. 1464–1465). It is a matter of simple logic, and the Court so finds, that longer, more complex local distribution facilities, on average, will require more time and effort properly to install and maintain. Because of this greater complexity, given equal effort, it will take longer on the average to clear trouble on the local plant furnished to SPCC than on the local plant used for Bell interstate private line service (Hunt, Tr. 5173).

The third factor mentioned by defendants involves special efforts by Long Lines to maximize the efficiency of local distribution, a striking example of which is the installation in New York City of special facilities known as "SURGE" cables (Hunt, Tr. 4163–4164; Hough, Tr. 3539; Kushan, Tr. 1468–1469). These cables provide direct connections between Long Lines Serving Test Centers and major buildings in which Bell System customers are located. (Hunt, Tr. 4163–4164; Kushan, Tr. 1470–1471). The routing of these cables bypasses entirely the operating company central offices through which local distribution facilities normally run and simplifies both the maintenance and installation of service for customers located in buildings so served. As Mr. Hunt testified, similar special arrangements are used elsewhere in the Bell System, including such facilities installed in Houston to connect a Serving Test Center to the NASA Space Center located in that metropolitan area (Hunt, Tr. 4164). Another practice employed by defendants which

the Court finds maximizes the efficiency of local distribution is the provision of direct connections, called trunks, between Serving Test Centers and numerous operating company central offices which are utilized in conjunction with the Serving Test Centers to provide services to customers. This practice reduces the number of local distribution links normally employed in Long Lines services and thus also facilitates installation and maintenance of such facilities (Hunt, Tr. 4159–4169; S–2I, S–2J, S–6T, S–6U, S–6W, S–7B).

Although the record is clear that facilities equivalent to the SURGE cables and the direct central office trunks utilized by Long Lines were available to SPCC from the Bell operating companies (Hunt, Tr. 4191), the record is also clear that SPCC has not chosen to avail itself of such facilities (Kushan, Tr. 1470). Of course, SPCC would have been required to pay for such facilities—available under defendants' facility tariffs (S–3469B at 16; S–3471 at 749–750) —but it appears SPCC has not been willing to make the investment. SPCC has presented no evidence, and has not even charged, that the prices for such facilities were in any way unreasonable. The practical result of SPCC's decision in this respect is that local distribution facilities furnished to it often contain more links than would be the case for a Long Lines circuit. The Court is convinced that such differences, for the reasons just set forth, do not constitute anticompetitive discrimination.

The fourth factor defendants mention is what might be termed the "learning curve." The Court is cognizant of the history of the Bell System and the interstate partnership and it is a logical conclusion—amply supported by the record—that that history would contribute to efficient and expeditious operations. Moreover, it is obvious and the record is clear that there was a learning process involved on both sides in the operating company-SPCC relationship (Grant, Tr. 759–60; Vasilakos, Tr. 3082; 3088–89; Hough, Tr. 3542–43). SPCC specifically acknowledged this process in a memorandum prepared for use in its financing efforts (S–3542 at 31):

"Generally SPC has enjoyed good working relationships with AT & T and the Bell operating companies. It has taken some time for Bell to learn how to deal with SPC, since other carriers were a totally new entity that had not been encountered before. However, the learning process is now proceeding rapidly. FCC Docket 20099 will further facilitate these relationships in terms of types of facilities provided and joint testing."

In view of the four factors discussed above, the Court concludes that the simplistic analogy SPCC seeks to draw between itself and the Long Lines Department of AT & T in support of its discrimination claims is totally inapposite. To use a phrase that was heard frequently during the trial, SPCC's comparison is a matter of "apples and bananas" and of no help in resolving the issue of discrimination. The problem posed to the Court is to determine the existence or non-existence of anticompetitive discrimination in the context of a partnership relationship on the one hand and a competitor/customer-supplier relationship on the other. In this context, mere differences alone, such as pointed to by SPCC, are not sufficient to prove or even to suggest discrimination, because such differences are both inevitable and to be expected. These undisputed facts, and the conclusions that necessarily follow from them, are sufficient alone to dispose of SPCC's claim of discrimination by comparison to Long Lines. However, the Court has examined those claims against SPCC's suggested standard of equality, and as is discussed below, concludes that the charge of discrimination is without support in the record.

### NON–COOPERATION

Plaintiffs' allegation of non-cooperation in the area of interconnection pervades all their charges regarding defendants' practices, procedures, and performance. The theory advanced by SPCC is that inasmuch as defendants were unable to prevent competition in the intercity private line area by persuading the FCC not to authorize new entrants, they sought to overturn the *Specialized Common Carriers* decision through a "self-help" effort involving non-cooperation with and resistance to competitors at every turn (Tr. 32–33, 311, 1407, 1443–44, 3426, 3429).

As outlined in the initial version of "Plaintiffs Memorandum Summarizing the Issues," SPCC's claim is that "AT & T was unhappy with [the *Specialized Common Carriers*] decision, roundly criticized it in speeches to its top executives, and in ... internal communication to 200,000 management level people in AT & T and the BOCs" (p. 1). According to SPCC, "the possibility of using the local monopolies to frustrate intercity competition with Long Lines was already recognized" and "[p]olicy in this matter was set at 195 Broadway" (*id.*). Plaintiffs' Memorandum goes on to characterize the interconnection charges, asserting that all were part of the policy set at "195 Broadway" and that "[i]t would have taken a major effort on the part of top management of AT & T and the BOCs to overcome the [anticompetitive] attitude and the effect of all the speeches denouncing the decision. The effort was not made" (*id.* at 2).

This charge by plaintiffs, and the nature of it, has been of consistent concern to the Court throughout the trial. As even counsel for the plaintiffs concedes (Tr. 312), the employees of the Bell System represent some of the finest corporate citizens in the nation. The provision of quality service to its customers is, as Mr. Charles Marshall, formerly the President of Illinois Bell Telephone testified, regarded by the people of the Bell System as "our whole tradition" and the reason "why our people work for this business" (Marshall, C., Tr. 4327). There is no doubt from the record in this case that the people of the Bell operating telephone companies regarded SPCC as a customer to whom service in the tradition of the Bell System was due (see, *e.g.,* Spencer, S–T–81 at 3; [249] Marshall, T., S–T–92 at

---

**249.** Mr. Spencer is the principal Illinois Bell Telephone company employee responsible on a daily basis for the provision of services and facilities to the OCC's (S–T–81 at 3):

4). Yet SPCC's charge impugns the integrity of every Bell System employee—whether with AT & T or an operating telephone company—who was in any way responsible for dealing with SPCC.

Every such employee who has testified in this case has denied any intent to do anything less than to cooperate as fully as possible with plaintiffs and to render the best service possible. The plain import of plaintiffs' theory, however, is that all such witnesses concealed from the Court their true intent and purpose. The Court is compelled to reject this theory.

The Court has previously expressed on the trial record (Tr. 4729) its belief in the credibility and good faith of defendants' witnesses. From the Court's further review of the entire record, the Court finds that defendants' witnesses were credible in all respects. Indeed, it is apparent to the Court that in order to find a violation of the antitrust laws on all of the claims advanced herein, each and every employee must have been involved.

Indeed, the Court is convinced that defendants' policy and practice was to cooperate fully with SPCC and that defendants' employees, from both AT & T and the operating companies, to use defendants' phrase, literally "bent over backwards" to give SPCC everything to which it was entitled and more.

Although AT & T disagreed with the *Specialized Common Carriers* decision, a policy of full cooperation in the provision of required facilities and services was established even before the first specialized common carrier—MCI—went into operation between Chicago and St. Louis (Marshall, C., Tr. 4306). This policy was established by Mr. deButts himself and was disseminated throughout the Bell System (Marshall, C., *id.;* deButts, Tr. 4039–40). The policy established by AT & T was heard, understood, and implemented within the operating companies (Saenger, S–T–69, at 1; Schwartz,

S–T–70 at 2–4; Marshall, C., Tr. 4306). In the words of the then President of Illinois Bell, Charles Marshall, AT & T "made it very clear to all the officers of the Bell System and we in turn to others that we were going to provide that service in a timely manner and do it well" (Marshall, C., Tr. 4327).

The importance of the policy of full cooperation was made even more clear to the operating companies in March 1973, months before SPCC served its first customer, after Mr. deButts was threatened with an antitrust suit by the Chairman of MCI, William McGowan (Cook, S–T–57 at 44). Understandably concerned that MCI would seize upon any opportunity to justify the appearance of an antitrust claim, Mr. deButts instructed Mr. Cook, who was then the AT & T Vice President responsible for the Bell System's relations with MCI, to brief other senior executives about the threat and specifically (S–2579 at 3–4)

" . . . *to reemphasize* to the companies—with respect to loop arrangements—*that our policy is to process orders with the same speed and efficiency that we process orders from our own customers."* (Emphasis supplied.)

The evidence confirms that Mr. Cook carried out these instructions and contacted senior executives of the operating companies to convey the message that AT & T and Mr. deButts would not tolerate any "foot dragging" by the companies in the provision of facilities to the specialized common carriers (Cook, S–T–57 at 45). Again, as Mr. C. Marshall also testified (Marshall, C., Tr. 4318–19), the reemphasized message was heard and acted upon by the operating companies. Thus at Illinois Bell, Mr. Marshall's operating company, instructions were issued by Mr. Brown, then President of Illinois Bell and now the Chairman of AT & T, to double check that the Illinois Bell employees were in fact carrying out the policy (*id.* at 4319). This was done and it

---

"I use the word 'customers' in referring to the OCC's deliberately because to us that is what they are—customers to whom we must provide the best service we can without de-

lay or discrimination. That *attitude or policy, if you will, has been impressed on me by various means ever since I became involved in OCC work."* (Emphasis supplied).

was "verified that in fact they were doing that" (*id.*).

AT & T's policy was endorsed and its implementation supervised by the directors of the Bell operating telephone companies, many of whom were eminent individuals such as the distinguished historian and scholar of Black American history, Dr. John Hope Franklin (S–T–56 at 2–3). This policy, emanating from the highest levels of the Bell System (deButts, Tr. 4153–54; Marshall, C., Tr. 4307), was well understood by the operating company employees who dealt with the specialized carriers (see, *e.g.*, Case, S–T–202 at 2; Cherry, S–T–100 at 2; App., S–T–85 at 5; Masterson, S–T–110 at 2; McKeever, S–T–87 at 5; Mendelsohn, S–T–78 at 2; Riordan, S–T–94 at 2; Robertson, S–T–114 at 2; Holt, S–T–120 at 2; Grubb, S–T–104 at 2; Schweitzer, S–T–80 at 2[250]; Schrider, S–T–79 at 1; Schaal, S–T–119 at 3; Furkas, S–T–84 at 2; Jackson, S–T–58 at 2).

Mr. Ronald E. Stevens of Southwestern Bell testified as to his understanding of the stated policy wherein he stated (S–T–125 at 2–3):

"Mr. Johnson reviewed with me the Settlement Agreement and all of the engineering practices and procedures he had received in St. Louis, as well as the existing engineering instructions we had received from AT & T. I remember that his instructions were that all of our OCC designs were to be done in full accord with the provisions of the Agreement and the related practices. He made it clear that the Agreement and practices represented what the Bell System had agreed to with the OCC's and that this was the way the work would be done. *In other words, my job was to provide the requested and agreed services and not concern myself with the identity of character of the customer—OCC or Bell—who had ordered services.*" (Emphasis supplied).

Mr. Bruce G. Schwartz, Vice President—Business Services of AT & T, was very emphatic about Bell's policy toward the OCC's.

"As an individual who has held senior management positions in two major Bell Operating Telephone Companies (BOC's) —NWB and PT & T—as well as with AT & T itself, I can say, emphatically that such assertions by SPCC belie the truth. At no time has any executive of AT & T or any BOC with whom I am familiar ever established a policy or given a direction that would condone, much less encourage discriminatory treatment of SPCC or any other OCC. Such conduct would simply not be tolerated by the Bell System officers, with whom I have worked for almost thirty years. If the Bell System's "policy" towards OCC's must be characterized that policy in my experience has always been that we would bend over backwards to provide the best service possible and to treat the OCC's (who I consider as important customers) as much like our other customers and partners, such as the Long Lines Department, as we could."

AT & T, of course, did more than just announce a policy to ensure that plaintiffs and other specialized common carriers received facilities in a timely and efficient manner. Within AT & T itself, an entirely new organization—called Business Relations—was set up to represent AT & T to the new carriers and to minimize the possibility of problems and conflicts arising from the Bell System's role as supplier and competitor to the other common carriers. Similar organizations were created in the operating companies. Thus, Mr. Charles Jackson, AT & T's first Business Relations Director, who was appointed to the post in April 1971, testified (Jackson, S–T–58 at 3):

"The job of Business Relations Director was created in order to permit the Bell System effectively to fill its responsibilities to competing carriers outside the portions of the company directly concerned with contacting customers and

---

**250.** Mr. Christian Schweitzer of Cheasapeake and Potomac Telephone testified that (S–T–80 at 2), "I am confident that the service that the OCC's got was better than that provided to Long Lines."

servicing Bell sales. By centralizing responsibility in a separate organization, we could more expeditiously develop contracts, coordinate day-to-day relations and assure equality of treatment. For the same reasons, we also recommended and insured that each of the operating telephone companies assigned the responsibility of relations with competing carriers to a single group. To emphasize the importance of the job, we recommended the companies appoint a Department Head as the point of contact. Information flows between this group and the Bell Marketing and Rate groups was restricted to minimize potential conflicts of interest."

The Court is particularly impressed with the nature and function of AT & T's Business Relations organization. Its mere existence is an effective counter to SPCC's charge that there was an AT & T directed policy of non-cooperation. Mr. Wehmann, who was Business Relations Director in 1977–1978, a period encompassing many of SPCC's non-cooperation claims, testified that it was the purpose of his organization to be an "advocate" for the new carriers, such as SPCC, within the very management structure of AT & T itself (Wehmann, Tr. at 4436). Mr. Thompson, who served within the Business Relations group from 1972 until 1982, testified without challenge by SPCC that it was the responsibility of his group "to insure that the OCCs are provided with facilities as promptly and effectively as possible" (Thompson, S–T–65 at 2). He explained that AT & T's Business Relations staff would "work directly with the BOCs and the OCCs in an effort to improve the service provided to the OCCs and to solve any particular problems as they arise" (id.). As presently constituted, this organization is staffed by sixteen full time managers (id.).

Nor is AT & T's devotion of resources to providing service to the specialized carriers limited to the Business Relations group. Thus, the record reflects that within other parts of AT & T's General Departments, additional employees at management levels are assigned full time to the provision of facilities to specialized carriers. Mr. Thompson explained that within both the Engineering Department and the Operations Department, five full time managers work on such matters, as do six managers (called National Service Managers) from the Customer Services Department, and one manager from AT & T's Comptroller's Department (Thompson, S–T–65 at 3).

The evidence also establishes that AT & T has taken numerous other steps to see to it that SPCC and the other competing carriers are provided good service by the operating companies. Thus, to standardize practices and procedures as much as possible, formal instructions—called Bell System Practices (BSPs)—have been prepared and issued to the operating companies by AT & T on virtually every facet of the Bell-specialized carrier relationship (Thompson, S–T–65 at 3). Documents called AT & T System Letters are issued to advise the operating companies of changes and new developments even before BSPs can be prepared. Over 600 such System Letters have been issued by the Business Relations Department and additional letters are disseminated by other General Departments as necessary (id.). All of this information is shared with the other carriers through publications prepared for their use and distributed by AT & T without charge. These documents are called Other Common Carrier Administrative Notes ("OCCANs"), Other Common Carrier Engineering Information ("OCCEIs"), and Other Common Carrier Technical Notes ("OCCTNs"), and letters similar to the AT & T System Letters are also sent to the other carriers (id. at 4; see S–4614C). In addition to these efforts, AT & T has conducted extensive training of operating company personnel regarding relations with and service to the specialized carriers, both before and after the Docket No. 20099 Settlement Agreement, and also has a formal training course conducted in New Jersey for this purpose (Wehmann, S–T–64 at 16; S–5359; S–5405).

The record is replete with examples of AT & T encouraging the operating companies to do everything reasonably possible to

satisfy the needs, desires, and even whims of competitors such as SPCC. For example, as early as 1971, AT & T prevailed on Illinois Bell to grant more generous terms and conditions for interconnection than it felt appropriate (Marshall, C., Tr. 4308–4311). It was not uncommon for SPCC to complain to AT & T that it was somehow not satisfied with an operating company's decision on some matter and for AT & T to direct the company to accede to SPCC's request, despite the reasonableness of the company's position. This was precisely the case in the instance of SPCC's desire to use certain equipment that Pacific Telephone had built solely for its own use and did not offer to customers (Snyder, S–T–71 at 64–68). Moreover, when AT & T undertook a nationwide effort to improve Bell System performance in the special services area, it specifically included performance for the specialized carriers in that effort (Schwartz, S–T–70 at 21–22). In the Court's view, examples such as these completely belie SPCC's claim that AT & T was directing the operating companies, however subtly, not to cooperate with and give good service to SPCC and other specialized carriers.

At trial SPCC focused the Court's attention on certain documents prepared by AT & T and referred to as "Operational Reviews."[251] According to SPCC, these Operational Reviews demonstrate that the operating companies were not providing good service to SPCC and were not in compliance with the Settlement Agreement in Docket No. 20099. The Court finds these assertions totally unsupported.

As the Court reads the Operational Reviews, they demonstrate AT & T's commitment to treating the specialized carriers fairly and efficiently and to complying with the letter and the spirit of the Settlement Agreement. Indeed, the Court finds the Operational Review process utilized by AT & T, and also by the operating companies

themselves (see, e.g., S–5167), a laudatory undertaking.

Operational Reviews were undertaken by AT & T for the express purpose of identifying problems and shortcomings in the provision of service to the specialized carriers and in the implementation of the Settlement Agreement procedures (Hunt, Tr. 4178–79). The process involved the dispatch from AT & T of a team of experts in operational, engineering, administrative, financial, and other matters pertinent to relations with the Bell System's competitors, including specifically the requirements of Docket No. 20099 (Thompson, S–T–65 at 4). This team would visit an operating company and review all facets of its operations in the provision of service to other carriers, based upon samples of orders, requisitions, engineering diagrams, circuit layout records, and similar materials (see, e.g., S–4378B).[252] Once a review was completed, an on-site report and critique was given to the managers of the operating company under review.

Upon the review team's return to New York, a formal report—the "Operational Review"—of the team's findings and recommendations would be prepared. These reports were then sent to the appropriate managers in the operating company, including the senior executive responsible for operations and frequently the President (see, e.g., S–4378B) under the signature of Mr. Hunt—the highest level Plant executive at AT & T—and other senior AT & T executives (Hunt, Tr. 4178). Transmittal in this fashion was designed to ensure prompt and careful attention to the Reviews and reports from the operating companies regarding plans for any necessary corrective action which were required (Hunt, Tr. 4179).

As could be expected from their nature, the Operational Reviews frequently

---

251. See, e.g., PX4–0173; PX4–0174; PX4–0175; PX4–0176; PX4–0177; PX4–0178; PX4–0179; PX4–0180; PX4–0282; PX4–0283; PX4–0284; PX4–0285; PX4–0287; PX4–0288; PX4–0289; PX4–0290; S–5165B; S–5167.

252. As Mr. Hunt testified, the Bell System has for years conducted similar reviews of various aspects of its operations (Hunt, Tr. 4180–81). This is a good management technique and the Court draws no adverse inference from its use in the specialized carrier area.

found fault with various aspects of the operations and procedures of the operating telephone companies. Indeed, as Mr. Hunt testified, this was their very purpose (Hunt, Tr. 4178–79; see also Schwartz, S–T–70). SPCC seizes upon such findings as proof of poor performance and anticompetitive conduct. The Court has examined all of the Operational Reviews with great care and rejects SPCC's interpretation. Despite sometimes severe criticism of several companies by the AT & T team, the Court finds no indication in any of the Reviews that the operating companies were deliberately providing poor service or not complying with the Docket No. 20099 Agreement. Errors and misunderstanding, such as revealed by the Reviews, are no more than is to be expected in a process as complex as that involved in the Bell-specialized carrier relationship or in any undertaking dependent upon human beings. As defendants have pointed out, perfection in process or result is not required—the test is intent and the Court finds no evidence of anticompetitive intent in the Operational Reviews. The small number of defendants' operating company witnesses (3 of 50) that SPCC even tried to cross-examine with the Operational Reviews were more than candid in admitting that there were errors as revealed by the Reviews (Cherne, Tr. 4479; Masterson, Tr. 4506; Little, Tr. 4517). However, these witnesses testified, and subsequent reviews of the operating companies disclose, that such errors were corrected as promptly as possible.[253]

The Court concludes that the Operational Reviews are evidence not of discrimination or anticompetitive conduct but rather of AT & T's and the Bell operating companies' sincere efforts to do the best job reasonably possible for plaintiffs and the other specialized carriers. The "supercritical" nature of the Reviews (Hunt, Tr. 4207), the fact that the operating companies "welcomed" the Reviews (Schwartz, S–T–70 at 18), the fact that the Review process was instituted promptly in 1975 after the approval of the Settlement Agreement in Docket No. 20099 and is still continuing (Hunt, Tr. 4180), the findings in the Reviews of good faith effort by the operating companies and of problems caused by the specialized carriers themselves, all lead the Court to reject SPCC's claims based on the Operational Reviews.

In addition to the Operational Reviews, there is substantial evidence in the record which establishes that the operating companies made every reasonable effort to provide good service to SPCC and devoted substantial resources in capital, personnel, and equipment to that end. As discussed above, the companies established Business Relations groups to parallel that of AT & T (Thompson, S–T–65 at 2). Some of these became very substantial organizations, with large budgets, extensive staffs, and jurisdiction over all aspects of the Bell-specialized carrier relationship (Marshall, C., Tr. 4314–15; Snyder, S–T–71 (Pacific Telephone); Marshall, T., S–T–129 (New York Telephone); Spencer, S–T–81 (Illinois Bell); Skinner, S–T–124 (Southwestern Bell)).

Within New York Telephone, for example, one of the companies most heavily attacked by SPCC, over 600 employees have been devoted exclusively to work on matters related to the provision of facilities for SPCC and the other new carriers (Thompson, S–T–65 at 3). Also in New York Telephone, entire work forces in the outside plant division of the company were dedicated exclusively to such work, as were personnel and offices—called "TRCO's" (Trouble Reporting Control Office)—set up expressly to handle repair work for the new carriers (Walsh, S–T–96A at 5). A similar situation existed at Pacific Telephone, also the subject of vehement attack by SPCC (Schwartz, S–T–70 at 13, 15–16). Personnel were assigned within all the operating companies solely to be points of contact and sources of information for SPCC and the other specialized carriers. These functions,

---

**253.** The Court rejects SPCC's inference of poor performance from the fact that "re-reviews" of some operating companies were conducted when the original 1975 and 1976 reviews found particular problems. It is entirely understandable to the Court that problems will recur or new problems develop with time.

**1032**

called "BPOCs" (Bell Points of Contact) and "EPOCs" (Engineering Points of Contact), were not available to Long Lines or other operating company customers and served to facilitate SPCC's provision of service to its customers in innumerable respects (see, e.g., Euler, S–T–102; Holt, S–T–120; Squires, S–T–82 [254]; Cherne, S–T–72; King, D., S–T–75; Furkas, S–T–84, S–T–84A; App., S–T–85). Plaintiffs have not identified, nor has the Court found in the record, evidence that any other class of telephone company customer, including Long Lines, was afforded such dedicated work forces.

The Court finds particularly pertinent to SPCC's charge of non-cooperation the numerous acknowledgments by its own employees, including several who testified at trial, of the very cooperation by the operating companies that SPCC now would have the Court believe did not exist. Thus, for example, in a memorandum to Mr. Biaggini, Mr. Grant commended New York Telephone for providing SPCC with the "best overall service" and "preferential treatment" (Grant, Tr. 762; S–4178). In fact, Mr. Grant went out of his way to compliment Tom Marshall, New York Telephone's Business Relations Coordinator, who interfaced directly with SPCC. In this regard, in a letter to New York Telephone's President, Mr. Grant complimented Mr. Marshall for his "outstanding job of carrying out the policies of New York Telephone and in working with Southern Pacific Communica-

tions Company in a manner that is most efficient for both companies" (S–3515). Mr. Grant also acknowledged that Mr. Marshall not only represented New York Telephone in a professional manner, but also made a "lot of friends" in the SPCC organization (S–3611).

Mr. Grant's views reflected the sentiments of other SPCC employees concerning the lengths to which the Bell System had gone in meeting SPCC's service demands. In this regard, Mr. Gundy of SPCC, in commenting on SPCC's relationship with Pacific Telephone in the San Francisco area in 1976, stated that cooperation was "very good" (S–4016 [255]). In another memorandum, Mr. Gundy praised the "excellent relationship" between Pacific Telephone's Northern Region and SPCC (S–4177). Similarly, in a letter dated October 6, 1977, Mr. Gundy thanked Mr. Zell of Pacific Telephone for the "spirit of cooperation between SPC and PT & T" (S–5246). In April of 1978, Mr. Kushan of SPCC reported to Mr. Vasilakos that there is a "great deal of cooperation now and due dates are being met" by Pacific Telephone in Northern California (S–5491).

This was confirmed in a March 10, 1978, letter to Mr. Williams, wherein Mr. Bauerle, a SPCC Circuit Installation Supervisor wrote (S–5461):

"I would like to commend your entire group for the professional job that was

---

**254.** Mr. Squires was the BPOC with Indiana Bell, whose job it was to "provide quality, prompt service for the OCC's and their customers" (S–T–82–4). He further testified (*id.* at 8):
It is my considered opinion that the company and its employees have been responsive in good faith, to such requests and further, have cooperated with OCC personnel in instances where problems have arisen between the company and the OCC respecting service and facilities."

**255.** This January 6, 1976, memorandum from Dennis Gundy to Paul Freels admitted that many of the problems experienced by SPCC were created by SPCC. Mr. Gundy wrote (S–4016):
"Cooperation with this group (Southern California's BPOC) are very good at this time. *The only problem areas exist when SPC changes due dates within a short time frame*

or SPC finds it has ordered facilities wrong and changes the criteria requested from Bell without giving ample additional changes in due date requirements." (Emphasis supplied).
Again, in a June 29, 1976 memorandum to Mr. Brodman, Mr. Drew wrote (S–4362):
"We are becoming increasingly concerned about missed due dates caused by internal SPC delays. We had hoped that increasing the manpower in the circuit design groups would reduce these delays.
Today, another example of excessive delay was brought to our attention less than 48 hours before the due date."
Despite the admitted internal SPCC problems, the plaintiffs would want this Court to award them damages. The Court just cannot understand how the defendants could be held accountable for these problems.

done on the Crocker Bank cutover the weekend of March 4th & 5th.

. . . . .

Through the efforts of Mr. Tom Atkinson, Ken Morgenthaler, Bob McNicol and the many others involved in this project, it was completed without incident.

My technicians and I worked extensively with Mr. McNicol and we have the highest regard for the excellence and ability he has displayed on this project.

We appreciate everything your group has done and look forward to your continuing cooperation and professionalism. It is a pleasure to work with professionals who can accomplish a task this large with such ease."

A similar letter was written to Mr. Cherne by Ron Havens of SPCC on July 3, 1975 in which he wrote (S–3672):

"The purpose of this letter is to express my appreciation for the outstanding cooperation I received from Pacific Telephone in general, and specifically the people in your group, in implementing services in Northern and Southern California for American Express/Fireman's Fund.

. . . your group handled the task with admirable dispatch and efficiency."

Certainly, these documents do not evidence any lack of cooperation on the part of the defendants. What is most striking is that in reviewing all of the documents in this case, the Court finds little documentation highly critical of the defendants' performance. To the Court's knowledge, there were no letters written to the upper management of the defendants expressing any such displeasure.

Instead, what the Court has before it is other SPCC employees commenting on defendants' efforts in installing and repairing SPCC's facilities, praised Pacific Telephone on its "fine effort" (S–5195), "cooperation" (S–5284) and "professionalism" (S–5461; S–

4736); noted SPCC's "positive relationship with the Mountain Bell Telephone" (S–4945); praised Southwestern Bell's "fine work," (S–4045), "professionalism and good will" (S–5217); commended New York Telephone for its "prompt and efficient response" (S–4783); and Indiana Bell on its "professionalism" (S–4169) (see also Doc. Sub.—Cooperation). Defendants' witnesses from the operating companies also testified at length about the cooperative and business-like nature of their relationship with SPCC's lower level operational personnel, none of whom SPCC called to testify (Zimmerman, S–T–127 at 5–6; Riordan, S–T–94 at 5; Macdonald, S–T–108 at 4; Turner, S–T–89 at 5 [256]; Squires, S–T–82 at 3–4; Spencer, S–T–81 at 5, 8; Slater, S–T–76A at 2; Morgenthaler, S–T–113 at 7; Masterson, S–T–110 at 4; Moreno, S–T–109 at 6; McKeever, S–T–87 at 5; Little, S–T–122 at 4; Kinter, S–T–106 at 7; King, R., S–T–86 at 6; Holt, S–T–120 at 5; Hogue, S–T–105 at 4; Grubb, S–T–104 at 7–8; Charette, S–T–118 at 8; Case, S–T–202 at 4; App., S–T–85 at 5; Kunz, S–T–107 at 5–6; Euler, S–T–102 at 8). Indeed, Mr. William E. Thomas of Southwestern Bell testified (S–T–126 at 5, 6):

"I understand that it is alleged that the Bell Operating Companies, such as SWB, have not cooperated with the OCC's and given them as good service as we do our customers or the Long Lines Department. Based on my experience, I can honestly say that the allegation is simply not true. My orders from Mr. Tangney were exactly the opposite and my own instructions to my crew, including the several additional technicians I added to handle the OCC work, were that we would give MCI, CPI and the other OCC's the same service that we were providing for any other customer, including Long Lines. In fact, we effectively gave the OCC's better service than we gave Long Lines because I

---

**256.** Mr. Turner of New England Bell testified (S–T–89 at 5):

"Our basic instruction was and is that all efforts must be made to provide OCC circuits on time. The goal of providing timely services, barring unforeseen circumstances which

occasionally have caused delays, has been strictly maintained. The results of these efforts have been that the OCC's receive service as good, if not better than, those services provided to NET's customers."

gave priority to the OCC work over the Long Lines work I had in my District. I could and did postphone Long Lines related work to put in OCC circuits. I do not mean that we never missed an OCC due date because we did but it was not from lack of effort. When we missed an OCC order it was normally because our work capacity had simply been exceeded by the level of OCC orders."

Other Common Carriers have also commended BOC personnel for their outstanding service. In a March 4, 1980, letter to Mr. G. W. Spencer of Illinois Bell, Mr. Seaman of Western Union wrote (S–5876B):

When observing a succession of minor miracles, there is sometimes the tendency to accept them as matter of course without appreciating the effort involved.

I want to assure you that the extraordinary efforts of yourself, Lloyd Frye and his Staff are not unappreciated.

During the past few weeks, we have had more than our share of crash installations. Caterpillar Tractor . . . all required efforts by your staff much above the normal. Without this cooperation our customers would have suffered extended outages.

Again on August 20, 1980, Mr. Seaman wrote Mr. Spencer (S–5950B):

"Lloyd Frye again came to our rescue . . .

It is certainly refreshing to find people so willing to help in critical situations.

And on May 13, 1981, Mr. Seaman wrote (S–6032E):

"Please extend our thanks to Lloyd Frye and the people at BPOC.

. . . . . .

It is a pleasure to work with such professional people."

MCI also wrote Illinois Bell expressing gratitude on their performance. In a March 17, 1981, letter to Mr. Frye, Ms. Guzaushas wrote (S–6019):

"I would like to take this opportunity, on behalf of MCI Telecommunications, to acknowledge my appreciation on the efforts of Noreen Weik whose job knowledge has been a determining factor on the resolution of the numerous billing problems MCI has incurred over the past years."

It is clear to the Court that the personnel of the Bell operating companies who dealt with SPCC not only cooperated fully with SPCC but actually went out of their way to attempt to give SPCC superior performance and in fact did so. Defendants put into evidence the testimony of fifty witnesses from the operating companies. All of these witnesses were available for cross-examination, but SPCC waived such cross-examination with the exception of eight of these witnesses. Even in regard to those eight, however, SPCC was unable to establish any evidence to support its non-cooperation allegations.[257]

Finally, the Court finds that defendants have established their contention that the employees of the Bell System did in fact "bend over backwards" to accommodate SPCC. Defendants' evidence in this regard is too voluminous to discuss at length. However, the Court is struck by the unrefuted testimony of defendants' employees who made personal sacrifices and herculean efforts to meet the service demands of SPCC. Thus, for example, despite the fact that a state of emergency was declared in the Boston area during the blizzard of 1978, and ground travel restrictions were being strictly enforced, New England Telephone's repair employees diligently labored throughout the storm and thereafter in order to provide service to SPCC (Turner, S–T–89 at 7). Although beset by a personal family crisis (critically ill mother), one Mountain Bell employee worked overtime (at no charge to SPCC) in order to effect a

---

**257.** As one example, at the conclusion of the cross-examination of John Snyder, who has functioned as Pacific Telephone's coordinator with the specialized carriers for almost a decade, and whom the Court found to be highly credible and knowledgeable, Mr. Snyder answered with a simple "Yes, sir" to the Court's question whether a short summary of his testimony was that he and his organization "have attempted in every way possible to give SPCC the best possible service" (Tr. 4588–89).

coordinated conversion for SPCC (Urich, S–T–88 at 5). To ensure that SPCC's facilities were turned up on time, defendants' employees voluntarily decided to forego the obligations and pleasures of family and social outings (Deemer, S–T–77 at 3; [258] McKeever, S–T–87 at 11, Moreno, S–T–112 at 2–3). To improve the processing of orders for SPCC and other carriers, another employee developed, on his own time, special training programs for Pacific Telephone employees involved with such orders (Moreno, S–T–112 at 2–3).

The personal sacrifices and dedication evidenced on the part of defendants' employees graphically illustrate that defendants made every effort to cooperate with SPCC. Indeed, Mr. Cherry of Pacific Telephone was so dedicated to ensuring that SPCC's circuits were installed and repaired promptly that, although at a supervisory level, he violated a union contract by personally inserting channel units, placing jumper wire, and testing at a test board for SPCC; removed public pay phones to free up facilities; hand-carried channel units to the airport to meet an SPCC due date and worked until 3:00 a.m. to clear SPCC troubles, which, in some instances, were caused by SPCC's own equipment (Cherry, S–T–100 at 3, 5–6). Although not required to do so, other Bell System employees made daily calls to SPCC to confirm the number of circuits that would be turned up on a given day, the number of orders which were pending, and the number of orders which would be expedited (Morgenthaler, S–T–113 at 3–4; Cherne, S–T–72 at 5–6). When SPCC was experiencing a backlog of its orders, another employee jeopardized his performance rating by acceding to SPCC's demands relating to the prioritizing of SPCC's orders (Grubb, S–T–104 at 6–7). It is particularly

notable that many of these individuals are employees of Pacific Telephone, the operating company which SPCC alleges to have been most uncooperative. Mr. Bert Traften of PT & T made every effort possible to ensure that SPCC's new TOC in Palo Alto, California was in operation by October 15, 1975. Despite an inventory shortage, Mr. Traften was instructed "to do whatever was necessary" to obtain and install, by SPCC's due date, the equipment that was needed to meet SPCC's demands. (S–3569). This was done by commandeering two metallic facility terminal (MFT) bays that had been slated to be used in connection with MTF, a central office in San Carlos. (S–3593). This was done despite the fact that this resulted in the project being performed over budget (S–5450) and the necessity for a special waiver (S–3618) due to severe financial constraints imposed by AT & T. As a result, the two MFT bays were powered and ready for service by SPCC's due date. Against such evidence, SPCC's assertions of non-cooperation and a campaign of anticompetitive conduct orchestrated from on high in the Bell System simply cannot stand.[259]

### ORDERING PROCEDURES

SPCC alleges that the procedures it was compelled to follow to obtain local facilities were deliberately designed to be inefficient and cumbersome so as to impede SPCC's attempts to compete with Long Lines. Specifically, SPCC complains that in the first year of its operations, the operating companies had not always established formal ordering procedures such as a single point of contact, standard order forms and standard installation intervals. SPCC also complains that the procedures established in

---

**258.** Mr. William Deemer of C & P testified that (S–T–77 at):

"I vividly recall a Saturday afternoon call from Mr. Pope of Southern Pacific at my home. My car was loaded, and the family was just ready to head for the beach. The problem was such that I called in special forces to do the work and worked over the weekend. If it had been Long Lines, I would have told them to wait until Monday."

**259.** In making the determination, the Court has taken account of the concerns of Mr. Ron Kinter of PT & T who stated (S–T–106 at 3):

"There were some problems in interfacing with SPCC. Many of the technicians were ex-Bell employees who seemed to have a grudge against Pacific and who really seemed to go out of their way to make things difficult for us."

later years were inadequate, included unnecessary requirements and were not always adhered to by the Bell operating companies. The claimed inadequacies included AT & T's failure to give SPCC access to its Adnet Administrative System, failure to permit SPCC to utilize AT & T's Universal Service Order Code (USOC), failure to permit SPCC participation in the interactive design process, failure to provide SPCC with Bell Standard Practices (BSPs) and other necessary technical information and failure to coordinate due dates at each end of an SPCC circuit. SPCC's allegations of unnecessary practices concerned the need for it to obtain a letter of agency and the operating companies' return, rather than correction, of erroneous SPCC orders. SPCC's claim of a lack of compliance with established procedures consisted of its charge that several Bell operating companies, particularly New York Telephone, did not always comply with System-wide standard installation intervals.

Although each of SPCC's charges is discussed in detail below, the Court finds no evidence of any deliberate plan to impede SPCC in the ordering of facilities. The ordering procedures used made available by defendants to SPCC were reasonable and there is no evidence that SPCC was injured by any of these procedures.

Plaintiffs' evidence of early deficiencies in the ordering processes for local loops consisted of several insignificant matters that were expeditiously resolved. In the Court's view, SPCC's criticisms of the ordering and design process in the early days of its operations established nothing more than the fact that not every procedure or mechanism SPCC desired was always in place on the day SPCC served its first customer.

■■■ Typical of the nature of these claims is SPCC's complaint that in 1974, when SPCC was dealing with only a few operating companies, each company developed its own form for placing orders (Sanford, PX6–0007 at 4). These kinds of minor differences among the operating companies strike the Court as inevitable during the start up phase of any complex relationship and, in any event, do not provide a basis for finding a violation of the antitrust laws. Similarly, although SPCC complained that there were no established procedures for ordering local distribution facilities, its witness conceded that by the Fall of 1974 most operating companies provided a single point of contact for such orders (Sanford, PX–6–0007 at 4).[260]

■■■ SPCC also complained that the Bell operating companies initially failed to provide SPCC with standard installation intervals. However, the evidence shows that when SPCC commenced operations, each operating company had standard intervals for repetitive orders; on the other hand, for large or complex orders the intervals were established after the order was received (Thompson, S–T–65 at 13). Until 1976, the standard intervals provided plaintiffs and other specialized common carriers varied with each operating company (id.). Long Lines was treated in a similar manner and was required to negotiate an installation interval with each local Bell operating company involved each time it sought more than one circuit (Thompson, S–T–65A at 5). In these circumstances, the Court concludes that there is no evidence of discrimination in the provision of installation intervals.

The good faith of defendants in attempting to develop reasonable procedures for the ordering of local facilities during the early days of SPCC's operations is apparent from plaintiffs' own exhibit reporting on a meeting held at Pacific Telephone in March 1974 concerning procedures for leasing local facilities to the specialized carriers (PX4–0332). The document discussed the need to provide "uniform treatment" to the specialized carriers and states (id.):

> "AT & T Plant Department's advice is to treat orders for LDFs in the same manner as we would for private line service between the same points."

---

260. In fact, most of the operating companies within SPCC's service area had established a single point of contact prior to SPCC's entry into their territory (Thompson, S–T–65A at 9).

Thus, SPCC and the other new carriers were to be treated as ordinary customers—exactly the treatment plaintiffs requested—a fact plaintiffs' counsel and Chairman of the Board stressed to the Court (Tr. 1390–92, Biaggini, Tr. 3234). Therefore, the Court finds no convincing evidence that defendants' early ordering procedures for local distribution facilities were unreasonable in any manner.

SPCC also complained about the ordering and design procedures in effect today. The record is clear, however, that these procedures were established as a result of the Docket No. 20099 negotiations (Sanford, Tr. 1093; see Agreed Fact 6–2–011). As discussed above, the settlement agreement in Docket No. 20099 was reached only after extensive negotiations among the parties under the aegis of the FCC (Weinstein, S–T–201 at 6–7), and although at one point SPCC claimed that it entered into this agreement under "duress," the evidence contradicts this claim (e.g., Biaggini, Tr. 3207).

 Even if the Court were to disregard the fact that SPCC voluntarily agreed to these practices, it has failed to establish that any of the challenged practices were in any way improper. With respect to the period following Docket No. 20099, SPCC's witness, Mr. Sanford, identified only three major differences between Long Lines and SPCC in the ordering and design service provided by the Bell operating companies: use of defendants' Adnet system, participation in defendants' USOC ordering system, and participation in defendants' internal design process (Sanford, PX–6–0007 at 9). In addition to the fact that these procedures were voluntarily agreed to, the differences are of no consequence in view of the fact that SPCC has never offered to pay for the services in question (Sanford, Tr. 1080–81).

Furthermore, the evidence satisfies the Court that none of these services would have been particularly useful to SPCC. Thus, Mr. Sanford's testimony and SPCC's documents cast serious doubt on the validi-ty of SPCC's claims that access to the Adnet system would facilitate the ordering process. He testified that SPCC used courier services among its own locations and decided not to implement its own internal teletype system because it would cause mistakes and not result in appreciable time savings (Sanford, Tr. 1097–1100; S–4459C). Similarly, AT & T recommended against use of facsimile or electronic methods of exchanging information with the specialized carriers because it was costly and likely to lead to errors (Thompson, S–T–65 A at 18). When New York Telephone installed facsimile devices for the exchange of design information with the specialized carriers, it encountered recurring problems with SPCC's facsimile devices that were so severe as to require all communications also to be sent through the mail to insure that no information was lost (Marshall, T., S–T–129 at 17–18; S–3686; S–3746). The Court has also reached the same conclusion with respect to the claim regarding use of AT & T's complicated USOC codes—that is, the availability of those codes would not have saved any time for SPCC or reduced the error rate in its orders (Thompson, S–T–65A at 11).

SPCC also asserted that the ordering process was hampered by AT & T's failures to provide SPCC with essential technical information. SPCC charged that AT & T unreasonably failed to make available to it a large quantity of technical and other data which SPCC contended would have been useful to it—including, notably, the Bell System Practices (BSPs). As pointed out above, the Court finds, however, that defendants provided more than sufficient technical information to SPCC, and there is no requirement of which the Court is aware that they go further and divulge proprietary information which SPCC did not need in order to furnish its authorized services. Indeed, as defendants' witness, Mr. Hogan, pointed out, SPCC had nearly 200 of the most relevant BSPs in its possession (Hogan, S–T–205 at 20–21),[261] and the OC-

---

261. SPCC's possession of such a large number of mostly current BSPs leads the Court to seri-ously question the credibility of Mr. Deschaine who testified that the absence of current BSP

CANs, OCCEIs and OCCTNs provided to SPCC by AT & T would in any event be fully adequate, even if SPCC did not have access to these BSPs, for SPCC to design and provide its services (Thompson, S–T–65A at 12–15; Thovson, S–T–66A at 17–18). Given this state of the record, the Court concludes that anything in the BSPs which was not contained in the OCCANs, OCCEIs and OCCTNs would either have been superfluous or would have divulged highly sensitive descriptions of Bell System equipment and other proprietary data (Thompson, S–T–65A at 14–15).

 Two of plaintiffs' witnesses also complained that AT & T procedures did not provide for coordination of SPCC's local facilities at each end of a circuit involving more than one operating company (Vasilakos, PX6–0005 at 25–26; Gundy, PX6–0009 at 4). However, another SPCC witness, Mr. Sanford, testified that he did not expect AT & T or the operating companies to perform this coordination function (Sanford, Tr. 1101). Common sense suggests that it is properly the responsibility of the specialized carrier, with the operating companies' cooperation, to coordinate turn-up of its own circuits by negotiating compatible due dates with both operating companies involved (Thompson, S–T–65A at 12). The Court finds that this allocation of responsibility is fully consistent with the fact that the end-to-end service is an SPCC, not Bell, service and therefore overall management of the installation process logically falls to the carrier having overall responsibility for the service.

SPCC also took issue with the installation intervals it received from defendants in 1976. Although AT & T agreed in the Docket No. 20099 Settlement Agreement to treat the specialized carriers' orders the same as Long Lines, those carriers soon complained that such an arrangement was onerous (Thompson, S–T–65A at 6). Consequently, in 1976, at AT & T's insistence, the operating companies established standard

issues prejudiced SPCC and that he believed SPCC had less than 20 BSPs in its possession

intervals that were uniform throughout the country (Thompson, S–T–65 at 13). From the Court's review of the evidence, it appears that the procedures which were developed were actually more favorable to the specialized carriers than the treatment received by Long Lines. Thus, while the specialized carriers today have the benefit of standard intervals for up to eight circuits, Long Lines is quoted standard intervals only on orders of up to five circuits (Thompson, S–T–65A at 6). Although plaintiffs have pointed to the temporary inability of New York Telephone, in particular, to meet the system-wide standard intervals, the Court is satisfied that this situation was caused by problems beyond its control and did not reflect an intent to impede SPCC's operations (id. at 7–8).

In addition to these claimed deficiencies in the ordering process, SPCC also asserted that the process included unnecessary practices. First, SPCC complained about defendants' requirement that SPCC obtain an agency letter confirming its authority to represent and receive information concerning a customer (Sanford, PX6–0007 at 5). However, the evidence shows that SPCC (along with the other specialized carriers) required agency letters to be furnished it before it would cooperate in the conversion of an SPCC customer's service to another specialized carrier (Thompson, S–T–65A at 10–11; S–4227; S–6096). Mr. Gibbs, former SPCC Operations Manager for the Eastern Region, testified that SPCC required agency letters for the same reason he understood Bell to require them—for protection of the customer (S–6096 at 132–33). The Court can find no fault with such a widely used and sensible practice.

Second, SPCC claimed that the Bell operating companies returned its orders because of minor or correctible errors (Vasilakos, PX6–0011 at 28). The Court cannot conceive of any antitrust obligation on the part of defendants to correct SPCC's errors and thus, even if this charge were true, it is

(Deschaine, Tr. 1537–39).

meaningless. The Court finds, however, that SPCC has failed to substantiate its claim. Defendants' policy was to return orders only for serious errors and that wherever possible, corrections should be worked out over the telephone (Thompson, S–T–65A at 7). This policy was adhered to by the operating companies (*id.;* see also, Charette, S–T–118 at 5; Cherne, S–T–72 at 13; Euler, S–T–102 at 5–6; King, D., S–T–75 at 5–6).

■■■ SPCC asserts that the effect of these ordering procedures was to cause it to experience a 50 to 58 day ordering interval versus 12 to 18 days for Long Lines (Sanford, Tr. 1066–68). The Court finds that this proposition is unsupported by the evidence. First, as discussed in more detail below, it is apparent that SPCC suffered from severe internal delays in processing orders. For example, a memorandum written by Mr. Vasilakos on June 3, 1974 stated that "LDFs have not been ordered anywhere from two weeks to as much as two months after the order received by operations" (S–3037) and a later internal SPCC memorandum shows that the timeliness of SPCC's facilities orders to the operating companies was still very much a matter of concern in June 1976 (S–4362). Yet, this period of time—solely attributable to SPCC's own inefficiencies—is included in Mr. Sanford's 50–58 day figure. Second, the measurements for SPCC and Long Lines intervals are not comparable because the Long Lines interval does not include the time required for inter-company coordination of due dates, whereas the SPCC interval does (Sanford, PX6–0007 at Attachments 1, 2). Under these circumstances, SPCC has failed to prove that it was injured by defendants' ordering process.

■■■ The Court finds that the practices and procedures related to the ordering of local facilities do not constitute essential facilities, that none of defendants practices constituted independent antitrust violation and that they do not provide any inference of anticompetitive intent. Even if the Court does not rely on SPCC's prior agreement to these matters, the Court finds that the ordering practices and procedures were reasonable and SPCC has failed to prove that they were instituted with the intent of disadvantaging SPCC or that they in fact disadvantaged SPCC in any manner.

## INSTALLATION AND REPAIR

Plaintiffs devoted a considerable portion of their interconnection case to the claim that SPCC received intentionally inferior service from the Bell operating companies in the installation and repair of local distribution facilities. SPCC claimed that the service it received was so much worse than that given Long Lines as to constitute evidence of anticompetitive discrimination by defendants against SPCC. As proof of this alleged discrimination, SPCC principally relied on selected statistical data purporting to measure (1) the percentage of SPCC local distribution facility installation dates missed by Bell operating companies, and (2) the average time taken to repair SPCC circuits when troubles were encountered. SPCC then compared these data with installation and repair statistics for Long Lines and with Bell's self-imposed service goals.

Plaintiffs also made a number of minor charges against defendants related to specific practices which SPCC claimed were unreasonable. In the area of installation service, these practices included the operating companies' alleged refusal to engage in preservice and joint end-to-end testing, their refusal to provide end links terminating in customer-owned and maintained ("COAM") equipment, inferior transmission and testing parameters for facilities provided to SPCC and to other specialized carriers as compared to those applicable to Long Lines, and alleged abuse by the operating companies of the special construction provisions of the local distribution facility tariffs. SPCC also complained of certain operating company's insistence upon wiring local distribution facilities onto "66" block connectors and the refusal by Illinois Bell to install inside wiring at SPCC's customer location between SPCC's station package and the Bell equipment terminations. Finally SPCC also introduced evidence of sev-

eral specific incidents where installation delays allegedly affected individual customer accounts.

In the area of repair, SPCC claimed that it was hampered by AT & T's refusal to provide it with CCSA routing guides and that the Bell operating companies imposed inferior procedures for reporting troubles on local facilities. SPCC also complained that it was unfairly charged for overtime work performed by operating company personnel for repair service on local distribution facilities and that it received delayed repair service in several discrete instances.

■■■■■ As discussed above, SPCC principally relied on statistical data of the Bell operating companies' repair and installation performance. Statistics can, of course, be used as evidence of anticompetitive activity, but they are seldom solely determinative. *See, e.g., United States v. General Dynamics Corp.*, 415 U.S. 486, 498, 94 S.Ct. 1186, 1194, 39 L.Ed.2d 530 (1974) (statistics on market share alone were not enough, further examination into the particular market was required). The use of statistical evidence to prove discrimination in some types of cases under the Civil Rights Act of 1964 can be used to give rise to an inference of discrimination in regard to the establishment of a prima facie case. However, this merely requires the defendant to assume the burden of persuasion that the conduct complained of was for a legitimate non-discriminatory reason. When this is done, as was the case here by the defendants, unless the plaintiffs prevail on rebuttal to show, for example that defendants' conduct was pretextual, then the plaintiffs lose. This is so elemental now that it needs no reference or citation to numerous Supreme Court cases. Moreover, the statistical evidence must not be flawed by problems in data gathering, inadequate data assembly or selective comparisons and it must be representative and accurate.

■■■ For a variety of reasons the Court concludes that SPCC's statistical evidence, which constitutes its principal proof of inferior installation and repair service, is seriously deficient and does not support SPCC's allegation of discriminatory treatment. As shown above, there are significant differences between Long Lines and SPCC facilities which greatly increase the effort needed to install and repair SPCC facilities as compared to those of Long Lines. In addition, as detailed below, a careful examination of the statistics proffered by SPCC shows them to be of little value. Similarly, the Court concludes that SPCC has not proven its litany of miscellaneous installation and repair charges against the operating companies, or that these charges, even if proven, demonstrate either a denial of essential facilities or an anticompetitive intent on the part of defendants. The Court will now examine SPCC's evidence with respect to its statistical and other evidence.

## INSTALLATION

SPCC's statistical evidence of discriminatory installation treatment consisted of a single parameter, the percentage of times that Bell operating companies failed to provide local distribution facility installations to SPCC on the date promised.[262] SPCC statistics purported to show that the operating companies missed a higher percentage of due dates for SPCC than they did for Long Lines (Vasilakos, PX6–0006; Petty PX6–0008; Bastic PX6–0010). In support of this claim, SPCC introduced three sets of statistics. The first set of results was for Pacific Telephone. From these results, Mr. Bastic concluded that Pacific Telephone missed 55 percent of SPCC's installation due dates (Bastic, PX6–0010 at 11; see also PX4–0320; PX4–0510; PX4–0313; PX4–0470) between December 1, 1977 and March 10, 1978.[263] The second set, pertaining to

---

**262.** With the exception of several isolated instances (Bastic, PX6–0010 at 10; Gundy, PX6–0009 at 4–6), SPCC made no attempt to show the amount of time the installation was late.

**263.** SPCC also introduced evidence of missed due dates in April 1977, but this was limited to the Los Angeles area (PX4–0321). There was also some evidence that during August 1974, Pacific Telephone completed only about 5 percent of SPCC requested interconnections on

New York Telephone operations, covered a one week period in 1977 and a two month period in 1978. This data showed New York Telephone missing between 17 percent and 22 percent of SPCC's installation due dates (PX4–0428). The third set of statistics covered an eleven week period in 1978 for all operating companies in which SPCC was doing business and showed the operating companies missing only 16 percent of the due dates over the period (PX4–0191).

Even if the percentages of missed installation dates calculated by SPCC were to be accepted, the Court finds these data to be of limited usefulness. SPCC claimed that it was discriminated against from the day it commenced operations—December 26, 1973—until this action was filed in March 1978. Yet SPCC offered no evidence that these small statistical samples were in any way representative of this four year period. The longest statistical interval covered only thirteen weeks for Pacific Telephone in 1977–78, barely 5 percent of the period covered in the complaint. There was no showing that these isolated and sporadic statistics were representative of the Bell System's (rather than a few companies') installation service to SPCC. Indeed, SPCC's own statistics confirm that several operating companies completed 100 percent of SPCC installations on time (PX4–0191). Nor did SPCC offer any evidence that the statistics were even representative of each companies' performance. For example, the results cited for Pacific Telephone pertained only to the Northern California area in one instance (PX4–0510) and Los Angeles in another instance (PX4–0321). The New York Telephone results were only for two New York City locations (PX4–0428). Since SPCC was doing business in other areas serviced by these companies, the stu-

dies are not necessarily representative of each operating company's actual performance.

The Court's examination of these statistics also shows that they are inconsistent with each other. For example, Pacific Telephone is shown in the third set of statistics as missing approximately 16 percent of its SPCC due dates over the same period in which the first set of statistics, containing just data for the Northern California region, showed that 55 percent of the due dates were missed. The Court cannot place too much confidence in statistics which differ from each other by more than 300 percent. Furthermore, because of the small samples involved there is tremendous variation within the statistics themselves. For example, New England Telephone's performance changed from 47 percent on-time to 100 percent on-time in the space of one week (PX4–0191).

In addition to these statistics being non-representative and inconsistent, their underlying data are suspect. Although Mr. Petty testified that SPCC's reports, which tracked late installations by the Bell operating companies and which contain the raw data for SPCC's statistics, were prepared in the normal course of business, the record shows otherwise. These reports were routinely sent to SPCC's legal department pursuant to instructions from that department and were prepared to support SPCC's legal activities (Petty, Tr. 1206, 1209–10). Accordingly, even though the Court received these reports in evidence and carefully considered them, the Court believes there is strong evidence to support defendants' position that the SPCC reports are not entitled to treatment as "business records." [264]

time (Grant, PX6–0004 at 18, Grant, Tr. 666–68, PX4–0470). However, these statistics did not measure the Pacific Telephone results accurately. When corrected, Pacific Telephone's performance in August 1974 reflected 73 percent of SPCC orders completed on or before the due date (Snyder, S–T–71 at 22–23).

**264.** In *Palmer v. Hoffman,* 318 U.S. 109, 113, 63 S.Ct. 477, 480, 87 L.Ed. 645 (1943), the Su-

preme Court upheld the exclusion of a train engineer's statement concerning an accident which gave rise to litigation because:

> "the fact that a company makes a business out of recording its employees' versions of their accidents does not put those statements in the class of records made 'in the regular course' of business within the meaning of the Act."

 On the assumption that these reports constitute legitimate business records, the Court nonetheless finds them to be sufficiently deficient in several critical respects to render them of little probative value. The data for these reports were not gathered in a standardized manner and were not reviewed by Mr. Petty, who compiled the reports (Petty, Tr. 1222–24). Although the reports purport to measure instances where defendants were "late" in their performance, Mr. Petty gave no instructions regarding the meaning of "late," but rather, left this to the interpretation of SPCC's individual terminal managers (Petty, Tr. 1227). Mr. Petty, who sponsored the reports at trial, had "no idea" of how many of the "late" installations were cured the very next day (Petty, Tr. 1227–28). Thus, these reports do not constitute meaningful or even accurate evidence of the number of delayed installations.

Even disregarding all of these defects in SPCC's statistical proof, the Court finds the data misleading for another reason. It is clear that SPCC's internal problems contributed substantially to installation delays (Sanford, Tr. 1084–85; Petty, Tr. 1229, 1231–32, 1254; Segal, S–T–95 at 2). Internal delays in ordering local distribution facilities were a significant cause of SPCC's long installation intervals and delayed installations (Sanford, Tr. 1085; Vasilakos, Tr. 3085; Thompson, S–T–65A at 4; Hunt, Tr. 4179–80; Kinter, S–T–106 at 5–6; S–3037; S–4362; S–4016; S–3045; S–4362B; S–4923; S–4303; S–4252; S–4362; S–4379). As late as the Fall of 1977, severe difficulties in SPCC's internal order processing caused a large number of due date movements (Petty, Tr. 1229, 1231–32, 1254; S–4748; S–4857; S–5030). Mr. Segal of New York Telephone testified that one of their principal problems was "the failure of SPCC to provide us with all the information we needed to install circuits for them." (S–T–95 at 2). He also expressed his frustrations at being unable to contact the person with appropriate authority to solve a given problem. (*id.*) Even when a problem was solved with one of SPCC's front-line employees, headquarters would veto the solution (*id.* at 4). Mr. Segal went on to state (*id.*):

> "In short, New York Telephone always tried to cooperate with the OCC's, including SPCC, despite the frustrations we encountered in SPCC's organizational limitations in carrying on business."

The defective orders SPCC provided to the operating companies also resulted in installation delays and missed due dates (Thompson, S–T–65A at 4; Kunz, S–T–107 at 2–3; Little, S–T–122 at 3; Kinter, S–T–106 at 6; Marshall, T., S–T–129 at 17–19; Moreno, S–T–112 at 6; S–4748). SPCC's documents and the testimony show that SPCC often ordered the wrong type of Bell facilities because of errors by SPCC's Circuit Design Department (S–4252; S–4601; S–4626; S–4662; S–4685; S–4768; S–4785; S–4823; Euler, S–T–102 at 5–6; Robertson, S–T–114 at 3–4; Cherne, S–T–72 at 12–14; King, S–T–75 at 4–6) and that these errors frequently caused missed customer due dates (S–3368; S–4054; S–4362; S–4379; S–4697; S–4942; S–5067; S–5307). SPCC conceded that the poor quality of its orders caused the Bell operating companies serious problems in meeting installation dates, and the Court finds that defendants' complaints about the deficiencies in the orders were valid (Sanford, Tr. 1092–93; PX4–0180 at 6–7; PX4–0179 at 19). As SPCC's former Vice President John Geier pointed out in September 1975, inaccurate sales order information (combined with inaccurate site survey data) was "[a] main cause for re-

Underlying the decisions of both the Supreme Court and the Second Circuit in that case was the fact that the accident report was made with a view to litigation and was therefore, in the words of the Second Circuit, "dripping with motivations to misrepresent" (129 F.2d 976, 991 (1942)). The decision in *Palmer v. Hoffman* has consistently been followed by the federal courts when confronted with documents of the nature of SPCC's performance reports. As stated by the Court of Appeals for this Circuit in *United States v. Smith,* 521 F.2d 957, 966 (D.C.Cir.1975), the "'litigation records' doctrine of *Palmer v. Hoffman*" acts to "deny the business records exception to any document prepared with an eye toward litigation when offered by the party responsible for making the record."

scheduling targeted installations for customers" (S–3813). In fact, internal reviews of service orders by SPCC from November 1976 through January 18, 1977 revealed that 57 percent of SPCC's service orders were improperly written because of insufficient or incorrect information, excessively short intervals and other problems (S–4662B; S–4772; S–4848; see, Sanford, Tr. 1092).

The magnitude of these problems was confirmed by Bell operating company witnesses. For example, during June and July of 1975, all the SPCC orders received by Bell of Pennsylvania in Pittsburgh and 75 percent of the requests received in Philadelphia had to be clarified by Bell personnel (King, S–T–75 at 6). In addition, the evidence shows that SPCC frequently changed the specifications in its orders (Robertson, S–T–114 at 3–4; Cherne, S–T–72 at 14–17; S–3993B; Hunt, Tr. 4179–80) and requested expedited installations which were later delayed because of SPCC or its patrons (Cherne, S–T–72 at 14).

The Court finds that operating companies' installation efforts were also hampered by SPCC's failure to provide accurate and timely forecasts of its future facility requirements, its failure to provide information concerning its inter-office facility requirements, and its failure to provide the Bell operating companies with sufficient lead time for cable construction (Marshall, T., S–T–92 at 7–12; Case, S–T–202 at 3; Snyder, S–T–71 at 4759). Indeed, these forecasting deficiencies are reflected in SPCC's own documents (S–4030; S–6139 at 3–4; S–6096 at 6).

Thus, the evidence shows that the vast majority of installation delays were attributable to SPCC's customers or to SPCC's own inefficiencies. Fully 80 to 90 percent of late SPCC installations were due to problems entirely unrelated to defendants (Sanford, Tr. 1086–90; S–4465). Mr. Sanford, SPCC's Manager of Facilities, admitted that defendants were responsible for a relatively small percentage of SPCC's late installations (Sanford, Tr. 1090). These facts lead the Court to conclude that SPCC's statistics are virtually meaningless.

Nevertheless, even if the Court were to accept SPCC's reports on defendants' installation performance as valid, those reports show only that, while defendants were not, in every instance, performing as well as they had hoped, they were performing very well. SPCC's own reports, which Mr. Petty sponsored, confirm that the operating companies involved completed installations on time in 89 percent of the cases reported over a six week period in 1978 (Petty, Tr. at 1134). Defendants' objective, in which SPCC concurred, was a 95 percent on-time rate (Petty, Tr. 1138; PX4–0179 at 19, 49). The evidence demonstrates most Bell operating companies achieved or surpassed this objective and indeed, the report sponsored by Mr. Petty shows that a number of operating companies met 100 percent of their installation due dates during the period covered by the report (PX4–0191).

For example, over the four-year period 1975 through 1978, New York Telephone met SPCC requested due dates for installation of facilities—except those postponed by SPCC or SPCC's customers—96.9 percent of the time (Marshall, T., S–T–92 at 23; Riordan, S–T–94 at 4). Dallas is currently meeting 99 percent of its due dates for specialized carrier orders whereas its performance on Bell orders ranges from 83 to 98 percent on time (Holt, S–T–120 at 4), and in 1976 it completed 98 percent of its specialized carrier orders on time (Lindgren, S–T–121 at 4). In 1975 and 1976 the Philadelphia and Eastern areas of Bell of Pennsylvania completed 98.1 percent and 97.8 percent respectively of SPCC's requests for facilities on time (King, S–T–75 at 4; S–5377B). In 1977 and 1978 the same company, on a statewide basis, completed 95 percent and 99 percent of SPCC's orders on time (King, S–T–75 at 4; S–5377B). In 1976, Pacific Telephone's Northern sector missed only 1.1 percent of its due dates on specialized carrier orders as compared to 2.8 percent on Bell special service orders (Cherne, S–T–72 at 10; S–3993B). Similarly, from April 1975 through December 1977, 2,986 SPCC orders were handled by Moun-

tain Bell in Arizona with only 22 missed due dates—less than one percent (App., S–T–85 at 15). See also PX4–0170; PX4–0429; Lindgren, S–T–121 at 4; Schwartz, S–T–70 at 22.

 Furthermore, the evidence shows that those companies not meeting the 95 percent on time objective—such as the Colorado region of Mountain Bell and Southern New England Telephone which had on-time rates of about 90 percent—were either performing better for the specialized common carriers than for their own special service customers (McKeever, S–T–87 at 9–10) or experienced due date misses caused by the specialized carriers or their customers (Charette, S–T–118 at 8). The Court finds that the fact that defendants were not in every instance achieving their self-imposed objective does not demonstrate any intent to disadvantage SPCC and presents no violation of the antitrust laws.[265] The Court recognizes that the issue involves which data the Court should follow. After rejecting the use of plaintiffs' data above, the Court relies upon the defendants' data. Even assuming that somehow the defendants' data was exaggerated by 10%, an 80% to 90% on time rate would not give rise to antitrust liability, especially in light of the fact that plaintiffs have been unable to cite any significant loss of business due to the delays.

SPCC has raised a number of additional complaints concerning the installation service received from the Bell operating companies. First, SPCC challenged the operating companies' alleged refusal to engage in preservice and joint end-to-end testing, their refusal to provide end links terminat-

ing in customer owned and maintained ("COAM") equipment, and the transmission and testing parameters applicable to local facilities provided to SPCC and the other specialized carriers.[266] The Court finds that all of these charges have been effectively dealt with in the evidence presented by defendants. SPCC's complaint concerning preservice testing, for example, is clearly without foundation (Thompson, S–T–65A at 21), and the testing arrangements of which SPCC complains were freely agreed to by plaintiffs and are contained in Appendix D to the Settlement Agreement in Docket No. 20099 (S–3469B). Similarly, the prohibition on end links to COAM equipment, which is no longer in effect, was acknowledged by one of SPCC's own employees to be reasonable (S–6063 at 198–99; see also Thovson, S–T–66A at 15–17) and the transmission quality targets for facilities provided to the specialized carriers were more rigorous than for defendants' own services (Thovson, S–T–66A at 18–22).

SPCC also presented the testimony of one witness, Mr. Deschaine, that Pacific Telephone employees were instructed to perform inferior tests on specialized carrier circuits. to those performed on its own circuits (Deschaine, Tr. 1605–09). However, this testimony was effectively rebutted by Mr. Deschaine's training instructor, Jon Arild, who testified that the test Mr. Deschaine thought to be inferior was standard procedure and the more sophisticated test was not normally provided for Pacific Telephone circuits (Arild, S–T–97 at 3). In situations where the specialized carriers were willing to pay for additional, more

**265.** As discussed above, the fact that SPCC located its technical operating centers without regard to the layout of the Bell operating companies local plant means that the local distribution facilities furnished to it tend to be longer and more complex than those used for the intrastate enterprise, and that fact alone would lead to more difficulties in meeting installation objectives (Hunt, Tr. 4166–67). Given the added fact that SPCC personnel were relatively inefficient in performing their part of the installation effort (See Doc.Sub. XV), it is obvious to the Court that defendants would have had to expend far greater efforts to meet installation

objectives for SPCC than they would to meet those objectives for the intrastate enterprise.

**266.** SPCC also has charged that defendants were unreasonable in declining to lease "stand-alone" handsets and modems to the specialized carriers. As Mr. Thompson of AT & T testified, however, that decision was based on the probable incompatibility between leasing of such equipment and the provisions of the 1956 Consent Decree, and on possible maintenance problems which such leased equipment would present (Thompson, S–T–65A at 17).

sophisticated tests, such tests would be performed (*id.*).

SPCC also charged that the installations the operating companies provided were inadequate because of the operating companies' refusal to connect to SPCC's main frames and their insistence upon wiring SPCC's local distribution facilities onto "66" block connectors (Gundy, PX6-0008 at 13–14; Tr. 1285–89). It is clear to the Court that AT & T did not refuse to connect to SPCC's main frames. AT & T's Engineering Letter No. 3934 (S–3861C) specifically provides for main frame connection through either an operating company or specialized carrier provided connector on the specialized carrier's frame (Thompson, S–T–65A at 16). Moreover, SPCC's employee, Mr. Sessamen, admitted in his deposition that Illinois Bell interconnected on SPCC's main frames in Chicago (S–6068B at 115–16).

Plaintiffs' charges concerning use of the "66" block are also without support in the record. Contrary to SPCC's contentions, its own operational employees admitted that the 66-block is an entirely adequate connection device which caused no particular problems for SPCC (S–6071 at 80–81; S–6069 at 2; S–6068B at 2; see also, Mendelsohn, S–T–78 at 3). In any event, SPCC was offered the option of specifying other connectors, such as the 301 wire-wrap device (Thompson, S–T–65A at 16; King, S–T–75 at 3) and, in fact, received a non-66 block in its Chicago terminal (S–6068B at 4) and in one of its New York City terminals (S–3479).[267]

Although SPCC also complained that Pacific Telephone abused the special construction provisions of the local distribution facilities tariffs, Mr. Gundy of SPCC was unable to specify precisely which provisions of those tariffs had been so abused (Gundy, Tr. 1315). Further, while Mr. Gundy testified that Pacific Telephone failed to acti-

vate all of the cable pairs it had installed to SPCC's Technical Operating Centers in Sacramento, Fresno and Bakersfield (Gundy, Tr. 1316–23), it is clear to the Court that Mr. Gundy simply did not understand forecasting procedures. In fact, the evidence clearly shows that SPCC failed to request reserved complements for these Technical Operating Centers—a request which would have guaranteed that facilities would be activated and dedicated for SPCC's use (Snyder, S–T–71 at 59–63). The record also establishes that SPCC requested facilities under the forecast of facilities procedure (*id.* at 62–63). Under this procedure, Pacific Telephone's obligation was to take SPCC's forecast into account when planning for construction and to make good faith efforts to supply the facilities in question (*id.* at 60–61). The Court is satisfied from the evidence that Pacific Telephone clearly met those obligations (*id.* at 62–63).

Similarly, SPCC also complained that, in 1975, Illinois Bell refused to install inside wiring at SPCC's customer location between SPCC's station package and the Bell equipment terminations, and that, in one instance, SPCC had to hire an electrician to perform this task (Bastic, PX6–0010 at 3–4; Bastic, Tr. 1334–35). It is clear to the Court that a service which was obtainable from the local electrician does not remotely resemble an "essential" service under the antitrust laws, nor can any inference of anticompetitive intent be drawn from a failure to provide a service which SPCC could so easily provide for itself.

In an attempt to buttress its basic allegation that the Bell System engaged in anticompetitive conduct, SPCC selected a handful of discrete incidents involving particular customers who experienced installation delays, repair delays, and maintenance problems because of Bell operating compa-

---

**267.** SPCC's witness testified that the "66" blocks caused "maintenance problems" because Bell technicians failed to replace a clip which had to be removed in making the interconnection (Gundy, Tr. 1287). Such failure necessitated SPCC's verification that the "terminations were back on and that they were on

correctly" (Gundy, Tr. 1288). There was not even a suggestion in the record that the failure to replace the clip was deliberate. Moreover, while this "maintenance problem" may have been an annoyance to SPCC, it scarcely constitutes an antitrust violation.

nies. The Court, finds, however, that SPCC's evidence is unpersuasive, particularly where the isolated episodes upon which it has relied are trivial in nature. More important, however, these isolated episodes fail to establish that the Bell System engaged in any course of action that could possibly be ascribed to anticompetitive activity.

Thus, for example, SPCC has complained that several of its patrons, including Liberty Electronics, California Federal Mortgage Company, Crocker Bank and Allstate Insurance Company, experienced installation and repair delays because of Bell operating companies. SPCC charges that these delays were caused by deliberate efforts on the part of the Bell System to impede SPCC (Gundy, PX6–0009 at 4–6; Bastic, PX6–0010 at 8–11). The Court finds these charges to be without support in the record. First, SPCC failed to call a single customer to testify. Thus, SPCC's claim of injury is defective because "the record [was] totally devoid of evidence . . . [from] any customers" relating to the challenged conduct. *Berkey Photo, supra,* 603 F.2d at 288–89. Furthermore, the uncontroverted testimony of defendants' witnesses clearly establishes that these installation and repair delays were short-lived delays caused by mere human error or temporary operational difficulties which were resolved by the operating companies as expeditiously as possible (Snyder, S–T–71 at 68–70; Atkinson, S–T–98; Cherne, S–T–72 at 10–11). And SPCC's own witnesses corroborated that testimony, admitting that such delays were

"intermittent" problems which were quickly resolved by the operating companies (Bastic, Tr. 1342).[268]

For example, Mr. Bastic testified that although Michigan Bell claimed that it could not provide an off-network access line (ONAL) for SPCC's patron, Motorola, until January 1977 because of an equipment shortage, Motorola, after placing an identical order with Long Lines, was able to obtain the circuit months before January 1977. Mr. Bastic further concluded that Michigan Bell provided to Long Lines the equipment that was needed in order to service Motorola (Bastic, PX6–0010 at 8–9). It is clear to the Court, however, that Mr. Bastic's charges are frivolous and based upon hearsay and speculation. In this regard, Mr. Bastic had no personal knowledge as to whether Long Lines actually provided the ONAL to Motorola months before the January date quoted to SPCC (Bastic, Tr. 1352). Further, the unrefuted testimony of Harry Furkas of Michigan Bell indicates that Michigan Bell did not provide to Long Lines the equipment that was needed in order to furnish Motorola with the ONAL, that Michigan Bell did not even have a ready inventory of such equipment, and that Michigan Bell tried, unsuccessfully, to obtain such equipment in order to comply with SPCC's facility request for Motorola (Furkas, S–T–84A).[269] Despite SPCC's protestations to the contrary, the Court finds that every effort was made by Michigan Bell to cooperate with SPCC.

268. Although SPCC seemed to imply that particular patrons were lost solely because of AT & T's failings, the testimony of SPCC's witnesses casts considerable doubt upon such a claim. Thus, for example, Mr. Petty of SPCC admitted that Western States Bankcard Association—a patron which SPCC claimed was lost because of Pacific Telephone's actions—was critical of SPCC's own performance (Petty, Tr. 1242–43). Similarly, although SPCC claimed that Allstate Insurance Company experienced service outages in 1976 because of New York Telephone, Mr. Bastic admitted that during that same time period, Allstate experienced impaired service and outages because of internal SPCC problems and problems with Rochester Telephone (Bastic, Tr. 1343–44).

269. Mr. Petty of SPCC also testified that Pacific Telephone unreasonably refused to provide tie line verification equipment on certain tie lines that SPCC provided to Crown Zellerbach (Petty, PX6–0008 at 6–7). The evidence shows, however, that the initial refusal to provide equipment was reasonable, inasmuch as SPCC could have designed similar equipment and inasmuch as the equipment was designed to facilitate maintenance only, was not part of a Centrex offering, and could not be ordered by customers. In any event, Pacific Telephone subsequently agreed to provide the maintenance arrangement (Snyder, S–T–71 at 64–68).

■ The Court concludes that SPCC has failed to prove that it received installation service from the operating companies inferior to that provided to Long Lines. Even if the Court accepted SPCC's evidence, SPCC's installation claims would fall for failure to prove any injury attributable to defendants' actions. Regarding the statistical evidence offered, because the extent of any lateness cannot be determined from the data,[270] the Court cannot ascertain whether SPCC was harmed at all, especially in view of SPCC's practice of requesting defendants to install circuits five days earlier than the due date for the customer's service in order to account for any lateness by defendants in delivering those circuits (Petty, Tr. 1131, 1228–29).[271]

The absence of any injury attributable to the installation services received from the Bell System is also demonstrated by the testimony of SPCC's own expert witness, Dr. Brown. Dr. Brown presented the results of a study that determined "the extent to which SPCC lost revenues due to customer cancellations and reductions in private line service" (Brown, PX6–0031 at 3). The findings of this study were stated as follows (*id.* at 8):

> "The percent of revenues lost due to cancellations, based on my experience with high technology start-up ventures, is low, and that due to reductions is well within the expected range. Whatever SPCC's start-up operating problems may have been, they were not the cause of untoward revenue losses from existing customers. Taken together, the data show that SPCC was successful in retaining the customers to whom it was able to sell its services in the first place."

Dr. Brown made no attempt in the study to distinguish losses or reductions caused by SPCC's internal problems from those allegedly due to defendants' actions or other reasons (Brown, PX6–0031 at 7). Instead, the study concludes that losses or reductions, for whatever reason, were low. In view of the compelling evidence introduced throughout the trial concerning the severe internal technical and operational problems experienced by SPCC, the study results were quite surprising to the Court. The combination of SPCC's internal problems and lower than normal customer losses and reductions leads the Court to the inescapable conclusion that SPCC was not injured by the service it received from defendants. In fact, as Dr. Brown agreed, his study results are consistent with defendants' claim that they bent over backwards to assist SPCC (Brown, Tr. 5946).

### REPAIR

As in the case of installation, plaintiffs' principal attempt to show inferior repair service was through statistical evidence. SPCC introduced several statistical tables purporting to show the length of time it took Bell operating companies to repair a malfunctioning SPCC circuit as compared to the repair time for a Long Lines circuit. SPCC also claimed Bell System internal procedures created incentives to prefer Long Lines and resulted in inferior trouble reporting and excessive repair charges for SPCC. Although the Court finds none of these charges supported, SPCC's repair claims are discussed in detail below.

Before turning to a specific analysis of the statistics offered by SPCC, the Court considers it important to differentiate the two ways of measuring repair time. The first approach, known as the Customer Trouble Report Analysis Plan (CTRAP), was used by defendants prior to 1979 to measure repair times on all intracity facili-

---

**270.** The only evidence offered for the time in which late local distribution facilities were finally delivered was the testimony of Mr. Bastic, who in late 1977 complained that Pacific Telephone was delivering facilities three days late on the average (Bastic, PX6–0010, at 10).

**271.** Although SPCC complains of occasional short delays by defendants, SPCC's own circuit capacity problems in 1975 forced some customers to wait at least four months for a circuit. Mr. Gibney testified that this long waiting time did not cause SPCC to lose any business (Gibney, Tr. 2377). Against this background, the Court finds SPCC's assertion that a delay of a few days by defendants caused it harm is not credible.

ties, be they facilities provided to Long Lines or the specialized common carriers. Under CTRAP, the elapsed repair time was simply the time between the notification to a local operating company of the trouble and the satisfactory repair of the circuit (Hogan, S–T–205 at 7). The second approach, known as the Special Services Results Measurement Plan (SSRMP), was used by AT & T prior to 1979 to measure repair times on intercity facilities. In contrast to CTRAP, under SSRMP the measurement "clock" was stopped for a variety of reasons, the most significant being whenever Bell System repairmen could not gain access to the customer's premise to test or repair a circuit (Hogan, S–T–205 at 8). Accordingly, repair performance times calculated under CTRAP were appreciably higher than repair performance times calculated under SSRMP (Hogan, S–T–205 at 8). Thus, as neither party disputes, CTRAP and SSRMP statistics are not comparable (Hogan, S–T–205 at 4–7; Hunt, Tr. 4201; Deschaine, PX6–0012 at 27).

SPCC offered into evidence five sets of repair statistics. To illustrate the repair times for Long Lines circuits, SPCC introduced AT & T SSRMP countrywide repair data for Long Lines for the period 1970–77, and also individual Long Lines repair statistics for Pacific Telephone, New York Telephone and Southwestern Bell for the years 1974 through 1977 (Deschaine, PX6–0012 at 27). According to these statistics, the nationwide average repair time for the local portion of the Long Lines intercity circuits ranged from a high of 3.0 hours in 1970 to a low of 2.1 hours in 1976 and 1977, and the repair times at Pacific Telephone, New York Telephone and Southwestern Bell were 2.6 hours or less.

In contrast to these AT & T SSRMP data, SPCC introduced its own data of repair performance for SPCC circuits for the period July 1977 through December 1978 (Deschaine, PX6–0012 at 30; PX4–0764). The average repair time, as shown in these statistics, ranged from a high of 38.4 hours for August 1977 to a low of 6.0 in October and November of 1978. However, for several reasons these figures cannot be compared

with the previous Bell System figures for Long Lines. First of all, these statistics are based on CTRAP data which SPCC attempted to modify to SSRMP-like data by deducting "no-access" time (Deschaine, PX6–0012 at 29), to the extent known by SPCC. Second, as admitted by Mr. Deschaine, the data included repair time for *all* telephone companies, including independent companies (Deschaine, PX6–0012 at 29). Evidence in the record indicated that the independent telephone companies generally gave the same or poorer service to SPCC than did the Bell operating companies (Grant, Tr. 654–55, 658; S–8F), so that even the inclusion of a few independent companies' repair performances in the data could skew the statistics unfairly. Moreover, the time frame to which the statistics relate, as well as other factors discussed above, make them subject to the same "prepared for litigation" character as the installation statistics.

SPCC also introduced statistical data on the repair performance for SPCC circuits of three individual operating companies—Pacific Telephone, New York Telephone and Southwestern Bell. The Pacific Telephone data were for the nine-month period December 1976 through August 1977 (PX4–0528). The New York Telephone data were for selected weeks from January through March 1977 (PX4–0513; PX4–0514; PX4–0515; PX4–0516). The Southwestern Bell data covered a 15 month period from June 1979 through September 1980 (PX4–0212; PX4–0213). All these statistics were based on CTRAP data, and only the Pacific Telephone data provide an indication that SPCC uniformly and consistently corrected for no-access time (Gundy, PX6–0009 at 11; PX4–0513; PX4–0514; PX4–0515; PX4–0516). Thus, the New York Telephone and Southwestern Bell data are clearly not comparable to the earlier SSRMP data. Furthermore, the Pacific Telephone data cover only the Los Angeles area, and the New York Telephone data consist only of New York City performance times.

Thus, in large part, SPCC relied on statistics from only certain areas of certain oper-

ating companies for limited periods of time, and its focus was on those portions of the Bell System areas which, during the relevant period, were experiencing general service problems. For example, although SPCC made special note of service problems in Houston, the record shows that Southwestern Bell experienced severe general service problems in that city during the mid-1970s due to unexpected growth, older equipment and technical problems (Marshall, C., Tr. 4316, 4332–33; Robbins, S–T–123; Zimmerman, S–T–127). This resulted in a general service problem for the specialized carriers as well as in Southwestern Bell's own facilities (Marshall, C., Tr. 4333). Likewise, during the 1975–1980 period, Pacific Telephone's service performance for all classes of customers was severely strained due to explosive growth and financial constraints (Saenger, S–T–69; Schwartz, S–T–70). For example, Pacific's Trouble Reporting Control Office in Los Angeles, which was handling approximately 1650 active specialized carriers circuits in January 1976, was handling approximately 3230 active circuits—almost double the workload—a year later (Snyder, S–T–71 at 31). Pacific Telephone fell behind in providing services for both Long Lines and the specialized carriers on a timely basis (Saenger, S–T–69 at 16–17; Schwartz, S–T–70 at 10, 17; S–522B). Two problems that accelerated the situation in California were explosive growth and the weather. First, there was rapid and unprecedented growth in service in California in the mid and late 1970's. (Schwartz, S–T–70 at 6). Some of the reasons included increases in both the general population of California and in the volume of business and industrial activity in California. (id.) Such phenomenal growth was beyond even PT & T's optimistic projections (id. at 7). The second major problem encountered by PT & T was the weather. A two year period in 1976–1977 of record drought was followed by a thirteen month period of record rains which led to an "onrush of cable failures and problems caused by water entering cracks in cables, which had developed but not caused trouble (and thus were not identified) during the dry period." (id. at

9). Moreover, these problems also confronted General Telephone Company (id. at 6) but who has not been sued. Nevertheless, that company made special efforts to better its performance in providing services to SPCC and other specialized carriers, and by October 1977, SPCC was complimenting Pacific Telephone on its improved performance in regard to circuit installation and maintenance (Wehmann, S–T–64 at 15–16; Snyder, S–T–71 at 38; S–5246). If anything, the record shows that PT & T treated all of its customers, Long Lines and the OCC's nondiscriminately poor.

▪ Thus, even if the Court accepts SPCC's data as accurate, the data fail to show a pattern of difference between the repair service provided Long Lines and that provided SPCC. Indeed, the Court finds SPCC's statistics cannot be used to compare repair service and that there is no credible evidence that they are representative of the Bell System's overall repair service to SPCC. *Workman v. State Farm Mut. Auto Ins. Co.,* 520 F.Supp. 610 (N.D.Cal.1981). Moreover, the variations between operating companies significantly detract from SPCC's theory that the operating companies' repair services to SPCC reflects an anticompetitive intent.

The Court also finds SPCC's statistics concerning repair performance to be based on deficient and imprecise data. SPCC reports analyzing defendants' repair time were based on the information contained in SPCC's repair tickets (Petty, Tr. 1235). However, SPCC's repair tickets were often inaccurate, and thus the reports based on them are entitled to little or no weight. As Mr. Kushan testified, SPCC had "tickets that showed . . . outages that ran 24 hours and 15 minutes when in fact it was only 15 minutes" (Kushan, Tr. 1474–75). The Court must conclude that such substantial errors in the raw data would have a significant effect on any averages compiled thereby. In addition, SPCC failed to get all data from repair tickets entered into its data base (Kushan, Tr. 1473–75). Mr. Deschaine, plaintiffs' expert witness in this area, did not review or correct the trouble tickets in

making his study, but rather used SPCC's existing studies, which were based upon the admittedly defective trouble tickets (Deschaine, Tr. 1530–35).

As the Court found in the area of installation, the evidence also shows that SPCC's own internal inefficiencies caused increased repair time. For example, in August 1977, it took SPCC an average of 2.4 hours even to refer a trouble ticket to the telephone company (Kushan, Tr. 1476–77; S–5227). Yet in measuring the telephone company's repair clearance performance, SPCC would measure from the time it received a trouble report from its customer until the trouble was cleared by the telephone company (Snyder, S–T–71 at 23). And, despite its own lackadaisical approach to reporting circuit outages, SPCC expected the Bell operating companies to repair a trouble in less time than SPCC took to report it.[272]

In addition, the poor quality of SPCC's trouble reports adversely affected the operating companies' repair efforts. Unlike Long Lines, which provided the operating companies with specific and accurate trouble reports that enabled the particular trouble in the circuit to be located and identified quickly, the specialized carriers, including SPCC, often did not properly test and isolate troubles on circuits before contacting Pacific Telephone (Boran, S–T–91 at 5; Walsh, S–T–96A at 3). As a result, that company spent a great deal of time and expense in responding to trouble reports which ultimately proved to be erroneous or a problem located in SPCC's own equipment

(Martinez, S–T–109 at 2; Grubb, S–T–104 at 6). The telephone companies also experienced difficulty in reaching SPCC personnel to have them accept a cleared circuit or cooperatively test the repaired circuit (Boran, S–T–91 at 5–7; Mendelsohn, S–T–78 at 4). Furthermore, SPCC's maintenance force was hampered by understaffing, lack of training, lack of necessary test equipment and an absence of standardized procedures (S–3566; S–3568; S–3905; S–4478; S–3082; S–3566; S–3923; S–4245).

Even if the Court were to credit SPCC's data, the evidence shows that when truly comparable facilities are considered and comparable statistics used, the repair time for facilities provided SPCC and the other specialized carriers was less than for facilities provided Long Lines (PX4–0170; Deschaine, Tr. 1565, 1570; Hogan, S–T–205 at 13, 15–17; Hunt, Tr. 4171–72, 4182; Mendelsohn, S–T–78 at 4).[273] The complexity of facilities provided the specialized carriers can be compared to metropolitan local private lines (Hough, Tr. 3540). Plaintiffs' counsel conceded that "what in effect we buy from them is like a local private-line operation" (Tr. 1390). Likewise, Mr. Biaggini agreed that SPCC wanted to obtain "parity with customers utilizing private-line and local tariffs" (Biaggini, Tr. 3234). Yet, for each time period selected by SPCC, the evidence shows that intracity facilities provided the specialized carriers were repaired more quickly than defendants' intracity private line facilities (S–9D).[274] In fact, by

272. For example, 42 percent of the trouble reports made by SPCC to New York Telephone in October 1976 were unrelated to any problem on Bell System supplied facilities (Walsh, S–T–96A at 4; S–4604B). Similarly, 51 percent of the trouble reports submitted by the specialized carriers to Pacific Telephone's Southern Sector in September 1976 were related to problems caused by specialized carrier equipment (Snyder, S–T–71 at 42).

273. Although SPCC criticized the basis for Mr. Hogan's testimony and the statistical data he presented, the Court finds this evidence significantly more credible than the repair statistics offered by SPCC. The data presented by Mr. Hogan, based on standard Bell System reports, are the most comprehensive presented at trial.

Plaintiffs' efforts to discredit Mr. Hogan's results by asserting that his studies were conducted in a very short time did not succeed. The evidence shows Mr. Hogan to be very experienced in this area (Tr. 5315) and the Court finds the studies he conducted in response to the Court's request of June 25, 1982 to be both very helpful and credible.

274. For example, SPCC complained of New York Telephone average repair times of 15.1 hours for October 1977 (PX4–0288), 26.66 hours for February 1978 (PX4–0193) and 12.0 hours for March 1978 (PX7–0033). Yet, the evidence shows that New York Telephone repaired the specialized carriers' intracity facilities significantly more quickly than it repaired

late 1978, SPCC was experiencing an average 4 hour restoral time throughout the Bell System (S–5687), while the Bell System average total repair time for its own special services was well in excess of this time (S–9E). In addition, AT & T submitted studies of SSRMP repair times for all specialized carriers over the period 1974–77 which demonstrated that Bell System repair service for those carriers equalled or bettered the repair performance for Long Lines (Hogan, S–T–250; S–0009B; S–0009C). The repair time for New York Telephone's own intracity private lines was 25.34 for October 1977, 30.11 hours for February 1978, and 21.41 hours for March 1978 (S–9D). By late 1975, trouble clearing time for specialized carriers in Southern California was four to six hours, as compared to 20 to 25 hours for Bell System special services (Cherry, S–T–100 at 4).

SPCC also raised several additional complaints concerning trouble reporting procedures, Bell operating companies' repair charges and claimed disincentives to repair SPCC's facilities on a timely basis. First, SPCC presented evidence concerning alleged inferior trouble reporting procedures during the early days of its operations. It claimed that prior to March 1975, Illinois Bell did not provide SPCC with its own telephone number to report troubles on local facilities, requiring SPCC instead to use the general purpose "611" repair number (PX–6–0010 at 5–6). However, it was admitted that by the end of 1974 SPCC had only *four circuits* in operation in Chicago, and, at the end of March 1975, when Illinois Bell did provide SPCC with a special repair number, SPCC had fewer than 50 circuits in operation (Bastic, Tr. 1330–33). The evidence shows that the various operating companies have seen to it that seven-digit numbers were assigned for specialized carrier use as the size and complexity of their circuits came to justify it (Thompson, S–T–65A at 18) and in many instances these numbers were assigned prior to SPCC's expansion into the operating company's territory (Boran, S–T–91 at 2 (New York Telephone); Mendelsohn, S–T–78 at 2 (C & P); McKeever, S–T–87 at 5 (Mountain Bell)).

SPCC also found fault with the procedures used to report troubles to the Bell operating companies after Docket No. 20099. Despite SPCC's criticism of temporary failures by the operating companies to provide a single point of contact to accept facility orders, it challenged the institution of just such a contact point for trouble reports (Deschaine, PX–6–0012 at 4, 24–25). It is undisputed that pursuant to the Docket No. 20099 Settlement Agreement, AT & T established Trouble Reporting Control Offices (TRCOs) in each operating company to receive trouble reports and coordinate repair efforts on the facilities provided to SPCC and the other specialized carriers (*id.* at 24). Despite its agreement to these testing procedures, SPCC claimed that the TRCOs were ill-suited to expeditious isolation and repair of private line problems largely because the TRCOs were separated from field forces and did not have direct test access to SPCC's local facilities (*id.* at 4, 25). Although these charges do not, in the Court's view, even state a cognizable antitrust claim, they have been completely refuted by defendants. For example, Pacific Telephone, at substantial expense, equipped its largest TRCO with the most sophisticated testing equipment available (Schwartz, S–T–70 at 14–16). Other operating companies also made large expenditures for test equipment to better serve the specialized carriers (McKeever, S–T–87 at 6). In addition, contrary to SPCC's claim, in 1977 Pacific combined its TRCO forces and the outside plant crews into one organization under a common division manager (Schwartz, S–T–70 at 16).

SPCC further complained that it was sometimes charged for repair service performed by defendants' personnel after normal business hours. Such overtime charges were alleged to be unfair and anticompetitive because SPCC felt it was paying for "24-hours-a-day, seven-days-a-week service" through the basic charge paid for

its own facilities (Hogan, S–T–205 at 16; Hough, Tr. 3542).

local distribution facilities (Vasilakos, PX–6–0006 at 33). The Court finds this allegation to be without merit. The record shows that SPCC was paying substantially less for local distribution facilities than the cost of such facilities (Cashman, S–T–31 at 2, 8, Tr. 3949), and that SPCC agreed to pay such charges as part of the Settlement Agreement in Docket No. 20099 (PX–4–0678). Moreover, the overtime charge for such repair service was negligible—an incremental charge of $5.00 per hour (*id.* at 48). In addition, overtime repair service was performed only at SPCC's specific request and was not charged for without such a request and agreement to the charge (PX4–0329); Thompson, S–T–65 at 24–25, S–T–65A at 20). Quite frequently, defendants did not even attempt to bill SPCC for such overtime charges but absorbed the expense themselves (Thompson, S–T–65A at 20; Urick, S–T–88 at 5–6; Cherry, S–T–100 at 3; Grubb, S–T–104 at 5; Kinter, S–T–106 at 6; Martinez, S–T–109 at 6).

SPCC also charged that AT & T performance indices for maintenance and repair provided built-in incentives for Bell System technicians to discriminate against SPCC and in favor of Long Lines (Deschaine, PX6–0012 at 21–24). The Court finds no basis for this allegation. As explained by defendants' witnesses, AT & T's measurement plans, which were developed before SPCC's existence, measure repair performance on all facilities (other specialized carrier or Long Lines) on the same basis (Thompson, S–T–65A at 19). As discussed above, interexchange repairs (whether specialized carrier or Long Lines) fell under the SSRMP plan, while local exchange repair performance was measured under CTRAP, and the choice of which plan to use had nothing to do with which carrier's facilities were involved. The Court concludes that because the performance index applicable to Bell System technicians is based on the composite index of all SPCC facilities and AT & T services maintained by a particular office, there was no discrimination in favor of Long Lines (Thompson, S–T–65A at 19).

As was true with installation, the Court finds that SPCC has failed to establish the requisite causal connection between the alleged conduct of defendants in providing repair services and any injury to plaintiffs. It is evident to the Court from SPCC's many admissions about its internal shortcomings that factors entirely unrelated to any conduct of defendants were a substantial, if not the principal, cause of the alleged repair delays upon which this charge is based. Furthermore, SPCC failed to prove that it lost a single customer due to defendants' repair service and, indeed, the testimony of its own expert witness, Dr. Brown, established that its customer losses from all reasons were lower than normal for a start-up venture (Brown, PX6–0031 at 7). The Court finds that such small customer losses are inconsistent with SPCC's claim that it received consistently inferior maintenance services.

## OTHER CLAIMS

SPCC made two final complaints regarding the Bell operating companies' provision of local distribution facilities. The first involved operating company jurisdictional classification procedures. SPCC complained that the operating companies would unfairly and arbitrarily reclassify their service as intrastate after SPCC had taken over service on the interstate portions of the customer's network. SPCC alleged that this reclassification was done deliberately to raise the rates on the local portion of the service and make SPCC's interstate service less attractive to customers. However, in the only instance he could remember, Mr. Grant conceded that both the FCC and the state regulatory agencies agreed with this reclassification policy (Grant, Tr. 748–9).

The other aspect of SPCC's complaint about classification procedures concerned Pacific Telephone's decision not to provide SPCC with connecting facilities for service wholly between Los Angeles and San Francisco. SPCC had hoped to provide this service without a certificate of public convenience and necessity from the California

Public Utilities Commission by labelling the service interstate and providing it under the tariffs on file with the FCC (S–2683; S–2723). However, SPCC's witness on this issue conceded that SPCC did not obtain authorization from the California Public Utilities Commission to provide such clearly intrastate service until 1975 (Vasilakos, Tr. 888–89), and in any event could only identify one potential customer in this category affected by PT & T's decision.

Paul Darling, former Chief of the Common Carrier Bureau's Tariff Division, testified that he agreed with AT & T's position that the jurisdictional classification of the service provided by each carrier depended on where the termination points of each carrier's service were physically located and that he had informed SPCC of that position (Darling, S–T–148A at 2–3; S–2661). In response to a May 1974 complaint by MCI concerning reclassification of service, the Common Carrier Bureau adopted AT & T's and Mr. Darling's position (S–3080):

> "It is our opinion that intrastate rates filed with the appropriate state regulatory commissions are applicable to private line service provided to the (non-carrier) customer by a local telephone company between two exchange areas within one state, even when interconnected with interstate service furnished to the customer by a specialized common carrier."

In view of these jurisdictional disputes and the accompanying legal uncertainty, SPCC has failed to prove that defendants' classification practices were unreasonable.

 The Court also finds that SPCC was not injured by defendants' classification practices. As a result of the Docket No. 20099 negotiations, AT & T filed revised tariffs with the FCC (S–3433) which became effective on February 25, 1975 (S–3437; Darling, S–T–148A at 6–7). The testimony shows that the reclassification policy was changed to SPCC's satisfaction by these revised tariffs and that the policy in effect prior to that date had no impact on SPCC (Vasilakos, Tr. 900).

 SPCC's second complaint was that AT & T improperly monitored the activities of its competitors, including developing a market research group to review the services and prices offered by specialized common carriers. SPCC charged that AT & T used these marketing tools and the customer information AT & T routinely received to harm SPCC (Tr. 2668–77). Other than the fact that AT & T did establish such a program, the record is barren of any evidence that AT & T acted improperly or somehow misused this information to cause SPCC to lose any actual or potential customers.

The evidence shows that AT & T's competitive monitoring information was drawn from publicly available information and market research projects (Stoddard, S–T–13 at 10). It included information such as rate structures and levels, construction activity, financing, management and operational structure (id.). The purpose of assembling and maintaining this information was to facilitate realistic rate planning activities and permit senior executives to assess those activities in the light of changing market factors, including developing competition (id.).

Indeed, the evidence shows that AT & T did not misuse information available to it as the provider of facilities to the specialized carriers. One of the Interbusiness Relations reports, to which plaintiffs have pointed on several occasions, states that "no attempts are being made to take unfair sales advantage of our position as facilities supplier to the SCCs" and that a " 'Mr. Clean' contact is the common approach" (PX1–0147 at AF96 1127).[275]

---

**275.** Related to their competitive monitoring claims is plaintiffs' reliance on a single sales presentation to a Long Lines' customer in 1975 in an effort to show anticompetitive intent (PX1–0057). This memorandum simply points out that trouble reporting and clearance becomes more complicated when both Bell and a specialized carrier are involved in providing service. As discussed above, increased maintenance difficulty is a logical and inevitable consequence of involving two competing parties in the provision of service (Enticknap, Tr. 3972, 3978–79). Even if this memorandum is in some way improper, it is significant that after four

This Court finds this claim defective, because the alleged wrong consists of nothing more than normal business conduct. The AT & T documents referred to by SPCC to support its claim actually establish that the information was drawn from an existing, as opposed to new, data base and that the tracking data were helpful to AT & T in various regulatory filings (Stoddard, S–T–13 at 20, Tr. 2670, 2673).[276] The customary nature of such monitoring activities is apparent from Mr. Brodman's testimony that one of his responsibilities for SPCC was "to monitor the competitors' activities" (Brodman, Tr. 1767). The record thus establishes that AT & T was engaging in a routine practice prevalent throughout the industry and not in any proscribed or predatory conduct. *SuperTurf, Inc. v. Monsanto Co.,* 660 F.2d 1275, 1281–82 (8th Cir.1981); *Telex Corp. v. International Business Machines Corp.,* 510 F.2d 894, 928 (10th Cir.), *cert. dismissed,* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975).[277] Accordingly, SPCC has failed to prove that AT & T acted improperly in monitoring the actions of its competitors.

## RELIANCE UPON FCC DECISIONS ON PRICING AND INTERCONNECTION CLAIMS

As the foregoing discussion reflects, pursuant to the guidelines set forth in the Court's order of April 20, 1982, the Court has permitted plaintiffs to offer into evidence decisions and findings of the FCC as exceptions to the hearsay rule under Rule 803(8)(C) of the Federal Rules of Evidence as "factual findings resulting from an investigation made pursuant to the authority granted by law." Nevertheless, although the Court has given consideration to the factual findings in the FCC decisions, it has given very little weight to those factual findings for the reasons discussed hereafter.

■ Given the distinctly different standards applicable in regulatory and antitrust proceedings, the opposite allocation of the burden of proof, and a need for the FCC to make statutory findings of "unlawfulness" in order to justify actions that are essentially legislative in character, the significance of any adverse findings to AT & T by the FCC to the issues in this case is highly questionable. See *American Tel. & Tel. Co. v. FCC,* 602 F.2d 401, 410 n. 49 (D.C.Cir.1979). The questionable nature of using FCC findings as evidence in the prosecution of an antitrust case is particularly pronounced here, where plaintiffs rely heavily on findings by the Commission that AT & T tariffs were "unlawful" and that AT & T failed to "justify" its tariffs. As the Commission itself has pointed out, under the Communications Act, AT & T had the "statutory burden of proof to justify" its tariffs (58 F.C.C.2d 362, 365 (1976))—a situation just the opposite of an action under the antitrust laws where the plaintiffs have the burden of showing that the de-

---

years of discovery, SPCC came forward with only one document. Such isolated and random conduct does not give rise to an inference of anticompetitive intent. *United States v. Kohler Co.,* 1953 Trade Cas. ¶ 67,453 at 68,289 (E.D.Pa. 1953). In *United States v. Hudnut,* 8 F.2d 1010 (S.D.N.Y.1925), the court noted that plaintiff had identified only 73 transactions in which defendant's personnel had threatened to cut off customers that did not adhere to defendant's suggested retail price out of a total of 40,000 customers of defendant. Recognizing the "inevitable enthusiasm" of sales personnel, the court concluded that this proof of a "small fraction" of defendant's transactions did not establish a "body of transactions which merit

condemnation for violation of the Sherman Act" (*id.*).

**276.** In fact, such tracking studies were necessary to satisfy the Commission's direction to AT & T to document fully the effects of new entry. See *Specialized Common Carriers,* 29 F.C.C.2d 870 (1971); PX4–0140 at 2.

**277.** As the Court held in *Transamerica Computer Co. v. IBM Corp.,* 481 F.Supp. 965, 1010 (N.D.Cal.1979), the plaintiff there failed "to prove illicit intent" even though "IBM fought hard to maintain market share" and "*undertook intensive studies of the chief PCM competitors in order to determine their viability*

fendants' actions were improper.[278] Moreover, as noted above, the Court of Appeals for this Circuit has held, the "rhetoric" of "unlawfulness" in FCC decisions does not equate to a finding of substantive illegality. In *MCI Telecommunications Corp. v. FCC,* 627 F.2d 322, 337, 338 (D.C.Cir.1980), the Court of Appeals pointed out that the FCC must find a "carrier's tariff to be 'unjust and unreasonable'" and thus "unlawful" before it can undertake the quasi-legislative act "'to determine and prescribe' just and reasonable rates itself." Consequently, these findings of "unlawfulness" by the FCC simply do not address the issues before this Court.

The Court is also reluctant based on this record to give any significant weight to the findings of fact of the FCC because the circumstances under which the decisions were written raise substantial doubt as to the extent to which the decisions were based upon any real expertise and objective evaluation of the record before the Commission. Mr. Walter Hinchman, who was Chief of the Common Carrier Bureau of the FCC from 1974 to 1978, testified on behalf of plaintiffs and acknowledged that his staff wrote all of the decisions of the FCC relating to telecommunications (Hinchman, Tr. 4986–87). Although Mr. Hinchman denied that the Commissioners merely accepted the staff's recommendations, he was unable to recall a single change ever made in a staff recommendation by the Commissioners or even to identify "any input" ever made by any Commissioner to a decision (Hinchman, Tr. 2221–22).

Moreover, the recommendations by the Chief of the Common Carrier Bureau that ultimately became the FCC decisions do not necessarily appear to be the product of the exercise of informed judgment. Mr. Hinchman, for example, was totally unfamiliar with the basis for any of the decisions for which he was responsible and did not even understand the concepts involved (Hinchman, Tr. 4988, 4997). Perhaps the most striking example of the questionability of relying upon the findings in the Commission decisions are the events leading up to the Commission's decision in Docket No. 18128, in which the Commission found AT & T's Telpak tariff to be "unlawful," 61 F.C.C.2d 587, 659 (1976). As discussed above, the record in that proceeding, which had been going on for a number of years, was closed in 1972. In July 1973 senior members of the Common Carrier Bureau tentatively agreed to adopt LRIC as the appropriate cost standard and to accept the Bell System's cost studies relating to Telpak (S–2676). In November 1973 a draft of a recommended decision reflecting those determinations, as well as holding Telpak to be "lawful," was delivered to the then Chief of the Common Carrier Bureau, Mr. Bernard Strassburg (S–2825C). On January 1, 1974, Mr. Hinchman replaced Mr. Strassburg as Chief of the Common Carrier Bureau. Mr. Hinchman never even reviewed the draft decision, *but rather two years later,* after discussions with other unnamed members of the Bureau, issued a recommended decision reaching an opposite conclusion—that Telpak was "unlawful" (Hinchman, Tr. 4963, 4967, 4980). Mr. Hinchman never reviewed the record, and there is no indication that anyone involved in the final decision had any familiarity with the record (Hinchman, Tr. 4981). The Court concludes that it cannot give any weight to a Commission decision finding that Telpak was "unlawful" when it appears that the finding was chiefly a product of Mr. Hinchman, who is woefully lacking in knowledge about the basis for the decision, and when the decision appears to be directly contrary to the recommendations of those members of the Com-

---

*and to predict what would be required to contain them."* (Emphasis supplied.)

**278.** The FCC's findings that AT & T's tariffs are "unjustified" or "unlawful" result, in part, from the FCC's "institutional bias" against doing any more than determining whether AT & T met its burden of satisfying the FCC (Scott, Tr. 2073). Since, as previously discussed, the FCC has refused to establish clear standards in advance of tariff filings as to what the FCC will consider as satisfactory, the FCC findings of "unjustified" or "unlawful" are, at most, proof that AT & T has been unable to predict successfully what standards the FCC will utilize.

**1056**

mon Carrier Bureau who were most familiar with the record.

There is also a serious question as to whether the staff of the FCC was truly objective in formulating the FCC decisions, particularly beginning in 1973. As discussed elsewhere, the FCC's decisions relating to competition, including its *Specialized Common Carriers* decision, generated considerable controversy and were generally opposed by state regulatory agencies. In September 1973, Mr. John deButts, then Chairman of the Board of AT & T, in a speech before the National Association of Regulatory Utility Commissioners, was critical of the FCC's policies. Although, as discussed later, the Court finds the speech (PX1–0001) to be a reasonable and responsible call for a reconsideration of FCC policy, it was not so regarded by Mr. Strassburg, who characterized the speech as a "harangue" (Strassburg, S–T–171, U.S.Tr. at 23379). Mr. Strassburg testified that he considered Mr. deButts to have declared "war" on the FCC's policies (*id.* at U.S.Tr. 23387) and determined that he would "do what I could to assist the specialized carriers" (*id.* at U.S.Tr. 23395).

Shortly thereafter, Mr. Strassburg took two steps to help the specialized carriers. First, as discussed previously, in spite of his own privately professed doubts as to whether the FCC had authorized specialized carriers to provide FX and CCSA services (S–

2761, S–2762 and S–2762A), on October 19, 1973, he issued a letter to MCI stating they were authorized to provide such services (S–2785).[279] The letter was not authorized by the Commission and Mr. Strassburg and his deputy were criticized for their behavior by the General Counsel of the Commission, Mr. Pettit, who pointed out that the letter was contrary to the representations the Commission had made to the Court of Appeals for the Ninth Circuit (Pettit, S–T–134 at 1–2).

Secondly, Mr. Strassburg abandoned any attempt to implement the tentative decision that had been reached in July of 1973 to find Telpak lawful and to allow AT & T to price its competitive tariffs on the basis of LRIC. Mr. Strassburg simply allowed the recommended decision to sit on his desk "for several months" without any action until he retired (Strassburg, S–T–171, U.S.Tr. at 23444, 23447–48).

With the arrival of Mr. Hinchman, who succeeded Mr. Strassburg as Chief of the Common Carrier Bureau, the record before the Court suggests that at least some of the staff of the Common Carrier Bureau abandoned all objectivity. The inference is justified that under the direction of Mr. Hinchman, whom the Court found to be lacking in candor and trustworthiness, the staff launched into a program to protect the specialized carriers from competition from AT & T and to create FCC findings that could

**279.** Prior to September 21, 1973, when Mr. deButts made his NARUC speech, neither Mr. Strassburg nor any other member of the FCC staff had given any indication that specialized carriers were authorized to provide FX or CCSA service. Indeed, as discussed above, all indications were to the contrary. Within two weeks after Mr. deButts' speech, Mr. Strassburg had met with representatives of MCI and SPCC to formulate a plan that would permit Mr. Strassburg to "confirm" the right of the specialized carriers to provide FX and CCSA services, which "confirmation" could be used in litigation without the necessity of obtaining the approval of the FCC Commissioners. The details of the plan, and the reasons therefor, are spelled out in the notes of MCI and SPCC executives of meetings among themselves and between MCI and SPCC on October 3, 1973 (S–2761, S–2762, S–2762A). Those notes re-

flect that Mr. Strassburg was "concerned about the Commissioners" (S–2762, S–2762A) and that even with Mr. Strassburg's support the possibility of obtaining a favorable decision from the Commissioners was considered to be no more than "50–50" (S–2761). The full background of the decision to avoid presenting the issue directly to the Commission and to litigate the issues in the courts with the backing of Mr. Strassburg and his staff are set forth in documents referenced in the Interconnection Doc. Sub. and the testimony of Messrs. Strassburg and Darling (Darling, S–T–148 at 9–17 and Strassburg, S–T–171, U.S.Tr. at 23369–23410). Although the FCC Commissioners were concerned about the propriety of Mr. Strassburg's behavior and requested the General Counsel to investigate (Pettit, S–T–134 at 4), the Commission ultimately acquiesced in the views of Mr. Strassburg and Mr. Hinchman.

be utilized as predicates in antitrust actions against the Bell System.[280]

On December 5, 1973, Mr. Hinchman wrote that the *Specialized Common Carriers* decision was "vague" as to whether specialized carriers could provide FX and CCSA services (S–2831). Nevertheless, four months later, after he had become the Chief of the Common Carrier Bureau, the FCC decision in Docket No. 19896, presumably provided by him to the Commission, found that by denying FX and CCSA interconnections, Bell had been "unreasonable," acted "unlawfully," and "discriminated" against the specialized carriers (S–2987 at para. 45).

As indicated above, Mr. Hinchman also abandoned the recommended findings in Docket No. 18128 that Telpak was lawful, that LRIC was the appropriate standard upon which AT & T should base its prices, and that the procedures used by AT & T to develop its costs were reasonable. The decision he wrote in Docket No. 18128 required AT & T to use FDC and found the cost studies to be wholly deficient. Yet, Mr. Hinchman testified that he has no knowledge of whether AT & T was "right or wrong" on basic costing issues (Hinchman, Tr. 4988) and that his knowledge of what is important in a cost study is limited to the truism that "costs are the most important" factors (Hinchman, Tr. 4997).

During the time Mr. Hinchman served as Chief of the Common Carrier Bureau, the FCC found every competitive rate filed by AT & T, including Telpak, Hi/Lo and DDS,[281] not to be properly supported. Yet, in every instance, Mr. Hinchman had been provided either with a finding by the staff of the Common Carrier Bureau (Telpak: S–2828C) or with a study by the Office of Telecommunications Policy (DDS: Sutter, Tr. 4635–36, S–3052B, S–2664D, S–2668B, S–2994B; Hi/Lo: Sutter, Tr. 4929, S–3161, S–3011, S–3063B, S–3523D) that the rates were properly justified and exceeded all relevant costs. Similarly, in 1976, under Mr. Hinchman's aegis, the FCC found Bell's piece-out tariffs to be "unlawfully discriminatory" (S–4414) even though, as discussed above, the Commission had permitted the tariffs to go into effect in 1968 without suspension and had never previously indicated in any way that the tariff provisions were inconsistent with FCC policy (Darling, S–T–148 at 3–9).

Finally, the Common Carrier Bureau's objectivity was flawed because of blatant conflicts of interest. As previously noted, Dr. Melody was employed by the staff as a consultant at the same time he was employed as a consultant by defendants' competitors (Melody, Tr. 5637–39).[282]

---

**280.** Mr. Hinchman acknowledged that, although he remained as Chief of the Common Carrier Bureau for five years, he did not believe that the Bell System could be regulated (Hinchman, Tr. 5000). While Mr. Hinchman denied that his lack of faith in regulation influenced him, Dr. Owen was more candid in acknowledging that he had endeavored to enlist the support of the FCC in aid of antitrust action against the Bell System (Owen, Tr. 5721–27).

**281.** The DDS filing was found not to be properly supported despite the fact that in an April 8, 1974, letter to Mr. Herbert Forrest (SPCC counsel), Mr. Charles W. King, an independent economic consultant wrote (S–2970 at 1):

"At your request, I have reviewed the filing by AT & T for the Dataphone Digital Service from the viewpoint of Southern Pacific Communications Company.
*I must confess that this is probably one of the best written, clearest, and most supported filing I have seen come out of AT & T.* Until I talked with Datran on Friday last *I*

*found very little that SPCC could complain of.*" (Emphasis supplied).
While Mr. King's opinion does not change the FCC's determination on DDS, it does show that once again, there were knowledgeable individuals who thought that defendants' filing(s) were very good. Utopia, perhaps not, but the Court finds that the filings were at the very least good enough to pass antitrust scrutiny.

**282.** Although Dr. Melody testified that he did not begin to work for Datran until August 1971 when he had left the staff of the FCC (Melody, Tr. 5632–33), that testimony is directly contradicted by Datran's contemporaneous records (S–2156E, S–2156F, S–2156G) and the Court does not credit Dr. Melody's denial. While this conflict of interest apparently was unknown to the Common Carrier Bureau, the Bureau later hired Dr. Melody as a consultant in the *MPL* case after he had represented the specialized carriers in the *Hi/Lo* proceeding and at the same time he represented MCI in its antitrust suit against AT & T (Melody, Tr. 5637–39).

Under all these circumstances, the Court concludes that it can give little weight to the factual findings of the FCC upon which SPCC seeks to rely to establish antitrust liability.

## FACT OF INJURY

Even if SPCC had been able to establish that defendants violated the antitrust laws, the Court would still have to enter judgment for defendants on the ground that plaintiffs failed to demonstrate that defendants' actions caused SPCC injury in fact.

Plaintiffs contended that as a result of defendants' unlawful conduct, SPCC suffered injury to its business in three respects: it lost revenues that it might otherwise have earned; it lost existing customers that it might otherwise have retained and new customers that it might otherwise have obtained; and it incurred costs that it might not otherwise have had to bear. However, as discussed in more detail below, the Court finds that SPCC failed to carry its burden of proving that it suffered either lost revenues, lost customers or increased costs due to defendants' conduct.

## THE APPLICABLE LEGAL STANDARD FOR PROVING FACT OF INJURY

■ An essential element for the recovery of antitrust damages is proof that the plaintiff suffered economic injury and that the injury resulted directly from defendant's challenged conduct.[283] Failure to prove this element must result in the entry of judgment for the defendants. *Federal Prescription Service, Inc. v. American Pharmaceutical Ass'n,* 663 F.2d 253, 268 (D.C.Cir. 1981); *Comfort Trane Air Conditioning Co. v. Trane Co.,* 592 F.2d 1373, 1383 (5th Cir. 1979); *Kestenbaum v. Falstaff Brewing Corp.,* 514 F.2d 690, 694 (5th Cir.1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976).

■ It is well established that the fact of injury must be "certainly proved" before a court will even attempt to quantify the amount of damages. *Federal Prescription, supra,* 663 F.2d at 268; *Poster Exchange, Inc. v. National Screen Service Corp.,* 431 F.2d 334, 340 (5th Cir.1970), *cert. denied,* 401 U.S. 912, 91 S.Ct. 880, 27 L.Ed.2d 811 (1971). Thus, only after the "proof ... show[s] a clear connection" between that which makes the conduct unlawful and an injury actually sustained may the trier of fact go on to determine the amount of injury suffered by a plaintiff. *Virtue v. Creamery Package Mfg. Co.,* 227 U.S. 8, 24–25, 33 S.Ct. 202, 203, 57 L.Ed. 393 (1913); *Kirby v. P.R. Mallory & Co.,* 489 F.2d 904, 911 (7th Cir.1973), *cert. denied,* 417 U.S. 911, 94 S.Ct. 2610, 41 L.Ed.2d 215 (1974); *In re Ampicillin Antitrust Litigation,* 1980–81 Trade Cas. ¶ 63,750 at 77,991 (D.D.C.1981); *Broadway Delivery Corp. v. United Parcel Service, Inc.,* 74 F.R.D. 438, 439 (S.D.N.Y. 1977). As the Second Circuit observed in *Herman Schwabe, Inc. v. United Shoe Machinery Corp.,* 297 F.2d 906, 909–10 (2d Cir.), *cert. denied,* 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962), no case has ever held "that mere proof that a defendant has injured its competitors generally warrants recovery in the absence of evidence that would justify a finding of injury to the particular plaintiff." *Accord, McCleneghan v. Union Stock Yards,* 349 F.2d 53, 57 (8th Cir.1965).

■ The fact of injury cannot merely be presumed from the nature of the violation. E. Timberlake, *Federal Treble Damages Antitrust Actions* § 20:02 (1965). For example, in *Federal Prescription,* the Court of Appeals for this Circuit reversed the trial court's conclusion that injury could be inferred from the "necessary effect" of defendants' conduct (663 F.2d at 270). It also takes "far more detailed proof than the *ipse dixit* of [plaintiffs' executives] to show that there was a causal connection" between a violation and injury to plaintiff (*id.*). Ac-

---

**283.** The underlying statute, Section 4 of the Clayton Act (15 U.S.C. § 15) limits the recovery of antitrust damages to "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws."

*cord, H & B Equipment Co. v. International Harvester Co.,* 577 F.2d 239, 247 (5th Cir. 1978). Moreover, the Court in *Federal Prescription* emphasized that proof of the "causal link" must be weighed against "the availability of alternative explanations" for plaintiff's losses (663 F.2d at 269). No recovery can be had for injuries that are a result of "other obstacles" for which defendants were not responsible (*Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 126, 89 S.Ct. 1562, 1578, 23 L.Ed.2d 129 (1969)), such as the plaintiff's own inefficiency, their failure to market a quality product, or the effect of competition from other carriers.

■■■ It is also clear that the courts must examine each individual claim to determine whether the plaintiff has suffered injury in fact as a result of the challenged conduct. For example, in *Federal Prescription,* the Court of Appeals separately considered the injury in fact resulting from each of four separate antitrust violations, stating (663 F.2d at 268):

"In examining these findings we inquire in each instance whether Federal has shown that the conduct in question has caused it injury in fact."

SPCC contends that in this case examining each of its claims alone to determine whether SPCC suffered injury in fact may not be sufficient because it is the alleged "synergistic" effect of all the defendants' acts which resulted in injury to plaintiffs' business.[284] Although the Court is not convinced that such a "synergism" can result in injury where no individual act has caused injury, it has nonetheless analyzed plaintiffs' claims with reference both to the individual claims in the case and in the broader context of all of the claims considered as a whole. In either instance, the Court finds that plaintiffs have not proven with sufficient certainty that they were harmed by any actionable conduct attributable to defendants.

In its previous discussion of each of plaintiffs' specific claims, the Court has already found that plaintiffs were not injured in fact by defendants' conduct. Thus, the Court has found that plaintiffs were not injured by defendants' Telpak, Hi/Lo or MPL tariffs or by defendants' interconnection policies or practices. The Court will not repeat the substance of those findings here other than to note that in no instance have plaintiffs carried their burden of proving with sufficient certainty that they suffered economic harm attributable to the challenged conduct of the defendants.

## EVIDENCE RELATING TO ALLEGED LOSS OF REVENUE

■■■ Plaintiffs argued that SPCC lost revenues as a result of defendants' challenged policies and practices. Although it is clear that SPCC failed to generate the revenue from its private line business that it had originally hoped to earn, there was no credible evidence to show that SPCC's difficulties in this regard were attributable to defendants' policies or practices. To the contrary, the Court finds that SPCC's revenue problems were related to the highly competitive nature of the private line communications market and to SPCC's own inability to perform adequately in that environment. SPCC's own internal memoranda demonstrate the foregoing conclusively for a substantial part of the relevant period in question here. The competitive nature of the private line market can be seen from a comparison of SPCC's "but-for" private line rate with their actual cost figures submitted to the FCC. On March 31, 1975, SPCC submitted a LRIC figure of $.2133 per circuit mile (S–3499B). SPCC's first quarter 1975 "but-for" revenue per mile was $1.17 per mile (PX5–0145), or a 548.5% return on its LRICs, as compared to a 41% return on its actual revenues of $.30 a mile.[285] With such an astronomical return on investment, the Court believes that there would clearly be more than just three other

---

284. The Court recognizes of course that plaintiffs assert that each direct claim also constitutes a violation of the antitrust laws standing alone and that a violation of each caused it damages.

285. The actual return on investment in the "but-for" world is 448% as opposed to 41% in the real world.

common carriers.[286] Indeed, with such a return, it appears as if every rational businessman would attempt to enter the market.

The evidence establishes that SPCC failed to generate its desired revenues in part because of competition from other common carriers, especially the domestic satellite carriers. As set forth above, SPCC encountered "fierce" competition from the satellite carriers [287] which resulted in a "price war" (S–4074 at 1; [288] Grant, Tr. 707; Brodman, Tr. 1860–61; S–3690).[289] To meet this competition from the satellite carriers, SPCC

**286.** Subsequent years produce an equally high return on LRIC:

| | LRIC | "but-for" Revenues | % Return |
|---|---|---|---|
| Jan. 27, 1976 (S–4050) | 26¢ | 1.24 | 377% |
| Nov. 1, 1976 (S–4614B) | 23¢ | 1.28 | 457% |
| May 12, 1977 (S–4937B) | 33¢ (30 day com.) | 1.27 | 284% |
| | 27¢ (6 mos. com.) | 1.27 | 370% |
| | 22.6¢ (2 yrs. com.) | 1.27 | 462% |
| June 9, 1977 (S–4999B) | 33¢ | 1.28 | 284% |
| Oct. 20, 1977 (S–5265B) | 23¢ | 1.28 | 457% |
| Sep. 8, 1978 (S–5637B) | 31¢ | 1.28 | 312% |

**287.** A recent article in the July 2, 1982 *Wall Street Journal* highlighted the increased competition from satellite carriers. In the article entitled, *Satellite Transmission of Data May Take Off as Prices Drop,* it was noted that (at 15):

> According to estimates by Interactive Data Corp., a Waltham, Mass. market research company, the number of domestic transponders will reach 374 by 1985, almost twice today's total. Interactive expects the result to be, significant excess capacity, with about a third of the transponders unused at any one time.

Moreover, the article pointed out that through the use of advancements in multiplexing "satellite transponders will soon be able to carry 2,800 telephone conversations instead of the 1,800 they carry today." (*id.*) This represents a 64% increase in circuit capability over the same equipment. With so much at stake the Court is sure that each carrier will compete very intensely to assure that the estimated third of the unused transponders will not be their own. Moreover, while this article is not used to show specifically the number of satellite carriers in operation, it does evidence that satellite competition is a very real concern.

**288.** This is a February 9, 1976 memorandum to Rex Hollis in which Dick Smith points out the problems SPCC is encountering from satellite competition. This memorandum points out that (at 1):

> "*This amount of revenue has been lost and cannot be regained because of price and the viability of the satellite carriers in this market....* Thus far in 1976, SPCC has lost $179,400 in annual revenue and $4,140 in installation revenue.
> ... *As I pointed out in Houston, our rates, even the Houston point-to-point are not com-*

*petitive and this market is strictly price conscious plus* the fact that satellite carriers are providing good service....

*This direct competitive situation has obviously affected our results as well as the morale of the Houston office in particular. We have been told by Exxon, Texaco and others that SPCC is not competitive.* Since the large users have not ordered 240 or more circuits our tariff is not competitive. The Texaco proposal we lost this week was $27,180 a year higher than Westar or ASC." (Emphasis supplied.)

This document shows that no matter how high the defendants prices were, the fact is, SPCC was engaged in competition with the satellites (at least in this market) and would have lost still more business at the higher price. It is very interesting to note that it is SPCC's position that the defendants should have maintained a higher price and thus make no attempt to become competitive. Yet, as Mr. Smith's memorandum goes on to point out (*id.* at 2)

> "*Until such time as SPCC is competitive with an exact mirror tariff of the satellite carriers, we will be left with the short mileage circuits.*" (Emphasis supplied.)

Mr. Smith's memorandum expressed the same concerns as many of the internal memoranda of AT & T, that is, there is competition, we are losing business, and what responses should be made. Based on plaintiffs' theories, this document could infer anticompetitive intent on the part of SPCC.

**289.** This is a July 14, 1975 memorandum to Rex Hollis from Marty Burack detailing competition on an industry wide basis. What is noticably absent from this memorandum is any mention of the defendants. Rather, Mr. Burack describes the competition from carriers providing

was forced to set rates which were only about one-half of AT & T's rate (S–3068, S–3441).[290] (S–3655 [291] & S–3857) [292] These very low SPCC rates were filed after SPCC had filed its competitive response to AT & T's Hi/Lo tariff (*id.*), and they were kept low throughout the period of the Hi/Lo and MPL tariffs.

SPCC's revenues were also reduced by the threats of its large customers that they would build their own private microwave systems if SPCC did not keep its rates low

> satellite transmission wherein he wrote (*id.* at 1):
>
> > "I've received some calls from salesmen and managers about a very difficult situation. From time to time, salesmen have run into situations where they have been underbid by Amsat and RCA salesmen. This has even happened in the brokerage and the airline industries where we have fairly competitive offerings."
>
> Mr. Burack goes on to point out (*id.* at 1–2): "*Litton Industries has told us we're too high-priced* Warner Communications has identified twenty-plus circuits in the entertainment industry, fifteen or more being coast-to-coast. *Warner would prefer terrestrial circuits, but they'll probably go with the carrier which offers the biggest savings. If RCA gets in, we're frozen out with very little chance of getting any of these circuits.*" (Emphasis supplied).
>
> The Court must again reemphasize the fact that, in its opinion, the price of AT & T's circuits had little bearing on SPCC. It was the other carrier's prices that SPCC was concerned about. Of course, the Court recognizes that all of the competitors claim (or may claim) that their rates were low because of AT & T's rates, as MCI has done, yet the fact is, competition would eventually drive the prices lower anyway. *See* (S–3946) (the effective satellite rates have been driven down to the lowest levels). This is a fact that Mr. Burack pointed out (*id.* at 2):
>
> > "*Either we get into the RCA—Amsat price war, or we will begin to lose significant long-haul business.*" (Emphasis supplied).
>
> Mr. Burack's memorandum also suggested some alternatives for SPCC to undertake in an effort to maintain and expand their portion of the market. After all, SPCC would want to meet or beat their competitors instead of "letting those 'bastards' take away their business."

**290.** This was a February 28, 1975, memorandum from T.J. Brodman to G.A. Young on pricing policy on extension of special point-to-point circuits wherein he wrote:

> "*The original reason for developing special point-to-point rates was to provide a rate*

(Hollis, Tr. 2294–95). Thus, even after AT & T's Telpak tariff was terminated in May 1981, SPCC retained its low bulk rate to forestall the loss of large customers to private microwave systems (Hollis, Tr. 2294–95; Brodman, Tr. 1815).

SPCC's own studies confirm that SPCC's alleged revenue losses were due principally to competition from other carriers or other alternatives rather than defendants' rates. According to plaintiffs' own calculations, SPCC was losing more revenues after the

> *that would be competitive with the domestic satellite carriers between certain key cities.* The rate structure was developed of competitive necessity and is separate and distinct from standard pricing, in so far as intercity channel charge is concerned. (Emphasis supplied).

**291.** This was a June 27, 1975 memorandum from T.J. Brodman to Bill Gallagher in which it was pointed out (at 1):

> "I recognize that this raises some questions, however, keep in mind that the point-to-point rate structure was developed as a competitive response to the satellite carriers. To the extent that the satellite carriers have subsequently extended service to many more cities than the original five which are listed as point-to-point rates, we have to review our posture and determine how we can be most competitively effective and yet maintain the desired level of profitability with the service."

**292.** In a memorandum dated October 10, 1975 detailing sales to the entertainment industry, Mr. Burack informed Mr. Hollis that (at 1):

> "If we accepted an entertainment industry group as a customer, *we would still be uncompetitive in price unless we reduced our satellite rates.* Amsat and RCA are selling coast-to-coast for less than 27¢ per circuit mile. We might also have legal problems due to the apparent looseness of discount eligibility (although RCA and Amsat, should face the same difficulty). We'd wind up with circuits we should get anyway (where Amsat and RCA don't compete) but at a lower rate than we can now get from the same companies. *We might pick up some business temporarily which we're currently losing to MCI.* But they'd get wind of it soon and would quickly offer discounts to the entertainment industry too." (Emphasis supplied.)

With the satellites selling circuits at 27¢ a mile, the Court is very skeptical that SPCC would have been competitive with a "but-for" rate of $1.21 per mile (*See* PX5–145).

elimination of Telpak than before (Lim, Tr. 5920–23). The only logical explanation for this is that it was competition from other carriers and not AT & T's rates that forced SPCC to keep its rates low, thereby reducing SPCC's revenues (Lim, Tr. 5923). Indeed, what the Court has found most interesting, as is revealed in the documents previously discussed, is that SPCC was worried about possible "creamskimming" of the long-haul routes by the satellites, as well as their own bulk offerings.

### EVIDENCE RELATING TO ALLEGED LOSS OF CUSTOMERS

In addition to the claim that SPCC lost revenue as a result of defendants' rates, plaintiffs contended that defendants' unlawful conduct reduced SPCC's revenues by causing SPCC's customers to cancel or reduce their service orders with SPCC and by discouraging customers from placing new or enlarged orders. This theory was completely undermined, however, by the statement of Mr. Grant, made in July 1975 and reacknowledged at trial, that "while we have had our difficulties, we have yet to lose a customer and most have a good word for us" (Grant, Tr. 758). Moreover, plaintiffs did not call a single customer, actual or potential, to testify at trial to prove a causal link between SPCC's alleged loss of business and any unlawful conduct of defendants. Thus, as in *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 288–89 (2d Cir.1979), the record in this case is "totally devoid of evidence . . . [from] any customers" concerning the effect of the defendants' practices. There is, therefore, no direct evidence that a single customer chose not to deal with SPCC because of AT & T's

actions. There are, however, documents which reveal a loss of customers to the satellites.[293]

SPCC's own evidence demonstrated conclusively that customer cancellations from all causes combined were never a significant problem for SPCC. Thus, plaintiffs' witness, Dr. Brown, stated in his prepared testimony that (Brown, PX6–0031 at 3):

> "In my opinion, the revenues lost due to cancellations were very low for a high technology start-up venture such as SPCC. The cancellations and reductions—which include revenue losses due to all causes—are well within the range to be expected in such a business."

Dr. Brown further conceded at trial that his study was consistent with the testimony of defendants' witnesses that defendants "bent over backwards" to help SPCC provide better service to its customers (Brown, Tr. 5946).

Further evidence of this fact is contained in an October 7, 1975, memorandum to Mr. Bayhen in which Mr. Vetters discusses the Buffalo-Telco entrance cable problem (S–3847). In this memorandum, Mr. Vetters reports that New York Telephone Company provided the entrance cable within 7 days rather than the 30 to 60 days that he had anticipated (*id.*). Mr. Vetters goes on to point out that (*id.*):

> "The Telephone Company (all telephone companies) is not obligated to undertake any construction until the FCC has approved the necessary Tariffs. However, at many locations around the country, including New York City, the Bell operating companies have undertaken construction prior to FCC approval in order to meet our needs. Moreover, due to our

---

**293.** In a November 25, 1975 memorandum to Rex Hollis, Dick Smith wrote (S–3942):

> "Today, Raymond International cancelled an existing Houston to New York circuit and will order the replacement from Westar. We also made a proposal to Texaco last week for the 12 Houston to New York circuits. Texaco indicated that they will go with either ASC or Westar for those circuits unless we are competitive in rate."

On October 20, 1975, Dick Smith listed a number of customers that SPCC had either lost to

satellite competition or that were in jeopardy. (S–3886). These customers included Hydril, Bank of America, Bechtel, Brown and Root, Chevron Oil, Exxon, Toley's Occidental, Sakowitz, Stewart and Stevenson, and Texaco. (S–3886). Again on December 1, 1975, Dick Smith wrote (S–3948)

> "The Houston sales office has received another cancellation of an installed circuit. New Process Steel's Houston to Chicago circuit has been cancelled to be replaced by ASC."

location in Buffalo, I have not been to this site, but have been advised that we are approximately 3.8 miles out of town in an area that requires very little telephone service. Therefore, the Telephone Company considers the 600 pair cable project a major construction project which will require extensive conduit, manhole, and cable construction. Also, Mr. Eldred indicated that they will try and provide 60 to 70 pairs for temporary relief at our TOC, however, he does not expect this to be available until January 1976. I have inquired if this date can be moved forward by overtime, and, Mr. Eldred will have the project engineer contact me Monday morning.

*The situation at Buffalo is critical, however, if the telephone had been provided with the proper forecast information, as contained in my letter to them on September 23, 1975, in April when I first requested a forecast, or even before when we first acquired this TOC, this situation could have been avoided."* (Emphasis supplied).

Far from confirming the fact that AT & T was at fault, this document shows just how far AT & T went to accommodate SPCC, even when SPCC showed a complete disregard for making things easier for AT & T.

Moreover, even if SPCC had encountered difficulties attracting and keeping customers over and above the satellite competition, there is ample evidence in the record showing that any problems in that regard would have been attributable to SPCC's own inadequate performance and not to any action by defendants. The vast majority of customer complaints experienced by SPCC were the result of SPCC's own inefficiencies. Each year SPCC filed an annual report with the FCC setting forth information concerning its performance during the preceding year (S–7T). As part of this report, SPCC is required to identify any "written service complaints" that it has received within the past year and to indicate how those problems were resolved. Since 1974, SPCC has identified in its filings 199 written service complaints. In describing the nature and resolution of each of these complaints, SPCC mentioned the Bell System in connection with only four complaints and there is no evidence as to these four that the problems were the result of anticompetitive conduct (*id.*). On the other hand, as discussed more fully below, SPCC had severe internal problems which caused serious customer dissatisfaction.

The evidence also shows that SPCC was incapable of handling any more business than it actually had.[294] Thus, the record shows that throughout the relevant time period SPCC was operating at full capacity and selling all of its available circuits (see documents cited in Capacity Problems in the Real SPCC Doc.Sub.). For example, in August of 1974, at a time when the entire SPCC system consisted only of service between San Francisco and San Antonio, Mr. Grant reported that SPCC had "sold out" its capacity between Phoenix and San Antonio and all of the Western Union satellite capacity it had leased between St. Louis, Chicago and New York (S–3152).[295] In Oc-

---

**294.** In his March 7, 1975 report to Mr. Biaggini, Mr. Grant wrote (S–3459 at 1), "Business continues at a level in excess of our ability to serve, and we are reacting to this challenge as rapidly as possible." Again on May 5, 1975, Mr. Grant wrote (S–3546 at 1), "We still are facing a condition of having more business on order or in prospect than we can physically handle."

**295.** In the August 23, 1974 letter to Mr. Biaggini, Mr. Grant wrote (S–3152 at 1):

"Our order backlog has stabilized itself at about 3.4 million dollars, and we anticipate that it will stay in this area until we can break some of the bottlenecks that are relat-

ed to our installation progress. We also believe that our order backlog will be affected for a few months to come because we are no longer in a position to accept orders between St. Louis, New York and Chicago because the Western Union capacity, is sold out. We are also quoting long delivery of circuits between Phoenix and San Antonio because the limited capacity available to us from the railroad has been sold out. *We will not be in a position to install added circuits on this system, beyond those already committed until the first quarter of 1975."* (Emphasis supplied).

Clearly, SPCC's bottleneck problem here cannot be attributable to the defendants. Moreover, it is apparent to the Court that even in

tober of 1974, Mr. Grant was still reporting delays in obtaining additional revenues because of "bottlenecks in system capacity" (S–3220). In February 1975, Mr. Grant reported that all "circuits east of St. Louis" were being used (S–3406). In March 1975, he reported SPCC had "sold our entire available capacity of circuits east of Cleveland" (S–3488, S–3519), and in May 1975, SPCC had sold out the major system segments on its route from San Francisco to St. Louis and from Buffalo to New York City (S–3563).

In July 1975, Mr. Grant told a potential customer that SPCC's inability to handle the customer's order was due to the fact that SPCC had "sold out all available facilities" (S–3718). The customer was also informed (*id.*):

> "We have experienced growing pains. The construction of our nationwide network, staffing to meet operational re-

the "but-for" world, SPCC would have been unable to expand their system any faster as of August 23, 1974.

**296.** The August 27, 1975 letter to Mr. Biaggini from Mr. Grant stated (at 1):

> "This growth will probably drop off after the month of September as we run out of capacity in our *Eastern network due to blockage incurred because of environmental problems.* Our backlog has dropped slightly, which we have previously predicted. This is due again to lack of capacity in the immediate future on our Eastern network. *Customers, in many cases, are not willing to give us orders that cannot be hooked up within the next 90 days.*" (Emphasis supplied.)

**297.** The December 24, 1975 report to Mr. Biaggini from Mr. Grant stated (at 1):

> "We are having increasing difficulties in maintaining circuit hookup rates because we have used all reasonable combinations of circuits east of Chicago and are generally bottlenecked until we can open the Pittsburgh/Philadelphia/New York segment. This segment is now scheduled to go into service between February 13th and March 1st. We have lost between 30 and 45 days on the construction program because we could not gain access to the last remaining cite not covered by permits. We finally have obtained a permit and are moving ahead; but in the course of obtaining the final approvals, we were required by the community to go to a cinderblock house instead of one of our regular prefabricated buildings. We readily accepted this restriction because time is so

quirements, and a market demand in excess of expectations has made our people wear many hats and has caused extended delivery dates in some cases. In looking into Bear, Stearns orders, I could find no single factor for the lack of crisp performance: We just did not have our act together."

In his deposition (S–6234R at 175), Mr. Grant again admitted that in 1974–75 SPCC had more business than it could handle.

SPCC continued to operate at capacity at least through the end of Mr. Grant's tenure as President (see, *e.g.*, S–3781 [296] 75,[297] S–4092,[298] S–4918B).[299] S–4856,[300] As late as August 1981, Mr. Pilz, then President of SPCC, reported (S–6068D):

> "It has been our experience and the experience of our industry that we are able to sell whatever capacity we have available."

important to us and the cost factor of the building was not a major item. Our backlog continues to drop slightly in part, because of cancellation of orders where the customers were unable to wait any longer and have generally elected to remain with AT & T. We have not lost these orders to MCI or Western Union."

**298.** In his February 19, 1976 memorandum, Mr. Grant informed Mr. Biaggini that (at 1):

> The main installation activity is in the West where we still have some capacity not installed. Activity in the Central and Southwest is very low because the backlog for these areas is, in many cases, related to the Eastern area where we lack capacity. We are also finding a growing imbalance in our order backlog for the Central and Southwest where we have local capacity.

**299.** In an April 26, 1977 memorandum, Mr. Rex Hollis informed Mr. Grant that:

> "Key routes are now out of capacity. Orders have been refused on routes such as NY/Chi, Chi/Hou, Chi/Cle and Chi/DC. The situation will deteriorate rapidly when capacity over other key routes, like those shown below, is exhausted."

**300.** On March 18, 1977, Mr. Rex Hollis informed the Regional Sales Managers (at 1):

> "In effect, I am telling you that, pending unforeseen developments, you can't sell any more private lines between Chicago and New York until new capacity is obtained."

## EVIDENCE RELATING TO ALLEGED INCREASES IN COSTS

Although the major portion of SPCC's claimed damages in this case concerns conduct which, if proved, would have caused SPCC to lose revenues that it might otherwise have earned, SPCC also claimed that it suffered injury because its costs of doing business were increased as a result of defendants' unlawful conduct. These claims of increased costs relate primarily to certain alleged discriminatory practices by defendants in the provision of local distribution facilities to SPCC. SPCC claimed that it was overcharged for these facilities and that defendants failed adequately to install and maintain them. If SPCC was unlawfully overcharged for local distribution facilities, SPCC's costs obviously were increased as a result of defendants' conduct, and SPCC was injured. With this one exception, however, plaintiffs failed to establish the necessary causal link between defendants' alleged offense and SPCC's alleged injury. Thus, even if defendants had discriminated unlawfully against SPCC as alleged, the Court would have to find that the record is insufficient to support SPCC's claim that it incurred increased costs as a result of such discrimination.

The only evidence presented by SPCC to demonstrate the cost impact of defendants' allegedly unlawful practices was the testimony of Mr. Vasilakos who made certain adjustments to the manhours required in the hypothetical "but for" world of SPCC's damage model for circuit installations and repair and maintenance activities (thereby lowering costs) and adjusted the rates charged by defendants to SPCC for local distribution facilities to reflect the rates that he claimed that AT & T should have charged SPCC for such facilities (Vasilakos, Tr. 3009–13). Although Mr. Vasilakos made such adjustments, he provided no evidence that delayed installations or repairs by defendants actually caused the real world company to incur additional manpower costs. Nor did Mr. Vasilakos provide a rationale for adjusting the local distribution facility charges other than his arbitrary assumption that SPCC should have received a 30 percent discount. Plaintiffs ask the Court, without any further support, to rely solely on Mr. Vasilakos' testimony that SPCC was injured in the manner he alleged. Such *ipse dixit* of SPCC's executives is insufficient for the Court to find that SPCC incurred additional costs as a result of defendants' alleged unlawful conduct (*Federal Prescription, supra*, 663 F.2d at 270), particularly in light of the fact that Mr. Vasilakos did not show himself to be a credible witness (see, *e.g.*, Vasilakos, Tr. 3055–69, 3073–76, 3082–88).

In its rebuttal case, SPCC attempted to quantify the amount of increased costs allegedly caused by certain of defendants' actions (Lim, PX6–0032 at 7–9). However, Mr. Lim conceded that his calculations were based solely on what he was told by Mr. Vasilakos (Lim, Tr. 5933–34). Nor has SPCC attempted to differentiate between the delays caused by itself and those allegedly caused by the defendants and to thus assign any damages between the two companies. Moreover, Mr. Lim admitted on cross-examination that even if the Bell operating companies took longer to repair SPCC's local distribution facilities than Long Lines', it would have had no impact on SPCC's costs (Lim, Tr. 5932–33). Thus, the Court cannot find that delays by defendants in installing or repairing SPCC's facilities resulted in additional costs to SPCC as opposed to lost revenues or customers.

It may be that the Bell operating companies treated plaintiffs somewhat differently than Long Lines in some insignificant part in regards to the provision of local distribution facilities. For example, prior to the Settlement Agreement in Docket No. 20099, the interconnection arrangements provided by the Bell operating companies required that SPCC provide station packages and the local distribution charges to SPCC were different than what the Bell operating companies charged Long Lines. SPCC has failed to prove, however, that these differences in treatment resulted in higher overall costs to SPCC. For example, the interconnection arrangement offered to SPCC prior to the

Settlement Agreement in Docket No. 20099 was based upon a "clean interface" arrangement which permitted each carrier to test separately on its side of the demarcation point (Thovson, S–T–66A at 2–3), thereby eliminating the need for costly joint testing. There is no evidence that SPCC's overall cost of doing business was increased as a result of the allegedly different treatment of SPCC and Long Lines. *Indeed Ms. Cashman's study showed that if SPCC had been "treated like Long Lines" its costs would have been substantially increased* (Cashman, S–T–31 at 9–10; S–6234G).

The only instance in which SPCC would have suffered increased costs as a result of defendants' conduct is plaintiffs' claim that they were unlawfully overcharged for local distribution facilities. The record shows this to be spurious and without merit. There is no evidence whatever in the record that defendants overcharged SPCC for local distribution facilities. To the contrary, the evidence is overwhelming that defendants substantially undercharged SPCC for local distribution facilities in that defendants' costs of providing them to SPCC were substantially greater than the rate paid by SPCC (Cashman, S–T–31; S–6234E). Indeed, defendants showed that from 1974 through 1981 SPCC's local distribution facility costs were actually subsidized by defendants in the amount of $27.7 million (S–20033). Far from showing injury to SPCC, therefore, the record shows that SPCC received a substantial benefit from defendants' local distribution facility charges. It will be interesting to see what the parties or the FCC does about this on behalf of the public! As the Court notes in its conclusion, "competition" which is contrived or subsidized is not in the public interest. Hopefully, it is not too late to get responsible regulators to bring our country back to sanity in this emerging and advancing field of telecommunications.

## OTHER CAUSES OF SPCC'S LOSSES

Although the Court finds that there is no evidence in this record that plaintiffs lost revenues or customers or incurred additional costs as a result of the challenged acts of defendants in this case, it is uncontroverted that SPCC suffered substantial losses in connection with its private line business. Thus, plaintiffs' damage study shows that as of the end of 1981, SPCC's "damaged" private line business was still not profitable (PX5–0127).

However, plaintiffs' damage study does not prove the existence of any injury caused by defendants. Indeed, plaintiffs specifically stated that the damage study was introduced solely to prove "the *amount* of damages, not the fact or cause of injury" (*Plaintiffs' Memorandum In Opposition To Defendants' Motion To Exclude Plaintiffs' Damage Studies,* May 17, 1982 at 13). (Emphasis in original.) Indeed, the Court notes that, if anything, plaintiffs' damage study proved that plaintiffs were not injured in fact by defendants' challenged actions. When SPCC's model is run substituting several assumptions which the defendants' witnesses have shown to be more reasonable and appropriate than those assumed by plaintiffs, even the idealized "but for" company would not have been profitable in the private line business (Joskow, S–T–167 at 36; McNamara, S–T–169 at 35).

This result is consistent with the testimony in the record that it is not economically feasible to make money in the private line business with a network that is built solely for private line (deButts, Tr. 4141–42; Hough, Tr. 3693). Given the economic and operational realities of the telecommunications industry, it is not surprising that SPCC incurred losses in the private line field.

The record conclusively demonstrates that as a result of substantial economies of scale and scope in the transmission of telecommunication services, the Bell System is able to provide existing service at lower costs than new entrants having lower volume and growth (Rosse, S–T–43 at 46–47). In this situation, it would be extremely difficult for any new entrant to develop the characteristics necessary to provide private line service profitably. Assuming all par-

ticipants are allowed to compete freely, competitive entry could only be successful if new entrants were able to capture offsetting economies of specialization in the provision of new and innovative services (*id.* at 47–63).

Contrary to SPCC's initial representations to the FCC that SPCC planned to offer new and innovative services, the private line services [301] provided by SPCC essentially duplicated defendants' existing services [302] (Rosse, S–T–43 at 47–65). Without innovative services SPCC had no chance of success if Bell were allowed to deaverage its rates and otherwise compete as envisioned by the FCC's *Specialized Common Carriers* decision (Rosse, S–T–43 at 65–75; deButts, Tr. 4141–42).

By 1976, SPCC recognized that as a result of the Bell System's substantial economies of scale and scope in the transmission of intercity services, SPCC could not make a profit by providing only private line service.[303] To cope with this problem, SPCC undertook to expand its service offerings to include switched services that were the functional equivalent of defendants' MTS and WATS services.

Even though it was widely recognized that AT & T's cost of providing MTS and WATS was lower than SPCC's cost of providing similar services, and that therefore SPCC's Sprint services could not compete successfully with AT & T's services unless they enjoyed an artificial competitive advantage, SPCC was able to use the FCC-prescribed separations procedures to obtain such an advantage (Jones, S–T–53 at 19; Partoll, S–T–149 at 17–21). Although plaintiffs' Sprint services use subscriber plant (terminal equipment, local loops from the subscribers to the local switching offices, and the terminations of the subscriber lines in the local switching offices) in essentially the same manner as defendants' MTS and WATS services, plaintiffs have never adequately compensated the Bell operating companies for the use of such subscriber plant (Jones, S–T–53 at 19–21). Thus, even under the current ENFIA agreement, SPCC continues to enjoy rates for interstate use of exchange network facilities which do not fully recover the interstate costs generated by that use.[304]

To the extent that plaintiffs continue to receive local access for their MTS and WATS-like services at rates which are below cost, SPCC enjoys an artificial competitive advantage to the detriment of the general body of ratepayers (Jones, S–T–53 at 22–27; Partoll, S–T–149). As a result of this artificial competitive advantage, as well as by targeting high usage customers and by providing service over only high density routes, plaintiffs have successfully undercut Bell's rate for MTS and WATS service (*id.*). In recent years, SPCC has been so successful in providing Sprint services that it voluntarily ceased seeking new private line customers. Indeed, plaintiffs' telecommunications operations as a whole were profitable in 1981 and large increases

---

**301.** The Court notes that in its marked version of the defendants' proposed findings of fact and conclusions of law, the plaintiffs did not dispute this fact.

**302.** This representation is even questioned by one of SPCC's salesmen (S. Dufala) who in 1975 wrote (S–3695 at 3 MLAO 634):

"At this rate, it is impossible for us to live up to or establish any credibility as far as being innovative and responsive to unique customer requirements."

**303.** The Court notes that there was a hint of this by Mr. Grant in a September 8, 1974 memorandum to Senior Executives wherein he wrote, (S–3171 at 2): "It is becoming increasingly evident that a switching system is required for our facilities."

**304.** Most of that shortfall relates to payments for the use of subscriber plant—a use which is absolutely identical for the Bell System and the plaintiffs (Jones, S–T–53 at 19–22; Partoll, S–T–149 at 35, U.S.Tr. 21505–06). First SPCC paid only 35 percent of its subscriber plant costs; then they paid 45 percent; and thereafter SPCC has paid 55 percent of the costs associated with the use of such subscriber plant (*id.;* Partoll, S–T–149 at 39–42). This amount of costs which the specialized common carriers do not pay to the operating companies translates almost exactly into the rate differential that existed in 1981 between Execunet/Sprint services and AT & T's long distance services.

in revenues and profits for Sprint services are predicted for the coming years. This marked improvement in the fortunes of SPCC, however, does not in any way suggest that SPCC could ever have been profitable as a stand-alone private line company.

 In addition to the difficulties that any new entrant would face in the private line business, the record is replete with evidence that any problems SPCC may have encountered in generating revenues, attracting customers, or holding down costs were the result of SPCC's own internal deficiencies. The record is clear that SPCC encountered serious problems of inadequate management and planning and that the company was in operational disarray.[305] These internal problems resulted in the loss of revenues and customers and significantly increased SPCC's operating costs. Moreover, SPCC had difficulty providing certain types of transmissions in its early years. In a September 9, 1974, memorandum, George Vasilakos wrote (S–3172 at 1):

"As you are aware, our current nationwide network consists of various system pieces. These include SPC's new 1800 channel system between San Francisco and Tucson, temporary use of SPT facilities until December 1974 between Tucson-San Antonio, SPC's own system between San Antonio-St. Louis, use of Western Union facilities between St. Louis-Chicago-New York, and the TCM system from New York through Philadel-

phia and upper New York state. Tests have indicated that high speed data transmission [up to 9600 BPS] at satisfactory error rates *cannot be carried over most system segments.*" (Emphasis supplied).

(See, also S–3184).

Inadequate management and planning cost SPCC millions of dollars of revenues, impaired SPCC's ability to attract and keep customers and caused SPCC's operating costs to increase. For example, one internal study found that "[p]oor corporate planning [was] costing SPC millions of dollars on a long range operating basis and therefore inhibiting the profitability of the company" (S–6042B at 8, 98; Docter, Tr. 5803, 5814).

Deloitte Haskins & Sells, SPCC's auditors, also found that SPCC lacked "sufficient operating management" and was "operating inefficiently" (S–5908B at 8), and these findings followed several years of similarly negative reports on SPCC by that firm (see, *e.g.,* S–3648B; S–4378; S–5745B). This concern was echoed by Dale Piltz, Executive Vice President and Chief Operating Officer of SPCC at a December 30, 1980, meeting wherein he indicated that he was, "Overwhelmed by the short-falls in their systems" (S–6004B at 1).

SPCC's inadequate network planning left SPCC unable to meet customer needs and disadvantaged SPCC vis-a-vis other special-

---

**305.** These problems were highlighted in an undated employee opinion survey. (S–0136). Many of the problems include:

—Quality of supervisors in general are poor and give promotion opportunities only to individuals who can save face for them—to cover their inadequacies (at 1 PLC 1190).
—SPCC has lost most of the former techs that had the ability to operate the system (the quality of performance and customer acceptance is low) are leaving the system now that the economy has begun upward again and SPC is going to be left with a $10,000.00 tech and a very unhappy customer unless the trend is reversed (at 1 PLC 1190–1).
—Better planning proper tools to do the job (at 1 PLC 1191).
—Lack of qualified salesmen in SPC (at 1 PLC 1191).

—Lack of qualified personnel to trouble shoot data circuits (at 1 PLC 1191).
—Manning levels critically low additional manpower needed for peak load times (vacations, sick leave, excessive customer pkg. outages) instead SPC has budgeted only for low ebb activity (at 1 PLC 1190).

Even in its infancy, SPCC was experiencing internal problems which lead to lost accounts. In a November 1, 1973 memorandum to John Geier, Mr. Vasilakos wrote (S–2798 at 2):

"If we do business this way, then we're doing it exactly the opposite of our intentions. How can we sell reliability, dependability, and service when we don't even know two weeks before proposed service date . . . that we can't provide service because our construction isn't done?"

ized common carriers. SPCC originally planned to construct a regional microwave network, serving the areas around the parent company's right-of-way facilities. SPCC soon found that this network plan was not acceptable to customers because customers' telecommunications needs were seldom regional and customers were unwilling to deal with several vendors for communications services (S–3780D; S–6235B at 60–62; S–2664E; S–6235F at 38, 79–80). When SPCC finally attempted to build a nationwide network, SPCC's late start in the East adversely affected its ability to penetrate that market where other specialized carriers had a head start both in building facilities and attracting customers (S–6235F at 74–79).

In its haste to expand the network, SPCC knowingly ignored the development of standards to assure quality network performance. This omission resulted in customer complaints of excessive noise on the SPCC network (S–4941; S–4959; S–3245; S–3764; S–3870; S–4468; S–4561; S–5114).

Inadequacies at SPCC with regard to planning for the daily operation and maintenance of the network resulted in serious customer problems for SPCC. For example, system outages attributable to the inadequacies of SPCC alarms plagued SPCC virtually from the beginning of its operations (S–3164; S–3404). SPCC recognized the problems with its alarm systems and the inadequacy of SPCC's personnel training in this regard (S–3410;[306] S–3404).[307] However, these system outage problems persisted at SPCC for several years[308] (see, e.g., S–3164; S–3404; S–3614; S–4967B; S–5134; S–5367; S–5406) resulting in customer service complaints (S–3970; S–4023; S–4455; S–4459; S–5151). Even as late as January 8, 1976, Mr. Geier wrote Mr. Grant (S–4019 at 1), "I know that you'll agree that the system outage situation has become intolerable."

SPCC's inadequacies with regard to the planning of offered services also caused customer dissatisfaction. For example, SPCC's offering of an Automated Traffic Analysis System (ATAS), intended to provide subscribing customers with information regarding line usage, was fraught with problems, including poor circuit retrofit requirements, unreliable equipment, and delays in expanding the service (S–3943; S–4395; S–4406; S–4412; S–4416; S–4422; S–4544). Similarly, poor service planning that accompanied SPCC's offering of Scheduled Metered Time Service (SMTS), a service that required the metering of customer usage for billing purposes, resulted in substantial revenue loss because SPCC was unable to bill customers for the service when its SMTS metering equipment proved to be inadequate (see, e.g., S–3965; S–4080; S–4325; S–4347; S–4429; S–4689; S–4795; S–5289; S–4342).

SPCC was also beset from the outset by serious internal operational problems[309]

**306.** In a January 27, 1975, memorandum to Mr. Vasilakos, Mr. Smith complained about system outages with respect to Compass Computer Services and went on to point out (S–3389 at 2). This is another example of the credibility problems I am experiencing with accounts in my region due to poor performance of installed circuits. *See also*, S–3371 (outages experienced by Hatch); S–3343 (Vasilakos memorandum complaining about constant system shutdowns).

**307.** What is noticeably absent from these notes on the management meeting is any mention of problems created by AT & T.

**308.** This February 3, 1975 memorandum (S–3410) from Mr. Geier pointed out that an inadequate level of training and familiarity with the alarm system was one of the biggest problems facing SPCC. The Court can only wonder, how

in SPCC's "but-for" world with a bigger system could this and other problems be overcome?

**309.** A March 3, 1975, memorandum from Ralph Brown detailed the reasons for the delay on the Bear, Steams account. (S–3445). *The result of the delay was not the fault of AT & T, but rather the result of internal bickering among SPCC's own employees. See also* S–0136. In another memorandum of the same date, Mr. Bill Gallagher wrote Mr. Paul Phillips complaining about problems in gaining information from the office in Burlingame wherein he wrote (S–3447):

"We have been experiencing numerous situations where we get a due date from the priority list you publish, and a couple of days before the due date, we find out that a vital element in putting up the facility is missing."

which impaired SPCC's ability to provide customers with adequate service and increased SPCC's operating costs. Shortly before SPCC began providing service, Mr. Vasilakos wrote that because SPCC did not "appreciate the customer service problem ... potential disasters await our first customers" (Vasilakos, Tr. 3084; S–2802). Mr. Vasilakos' words proved prophetic. By 1974, Mr. Vasilakos was asserting that SPCC's installation efforts were a "mess" (Vasilakos, Tr. 3086; S–3082).

At about the same time, Mr. Brodman, an SPCC marketing executive, summarized SPCC's customer problems as follows (S–3218):

"It is obvious that we are not meeting our commitments to our customers.... In talking with our technical people at the working level in the various TOC's including New York, Chicago, Los Angeles and San Francisco, the story seems to be the same. 'Equipment is never delivered on time,' 'we do not have enough people,' 'we do not have the proper test equipment,' etc., etc."

SPCC's employees complained bitterly and often about the "lack of professionalism" which typified SPCC's operations (S–3391 [310] and the chronic "bungling" which resulted in lost revenue and cancelled customer accounts (S–3577; S–3751, S–3695).[311] In cancelling SPCC data service, *The United California Bank commented that SPCC personnel were "totally incompe-*tent" and "idiots"* (Gibney, Tr. 2372–73; S–4460). Mr. Bill Gallagher vigorously complained to Mr. Vasilakos in an August 12, 1975, memorandum wherein he wrote (S–3754):

"We have an order for Transamerica 6 intermachine trunks between Dallas and Chicago. We were advised months ago by circuit design that we could put these facilities in by September 1975.... In checking with our people in Burlingame, they told us the first week in September would present no problem.

We were advised today that we will not be able to provide the facilities until approximately November 1st. *This is ridiculous.*

*We are going to lose this order if we don't deliver. We are going to lose this one like we lost American Express and as we will lose numerous others* unless we put somebody up there who realizes that when the customer wants something, it does not depend on when we want to give it to him." (Emphasis supplied).

The evidence discloses that SPCC was deficient in creating and maintaining a mechanism for overseeing the movement of customer orders through the provisioning process—from the processing of service orders through the design of the circuit and the ordering of necessary equipment, to the installation and maintenance of service (S–3628B; S–3698;[312] S–0001S; S–5017; S–

---

**310.** Rauscher-Pierce cancelled its circuit from SPCC in January of 1975 and transferred this business not to AT & T, but rather to MCI (S–3391 at 1). The same thing occurred with Shure Electronics. This company had a circuit from AT & T and was looking to switch its account. Shure did so and went with MCI. (S–3482).

**311.** Mr. Steve Dufala complained very strenuously to Mr. Chuck Simon in a July 1, 1975 memorandum that SPCC's bungling cost him an account worth $5,740.00 in commissions and SPCC $275,536.80 in yearly revenues (S–3695 at 2 MLA 0637).

**312.** This July 16, 1975, memorandum from Mr. I Tunis Corbell depicted a number of problems in SPCC's tower construction. This memorandum pointed out that (S–3698 at 3 HLD 0895–6):

"The results of these reports generally indicate that unless we take corrective action at an early date we are likely to experience some long outages due to failure of a number of our towers in the system. Some of the problems found with the towers result from normal wear and tear in the case of TMC, and problems with the other towers indicate that either our specifications to the tower vendors were inadequate or we did not receive what we purchased. For example, all of the towers including those just completed show evidence of extensive rusting which indicates that the hardware was either not specified correctly or was of poor quality. There are numerous cases of missing grounds or inadequate grounding that sooner or later will result in lightening damage to the tower. There are other cases of missing bolts in wave guide flanges which will eventually result in leaky wave guides. There are cases of

5133; S–5345) and finally to the billing of the customers. (S–3836, S–5658).[313] These internal problems were the cause of installation delays,[314] missed customer due dates, and resulting increased operating costs for SPCC for which SPCC attempted to blame defendants.

SPCC's customer service was undermined by the chronic failure of SPCC's sales personnel to complete and submit accurate customer orders (S–3813; S–6191B; S–4923; S–4303). For example, SPCC conducted three evaluations of its service orders from November 1976 through January 1977. These studies showed that 59.5% of SPCC's service orders for this period were defective because of insufficient or incorrect information, excessively short intervals and other problems (S–4662B; S–4772; S–4848).

Another SPCC operational problem which caused customer problems and increased operating costs was the repeated failure of SPCC's Circuit Design Department to place accurate and timely facilities orders with the local Bell operating companies. For example, SPCC often gave due dates to SPCC customers which did not allow time for the local operating company to do its job (S–3037; S–4252; S–4362; S–4379; S–4857; S–4938B; S–5030). The Circuit Design Department at SPCC also caused customer due dates to be missed because of its failure to provide the technical circuit design specifications required to install the customers' service. These circuit design specifications were often late (S–4362; S–5067; S–4379; S–4942; S–5307; S–4697) and inaccurate (S–4601; S–4626; S–4662; S–4685; S–4768; S–4785; S–4823; S–4054). Falling behind in the planning of system multiplex in the latter part of 1974 also caused SPCC to fall behind in its ability to install circuits (S–3565).

SPCC's installation efforts were frequently inadequate and caused customer dissatisfaction.[315] Installation problems

leaning towers and out of spec. guy wire tensions which can result in wind damage. There are other cases of missing hardwire or improper mounting of antennas with the comment that the antennas are likely to shift in strong winds. Some of the ice shields are missing which could spell trouble next winter. A number of the beacon flasher controls are not working and probably never have worked which consumes unnecessary power and shortens the beacon life. In a majority of the towers, hardware has been installed incorrectly and in many cases, is loose.

... From a quick perusal of the inspection reports from the Western Area, I believe the same general situation exists so that the tower problem is system-wide."

*See also* S–3757, S–3823, S–3825, S–3838, S–4028, S–4407, S–4441.

**313.** In an October 2, 1975 memorandum to the Regional Sales Managers, Mr. Brodman wrote (S–3836 at 1):

"No one is more aware than you of the problems that we have had with our billing system. The root cause of many of these problems is the Accounts Receivable Computer Program which is used to prepare the customer bills. The present program is incapable of calculating sales and commission, is very rigid in format, and has many other serious shortcomings."

It is clear to the Court that SPCC may not have collected all of the funds that it was due. Yet, in the "but-for" world it would have AT & T pay for this problem. Moreover, while in the "but-for" world SPCC would have been earning more revenues, it is axiomatic that SPCC would be losing more money due to the errors in the computer program, which they overlook in regard to the damages sought in this case from AT & T.

**314.** Other problems causing installation delays included late deliveries from suppliers other than AT & T. In a November 5, 1974, letter to one of its vendor's, Singer Teleprinter, SPCC had to threaten legal action as well as the possibility of removing Singer from its vendor's list to assure timely delivery or a suitable substitute. (S–3257) The Court must note that in plaintiffs "but-for" world, all of SPCC's vendors would also be in a "but-for world", that is, the vendors would *always* have the necessary supplies on hand at the appropriate time. This of course just does not happen 100% of the time in the real world, particularly with a company like the plaintiffs whose own employees were in the main, untrained and called "idiots" as previously pointed out.

**315.** This problem was patently obvious on the Rockwell International account. (S–3254). In a November, 1974, memorandum to Mr. John Geier, Mr. Bill Gallagher cited a number of problems that led to delays in providing service to such an important customer as Rockwell. What was noticeably absent from this memorandum was any complaint about the Bell system. Instead, Mr. Gallagher paid the highest compliment to Bell wherein he stated (S–3254

stemmed from a lack of defined installation and testing procedures, a lack of proper test equipment, and inadequate training of SPCC personnel (S–3082; S–3617; S–3622; S–3404; S–4392; S–3905). SPCC's maintenance and repair efforts were also inadequate due to a lack of trained maintenance personnel (S–3566; S–3568; S–3905; S–4477), maintenance procedures (S–3082; S–3566; S–3905; S–4275), and tools and test equipment (S–3617; S–3566). SPCC also suffered delays as well from a lack of spare parts. In an October 10, 1974 letter to Mr. Grant, Mr. Albertson wrote (S–3212 at 3):

> As you know we have been delayed in obtaining spare parts for the Zenkurt System *since no orders have been placed,* Mr. Peterson advised had he had the spare parts he might have quickly cleared the problem at final. (Emphasis supplied)

Employee turnover was another serious problem affecting all of SPCC's operations (S–5018). In 1977, Mr. Vasilakos stated, "In 1976 employee turnover probably cost Operations somewhere between $285,000 and $475,000. Our costs for 1977 may be from $312,000 to $520,000.[316] This was a very serious problem" (*id.*). Indeed this was a problem that Deloitte Haskins and Sells made specific mention of in both 1978 (S–5745B) and 1979 (S–5908B) audits.

Despite this problem of employee turnover in the real world, plaintiffs' "but-for" world would have compounded it. SPCC's "but-for" world showed little regard for the individuals working for it. A glaring example of the callousness with which SPCC treats its employees can be seen in plant operations. In the first quarter of 1978, SPCC has 52 supervisors (PX5–0130 at 50). The second quarter of 1978 shows an increase of 3 supervisors to 55, but in the third quarter of 1978, four supervisors are

either fired or demoted (PX5–130 at 50). This cavalier attitude is particularly acute with the technicians. Despite the real world fears of ending up with 10,000 technicians and unhappy customers (S–0136 at 1 PLC 1190–1), the "but-for" world hires and fires the technicians to suit their needs. In plant operations in the first quarter of 1977, SPCC had 242 technicians in the "but-for" world (PX5–D130 at 49). The 2nd quarter of 1977 showed a decrease to 223 technicians. (*id.*) The 4th quarter showed an increase to 234 and showed subsequent increases to 283 in the first quarter of 1978 and the 2nd quarter to 303 technicians (*id.* at 50). However, the third quarter of 1978 showed a decrease in the number of technicians to 277. (*id.* at 50). The same results occurred in the circuit design department as well as the other departments of SPCC's "but-for" world (PX5–0130 at 68–9). While such a result may be fine in attempting to understand the production dynamics of a company in arriving at the "perfect budget," such a result would be disastrous in the real world, especially in light of SPCC's desire to remain non-union. Surely, SPCC would not expect its employees to be subjected to such job insecurity without trying to do something, i.e., either leaving or unionizing. In the Court's opinion, this would lead to further employee problems for SPCC.

In the light of the overwhelming evidence that SPCC's financial difficulties were not caused by the challenged actions in this case, but rather the economic realities of the private line industry and SPCC's own internal problems, the Court finds that SPCC has not proved with sufficient certainty that it has suffered injury in fact resulting from defendants' conduct. Rather, it was the natural growing pains in a business that became super competitive. This certainly was not a "but-for" company

---

at 2); "[i]f we did not have a competitor (AT & T) dedicated to his customer's service, we might have lost a major account." Far from anticompetitive actions, AT & T actually saved a very important customer for SPCC when it would have been easy to conduct the cut-over when first scheduled, thus causing a very serious problem for SPCC.

**316.** SPCC had a turnover rate of 30% in 1975, 30% in 1976, and a projected 43% rate for 1977. (S–5018 at 1). This is certainly not evidence of a business that would have been even larger in the "but-for" world.

where SPCC would have perfect knowledge. Indeed, on December 23, 1974, Mr. Grant wrote to Mr. D.K. McNear describing how SPCC was building its system stated, (S–3323 at 3), "These plans will get us through 1977 in fine shape." Nowhere is it mentioned that SPCC would be further along in their system's growth at any time prior to the trial, nor that SPCC was thrown off its timetable. In the same letter to Mr. McNear, Mr. Grant wrote (S–3323 at 2):

"Accordingly for our long range planning we have arbitrarily chosen or compromised which we believe will preserve our market position and growth without damage to our customer relations."

It is clear to the Court, that SPCC was a business trying to overcome the problems of getting entrenched into the market, but SPCC showed no signs of being harmed in any way by AT & T. As late as June 30, 1980, Deloitte Haskins and Sells reported on its audit of SPCC for the year ended 1979 that the company had impressive growth (S–5908B at 6). While falling short of its budget, Deloitte Haskins and Sells commented (S–5908B at 6):

"*Budgets used to plan the operational and financed requirements of the Company should be based on probable rather than optimistic assumptions.* In addition, reasons for not meeting budget should be analyzed and documented." (Emphasis supplied).

Yet despite the optimistic budget of 1979, SPCC would have this Court find that but for AT & T's alleged anticompetitive conduct, they would have been making even more money, with a much bigger company. Such a result seems totally illogical to the Court, and will not be adopted by it in the face of the record before it.

## AMOUNT OF DAMAGES

Even if SPCC had proven all the other elements of its claim, the Court would still have to render judgment for defendants because SPCC's damage evidence provided no reasonable basis for determining the amount of damages caused by defendants' allegedly unlawful actions.

## SPCC'S DAMAGE EVIDENCE

At the outset of the trial, SPCC claimed damages in the amount of $567 million (before trebling) based upon an elaborate computer model of a hypothetical "but for" company (Tr. 91). One month later, when SPCC began to present its damage evidence at trial, plaintiffs reduced their damage claim to $480 million as a result of certain "programming errors and other miscalculations" they had found in their model (Tr. 2690–91). It was this version of the "but for" model that was the subject of most of the testimony at trial. On the last day of its rebuttal case, however, SPCC abandoned its $480 million damage claim and substituted a new aggregated $230 million claim based upon a new run of the same "but for" model (Lim, Tr. 5890–91). In addition, at the request of the Court, SPCC submitted on the last day of its rebuttal a set of six alternative damage computations purporting to measure separately the amount of damages caused by some of particular practices alleged in SPCC's claim apart from the damage model (Lim, PX6–0032 at 5–9; Lim, Tr. 5912).

Each of SPCC's aggregate damage claims was based on the cumulative difference between the net cash flows of a hypothetical "but for" company and those of SPCC's "damaged" private line business for the period 1972 through 1991 or, in the final version of the claim, 1986 (PX5–0169; PX5–R169). The net cash flows of the hypothetical "but for" company were simulated by a computer model purporting to represent what SPCC "might have done" in a "but for" world hypothesized by SPCC and its economists (Biaggini, Tr. 3194). This "but for" company was an "imaginary," made-for-trial fiction (Tr. 309) which did not purport to be based on any business plan that SPCC ever had in the real world (Grant, Tr. 776; Lim, Tr. 2775–76). SPCC assumed that in the "but for" world AT & T would have charged substantially higher rates for single channel private line circuits and would never have offered a bulk rate.

SPCC further assumed that there would be only three non-Bell competitors in the private line market in the "but for" world (Vasilakos, Tr. 2986), and that those competitors would have captured 60 percent of the private line business on any route they chose to serve by pricing their service at 15 percent below AT & T's rates (Hieronymus, Tr. 2833–34). The model assumed that this price umbrella would remain constant throughout the 20-year period included in the damage model, regardless of any price competition from other carriers or lawful competitive responses by defendants (Hieronymus, Tr. 2890).

The computer-generated net cash flows of this idealized "but for" company in the damage model were contrasted with the performance of the so-called "damaged" private line business. From 1972 through 1976, the "damaged" private line business is the same as the real world SPCC. From 1977 through 1981, the "damaged" business is plaintiffs' estimate of what SPCC might have looked like in the real world if it had never offered SPRINT or other switched services (Tr. 108–09; McNamara, S–T–169 at 5). From 1982 through 1991, the damage model initially assumed that the "damaged" business would require ten years to "recover" and that this "recovery" would be on a straight-line basis (Vasilakos, Tr. 2974; McNamara, S–T–169 at 5–6). In their final version of the damage model, however, plaintiffs abandoned this ten-year, straight-line "recovery" assumption as a result of defendants' criticisms and substituted in its place a new five-year "circuit catch-up" methodology (PX5–R169; Lim, PX6–0032 at 2; Docter, PX6–0027 at 10–11).

All differences in the net cash flows of these two fictional companies from 1972 through the end of the damage period were ascribed by SPCC to unlawful conduct by defendants and claimed as damages to be trebled by the Court. Thus, defendants were asked to pay in treble damages for every discrepancy between the performance of the idealized "but for" company and the "damaged" company stripped of its profitable services (McNamara, S–T–169 at 6)—regardless of the causes of those discrepancies

such as the competition of other carriers, lawful competition by AT & T, or any poor planning or other mistakes made by SPCC management in the real world.

Defendants challenged the sufficiency of SPCC's "but for" damage model at trial on a number of legal and factual grounds. They contended that the model was unduly speculative as a matter of law because the performance of the "but for" company was not premised on any business plan that SPCC had adopted or even considered in the real world and because certain of SPCC's assumptions about the "but for" world were patently unrealistic and unreasonable (Defendants' Motion to Exclude Plaintiffs' Damage Studies, filed May 10, 1982). They further contended that the aggregated nature of the "but for" damage claim precluded the Court from filtering out injuries caused by factors other than defendants' alleged unlawful conduct and thus left the Court with no basis other than speculation and guesswork to determine the amount of damages unless the Court accepted every one of plaintiffs' assumptions and charges (id.). Defendants also introduced evidence showing that SPCC's assumptions about demand and competition in the hypothetical "but for" world were unreasonable or erroneous (Joskow, S–T–167; Joskow, Tr. 5093–96); that SPCC's assumptions about how the hypothetical "but for" company might have behaved in this imaginary world were unrealistic (McNamara, S–T–169 at 7–12; La Blanc, S–T–165; Smith, S–T–166; McNamara, Tr. 5236); that the costs of the "but for" company were understated (McNamara, S–T–169 at 25–33; Whitaker, S–T–203 at 10–11; McNamara, Tr. 5261–62); and that the costs of the "damaged" private line business were overstated and produced nonsensical results on the damage claim (Whitaker, S–T–203 at 2–9; McNamara, S–T–169 at 13–25; McNamara, Tr. 5236–38). Correcting only nine of the many errors and unreasonable assumptions in SPCC's damage model, defendants showed that SPCC's model produced a negative damage claim in the amount of *minus* $197.8 million (McNamara, S–T–169 at 33–

35). Based on this result, defendants' witnesses concluded either that SPCC was not damaged by defendants' alleged anticompetitive conduct or that SPCC's "but for" damage model did not provide a useful means of measuring the amount of damages in this case (Joskow, S–T–167 at 36; Joskow, Tr. 5097; McNamara, S–T–169 at 35; McNamara, Tr. 5239).

In their rebuttal case, plaintiffs acknowledged that many of defendants' criticisms of the assumptions in SPCC's "but for" model were well-founded (Docter, Tr. 5778, 5779, 5781, 5784, 5786, 5794; Docter, PX6–0027 at 4–5, 7, 10, 15–16; Hieronymus, PX6–0030 at 1–2, 25, 26–27; Berner, PX6–0029 at 3; Lim, Tr. 5935). Implementing some of defendants' proposed modifications (primarily those of a mechanical nature), rejecting others, and making a number of other changes of their own, plaintiffs abandoned their $480 million damage claim and substituted a new aggregated damage claim for $230 million (Lim, Tr. 5890–91). SPCC's final $230 million claim, however, contained most of the same basic assumptions about the "but for" world that characterized its earlier damage claims (Lim, Tr. 5892).

Prior to the final day of their rebuttal case, plaintiffs declined to offer any evidence concerning the amount of damages except the single aggregated claim produced by their computer model of the hypothetical "but for" company despite the repeated urging of the Court both before and during the trial that some disaggregated measure of the amount of damages flowing from the alleged acts of defendants should be introduced.[317] Although the testimony indicated that plaintiffs' "but for" model was not designed to permit a disaggregation of plaintiffs' damage claim on a charge-by-charge basis (Joskow, Tr. 5093,

5133), on the first day of plaintiffs' rebuttal case one of SPCC's expert witnesses, Mr. Docter, acknowledged that it would be "relatively easy" to compute SPCC's actual, real world damages due to specific aspects of defendants' allegedly unlawful conduct totally apart from SPCC's "but for" damage model (Docter, Tr. 5774–75, 5824–25; see also Lim, Tr. 5912). Over the ensuing weekend SPCC produced six such computations (Lim, Tr. 5912–39).

For the reasons discussed below, the Court has concluded that SPCC's damage evidence—including both the grossly inflated and plainly unrealistic damage claim produced by its computer model of the imaginary "but for" world and its six separate alternative damage computations—is insufficient to provide a reasonable basis for determining the amount of damages in this case. Even assuming *arguendo* that some or all of the conduct challenged by SPCC in this case were found to be in violation of the antitrust laws, therefore, the Court would still have to enter judgment for defendants based upon plaintiffs' failure to sustain its burden of proof on the amount of damages.

## SUFFICIENCY OF THE "BUT FOR" DAMAGE MODEL

Although a plaintiff may make a "just and reasonable" approximation of the amount of damages based on "relevant data," a damage claim cannot be based upon mere "speculation or guesswork." *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946). *Accord, Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1189 (D.C.Cir. 1978). Moreover, a damage claim must be based on assumptions that are reasonable

---

**317.** The manner in which SPCC submitted its damage claim made it appear as though plaintiffs were submitting a separate "piece-out" claim. However, the testimony of the sponsor of this portion of the damage model, Dr. Berner, makes clear that the piece-out claim is not a stand-alone claim. Thus, SPCC's aggregated damage claim can be expressed either with or without piece out, but there is no separate piece-out claim without SPCC's principal claim.

Moreover, the piece-out claim is premised on the same basic methodology and assumptions about the "but for" world as the principal claim. If any of those assumptions are incorrect or unsubstantiated in the record, therefore, the piece-out claim is also deficient. (PX5–R169; Berner, Tr. 2923, 2928–29; Joskow, S–T–167 at 5 n. *; McNamara, S–T–169 at 4 n. *; Joskow, Tr. 5133–34.)

and consistent with real world market conditions. See, *e.g., Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1353 (3d Cir. 1975); *Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256, 1262 (9th Cir.1981), *cert. denied*, 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982). "Elaborate calculations which are at war with realities are of no avail." *Lindheimer v. Illinois Bell Telephone Co.*, 292 U.S. 151, 164, 54 S.Ct. 658, 663, 78 L.Ed. 1182 (1934). In the Court's view, SPCC's "but-for" damage model is based purely on speculation about what an imaginary company might have done in a "but-for" world that is "at war with realities" in a number of important respects.

SPCC's computer simulation of the hypothetical "but for" company is premised upon a number of critical assumptions (Brown, Tr. 5947). The failure to establish the reasonableness of these assumptions is fatal not only to the damage claim, but to plaintiffs' entire case. See, *e.g., Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d 906, 911–13 (2d Cir.), *cert. denied*, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962) (affirming directed verdict for defendants based on plaintiff's failure to establish reasonableness of assumptions underlying damage evidence); *R.S.E., Inc. v. Pennsy Supply, Inc.*, 523 F.Supp. 954, 965–71, 974–75 (M.D.Pa.1981) (granting defendants' motion for judgment n.o.v. based on plaintiff's failure to prove reasonableness of assumptions underlying damage evidence and denying plaintiff's motion for new trial); *Shannon v. Crowley*, 538 F.Supp. 476, 483–84 (N.D.Cal.1981) (dismissing action after granting defendants' motion *in limine* to exclude damage evidence due to failure to show appropriateness of damage claim assumptions); *Ways & Means, Inc. v. IVAC Corp.*, 506 F.Supp. 697 (N.D.Cal.1979), *aff'd*, 638 F.2d 143 (9th Cir.), *cert. denied*, 454 U.S. 895, 102 S.Ct. 394, 70 L.Ed.2d 210 (1981) (granting defendant's motion for summary judgment based on insufficiency of plaintiffs' damage evidence). Based on a thorough review of the record, the Court finds that several of the critical assumptions underlying plaintiffs' damage model are not supported by the record or are demonstrably inconsistent with conditions in the real world.

### MARKET SHARE ASSUMPTIONS

SPCC's damage model assumed that in the "but for" world defendants' competitors would capture 60 percent of the private line business [318] on every city-pair over which they chose to compete, and that this 60 percent would be divided equally among three non-Bell carriers, each obtaining a 20 percent share [319] (Vasilakos, Tr. 2986). The

---

**318.** The 60% market share assumption is based on the three non-Bell carriers pricing their services at 15% below Bell's prices. (PX5–0150 at 19.) Yet, there has been no evidence adduced that both MCI and USTS priced at 15% below Bell's costs. Nor has there been a sufficient showing that SPCC always priced at 15% below Bell's costs. Indeed, Mr. Grant stated that SPCC's costs were somewhere around 8% below Bell's costs. By pricing at 10% below Bell's costs, the total market available would decrease to 41%, with SPCC's share at 13.66% of the total private line market. (PX5–0150 at 19–22).

**319.** In its demand model documentation, SPCC contends that the only three carriers in the private line market would be themselves, MCI and USTS. (PX5–0150 at 9). However, it is clear to the Court that in the real world, as the Court has previously noted, there are many more companies in the market. Indeed, in a recent article in the October 11, 1982 *Business Week,* an article entitled "TELECOMMUNICA-

TIONS, everybody's favorite growth business, The battle for a piece of the action," 60 (1982) it was noted that the nations communications industry is becoming a competitive free-for-all. In the intercity market, the article listed as competitors of AT & T the Satellite Carriers, which include, *inter alia,* American Satellite (Continental and Fairchild Industries), GTE, Hughes Communications, RCA Communications, Satellite Business Systems (Aetna, IBM, and Comsat), Western Union and Vitalink. The article also listed the Other Common Carriers, which include, *inter alia,* Cylix (RCA), Equatorial Communications, Graphic Scanning, GTE Telenet, ITT, MCI, Starnet, Tymnet (Tymshare) and Isacomm (United) (*id.* at 61). While the Court certainly cannot judge what the market shares of all of the market entrants are from the above information, nor would it be appropriate, but one thing is for certain, there will be more than three other common carriers in the intercity telecommunications market with the result being very fierce competition.

basis of this assumption was the testimony of SPCC's economist, Dr. Hieronymus, that a potential competitor providing only private line services would have required at least a 20 percent market share in order to earn a rate of return sufficient to attract investors into the "but for" market (Hieronymus, Tr. 2846, 2867–68). Based upon this analysis, Dr. Hieronymus concluded that only three non-Bell stand-alone private line companies would ever enter the private line market (*id.*).

One of SPCC's own expert damage witnesses acknowledged that the market share assumptions contained in the "but for" damage model were "probably not" reasonable (Brown, Tr. 5953), and a number of defendants' witnesses also criticized those assumptions as conceptually unreasonable and contrary to all historical experience in the private line market (Joskow, S–T–167 at 11–23; Smith, S–T–166 at 6–7, 12; La Blanc, S–T–165 at 15–18). Based upon a thorough review of the record, the Court agrees.

The unrealistic nature of plaintiffs' market share assumptions is highlighted by the testimony of Dr. Hieronymus that SPCC would have obtained a 20 percent market share in the "but for" world regardless of whether the non-Bell carriers in the aggregate achieved a 20, 40, 60 or 80 percent share of the market (Hieronymus, Tr. 2867–68; see also Joskow, S–T–167 at 19–20). His reasoning was that, because in the "but for" world a 20 percent market share would be necessary to earn an attractive rate of return, SPCC would have obtained a 20 percent market share. Such circular reasoning does not provide a rational basis for one of the critical assumptions in the damage claim.

SPCC's market share assumption ignores the fact that by 1977, with the advent of competition in the switched services business, companies could enter the private line business as a secondary line of business (La

Blanc, Tr. 5059–62; Joskow, S–T–167 at 19; Joskow, Tr. 5135–38). Even if SPCC were correct that the market would sustain only three stand-alone non-Bell private line competitors, therefore, the target rate of return set by Dr. Hieronymus for a stand-alone private line business would be irrelevant to companies which also competed in the switched services business (Joskow, S–T–167 at 19). The private line market could very well be split up among many companies willing to compete for very small market shares because they could provide private line service at low incremental costs and earn a competitive rate of return on their incremental investments (*id.*). Thus, Dr. Hieronymus' analysis of stand-alone private line company entry has no validity in the real world where the switched services business is open to competition (*id.*).

SPCC's assumption about the number of competitors that ought to exist in the "but for" world is also demonstrably inconsistent with the number of competitors that actually exists in the private line business in the real world. The evidence shows, and as the Court has previously discussed, that in the real world there are several more than three non-Bell carriers actively competing in the market for private line services, and that still more presently plan to enter.[320] Since the early 1970s, at least four carriers have offered terrestrial microwave private line services, and at least three satellite carriers have competed in this market (Brodman, Tr. 1839–40; Hieronymus, Tr. 2869; Paschall, Tr. 4754–55; Pace, S–T–156 at 69–73; Joskow, S–T–167 at 21). Another major satellite carrier, a consortium of IBM, Comsat, and Aetna Insurance Company known as Satellite Business Systems, presently plans to enter this market (Hieronymus, Tr. 2870). If, as SPCC hypothesizes, private line rates were significantly higher in the "but for" world than in the real world, additional competitors could also be expected to enter the private line market

320. *Although SPCC's economist, Dr. Hieronymus, attempted to limit his analysis to nationwide carriers (Hieronymus, Tr. 2870–71, 5857), he admitted that the hypothetical "but for"* company only serves 106 of the 311 cities programmed into the damage model *(Hieronymus, Tr. 5878, 5858). (Emphasis supplied.)*

(Smith, S–T–166 at 6, 12[321]; La Blanc, S–T–165 at 17). In these circumstances, it defies common sense that in the supposedly much more attractive environment of the "but for" world—where prices are substantially higher and profits greater—only three non-Bell carriers would have attempted to compete. Indeed, Mr. Milton R. Skinner, Jr., of Southwestern Bell testified that he presently provides services and facilities to 23 OCC's such as MCI, SPCC, WU, USTA, American Satellite, RCA and SBS. (S–T–124 at 2–3).

 Even putting aside the obvious inconsistency between real world competitive conditions and SPCC's assumptions about competition in the imaginary "but for" world, and even assuming *arguendo* that private line services would only be provided by stand-alone private line companies, SPCC's market share assumptions are unreasonable because they are necessarily based on an assumption that in the early 1970s all potential competitors would have had perfect foresight as to their future rate of return and that only those companies who knew with certainty that they would be successful would enter the market (Joskow, S–T–167 at 20). It is obvious that the business world does not operate in this fashion. In the real world, companies enter markets under mistaken assumptions and often stay in business for some time before leaving, particularly where substantial investment costs are sunk (*id.*). Even assuming that the private line market could support only three stand-alone non-Bell competitors in the long run, therefore, there is no reason whatever to assume, as did Dr. Hieronymus, that such a long-run equilibrium would be established immediately after the *Specialized Common Carriers* decision (*id.*).

**321.** Mr. Smith is a former Vice President of General Electric who seriously questioned the validity of SPCC's 20 market share assumption (S–T–166 at 3). Moreover, Mr. Smith points out that at a higher price, GE would have seriously considered building a private microwave system (*id.* at 5).

"Furthermore, if SPCC's market share and pricing assumptions had been a reality, Gen-

Moreover, even if Dr. Hieronymus' reasoning were valid, there is no basis on this record upon which the Court could conclude that SPCC would be one of the three surviving non-Bell carriers from among the eight now participating in the private line market, or that it would ever achieve the 20 percent market share hypothesized for the "but for" world (see, *e.g.*, Joskow, S–T–167 at 20; Paschall, Tr. 4749–51, 4754–55). Indeed, the back-up materials to SPCC's damage study show that SPCC had only about 10 percent of non-Bell private line revenues in 1980 (Joskow, S–T–167 at 22 n. *). Moreover, in a February 24, 1975 memorandum to Senior Executive, Mr. Grant wrote (S–3436 at 4), "*at no time will SPCC obtain more than 5% of the private line market.*" (Emphasis supplied). Again in a 1980 presentation to investors, SPCC stated (S–5947 at 114 (_JJA 1660):

> "SPCC's main thrust is aimed at a market which is forecast to grow $23 billion during the next five years. Stated differently, SPC's forecast is based on getting less than 2% of this increased market."

Even assuming that the non-Bell competitors did capture 60 percent of the market, therefore, SPCC's total market share would then be only 6 percent (*id.*).

 A damage claim which fails to account adequately for the effect of other competitors on the plaintiff's market share is insufficient as a matter of law. *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1353 (3d Cir.1975) (rejecting damage claim which failed to separate the impact of defendants' unlawful competition, as opposed to the lawful competition of defendants or other competitors, on plaintiff's market share); *Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256, 1262 (9th Cir.1981) (affirm-

eral Electric might very well have entered the common carrier business in competition with SPCC."
With sales of over $27,000,000,000 and net income of $1,600,000,000 in 1981, it is obvious that GE would have been a very viable competitor. Williams, *Fortune Directory of the Largest U.S. Industrial Corporations*, FORTUNE, at 260 (May 3, 1982).

ing rejection of damage claim due to failure to establish reasonableness of assumptions relating to expected market share); *R.S.E., Inc. v. Pennsy Supply, Inc.*, 523 F.Supp. 954, 966 (M.D.Pa.1981) (same). SPCC's failure to establish the reasonableness of its critical assumptions about competition and market share leaves the Court with nothing but speculation about SPCC's potential market share in the "but for" world (*id.*). The entire "but for" damage model is thus left with no foundation.

In any event, Dr. Hieronymus testified on rebuttal that SPCC's final damage claim would be reduced to zero if SPCC obtained only a 17 percent market share (that is, one-third of a 50 percent non-Bell SCC market) rather than the 20 percent postulated in the damage model (Hieronymus, Tr. 5871–72). Because the Court finds that there is no basis in the record for assuming that SPCC would have had a market share as high as 17 percent, the Court concludes that plaintiffs' model of the "but for" world shows no damages.

## DEMAND ASSUMPTIONS

 SPCC's damage claim was also premised on a number of other unreasonable and unrealistic assumptions about the demand for private line services potentially available to SPCC in the hypothetical "but for" world. For example, SPCC substantially overestimated the private line demand available to the "but for" company by grossly understating the quantity of Telpak circuits that would have been lost to the private line market if Telpak bulk rates had never been offered, because Telpak customers would have turned to other alternatives such as private microwave systems (Joskow, S–T–167 at 7–10; Smith, S–T–166 at 2–5). Similarly, SPCC overstated its potential "but for" market by ignoring the special requirements and "sole source" policy of the largest user of private line service, the Department of Defense, which largely precluded SPCC from providing service to that customer (Joskow, S–T–167 at 11; Jacobsmeyer, S–T–163; Paschall, Tr. 4747–48).

SPCC also overestimated the amount of private line business that might be expected to shift from defendants to their non-Bell competitors in the "but for" world. This estimate was based on a survey done for AT & T in 1975 (Hieronymus, Tr. 2828; PX5–0255). In applying the survey results to the situation hypothesized in the damage model, however, SPCC ignored important differences between the private line services which were the subject of the 1975 survey and those that SPCC said it would provide in the "but for" world. For example, the 1975 survey assumed that AT & T's competitors would provide equivalent service, including circuits less than 25 miles in length and complete multi-point circuits, whereas SPCC's damage model assumed that the hypothetical "but for" company would not provide circuits of less than 25 miles, and it would not serve all of the locations involved in multi-point circuits (Joskow, S–T–167 at 11–17; Vasilakos, Tr. 2982–84; Hieronymus, Tr. 2812).

Defendants' economist, Dr. Joskow, also demonstrated that SPCC had substantially overstated the damage claim produced by its "but for" model by using an inappropriate "gravity" model to allocate the total demand for private line circuits among the various city-pairs in SPCC's model (Joskow, S–T–167 at 23–29). In their rebuttal case, plaintiffs agreed with Dr. Joskow's criticisms and made certain corrections to their gravity model in their final $230 million damage claim (Hieronymus, PX6–0030 at 26–28).

SPCC's damage model also overstated the cash flows of the hypothetical "but for" company by assuming that it would capture a 20 percent share of the demand for private line service on any route it chose to serve on the very first day that it had capacity in place to serve that route (Vasilakos, Tr. 2988; McNamara, S–T–169 at 11; Docter, PX6–0027 at 7). This unrealistic assumption was conceded to be overly "optimistic" and "not ... reasonable" by plaintiffs' own witnesses (Vasilakos, Tr. 2988–89; Docter, PX6–0027 at 7; Docter, Tr. 5781). Perhaps the most important demand assumption that was ignored was SPCC's own

plans. In an August 14, 1980 presentation to investors, SPCC informed its investors of its intent to move away from private line wherein it stated (S–5947 at 17 (3JJA 1605)):

> "In 1978, SPCC's business emphasis changed from Monthly Leased Lines (MLL's) to switched services. As of the end of 1978 approximately 10,500 MLLs were in service and this has remained relatively constant through 1980. *No growth in MLL is anticipated in 1981, probably some contraction.*" (Emphasis supplied) [322]

As Mr. Hollis stated (S–5947 at 25 (3JJA 1571):

> "As previously mentioned, dedicated lines are not the most efficient use of transmission, and *certainly not the most profitable.*" (Emphasis supplied).

SPCC's strategy of moving from private line to the switched service is thus clearly based on economic consideration.[323] Indeed to the extent that SPCC could fill up its system using switched service, it will retrench in its private line.[324] Yet once again, for this voluntary retrenchment, SPCC would have AT & T pay damages of $230.2 million before trebling. Once again, this seems ludicrous to the court.[325]

## PRICE ASSUMPTIONS

SPCC's "but for" damage model was also premised upon a number of assumptions about the price of private line service in the hypothetical "but for" world that were unsubstantiated by the evidence and contrary to real world experience. For example, SPCC assumed that both the "but for" company and its two non-Bell competitors would price their services at 15 percent below AT & T's private line rates in the "but for" world throughout the 20 year period from 1972 to 1991 while capturing 60 percent of the market where they competed (Hieronymus, Tr. 2836). SPCC's damage model thus assumed that AT & T would maintain a "price umbrella" throughout the 20 year period of the damage claim and take no action to keep its prices competitive even if faced with the prospect of losing nearly two-thirds of its private line business (Hieronymus, Tr. 2890).

■ This assumption that AT & T would make no price response to competition is plainly contrary to practical experience and unreasonable on its face (La Blanc, S–T–165 at 16), and even one of SPCC's own witnesses acknowledged that it was "probably not" reasonable (Brown, Tr. 5953). Indeed, such assumptions have been held to be unreasonable as a matter of law. Thus, the Ninth Circuit recently rejected a damage study premised on such an assumption in *Murphy Tugboat Co. v. Crowley,* 658 F.2d 1256, 1262 (9th Cir.1981):

> "The expert witness's testimony as to Murphy's expected share in the large vessel and flat tow market segment depend-

---

**322.** The Court recognizes that early on SPCC claims that they would no longer sell private lines due to the alleged unlawful volume discount of AT & T's offering (S–5947 at 25 (3JJA 1571) yet this is not in line with the facts. It is clear that SPCC would maximize its profit, and to do so would mandate a change in the use of its facilities to switched services.

**323.** This is consistent with the decrease in the actual quantity of SPCC circuits. The actual number of SPCC circuits decreased from over 10,000 circuits in 1977 to 9,974 circuits in 1981. (PX5–0240). This is totally inconsistent with SPCC's but-for world which would increase from approximately 19,000 circuits in 1977 to over 22,000 circuits in 1981. In the quantity of circuits available to it in 1981, SPCC contends that there would have been over 30,000 circuits, over a threefold increase over the actual circuits available. (PX5–0150 at 24). Even in a but-for world, the Court finds this to be totally out of line with what SPCC could have even possibly developed even in a but-for world. SPCC has not shown that it had the capability to build such a system, despite any potential revenue that would have been available.

**324.** This is in line with AT & T's contention that private-line is not a profitable stand alone business (nor would the return on private line be as great) and that the profits are in switched services.

**325.** Even to the extent that SPCC had extra capacity which based on the record, they clearly would not, SPCC would have devoted this excess capacity to the more profitable service, namely switched.

ed upon an assumption that Red Stack would not cut its prices in reaction, even to a loss of over one-quarter of its prior share of this portion of the market. Murphy argued that Red Stack had never cut its prices, and that there was no reason to believe that it would have done so under the hypothetical circumstances. A reasonable jury could not, however, indulge in the assumption that a competitor would follow a course of behavior other than that which it believed would maximize its profits.... In a hypothetical economic construction, such as the one underlying Murphy's theory on lost past profits, economic rationality must be assumed for all competitors, absent the strongest evidence of chronic irrationality. Otherwise it will be impossible to keep speculation in check."

This same conclusion was reached in another recent decision in *R.S.E., Inc. v. Pennsy Supply, Inc.,* 523 F.Supp. 954, 966 (M.D.Pa. 1981):

"Perhaps the most blatant defect in plaintiffs' damage model for lost profits is its failure to account for any lawful competition. Surely plaintiff cannot have expected the defendants to sit idly by while it proceeded to grasp 25 percent of the road construction market and maintain its roughly 12 percent of the blacktop production market, when each market began to dry up. As defendants point out, they were well integrated, established firms in the area. To postulate damages on the assumption that they would not individually react by reducing their prices and therefore require plaintiff to further reduce its price, thus reducing its net profit, is absurd. Nor did plaintiff present any evidence from which the jury could, without speculation, determine what the effect of lawful competition would have been and reduce the damages accordingly."

*Accord, American Bearing Co. v. Litton Industries, Inc.,* 540 F.Supp. 1163 (E.D.Pa. 1982).

■ SPCC also produced no evidence that it could or would maintain a 15 percent price discount below AT & T's rates in the "but for" world. In fact, the evidence showed that in the real world SPCC continues to maintain a low bulk rate that is at least 30 percent lower than AT & T's private line rates (Brodman, Tr. 1815; see also Lim, Tr. 5923; Biaggini, Tr. 5985). Moreover, Mr. Vasilakos, plaintiffs' primary damage witness, directly contradicted the assumption in the damage model by testifying that today SPCC's prices are "in the range of 20 percent" below AT & T's present MPL rates, the rates which formed the basis of the AT & T "but for" price in the damage model (Vasilakos, Tr. 3044–45; see also Brodman, Tr. 1842–43). In these circumstances, SPCC failed to establish the reasonableness of its assumption that the hypothetical "but for" company would be able to maintain a 15 percent discount under AT & T's rates over the 20 year period of the damage study.

■ SPCC's assumptions with respect to price failed to take into account the fact that in the real world SPCC set its private line rates taking into consideration the rates of the satellite and other non-Bell carriers which were substantially below those of defendants (Grant, Tr. 708; Brodman, Tr. 1858; Lim, Tr. 5923). The satellite carriers, for example, had, and continue to have, significant cost advantages over long-haul routes, and their services were, and continue to be, generally priced well below SPCC's (Grant, Tr. 706–08; Hieronymus, Tr. 2872–73; La Blanc, S–T–165 at 16; Paschall, Tr. 4751). Because of the high cross-elasticity of demand between satellite and terrestrial service, SPCC was forced in the real world to lower its rates to meet competition from the satellite carriers (Brodman, Tr. 1858, 1865–66), and even to engage in a "price war" with them (Grant, Tr. 707). As a result, almost none of SPCC's over 1,000 mile business was sold at rates designed to be competitive with the higher rates of defendants (Brodman, Tr. 1865–66). The effect of SPCC's disregard of satellite competition in its damage model was substantially to overstate the revenues of the hypothetical "but for" company by

overstating both its rates and its market share, and thereby overstating the damage claim.

▪ SPCC's damage claim also treated price as if it were a concept totally divorced from quality.[326] Thus, the damage model assumed that the quality of the service offered by the hypothetical "but for" company would be the same as that offered by defendants (Vasilakos, Tr. 3013; Berner, Tr. 2930), even though SPCC's service in the real world was conceded to be distinctly inferior to AT & T's (Brodman, Tr. 1776–77, 1781, 1846, 1849–50; Tr. 2178). Although SPCC complained that the quality of its service was adversely affected by the nature of the interconnections provided by defendants, the Court cannot find on the present record that defendants' conduct was the cause of SPCC's inferior service quality (see, *e.g.,* Grant, Tr. 669, 675; Hollis, Tr. 2289–90; Gibney, Tr. 2372–73; Brodman, Tr. 1855–56; S–4941; S–4959; S–3245; S–3764; S–3870; S–4468; S–4561; S–5114; SPCC Customer Complaints Doc. Sub.).

▪ SPCC's price assumptions are also deficient because of the manner in which they are applied in the model of the "but for" company. In determining AT & T's rates in the "but for" world, SPCC assumed that AT & T's MPL private line tariff after the elimination of Telpak in May 1981 would be a reasonable basis for calculating price levels in a "but for" world where there was no Telpak (Vasilakos, Tr. 2985). AT & T's Telpak tariff was terminated on May 6, 1981 (S–6030E; S–6030D), and AT & T's first revision to its MPL tariff following the elimination of Telpak went into effect on May 14, 1981 (PX5–0270 at 6). Rather than selecting AT & T's May 14, 1981 MPL tariff, however, SPCC selected AT & T's higher June 1981 MPL tariff (*id.*). The record shows that the May tariff was the first AT & T tariff which assumed the absence of Telpak, and that the June tariff

revision differed from the May tariff only in that the FCC permitted AT & T to make an across-the-board 16 percent rate increase to earn a higher authorized rate of return (Joskow, S–T–167 at 30–31). Using the June 1981 MPL tariff as the basis for the "but for" rate prior to that time, therefore, would improperly have AT & T earning a rate of return in the "but for" world that was higher than the return AT & T was actually authorized to earn by the FCC during that period (*id.*).

Although the June 1981 MPL tariff in the real world is distance sensitive such that the rate per mile decreases as the circuit length increases, SPCC's initial damage study assumed that an average rate per mile could be applied for any circuit length (Berner, Tr. 2933; Vasilakos, Tr. 3037–38). SPCC offered no evidence that using an average price was appropriate for calculating "but for" revenues, and Mr. Vasilakos admitted that he did not know what the impact would be of using the rate structure of the tariff rather than an average price (Vasilakos, Tr. 3046). Similarly, SPCC's "piece out" damage expert, Dr. Berner, indicated that he never checked to see whether using the actual distance sensitive rate structure would make a difference in the results of his study (Berner, Tr. 2937–38). As defendants' expert economist, Dr. Joskow, demonstrated, the use of an average rate instead of the distance sensitive rate found in the real world produced highly misleading results and grossly overstated the damage claim (Joskow, S–T–167 at 31–34). These criticisms were conceded by SPCC on rebuttal to be correct, and SPCC's final damage claim was adjusted to substitute distance sensitive rates for the average rate initially used by SPCC (Hieronymus, PX6–0030 at 2, 25).

▪ Correcting only the deficiencies he found in the "demand" portion of SPCC's initial "but for" damage model relating to demand, price and market share, Dr. Jos-

---

**326.** Moreover, because the market share assumptions in the "but for" damage model are based on projected price differentials, SPCC's market share assumptions also fail to reflect real world conditions to the extent that SPCC failed to take service quality differences into account in its pricing assumptions.

kow showed that SPCC's initial model produced a *negative* damage claim in the amount of minus $77.5 million (Joskow, S–T–167 at 35–36; Joskow, Tr. 5096). None of his adjustments or corrections was adequately refuted by plaintiffs. Moreover, plaintiffs' witness, Dr. Hieronymus, who accepted some of Dr. Joskow's adjustments in making SPCC's final $230 million run of the model but rejected others, conceded at trial that even a small reduction in the assumed market share of the "but for" company would reduce SPCC's final damage claim to zero (Hieronymus, Tr. 5871–72). In these circumstances, the Court concludes that SPCC's "but for" damage model does not provide a reasonable means of measuring the amount of damages in this case.

## ASSUMPTIONS ABOUT THE PLAN OF THE "BUT FOR" COMPANY

▇ In addition to the foregoing assumptions about demand, competition and prices in the "but for" world, SPCC's damage claim was premised on a host of other unrealistic and unreasonable assumptions about the manner in which the hypothetical "but for" company would do business. For example, unlike a real world business enterprise, the "but for" company in SPCC's damage model was assumed to have perfect knowledge about the future demand and price for its service and its future costs (McNamara, S–T–169 at 8). Thus, there was assumed to be no risk or uncertainty in the "but for" world. This contrasts sharply with the situation confronting a business enterprise in the real world which must attempt to predict what future market conditions and costs will be in an environment of uncertainty, and, based on that prediction, establish a long-range business plan for the future operation of its business (*id.*). Sometimes that business plan will prove to be overly conservative, thereby causing the business to underinvest in productive capacity and be unable to serve some of the actual demand that develops (*id.* at 8–9).

Conversely, sometimes the plan will prove to be overly ambitious, resulting in excess capacity (*id.* at 9). In either event, the real world business will be worse off than a company with perfect knowledge of the future (*id.*).[327]

SPCC acknowledged at trial that its computer model of the hypothetical "but for" company was not based on any business plan that SPCC actually adopted or even considered in the real world (Grant, Tr. 776; Lim, Tr. 2775–76). The model merely represents an after-the-fact conjecture about what SPCC might have considered doing in the "but for" world created by SPCC's economists and computer experts.

▇ By modeling a "but for" company whose investment decisions are determined on a "demand-driven, return-driven basis" (Tr. 105) with perfect knowledge of future demand and future costs rather than on any business plan that SPCC actually adopted or considered in the real world, SPCC's hypothetical company avoids any element of management fallibility. The "but for" company never makes mistakes in planning or building its hypothetical microwave network (compare, *e.g.,* S–6042B at 8, 19; Docter, Tr. 5801–05; documents cited in SPCC's Inadequate Planning and Resulting Problems Doc.Sub.). To permit damages to be awarded on the basis of such an idealized business plan would open antitrust defendants to virtually unlimited damage claims based upon whatever after-the-fact scheme plaintiffs, or their lawyers and economists, might conjure up. Such conjectures about what plaintiffs might have thought of doing at an earlier time provide no meaningful measure of the damages actually suffered by plaintiffs. See, *e.g., Transamerica Computer Co. v. IBM Corp.,* 481 F.Supp. 965, 1020 (N.D.Cal.1979) (rejecting claim for lost profits based on "hypothetical transactions which ... were never even proposed"); *Roberts v. Sears Roebuck & Co.,* 531 F.Supp. 784, 788 n. 5 (N.D.Ill.1982)

**327.** This problem is exacerbated in industries, like that involved in this case, where the company is making fixed investments in capacity on a number of geographically separate routes, because overinvestments on one route do not offset underinvestments on other routes; both result in lower net income (McNamara, S–T–169 at 9).

("Roberts' current conjecture as to what he might have *thought* about doing at an early time is simply too speculative to be characterized as admissible."); *Maheu v. Hughes Tool Co.,* 569 F.2d 459, 475–77 (9th Cir.1977) (previously undisclosed "plan" rejected as "sheer fantasy, nothing more").

In an effort to keep speculation in check, a number of courts have distinguished between damage claims based upon reasonable business plans actually developed and adopted by businessmen in the regular course of business and claims based upon made-for-trial speculation about what different business decisions the plaintiff might have made under different circumstances.[328] In *Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1191 (D.C.Cir.1978), for example, the Court of Appeals for this Circuit rejected as a "speculative guess" the trial court's finding that, but for the NFL draft, Smith would have negotiated a multi-year contract with the Washington Redskins guaranteeing payment even if he were injured during the term of the contract where Smith had never sought to negotiate such a contract in the real world. Similarly, in *Newberry v. Washington Post Co.,* 438 F.Supp. 470, 483 (D.D.C.1977), the Court, finding that the Washington Post's unlawful price maintenance scheme prevented Post dealers from raising the price they charged their customers, awarded damages to those dealers who had actually attempted to raise their prices, but rejected as "the sheerest speculation" any award but nominal damages of $3.00 for those dealers that never took any actual steps to raise their prices. See also *Webb v. Utah Tour Brokers Ass'n,* 568 F.2d 670, 677 (10th Cir.1977) (allowing recovery of added costs incurred in arranging tours with a non-boycotting motor carrier, but rejecting as too speculative claimed lost profits from tours that plaintiff tour operators claimed they might have operated but for defendants' boycott); *Transamerica Computer Co. v. IBM Corp.,* 481 F.Supp. 965, 1020 (N.D.Cal.1979) (rejecting a "but for" computer-simulated lost profits model as "fanciful projections" that were "predicted only by assuming hypothetical transactions which never were likely to occur and were never even proposed").[329]

The soundness of these decisions limiting damage claims to business transactions actually planned or attempted in the real world is demonstrated by SPCC's claim in this case. By hypothesizing that it would have built a microwave network in the "but for" world that was substantially larger than any private line network ever constructed or planned by SPCC in the real world and dramatically more profitable (Tr. 94; Vasilakos, Tr. 3001–03),[330] SPCC was

**328.** See, *e.g., Autowest, Inc. v. Peugeot, Inc.,* 434 F.2d 556, 566 (2d Cir.1970), affirming admission of a projection of future profits on the ground that it was not "prepared with an eye on litigation," but rather was developed in the actual running of the business as "the product of deliberation by experienced businessmen charting their future course." See also *Greyhound Computer Corp. v. IBM Corp.,* 559 F.2d 488, 507 (9th Cir.1977) (damage claim based on actual business plan). In addition to proof of an actual business plan adopted in the normal course of business, the courts have required a showing that such actual business plan was reasonable and that plaintiffs had an actual intention and ability to implement it. See, *e.g., Transamerica Computer Co. v. IBM Corp.,* 481 F.Supp. 965, 1020 (N.D.Cal.1979); *Volasco Products Co. v. Lloyd A. Fry Roofing Co.,* 308 F.2d 383, 395–96 (6th Cir.1962), *cert. denied,* 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963); *Image and Sound Service Corp. v. Altec Service Corp.,* 148 F.Supp. 237, 239–40 (D.Mass.1956); *Martin v. Phillips Petroleum Co.,* 365 F.2d 629, 632–34 (5th Cir.), *cert. denied,* 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966); *Denver Petroleum Corp. v. Shell Oil Co.,* 306 F.Supp. 289, 308 (D.Colo.1969).

**329.** There is, of course, no need to consider plaintiff's business plan where the amount of damages claimed is based solely on the volume of business actually achieved by plaintiff in the real world since plaintiff's actual volume of business is obviously less speculative than any planned volume that was not achieved. See *Story Parchment Co. v. Patterson Parchment Paper Co.,* 282 U.S. 555, 561, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931).

**330.** SPCC assumed that the hypothetical "but for" company would have invested $202 million in capital expenditures through the end of 1975 and $366 million through 1980 (PX5–0169), as contrasted with capital expenditures of $88 million by SPCC in the real world through 1975 and $124 million through 1980 (PX5–0127; see also La Blanc, S–T–165 at 6). It was further

able substantially to inflate its "lost" profits, and thereby inflate its damage claim, far beyond any losses actually suffered by SPCC in the real world. This may explain in part why plaintiffs changed the amount of its damage claim so often, from the time of its complaint against the defendants, again at the opening of trial, and finally on rebuttal.

Similarly, by endowing the hypothetical "but for" company with an imaginary business plan predicated upon perfect knowledge and foresight of future demand, the "but for" company is able to avoid any capacity bottlenecks in its system (McNamara, S–T–169 at 9). This contrasts sharply with SPCC's experience in the real world where insufficient capacity on some routes resulted in chronic bottleneck situations (see, e.g., Vasilakos, Tr. 3055–69; documents introduced in Capacity Problems in the Real SPCC Doc.Sub.). SPCC's unrealistic assumptions about the network it might have constructed, therefore, again leads to an overstatement of the damage claim.

Based on its review of the record, the Court finds that SPCC's modeling of the hypothetical "but for" company in its damage model purely on a "demand-driven, return-driven basis" (Tr. 105) with perfect knowledge of future demand and future costs, rather than on any business plan that SPCC actually adopted or considered in the real world, is unrealistic and unreasonable and substantially overstates SPCC's damage claim. In these circumstances, the Court finds that SPCC's model of the "but for" company does not provide a meaningful measure of damages.

## OTHER ASSUMPTIONS ABOUT THE CONDUCT OF THE "BUT FOR" COMPANY

▮▮ The idealized model of SPCC's "but for" company also contains several other unrealistic features which tend unreasonably to overstate the damage claim.

For example, as a result of its perfect foresight of future demand, the hypothetical "but for" company always begins construction with precisely the correct amount of lead time to have new capacity in place to serve demand at the very instant that such service becomes profitable for the company (McNamara, S–T–169 at 10). As a result, unlike the real world SPCC, the hypothetical "but for" company never experiences unexpected delays in obtaining necessary construction permits from local authorities (compare, e.g., S–3220, S–4092), or delays in obtaining certificates of public convenience and necessity from state regulatory commissions. Similarly, in the idealized "but for" world assumed by SPCC, AT & T is presumed to raise its "but for" rate (thereby automatically raising the "but for" rate of the hypothetical company by a like amount) every quarter without regard to regulatory controls and with no regulatory lag (McNamara, S–T–169 at 10). SPCC failed to establish that these assumptions were reasonable.

Although SPCC introduced some general testimony that SPCC would have been able to obtain the necessary financing to construct its greatly enlarged "but for" network (see, e.g., Biaggini, Tr. 3184), that claim was strongly disputed by defendants in light of the very tight financial conditions that existed in the critical 1973–1976 timeframe and the particularly difficult financial situation of the Southern Pacific Railroad during that period (La Blanc, S–T–165 at 5–15; La Blanc, Tr. 5056–59, 5067–68; Biaggini, Tr. 5980). The burden of proving that it could have obtained the necessary financing was on SPCC, and SPCC failed to satisfy that burden.

▮▮ Defendants also introduced evidence to show that the construction costs and operating expenses assumed by SPCC for the hypothetical "but for" company were substantially understated and not reasonable (see, McNamara, S–T–169 at 25–33;

assumed that the hypothetical "but for" company would build facilities on routes that SPCC never served in the real world (Vasilakos, Tr. 2993), and that the "but for" company would

have more than twice as many private line circuits as SPCC ever had in the real world (Tr. 95; Vasilakos, Tr. 3017).

Whitaker, S–T–203 at 9–11; McNamara, Tr. 5252–57). Thus, defendants demonstrated that SPCC had erroneously omitted from its computer model large amounts of the costs of the Engineering and National Microwave Departments (McNamara, S–T–169 at 26–29), that many other costs were calculated on the basis of inconsistent and unexplained judgments (*id.* at 30–33), and that SPCC's model produced results that were both unrealistic and directly contrary to SPCC's real world policies (*id.* at 12).[331] Defendants also showed that the property records used by SPCC to derive unit construction costs for the "but for" company were inadequate and unreliable for that purpose (Whitaker, S–T–203 at 9–10; documents cited in SPCC's Administrative Deficiencies Doc.Sub.; Schaefer Testimony Doc. Sub.).[332] Defendants' principal criticism, the omission of substantial amounts of the costs of the Engineering Department of the "but for" company from the damage model, was confirmed by plaintiffs' witness, Mr. Docter (Docter, Tr. 5784–85).

SPCC's assumption that it would have received a 30 percent discount from defendants' real world prices for all local distribution facilities in the hypothetical "but for" world was wholly arbitrary and based entirely on the speculation of Mr. Vasilakos (Vasilakos, Tr. 3012–13). SPCC offered no cost evidence to show that it was being overcharged for such facilities by defendants or the amount of any such overcharge. Indeed, SPCC's own evidence demonstrated that SPCC was charged over 60 percent

more for local distribution facilities by the independent telephone companies than it was by defendants (Lim, Tr. 5937–39). Moreover, defendants demonstrated that their cost of providing local distribution facilities to SPCC substantially exceeded the rate charged to SPCC (Cashman, S–T–31; S–6234E), and that if SPCC's assumption about the appropriate charges to SPCC for local distribution facilities in the "but for" world were accepted, defendants would be forced to subsidize SPCC and its customers in the amount of approximately $280 million (Cashman, S–T–31A).

The Court was asked to accept SPCC's assumptions concerning the construction costs, manpower requirements and operating expenses of the "but for" company based on the conclusory testimony of two SPCC witnesses that they were reasonable. However, one of those two witnesses, Mr. Lim, SPCC's Assistant Treasurer, conceded that he had neither the operational nor engineering experience upon which to evaluate the reasonableness of many of the critical cost assumptions in the model (Lim, Tr. 2750–56, 5933–34) and that he had relied on plaintiffs' other witness, Mr. Vasilakos, to make those assumptions (Lim, Tr. 2754, 2755). The Court was thus forced to rely upon the judgment and credibility of Mr. Vasilakos, whom the Court found exceptionally evasive and wholly unable to establish the reasonableness of the critical cost and productivity assumptions in the model (see, *e.g.,* Vasilakos, Tr. 3055–69, 3073–76, 3082–88).[333] In these circumstances, the

---

**331.** For example, SPCC's hypothetical "but for" company hires, fires and rehires trained workers from quarter to quarter so that it always has on the payroll in each quarter only the minimum number of employees required by plaintiffs' computer model for that quarter (PX5–0130). This hypothetical employment pattern contrasts sharply with SPCC's actual employment policy in the real world where SPCC "never had a layoff" (S–5245 at 1; McNamara, S–T–169 at 12) and, as the Court has already pointed out, is just no way to run a business, especially in light of plaintiffs' desire to remain non-unionized.

**332.** Defendants also introduced evidence showing that SPCC attempted to conceal certain internal documents that were highly critical of

the property records that were used by SPCC to establish the unit construction costs of the "but for" company in order to avoid impairing "SPCC's position versus AT & T on the damage study" (S–6234T at 2; S–6235D at 43).

**333.** SPCC's attempt on rebuttal to have the cost assumptions of the "but for" model blessed by two expert witnesses was unavailing. There is no evidence that Mr. Docter's last minute review of the cost accounting assumptions and calculations in the model extended to the critical underlying operational or engineering assumptions made by Mr. Vasilakos (Docter, PX6–0027 at 1–4, 12–16; Docter, Tr. 5776, 5783–85), and Dr. Brown specifically disclaimed ever having attempted to evaluate the

Court finds that SPCC failed to establish the reasonableness of its assumptions concerning the costs and expenses of the hypothetical "but for" company. SPCC's damage claim, therefore, must be rejected on this ground as well.

## DISCOUNT RATE ASSUMPTION

■ In addition to the foregoing deficiencies in SPCC's damage claim, SPCC contended that the future net cash flows of the hypothetical "but for" company (as well as those of the "damaged" private line business) should be discounted using a "riskless" discount rate (equivalent to the current rate for Treasury Bills) which assumes, like the "but for" world, that there is no risk or uncertainty in the future operation of SPCC's private line business (Colman, PX6-0026 at 1, 7). Even in the "but for" world, however, there is plainly a substantial degree of risk involved in the future operation of SPCC's private line business and in projecting its sales, prices and costs 10 years into the future (La Blanc, S–T–165 at 18–19). In these circumstances, the use of a "riskless" discount rate is clearly improper. As explained in Schneider, "Damages for the Termination of a Business Interest," 49 *Antitrust L.J.* 1295, 1301 (1980):

> "It is conceptually wrong to discount lost future profits at a simple conservative rate.... [U]sing a rate for a conservative investment would, in practical effect, eliminate the risk factor that would have confronted the plaintiff had he remained in his business. Stated another way, using a discount rate for a conservative investment would give the plaintiff an award which he could immediately invest in a low-risk investment and have the certainty of receiving the same return he would have hoped to earn in his former high-risk business."

An appropriate discount rate must take into account the degree of risk and uncertainty actually present in the future operation of

SPCC's private line business (La Blanc, S–T–165 at 19; Mendelson, "Payout Policy and Resource Allocation," 116 *U. of Pa.L. Rev.* 377, 390–91 (1968)). Using a more appropriate discount rate, standing alone, reduces SPCC's initial damage claim. Using the defendants' discount rate of 23% reduces plaintiffs' initial damage claim by over $60 million (La Blanc, S–T–165 at 19). In an effort to reach a compromise between the different discount rates, the Court will average the two for a discount rate of 18%, which the Court finds to be an appropriate rate.[334]

## ASSUMPTIONS ABOUT THE "DAMAGED" PRIVATE LINE BUSINESS

■ Because SPCC contrasted the performance of the imaginary "but for" company with the performance of SPCC's "damaged" private line business in order to compute the amount of SPCC's damage claim, SPCC also presented at trial a series of financial statements purporting to depict the performance of SPCC's private line business in the real world (PX5–0127). For the years 1972 through 1976, the "damaged" company was the same as the real world SPCC, and the reasonableness of SPCC's financial statements for the "damaged" private line business was not contested by defendants.

Beginning in 1977, however, SPCC devoted its facilities and resources in the real world principally to the provision of switched service rather than to private line service because its SPRINT switched service was immensely more profitable than private line (Biaggini, Tr. 3186; Grant, Tr. 771; Lim, Tr. 2778–79). Indeed, SPCC in its 1980 report to investors stated (S–5947 at 105 (3JJA 1651–3), "We are not growing this service (private *line*) but rather strategically increasing rates that encourage customers using some routes to terminate service and free facilities for more profitable

reasonableness of any of the assumptions of the model (Brown, Tr. 5946–50).

**334.** As the Court does not have access to the computer model (nor is it necessary since the

Court has already determined that there is no liability nor any damages), the Court is unable to determine the exact decrease in plaintiffs' damage claim using the 18% discount factor.

switch service business." The report went on to point out (at 114 (3JJA 1660)), "Essentially, all growth during this period is expected to be in Switch Services—SPRINT V and SPRINT LTD." As a result, the facilities built by SPCC prior to 1977 for the provision of private line service were in fact used by SPCC from 1977 through 1981 to earn substantial profits from switched service (Lim, Tr. 2778–79, 2794). SPCC excluded these SPRINT profits from the financial statements of the "damaged" company on the theory that its claims in this case were limited to lost private line profits. To the extent that they excluded SPRINT, SPCC's financial statements for the "damaged" company were "inconsistent" with SPCC's actual business (Grant, Tr. 776). Because the exclusion of the SPRINT profits earned on SPCC's private line facilities from the financial statements of the "damaged" private line business substantially increased SPCC's damage claim (Whitaker, S–T–203 at 2–9; McNamara, S–T–169 at 19–21), SPCC had the burden of establishing the reasonableness of this exclusion.

Based on a thorough review of the record, the Court finds that SPCC has failed to establish the reasonableness of its exclusion of SPCC's SPRINT profits from the "damaged" private line business in its damage claim. SPCC's "but for" damage model claimed lost private line profits on circuits which SPCC in reality had used to earn higher SPRINT profits. If plaintiffs were awarded damages based on their model,

they would effectively reap a double recovery on those assets. Such double recovery is not permissible. See *Lehrman v. Gulf Oil Co.,* 464 F.2d 26, 46–47 (5th Cir.1972).[335]

In order to accomplish the exclusion of SPRINT from its damage claim, SPCC allocated its real world investment costs, expenses and revenues between its private line and switched service businesses (Lim, Tr. 2702). Defendants demonstrated, however, that the allocation procedures used by SPCC in its initial damage model produced misleading and unreasonable results—all of which tended to overstate the damage claim (McNamara, S–T–169 at 19–21; Whitaker, S–T–203 at 2–9). Defendants also showed that the "short-run" incremental cost methodology used by SPCC in its initial damage model (Froggatt, Tr. 3713–14; Lim, Tr. 2799–2800) was inconsistent with SPCC's criticism of incremental costing and contradicted by the evidence or unsupported in the record. SPCC also failed to establish the reasonableness of its assumptions about its "damaged" private line business or its "recovery" period. Whatever the evidence of liability, therefore, SPCC's damage evidence provides no basis for measuring the amount of damages in this case, and the inadequacy of SPCC's only damage evidence requires the entry of judgment for defendants. See, *e.g., Herman Schwabe, Inc. v. United Shoe Machinery Corp.,* 297 F.2d 906 (2d Cir.), *cert. denied,* 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962); *R.S.E., Inc. v. Pennsy Supply, Inc.,* 523 F.Supp. 954,

**335.** In an effort to avoid this problem of double recovery on private line facilities that were actually used to provide SPRINT service, SPCC contended that in the "but for" world SPCC could have built both a greatly enlarged private line network and the substantial additional capacity required to provide SPRINT service. In order to prevail on this contention, however, it was essential for SPCC to prove that it could have constructed both a substantially larger private line network and the additional capacity for SPRINT after 1976, and there is no support for such a position in the record. Even so, the Court is convinced that in the "but-for" world, with its larger system, plaintiffs would have attempted to use most of the larger system for the more profitable service, SPRINT. The evidence shows that SPCC actually built its system as rapidly as it could to keep up with

private line demand (Grant, Tr. 773) and that for "a considerable period of time" SPCC artificially restricted itself to not more than 10,000 private line circuits in order to "deemphasize" its private line business in favor of its more profitable SPRINT business (Grant, Tr. 774). The evidence shows that SPCC would probably have been unable to obtain the financing necessary to support such an expanded business (La Blanc, S–T–165 at 5–15; La Blanc, Tr. 5056–59, 5067–68), and that even with the far more conservative growth rate experienced by SPCC in the real world, SPCC suffered "growing pains" and a shortage of intelligent managers (Grant, Tr. 669; Petty, Tr. 1255). There is no record support, therefore, for SPCC's assumption that it would have achieved the substantially higher rate of growth in private line service in addition to its SPRINT service.

970–71, 974–75 (M.D.Pa.1981); *Shannon v. Crowley,* 538 F.Supp. 476, 483–84 (N.D.Cal. 1981); *Ways & Means, Inc. v. IVAC Corp.,* 506 F.Supp. 697, 703 (N.D.Cal.1979), *aff'd,* 638 F.2d 143 (9th Cir.), *cert. denied,* 454 U.S. 895, 102 S.Ct. 394, 70 L.Ed.2d 210 (1981).

## PIECE–OUT CLAIM

SPCC's supplemental "piece-out" claim was also based on a number of unsupported and unreasonable assumptions. In the first place, as discussed above, there was no evidence that defendants' lease policies and customer premises restriction had anything more than a *de minimus* impact on SPCC. Thus, Mr. Vasilakos was unable to identify more than one customer affected by this policy (Vasilakos, Tr. 902), and Mr. Grant could identify only one piece-out circuit in operation, despite the fact that no piece-out restrictions have been in effect for over six years (Grant, Tr. 751). Moreover, the economist who sponsored the piece-out damage study, Dr. Berner, admitted that he had made no study whatever to determine the effect, if any, of AT & T's piece-out restrictions on SPCC in the real world (Berner, Tr. 5884, 2899). Indeed, he maintained that the real world was not relevant to his study at all (Berner, PX6–0029 at 2; Berner, Tr. 5883–84).

SPCC's supplemental piece-out model was grafted onto SPCC's principal damage model and related only to the additional revenues that would theoretically have been available to the hypothetical "but for" company by piecing-out circuits (Berner, Tr. 2923). Dr. Berner relied on a number of critical assumptions made in other parts of the model without making any independent analysis of their validity, and he acknowledged that if those assumptions were incorrect, the results of his study were also incorrect (Berner, Tr. 2928, 5883). Dr. Berner also assumed that SPCC would have offered piece-out service equal in quality to AT & T's through service (Berner, Tr. 2916), even though the record shows that piece-out was technically difficult to accomplish, and that most customers wanted only one carrier to be responsible for service (Grant, Tr. 750–51).

Dr. Berner's entire study was dependent on the validity of his method of computing the price of a piece-out circuit versus an end-to-end AT & T circuit, and there is no evidence that his methodology was reasonable or had any relevance to the real world (Berner, Tr. 5883–84). In his initial piece-out model, Dr. Berner applied an average rate per mile, despite the fact that the tariff on which the "but for" rate was based was distance sensitive. This use of an average rate was shown by defendants to produce unrealistic and unreasonable results (Joskow, S–T–167 at 33 n. *). Indeed, Dr. Berner admitted that if he had used a distance sensitive rate in the only example given at trial, AT & T's price for an end-to-end circuit would have been lower than SPCC's piece-out price (Berner, Tr. 2933–38), and he abandoned his average rate approach in favor of distance sensitive rates in his revised piece-out model submitted during SPCC's rebuttal case (Berner, PX6–0029 at 4).

Dr. Berner testified that his revised piece-out model indicated that the hypothetical "but for" company would have received $1.28 million in additional gross revenues from 1974 through mid-1976 if piece out had been permitted (Berner, PX6–0029 at 5; Berner, Tr. 5884). From this amount, SPCC's damage model should have deducted the costs to SPCC of providing that additional service (Berner, Tr. 5886; Lim, Tr. 5902). Yet SPCC's model produced a supplemental piece-out claim of nearly $2.8 million, over twice the amount of the lost revenues (PX5–0364; Berner, Tr. 5884; Lim, Tr. 5906). SPCC's witnesses were wholly unable to explain this nonsensical result at trial (Berner, Tr. 5885–87; Lim, Tr. 5902–07).

In these circumstances, the Court must conclude that SPCC has failed to establish the reasonableness of the assumptions underlying its supplemental piece-out claim. Consequently, even if SPCC had established that defendants' piece-out policies were in violation of the antitrust laws and caused

injury to SPCC, the Court would be unable to rely upon SPCC's model for determining the amount of damages resulting from those policies.

### SEGREGATION OF DAMAGES

■ Even if SPCC had succeeded in establishing that the many assumptions underlying its "but for" damage model were reasonable and consistent with the real world, SPCC's single aggregated "but for" damage model was fatally deficient in that it provided no basis for the Court to determine without speculation the amount of damage, if any, caused by any of the particular actions of defendants. Thus, SPCC's aggregated damage model gave the Court no means of assuring itself that injuries attributable to other causes—such as lawful competition or SPCC's own inefficiencies—have been excluded from the damage claim, and no means of determining whether the challenged conduct of defendants materially contributed to SPCC's injury. In short, the Court was again left with no basis other than speculation upon which to measure the amount of damages caused by the conduct involved in this case.

■ Although an antitrust plaintiff cannot be required to prove the amount of damages with precision, SPCC had an obligation to come forward with the best, most accurate measure of damages that is reasonably available. As Judge Sirica held in *Riss & Co. v. Association of American Railroads,* 190 F.Supp. 10, 18 (D.D.C.1960), *aff'd on this point,* 299 F.2d 133 (D.C.Cir.), *cert. denied,* 370 U.S. 916, 82 S.Ct. 1555, 8 L.Ed.2d 498 (1962):

> "In antitrust cases, a party has the burden of furnishing the best available evidence that the subject matter permits, as to what the impact of the claimed illegal conduct was on its business."

*Accord, ILC Peripherals Leasing Corp. v. IBM Corp.,* 458 F.Supp. 423, 436 (N.D.Cal.

1978), *aff'd sub nom. Memorex Corp. v. IBM Corp.,* 636 F.2d 1188 (9th Cir.1980), *cert. denied,* 452 U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981). See also 15 J. Von Kalinowski, *Antitrust* § 115.02[1][a] (1980); E. Timberlake, *Federal Treble Damage Antitrust Actions* § 21.14 (1965).[336] Failure to come forward with relevant evidence produces a presumption that the actual data is adverse to plaintiffs' claims. *Cf. A.C. Becken Co. v. Gemex Corp.,* 314 F.2d 839, 841 (7th Cir.), *cert. denied,* 375 U.S. 816, 84 S.Ct. 49, 11 L.Ed.2d 51 (1963).

■ The trier of fact must be able to determine from the damage evidence whether each of the particular actions alleged to form an antitrust violation "materially contributed" to plaintiffs' injury. See, *e.g., Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 702, 82 S.Ct. 1404, 1412, 8 L.Ed.2d 777 (1962); *Momand v. Universal Film Exchanges,* 172 F.2d 37, 42–43 (1st Cir.1948), *cert. denied,* 336 U.S. 967, 69 S.Ct. 939, 93 L.Ed. 1118 (1949). Moreover, the Court must have a basis for assuring itself that other causes of plaintiffs' injury have been "filtered out" of the damage claim. *Transamerica Computer Co. v. IBM Corp.,* 481 F.Supp. 965, 1013–14 (N.D.Cal.1979). These requirements necessitate that damage evidence be particularized to the extent possible to enable the Court to connect the damages to the challenged conduct of defendants (*id.*). In *Transamerica,* for example, the court held that an aggregated damage model very similar to the model involved in this case was too speculative to provide the basis of a damage award in a monopolization case even if the jury found all of the challenged conduct unlawful because it failed to connect the amount of damages to the particular conduct challenged in the case so that "the influence of extraneous factors"—such as lawful competition or problems for which the defendant was not responsible—could be "filtered out" (*id.*).

---

**336.** As the Supreme Court held in *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946), a plaintiff may make a "reasonable estimate" of the amount of damages caused by an antitrust vio-

lation only "in the absence of more precise proof," and provided that the plaintiff's estimate is "based on relevant data" and it is shown that the damages claimed were "not . . . attributable to other causes."

Similarly, in *ILC Peripherals Leasing Corp. v. IBM Corp.*, 458 F.Supp. 423, 434 (N.D.Cal.1978), *aff'd sub nom. Memorex Corp. v. IBM Corp.*, 636 F.2d 1188 (9th Cir.1980), *cert. denied*, 452 U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981), the court granted a directed verdict for defendant in a monopolization case on the ground that the plaintiffs' aggregated damage model was insufficient to provide a basis for measuring damages even if all of the defendants' actions were found to be unlawful:

> "The way Memorex structured its damage claim there was no basis in the record for the jury to determine what the effect on damages would be if it found one or more of the challenged acts lawful. Thus, if one of IBM's acts was not a violation of the antitrust laws, much of the damage claim would become invalid. In addition, even if the jury found IBM guilty of every violation alleged, there was no basis for it to independently evaluate what the separate effect of each violation was. It would have to take Memorex at its word. In either case, a verdict rendered on the damage evidence offered by Memorex would have been speculative."

To the same effect is *Van Dyk Research Corp. v. Xerox Corp.*, 478 F.Supp. 1268, 1327 (D.N.J.1979), *aff'd*, 631 F.2d 251 (3d Cir. 1980), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981), in which Judge Lacey held:

> "Even if Xerox were to have been found guilty of violating Sections 1 or 2 of the Sherman Act, and guilty of the alleged illegal acts and practices charged by Van Dyk, the latter has failed to

present evidence providing a sufficient basis for an award of damages.

It cannot be said that the amount of Van Dyk's damages, if any, was proved to the point where the damages can be determined, not by speculation or guess, but by reasonable inference.

As previously noted, Van Dyk's damages proof was not calculated in terms of measuring the effects of any alleged illegal acts upon Van Dyk. In calculating the difference between Calculations I and II, the 'damages' were not related to any specific alleged illegal practice of Xerox." (Citations omitted.)

And recently, in *Spray-Rite Service Corp. v. Monsanto*, 684 F.2d 1226 (7th Cir.1982), the Seventh Circuit also affirmed that a plaintiff claiming injury caused by more than one unlawful practice must segregate the amount of damage attributable to each unlawful practice wherever such segregation is possible so as to ensure that losses due to lawful conduct are not included in the damage claim (684 F.2d at p. 1243 n. 13):

> "Where it is possible to apportion the amount of damages caused by the unlawful conduct alone, the defendant cannot be held liable for the plaintiff's losses attributable to lawful competition."

See also *Momand v. Universal Film Exchanges*, 172 F.2d 37, 42–43 (1st Cir.1948), *cert. denied*, 336 U.S. 967, 69 S.Ct. 939, 93 L.Ed. 1118 (1949).[337]

It was readily apparent to the Court throughout the trial that SPCC could (or should) at the outset have calculated the amount of damage, if any, that resulted to

---

**337.** Nothing in *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), sanctions SPCC's theory that it has a right to rely on a single aggregated damage claim where a monopolization claim is made involving interrelated conduct having a "synergistic" effect. As the recent monopolization cases discussed above make clear, *Continental Ore* plainly does not hold that plaintiffs in monopolization cases may dispense with particularized proof of damages where disaggregation is possible. Indeed, the Supreme Court in that case specifically reviewed the evidence relating to each of the

five incidents involved to determine whether the evidence on each was sufficient to submit that conduct to the jury (*id.* at 700, 701, 702, 706, 82 S.Ct. at 1411, 1412, 1414), and the Court pointed out that the jury would have to determine whether each of the five incidents "materially contributed ... to Continental's damage" (*id.* at 702, 82 S.Ct. at 1412; see also *id.* at 700, 701, 82 S.Ct. at 1411). SPCC's aggregated damage claim makes it impossible for the Court—here the finder of fact—to make the type of assessment of damage flowing from plaintiffs' specific claims that the Supreme Court left to the jury in *Continental Ore.*

its business in the real world from each of the challenged acts of defendants, and this fact was specifically confirmed by witnesses for both parties (see, *e.g.,* Docter, Tr. 5774–75, 5824–25; Joskow, Tr. 5133–35).[338] Such particularized damage evidence would not have foreclosed SPCC also from arguing that the sum of these damage amounts did not represent a full measure of the damages incurred. Nevertheless, SPCC's principal damage witness conceded during plaintiffs' case-in-chief that he had never even tried to disaggregate SPCC's damage claim (Vasilakos, Tr. 2973–74).[339]

Although SPCC finally submitted on the last day of its rebuttal case six calculations of specific damages allegedly caused by certain of defendants' actions (Lim, PX6–0032 at 5–9), these alternative damage computations were entirely independent of SPCC's "but for" damage model, which was never disaggregated (Lim, Tr. 5912). Consequently, if the aggregate difference in SPCC's "but for" model between the net cash flows of the hypothetical "but for" company and the "damaged" private line business was due to any factors other than unlawful conduct of the defendants, SPCC's "but for" damage model provided no means for estimating the amount of damages in this case other than speculation.

It is apparent from the record that the cumulative difference between the net cash flows of the hypothetical "but for" company and the "damaged" private line business in SPCC's damage model was due at least in substantial part to a number of factors wholly unrelated to any conduct (lawful or unlawful) of defendants. In the first place, the high cash flows of the hypothetical "but for" company were the result of SPCC's unrealistic assumptions about the "but for" world, such as the assumptions of perfect

knowledge of future demand, future prices and future costs (McNamara, S–T–169 at 8; Lim, Tr. 2782–84); the assumed ability always to capture 20 percent of the demand in every market on the first day of entry (Vasilakos, Tr. 2988); and the assumed ability always to price at 15 percent below AT & T throughout the 20-year period of the damage claim without regard to price competition from either AT & T or any other carriers (Hieronymus, Tr. 2833–34). All of these assumptions result in an overstatement of the damage claim produced by the "but for" model.

Similarly, any problems not caused by defendants that were experienced by SPCC in the real world and that resulted in a reduction of the cash flows of the "damaged" private line business without having any corresponding effect on the cash flows of the hypothetical "but for" company result in an overstatement of SPCC's "but for" damage claim (see, *e.g.,* McNamara, S–T–169 at 22–29; Non-Bell Reasons for SPCC's Losses Doc.Sub.). The record shows that the performance of the "damaged" private line business was adversely affected in the real world by a host of problems having nothing to do with any conduct of defendants and having no counterpart in the "but for" world. For example, SPCC in the real world lost millions of dollars as a result of inadequate network and operations support planning (Docter, Tr. 5802–05, 5814; S–6042B at 8, 13, 19, 98; documents cited in SPCC's Inadequate Planning and Resulting Problems Doc.Sub.). These planning deficiencies led to chronic bottlenecks in SPCC's microwave system which reduced the revenues of the "damaged" private line business (see, *e.g.,* documents cited in Capacity Problems in the Real SPCC Doc.Sub.), but these

---

**338.** *For example, SPCC should have been able to provide a reasonable estimate of the revenue it lost as a result of defendants' denial of interstate FX/CCSA interconnections from December 26, 1973 (when SPCC started in business) to April 23, 1974 (when defendants began providing these interconnections pursuant to the FCC's opinion and order in FCC Docket No. 19896). The reason for SPCC's refusal to provide such discrete damage claims is perhaps*

*best explained by the statement of Mr. Grant, SPCC's president, made in July, 1975 and reacknowledged at trial that "while we have had our difficulties, we have yet to lose a customer and most have a good word for us."* (Grant, Tr. 758). (Emphasis supplied).

**339.** As previously noted, SPCC's supplemental "piece-out" claim was not in fact a disaggregated or stand-alone claim.

planning problems are not in any way reflected in the idealized model of the "but for" company which never has a bottleneck (McNamara, S–T–169 at 9–10).

The record shows that SPCC's private line business in the real world was also plagued by a number of other problems and inefficiencies due entirely to SPCC's own actions (see, e.g., Grant, Tr. 775; Biaggini, Tr. 3220–22; SPCC's Internal Operational Problems Doc.Sub.; Schaefer Testimony Doc.Sub.; Swentzel Testimony Doc.Sub.; Docter Testimony Doc.Sub.; Riley Testimony Doc.Sub.), and that SPCC lost or angered customers for a number of reasons unrelated to any action or inaction of defendants (Grant, Tr. 669, 675; Hollis, Tr. 2289–90; Gibney, Tr. 2372–73; Brodman, Tr. 1855–56; see also SPCC Customer Complaints Doc.Sub.). The record is thus replete with problems encountered by SPCC in the real world that adversely affect the performance of its "damaged" private line business, but which are not reflected in the idealized "but for" company. The result of the manner in which SPCC computed its aggregated "but for" damage claim is that defendants are asked to compensate SPCC for all of these problems caused by other factors.[340]

With the very limited exception of two small deductions for SMTS and data modem losses suffered by SPCC in the historical world that SPCC made during its rebuttal case (Lim, PX6–0032 at 2; Lim, Tr. 5890–91; PX5–0350), SPCC made no attempt to eliminate the effects of the real world problems suffered by the "damaged" private line business from its aggregated "but for" damage model so as to avoid charging defendants for losses suffered by SPCC in the real world that had nothing to do with any conduct by defendants (McNamara, S–T–169 at 24). As a result, the Court is unable to determine either whether the allegedly unlawful conduct of defendants which is the subject of this lawsuit—whether considered separately or together—materially contributed to SPCC's alleged injury, or, if so, the amount of any such injury caused by defendants' conduct.

Even if the Court could filter out of SPCC's aggregate damage claim the financial impact of the factors other than defendants' challenged conduct, however, SPCC's "but for" damage model would still be deficient because it does not provide the Court with any reasonable basis for calculating the damages caused by each of the alleged anticompetitive acts at issue. Thus, unless this Court were to find both that defendants were liable for every one of the actions challenged by SPCC and that no other factors materially contributed to the difference between the performance of the "damaged" and "but for" companies, the Court could not calculate the amount of damages in this case without engaging in speculation or guesswork.

## THE SUFFICIENCY OF SPCC'S ALTERNATIVE MEASURES OF DAMAGES

In response to repeated requests from the Court for the amount of damages suffered by SPCC in the real world as a result of the specific practices of defendants alleged in SPCC's claim, SPCC produced six separate alternative damage computations on the final day of its rebuttal case (Lim, PX6–0032 at 5–9). These six alternative computations were based on several of the same price and cost assumptions of Mr. Vasilakos that were used by SPCC to develop its aggregated "but for" damage model (Lim, Tr. 5933–34), but these computations were separate and apart from the model itself (Lim, Tr. 5912). Thus, they did not represent a disaggregation of the "but for" damage model.

SPCC's six alternative damage computations purported to measure the amount of damages caused by some of the conduct of defendants alleged by SPCC to be unlawful. A number of SPCC's liability claims were not addressed in these alternative damage computations, however. To the extent that

---

**340.** SPCC's aggregated damage claim would also require defendants to pay for any adverse effect on SPCC which resulted from the 1977 order of the Court of Appeals of this Circuit enjoining AT & T from withdrawing its Telpak tariff.

SPCC provided no 'alternative measure of damage for these liability claims, SPCC relied exclusively on its aggregated "but for" damage model to measure the amount of damages resulting from those claims, and in view of the Court's rejection of SPCC's model, judgment must be rendered for defendants on those claims based upon SPCC's failure to offer any reasonable means of measuring the amount of damages.

 SPCC's first alternative "damage" computation compared SPCC's historical revenues with the amount of revenues that SPCC might have been able to attain from 1974 through 1981 if all of SPCC's historical circuit miles had been sold at SPCC's first-filed single channel full-time rate that was actually in effect in early 1974 (Lim, PX6–0032 at 6; Lim, Tr. 5913). SPCC's witness, Mr. Lim, conceded that this computation was "not a measure of damages" (Lim, Tr. 5913).

Mr. Lim admitted that he had no basis for representing that SPCC's first-filed single channel rates were reasonable or that they could appropriately be applied to later periods (Lim, Tr. 5913–19). His only role was to perform the computation (Lim, Tr. 5917). Indeed, he conceded that if the filed rate had been $17 instead of $.95, he would have performed the same computation using $17 (Lim, Tr. 5917). Moreover, this first-filed single rate does not take into account the very strenuous competition from the other common carriers (along with the threat of private microwaves and the satellites) which this Court has already determined to be the principal cause of the much lower rates in the real world.

Mr. Lim also admitted that SPCC historically had sold only a small percentage of its circuits at the high single channel full-time rate used in his computation (Lim, Tr. 5918) and that all of SPCC's other rates were lower (Lim, Tr. 5917). His alternative computation, therefore, "obviously" reflected the effects of "discounts and/or reduced prices to meet competition" from all sources, including competition from the satellite carriers and the lower rates of MCI (Lim, Tr. 5913, 5915), as well as any conduct by defendants. Mr. Lim made no attempt to evaluate the reasons why SPCC had never been able to sell all of its circuits at its highest single channel full time rate or to analyze the competitive conditions that existed in the private line market from 1974 to 1981. Mr. Lim also made no adjustment to the quantity of circuits historically sold by SPCC to account for the substantially higher price used in his calculation even though higher prices usually result in smaller quantities being sold (Hieronymus, Tr. 2820–22, 2827).

Although this first alternative computation purported to represent the additional revenues that SPCC would have earned if it had never cut its original single channel rates (Lim, PX6–0032 at 6), there is no evidence that this difference in revenues was caused even in significant part by any conduct of defendants. Moreover, it appears to the Court that this difference was caused in substantial part by competitive factors unrelated to any conduct of defendants (Grant, Tr. 708; Brodman, Tr. 1858; Lim, Tr. 5923). At best, therefore, SPCC's first alternative damage computation was a crude and grossly overstated outer limit of SPCC's lost revenues from all causes. Within that obviously overstated outer limit, SPCC provided no basis for estimating the amount of damages, if any, resulting from defendants' actions other than pure speculation. The Court finds, therefore, that this calculation is not useful for measuring the amount of damages in this case.

 SPCC's second alternative damage computation compared SPCC's historical revenues with the revenues that SPCC might have been able to earn from 1974 through 1981 if all of SPCC's historical circuit miles had been sold at 15 percent below AT & T's Hi/Lo and MPL rates (Lim, PX6–0032 at 7). This computation purported to determine the impact of AT & T's Telpak tariff on SPCC (Lim, Tr. 5919).

The record shows that when AT & T was allowed to terminate its Telpak tariff in May 1981, SPCC immediately increased its private line rates (Lim, Tr. 5922). Nevertheless, the damages computed by SPCC's

second alternative computation for the last two quarters of 1981 were substantially larger than those computed by this methodology for the first two quarters of 1981 (Lim, Tr. 5921–22). This anomalous result strongly suggests that the difference in revenues being measured by this computation is not a measure of anything caused by defendants' pricing policies, but reflects instead the influence of other factors in the market such as competition from other non-Bell carriers (Lim, Tr. 5923). Indeed, if the ratio of SPCC's historical revenues for the last two quarters of 1981 to the revenues that SPCC would have earned if it had in fact been able to sell all of its circuits at 15 percent below AT & T's MPL rate were assumed to reflect the effect of other factors besides Bell's Telpak tariff and that ratio were applied to prior periods, the damages calculated by SPCC's second alternative computation would disappear (Tr. 5929–30). In these circumstances, the Court concludes that SPCC has failed to carry its burden of proving that either its first or second alternative damage calculation provides a reasonable basis for measuring the amount of damages caused by defendants' allegedly unlawful pricing policies.

 SPCC also offered four additional alternative damage computations, each purporting to measure the amount of damages caused by certain alleged interconnection practices of defendants (Lim, PX6–0032 at 7–9). Each of these computations was made by Mr. Lim based on cost assumptions made by Mr. Vasilakos for use in SPCC's "but for" damage model (Lim, Tr. 5933–34). For example, Mr. Lim simply took the increase in SPCC's repair time assumed by Mr. Vasilakos to have been caused by defendants' conduct for purposes of the "but for" model and calculated the total cost of such additional repair time to SPCC to arrive at a damage figure (Lim, PX6–0032 at 8). These computations, therefore, were completely dependent upon the reasonableness of Mr. Vasilakos' judgment and his credibility, neither of which was established in this record (see, e.g., Vasilakos, Tr. 3055–69, 3073–76, 3082–88).

SPCC's alternative interconnection damage computations were also only tenuously related to SPCC's liability claims in this case. For example, SPCC's damage computation relating to repair practices was based on the additional repair costs supposedly imposed upon SPCC as a result of defendants' repair practices, whereas SPCC's liability claim was based on defendants' alleged failure to perform repairs on their own facilities on a timely basis, thereby causing SPCC to lose revenue (Lim, Tr. 5932–33). To the extent that SPCC's alternative damage computations do not measure the injury caused by the violations alleged by SPCC, they obviously provide no basis for estimating the amount of damage.

Finally, in addition to being based entirely on the arbitrary and completely unsupported assumption of Mr. Vasilakos that SPCC should be given a 30 percent discount on all local distribution facilities in a "but for" world (Vasilakos, Tr. 3012–13), SPCC's alternative computation of defendants' alleged "overcharges" to SPCC for local distribution facilities overlooks the unrebutted testimony of Ms. Cashman showing that defendants' cost of providing local distribution facilities to SPCC substantially exceeded their costs (Cashman, S–T–31; S–6234E). Indeed, defendants showed that if they were forced to charge the below-cost local distribution rates assumed by SPCC in its alternative damage calculation, defendants would be subsidizing SPCC in the amount of $27.7 million from 1974 through 1981 (S–20033)—more than the sum of the combined interconnection damages claimed by SPCC. SPCC has made no showing, therefore, that it was damaged at all by defendants' interconnection practices.

## CONCLUSION

 Under the controlling decisions of the Supreme Court, it is undisputed that matters subject to a pervasive scheme of public utility or common carrier regulation are not subject to the antitrust laws. *Pan American World Airways, Inc. v. United States,* 371 U.S. 296, 300–01, 305, 309, 83

S.Ct. 476, 479, 482, 484, 9 L.Ed.2d 325 (1963); *Hughes Tool Co. v. Trans World Airlines, Inc.,* 409 U.S. 363, 387–89, 93 S.Ct. 647, 660, 34 L.Ed.2d 577 (1973); *United States v. Radio Corp. of America,* 358 U.S. 334, 348–49, 79 S.Ct. 457, 465, 3 L.Ed.2d 354 (1959). Based on the evidence adduced at trial, the Court finds that all of the rates and practices of defendants challenged by SPCC in this case are subject to pervasive federal and state regulatory control under a public interest standard that is quite different from and inconsistent with the application of the antitrust laws. Though this reverses the Court's earlier 1979 ruling on a Motion to Dismiss, it is clear from all of the evidence now before this Court with respect to this plaintiff,[341] that every action complained of in this case could have or should have been handled by the appropriate regulatory bodies,[342] which responsibility the regulators miserably mishandled or failed to handle. What the FCC actually did over the years was talk about competition (in reality contrived) in order to achieve deregulation which has and will be shown to be contrary to the best interests of millions of Americans throughout the country and by those outside the profitable big city areas with a resultant loss of service, quality, and higher costs to those least able to afford this now essential service. It is clear that defendants could not make one penny more than what the various regulators allowed them. Indeed, AT & T had a double burden—not only could their rates not be too low, but neither could they be too high. The states have done a particularly good job in regulating the defendants in order to insure the highest quality of service at the lowest possible cost for all of their citizens. There are many instances in which AT & T would seek a rate increase from the state, only to be denied all of it or part of it. The states were also very effective in regulating the interconnection problems as well. The picture became cloudy on the interconnection matter only because the FCC attempted, and quite successfully, to obtain jurisdiction over intrastate matters. Whether this was in the public interest will remain for another day. The bottom line of "public interest" has actually been construed as what some powerful interests in this country want as distinguished from what the public can afford, namely, safe, reliable service to everyone (instead of creamskimming the big city areas where profits are maximized) at the lowest possible cost to *all* and particularly those least able to afford telecommunications service, which should be

**341.** In its July 2, 1979, slip opinion, the Court, on a Motion to Dismiss rejected part of the defendants' arguments, upon facts alleged in the pleadings, not proven or upon verifiable evidentiary facts and the proof adduced at this trial. The record now before the Court has been fully developed and it is crystal clear that each and every action of the defendants' complained of herein is covered by either federal or state regulation and the law as applied to the evidence of record. The fact that either a federal or state regulatory body has disapproved a particular filing of the defendants' is not tantamount to an antitrust violation.

**342.** The FCC recognized this in its Second Draft of Working Group in Docket 18128 (S–2825c at 49–50) wherein it was noted:

"Bell attempts to set its private line rates at levels which will allow the services to retain sufficient business to remain viable. Bell's natural desire in an unregulated environment would be to fix the private line rates low enough to meet or beat the competition at a given point in time but high enough for the long term to maximize profits. *However, in the real world of regulation Bell is not free to change rates at will absent the Commission's watchful eye and its mandate of protecting the public interest.* Thus, Bell policy is to fix private line rates for a given service which for the foreseeable future will be sufficient to meet the revenue requirements, barring interservice cross-subsidy which Bell professes to be against, which covers costs, but which are low enough to be reasonably competitive but high enough to "optimize" (as distinguished from maximize) the "contribution" the service makes to the overall company revenue requirement. *The Commission's task is to determine whether such policy serves the public interest and, if so, whether Bell's optimized private line rates are at levels which serve the public interest.* (Emphasis supplied).

While the Court recognizes that this recommended decision was never adopted by the FCC, it does evidence the fact that at least some members at the FCC recognize that in the real world, AT & T could not charge one dime more than what the FCC allows as has been stated herein several times.

our continued standard. This Court believes that the antitrust laws were never intended to destroy an essential public utility such as we have here. It may be necessary for Congress and the Justice Department to re-examine the problems herein discussed and to bring about the return of responsible regulation so that there will be no more contrived competition in profitable areas only. This Court believes that sound and honest regulation of telecommunications at the federal and state level is our only guarantee of access to this necessity throughout the *whole* country and not just part of it. Regulation in this area of telecommunications up until the 1970's at the federal and state levels has served this country well and it is hoped that sometime in the near future it will again do its proper job without abdication to the greed of a few, no matter how big or small.

It is necessary to mention the FCC again. It put the Specialized Common Carriers into business for the benefit of a few without taking into account the myriad of problems to our people and our national security. It was the FCC that never found TELPAK (C & D) unlawful for over *20* years, as well as delayed making other very important decisions. It cannot be successfully disputed that whatever the FCC mandated throughout the relevant period of this case, that AT & T was obligated to, and did in fact, follow, no matter whether it made any sense in economics or law. It was primarily the FCC staff during this entire period, after permitting the Specialized Common Carriers entry into the market in the name of competition (really contrived), whose performance was, to say the least, totally unprofessional and inadequate by virtue of the likes of Messrs. Cox, Hinchman, Tucker, and Scott. It was a result of their actions (or inaction) as well as a thin majority of the Commissioners in the 60's and 70's that has subjected AT & T to many lawsuits in the antitrust field now pending today. Had the FCC not engaged in its usual regulatory lag and dealt forthrightly and properly with the problems as they arose, then few, if any, of the cases would now be before the antitrust Courts, such as this one.

In order to establish a violation of Section 2 of the Sherman Act, plaintiffs are required to prove that the defendant possesses monopoly power in a relevant market. Monopoly power is defined as "the power to control prices or exclude competition" in the relevant market. *United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 391–92, 76 S.Ct. 994, 1004, 100 L.Ed. 1264 (1956). On the basis of the foregoing findings, the Court finds that the relevant market in which defendants' monopoly power must be assessed in this case is the interstate, intercity private line market (excluding sole source governmental telecommunications needs and short haul) in the geographic areas which plaintiffs elected to serve, or would have served in their "butfor" world and the Court concludes that plaintiffs failed to prove that defendants possessed monopoly power in that market.

In order to establish an unlawful monopolization, the plaintiffs must also prove that defendants deliberately used their power over price and entry in the relevant market in a predatory or unfair manner with the specific intent of excluding competition. *United States v. Griffith,* 334 U.S. 100, 106–07, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948); *Telex v. IBM Corp.,* 510 F.2d 894, 926–28 (10th Cir.), *cert. dismissed,* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975); *City of Groton v. Connecticut Light & Power Co.,* 662 F.2d 921, 931–32 (2d Cir.1981). On the basis of the foregoing, the Court finds that SPCC failed to prove that defendants engaged in any predatory or unlawful acts with the intent of excluding competition. Further, the Court finds that the defendants have not engaged in unlawful packaging of monopoly and non-monopoly services through its structuring of the Telpak tariff; or engaged in unlawful predatory pricing through the rate levels established in its Telpak, Hi/Lo, MPL and DDS tariffs; or unlawfully denied access or provided discriminatory access to its essential local distribution facilities by arbitrarily defining local distribution areas, refusing to provide

interconnection for FX and CCSA services, charging excessive prices for LDFs, requiring the installation of station packages and other superfluous equipment, and by its ordering, installation and repair procedures and performance; or refusing to deal, through its policy of not leasing intercity facilities; or tying of monopoly and non-monopoly services, through its imposition of a customer premises restriction; or engaging in unlawful surveillance of competitors and their customers. The Court concludes, therefore, that defendants have not unlawfully maintained or abused monopoly power as a federally and state regulated public utility.

In order to recover antitrust damages, the plaintiffs must prove with certainty as one element of their claim that they suffered economic injury in fact and that the injury was caused directly by defendants' actionable conduct. *Federal Prescription Service, Inc. v. American Pharmaceutical Ass'n,* 663 F.2d 253, 268 (D.C.Cir.1981) *cert. denied,* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982); *Comfort Trane Air Conditioning Co. v. Trane Co.,* 592 F.2d 1373, 1383 (5th Cir.1979). On the basis of the foregoing, the Court finds that plaintiffs have not proven that SPCC has suffered any injury in fact due to defendants' alleged anticompetitive conduct based upon a careful analysis by the Court of every claim together with all the testimony and the thousands of exhibits in this record.

Even if all other elements of its claim were proven, in order to recover antitrust damages, plaintiffs must make a "just and reasonable" approximation of the amount of damages and may not base their claim on mere "speculation or guesswork." *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946); *Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1189 (D.C.Cir.1978). On the basis of its findings of fact and conclusions of law set forth in this Opinion, the Court finds that plaintiffs' damage claim does not provide the Court with any basis to make a "just and reasonable" approximation of the amount of damages even if SPCC had proven all the other elements of its claim. Any

damage amount awarded by the Court, therefore, could only be based on pure speculation or guesswork.

Based upon the foregoing Memorandum Opinion, judgment will be entered in favor of defendants and against plaintiffs. The documents in this case, as well as the testimony exhibited to the Court, show a company (plaintiffs) encountering numerous problems that are typical of any new company, especially a fast growing company in a new and emerging field of unusual technicalities. The foregoing analysis and findings of the Court should make it obvious that these problems are not the result of any anticompetitive conduct of AT & T, but rather just normal growing pains of a new company. It is easy for a new company who enters the market with expectations of grandure to attack a giant when their expectations do not pan out. However, the evidence is clear, that SPCC's non-profitability is not the result of any illegal anticompetitive conduct on the part of AT & T on the basis of this record.

The Court would also note the *excellent* cooperation that counsel for both sides exhibited—the highest degree of professionalism that this Court has experienced in over 33 years—which led to the creation of the best record that this Court has seen. Counsel for both sides also willingly embarked upon a road involving many new and innovative techniques that led to an expedition of the trial, which should serve as a model for complex cases in the future. These techniques included, *inter alia,* filing in advance their direct testimony with time for evidentiary objections and resulting in more concise and effective cross-examination, glossary of terms, minimization of evidentiary objections through the use of *in limine* motions, continuous summaries of the daily transcript with index and cross references by the new company Endispute, two Statements of Contentions and Proof, helpful and succinct memoranda of law, placing of the exhibits on the witness stand, along with their previously prepared testimony, while providing copies to the Court prior to direct examination and the exchange of

proposed findings of fact and conclusions of law.

Finally, the Court finds most interesting and appropriate the speech made by former FCC Commissioner Benjamin Hooks at the September 20, 1973 NARUC meeting in Seattle wherein he emphasized what most of this country felt then about the defendants (S–2731 at 11–12):

"I have never owned a car, a clock, a wrist watch, a TV or radio set, an electric mower, or coffee pot (electric), dishwasher, a washing machine, a timer, a bicycle, that worked *all* of the time. But in closing, let me say, I have owned a phone. That is to say, I have had a phone in my home most of my adult life, and never had to fix one. It is an old friend I would certainly be lost without.

When my little grandson gets hold of my phone and dials it, plays with it, drops it, as small children will, I never get too concerned because I know when he's through, somehow the phone will work. It always has. But if he had been playing with my radio set or TV or with an electric mixer, I would have had problems.

The phone is durable and to me it symbolizes the durability and effectiveness of the phone system, and by extension, really the constancy of our way of life.

Think about that. It is almost nightmarish to think that if we keep doctoring the phone system and drive it up the wall, then maybe we'll have to deal with the wreck.

So I say there is one thing I am sure of, we do have a basically good communications system. That doesn't mean that it can't be improved both by the company itself, and certainly by some of the things that we regulatory folk at both the FCC and state level are doing.

But above all let's remember that our telephone communications system, strong as it may seem—may be as fragile as Humpty Dumpty. If we mess with it too much we might topple it off the wall, then all the king's horses and all the king's men may not be able to put it together again. All talk then of regulation versus a free market, will it mix, or will it not, will be moot."

Based on all of the evidence adduced at trial, the Court will enter judgment for defendants and dismiss the case with prejudice, with costs in favor of the defendants.[343]

---

**343.** Any finding of fact deemed to be a conclusion of law herein is adopted as such. Conversely, any conclusion of law deemed to be a finding of fact herein is also adopted as such.